**No. 24-1759**

IN THE

# United States Court of Appeals for the First Circuit

_____

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. AND ALLIED PRODUCERS' COOPERATIVE, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants,*

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS, AND ASHELY RANDLE, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS COMMISSIONER OF AGRICULTURE,

*Defendants-Appellants,*

_____

On Appeal from the United States Court
for the District of Massachusetts

Case No. 1:23-cv-11671-WGY, The Honorable William G. Young

_____

## BRIEF OF APPELLANTS

_____

RYANN A. GLENN
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
(402) 964-5000
ryann.glenn@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com

*Counsel to Appellants*

## DISCLOSURE STATEMENT

Plaintiffs-Appellants Triumph Foods, LLC ("Triumph"), together with Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers' Cooperative ("APC"), both in its official capacity and on behalf of their members ("Farmer Appellants") (all together, "Appellants"), respectfully submit this corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: Farmer Appellants consist of several limited liability companies, a limited partnership and cooperative. Hanor has a parent holding company identified as HK USA Holdings, Inc. None of the remaining Appellants have parent companies and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ...................................................................i

TABLE OF AUTHORITIES .....................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD................1

INTRODUCTION ....................................................................................2

JURISDICTIONAL STATEMENT ..........................................................4

STATEMENT OF THE ISSUES...............................................................4

STATEMENT OF THE CASE ..................................................................6

I.   Massachusetts Passes the Act ........................................................6

II.  Appellants Sue and Move For Preliminary Injunction; the Court
     Consolidates Proceedings ..............................................................7

III. The Court Dismisses Nine out of Ten Claims Without Analysis
     or Written Order.............................................................................8

IV.  The Court Grants Summary Judgment *Sua Sponte* Against
     Appellants on their *Pike* Claim .................................................10

V.   The Court Strikes the Slaughterhouse Exception.........................13

VI.  The Court Grants Summary Judgment to Massachusetts ...........13

SUMMARY OF THE ARGUMENT ........................................................14

ARGUMENT ...........................................................................................17

I.   The Court Erred by Dismissing Nine of Appellants' Ten Claims
     Without Any Stated Reasoning ....................................................18

     A.   The Court Erred in Dismissing the Claims ..........................19

1.    *Privileges and Immunities Clause* ...............................19

2.    *Express and Conflict Preemption by FMIA*.................22

3.    *Preemption by Packers and Stockyards Act*.................22

4.    *Full Faith and Credit Clause* .......................................23

5.    *Due Process Clause* ......................................................24

6.    *Import-Export Clause* ..................................................26

7.    *Declaratory Relief and Judicial Review*.......................27

B.    At The Very Least, This Court Should Remand for a
Sufficient Ruling ....................................................................28

II.    The Court Erred When It Sua Sponte Rejected Most of
Appellants' Dormant Commerce Clause Theories........................30

A.    The court improperly entered *sua sponte* judgment against
Appellants on their *Pike* claims.............................................32

1.    *The Court violated Rule 56(f)* .......................................32

2.    *Setting aside the procedural error, the court
improperly entered judgment on Appellants'* Pike
*claims*...............................................................................36

B.    The court erred in granting summary judgment to
Massachusetts    on    Farmer    Appellants'    direct-
discrimination claim .............................................................38

1.    *Legal Background* .........................................................38

2.    *The Act Carries Discriminatory Effect* .........................41

3.  *Massachusetts Cannot Meet Their Burden To Establish A Legitimate Local Purpose, Much Less That No Nondiscriminatory Alternatives Are Available* ........................................................... 47

III.  The Court Erred in Holding That the Act Is Not Preempted by the FMIA ...................................................................... 50

    A.  Background of Federal Preemption and the FMIA .............. 51

    B.  The Court Misapplied *Harris* to conclude the Act is not expressly preempted ........................................................ 53

        1.  *The* Harris *Decision* ...................................................... 53

        2.  *The Court Erred in Holding the Sales Ban Does Not Regulate a Slaughterhouse* .......................................... 55

        3.  *The Act Is Within the Scope of the FMIA* .................... 60

    C.  The Court Erred in Dismissing Appellants' Conflict Preemption Claims.................................................................. 61

IV.  The Path Forward .................................................................. 64

CONCLUSION ........................................................................... 67

CERTIFICATE OF COMPLIANCE ......................................... 69

CERTIFICATE OF SERVICE................................................... 69

ADDENDUM

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**<u>Cases</u>**

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge,*
   403 U.S. 274 (1971) ................................................................. 62

*Anvar v. Dwyer,*
   82 F.4th 1 (1st Cir. 2023) ...................................................... 40

*Associated Indus. of Massachusetts v. Snow,*
   898 F.2d 274 (1st Cir. 1990)................................................. 52

*ATC Realty, LLC v. Town of Kingston, New Hampshire,*
   303 F.3d 91 (1st Cir. 2002)................................................... 32

*Berkovitz v. Home Box Office, Inc.,*
   89 F.3d 24 (1st Cir. 1996)..................................................... 34

*Bodfish v. State,*
   No. A-10070, 2009 WL 3233716 (Alaska Ct. App. Oct. 7, 2009) ......... 25

*Borges ex rel. S.M.B.W. v. Serrano-Isern,*
   605 F.3d 1 (1st Cir. 2010)..................................................... 32

*Carrasquillo v. United States,*
   818 F. Supp. 2d 385 (D. Mass. 2011) ................................... 30

*Cook & Co. v. Volunteer Firemen's Ins. Servs.,*
   657 F. App'x 1 (1st Cir. 2016) ............................................. 29

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) .............................................................. 62

*Dunn v. Attorney General,*
   474 Mass. 675, 54 N.E.3d 1 (2016) ..................................... 46

*Fam. Winemakers of Cal. v. Jenkins,*
   592 F.3d 1 (1st Cir. 2010) ........................................................ 40, 43, 47

*Foisie v. Worcester Polytechnic Inst.,*
   967 F.3d 27 (1st Cir. 2020) ................................................................. 19

*Forrest v. Parry,*
   930 F.3d 93 (3d Cir. 2019) ................................................................. 33

*Francis v. Goodman,*
   81 F.3d 5 (1st Cir. 1996) ................................................................... 29

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
   505 U.S. 88 (1992) ............................................................................. 62

*González v. Vélez,*
   864 F.3d 45 (1st Cir. 2017) ................................................................. 18

*Hunt v. Washington State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) ........................................................................... 45

*In re Pub. Offering PLE Antitrust Litig.,*
   427 F.3d 49 (1st Cir. 2005) ................................................................. 29

*Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. &*
   *Apostolic Church,*
   499 F.3d 32 (1st Cir. 2007) ................................................................. 51

*Leyva v. On the Beach, Inc.,*
   171 F.3d 717 (1st Cir. 1999) ............................................................... 33

*Maine Forest Prod. Council v. Cormier,*
   51 F.4th 1 (1st Cir. 2022) ........................................................... 62, 65

*Martone Place, LLC v. City of Springfield,*
   No. 16-CV-30170-MAP, 2017 WL 5889222 (D. Mass. Nov. 29, 2017)
   *aff'd*, No. 18-1020, 2018 WL 11231884 (1st Cir. Dec. 19, 2018) .......... 28

*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*,
58 F.4th 5 (1st Cir. 2023) ........................................................ 51

*Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*,
467 U.S. 461 (1985) ................................................................ 51

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
385 F.3d 72 (1st Cir. 2004) ...................................................... 29

*Minnesota v. Clover Leaf Creamery Co.*,
449 U.S. 456 (1981) ................................................................ 45

*Napier v. Atlantic Coast Line R. Co.*,
272 U.S. 605 (1926) ................................................................ 62

*National Meat Association v. Harris*,
565 U.S. 452 (2012) ........................................................ passim

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023) ........................................................ passim

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*,
45 F.4th 542 (1st Cir. 2022) .................................................... 39

*New Energy Co. of Indiana v. Limbach*,
486 U.S. 269 (1988) ................................................................ 47

*Nken v. Holder*,
556 U.S. 418 (2009) ................................................................ 65

*Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of Cal.*,
306 U.S. 493 (1939) ................................................................ 23

*Paraflon Invs., Ltd. v. Fullbridge, Inc.*,
960 F.3d 17 (1st Cir. 2020) ...................................................... 29

*Pfizer Inc. v. Ajix, Inc.,*
    2005 U.S. Dist. LEXIS 15984 (D. Conn. 2005) ...................................... 25

*Pike v. Bruce Church, Inc.,*
    397 U.S. 137 (1970) ............................................................................. 3, 7

*Pleasantdale Condos., LLC v. Wakefield,*
    37 F.4th 728 (1st Cir. 2022) ................................................................... 32

*Portland Pipe Line Corp. v. City of S. Portland,*
    288 F. Supp. 3d 321 (D. Me. 2017) ......................................................... 52

*Public Service Co. of N.H. v. Town of W. Newbury,*
    835 F.2d 380 (1st Cir. 1987) ................................................................... 66

*Rodríguez-Reyes v. Molina-Rodríguez,*
    711 F.3d 49 (1st Cir. 2013) ..................................................................... 18

*Roque-Rodriguez v. Lema Moya,*
    926 F.2d 103 (1st Cir. 1991) ................................................................... 29

*Sanchez v. Triple-S Mgmt. Corp.,*
    492 F.3d 1 (1st Cir. 2007) ....................................................................... 34

*SEC v. Tambone,*
    597 F.3d 436 (1st Cir. 2010) ................................................................... 18

*Sola Commc'ns, Inc. v. Bailey,*
    2003-905 (La. App. 3 Cir. 12/10/03), 861 So. 2d 822 ............................ 25

*Souza v. Pina,*
    53 F.3d 423 (1st Cir. 1995) ..................................................................... 28

*SPGGC, LLC v. Ayotte,*
    488 F.3d 525 (1st Cir. 2007) ................................................................... 51

*Stafford v. Wallace,*
  258 U.S. 495 (1922) .................................................................... 22

*Stella v. Town of Tewksbury, Mass.,*
  4 F.3d 53 (1st Cir. 1993) ..................................................... 18, 33

*Tobin v. Fed. Express Corp.,*
  775 F.3d 448 (1st Cir. 2014) ..................................................... 52

*Toomer v. Witsell,*
  334 U.S. 385 (1948) .............................................................. 19, 20

*Trailer Marine Transp. Corp. v. Rivera Vazquez,*
  977 F.2d 1 (1st Cir. 1992) ......................................................... 44

*Triantos v. Guaetta & Benson, LLC,*
  91 F.4th 556 (1st Cir. 2024) ..................................................... 30

*Tyler Pipe Indus., Inc. v. Washington State Dept. of Revenue,*
  483 U.S. 232 (1987) .................................................................. 20

*United States v. Johnson,*
  467 F.3d 56 (1st Cir. 2006) ....................................................... 37

*Ward v. State,*
  79 U.S. 418 (1870) .................................................................... 20

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt.
  Council,*
  589 F.3d 458 (1st Cir. 2009) ..................................................... 22

*Wightman v. Springfield Terminal Ry. Co.,*
  100 F.3d 228 (1st Cir. 1996) ..................................................... 51

## Statutes

7 U.S.C. § 192(b) ........................................................................... 22

21 U.S.C. § 601 .............................................................................. 50

21 U.S.C. § 602 ........................................................................ 60

21 U.S.C. § 603-06 ................................................................. 60

21 U.S.C. § 608 ........................................................................ 60

21 U.S.C. § 678 .................................................................... 3, 52

28 U.S.C. § 1291 ....................................................................... 4

28 U.S.C. § 1331 ....................................................................... 4

Mass. Gen. Laws Ann. Ch. 129 App., §§ 1-1 *et seq.* .............. 1, 6

Mass. Gen. Laws Ann. ch. 129 App., § 1-2 ............................. 41

Mass. Gen. Laws Ann. ch. 129 App., § 1-3 .............. 6, 41, 48, 64

Mass. Gen. Laws Ann. ch. 129 App., § 1-5 ...................... 6, 7, 64

Mass. Gen. Laws ch. 30A, § 7 .................................................. 27

Mass. Gen. Laws ch. 231A ....................................................... 27

Mo. Const. art. I, § 35 .............................................................. 24

U.S. Const. art. I, § 8, cl. 3 ................................................ 38, 39

U.S. Const. art. I, § 10, cl. 2 .................................................

U.S. Const. art. IV, § 2, cl. 1 ................................................... 19

Wyo. Stat. § 11-29-115 ............................................................ 24

Wyo. Stat. § 11-44-104 ............................................................ 24

## Rules

D. Mass. Local Rule 7.1(b)(2) ...................................................................... 33

D. Mass. Local Rule 56.1 ............................................................................. 33

Fed. R. Civ. P. 8(a)(2) ................................................................................ 18

Fed. R. Civ. P. 52(a)(3) ............................................................................... 28

Fed. R. Civ. P. 56(f) ............................................................................. passim

## Regulations

9 C.F.R. § 309 ............................................................................................ 60

345 Ind. Admin. Code 14-2-3 ..................................................................... 24

345 Ind. Admin. Code 14-2-4 ..................................................................... 24

## Other Authorities

Br. for United States, *National Meat Association v. Harris,* 2011 WL
    3821398, at *17 (Aug. 29, 2011) .......................................................... 57

Order of Court, *Carrasquillo v. United States*, No. 10-1489 (1st Cir.
    Sept. 26, 2011) ..................................................................................... 30

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This appeal presents important questions involving various provisions of the Constitution and federal law. State action attempting to regulate industries and conduct in *other states* invites retaliatory action, increasingly leading the Nation toward interstate trade warfare, something the Framers specifically sought to avoid. Given the importance of the legal issues implicated in this appeal and the ongoing irreparable harm caused by Mass. Gen. Laws Ann. Ch. 129 App., §§ 1-1 *et seq*. and the district court's delay, oral argument will assist the Court—on a matter of first impression—in resolving this appeal.

Given the number of claims involved, and the complex procedural posture of the various rulings on appeal, Appellants respectfully suggest that argument of twenty minutes per side may be helpful to the Court.

## INTRODUCTION

No different than Iowa telling New England's lobstermen how they must trap lobster, Massachusetts passed a law telling Midwestern pig farmers how they must raise pigs. Don't farm how we tell you to? Then you can't sell here. So says Massachusetts.

That's unconstitutional. It encourages tit-for-tat trade wars among the States. And it extensively disrupts the Nation's pork supply chain. So, a group of family-owned, Midwestern pig farmers, and a Midwestern pork processor, sued and sought a preliminary injunction. It wasn't for 353 days that they received an appealable order on that requested relief.

Unfortunately, that near-year-long struggle produced several errors. Most egregiously, the court dismissed 90% of Appellants' claims without a written order, and without any reasoning on the record. And, in any event, the detailed complaint shows Appellants stated a claim under each of those legal theories.

Things didn't improve from there. The one claim that survived was Appellants' challenge under the dormant Commerce Clause—a claim divided into two legal theories: (1) direct discrimination; and (2) the unlawful burden test articulated by the Supreme Court in *Pike v. Bruce*

*Church*, 397 U.S. 137 (1970). At summary judgment, the court entered judgment *sua sponte* against Appellants under Rule 56(f) on nearly every theory under that claim, despite Defendants never having moved for such and despite the court had never given Appellants the required prior notice of a *sua sponte* ruling. The court used that same procedure to enter judgment against Appellants on their *Pike* theory, even though Appellants *had not moved for summary judgment on that portion of the claim*, due to the many factual disputes requiring further adjudication. Additionally, the legal ruling was simply wrong. The court based its decision on a "holding" from a recent Supreme Court case, but the portion of the opinion the court cited was joined by only three Justices.

Next, on the narrow dormant Commerce Clause issue that remained, the court properly concluded one portion of the statute directly discriminated against out-of-state processors, and thus severed it (a ruling Massachusetts does not challenge on appeal). The question then became whether the Act is preempted by the Federal Meat Inspection Act, which broadly preempts requirements "in addition to, or different than those made under this chapter." 21 U.S.C. § 678. The Supreme Court analyzed the breadth of this preemption clause in *National Meat*

3

*Association v. Harris*, 565 U.S. 452 (2012), and the court's conclusion that the Act is not preempted runs directly afoul of that binding precedent.

Finally, this Court should consider that, throughout this extended process, Appellants had a motion for preliminary injunction pending for almost a year. The district court's consolidation of that request with the merits does not remedy the irreparable harm being suffered. And as this brief will demonstrate, Appellants are likely to succeed on the merits.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, and the court granted final judgment on July 22, 2024. Add.71. This Court has jurisdiction under 28 U.S.C. § 1291. Appellants timely filed a notice of appeal on August 13, 2024. A2197.

## STATEMENT OF THE ISSUES

I.      Did the court err in summarily dismissing nine of Appellants' claims by failing to accept all of Appellants' allegations as true, and further entering dismissal without analysis or written order?

II.     Did the court err in entering summary judgment *sua sponte* against Appellants for their dormant Commerce Clause claim premised

upon *Pike v. Bruce Church* without notice or opportunity under Fed. R. Civ. P. 56(f) and where there were disputed material facts concerning the Act's burden on interstate commerce?

III.     Did the court err in entering *sua sponte* summary judgment against Farmer Appellants for their direct-discrimination dormant Commerce Clause claim by holding the Act does not discriminate against Farmer Appellants and without providing notice or opportunity under Fed. R. Civ. P. 56(f)?

IV.     Did the court err in holding that the Act is not preempted, through express or implied means, by the Federal Meat Inspection Act following severance of the unconstitutional sales exemption?

## STATEMENT OF THE CASE

### I.    Massachusetts Passes the Act.

On November 8, 2016, Massachusetts voters approved Mass. Gen. Laws Ann. Ch. 129 App. §§ 1-1 *et seq.* (the "Act"). Add.72-85. Relevant here, the Act bans a "business owner or operator to knowingly engage in the sale within Massachusetts of any . . . Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Mass. Gen. Laws Ann. ch. 129 App., § 1-3; Add.74. It defines "confined in a cruel manner" as confinement that "prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely." *Id.* § 1-5; Add.76. Breeding pigs are "covered animals" in the Act. *Id.* § 1-5; Add.76.

The sales ban contained an exception by defining "sale" as "a commercial sale by a business" of covered Whole Pork Meat,[1] but then

---

1 "Whole pork meat" definition itself excepted all "combination food products," like pepperoni and sausage, which are made from the sow being regulated here. Mass. Gen. Laws Ann. ch. 129 App., § 1-5; A1352, A1363.

excluded all sales "undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act[.]" *Id.* § 1-5; Add.76. After multiple extensions and delayed enforcement, due in part to the Supreme Court's decision concerning a similar legal challenge to a California law, *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 409 (2023), the Act became enforceable against breeding pigs on August 24, 2023. A2045.

## II.    Appellants Sue and Move for Preliminary Injunction; the Court Consolidates Proceedings.

On July 25, 2023, Triumph and Farmer Appellants[2] sued to preliminarily and permanently enjoin the Act. A22-102. Appellants asserted ten claims: (1) dormant Commerce Clause violations by directly discriminating against out-of-state commerce and by unduly burdening interstate commerce as described in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); (2) Privileges and Immunities Clause violations; (3) preemption under the Federal Meat Inspection Act (the "FMIA"); (4) implied preemption under the FMIA; (5) preemption under the Packers

---

[2] Triumph is a farmer-owned pork processor producing high-quality pork products sold nationally (including within Massachusetts). A25. The Farmer Appellants are a collection of family-owned farmers who breed pigs to supply Triumph's pork processing operations. A25-26.

and Stockyards Act (the "PSA"); (6) Full Faith and Credit Clause violations; (7) Due Process Clause violations; (8) Import-Export Clause violations; (9) declaratory relief on unconstitutionality; and (10) judicial review of the Act's regulations. A22.

On September 6, 2023, the court held a hearing and immediately collapsed the motion for preliminary injunction with a trial on the merits under Rule 65(a)(2). Add.1-2. In response, Appellants requested a trial be held "as soon as possible." Add.4. The court "expressed hope" that instead of cross-motions for summary judgment, the parties could place "the agreed-upon record . . . before the Court." Add.8. The court set a pretrial hearing for October 10, 2023. Add.5.

## III. The Court Dismisses Nine out of Ten Claims Without Analysis or Written Order.

On September 14, 2023, the parties filed a joint status report. A465. Massachusetts—for the first time—objected to the October 10 pre-trial conference, arguing it provided insufficient time to prepare for trial. A468-70. Massachusetts also requested the October 10 conference be continued and a motion to dismiss briefing schedule. A467.

Over Appellants' objections, the court set that "schedule" and ordered Massachusetts to file its motion by Thursday, September 28,

8

with the motion hearing for Monday, October 2—*a mere four days later*. A10. The order didn't address whether, when, or how Appellants could oppose the motion prior to the hearing. A10.

On September 28, Massachusetts moved to dismiss *all* ten claims under Rules 12(b)(1) & 12(b)(6). A475-500. Appellants filed an opposition less than 24-hours later. A701.

The court heard the motion on October 2. Add.7-14. After instructing the parties to argue only the dormant Commerce Clause claim (Count I) at the hearing, the court orally granted the motion to dismiss as to the other nine counts, from the bench, without argument. Add.9-12. The sole reasoning appears in a single line in the transcript:

> I'm going to dismiss them [Appellants' claims] except for the dormant Commerce Clause claim, and I'm going to dismiss them because Massachusetts has every right, as against your other claims, to pursue its own approach to animal housing.

Add.9; *see also* Add.7. All that survived was Appellants' dormant Commerce Clause claim (under both legal theories), despite the Supreme Court indicating several of Appellants' pled claims likely to be viable under similar legal challenges. Add.11-12; *Ross*, 598 U.S. at 370, 376, 408. The court ordered the parties to discuss how to proceed to trial on

the remaining claim, again suggesting a case-stated proceeding. A902-09. The court set the final pretrial conference for October 10, 2023. Add.7.

## IV. The Court Grants Summary *Judgment Sua Sponte* Against Appellants on their *Pike* Claim.

The parties submitted a joint pre-trial memorandum in early October, as amended. A730, A805. Appellants explained they were ready to proceed to trial, but considering the court's suggestions, they were amenable to moving for partial summary judgment on its direct-discrimination claim, so long as the *Pike* claim could proceed later on a case-stated (or trial) basis. *See* A805. But Appellants made clear they wanted a speedy resolution, or that at the very least, be awarded a preliminary injunction. A808. The court then issued an order allowing Appellants to file a motion for early *partial* summary judgment and set a hearing for November 14, 2023. A14, A962.

Accordingly, Appellants filed their motion for *partial* summary judgment. *See* A1328. Appellants explained that there are "two ways for a plaintiff to demonstrate a violation of the dormant Commerce Clause": direct discrimination, and alternatively, that a "law violates the balancing test the Supreme Court announced in *Pike*." A1335. Appellants stated that "the first basis—discrimination—is the sole focus of this

partial motion for summary judgment" and reserved its *Pike* claim for trial. A1335 n.1. As a result, Appellants submitted no evidence or statement of undisputed material facts in support of the *Pike* claim. A1356.

Massachusetts did not cross-move for summary judgment. *See* Add.16. Instead, within their opposition brief filed on November 7, Massachusetts requested—in a single sentence—that the court not only deny Appellants' motion, but also grant summary judgment *sua sponte* to Massachusetts on the direct-discrimination theory. A1388-89. Massachusetts also requested *sua sponte* summary judgment on Appellants' *Pike* claim, *despite Appellants expressly reserving that theory within their own partial motion for summary judgment*. A1371, A1388-89.

Appellants replied five days later, *again* making clear they were only moving on the direct-discrimination claim, not on *Pike*. A1437-38. At no time before the November 14 hearing did the court provide Rule 56(f) required notice. *See* A1437-38.

At the November 14 hearing, the court committed the parties to submitting the "slaughterhouse exemption" issue—*i.e.*, the sale of non-

compliant pork meat from FMIA-inspected facilities—on a case-stated basis. Add.15-16. It then heard the Farmer Appellants' argument on their remaining direct-discrimination issues. Add.15-16.

The court - without written order or reasoning - denied Appellants' partial motion, *but then proceeded to grant summary judgment to Massachusetts,* dismissing all *Pike* claims and Farmer Appellants' direct-discrimination claim. *See* Add.13. When Appellants' counsel explained that neither party had moved on the *Pike* theories, and that no evidence was submitted on that claim, the court only stated its belief that Massachusetts' opposition "was an outright, um, opposition, and I think they're properly before me, and in any event I reject it." Add.17-19. It then issued a text-only order, stating that the "[p]arties agree to case stated solely as to pork producer slaughterhouse issue. Commonwealth's opposition motion for summary judgment allowed solely as to farmers." Add.13.

Appellants filed a written objection once the court clarified it was dismissing ***all*** *Pike* claims. A1440. The court's only response to this objection came months later, when the court—during a hearing on a separate motion—said "I reject the *Pike* analysis" and "I think the briefs

fairly raise the issue, and since on the merits I reject the analysis, I don't think it's a question of notification or the like. And I thought I was being fair to all parties. So I don't think I need anymore." Add.22. The court later stated (in a different order involving a different motion) that Appellants' objection was "of no practical moment (as the Court sought to explain during a busy motion session). The legal issue had been fully briefed and the *Court's resolution obviated the need for evidence*." Add.37. (emphasis added).

## V.    The Court Strikes the Slaughterhouse Exception.

The court then set the case-stated hearing on Triumph's direct-discrimination claim concerning the "slaughterhouse issue." Add.13. The court ruled on February 5, 2024, that the sales exemption violated the dormant Commerce Clause, and ordered that exemption severed. Add.24. Because the Act's sales ban now applied to all FMIA facilities, the court reinstated Appellants' FMIA preemption claims, and ordered Appellants to move for summary judgment on them. Add.24.

## VI.   The Court Grants Summary Judgment to Massachusetts.

Triumph moved for summary judgment per the court's order. A1736. Although the court only authorized Triumph to move for

summary judgment, Massachusetts cross-moved as well, but not until 30 days *after* Appellants' motion. A1874. The motions were fully briefed, and the court held a hearing. A1736-2196.

On July 22, 2024—353 days after Appellants moved for a preliminary injunction, and 323 days after the court's consolidation—the court denied Triumph's motion and granted Massachusetts,' finding the Act was not preempted by the FMIA. Add.52.

This appeal follows.

## SUMMARY OF THE ARGUMENT

This appeal presents several unique options for this Court to halt unconstitutional state regulation of industry outside its own borders. Triumph, a pork processor providing federally regulated pork nationwide, and the Farmer Appellants who raise and supply pigs to Triumph, request this Court take action to preserve the Constitution and prevent further irreparable harm caused by Massachusetts' extraterritorial over-regulation based upon voters' moral or policy judgment.

This Court must *at least* reverse and remand due to the procedural and substantive failures of the court, with direction to enter a

14

preliminary injunction order to stay enforcement of the Act and regulations nationwide. First, Appellants don't know why the court summarily dismissed nine claims, because the court provided no reasoning or written order. Furthermore, if this Court analyzes those nine claims dismissed pursuant to the correct standard of review, Appellants sufficiently pled each claim through their 310 well-pled allegations in the Complaint.

The court's errors continued, as it ultimately entered summary judgment *sua sponte* against Farmer Appellants without notice or opportunity under Rule 56(f) on most of the remaining dormant Commerce Clause theories. Again, the court dismissed Farmer Appellants' claim without reasoning or written order, and despite overwhelming evidence that the Act's effect creates a scheme of economic protectionism for in-state farmers detrimental to out-of-state farmers' interests. But the court did not stop there, and instead further erred in entering summary judgment against *all* Appellants on their *Pike* claims. This came despite no party briefing the issue in detail, no evidence being presented, and disputed key material facts permeating the record. The *Pike* claims must be fully developed and presented to the court at trial.

Finally, the two narrow issues on which the district court made substantive rulings present this Court with the most efficient route to decision here. This Court should direct judgment to be entered in Appellants' favor, finding the sales ban is unconstitutional for two reasons. First, it discriminates in effect against the Farmer Appellants and those similarly situated across the Nation. The Act regulates conduct occurring *only* at out-of-state farms, thus providing a distinct advantage to in-state farmers. Moreover, legislative committee hearing members had direct knowledge of this discrimination, with one even recognizing a strong risk of the Act violating the dormant Commerce Clause.

Second, with the Act's sales exemption now stricken by the court as unconstitutional, the Act is preempted by the FMIA. The Act directly regulates FMIA regulated facilities. The Act's effects impose additional and different requirements on Triumph, which the Supremacy Clause (and the FMIA's express preemption clause) prohibits. And those additional requirements fall within the FMIA's scope, preventing Massachusetts from supplanting its own determination of what constitutes "safe" pork for its consumers while disregarding what the

USDA has long-implemented to ensure the free flow of safe, unadulterated meat throughout interstate commerce.

Massachusetts may regulate its own in-state farmers, but that's where its authority stops. This Court should reverse, and direct judgment be entered for Appellants. If, however, this Court disagrees, then *at minimum* this Court should reverse and remand for further proceedings concerning the remaining claims summarily dismissed by the court, allow Appellants' *Pike* claims to be set for determination at trial, and direct a preliminary injunction be entered pending further proceedings.

## ARGUMENT

This argument proceeds in four parts. The first three sections mirror the procedural stages at which the errors occurred: (1) dismissal of nine claims without reasoning; (2) summary judgment to Massachusetts on the *Pike* claims and Farmer Appellants' direct-discrimination claim; and (3) summary judgment to Massachusetts on FMIA preemption. Finally, the fourth section reiterates the procedural posture in which this case began—a motion for preliminary injunction—and discusses how this case should proceed from here.

## I.   The Court Erred by Dismissing Nine of Appellants' Ten Claims Without Any Stated Reasoning.

Without a written order or any substantive reasoning, the court dismissed 90% of Appellants' claims. That is error both on substance and procedure. First, on each of the dismissed claims, the Amended Complaint establishes that the factual allegations at least state a claim under the pled legal theories. Second, at the very least, the court's deficient adjudication of these claims warrants remand for further analysis.

This Court reviews dismissals under Rule 12(b)(6) *de novo*, *González v. Vélez*, 864 F.3d 45, 50 (1st Cir. 2017), evaluating whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not include "exhaustive factual allegations," only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (quotations omitted). The Court accepts "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013) (quotation omitted). The Court may supplement

these facts and inferences with information gathered from "matters of public record" and "facts susceptible to judicial notice." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 44 (1st Cir. 2020).

## A.    The Court Erred in Dismissing the Claims.

No one knows why the court dismissed the nine claims. All Appellants can assume is the dismissal was based on the arguments Massachusetts asserted in its motion. But had the court appropriately considered the allegations in the Amended Complaint and applied the correct standard, it would have never dismissed those claims for the reasons discussed below. This Court should reverse.

### 1.    *Privileges and Immunities Clause*

The Privileges and Immunities Clause provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1; *Ross*, 598 U.S. at 370. "The primary purpose of this clause . . . was to help fuse into one Nation a collection of independent, sovereign States" and "designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948); It guards "against rank discrimination against citizens of other States[.]"

19

*Tyler Pipe Indus., Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part). Thus, the Clause protects several fundamental rights, including the right to practice a trade or profession. *Toomer*, 334 U.S. at 388, 403; *Ward v. State*, 79 U.S. 418, 430 (1870). (stating the clause "plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation").

Rank discrimination inviting retaliation and preventing out-of-state farmers from engaging in their chosen profession is what the Amended Complaint alleges. The Act "directly and intentionally targets and seeks to regulate out-of-state activity that is permissible in the states in which it occurs" and represents an attempt to "effectively regulate pig farming, manufacturing, and production in other states." *See* A24, A54.

And the Amended Complaint extensively alleges this charge of discrimination. For example, "the burden of compliance with the Act's Minimum Size Requirements falls almost entirely on out-of-state pig farmers and pork processors to the benefit of in-state farmers and pork processors." A32-33, A54. Further, "Massachusetts pig farms did not use

20

gestation crates for housing breeding sows" when the Act was approved, and thus "directly targeted out-of-state farmers only." A33; *see also* A1491.

Additionally, the Amended Complaint describes how the Act impacts out-of-state farmers and will preclude them from pursuing their trade and profession. *See, e.g.*, A32-34, A44-46 (stating it is "neither feasible nor practical for farmers to segregate their product on a state-by-state basis" as doing so would mean "many farmers' operations will become cost prohibitive" due to "lack of space and financial inability."). Of course, to the extent the court doubted any of these allegations, the pleadings are not the appropriate stage to address it.

Finally, in analyzing whether the Amended Complaint sufficiently pled discrimination among citizens of different states, look no further than the court's *own ruling* on the "slaughterhouse exception." The court found that this portion of the Act discriminated against out-of-state processors in favor of in-state processors. Add.41. ("The slaughterhouse exception has a discriminatory effect."). This demonstrates the Amended Complaint sufficiently alleges discrimination.

### 2.    *Express and Conflict Preemption by FMIA*

The court dismissed the FMIA-preemption claim, but later reinstated it and adjudicated it on summary judgment. To avoid duplication, Appellants address this claim in Section III, *infra*.

### 3.    *Preemption by Packers and Stockyards Act*

For conflict preemption, one must allege that the "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 472-73 (1st Cir. 2009). Here, the PSA prohibits any "packer or swine contractor" from "giv[ing] any undue or unreasonable preference or advantage to any particular person or locality." *See* 7 U.S.C. § 192(b). Thus, any state law that conflicts with the PSA—which is intended to prevent "unfair, discriminatory, or deceptive practices" in the packing industry, *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922)—is preempted.

Once again, this is exactly what Appellants allege. Triumph must now source compliant pigs to gain access to the Massachusetts marketplace and thus must pay a premium to farmers who meet the

demand. A61. This plainly favors Massachusetts farmers who never used the farming methods now banned. A33, A61.

In opposition, Massachusetts simply regurgitated its argument that the Act does not encourage discriminatory practices, and it provides no undue or unreasonable preference or restraint on trade for a pork processor to source compliant meat. In addition to being issues to address through fact-finding as opposed to the pleadings, if the *state law* is discriminatory, *compliance* with that state law necessarily encourages discrimination. This plausibly alleges a conflict with the PSA. The Court should reverse the dismissal of this claim.

### 4.    *Full Faith and Credit Clause*

The Full Faith and Credit Clause preserves rights acquired or confirmed under the public acts and judicial proceedings of one state by requiring recognition of their validity in other states. *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of Cal.*, 306 U.S. 493 (1939). Massachusetts moved to dismiss, arguing (1) that there cannot be a standalone claim under the Clause, and (2) that the Amended Complaint didn't allege that the Act constituted a "'policy of hostility to the Public Acts' of another state." A497. Both arguments reveal Massachusetts'

misunderstanding of the Amended Complaint. Appellants' claim merely sought to enforce the "Right to Farm" laws that exist in several states in which Appellants operate. A25-26; Mo. Const. art. I, § 35.[3] And because the Act bans a particular farming practice expressly used (and regulated) in those states, the "[the Act] [is] in direct conflict with state statutes for the actual states in which the breeding pigs are housed." A46, A63-64. This alleges that the Act runs afoul of those laws, and thus the Clause. *See, e.g.*, *Ross*, 598 U.S. at 409 (Kavanaugh, J., concurring and dissenting in part) (collecting supporting sources for the theory and recognizing it as a viable claim).

The Amended Complaint plainly alleges a claim under the Full Faith and Credit Clause.

### 5.   *Due Process Clause*

Appellants alleged that the Act is unconstitutionally vague in violation of the Due Process Clause because it fails to define what it means to "engage in the sale" of the prohibited pork product. A65. Also, the Act and its attendant regulations failed to specify the square footage

---

[3] And there are others. *See, e.g.*, Wyo. Stat. § 11-29-115; Wyo. Stat. § 11-44-104; 345 Ind. Admin. Code 14-2-3 through 14-2-4.

requirements for a breeding pig to "turn around freely." A65. In response, Massachusetts claimed these terms are ordinary terms capable of understanding. A497-98. That disregards the allegations in the Amended Complaint, is more akin to a factual dispute at summary judgment, and misses the main thrust of Appellants' theory. *Ross*, 598 U.S. at 376.

First, due to the interconnectedness of the national supply chain, knowingly "engaging" in the sale could mean anyone up and down that supply chain. To be sure, if Massachusetts wanted to enforce the Act only against those who "sell," it would have worded the Act that way. But it didn't. Instead, the Act's wording is much broader; so broad, in fact, that courts have specifically held the word "engage" to be unconstitutionally vague in a variety of contexts. *See, e.g., Bodfish v. State*, No. A-10070, 2009 WL 3233716, at *5 (Alaska Ct. App. Oct. 7, 2009); *Pfizer Inc. v. Ajix, Inc.*, 2005 U.S. Dist. LEXIS 15984, *12 (D. Conn. 2005); *Sola Commc'ns, Inc. v. Bailey*, 2003-905 (La. App. 3 Cir. 12/10/03), 861 So. 2d 822, 829 (Ezell, J., concurring).

Second, it's vague to simply say a pig must be able to "turn around freely" to be compliant with the Act. Indeed, Appellants alleged they are "unable to discern whether the shipment of their pork products into

Massachusetts, if not compliant with the [the Act], is a prohibited conduct." A65. And this is because the ability of a sow to turn around varies, in part because of variations in the sow's size. As Appellants specifically alleged (and which should be obvious) sows are not "one size fits all." A65.

To the extent there was any doubt about the impact of the regulations at Appellants' farms, that is fodder for discovery and summary judgment, *not* a basis to dismiss on the pleadings. The constitutional-vagueness challenge under the Due Process clause is validly pled.

### 6.   *Import-Export Clause*

The Import-Export Clause states that "[n]o State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws." U.S. Const. art. I, § 10, cl. 2. While the Clause has historically applied to international trade issues, several Justices have indicated that such a reading "may be mistaken as a matter of constitutional text and history: Properly interpreted, the Import-Export Clause may also prevent States 'from imposing certain especially burdensome' taxes and

duties on imports from other States—not just on imports from foreign countries." *Ross*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part) (citations omitted).

Here, as alleged, the Act essentially imposes a duty or tax on out-of-state goods through its imposition of a particular method of raising pigs that is unquestionably more burdensome and more expensive, but only for out-of-state entities. To gain access to the Massachusetts marketplace, Appellants *must* adjust their practices. For the Farmer Appellants, this requires a substantial, costly overhaul to their farming practices. A67. For Triumph, this requires segregation, labeling, and processing-line adjustments. A67. And, once again, to the extent the court or Massachusetts doubted the veracity of these costs and disruptions, that should be addressed later in the case.

### 7.    *Declaratory Relief and Judicial Review*

Lastly, Count IX and Count X[4] are unique, in that they seek injunctive and declaratory relief based upon constitutional challenges to

---

[4] Defendants argued that Count X—which sought to challenge the Act under Massachusetts state law, Mass. Gen. Laws ch. 30A, § 7 and ch. 231A—was barred by the Eleventh Amendment. But at least part of the declaratory relief sought under that count relates to violations of the federal constitution. *See* A68. Regardless, federal courts have

27

the Act and its regulations. Appellants are entitled to the declaratory and injunctive relief sought, whether pled as a separate count or just a form of relief.

Had the court applied the correct motion to dismiss standard, it would not have dismissed these detailed, well-pled claims. This Court should reverse.

### B. At The Very Least, This Court Should Remand for a Sufficient Ruling.

As discussed, this Court should reverse dismissal of the nine claims, as those claims are plainly sufficient on the face of the Amended Complaint. But, if the Court is unable to do so based on the lack of sufficient (or any) reasoning from the court, this Court should remand.

Although it is not a technical requirement for a court to "state findings or conclusions when ruling on a motion under Rule 12," Fed. R. Civ. P. 52(a)(3), this Court strongly prefers it to allow for meaningful appellate review. *Souza v. Pina*, 53 F.3d 423, 424 n.4 (1st Cir. 1995) ("some explication of the trial court's reasoning will often prove valuable

---

"jurisdiction to evaluate a claim under th[at] Massachusetts statute and to award relief.*" Martone Place, LLC v. City of Springfield*, No. 16-CV-30170-MAP, 2017 WL 5889222, at *25 (D. Mass. Nov. 29, 2017), *aff'd*, No. 18-1020, 2018 WL 11231884 (1st Cir. Dec. 19, 2018).

to both the litigants and to the reviewing court"); *Roque-Rodriguez v. Lema Moya*, 926 F.2d 103, 105 n.3 (1st Cir. 1991) (same at summary judgment); *see also Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) ("There is no question that a trial judge can facilitate the appellate task by spelling out his rationale, and we encourage such elaboration").

This case involves ten counts and detailed factual allegations. Yet the court provided no analysis; it is entirely unclear why it dismissed these claims. The court did not "lucidly articulate[] its reasoning in support of dismissal." *Cook & Co. v. Volunteer Firemen's Ins. Servs.*, 657 F. App'x 1, 3 (1st Cir. 2016). And the single statement from the bench that "Massachusetts has every right, as against your other claims, to pursue its own approach to animal housing," Add.9, is in no way "clear enough to permit meaningful appellate review." *Paraflon Invs., Ltd. v. Fullbridge, Inc.*, 960 F.3d 17, 32 (1st Cir. 2020); *Francis v. Goodman*, 81 F.3d 5, 7 (1st Cir. 1996) (remanding as order was "not amenable to reliable appellate review under any standard, since the findings of fact and subsidiary conclusions of law are not discernible"); *In re Pub. Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005) ("we need

the benefit of the [] court's reasoning" due to the "variety of issues" and the "sensitive balancing of interests . . . that has hitherto not been addressed").

Thus, at the very least, this Court should reverse and remand for sufficient adjudication of the motion to dismiss.[5]

## II. The Court Erred When It *Sua Sponte* Rejected Most of Appellants' Dormant Commerce Clause Theories.

The one claim remaining—Appellants' challenge under the dormant Commerce Clause—proceeded to adjudication on Appellants' *partial* motion for summary judgment. Key to keeping the claims and rulings straight through this analysis is understanding that each set of Appellants—Triumph (a processor) on the one hand, and the Farmer Appellants, on the other—asserted both a direct-discrimination claim and a *Pike* claim.

---

[5] This district court is aware of this issue. *See, e.g., Triantos v. Guaetta & Benson, LLC*, 91 F.4th 556, 564 (1st Cir. 2024) (remanding due to "deficiencies [that] make it difficult for us to conduct meaningful appellate review"); *Carrasquillo v. United States*, 818 F. Supp. 2d 385, 386 (D. Mass. 2011) (quoting Order of Court, *Carrasquillo v. United States*, No. 10-1489 (1st Cir. Sept. 26, 2011)) (remanding as "we are not able to discern the reasons for the dismissal.").

Appellants moved for summary judgment on *only* the direct-discrimination claims. As Appellants explained, the *Pike* claims were extremely fact intensive and remained for adjudication at trial. Massachusetts did not move for summary judgment on any claim.

Nevertheless, the court *sua sponte* entered summary judgment against Appellants ***on their* Pike *claims*** without the notice or opportunity required by Rule 56(f). This alone justifies reversal on the *Pike* theory; the court never received *any* evidence with respect to that theory, it never addressed disputed material facts plainly found in the record, nor did it even receive any substantive material briefing. And even if that procedural error was somehow not enough, the court's legal reasoning (cursory as it is) was also flawed.

Further, the court improperly granted *sua sponte* judgment against Farmer Appellants on their direct-discrimination claim. That, too, was error, both on procedure and on substance.

 Summary judgment is appropriate when there remains no dispute of material fact, *i.e.*, there is no factual determination which a "rational factfinder" could make as to the "existence or nonexistence" of a fact that "has the potential to change the outcome of the suit"—such that "the

31

moving party is entitled to judgment as a matter of law." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010). This Court reviews summary judgment rulings *de novo* and draws all inferences in favor of the party against whom summary judgment was entered. *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 732-33 (1st Cir. 2022). Finally, when there is no dispute as to the material facts in the record, this Court may not only reverse a grant of summary judgment for one party, but direct its entry to the other. *See, e.g.*, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 99 (1st Cir. 2002).

### A. The court improperly entered *sua sponte* judgment against Appellants on their *Pike* claims.

#### 1. *The Court violated Rule 56(f)*

Although a court may issue *sua sponte* rulings, adversely affected parties must receive notice from the court and an opportunity to respond before such a ruling may issue. Fed. R. Civ. P. 56(f). Generally speaking, "the notice requirement for *sua sponte* summary judgment demands at the very least that the parties (1) be made aware of *the court's intention* to mull such an approach, and (2) be afforded the benefit of the [then-applicable] minimum 10-day period mandated by Rule 56." *See Stella v.*

*Town of Tewksbury, Mass.*, 4 F.3d 53, 56 (1st Cir. 1993).[6] Failure to provide this required notice is reversible error. *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999); *see also Forrest v. Parry*, 930 F.3d 93, 113 (3d Cir. 2019).

Here, the first time Appellants received any notice from the court[7] of a possible *sua sponte* ruling was the *sua sponte* ruling itself. Rule 56(f) simply does not allow this. It deprived Appellants of putting their "best foot forward" in opposing such an order, *Leyva*, 171 F.3d at 720 (cleaned up), and this Court should reverse on this basis alone.

---

[6] Here, as a proxy for a "reasonable time to respond," the local rules permit a party 14 days to file oppositions or replies in typical summary-judgment practice. *See* D. Mass. Local Rules 7.1(b)(2) & 56.1.

[7] Defendants suggest that because their opposition brief suggested a ruling under Rule 56(f), that provided "notice." A1471-75. Not so. First, that's textually inaccurate—the *court* must provide notice. Fed. R. Civ. P. 56(f) ("After **giving notice** and a reasonable time to respond, **the court** may . . . grant summary judgment for a nonmovant."); *see also Leyva*, 171 F.3d at 720. And that makes sense. A suggestion by an opposing party in a brief is, of course, far different than notice from a court that it is entertaining such a ruling, *especially* on a claim that was not even raised by the moving party in the operative motion. Nor would Defendants' "notice" have provided Appellants a "reasonable time" to respond on a claim that was not even at issue in the motion. That opposition brief suggesting a *sua sponte* ruling was filed on November 7, just seven days before the hearing, and five days before Appellants submitted their reply on the claims actually at issue in the partial motion.

Moreover, granting summary judgment on a claim without considering the relevant evidence separately runs afoul of Rule 56(f). *See, e.g., Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 7 (1st Cir. 2007) (in order for Rule 56(f) to be triggered, the "discovery process must be sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts" (cleaned up)); *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir. 1996). Here, it is impossible for the court to have made any factual evaluation whatsoever, as it never had the requisite facts before it. When moving for *partial* summary judgment, Appellants explicitly reserved the right to pursue the *Pike* claims at trial because disputed facts already existed, and the parties were engaged in discovery with respect to *those very claims* at the time of the hearing and thereafter. *See* A1356. Indeed, Massachusetts contended that extensive discovery was required to address factual issues on the record. *See, e.g.*, A907; *see also* A814. Thus, no evidence was ever submitted; both parties *jointly represented* this to the court. *See, e.g.*, A821-22 (Massachusetts confirming the following were *contested facts*: the "alleged economic or other burden on the interstate pork market imposed by the Massachusetts law," the "nature of the local benefit of the

law and/or the justification for it," and the "extent to which there is any evidence of discriminatory purpose or effect").

In response to Appellants' objections as to the *sua sponte* ruling, all the court said was that it thought the issue was appropriately "before" it, that the briefs "fairly raise[d] the issue," and that it thought it was "being fair to all parties." Add.19-22. This is insufficient under Rule 56(f) and factually inaccurate. Massachusetts' opposition brief argued (without citation to *any* evidence or *any* facts) that the "claim fails as a matter of law because the Supreme Court's decision in *Ross* forecloses it" as "[Appellants] make materially indistinguishable factual assertions and legal arguments here." A1388. Appellants' reply described that Massachusetts mischaracterized *NPPC v. Ross* but didn't fully brief the issue for the obvious reason that it was never on notice from the court that it was entertaining *sua sponte* judgment on this claim. That's especially so given Appellants' express reservation of the *Pike* claims for trial, making Massachusetts' opposition briefing on *Pike* outside the scope of what was before the court. A1437-38.

The court granted summary judgment, *sua sponte*, without providing notice to the adverse party, without considering any evidence

in support of the claim, without the claim being properly before the court and without providing any ability to Appellants to submit evidence or brief the issue. This is patent error, and the Court should reverse and remand all *Pike* claims accordingly.

> **2.    Setting aside the procedural error, the court improperly entered judgment on Appellants' Pike claims**

Absent any Rule 56(f) error, the court erred as a matter of law in dismissing Appellants' *Pike* claims. Again, the court initially provided no reasoning on his entry of judgment on the *Pike* claims. Add.13-19. Months later, in an order on another motion, the court said it thought the *Pike* claims were foreclosed by *Ross*, and so it simply "decline[d] to engage in *Pike* balancing" entirely:

> The Supreme Court ruled that "harm to some producers' favored methods of operation" did not rise to a "substantial harm to interstate commerce," and that "increased production expenses" cannot be compared by a court to "noneconomic" state benefits. Further, the Court explained, "judges often are 'not institutionally suited to draw reliable conclusions of the kind that would be necessary . . . to satisfy [the] *Pike'* test as petitioners conceive it."

Add.35-37 (quotation omitted).

That's not the law. The court took this "understanding" from Part IV-B of the *Ross* opinion—and directly quoted that Part of the opinion as

36

coming from "the Court"—but that Part was joined by *only three justices*. To the contrary, **a six-to-three majority** of the Court confirmed that *Pike* remains good law and provides a framework to determine whether state laws are invalid under the dormant Commerce Clause. *Ross*, 598 U.S. at 403 (Kavanaugh, J., concurring in part and dissenting in part) (confirming that a six-Justice majority "affirmatively retain[ed] the longstanding *Pike* balancing test"). Put simply, the court erroneously based its ruling on the Supreme Court *minority*.

Since the First Circuit looks to all opinions—including dissenting and concurring opinions—"to find the ground of decision embraced by a majority of the Justices," *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006), it was error to refuse to engage in any *Pike* analysis. And it was especially inappropriate to dismiss that claim here, as *no party* moved on the claim due to evidentiary and factual disputes. This Court should reverse, clarify that *Pike* remains good law, and remand for the court to consider this claim on its merits at trial.

**B.    The court erred in granting summary judgment to Massachusetts on Farmer Appellants' direct-discrimination claim.**

The court also *sua sponte* entered summary judgment against the Farmer Appellants on their direct-discrimination claim. To begin, the court erred procedurally in entering judgment under Rule 56(f). *See supra*. Here, too, the lack of notice from the court is reversible error on the direct-discrimination claim.

But because the Farmer Appellants briefed the direct-discrimination claim in the partial motion, the record demonstrates that the court should have entered judgment *in favor* of the Farmer Appellants. The court's sole reasoning for its decision was: "the fact that the burden of the Act falls entirely on out-of-state pig farmers does not, on its own under the controlling law, substantiate a claim under the dormant commerce clause." Add.18. But this fails as a matter of law, and on this record, this Court should reverse and direct entry of judgment in favor of Appellants.

### 1.    *Legal Background*

The Commerce Clause provides that "Congress shall have [the] [p]ower . . . [t]o regulate Commerce . . . among the several States." U.S.

Const. art. I, § 8, cl. 3. This affirmative endowment of power also carries "a negative, self-executing limitation on the power of the [s]tates to enact laws [that place] substantial burdens on [interstate] commerce." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 545 (1st Cir. 2022) (quotation omitted). Referred to as the "dormant Commerce Clause," it "protects interstate commerce from the evils of economic isolation and protectionism that state regulation otherwise could bring about." *Id.* at 546 (quotation omitted). Thus, "the very core of [the Supreme Court's] dormant Commerce Clause jurisprudence" is "antidiscrimination," and thus the Clause bars "state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (cleaned up).

The Clause certainly prohibits laws that facially discriminate against out-of-state commerce, *see, e.g.*, *Ne. Patients Grp.*, 45 F.4th at 544, but that's not required; all that matters is the "discriminatory *character* of [a] challenged state regulation[.]" *Ross*, 598 U.S. at 377 (emphasis added). To make that determination, the court must examine not only the face of the statute, but also whether the law discriminates

"in effect, or in purpose—against interstate commerce." *Anvar v. Dwyer*, 82 F.4th 1, 8 (1st Cir. 2023). Discrimination in purpose or effect simply means "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter,' as opposed to state laws that 'regulate[] evenhandedly with only incidental effects on interstate commerce[.]'" *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (quotation omitted).

This inquiry is holistic; the Court may consider "statutory context, legislative history, and other factors" in determining whether a statute is discriminatory in effect. *Id.* at 5. A challenging party bears the initial burden of showing the discriminatory effects or purpose of a state law. *See, e.g., id.* at 9. When that burden is met, the burden then shifts to the state as the law "is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." *Id.* (citation omitted). This "exacting standard" is "rarely satisfy[ied]" for state laws that are discriminatory in purpose or effect. *Id.*

40

## 2. *The Act Carries Discriminatory Effect*

Here, there was no genuine issue of material fact that the Act "impos[es] disproportionate burdens on out-of-state interests and confer[s] advantages upon in-state interests[,]" and that its purpose was "'motivated by an intent to discriminate against interstate commerce.'" *Anvar*, 2023 WL 5765847 at *6 (quotation omitted). Indeed, Massachusetts defined the sales ban (and the farming practices prohibited) in a manner that applied to *none* of their farmers, but only to out-of-state farms supplying Massachusetts pork.

The Act makes it "unlawful for a farm owner or operator within Massachusetts to knowingly cause any covered animal to be confined in a cruel manner," defined as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely[.]" Mass. Gen. Laws Ann. ch. 129 App., § 1-2. So far, so good. Massachusetts may regulate its own farms without running afoul of the dormant Commerce Clause.

But Massachusetts didn't stop there. Instead, it included a sales ban on any Whole Pork Meat derived from sows confined in a "cruel" manner as defined, *no matter where the farm is located. Id.* § 1-3. But it

is uncontroverted that ***not a single pig farmer in Massachusetts*** was using gestation crates—the type of housing proscribed by the Act and used by Appellants (as well as other large farmers nationwide)—at the time the Act was before the voters. A1398-99, A1402-3l, A1491. In other words, Massachusetts defined farming methods not used by any farmer within Massachusetts as "cruel," instead targeting practices used only by out-of-state farms. And by implementing a sales ban, it burdens out-of-state economic interests in favor of in-state interests, as Massachusetts' farmers could continue business as usual to sell their pigs within Massachusetts, gaining a larger market share uninterrupted by any cost, delay, or burden associated with the Act.

Public, uncontested data demonstrates the magnitude of this discrimination. Consider, for example, that as of 2022, Massachusetts had as few as 1,500 breeding sows and approximately 6,000 total market hogs, and Massachusetts farmers raised 12,000 market hogs in 2022— enough hogs for about 1.9 million pounds of retail pork. A199, A780, A1490. By contrast, Missouri and Iowa in 2022 had 450,000 breeding sows and 900,000 breeding sows, respectively. A33, A780, A859, A1490. Massachusetts requires over 350 million pounds of pork annually. A199-

200, A1490. Thus, not only are out-of-state farmers burdened more by the sales ban because their farming operations are much larger than those in Massachusetts; Massachusetts farms are not burdened at all because they never utilized non-compliant housing in the first place. The natural effect of the Act, then, is to target exclusively out-of-state commerce, giving in-state farmers a newfound economic advantage.

Making in-state farmers more competitive while forcing out-of-state farmers from the market is the type of invidious discrimination this Court invalidated in *Jenkins*. 592 F.3d at 1. There, a Massachusetts law only allowed "small wineries"—subjectively defined as those producing less than a certain number of gallons of grape wine per year—to obtain a "small winery shipping license." *Id.* at 4. This license allowed a "small winery" to sell wine to Massachusetts consumers using three different distribution channels; "large" wineries, on the other hand, were required to choose from two. *Id.*

This Court recognized the law was "neutral on its face; it does not, by its terms, allow only Massachusetts wineries to distribute their wines through a combination of direct shipping, wholesaler distribution, and retail sales." *Id.* at 5. But it nonetheless violated the dormant Commerce

43

Clause because Massachusetts' in-state wineries qualified as "small wineries" under the definition chosen by Massachusetts; thus, only out-of-state entities were impacted by the law. *Id.* at 4. Consequently, "the effect" of the law was to "cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market," *id.* at 10, and thus "change[d] the competitive balance between in-state and out-of-state wineries in a way that benefits Massachusetts's wineries and significantly burdens out-of-state competitors[.]" *Id.* at 5.

So too here. Massachusetts subjectively defined the prohibited farming practices to impact only out-of-state farms, to the direct economic benefit of its own in-state farms. A "state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." *Id.* at 10; *see also Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 11 (1st Cir. 1992). That is the case here.

Even if that analysis—grounded in binding First Circuit authority—is not enough, the Act's legislative underpinnings confirm its

44

discriminatory effect on out-of-state farmers was a central goal. *See, e.g., Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 352 (1977) (legislative history is a relevant factor in determining discriminatory impact or purpose); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 465-68 (1981) (looking to a senator's and representatives' statements during floor debates as probative evidence of purpose).

Here, statements from legislators and the public confirm the Act's goal of dictating out-of-state farming practices to create a nationwide policy and benefit in-state farmers. During a committee hearing, public commentators, including then-Representative Anne Gobi, recognized that "we do not use gestation crates in Massachusetts." A1134, A1308. Nonetheless, one commentator recognized the need for the sales ban because "Massachusetts uses a lot of meat that is produced out of state in farms that use these cruel tactics." A1132. Another testified that "[t]his bill protects animals outside of Massachusetts that are sold and brought into the state." A1132.

Representative Gobi even expressed a concern that the Act violated the dormant Commerce Clause: "There were also lots of farms and

organizations who did not endorse this bill[]. When you know there is a [gestation] problem in other states, why isn't there more emphasis on fixing that problem in other states?" A1134; *see also* A1309 ("Now we're treading on interstate commerce and there are some constitutional issues that I think are rather large and could be a hurdle to get over.").

In fact, Massachusetts' own state courts recognized that in-state farmers' economic benefit is a central purpose of the Act, explaining it "protects Massachusetts farmers who comply with the law by preventing Massachusetts businesses from selling . . . pork obtained from out-of-State farmers who confine their animals in a cruel manner and who, by doing so, *may be able to underprice their Massachusetts competitors*." *Dunn v. Attorney General*, 474 Mass. 675, 681, 54 N.E.3d 1, 7 (2016) (emphasis added). The Court continued, explaining that the Act "protects . . . pigs in other States (and other nations) by providing non-Massachusetts farmers with an economic incentive not to confine their animals in a cruel manner if they wish to sell their . . . pork in the Massachusetts market." 474 Mass. at 681, 54 N.E.3d at 7. This type of obvious economic discrimination and market manipulation is exactly

what the Act intends to accomplish, but what the dormant Commerce Clause prevents.

The Act burdens exclusively out-of-state farmers to the direct benefit of in-state farms. This violates the dormant Commerce Clause's "core" antidiscrimination principles that the Supreme Court recognized but could not address in *Ross*, as no discrimination claim was pled. This Court should conclude that the Act discriminates.

### 3. *Massachusetts Cannot Meet Their Burden To Establish A Legitimate Local Purpose, Much Less That No Nondiscriminatory Alternatives Are Available*

As the Act discriminates for the reasons above, it "is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." *Jenkins*, 592 F.3d at 5 (citation omitted). Again, the burden is on Massachusetts, which may not rely on either "mere speculation" or "unsupported assertions" but, rather, must proffer "concrete evidence" demonstrating that the main effect of the law is the advancement of valid local interests, not economic protectionism. *Id.*; *see also New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 280 (1988) (holding that "health and commerce justifications amount to no more

47

than implausible speculation, which does not suffice to validate this plain discrimination against products of out-of-state manufacture.").

As set forth above, the court erroneously determined there was no disparate impact, and thus did not analyze less discriminatory alternatives at all. But this Court need not remand on this issue, as Massachusetts cannot articulate any plausible local benefit. *See, e.g.*, A1415-38. For example, the Act dictates how breeding sows are to be housed based upon a purported "animal cruelty" benefit and bans the sale of the meat from the offspring of these sows if not housed in accordance with the Act. Mass. Gen. Laws Ann. ch. 129 App., § 1-3. But as sows are generally processed into ground sausage, a product which is exempt from the Act, the alleged local benefit asserted by Massachusetts is a perverse one, where the alleged "cruelty" can apparently be ground out of the meat and made acceptable. That this situation exists demonstrates that Massachusetts has no legitimate local interest in this matter and is instead attempting to implement an unconstitutional trade restriction.

This Court should reverse the grant of summary judgment in favor of Massachusetts, and direct entry of judgment in favor of Appellants.

\*     \*     \*

48

The Nation is now entering a new phase where individual states are attempting to regulate conduct of other states based upon moral or policy reasons specific to that state. Our constitutional design, and the Tenth Amendment in particular, provide great leeway to states to regulate within their borders. But when states abuse that power and impose substantial burdens on the citizens of sister states, the dormant Commerce Clause responds to preserve free interstate markets.

The hypotheticals don't have to go too far afield before becoming truly alarming. Recall that Massachusetts and other states are attempting to justify its enforcement of these laws based on "moral" judgments around pig farming. So could states condition the sale of certain products on the minimum wage that out-of-state companies' pay their workers; or their parental or sick leave policies; or the immigration status of their employees; or the type of health insurance they offer? And it encourages tit-for-tat reprisals, with legislatures targeting top products for greater leverage. This is a dangerous slippery slope, and this Court should halt it.

## III.  The Court Erred in Holding That the Act Is Not Preempted by the FMIA.

Triumph's direct-discrimination claim proceeded to a case-stated proceeding, in which the court ruled that the "slaughterhouse exception" is unconstitutional and must be severed. Add.24. Massachusetts did not challenge that ruling on appeal, so it is now final.

That's significant, because Massachusetts *admitted* to the court that the reason the slaughterhouse exception was included in the Act was to avoid federal preemption under the FMIA. A890-91; 21 U.S.C. § 601. With that exception severed, the Act is clearly preempted by the FMIA, because it creates additional, or different, requirements governing what constitutes safe, wholesome, and unadulterated pork products entering interstate commerce. That directly violates the FMIA's express preemption clause or, at minimum, presents an obstacle to the FMIA objectives and goals of the need for uniformity and safety among the states' handling of meat. The court erred in concluding otherwise. This Court should reverse and direct entry of judgment in favor of Appellants.

This issue was presented to the court on cross-motions for summary judgment. The summary-judgment standard of review is discussed *supra* at Section II, and "[c]ross motions for summary judgment do not change

50

the standard." *Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007). The Court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996).

## A.    Background of Federal Preemption and the FMIA

Grounded in the Supremacy Clause, federal law "may preempt a state regulatory scheme in three relevant ways": express, implied, and conflict. *Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd*, 467 U.S. 461, 469 (1985); *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007). Express and conflict preemption are solely at issue in this appeal.

To determine whether a state law is expressly preempted, the Court "focuses on the plain wording of [any express preemption] clause, which necessarily contains the best evidence of Congress' preemptive intent." *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted). The Court also examines "statutory structure, purpose, and history" of the federal

law and any preemption clause to determine its preemptive reach. *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). The Court looks to the "*effect* of the [state] regulatory scheme," rather than its stated purpose, to determine whether it is preempted. *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274, 279 (1st Cir. 1990) (emphasis added). Thus, what matters most for the challenged state regulation is "the effect . . . the local law [has] on that federal law's goals." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 433-34 (D. Me. 2017).

The FMIA's express preemption clause preempts all state "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678. According to the Supreme Court, the FMIA's preemption clause "sweeps widely" and "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 459-60 (emphasis added).

Using these principles, this Court's *de novo* review evaluates: (1) whether the Act's sales ban, by way of its effects, imposes different or additional requirements that concern an FMIA establishment's premises, facilities, or operations; and if so, (2) whether those requirements are within the scope of the FMIA as informed by what regulations the pertinent agencies in charge of administering the FMIA (the United States Department of Agriculture ("USDA") or Food Safety and Inspection Service ("FSIS")) have issued—or even *could* issue. If so, the Act is expressly preempted by the FMIA. If not, this Court must still determine whether the Act conflicts with the FMIA.

### B. The Court Misapplied *Harris* to conclude the Act is not expressly preempted.

Below, the court largely held that there was no express-preemption problem based on *Harris*. But it materially misconstrued *Harris* in doing so.

#### 1. The *Harris Decision*

In *National Meat Association v. Harris*, the Court analyzed a state regulation requiring a slaughterhouse to immediately kill a nonambulatory pig and prevented the animal from being processed for food. 565 U.S. at 460-61. Like the Act here, the state law in *Harris* didn't

53

impose this requirement directly; it did so through a sales ban on the food products. *Id.* at 462-63. The *Harris* defendants argued the law could not be preempted by the FMIA because it regulated only the *sale* of the product, which occurred "prior to delivery, away from the slaughterhouse itself"; thus, the sales ban did "not involve a slaughterhouse's 'premises, facilities and operations.'" *Id.* at 462. The *Harris* defendants also argued the sales ban did not violate the FMIA's preemption clause because "[o]nce meat from a slaughtered pig has passed a post-mortem inspection, the [FMIA] 'is not concerned with whether or how it is ever actually sold'" and thus could not affect any onsite operations of the facility. *Id.* at 463.

The *Harris* Court unequivocally rejected these arguments: "The idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Id.* at 464. The sales ban "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" and "regulates how slaughterhouses must deal with non-ambulatory pigs on their premises." *Id.* Thus, the state law was preempted; to hold otherwise would allow "any State [to] impose any

regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.*

Lastly, the *Harris* defendants contended that the law fell outside the FMIA's scope because it excluded a class of animals—nonambulatory pigs—from the slaughtering process and did not relate to the onsite slaughtering process of a FMIA facility. *Harris*, 565 U.S. at 464. The Court rejected this, too, explaining the FMIA itself "exclude[d] many classes of animals from the slaughtering process." *Id.* at 465. Yet, nonambulatory pigs were not included in that list. *Id.* at 465-66. And this omission proved that the state had imposed requirements different from the FMIA—not evidence that the state requirement fell outside the FMIA's scope. *Id.* at 466. Thus, the state law fell within the scope of the FMIA because the state law "endeavors to regulate the same thing, at the same time, in the same place—except by imposing different requirements." *Id.* at 468.

### 2.    *The Court Erred in Holding the Sales Ban Does Not Regulate a Slaughterhouse*

In construing *Harris*, the court held that "the Act here only bans the sale of noncompliant pork meat; it does not regulate how a slaughterhouse operates." Add.64. It went on to reason that a

"[s]laughterhouse[] may still operate in the same way they did previously—noncompliant pork processing is not only allowed, but slaughterhouses are not even required to segregate noncompliant pork from compliant pork." Add.64. It concluded that "the Act requires changes in operations for pig farmers, which the FMIA does not cover, slaughterhouses may continue to operate as they did previously . . .." Add.65-66.

In addition to being factually inaccurate (discussed *infra*), that's the very same argument *Harris* rejected. And *Harris*'s broad discussion invalidated the sales ban because "[t]he idea—and the inevitable effect— of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Harris*, 565 U.S. at 464. So too here. The "inevitable effect" of the sales ban is that noncompliant pork *must be* segregated by processors.

The court also cited to a single line in *Harris*'s opinion, stating that the "FMIA's express preemption clause does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses.'" Add.63 (citing *Harris*, 565 U.S. at 463).

56

But this Court need only review the next few lines of the federal government's amicus brief cited in *Harris* (the portion ignored here by the district court):

> That said . . . to some extent the FMIA preempts state judgments about what finished meat and meat products are fit for commerce and human consumption, in that the FMIA defines certain conditions that render such products "adulterated"), bans commerce in adulterated products), and authorizes concurrent state enforcement on that subject only when "consistent with requirements under [the FMIA]". ***[The state law]'s sale ban could reasonably be characterized as an impermissible effort to add a class of adulteration unrecognized in federal law.***

Br. for United States, *National Meat Association v. Harris,* 2011 WL 3821398, at *17 (Aug. 29, 2011) (emphasis added). Far from establishing that a state sales ban may dictate what finished meat products are fit for commerce and human consumption, or how a slaughterhouse operates, *Harris* specifically held that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision." *Harris*, 565 U.S. at 464 (2012).

This is the *exact* upshot of the district court's ruling. Somehow, it held that the sales ban *doesn't* impact a FMIA-inspected

57

slaughterhouse's operations (and thus falls outside the scope of the FMIA), even though it *directly regulates* what Triumph can sell into Massachusetts, and adds a class of adulteration unrecognized in federal law by predetermining what meat may be sold premised on "health concerns" identified in the ballot language and the Act's purpose. Mass. Gen. Laws Ann. ch. 129 App., § 1-1.

The origin of the court's errant analysis is its fundamentally incorrect ruling that "slaughterhouses may continue to operate as they did previously[.]" Add.66. Nothing could be further from the truth based on undisputed evidence submitted by Triumph. Without the FMIA sales exemption, the sales ban *directly* creates additional or different requirements on FMIA establishments (like Triumph). First, it bans a FMIA establishment from selling USDA approved pork within Massachusetts. Add.74. Second, the Act's effects necessitate additional or different operational procedures from those within the FMIA and FSIS regulations. A1490 ("Triumph has implemented physical segregation procedures, and additional tracking and inventory management tools (*e.g.*, stock keeping units, or bar codes), new sorting procedures and new storage locations for purposes of ensuring Question 3 Whole Pork Meat

remains segregated from conventional, non-compliant Whole Pork Meat.")).

The court rejected these undisputed facts because it was "unclear on the record why that would be required under the Act." Add.65. But this ignores this Court's binding direction to analyze the *effects* of the Act, which the court recognized was *accurate*. Add.66. Any additional or different requirements, *i.e.*, "changes for storage and distribution," Add.65, is prima facie evidence of the triggering of the express preemption clause.[8]

Indeed, this precise fact was elucidated by the court itself during the hearing. In response to Massachusetts' arguments that the Act itself didn't require segregation, or that it only required action Triumph was already taking, the court pointed out that the Act required Appellants to "warrant that the [pork is] compliant with Massachusetts standards" and that the only way to do that is "to segregate it, one imagines, at minimum." A2192-93. And this was different from other products that Triumph was voluntarily segregating because it was not "voluntary";

---

[8] At the very least, there is a material fact issue that should have precluded summary judgment from being entered against Appellants.

instead "Massachusetts require[d] that." *Id.* at 18. That's exactly right, and the court shouldn't have waivered from its instinct.

### 3.    *The Act Is Within the Scope of the FMIA*

The Act's requirements fall within the scope of the FMIA. The FMIA was enacted given concerns that unhealthy meat products "impair[ed] the effective regulation of meat and meat food products in interstate or foreign commerce," and thus aimed "to prevent and eliminate burdens upon such commerce [and] to effectively regulate such commerce . . . ." 21 U.S.C. § 602. For this reason, the FMIA and its implementing regulations contain inspection and handling procedures for both live and postmortem pigs at the FMIA facility. 21 U.S.C. § 603-06, 608; *see, e.g.*, 9 C.F.R. § 309.1-.2, & .19.

A natural extension of FSIS regulations is a determination that they already accommodate for differing state regulations about how pork is processed. The FSIS *could* identify the conditions in which a pig was raised as relevant to how they are to be segregated and treated before and during slaughter, for purposes of determining whether those pigs are fit to enter the human food supply. **But it has not**. And this simply means the Act's "requirements [merely] differ from those of the FMIA—

not that [the Act's] requirements fall outside the FMIA's scope." *Harris*,

565 U.S. at 466.

The Supreme Court's foreshadowing in *Harris* has come to fruition.

The Act's sales ban now applies to all FMIA facilities. Without compliant

pork, Triumph cannot sell products into Massachusetts. A1492. This

functions as a command to FMIA facilities to structure their operations

to remove noncompliant Whole Pork Meat, just as the nonambulatory-

pig statute operated in *Harris*. If Triumph does nothing to adjust its

procedures, it will sell non-compliant pork into Massachusetts and risk

civil prosecution or potential embargo from selling into Massachusetts.

The FMIA express preemption clause does not allow this. *See* A1736-66,

2164-2175.

## C.    The Court Erred in Dismissing Appellants' Conflict Preemption Claims.

The Act is also preempted because it conflicts with, and obstructs,

the objectives of the FMIA.

The court erred by merely comparing the purpose of the FMIA with

the purpose of the Act (and, to be frank, only a portion of the purpose of

the Act). *See* Add.68. But the analysis is not whether the two laws conflict

in *purpose*; the question is whether the *effect* of the state law conflicts

with the "natural effects" of the federal legislation. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000). Thus, it matters not whether the purported goal of the Act is similar or dissimilar to those goals of the FMIA, for "[e]ven a state law that 'attempts to achieve one of the same goals as federal law' may be preempted when it 'involves a conflict in the method' of execution.". *Maine Forest Prod. Council v. Cormier,* 51 F.4th 1, 11 (1st Cir. 2022). Indeed, "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 287 (1971). Thus, health and safety laws that are stricter than federal counterparts may be preempted. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (reasoning that "[i]t would defeat the purpose of [a federal law] if a state could enact measures stricter than [the federal measures] by asserting a . . .purpose [different from the federal law] for the legislation."); *see also Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 612 (1926).

This misunderstanding of the applicable standard led the court to disregard material evidence about how the Act's sales ban conflicts with the FMIA. Stated summarily, the FMIA has a detailed regulatory

framework for what constitutes adulterated meat and what is safe for human consumption. And therein lies the conflict: pork that has passed USDA inspection and approved for sale, is now otherwise deemed unfit for human consumption within Massachusetts and unable to be sold. This is the definition of a conflict.

And the effect of the Act's sales ban is uncontroverted on the record. For example, the record reflects instances where a farmer erred in denoting pigs as compliant to Triumph when they were not, resulting in USDA-inspected and passed pigs out for shipment being withdrawn from the market, wasting perfectly healthy, fresh pork. A113-14.[9] The FMIA was intended to overcome these burdens on interstate commerce by allowing USDA-approved product to ship interstate without interference.

Fifty different state preferences as to what type of meat is fit for human consumption, and 50 separate segregation and inspection

---

[9] For this reason, the court erred in its determination that "[t]here is nothing in the record to indicate that since the Act's enactment, obstacles have occurred in ensuring safe and healthy pork in the Massachusetts market through the FMIA." Add.68-69. Same with its conclusion that "slaughterhouses can easily comply with both federal requirements imposed by the Act because the Act does not impose any new requirements on slaughterhouses within the scope of the FMIA." Add.69.

processes to comply. The court's holding endorses this. This Court should reverse and direct judgment in favor of Appellants.

## IV. The Path Forward.

Given the court's several errors at a variety of procedural stages, the question then becomes how this Court should posture this case moving forward. The most straightforward option—and one that avoids much of the procedural morass—is for this Court to direct that judgment be entered for Appellants on either the FMIA preemption claim, or on the Farmer Appellants' direct-discrimination claim under the dormant Commerce Clause. That ruling would result in full judgment for Appellants. And let's pause for a moment to describe the effect of that ruling on the Act. Appellants seek, and have always sought, only to enjoin the Act's sales ban. Mass. Gen. Laws Ann. ch. 129 App., § 1-3. Any relief on appeal would have no impact on the Act's regulation of farming practices within Massachusetts, a position Appellants have never asserted. Mass. Gen. Laws Ann. ch. 129 App., § 1-5.

If this Court does not direct judgment, it should remand claims to the district court for further adjudication. To be sure, that could include both claims discussed above if this Court concluded that no party is

entitled to judgment and that a trial is necessary to resolve fact issues. A remand should also include all claims improperly dismissed under Rule 56(f) as well as the claims improperly dismissed without any basis at the beginning of the proceedings.

Finally, any remand for further proceedings should be mindful of the Appellants' request for a preliminary injunction. Although that request was consolidated with the merits of the case, that doesn't resolve the urgent issues and ongoing irreparable harm suffered by Appellants. Thus, if there is a remand for further proceedings, this Court should direct that a preliminary injunction issue for the pendency of those proceedings, or at least direct the court to promptly, and separately, adjudicate that request.

A preliminary injunction is certainly warranted[10] on this record. Plaintiffs' likelihood of success on the merits is established by the previous arguments *supra*. And even the temporary loss of a

---

[10] Based on the familiar four factors: (1) a likelihood of success on the merits; (2) the likelihood of irreparable harm absent interim relief; (3) a balance of equities in the plaintiff's favor; and (4) service of the public interest. *Cormier*, 51 F.4th at 5. "The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418 (2009).

constitutional right may be a form of irreparable harm if the "temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *See Public Service Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). That is the case here, and Appellants' briefing and evidence below established substantial tangible irreparable harm as well. A99-100, 105-107. And such harm caused by the substantial burden imposed on interstate commerce and additional deprivation of Constitutional rights remains ongoing, which Appellants were unable to submit evidence on due to the court's summary dismissal and *sua sponte* rulings in this case. Because the only "harm" Massachusetts will face is its inability to enforce an unconstitutional law that would wreak economic harm across the national supply chain, the balance of harms supports Appellants. Massachusetts' interests are not impeded by an injunction, as federal law exists to protect the health and safety of Massachusetts' consumers. On the other hand, the Act harms Massachusetts agencies, businesses, and communities, and will create a pork shortage within Massachusetts.

To be sure, there are many possible variations on the above possibilities for relief. But, what is abundantly clear is that this Court's intervention is urgently needed.

## CONCLUSION

This court should reverse and direct that judgment be entered in favor of Appellants. In the alternative, this Court should remand all Appellants' claims for further adjudication. In the event of remand for further proceedings, this Court should direct issuance of a preliminary injunction, or direct the court to promptly, and separately, adjudicate that motion.

Dated: September 20, 2024       Respectfully submitted,

*/s/ Michael T. Raupp*
MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER A. TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
spencer.tolson@huschblackwell.com

RYANN A. GLENN

HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
ryann.glenn@huschblackwell.com

*Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF COMPLIANCE**

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,890 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point type.

*/s/ Michael T. Raupp*
*Attorney for Appellants*
Dated: September 20, 2024

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this Friday, September 20, 2024 the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Michael T. Raupp*

69