No. 24-1759

In The

# United States Court of Appeals for the First Circuit

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. AND ALLIED PRODUCERS' COOPERATIVE, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS, AND ASHELY RANDLE, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS COMMISSIONER OF AGRICULTURE,

*Defendants-Appellants*,

On Appeal from the United States Court
for the District of Massachusetts

Case No. 1:23-cv-11671-WGY, The Honorable William G. Young

## APPELLANTS' APPENDIX
## Volume I of IX [A1 to A294]

RYANN A. GLENN
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
(402) 964-5000
ryann.glenn@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com

*Counsel to Appellants*

## TABLE OF CONTENTS

| Date | Doc. No. | Description | Page |
|---|---|---|---|
| | | **Volume I** | |
| N/A | | Docket Sheet | A1 |
| 7/31/2023 | 17 | Amended Complaint for Injunctive and Declaratory Relief | A22 |
| 8/7/2023 | 26 | Plaintiffs' Motion for Preliminary Injunction | A73 |
| 8/8/2023 | 27 | Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction | A80 |
| 8/8/2023 | 27-1 | Exhibit 1 – Declaration of Matthew England in Support of Plaintiffs' Motion for Preliminary Injunction | A103 |
| 8/8/2023 | 27-2 | Exhibit 2 – Declaration of New Fashion Pork LLP in Support of Plaintiffs' Motion for Preliminary Injunction | A116 |
| 8/8/2023 | 27-3 | Exhibit 3 – Declaration of Mauricio Diaz of The Hanor Company in Support of Plaintiffs' Motion for Preliminary Injunction | A124 |
| 8/8/2023 | 27-4 | Exhibit 4 – Declaration of Greg Howard of Christensen Farms Midwest, LLC in Support of Plaintiffs' Motion for Preliminary Injunction | A135 |
| 8/8/2023 | 27-5 | Exhibit 5 – Declaration of Kenny Brinker of Allied Producers' Cooperative in Support of Plaintiffs' Motion for Preliminary Injunction | A146 |
| 8/8/2023 | 27-6 | Exhibit 6 – Declaration of Eichelberger Farms, Inc. in Support of Plaintiffs' Motion for Preliminary Injunction | A153 |

| 8/8/2023 | 27-7 | Exhibit 7 – Declaration of Dr. Janeen Salak-Johnson, Ph.D., in Support of Plaintiffs' Motion for Preliminary Injunction | A161 |
|---|---|---|---|
| 8/8/2023 | 27-8 | Exhibit 8 – Declaration of Jayson L. Lusk, Ph.D. in Support of Plaintiffs' Motion for Preliminary Injunction | A197 |
| **Volume II** | | | |
| 8/23/2023 | 34 | Supplemental Declaration of Matthew England in Support of Plaintiffs' Motion for Preliminary Injunction | A295 |
| 8/25/2023 | 35 | Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction | A300 |
| 8/25/2023 | 35-1 | Declaration of Vanessa Arslanian with Exhibits 1-7 | A324 |
| 9/5/2023 | 38 | Reply Memorandum of Law in support of Plaintiffs' Motion for Preliminary Injunctions | A440 |
| 9/5/2023 | 38-1 | Declaration of Matthew England in Support of Plaintiffs' Reply Brief to Motion for Preliminary Injunction | A449 |
| 9/8/2023 | 40 | Transcript of 9/6/23 Preliminary Injunction Hearing | A453 |
| 9/14/2023 | 45 | Joint Status Report | A465 |
| 9/28/2023 | 53 | Defendants' Motion to Dismiss the Complaint | A475 |
| **Volume III** | | | |
| 9/28/2023 | 54 | Defendants' Memorandum in Support of Their Motion to Dismiss the Complaint | A478 |
| 9/28/2023 | 54-1 | Addendum to Memorandum | A501 |

| 9/29/2023 | 58 | Plaintiffs' Opposition and Memorandum of Reasons to Defendants' Motion to Dismiss the Complaint | A701 |
|---|---|---|---|
| 9/29/2023 | 58-1 | Exhibit 1 – Declaration of Kenny Brinker of allied Producers' Cooperative in Support of Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss | A728 |
| **Volume IV** | | | |
| 10/2/2023 | 64 | Parties' Joint Pretrial Memorandum | A730 |
| 10/2/2023 | 64-1 | Exhibit A – Joint Stipulated Statement of Facts (Draft) | A755 |
| 10/2/2023 | 64-2 | Exhibit B – Defendants' Witness List | A784 |
| 10/2/2023 | 64-3 | Exhibit B1 – Plaintiffs' Trial Witness List | A787 |
| 10/2/2023 | 64-4 | Exhibit C – Plaintiffs' Trial Exhibit List | A790 |
| 10/2/2023 | 64-5 | Exhibit D – Defendants' Exhibit List | A800 |
| 10/9/2023 | 68 | Answer | A802 |
| 10/10/2023 | 72 | Parties' Amended Joint Pretrial Memorandum | A805 |
| 10/10/2023 | 72-1 | Exhibit A – Plaintiffs' Proposed Joint Statement of Facts | A835 |
| 10/10/2023 | 73 | Plaintiffs' Trial Witness List | A863 |
| 10/10/2023 | 74 | Plaintiffs' Trial Exhibit List | A866 |
| 10/10/2023 | 74-1 | Exhibit A – Exhibit List | A868 |
| 10/10/2023 | 75 | Exhibit C – Defendants' Witness List | A877 |
| 10/10/2023 | 76 | Exhibit E – Defendants' Exhibit List | A881 |
| 10/12/2023 | 78 | Transcript of 10/2/23 Motion Hearing | A885 |

| 10/20/2023 | 80 | Defendants' Expedited Motion for Discovery Status Conference Via Telephone (Memorandum Incorporated) | A910 |
|---|---|---|---|
| 10/22/2023 | 81 | Plaintiffs' Motion for Entry of Expedited Protective Order | A917 |
| 10/22/2023 | 81-1 | Exhibit A – Proposed Protective Order | A921 |
| 10/22/2023 | 82 | Memorandum of Law in Support of Plaintiffs' Expedited Motion for Entry of Protective Order & Response in Opposition to Defendants' Expedited Motion for Discovery Status Conference | A939 |
| 10/22/2023 | 82-1 | Exhibit A - Plaintiffs' Proposed, Adjusted Discovery Schedule | A953 |
| 10/23/2023 | 83 | Opposition to Motion for Protective Order and Request to Enter Defendants' Exhibit A as the Pretrial Schedule | A955 |
| 10/23/2023 | 83-1 | Exhibit A - Defendants' Proposed Pre-Trial Schedule | A958 |
| 10/23/2023 | 83-2 | Exhibit B - Defendants' Redline to Plaintiffs' Pre-Trial Schedule | A960 |
| 10/25/2023 | 85 | Order adopting Plaintiffs' Case Management Schedule | A962 |
| 10/27/2023 | 86 | Plaintiffs' Request for Judicial Notice | A964 |
| 10/27/2023 | 86-1 | Exhibit 1 - Massachusetts Information for Voters 2016 Ballot Questions for State Election, published by Secretary of the Commonwealth | A970 |
| 10/27/2023 | 86-2 | Exhibit 2 - Quarterly Hogs and Pigs (December 2022), published by United States Department of Agriculture National Agricultural Statistics Service | A975 |

iv

| 10/27/2023 | 86-3 | Exhibit 3 - United States Department of Agriculture Food Safety and Inspection Service, FSIS DIRECTIVE 8010.1 Rev. 6 (June 3, 2022) | A992 |
|---|---|---|---|
| | | **Volume V** | |
| 10/27/2023 | 86-4 | Exhibit 4 - World Agricultural Supply and Demand Estimates, June 9, 2023, published by United States Department of Agriculture Economic Research Service | A1025 |
| 10/27/2023 | 86-5 | Exhibit 5 - Livestock and Meat Domestic Data, published by United States Department of Agriculture Economic Research Service, last updated September 27, 2023 | A1065 |
| 10/27/2023 | 86-6 | Exhibit 6 - State Population Totals and Components of Change: 2020-2022, published by U.S. Census Bureau | A1069 |
| 10/27/2023 | 86-7 | Exhibit 7 - *Dunn v. Att'y Gen.*, 474 Mass. 675, 54 N.E.3d 1 (2016) | A1074 |
| 10/27/2023 | 86-8 | Exhibit 8 - State Archive Massachusetts House, No. 3930 Initiative Petition of Carter J. Luke and others for the passage of An Act to Prevent Cruelty to Farm Animals | A1087 |
| 10/27/2023 | 86-9 | Exhibit 9 - H.R. January 7, 2016 Journal, 2016 Regular Sess. (Mass. 2016) | A1120 |
| 10/27/2023 | 86-10 | Exhibit 10 - S. January 7, 2016 Journal, 2016 Regular Sess. (Mass 2016) | A1125 |
| 10/27/2023 | 86-11 | Exhibit 11 - H.3930, 2015-2016 Leg., 189th Sess. (Mass 2015-2016) | A1130 |
| 10/27/2023 | 86-12 | Exhibit 12 - Hearing Summary, Joint Committee on Environmental & Natural Resources, Masstrac, February 11, 2016 | A1131 |

| | | | |
|---|---|---|---|
| 10/27/2023 | 86-13 | Exhibit 13 - Mass. Gen. Laws Ann. Ch. 129, *et seq.* | A1137 |
| 10/27/2023 | 86-14 | Exhibit 14 - 330 CMR 35.00, *et seq.* | A1151 |
| 10/27/2023 | 86-15 | Exhibit 15 - Chapter 333 of the Acts of 2016 | A1156 |
| 10/27/2023 | 86-16 | Exhibit 16 - Mass. Const. art. XLVIII, *et seq.* | A1162 |
| 10/27/2023 | 86-17 | Exhibit 17 - United States Department of Agriculture Sausage Operations (Mar. 9, 2020) https://www.fsis.usda.gov/sites/default/files/media_file/2021-03/FPLIC_4a_Sausage_Operations.pdf | A1175 |
| 10/27/2023 | 86-18 | Exhibit 18 - Andy Metzger, *Gobi on animal protection ballot question: 'We don't have factory farms in Mass.'* TELEGRAM & GAZETTE, Feb. 13, 2016 | A1308 |
| 10/27/2023 | 86-19 | Exhibit 19 - Andrea Shea, Containment of Farm Animals: A Primer on Question 3 in Mass. WBUR (Sept. 20, 2016) https://www.wbur.org/morningedition/2016/09/20/farmanimal-containment-ballot-question | A1312 |
| **Volume VI** | | | |
| 10/27/2023 | 86-20 | Exhibit 20 - Andy Metzger, *Necessity of Cage Protections for Mass. Farm Animals Questioned.* State House News (Feb. 11, 2016) http://www.statehousenews.com/archives/necessity-ofcage-protections-for-massfarm-animalsquestioned/article_6f36af0cd722-5eb9-a4bf-11e2d3d5af93.html | A1324 |
| 10/28/2023 | 87 | Plaintiffs' Motion for Partial Summary Judgment, Expedited Briefing Schedule and Oral Argument | A1328 |

| 10/28/2023 | 88 | Plaintiffs' Memorandum of Reasons in Support of Plaintiffs' Motion for Partial Summary Judgment | A1331 |
|---|---|---|---|
| 10/28/2023 | 89 | Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for Partial Summary Judgment | A1356 |
| 10/29/2023 | 91 | Defendants' Opposition to Plaintiffs' Request to Set Deadline of November 3, 2023, for Defendants to Oppose Plaintiffs' Motion for Partial Summary Judgment and Request to Set Opposition Deadline of November 7, 2023 | A1365 |
| 11/7/2023 | 94 | Defendants' Opposition to Plaintiffs' Motion for Partial Summary Judgment and Request for Entry of Summary Judgment in Favor of Defendants Pursuant to Fed. R. Civ. P. 56(f)(1) | A1369 |
| 11/7/2023 | 94-1 | The Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 | A1392 |
| 11/7/2023 | 94-2 | Affidavit of Vanessa Arslanian | A1407 |
| 11/12/2023 | 98 | Reply in Support of Plaintiffs' Motion for Partial Summary Judgment | A1415 |
| 12/1/2023 | 102 | Objection to Fed. R. Civ. P. Rule 56(f) Sua Sponte Ruling | A1440 |
| 12/4/2023 | 103 | Transcript of 11/14/23 Summary Judgment Hearing | A1450 |
| 12/5/2023 | 105 | Defendants' Response to Plaintiffs' Objection to the Court's Fed. R. Civ. P. 56(f)(1) Ruling and Request that the Court Construe and Deny as a Motion for Reconsideration | A1467 |
| 12/8/2023 | 106 | Plaintiffs' Response in Support of Rule 56(f) Objection and Response to ECF No. 105 | A1477 |

| 12/12/2023 | 107 | Joint Motion for Clarification & Expedited Status Conference | A1484 |
|---|---|---|---|
| 12/12/2023 | 107-1 | Attachment A – Partial Stipulation of Facts | A1489 |
| 12/12/2023 | 107-2 | Petition with House Bill 712 filed on 1/15/2015 | A1498 |
| 12/12/2023 | 107-3 | Exhibit 1 – Massachusetts Information for Voters 2016 Ballot Questions | A1502 |
| 12/12/2023 | 107-4 | Correspondence to Judge Healey providing comments on Chapter 333 of the Acts of 2016 dated 2/23/2021 | A1507 |
| 12/15/2023 | 109 | Defendants' Brief in Support of Entry of Judgment in Defendants' Favor on a Case Stated Record | A1509 |
| 12/15/2023 | 110 | Plaintiff's Case-Stated Briefing | A1529 |
| 12/16/2023 | 111 | Plaintiff's Amended Request for Judicial Notice | A1553 |
| 12/16/2023 | 111-7 | Exhibit 7 - MPI Directory – Massachusetts – Livestock Slaughter: Pork, USDA FSIS, https://www.fsis.usda.gov/inspection/establishments/meat-poultry-and-egg-productinspection-directory. | A1560 |
| 12/16/2023 | 111-8 | Exhibit 8 - United States Department of Agriculture Food Safety and Inspection Service, FSIS DIRECTIVE 6100.1 (May 07, 2020), https://www.fsis.usda.gov/policy/fsis-directives/6100.1 | A1561 |
| 12/16/2023 | 111-15 | Exhibit 15 - An Act to Promote Farm Viability, H.B. 712, 189th Leg. Sess. (Mass. 2015), https://malegislature.gov/Bills/189/H712/Bills | A1579 |
| 12/18/2023 | 114 | Defendants' Motion to Dismiss the Amended Complaint for Lack of Article III Jurisdiction | A1584 |

| 12/18/2023 | 115 | Defendants' Memorandum in Support of Their Motion to Dismiss the Amended Complaint for Lack of Article III Jurisdiction | A1587 |
|---|---|---|---|
| 12/18/2023 | 115-1 | Declaration of Maryanne Reynolds | A1599 |
| **Volume VII** | | | |
| 12/18/2023 | 115-2 | Exhibit A - Marketing Agreement, bearing Bates Numbering TF0002077-TF0002129) | A1601 |
| 12/26/2023 | 118 | Transcript of 12/19/23 Case-Stated Hearing | A1654 |
| 12/29/2023 | 120 | Declaration of Maryanne Reynolds | A1677 |
| 12/29/2023 | 120-1 | Exhibit B – Invoice bearing Bates Number TF0003471 | A1679 |
| 1/2/2024 | 121 | Plaintiff's Opposition to Motion to Dismiss | A1680 |
| 1/2/2024 | 121-1 | Declaration of Matthew England in Support of Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss for Lack of Standing | A1706 |
| 1/2/2024 | 121-2 | Declaration of McClain Southwell in Support of Plaintiff's Response in Opposition to Defendants' Motion to Dismiss for Lack of Standing | A1713 |
| 1/16/2024 | 124 | Defendants' Reply to Plaintiff Triumph Foods, LLC's Opposition to Defendants' Motion to Dismiss the Amended Complaint for Lack of Article III Jurisdiction | A1717 |
| 1/16/2024 | 124-1 | Exhibit A – Declaration of Maryanne Reynolds | A1726 |
| 3/6/2024 | 126 | Plaintiffs' Motion for Summary Judgment, Expedited Briefing Schedule and Request for Oral Argument | A1736 |
| 3/6/2024 | 127 | Plaintiffs' Memorandum of Reasons in Support of Plaintiffs' Motion for Summary Judgment | A1739 |

| 3/6/2024 | 127-1 | Declaration of Ryann A. Glenn in Support of Plaintiffs' Motion for Summary Judgment with Exhibit 1 - Excerpts of Defendants' Answers to Plaintiffs' First Set of Interrogatories dated November 10, 2023, and Exhibit 2 - H.R. Rep. No. 90-651, pt. 1 (1967). | A1767 |
| 3/6/2024 | 128 | Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment | A1859 |
| 4/5/2024 | 136 | Defendants' Cross-Motion for Summary Judgment | A1874 |
| **Volume VIII** | | | |
| 4/5/2024 | 137 | Defendants' Opposition to Plaintiffs' Motion for Summary Judgment and Memorandum of Law in Support of Defendants' Cross-Motion for Summary Judgment | A1877 |
| 4/5/2024 | 138 | Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment | A1900 |
| 4/5/2024 | 139 | Defendants' Responses to Plaintiffs' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 | A1909 |
| 4/5/2024 | 140 | Declaration of Vanessa Arslanian | A1937 |
| 4/5/2024 | 140-1 | Exhibit A – Excerpt, Hog Procurement Agreement (HPA) between Triumph Foods LLC and Christensen Farms Midwest, LLC | A1942 |
| 4/5/2024 | 140-2 | Exhibit B – New Fashion Pork, *Introducing Old Fashion Pork* (Sept. 27, 2016), https://app.nfpinc.com/aboutus/news-article-/2016/09/27/introducing-oldfashion-pork, last visited Apr. 5, 2024. | A1949 |
| 4/5/2024 | 140-3 | Exhibit C – New Fashion Pork, *Our Operations: Old Fashion Pork,* | A1951 |

| | | https://www.nfpinc.com/our-operations-1 (last visited Apr. 5, 2024). | |
|---|---|---|---|
| 4/5/2024 | 140-4 | Exhibit D – Global Animal Partnership, *5-Step Animal Welfare Standards for Pigs v2.5* (Aug. 1, 2022). | A1956 |
| 4/5/2024 | 140-5 | Exhibit E – Hanor Company Spreadsheet, File Name "RFP4_Types of Breeding-Gestation Sow Housing.xlsx" | A2008 |
| 4/5/2024 | 140-8 | Exhibit H – Redacted Invoice dated Aug. 28, 2023 | A2010 |
| 4/5/2024 | 140-9 | Exhibit I – Redacted Invoice dated Sept. 11, 2023 | A2013 |
| 4/5/2024 | 140-10 | Exhibit J – Redacted Invoice dated Sept. 25, 2023 | A2015 |
| 4/5/2024 | 140-15 | Exhibit O – Redacted New Fashion Pork Breeding Pig Housing Types | A2017 |
| 4/5/2024 | 140-16 | Exhibit P – Redacted Eichelberger Farms, Inc. Schedule of Sow Gestation Housing Method by Farm | A2019 |
| 4/5/2024 | 140-17 | Exhibit Q – Excerpt, Excel spreadsheet, Triumph Foods Weekly Product Revenue Download (Cols. A – M only) | A2021 |
| 4/5/2024 | 140-18 | Exhibit R – Joint Stipulation, *Mass. Rest. Ass'n et al. v. Campbell et al.*, C.A. No. 22-cv-11245-MRG (Aug. 4, 2023), ECF No. 21 | A2041 |
| 4/5/2024 | 140-19 | Exhibit S – Triumph Foods Sustainability Report | A2048 |
| 4/5/2024 | 140-20 | Exhibit T – Cox, Elizabeth, *Lessons About Proposition 12 from Recent Pork Producer Visits*, California Department of Food & Agriculture (July 2022) | A2065 |

| 4/5/2024 | 140-21 | Exhibit U – Excerpt of 2016 Certified Election Results (Massachusetts) | A2070 |
|---|---|---|---|
| 4/5/2024 | 140-22 | Exhibit V – Mass. Gen. Laws c. 129 App. §§ 1-1 *et seq.* | A2075 |
| 4/5/2024 | 140-23 | Exhibit W – 330 Code Mass. Regs. § 35.00 *et seq.* | A2092 |
| 4/5/2024 | 140-24 | Exhibit X – Excerpt, Amended Joint Pre-Trial Memorandum | A2098 |
| 4/5/2024 | 140-28 | Exhibit AB – Prop 12 Load Card | A2102 |
| 4/5/2024 | 140-29 | Exhibit AC – Photograph, Pigs in Gestation Crates | A2103 |
| 4/5/2024 | 140-30 | Exhibit AD – Excerpt, Plaintiffs' Reply in Support of its Motion for Summary Judgment | A2105 |
| 4/5/2024 | 140-31 | Exhibit AE – Prop 12 – Sow Housing Guide | A2109 |
| 4/5/2024 | 140-32 | Exhibit AF – United States Department of Agriculture, Food Safety & Inspection Service, *Inspected Establishments: Triumph Foods LLC*, https://www.fsis.usda.gov/inspection/fsis-inspectedestablishments/triumph-foods-llc (last visited Apr. 5, 2024) | A2112 |
| 4/5/2024 | 140-33 | Exhibit AG – United States Department of Agriculture, Agricultural Marketing Service, *Seaboard Foods Process Verified Program*, https://www.ams.usda.gov/content/seaboard-foodsprocess-verified-program (last visited Apr. 5, 2024). | A2117 |
| 4/5/2024 | 140-34 | Exhibit AH – National Pork Producers Council, *Infographic: Swine Traceability* (2024), https://nppc.org/wpcontent/uploads/2024/04/Swine-Traceability-Infographic.pdf (last visited Apr. 5, 2024). | A2120 |

| | | | |
|---|---|---|---|
| 4/5/2024 | 140-35 | Exhibit AI – Excerpt, Plaintiffs' Answers to Defendants' First Interrogatories | A2122 |
| 4/5/2024 | 140-36 | Exhibit AJ – Excerpt, Declaration of Alice M. Thaler in Supp. of Defs' Mot. for Summ. J., *ALDF v. U.S. Dep't of Ag.*, No. 12-cv-04028, C.D. Cal. | A2129 |
| **Volume IX** | | | |
| 4/26/2024 | 157 | Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment | A2134 |
| 4/26/2024 | 158 | Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Summary Judgment | A2149 |
| 5/10/2024 | 165 | Defendants' Reply in Support of Defendants' Cross-Motion for Summary Judgment and Request to Reinstate Dismissal of Plaintiffs' Preemption Claim | A2164 |
| 7/2/2024 | 169 | Transcript of 5/15/24 Summary Judgment Hearing | A2176 |
| 8/13/2024 | 173 | Plaintiffs' Notice of Appeal | A2197 |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this Friday, September 20, 2024 the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.


*/s/ Michael T. Raupp*

Query    Reports    Utilities    Help    Log Out

<span style="color:green">APPEAL</span>

# United States District Court
# District of Massachusetts (Boston)
# CIVIL DOCKET FOR CASE #: 1:23-cv-11671-WGY

Triumph Foods, LLC et al v. Campbell et al
Assigned to: Judge William G. Young
Case in other court:  USCA - First Circuit, 24-01759
Cause: Constitutionality of State Statutes

Date Filed: 07/25/2023
Date Terminated: 07/22/2024
Jury Demand: None
Nature of Suit: 950 Constitutional - State Statute
Jurisdiction: Federal Question

## Plaintiff

**Triumph Foods, LLC**
*Individually and on Behalf of Its Members*

represented by **Robert L. Peabody**
Husch Blackwell LLP
One Congess Street
Suite 3120
Boston, MA 02108
617-598-6732
Fax: 617-720-5092
Email: robert.peabody@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryann Glenn**
Husch Blackwell LLP
14606 Branch Street
Suite 200
Omaha, NE 68154
402-964-5000
Email: ryann.glenn@huschblackwell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
Husch Blackwell LLP
4801 Main Street
Suite 1000
Kansas City, MO 64112
816-983-8381
Fax: 816-983-8080
Email: cynthia.cordes@huschblackwell.com
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
Husch Blackwell LLP
4801 Main St.
Suite 1000
Kansas City, MO 64112
816-983-8324
Email: michael.raupp@huschblackwell.com
*ATTORNEY TO BE NOTICED*

## Plaintiff

**A1**

**Christensen Farms Midwest, LLC**
*Individually and on Behalf of Its Members*

represented by **Robert L. Peabody**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryann Glenn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**The Hanor Company of Wisconsin, LLC**
*Individually and on Behalf of Its Members*

represented by **Robert L. Peabody**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryann Glenn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**New Fashion Pork, LLC**
*Individually and on Behalf of Its Members*

represented by **Robert L. Peabody**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryann Glenn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Eichelberger Farms, Inc.**
*Individually and on Behalf of Its Members*

represented by **Robert L. Peabody**
(See above for address)

**A2**

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryann Glenn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

| | | |
|---|---|---|
| **Allied Producers' Cooperative**<br>*Individually and on Behalf of Its Members* | represented by | **Robert L. Peabody**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Ryann Glenn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cynthia Cordes**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Thomas Raupp**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Andrea Joy Campbell**<br>*Attorney General of Massachusetts* | represented by | **Maryanne Reynolds**<br>Office of the Attorney General<br>One Ashburton Place<br>Boston, MA 02108<br>774-214-4407<br>Email: maryanne.reynolds@state.ma.us<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Grace Gohlke**
Massachusetts Attorney General's Office
McCormack Building
One Ashburton Place
Boston, MA 02108
617-963-2527
Email: grace.gohlke@mass.gov
*ATTORNEY TO BE NOTICED*

**Vanessa Azniv Arslanian**
Office of Massachusetts Attorney General
1 Ashburton Place

**A3**

Boston, MA 02108
617-963-2107
Email: vanessa.arslanian@mass.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ashley Randle**
*Massachusetts Commissioner of Agriculture*

represented by **Maryanne Reynolds**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grace Gohlke**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Vanessa Azniv Arslanian**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Humane Society of the United States, The**

represented by **Kimberly D. Ockene**
The Humane Society of the United States
2100 L Street, NW
Washington, DC 20009
202-285-1388
Email: kockene@humanesociety.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**Animal Legal Defense Fund**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Animal Equality**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Humane League**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Farm Sanctuary**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Compassion in World Farming USA**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**Animal Outlook**

represented by **Kimberly D. Ockene**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A4**

**Amicus**

**State of Iowa**                                  represented by **David M. Jellinek**
                                                   Law Office of David Jellinek
                                                   Suite 1
                                                   1163 Walnut Street
                                                   Newton, MA 02461
                                                   857-234-0135
                                                   Email: jellinek@djellineklaw.com
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Eric H Wessan**
                                                   Iowa Department of Justice
                                                   Solicitor General
                                                   1305 Walnut St.
                                                   Des Moines, IA 50319
                                                   515-823-9117
                                                   Email: eric.wessan@ag.iowa.gov
                                                   *ATTORNEY TO BE NOTICED*

**Amicus**

**Animal Wellness Action**                         represented by **Adam F. Keats**
                                                   Law Office of Adam Keats
                                                   2489 Mission St Ste 16
                                                   San Francisco, CA 94110
                                                   415-964-0070
                                                   Email: adam@keatslaw.org
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Jessica L. Blome**
                                                   Greenfire Law, PC
                                                   2478 Adeline St.
                                                   Suite A
                                                   Berkeley, CA 94703
                                                   510-900-9502
                                                   Fax: 510-900-9502
                                                   Email: jblome@greenfirelaw.com
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Amicus**

**Animal Wellness Foundation**                     represented by **Adam F. Keats**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Jessica L. Blome**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

**Amicus**

**Center for a Humane Economy**                    represented by **Adam F. Keats**
                                                   (See above for address)
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

                                                   **Jessica L. Blome**

**A5**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Email All Attorneys
Email All Attorneys and Additional Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 07/25/2023 | 1 | COMPLAINT against All Defendants Filing fee: $ 402, receipt number AMADC-9963211 (Fee Status: Filing Fee paid), filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Category Form Category Form)(Peabody, Robert) (Entered: 07/25/2023) |
| 07/25/2023 | 2 | NOTICE of Appearance by Robert L. Peabody on behalf of Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC (Peabody, Robert) (Entered: 07/25/2023) |
| 07/25/2023 | 3 | MOTION for Leave to File *Plaintiffs' Complaint for Injunctive and Declaratory Relief Under Seal* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Peabody, Robert) (Entered: 07/25/2023) |
| 07/25/2023 | 4 | MEMORANDUM in Support re 3 MOTION for Leave to File *Plaintiffs' Complaint for Injunctive and Declaratory Relief Under Seal* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Peabody, Robert) (Entered: 07/25/2023) |
| 07/26/2023 | 5 | ELECTRONIC NOTICE of Case Assignment. Judge William G. Young assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Paul G. Levenson. (Cook, Savannah) (Entered: 07/26/2023) |
| 07/26/2023 | 6 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (Quilter, Madison) (Entered: 07/26/2023) |
| 07/26/2023 | 7 | MOTION for Leave to Appear Pro Hac Vice for admission of Ryann A. Glenn Filing fee: $ 125, receipt number AMADC-9965108 by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Peabody, Robert) (Additional attachment(s) added on 7/27/2023: # 1 Exhibit A) (Paine, Matthew). (Main Document 7 replaced on 7/27/2023) (Paine, Matthew).\n\n**Modified on 7/27/2023 to Correct PDF as Counsel Incorrectly Filed the Motion and Exhibit as One Long PDF File (Paine, Matthew).**\n\n(Entered: 07/26/2023) |
| 07/26/2023 | 8 | MOTION for Leave to Appear Pro Hac Vice for admission of Michael T. Raupp Filing fee: $ 125, receipt number AMADC-9965110 by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Peabody, Robert) (Additional attachment(s) added on 7/27/2023: # 1 Exhibit A) (Paine, Matthew). (Main Document 8 replaced on 7/27/2023) (Paine, Matthew).\n\n**Modified on 7/27/2023 to Correct PDF as Counsel Incorrectly Filed the Motion and Exhibit as One Long PDF File (Paine, Matthew).**\n\n(Entered: 07/26/2023) |
| 07/27/2023 | 9 | Judge William G. Young: ELECTRONIC ORDER entered granting 7 Motion for Leave to Appear Pro Hac Vice Added Ryann A. Glenn. |

**A6**

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(Paine, Matthew) (Entered: 07/27/2023)

| | | |
|---|---|---|
| 07/27/2023 | 10 | Judge William G. Young: ELECTRONIC ORDER entered granting 8 Motion for Leave to Appear Pro Hac Vice Added Michael T. Raupp.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 07/27/2023) |
| 07/27/2023 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Cynthia L. Cordes Filing fee: $ 125, receipt number AMADC-9965423 by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Peabody, Robert) (Additional attachment(s) added on 7/27/2023: # 1 Exhibit A) (Paine, Matthew) (Main Document 11 replaced on 7/27/2023) (Paine, Matthew).<br><br>**Modified on 7/27/2023 to Correct PDF as Counsel Incorrectly Filed the Motion and Exhibit as One Long PDF File (Paine, Matthew).**<br><br>(Entered: 07/27/2023) |
| 07/27/2023 | 12 | Judge William G. Young: ELECTRONIC ORDER entered granting 11 Motion for Leave to Appear Pro Hac Vice Added Cynthia L. Cordes.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 07/27/2023) |
| 07/28/2023 | 13 | Judge William G. Young: ELECTRONIC ORDER entered denying 3 MOTION for Leave to File Plaintiffs' Complaint for Injunctive and Declaratory Relief Under Seal (Paine, Matthew) (Entered: 07/28/2023) |
| 07/28/2023 | 14 | NOTICE of Appearance by Ryann Glenn on behalf of Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC (Glenn, Ryann) (Entered: 07/28/2023) |
| 07/28/2023 | 15 | NOTICE of Appearance by Cynthia Cordes on behalf of Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of |

**A7**

| | | Wisconsin, LLC, Triumph Foods, LLC (Cordes, Cynthia) (Entered: 07/28/2023) |
|---|---|---|
| 07/28/2023 | 16 | NOTICE of Appearance by Michael Thomas Raupp on behalf of Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC (Raupp, Michael) (Entered: 07/28/2023) |
| 07/31/2023 | 17 | AMENDED COMPLAINT against All Defendants, filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 07/31/2023) |
| 08/03/2023 | 18 | NOTICE of Appearance by Maryanne Reynolds on behalf of Andrea Joy Campbell, Ashley Randle (Reynolds, Maryanne) (Entered: 08/03/2023) |
| 08/03/2023 | 19 | WAIVER OF SERVICE Returned Executed by Allied Producers' Cooperative, The Hanor Company of Wisconsin, LLC, Christensen Farms Midwest, LLC, New Fashion Pork, LLC, Triumph Foods, LLC, Eichelberger Farms, Inc.. Andrea Joy Campbell waiver sent on 7/31/2023, answer due 10/1/2023. (Glenn, Ryann) **Modified on 8/3/2023 to Correct Docket Text/Answer Date as Counsel Glenn Entered the Wrong Waiver Date as to the Defendant (Paine, Matthew).** (Entered: 08/03/2023) |
| 08/03/2023 | 20 | WAIVER OF SERVICE Returned Executed by Allied Producers' Cooperative, The Hanor Company of Wisconsin, LLC, Christensen Farms Midwest, LLC, New Fashion Pork, LLC, Triumph Foods, LLC, Eichelberger Farms, Inc.. Ashley Randle waiver sent on 7/31/2023, answer due 10/1/2023. (Glenn, Ryann) **Modified on 8/3/2023 Correct Docket Text/Answer Date as Counsel Glenn Entered the Wrong Waiver Date as to the Defendant (Paine, Matthew).** (Entered: 08/03/2023) |
| 08/03/2023 | 21 | NOTICE of Appearance by Grace Gohlke on behalf of Andrea Joy Campbell, Ashley Randle (Gohlke, Grace) (Entered: 08/03/2023) |
| 08/03/2023 | 22 | NOTICE of Appearance by Vanessa Azniv Arslanian on behalf of Andrea Joy Campbell, Ashley Randle (Arslanian, Vanessa) (Entered: 08/03/2023) |
| 08/03/2023 | 23 | Reset Answer/Response Deadlines: Andrea Joy Campbell 10/1/2023; Ashley Randle 10/1/2023. (Paine, Matthew) (Entered: 08/03/2023) |
| 08/03/2023 | 24 | Joint MOTION for Leave to File Excess Pages by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 08/03/2023) |
| 08/04/2023 | 25 | Judge William G. Young: ELECTRONIC ORDER entered denying 24 Joint Motion for Leave to File Excess Pages. (Gaudet, Jennifer) (Entered: 08/04/2023) |
| 08/07/2023 | 26 | MOTION for Preliminary Injunction by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 08/08/2023) |
| 08/08/2023 | 27 | MEMORANDUM in Support re 26 MOTION for Preliminary Injunction filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. 1 - Declaration of Matt England, # 2 Exhibit Ex. 2 - Declaration of New Fashion Pork, # 3 Exhibit Ex. 3 - Declaration of Hanor Company, # 4 Exhibit Ex. 4 - Declaration of Christensen Farms, # 5 Exhibit Ex. 5 - Declaration of Allied Producers' Cooperative, # 6 Exhibit Ex. 6 - Declaration of Eichelberger Farms, # 7 Exhibit Ex. 7 - Declaration of Dr. Salak-Johnson, # 8 Exhibit Ex. 8 - Declaration of Dr. Jayson Lusk)(Glenn, Ryann) (Entered: 08/08/2023) |
| 08/08/2023 | 28 | ELECTRONIC NOTICE Setting Hearing on Motion 26 MOTION for Preliminary Injunction : Motion Hearing (non-evidentiary) set for 9/6/2023 at 10:00 AM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 08/08/2023) |

**A8**

| 08/17/2023 | 29 | MOTION for Extension of Time to August 25, 2023 to Respond to Motion for Preliminary Injunction by Andrea Joy Campbell, Ashley Randle.(Reynolds, Maryanne) Modified on 8/18/2023 to correct event (Gaudet, Jennifer). (Entered: 08/17/2023) |
|---|---|---|
| 08/18/2023 | 30 | Judge William G. Young: ELECTRONIC ORDER entered granting 29 MOTION for Extension of Time to File Response/Reply, 26 MOTION for Preliminary Injunction . Response due on or by 8/25/2023. (Gaudet, Jennifer) (Entered: 08/18/2023) |
| 08/23/2023 | 31 | CORPORATE DISCLOSURE STATEMENT by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 08/23/2023) |
| 08/23/2023 | 32 | MOTION to Intervene by Humane Society of the United States, The, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming USA, Animal Outlook. (Attachments: # 1 [Proposed] Defendant-Intervenors' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction)(Ockene, Kimberly) (Entered: 08/23/2023) |
| 08/23/2023 | 33 | MEMORANDUM in Support re 32 MOTION to Intervene filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League. (Attachments: # 1 Declaration of Chris Holbein, # 2 Declaration of Kera Melrose, # 3 Declaration of Hannah Truxell, # 4 Declaration of Benjamin Williamson, # 5 Declaration of Cheryl Leahy, # 6 Declaration of Gene Baur, # 7 Declaration of Sarah Hanneken)(Ockene, Kimberly) (Entered: 08/23/2023) |
| 08/23/2023 | 34 | DECLARATION re 27 Memorandum in Support of Motion,,, *Supplemental Declaration* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 08/23/2023) |
| 08/25/2023 | 35 | Opposition re 26 MOTION for Preliminary Injunction filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Affidavit of Vanessa Arslanian)(Gohlke, Grace) (Entered: 08/25/2023) |
| 09/01/2023 | 36 | Assented to MOTION for Leave to File *Reply Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Exhibit A - Proposed Reply Memorandum iso Plaintiffs' Motion for Preliminary Injunction, # 2 Exhibit Exhibit 1 - Declaration of Matthew England iso Proposed Reply Memorandum)(Glenn, Ryann) (Entered: 09/01/2023) |
| 09/05/2023 | 37 | Judge William G. Young: ELECTRONIC ORDER entered granting 36 Assented to MOTION for Leave to File Reply Memorandum ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 09/05/2023) |
| 09/05/2023 | 38 | REPLY to Response to 26 MOTION for Preliminary Injunction *Leave to File Granted on September 5, 2023* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Exhibit 1 - Declaration of Matt England)(Glenn, Ryann) (Main Document 38 replaced on 9/5/2023) (Paine, Matthew). (Entered: 09/05/2023) |
| 09/06/2023 | 39 | Opposition re 32 MOTION to Intervene filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 09/06/2023) |
| 09/06/2023 | 42 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 9/6/2023 re 26 MOTION for Preliminary Injunction filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. The Court enters an order collapsing 26 Motion for Preliminary Injunction with trial on the merits in accordance with Rule 65(a)(1). Further hearing set for October 10, 2023 at 2:00 PM. The Court will proceed case stated if the parties agree. Counsel shall notify the Court on how they wish to proceed. (Hearing set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.) (Court Reporter: Richard Romanow |

| | | at bulldog@richromanow.com.)(Attorneys present: Attorneys Peabody, Glenn, Cordes and Raupp for the plaintiffs and Attorneys Arslanian and Gohlke for the defendants) (Gaudet, Jennifer) (Entered: 09/12/2023) |
|---|---|---|
| 09/08/2023 | 40 | Transcript of Motion Hearing held on September 6, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at bulldog@richromanow.com. Redaction Request due 9/29/2023. Redacted Transcript Deadline set for 10/10/2023. Release of Transcript Restriction set for 12/7/2023. (McDonagh, Christina) (Entered: 09/08/2023) |
| 09/08/2023 | 41 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 09/08/2023) |
| 09/13/2023 | 43 | MOTION for Leave to File *Reply Memorandum of Law in Support of Proposed Defendant-Intervenors' Motion to Intervene* by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League. (Attachments: # 1 Exhibit A - [Proposed] Reply Memorandum)(Ockene, Kimberly) (Entered: 09/13/2023) |
| 09/14/2023 | 44 | Judge William G. Young: ELECTRONIC ORDER entered granting 43 Motion for Leave to File Reply Memorandum of Law in Support of Proposed Defendant-Intervenors' Motion to Intervene by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 09/14/2023) |
| 09/14/2023 | 45 | STATUS REPORT *(Joint)* by Andrea Joy Campbell, Ashley Randle. (Arslanian, Vanessa) (Entered: 09/14/2023) |
| 09/14/2023 | 46 | MOTION to Set Briefing Schedule and Request for Hearing on Motion to Dismiss, and to Continue Proceedings Under Fed. R. Civ. P. 65(a)(2) by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Text of Proposed Order)(Arslanian, Vanessa) (Entered: 09/14/2023) |
| 09/18/2023 | 47 | REPLY to Response to 32 MOTION to Intervene filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League. (Ockene, Kimberly)<br><br>**Modified on 9/27/2023 to Correct Docket Text and CM/ECF Filing Event (Paine, Matthew).**<br><br>(Entered: 09/18/2023) |
| 09/19/2023 | 48 | Judge William G. Young: ELECTRONIC ORDER entered re 45 Joint Status Report. **The defendants shall file their motion to dismiss no later than Thursday, September 28, 2023 by 12:00 noon. The Court will hear argument on the motion at 3:00 PM, Monday, October 2, 2023. Should the motion be denied in whole or in part, the Court will proceed at once to hold a final pre-trial conference. At that time the Court will resolve the issues remaining herein.** (Motion Hearing set for 10/2/2023 03:00 PM in Courtroom 18 (In person only) before Judge William G. Young.)(Gaudet, Jennifer) (Entered: 09/19/2023) |
| 09/19/2023 | 49 | Judge William G. Young: ELECTRONIC ORDER entered finding as moot 46 Motion to Set Briefing Schedule and Request for Hearing on Motion to Dismiss, and to Continue Proceedings Under Fed. R. Civ. P. 65(a)(2) by Andrea Joy Campbell, Ashley Randle. *See Order entered 9/19/2023. Docket entry 48 .* (Gaudet, Jennifer) (Entered: 09/19/2023) |
| 09/19/2023 | 50 | Judge William G. Young: ELECTRONIC ORDER entered denying 32 Motion to Intervene.<br><br>The motion to intervene is denied as it appears the proposed intervenors' interests are adequately represented by the Commonwealth defendants. |

**A10**

| | | The Court welcomes the proposed intervenors as amici curiae. They shall receive notice of all filings in this case and may submit briefs on every issue. |
| | | Should it become apparent that the Court needs to receive evidence in this case about genuinely disputed facts, the Court will reconsider this ruling sua sponte. |
| | | (Gaudet, Jennifer) (Entered: 09/19/2023) |
| 09/25/2023 | 51 | MOTION to File the Joint Pre-Trial Memorandum by 12 p.m. on October 2, 2023 and Permit Its Supplementation by Andrea Joy Campbell, Ashley Randle.(Arslanian, Vanessa) (Entered: 09/25/2023) |
| 09/26/2023 | 52 | Judge William G. Young: ELECTRONIC ORDER entered re 51 MOTION to File the Joint Pre-Trial Memorandum by 12 p.m. on October 2, 2023 and Permit Its Supplementation (Paine, Matthew) **The defendants may file their joint pre-trial memorandum at the time of the final pre-trial conference and may, at the conference, request supplementation.** (Entered: 09/26/2023) |
| 09/28/2023 | 53 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* by Andrea Joy Campbell, Ashley Randle.(Gohlke, Grace) (Entered: 09/28/2023) |
| 09/28/2023 | 54 | MEMORANDUM in Support re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Addendum)(Gohlke, Grace) (Attachment 1 replaced on 9/28/2023) (Gaudet, Jennifer). (Entered: 09/28/2023) |
| 09/28/2023 | 55 | ELECTRONIC NOTICE issued requesting courtesy copy for 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction*, 54 Memorandum in Support of Motion,. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 09/28/2023) |
| 09/28/2023 | 56 | AMICUS BRIEF filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League *IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS*. (Ockene, Kimberly) (Entered: 09/28/2023) |
| 09/29/2023 | 57 | ELECTRONIC NOTICE Setting Hearing on Motion 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* : Motion Hearing set for 10/2/2023 03:00 PM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 09/29/2023) |
| 09/29/2023 | 58 | MEMORANDUM in Opposition re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. 1 - Declaration of Kenny Brinker of APC)(Glenn, Ryann) (Entered: 09/29/2023) |
| 10/02/2023 | 59 | NOTICE of Appearance by David M. Jellinek on behalf of State of Iowa (Jellinek, David) (Entered: 10/02/2023) |
| 10/02/2023 | 60 | NOTICE of Appearance by David M. Jellinek on behalf of State of Iowa (Jellinek, David) (Entered: 10/02/2023) |
| 10/02/2023 | 61 | NOTICE of Appearance by David M. Jellinek on behalf of State of Iowa (Jellinek, David) (Entered: 10/02/2023) |
| 10/02/2023 | 62 | First MOTION for Leave to Appear Pro Hac Vice for admission of Eric Wessan by State of Iowa. (Jellinek, David) (Entered: 10/02/2023) |
| 10/02/2023 | 63 | NOTICE OF ATTORNEY PAYMENT OF FEES by Amicus State of Iowa. Filing fee $ 125, receipt number AMADC-10064064. Payment Type : PRO HAC VICE. (Jellinek, David) (Entered: |

**A11**

| | | 10/02/2023) |
|---|---|---|
| 10/02/2023 | 64 | PRETRIAL MEMORANDUM by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. A - Joint Statement of Facts, # 2 Exhibit Ex. B - Defendants' Trial Witness List, # 3 Exhibit Ex. B1 - Plaintiffs' Trial Witness List, # 4 Exhibit Ex. C - Plaintiffs' Trial Exhibit List, # 5 Exhibit Ex. D - Defendants' Trial Exhibit List)(Glenn, Ryann) (Entered: 10/02/2023) |
| 10/02/2023 | 66 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 10/2/2023 re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* filed by Ashley Randle, Andrea Joy Campbell. After hearing arguments of counsel, the Court enters an order granting in part and denying in part 53 Motion to Dismiss for Failure to State a Claim; the motion is denied as to count 1 (commerce clause) and granted as to all other counts. A final pretrial conference is set for Tuesday, October 10, 2023 at 10:00 AM. (Final Pretrial Conference set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.); ( Final Pretrial Conference set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.). (Court Reporter: Richard Romanow at rhrbulldog@aol.com.) (Gaudet, Jennifer) (Entered: 10/06/2023) |
| 10/06/2023 | 65 | Judge William G. Young: ELECTRONIC ORDER entered granting 62 Motion for Leave to Appear Pro Hac Vice Added Eric Wessan.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 10/06/2023) |
| 10/06/2023 | 67 | ELECTRONIC NOTICE OF RESCHEDULING Final Pretrial Conference reset for 10/10/2023 01:45 PM in Courtroom 18 (In person only) before Judge William G. Young. **Time change only.** (Gaudet, Jennifer) (Entered: 10/06/2023) |
| 10/09/2023 | 68 | ANSWER to 17 Amended Complaint by Andrea Joy Campbell, Ashley Randle.(Reynolds, Maryanne) (Entered: 10/09/2023) |
| 10/10/2023 | 69 | NOTICE of Appearance by Eric H Wessan on behalf of State of Iowa (Wessan, Eric) (Entered: 10/10/2023) |
| 10/10/2023 | 70 | MOTION for Leave to File *Amicus Curiae Brief* by State of Iowa.(Wessan, Eric) (Entered: 10/10/2023) |
| 10/10/2023 | 71 | AMICUS BRIEF filed by State of Iowa . (Wessan, Eric)<br><br>**FILED IN VIOLATION OF COURT RULES AND CM/ECF NEXTGEN ADMINISTRATIVE PROCEDURES - SECTION R**<br><br>(Entered: 10/10/2023) |
| 10/10/2023 | 72 | PRETRIAL MEMORANDUM by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. A - Plaintiffs' Proposed Joint Statement of Facts)(Glenn, Ryann) (Entered: 10/10/2023) |
| 10/10/2023 | 73 | *Plaintiffs' Trial* Witness List by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 10/10/2023) |

**A12**

| 10/10/2023 | 74 | *Plaintiffs' Trial* Exhibit List by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.. (Attachments: # 1 Exhibit Ex. A - Plaintiffs' Trial Exhibit List)(Glenn, Ryann) (Entered: 10/10/2023) |
|---|---|---|
| 10/10/2023 | 75 | *Defendants'* Witness List by Andrea Joy Campbell, Ashley Randle. (Gohlke, Grace) (Entered: 10/10/2023) |
| 10/10/2023 | 76 | *Defendants' Proposed* Exhibit List by Andrea Joy Campbell, Ashley Randle.. (Gohlke, Grace) (Entered: 10/10/2023) |
| 10/10/2023 | 77 | MOTION for Leave to File *Amicus Curiae Brief* by State of Iowa.(Wessan, Eric) (Additional attachment(s) added on 10/10/2023: # 1 Exhibit Proposed Amicus Curiae Brief) (Paine, Matthew). (Main Document 77 replaced on 10/10/2023) (Paine, Matthew). Modified on 10/10/2023 to Correct PDF File As Counsel Wessan Filed the Motion and Proposed Brief as One Long PDF File. (Paine, Matthew). (Entered: 10/10/2023) |
| 10/10/2023 | 84 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Final Pretrial Conference held on 10/10/2023 (jury room). The Court reviews pretrial memo wtih counsel. The bench trial to commence on Monday, December 4, 2023 at 9:00 AM and to take no longer than seven (7) days sitting 9:00 AM -1:00 PM. Counsel shall amend deadlines to reflect December 4, 2023 trial date. The Court enters an order granting 77 Motion for Leave to File Amicus Curiae Brief by State of Iowa; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Bench Trial Day One set for 12/4/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Day Two set for 12/5/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Three set for 12/7/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Day Four set for 12/8/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Day Five set for 12/11/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Day Six set for 12/13/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young; Bench Trial Day Seven set for 12/14/2023 09:00 AM in Courtroom 18 (In person only) before Judge William G. Young.) (Court Reporter: None.) (Gaudet, Jennifer) (Entered: 10/25/2023) |
| 10/12/2023 | 78 | Transcript of Motion Hearing held on October 2, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 11/2/2023. Redacted Transcript Deadline set for 11/13/2023. Release of Transcript Restriction set for 1/10/2024. (McDonagh, Christina) (Main Document 78 replaced on 10/12/2023) (McDonagh, Christina). (Entered: 10/12/2023) |
| 10/12/2023 | 79 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 10/12/2023) |
| 10/20/2023 | 80 | Emergency MOTION for Discovery *Schedule Conference (Remote)* by Andrea Joy Campbell, Ashley Randle.(Reynolds, Maryanne) (Entered: 10/20/2023) |
| 10/22/2023 | 81 | MOTION for Protective Order by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. A - Proposed Protective Order)(Glenn, Ryann) (Entered: 10/22/2023) |
| 10/22/2023 | 82 | MEMORANDUM in Support re 81 MOTION for Protective Order , 80 Emergency MOTION for Discovery *Schedule Conference (Remote)* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. A - Plaintiffs' Proposed, Adjusted Discovery Schedule)(Glenn, Ryann) (Entered: 10/22/2023) |
| 10/23/2023 | 83 | Opposition re 81 MOTION for Protective Order filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Exhibit A - Defendants' Proposed Schedule, # 2 Exhibit B - Defendants' Redline of |

**A13**

| | | |
|---|---|---|
| | | Plaintiffs' Proposed Schedule)(Arslanian, Vanessa) (Entered: 10/23/2023) |
| 10/25/2023 | 85 | Judge William G. Young: ORDER entered. (Sonnenberg, Elizabeth) (Entered: 10/25/2023) |
| 10/27/2023 | 86 | Request for Judicial Notice by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit Ex. 1 - Massachusetts 2016 Voter Information, # 2 Exhibit Ex. 2 - Dec. 2022 Quarterly Hogs and Pigs, # 3 Exhibit Ex. 3 - FSIS DIRECTIVE 80101.1, # 4 Exhibit Ex. 4 - World Ag Supply & Demand Estimates, # 5 Exhibit Ex. 5 - Livestock and Meat Domestic Data, # 6 Exhibit Ex. 6 - 2020-2022 State Population Totals, # 7 Exhibit Ex. 7 - Dunn v. Attorney General, # 8 Exhibit Ex. 8 - House No. 3930 Initiative Petition, # 9 Exhibit Ex. 9 - H.R. Jan. 7, 2016 Journal, # 10 Exhibit Ex. 10 - S. Jan. 7, 2016 Journal, # 11 Exhibit Ex. 11 - H.3930 2015-2016 Leg. 189th Sess., # 12 Exhibit Ex. 12 - Hearing Summary, # 13 Exhibit Ex. 13 - Mass. Gen. Laws Ann. Ch. 129, # 14 Exhibit Ex. 14 - 330 CMR 35.00, # 15 Exhibit Ex. 15 - Chapter 333 of the Acts of 2016, # 16 Exhibit Ex. 16 - Mass. Const. art. XLVIII, # 17 Exhibit Ex. 17 - USDA Sausage Operations, # 18 Exhibit Ex. 18 - Metzer Article, # 19 Exhibit Ex. 19 - Shea Article, # 20 Exhibit Ex. 20 - Metzer Article)(Raupp, Michael) (Entered: 10/27/2023) |
| 10/28/2023 | 87 | MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Raupp, Michael) (Entered: 10/28/2023) |
| 10/28/2023 | 88 | MEMORANDUM in Support re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin,. LLC, Triumph Foods, LLC. (Raupp, Michael) (Entered: 10/28/2023) |
| 10/28/2023 | 89 | Statement of Material Facts L.R. 56.1 re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Raupp, Michael) (Entered: 10/28/2023) |
| 10/29/2023 | 90 | ELECTRONIC NOTICE issued requesting courtesy copy for 86 Request for Judicial Notice, 89 Statement of Material Facts L.R. 56.1, 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument*, 88 Memorandum in Support of Motion,. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 10/29/2023) |
| 10/29/2023 | 91 | RESPONSE to Motion re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument Opposing November 3 Opposition Deadline and Requesting November 7 Opposition Deadline* filed by Andrea Joy Campbell, Ashley Randle. (Gohlke, Grace) (Entered: 10/29/2023) |
| 10/30/2023 | 92 | Judge William G. Young: ELECTRONIC ORDER entered re 87 MOTION for Partial Summary Judgment Expedited Briefing Schedule and Oral Argument. (Paine, Matthew)<br><br>**The defendants shall have until November 7, 2023 to oppose the plaintiffs' motion for partial summary judgment.**<br><br>(Entered: 10/30/2023) |
| 11/01/2023 | 93 | ELECTRONIC NOTICE Setting Hearing on Motion 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* : Motion Hearing set for 11/14/2023 02:00 PM (In person only) before Judge William G. Young. **This hearing will take place at Boston University Law School, 765 Commonwealth Ave, 6th Floor, Boston, MA.** (Gaudet, Jennifer) (Entered: 11/01/2023) |
| 11/07/2023 | 94 | Opposition re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Response to Rule 56.1 Statement of Facts, # 2 Affidavit of Vanessa Arslanian)(Gohlke, Grace) (Entered: 11/07/2023) |

**A14**

| 11/07/2023 | 95 | Opposition re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League. (Ockene, Kimberly) (Entered: 11/07/2023) |
|---|---|---|
| 11/08/2023 | 96 | Response by Andrea Joy Campbell, Ashley Randle to 89 Statement of Material Facts L.R. 56.1,. (Paine, Matthew) (Entered: 11/08/2023) |
| 11/08/2023 | 97 | NOTICE of Change of Address or Firm Name by Ryann Glenn (Glenn, Ryann) (Entered: 11/08/2023) |
| 11/12/2023 | 98 | REPLY to Response to 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Raupp, Michael) (Entered: 11/12/2023) |
| 11/15/2023 | 99 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 11/14/2023 re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. Parties agree to case stated solely as to pork producer slaughterhouse issue. Commonwealth's opposition motion for summary judgment allowed solely as farmers. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Glenn, Peabody, Reynolds, Arslanian) (PSSA, 5) (Entered: 11/15/2023) |
| 11/17/2023 | 100 | ELECTRONIC NOTICE Canceling Hearing. Bench Trial deadlines terminated. Case stated hearing (one hour) to be set under separate notice. (Gaudet, Jennifer) (Entered: 11/17/2023) |
| 11/27/2023 | 101 | ELECTRONIC NOTICE Setting Hearing. Case Stated Hearing set for 12/19/2023 at 10:00 AM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 11/27/2023) |
| 12/01/2023 | 102 | Objection to 99 Motion Hearing,, by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC . (Raupp, Michael) (Entered: 12/01/2023) |
| 12/04/2023 | 103 | Transcript of Summary Judgment held on November 14, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 12/26/2023. Redacted Transcript Deadline set for 1/4/2024. Release of Transcript Restriction set for 3/4/2024. (McDonagh, Christina) (Main Document 103 replaced on 12/4/2023) (Dore, Samantha). (Entered: 12/04/2023) |
| 12/04/2023 | 104 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 12/04/2023) |
| 12/05/2023 | 105 | Response by Andrea Joy Campbell, Ashley Randle to 102 Objection *to the Court's Fed. R. Civ. P. 56(f)(1) Ruling and Request that the Court Construe and Deny It as a Motion for Reconsideration*. (Arslanian, Vanessa) (Entered: 12/05/2023) |
| 12/08/2023 | 106 | Response by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC to 105 Response . (Glenn, Ryann) (Entered: 12/08/2023) |
| 12/12/2023 | 107 | Joint MOTION to Expedite , Joint MOTION Clarification and Expedited Status Conference ( Responses due by 12/26/2023) by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Attachment A, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Reynolds, Maryanne) (Entered: 12/12/2023) |
| 12/15/2023 | 108 | AMICUS BRIEF filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League . (Ockene, Kimberly) (Entered: 12/15/2023) |

**A15**

| 12/15/2023 | [109](#) | CASE STATED BRIEF by Andrea Joy Campbell, Ashley Randle . (Gohlke, Grace) (Entered: 12/15/2023) |
|---|---|---|
| 12/15/2023 | [110](#) | CASE STATED BRIEF by Triumph Foods, LLC. (Raupp, Michael) (Entered: 12/15/2023) |
| 12/16/2023 | [111](#) | AMEDNED Request for Judicial Notice by Triumph Foods, LLC re [86](#) Request for Judicial Notice, . (Attachments: # [1](#) Exhibit 1 - Massachusetts 2016 Voter Information, # [2](#) Exhibit 2 - Dec. 2022 Quarterly Hogs and Pigs, # [3](#) Exhibit 3 - FSIS DIRECTIVE 8010.1 Rev. 6, # [4](#) Exhibit 4 - World Ag Supply & Demand Estimates, # [5](#) Exhibit 5 - Livestock and Meat Domestic Data, # [6](#) Exhibit 6 - 2020-2022 State Population Totals and Components of Change, # [7](#) Exhibit 7 - MPI Directory - Massachusetts - Livestock Slaughter: Pork, USDA FSIS, # [8](#) Exhibit 8 - FSIS DIRECTIVE 6100.1, # [9](#) Exhibit 9 - Dunn v. Att'y Gen., 474 Mass. 675, # [10](#) Exhibit 10 - House No. 3930 Initiative Petition, # [11](#) Exhibit 11 - H.R. Jan. 7, 2016 Journal, # [12](#) Exhibit 12 - S. Jan. 7, 2016 Journal, # [13](#) Exhibit 13 - H.3930 2015-2016 Leg. 189th Sess., # [14](#) Exhibit 14 - Hearing Summary, Feb. 11, 2016, # [15](#) Exhibit 15 - An Act to Promote Farm Viability, H.B. 712, 189th Leg. Sess., # [16](#) Exhibit 16 - Mass. Gen. Laws Ann. Ch. 129, # [17](#) Exhibit 17 - 330 CMR 35.00, # [18](#) Exhibit 18 - Chapter 333 of the Acts of 2016, # [19](#) Exhibit 19 - Mass. Const. art. XLVIII, # [20](#) Exhibit 20 - USDA Sausage Operations, # [21](#) Exhibit 21 - Metzger Article, # [22](#) Exhibit 22 - Shea Article, # [23](#) Exhibit 23 - Metzger Article)(Raupp, Michael) (Entered: 12/16/2023) |
| 12/17/2023 | 112 | ELECTRONIC NOTICE issued requesting PAPER courtesy copy for [110](#) CASE STATED BRIEF, [109](#) CASE STATED BRIEF, [111](#) AMEDNED Request for Judicial Notice. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 12/17/2023) |
| 12/18/2023 | 113 | ELECTRONIC NOTICE Resetting Hearing. Case Stated Hearing reset for 12/19/2023 at 11:00 AM in Courtroom 18 (In person only) before Judge William G. Young. **Time change only.** (Gaudet, Jennifer) (Entered: 12/18/2023) |
| 12/18/2023 | [114](#) | MOTION to Dismiss for Lack of Jurisdiction by Andrea Joy Campbell, Ashley Randle.(Reynolds, Maryanne) (Entered: 12/18/2023) |
| 12/18/2023 | [115](#) | MEMORANDUM in Support re [114](#) MOTION to Dismiss for Lack of Jurisdiction filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # [1](#) Affidavit, # [2](#) Exhibit)(Reynolds, Maryanne) (Entered: 12/18/2023) |
| 12/19/2023 | 117 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Case Stated Hearing held on 12/19/2023. The Court hears arguments of counsel and takes the matter under advisement. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Attorneys Glenn, Peabody and Cordes for the plaintiff; Attorneys Reynolds, Arslanian and Gohlke for the defendants) (Gaudet, Jennifer) (Entered: 12/26/2023) |
| 12/21/2023 | [116](#) | AMICUS BRIEF filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League . (Ockene, Kimberly) (Entered: 12/21/2023) |
| 12/26/2023 | [118](#) | Transcript of Case Stated Hearing held on December 19, 2023, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhrbulldog@aol.com. Redaction Request due 1/16/2024. Redacted Transcript Deadline set for 1/26/2024. Release of Transcript Restriction set for 3/25/2024. (McDonagh, Christina) (Entered: 12/27/2023) |
| 12/26/2023 | 119 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (McDonagh, Christina) (Entered: 12/27/2023) |
| 12/29/2023 | [120](#) | DECLARATION re [115](#) Memorandum in Support of Motion *to Dismiss the Amended Complaint* by Andrea Joy Campbell, Ashley Randle. (Attachments: # [1](#) Exhibit Exhibit B - REDACTED) (Reynolds, Maryanne) (Entered: 12/29/2023) |

**A16**

| 01/02/2024 | 121 | Opposition re 114 MOTION to Dismiss for Lack of Jurisdiction filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Affidavit Declaration of Matt England, # 2 Affidavit Declaration of McClain Southwell)(Raupp, Michael) (Entered: 01/02/2024) |
|---|---|---|
| 01/13/2024 | 122 | MOTION for Leave to File *Reply in Further Support of Motion to Dismiss* by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Exhibit Proposed Reply)(Reynolds, Maryanne) (Entered: 01/13/2024) |
| 01/16/2024 | 123 | Judge William G. Young: ELECTRONIC ORDER entered granting 122 Motion for Leave to File Reply in Further Support of Motion to Dismiss by Andrea Joy Campbell, Ashley Randle; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Gaudet, Jennifer) (Entered: 01/16/2024) |
| 01/16/2024 | 124 | REPLY to Response to 114 MOTION to Dismiss for Lack of Jurisdiction filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Affidavit Exhibit A)(Reynolds, Maryanne) (Entered: 01/16/2024) |
| 02/05/2024 | 125 | Judge William G. Young: ORDER entered.<br><br>MEMORANDUM AND ORDER<br><br>(Sonnenberg, Elizabeth) (Entered: 02/05/2024) |
| 03/06/2024 | 126 | MOTION for Summary Judgment by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 03/06/2024) |
| 03/06/2024 | 127 | MEMORANDUM in Support re 126 MOTION for Summary Judgment filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Affidavit Declaration of Ryann A. Glenn)(Glenn, Ryann) (Entered: 03/06/2024) |
| 03/06/2024 | 128 | STATEMENT of facts re 126 MOTION for Summary Judgment . (Glenn, Ryann) (Entered: 03/06/2024) |
| 03/06/2024 | 129 | ELECTRONIC NOTICE issued requesting PAPER courtesy copy for 127 Memorandum in Support of Motion, 126 MOTION for Summary Judgment , 128 Statement of facts. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 03/06/2024) |
| 03/12/2024 | 130 | ELECTRONIC NOTICE Setting Hearing on Motion 126 MOTION for Summary Judgment : Motion Hearing set for 5/15/2024 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 03/12/2024) |
| 03/20/2024 | 131 | MOTION for Extension of Time to April 5, 2024 to File Response/Reply as to 126 MOTION for Summary Judgment by Andrea Joy Campbell, Ashley Randle.(Gohlke, Grace) (Entered: 03/20/2024) |
| 03/21/2024 | 132 | Judge William G. Young: ELECTRONIC ORDER entered granting 131 MOTION for Extension of Time to April 5, 2024 to File Response/Reply as to 126 MOTION for Summary Judgment. Response due on or by 4/5/2024. (Gaudet, Jennifer) (Entered: 03/21/2024) |
| 04/05/2024 | 133 | AMICUS BRIEF filed by Animal Equality, Animal Legal Defense Fund, Animal Outlook, Compassion in World Farming USA, Farm Sanctuary, Humane Society of the United States, The, The Humane League *(Brief of Amici Curiae in Opposition to Plaintiffs' Motion for Summary Judgment)*. (Ockene, Kimberly) (Entered: 04/05/2024) |
| 04/05/2024 | 134 | MOTION to Seal *Temporarily* by Andrea Joy Campbell, Ashley Randle. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gohlke, Grace) (Entered: 04/05/2024) |

**A17**

| 04/05/2024 | [135](#) | MOTION to Strike [128](#) Statement of facts *in Part* by Andrea Joy Campbell, Ashley Randle.(Gohlke, Grace) (Entered: 04/05/2024) |
|---|---|---|
| 04/05/2024 | [136](#) | MOTION for Summary Judgment by Andrea Joy Campbell, Ashley Randle.(Gohlke, Grace) (Entered: 04/05/2024) |
| 04/05/2024 | [137](#) | MEMORANDUM in Support re [136](#) MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment (Dkt 126)* filed by Andrea Joy Campbell, Ashley Randle. (Gohlke, Grace) (Entered: 04/05/2024) |
| 04/05/2024 | [138](#) | STATEMENT of facts re [136](#) MOTION for Summary Judgment . (Gohlke, Grace) (Entered: 04/05/2024) |
| 04/05/2024 | [139](#) | *Defendants* Response by Andrea Joy Campbell, Ashley Randle to [128](#) Statement of facts *in Support of Plaintiffs' Motion for Summary Judgment*. (Gohlke, Grace) (Entered: 04/05/2024) |
| 04/05/2024 | [140](#) | AFFIDAVIT in Support re [136](#) MOTION for Summary Judgment *and Opposition to Plaintiffs' Motion for Summary Judgment (Dkt 126)* filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B, # [3](#) Exhibit C, # [4](#) Exhibit D, # [5](#) Exhibit E, # [6](#) Exhibit F, # [7](#) Exhibit G, # [8](#) Exhibit H, # [9](#) Exhibit I, # [10](#) Exhibit J, # [11](#) Exhibit K, # [12](#) Exhibit L, # [13](#) Exhibit M, # [14](#) Exhibit N, # [15](#) Exhibit O, # [16](#) Exhibit P, # [17](#) Exhibit Q, # [18](#) Exhibit R, # [19](#) Exhibit S, # [20](#) Exhibit T, # [21](#) Exhibit U, # [22](#) Exhibit V, # [23](#) Exhibit W, # [24](#) Exhibit X, # [25](#) Exhibit Y, # [26](#) Exhibit Z, # [27](#) Exhibit AA, # [28](#) Exhibit AB, # [29](#) Exhibit AC, # [30](#) Exhibit AD, # [31](#) Exhibit AE, # [32](#) Exhibit AF, # [33](#) Exhibit AG, # [34](#) Exhibit AH, # [35](#) Exhibit AI, # [36](#) Exhibit AJ) (Gohlke, Grace) (Attachment 1 replaced on 4/16/2024) (Paine, Matthew). (Attachment 5 replaced on 4/16/2024) (Paine, Matthew). (Attachment 9 replaced on 4/16/2024) (Paine, Matthew). (Attachment 10 replaced on 4/16/2024) (Paine, Matthew). (Attachment 15 replaced on 4/16/2024) (Paine, Matthew). (Attachment 16 replaced on 4/16/2024) (Paine, Matthew). (Attachment 17 replaced on 4/16/2024) (Paine, Matthew). (Attachment 28 replaced on 4/16/2024) (Paine, Matthew). (Attachment 29 replaced on 4/16/2024) (Paine, Matthew). (Attachment 35 replaced on 4/16/2024) (Paine, Matthew). (Entered: 04/05/2024) |
| 04/07/2024 | 141 | ELECTRONIC NOTICE issued requesting SINGLE-SIDED PAPER courtesy copy for [139](#) Response, [136](#) MOTION for Summary Judgment , [138](#) Statement of facts, [137](#) Memorandum in Support of Motion, [140](#) Affidavit in Support of Motion. Counsel who filed this document are requested to submit a courtesy copy of this document (or documents) to the Clerk's Office by Attention Matthew Paine - Docket Clerk - Judge Young. **These documents must be clearly marked as a Courtesy Copy and reflect the document number assigned by CM/ECF.** (Paine, Matthew) (Entered: 04/07/2024) |
| 04/08/2024 | 142 | ELECTRONIC NOTICE Setting Hearing on Motion [136](#) MOTION for Summary Judgment : Motion Hearing set for 5/15/24 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young. (Gaudet, Jennifer) (Entered: 04/08/2024) |
| 04/09/2024 | 143 | Judge William G. Young: ELECTRONIC ORDER entered re [134](#) MOTION to Seal Temporarily (Paine, Matthew)<br><br>**Motion allowed in the alternative. None of these documents deserve to be sealed.**<br><br>(Entered: 04/09/2024) |
| 04/12/2024 | [144](#) | Amicus Curiae APPEARANCE entered by Adam F. Keats on behalf of Animal Wellness Action, Animal Wellness Foundation, Center for a Humane Economy. (Keats, Adam) (Entered: 04/12/2024) |
| 04/12/2024 | [145](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Blome Filing fee: $ 125, receipt number AMADC-10365390 by Animal Wellness Action, Animal Wellness Foundation, Center for a Humane Economy. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3)(Keats, Adam) (Entered: 04/12/2024) |
| 04/12/2024 | [146](#) | AMICUS BRIEF filed by Animal Wellness Action, Animal Wellness Foundation, Center for a Humane Economy . (Keats, Adam) (Entered: 04/12/2024) |
| 04/12/2024 | [147](#) | Proposed Document(s) submitted by Animal Wellness Action, Animal Wellness Foundation, Center for a Humane Economy. Document received: Proposed Order. (Keats, Adam) (Entered: 04/12/2024) |

**A18**

| 04/15/2024 | 148 | Judge William G. Young: ELECTRONIC ORDER entered granting 145 Motion for Leave to Appear Pro Hac Vice Added Jessica L. Blome.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(Paine, Matthew) (Entered: 04/15/2024) |
|---|---|---|
| 04/15/2024 | 149 | MOTION to Modify Briefing Deadlines by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 04/15/2024) |
| 04/16/2024 | 150 | Judge William G. Young: ELECTRONIC ORDER entered granting 149 MOTION to Modify Briefing Deadlines. (Paine, Matthew) (Entered: 04/16/2024) |
| 04/16/2024 | 151 | Reset Deadlines as to 135 MOTION to Strike 128 Statement of facts *in Part*, 136 MOTION for Summary Judgment , 126 MOTION for Summary Judgment . Responses due by April 26, 2024 (Paine, Matthew) (Entered: 04/16/2024) |
| 04/16/2024 | 152 | NOTICE of Appearance by Jessica L. Blome on behalf of Animal Wellness Action, Animal Wellness Foundation, Center for a Humane Economy (Blome, Jessica) (Entered: 04/16/2024) |
| 04/19/2024 | 153 | MOTION for Reconsideration re 143 Order on Motion to Seal *and for Permanent Impoundment of Proposed Exhibits G, N, and AA* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit A - Declaration of Matthew England, # 2 Exhibit B - Declaration of Greg Howard)(Glenn, Ryann) (Entered: 04/19/2024) |
| 04/23/2024 | 154 | Opposition re 153 MOTION for Reconsideration re 143 Order on Motion to Seal *and for Permanent Impoundment of Proposed Exhibits G, N, and AA (in Part)* filed by Andrea Joy Campbell, Ashley Randle. (Arslanian, Vanessa) (Entered: 04/23/2024) |
| 04/26/2024 | 155 | MOTION for Leave to File *Reply in Support of Motion for Reconsideration of the Court's April 9, 2024 Order (ECF NO. 143) and for Permanent Impoundment of Proposed Exhibits G, N, and AA* by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Attachments: # 1 Exhibit A)(Glenn, Ryann) (Entered: 04/26/2024) |
| 04/26/2024 | 156 | MEMORANDUM in Opposition re 135 MOTION to Strike 128 Statement of facts *in Part* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 04/26/2024) |
| 04/26/2024 | 157 | Response by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC to 138 Statement of facts . (Glenn, Ryann) (Entered: 04/26/2024) |
| 04/26/2024 | 158 | REPLY to Response to 136 MOTION for Summary Judgment , 126 MOTION for Summary Judgment *Plaintiffs Reply in Support of Plaintiffs' Motion for Summary Judgment and Opposition to Defendants Cross-Motion for Summary Judgment* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Main Document 158 replaced on 4/27/2024) (Paine, Matthew) (Entered: 04/26/2024) |
| 04/26/2024 | 159 | MOTION to Strike 138 Statement of facts, 140 Affidavit in Support of Motion,,,,, *Plaintiffs Motion to Strike Defendants' Exhibits D, T, AJ, AG, and AH, and Their Corresponding Statements of Fact, to* |

**A19**

| | | Defendants' Cross-Motion for Summary Judgment by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC.(Glenn, Ryann) (Entered: 04/26/2024) |
|---|---|---|
| 04/26/2024 | [160](#) | MEMORANDUM in Support re [159](#) MOTION to Strike [138](#) Statement of facts, [140](#) Affidavit in Support of Motion,,,,,, *Plaintiffs Motion to Strike Defendants' Exhibits D, T, AJ, AG, and AH, and Their Corresponding Statements of Fact, to Defendants' Cross-Motion for filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 04/26/2024)* |
| 04/29/2024 | 161 | Judge William G. Young: ELECTRONIC ORDER entered granting [155](#) MOTION for Leave to File Reply; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (Paine, Matthew) (Entered: 04/29/2024) |
| 04/29/2024 | [162](#) | REPLY to Response to [153](#) MOTION for Reconsideration re 143 Order on Motion to Seal *and for Permanent Impoundment of Proposed Exhibits G, N, and AA* filed by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC. (Glenn, Ryann) (Entered: 04/29/2024) |
| 04/30/2024 | 163 | Judge William G. Young: ELECTRONIC ORDER entered re [153](#) MOTION for Reconsideration re 143 Order on Motion to Seal *and for Permanent Impoundment of Proposed Exhibits G, N, and AA* filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. (Paine, Matthew)<br><br>**Motion denied. The items sought to be impounded are not necessary for the merits decision. They may be returned to the litigant.**<br><br>(Entered: 04/30/2024) |
| 05/02/2024 | 164 | Judge William G. Young: ELECTRONIC ORDER entered re [135](#) Motion to Strike [135](#) MOTION to Strike [128](#) Statement of facts *in Part* (Paine, Matthew)<br><br>**Motion denied. The documents will have such weight as is their due.**<br><br>(Entered: 05/02/2024) |
| 05/10/2024 | [165](#) | REPLY to Response to [136](#) MOTION for Summary Judgment filed by Andrea Joy Campbell, Ashley Randle. (Gohlke, Grace) (Entered: 05/10/2024) |
| 05/10/2024 | [166](#) | Opposition re [159](#) MOTION to Strike [138](#) Statement of facts, [140](#) Affidavit in Support of Motion,,,,,, *Plaintiffs Motion to Strike Defendants' Exhibits D, T, AJ, AG, and AH, and Their Corresponding Statements of Fact, to Defendants' Cross-Motion for Summary Judgment filed by Andrea Joy Campbell, Ashley Randle. (Attachments: # [1](#) Affidavit Supplemental Arslanian)(Gohlke, Grace) (Entered: 05/10/2024)* |
| 05/13/2024 | 167 | Judge William G. Young: ELECTRONIC ORDER entered re [159](#) Motion to Strike (Paine, Matthew)<br><br>**Motion denied. The documents shall have such weight as it their due.**<br><br>(Entered: 05/13/2024) |
| 05/15/2024 | 168 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 5/15/2024 re [136](#) MOTION for Summary Judgment filed by Ashley Randle, Andrea Joy Campbell, [126](#) MOTION for Summary Judgment filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. After hearing arguments of counsel, the Court takes the matter under advisement. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Attorneys Raupp, Peabody, Glenn and Cordes for the plaintiff; Attorneys Reynolds and Gohlke for the defendants) (Gaudet, Jennifer) (Entered: 05/15/2024) |

| 07/02/2024 | 169 | Transcript of Summary Judgment held on May 15, 2024, before Judge William G. Young. The Transcript may be purchased through the Court Reporter, viewed at the public terminal, or viewed through PACER after it is released. Court Reporter Name and Contact Information: Richard Romanow at rhr3tubas@aol.com. Redaction Request due 7/23/2024. Redacted Transcript Deadline set for 8/2/2024. Release of Transcript Restriction set for 9/30/2024. (Cook, Savannah) (Entered: 07/02/2024) |
| --- | --- | --- |
| 07/02/2024 | 170 | NOTICE is hereby given that an official transcript of a proceeding has been filed by the court reporter in the above-captioned matter. Counsel are referred to the Court's Transcript Redaction Policy, available on the court website at https://www.mad.uscourts.gov/caseinfo/transcripts.htm (Cook, Savannah) (Entered: 07/02/2024) |
| 07/22/2024 | 171 | Judge William G. Young: ORDER entered.<br><br>MEMORANDUM AND ORDER<br><br>(Sonnenberg, Elizabeth) (Entered: 07/22/2024) |
| 07/22/2024 | 172 | Judge William G. Young ORDER entered: JUDGMENT for the Commonwealth, Andrea Joy Campbell and Ashley Randle. (Paine, Matthew) (Entered: 07/22/2024) |
| 08/13/2024 | 173 | NOTICE OF APPEAL 66 ELECTRONIC CLERK'S NOTES/ORDER, 99 ELECTRONIC CLERK'S NOTES/ORDER, 171 MEMORANDUM AND ORDER, 172 JUDGMENT by Allied Producers' Cooperative, Christensen Farms Midwest, LLC, Eichelberger Farms, Inc., New Fashion Pork, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC Filing fee: $ 605, receipt number AMADC-10552864 Fee Status: Not Exempt. NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov.** US District Court Clerk to deliver official record to Court of Appeals by 9/3/2024. (Glenn, Ryann)<br><br>**Modified on 8/13/2024 to Correct Docket Text and Add CM/ECF NextGen Document Links to Orders Being Appealed as Counsel Glenn Failed to Follow the CM/ECF NextGen Prompts When Filing the Notice of Appeal in Violation of Court Rules and CM/ECF NextGen Administrative Procedures. (Paine, Matthew).**<br><br>**(Entered: 08/13/2024)** |
| 08/15/2024 | 174 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 173 Notice of Appeal. (Paine, Matthew) (Entered: 08/15/2024) |
| 08/15/2024 | 175 | USCA Case Number 24-1759 for 173 Notice of Appeal, filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc.. (Paine, Matthew) (Entered: 08/15/2024) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 09/16/2024 13:03:34 | | |
| **PACER Login:** | STLouisAccess | **Client Code:** | 0549325-0000022pmb |
| **Description:** | Docket Report | **Search Criteria:** | 1:23-cv-11671-WGY |
| **Billable Pages:** | 23 | **Cost:** | 2.30 |

**A21**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TRIUMPH FOODS, LLC, CHRISTENSEN
FARMS MIDWEST, LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW
FASHION PORK, LLP, EICHELBERGER
FARMS, INC. and ALLIED
PRODUCERS' COOPERATIVE,
individually and on behalf of its members,

     Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of
Massachusetts, and ASHLEY RANDLE, in
her official capacity as Massachusetts
Commissioner of Agriculture,

     Defendants.

Case No. 1:23-cv-11671-WGY

**AMENDED COMPLAINT FOR
INJUNCTIVE AND DECLARATORY
RELIEF**

Plaintiffs Triumph Foods, LLC, Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc., and Plaintiff Allied Producers' Cooperative in its own capacity and in a representative capacity for its members ("Plaintiffs"), by and through their counsel of record, for their Amended Complaint for Declaratory and Injunctive Relief against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts ("Campbell"), and Ashley Randle, in her official capacity as Massachusetts Commissioner of Agriculture ("Randle") (collectively, "Defendants"), respectfully state to the Court as follows:

1

**A22**

## INTRODUCTION

1.      This case challenges the constitutionality of Massachusetts' Question 3 Minimum Size Requirements for Farm Animal Containment ("Question 3"), passed by Massachusetts voters on November 8, 2016, which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the State of Massachusetts from offspring of a covered animal (as hereinafter defined) confined in a manner inconsistent with Massachusetts' Minimum Size Requirements (as hereinafter defined), regardless of where in the nation the animal was raised.

2.      The Prevention of Farm Animal Cruelty Act was enacted by Acts (2016) Chapter 333 (the "Act") on December 15, 2016, which implemented Question 3.

3.      Regulations to implement and address enforcement of the Act were ultimately promulgated by the Department of Agricultural Resources and went into effect on June 10, 2022, which was well beyond the original date mandated within the Act.  2022 MA REG TEXT 610066 (NS) (the "Regulations").  The Regulations are included at 330 CMR 35.01-08.

4.      Question 3's stated purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts."

5.      The Act's Minimum Size Requirements are inconsistent with pork industry practices and standards, generations of farming experience, scientific research, and the consensus standards of other states.  The Act will impose costly mandates that substantially interfere with commerce among the states in hog and pork markets.  It will impose substantial burdens on pig farmers and pork processors primarily outside of Massachusetts, ultimately having a direct impact on the price of pork for all Americans—the vast majority of whom had no say in the Act—in the interstate pork market. It will take years and cost at least tens of millions of dollars for pig farmers to come into compliance with the Regulations.

6.      The Act primarily serves as a regulation on certain animal confinement practices but seeks to regulate such confinement by banning the sale of non-compliant products. The

2

**A23**

requirements of the Act itself have nothing to do with the products sold, but instead act as a means by which Massachusetts can regulate what occurs on farms.

7.    Through the Act, Massachusetts seeks to unilaterally impose sweeping changes across the national pork production industry and subject out-of-state pig farmers and processors in the pork market to Massachusetts' scientifically unsupported preferences.

8.    The Act discriminates against out-of-state farmers and pork processors in purpose and effect, unquestionably directly and intentionally targets and seeks to regulate out-of-state activity that is permissible in the states in which it occurs, and substantially burdens the interstate pork market through the confinement and inspection requirements and by stifling interstate commerce through the prohibition of sale of non-compliant Whole Pork Meat (as hereinafter defined) into and within Massachusetts.

9.    The Act's discriminatory purpose and effect further violates the rights of Plaintiffs under the Privileges and Immunities Clause, the Full Faith and Credit Clause of Article IV of the United States Constitution, the Due Process Clause of the Fourteenth Amendment to the Constitution, and the Import-Export Clause of Article I of the United States Constitution.  The Regulations also are invalid under G.L. c. 30A and G.L. c231A.  The Act is also preempted by the Federal Meat Inspection Act and the Packers and Stockyards Act.

10.    The Act poses a current and imminent risk of civil enforcement and injunctive relief against Plaintiffs, as the Act imposes civil penalties on any non-compliant business owner or operator or person who knowingly engages in a sale in Massachusetts involving Whole Pork Meat that a business owner or operator knows or should know is the offspring of a breeding pig that was confined inconsistent with the Minimum Size Requirements.

11.    Without immediate and permanent injunctive relief from this Court, the Act will unconstitutionally and irreparably risk and injure breeding pigs, piglets, and Plaintiffs.[1]

---

[1] Plaintiff will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

**A24**

## **PARTIES**

12.     Plaintiff Triumph Foods, LLC ("Triumph") is a farmer-owned company and produces high-quality pork products that are sold locally, nationally, and internationally. It was founded by independently owned pork farmers in the country, including a cooperative of farmers. It is headquartered in St. Joseph, Missouri, and largely receives its supply of pigs from its member-owners, who are pig farmers (collectively referred to as the "Farmer Plaintiffs") and other independent pig farmers.

13.     Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc., and Allied Producers' Cooperative ("the Farmer Plaintiffs") farm and produce pigs to supply Triumph's pork processing operations. Pork processed by Triumph is shipped directly into Massachusetts.

14.     The Farmer Plaintiffs are farrow-to-finish farmers. This means that each Farmer Plaintiff has breeding pigs, and after the breeding pigs give birth, the Farmer Plaintiff raises the pigs until they are ready for market.

15.     Christensen Farms Midwest, LLC ("Christensen Farms") is a member-owner of Triumph. Its farms are located in Minnesota, Iowa, Nebraska, Illinois, and South Dakota.

16.     The Hanor Company of Wisconsin, LLC ("Hanor") is a member-owner of Triumph and sells approximately 1.8 million market pigs each year. Its farms are located in Wisconsin, Oklahoma, North Carolina, Iowa, Missouri, and Illinois.

17.     New Fashion Pork, LLP ("NFP") is a member-owner of Triumph. Its farms are located in Minnesota, Indiana, Iowa, Illinois, South Dakota, Wyoming, and Wisconsin.

18.     Eichelberger Farms, Inc. ("Eichelberger") is a member-owner of Triumph. Its farms are located in southeast Iowa, Missouri, and Illinois.

19.     Allied Producers Cooperative ("APC") is a member-owner of Triumph and is a cooperative that consists of a group of midwestern farmers who are mostly multi-generational family pig farms, most of which are farrow-to-finish farmers consisting of several individual

**A25**

farmers. APC is headquartered in Iowa, but its members operate in various states throughout the Midwest.

20.     Defendant Campbell is the Attorney General of the State of Massachusetts. Campbell is responsible for the enforcement of the Act and is sued in her official capacity only.

21.     Defendant Randle is the Massachusetts Commissioner of Agriculture who oversees the Massachusetts Department of Agricultural Resources, which is responsible for implementation of the Act.  Randle is sued in her official capacity only.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this complaint for declaratory and injunctive relief pursuant to Fed. R. Civ. P. 57, 28 U.S.C. § 2201, 28 U.S.C. § 1441(a) and Fed. R. Civ. P. 65.

23.     The Court has authority to enjoin enforcement of the Act's sales ban under 42 U.S.C. § 1983 and 28 U.S.C. § 2201.

24.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this is the judicial district in which all Defendants reside.

## BACKGROUND ON QUESTION 3 AND REGULATIONS

25.     In 2016, Massachusetts enacted the Prevention of Farm Animal Cruelty Act through ballot initiative Question 3, which established minimum size requirements for egg-laying hens, breeding pigs, and calves raised for veal.

26.     The Act's claimed purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ann. Ch. 129 App., § 1-1 (West). *See also* SEC'Y OF THE COMMONWEALTH OF MASS., *Information for Voters, Massachusetts 2016 Ballot* at 8–11 (2016), https://www.sec.state.ma.us/divisions/elections/research-and-statistics/information-for-voters-2002-2020.htm (stating that a vote in favor "prevents cruel treatment of animals in Massachusetts" and "will remove inhumane and unsafe products from the Massachusetts

**A26**

marketplace" and that "because cage confinement increases food safety risks . . . a YES vote protects Massachusetts consumers.").

27.     The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" (hereinafter referred to as the "Minimum Size Requirements").  Mass. Gen. Laws Ch. 129 App., § 1-5.

28.     A "covered animal" is defined as any breeding pig, calf raised for veal, or egg-laying hen that is kept on a farm. A "breeding pig" is defined as any female pig of the porcine species kept for the purpose of commercial breeding.

29.     The Act also made it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner."  Mass. Gen. Laws Ch. 129 App., § 1-3. This prohibition is without distinction regarding where in the United States the Whole Pork Meat originated from.

30.     The Act does not define what it means for an individual to be "engaged in" a sale within Massachusetts, and by the plain language, an out-of-state farmer or processor is potentially subject to civil fines and injunctive relief for being "engaged in" the chain of sale of non-compliant Whole Pork Meat into the State of Massachusetts.

31.     Whole Pork Meat is defined as "any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives." Mass. Gen. Laws Ch. 129 App., § 1-5.

32.     Pork Meat is defined as "meat of a pig of the porcine species intended for use as human food." Mass. Gen. Laws Ch. 129 App., § 1-5.

6

**A27**

33.     The limited exceptions as applicable here include only the five-day period prior to the expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes.  Mass Gen. Laws Ch. 129 App., § 1-4.

34.     In December 2021, the Massachusetts Legislature amended portions of the Act by passing Acts (2021) Chapter 108.  The bill changed the definition of "confined in a cruel manner" regarding egg-laying hens and added other definitions regarding egg-laying hens.

35.     The amendments came on the heels of industry concerns that the Act would cause an extreme shortage of eggs or a steep increase in egg prices in Massachusetts, and an apparent recognition that industry practices for housing hens were not aligned with the Minimum Size Requirements. Chris Lisinski, *Mass. Legislature passes animal welfare law changes, set to ease egg supply fears* (Dec. 20, 2021),   https://www.wgbh.org/news/politics/2021/12/20/mass-legislature-passes-animal-welfare-law-changes-set-to-ease-egg-supply-fears.

36.     Yet, no changes were made to the Minimum Size Requirements regarding breeding pigs, apart from extending the date by which the sale of Whole Pork Meat not in compliance with the Act would be prohibited, despite the fact that Massachusetts legislators understood at the time of or before the amendment was passed that less than 4% of pork suppliers were in compliance with the Minimum Size Requirements, and that enforcing the Act would affect the supply and/or cost of pork products within the State. Matt Murphy, *House's Hen Welfare Bill Aims to Assure Egg Supply* (Oct. 6, 2021), https://www.statehousenews.com/news/20211859.

37.     Acts (2021) Chapter 108 § 6 did, however, amend the effective date for the Minimum Size Requirements as applied to breeding pigs to August 15, 2022.

38.     Due to the vagueness of the Act itself, the Act mandated that Regulations be promulgated in order to ultimately assist the Attorney General in ensuring compliance with the Act.

39.     Regulations to implement and address enforcement of the Act were ultimately promulgated by the Department of Agricultural Resources and went into effect on June 10, 2022,

**A28**

which was well beyond the original date mandated within the Act.  2022 MA REG TEXT 610066 (NS) (the "Regulations").  The Regulations are included at 330 CMR 35.01-08.

40.     The Regulations included that Whole Pork Meat products already in the supply chain as of and including August 15, 2022, would be deemed compliant in what is referred to herein as the "Sell Through Provision." Plaintiffs, as well as much of the pork producing and processing industry, interpreted this to mean that so long as the offspring of a sow existed prior to August 15, 2022 (*i.e.*, the sow has already been inseminated, the offspring is in gestation, or the pig was born but not yet harvested) that the offspring would be deemed compliant and be able to be sold into Massachusetts on or after August 15, 2022. Neither the Act nor the Regulations define the "supply chain," leaving Plaintiffs uncertain in their interpretation of the Sell Through Provision.

41.     The Regulations failed to provide any additional interpretation or guidance as to what constitutes a business owner or operator "engaging in the sale" of Whole Pork Meat within Massachusetts.

42.     In *Massachusetts Restaurant Association et al. v. Healey* (Case No. 4:22-cv-11245-MLW) this Court ordered a stay of the enforcement of the Act and the Regulations until 30 days from the issuance of the United States Supreme Court's final decision in *National Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023) (the "Stay Period"). (ECF No. 17). The opinion in that case issued on May 11, 2023, and the mandate issued on June 12, 2023. Recently, the Stay Period has been extended until at least August 23, 2023.

43.     After the expiration of the Stay Period, the Act and the Regulations will become enforceable and prohibit the sale of non-compliant Whole Pork Meat in Massachusetts.

44.     Under the Court's order staying enforcement of the Act and Regulations, Former Attorney General Healey and Former Commissioner Lebeaux agreed that they would not enforce

**A29**

the Pork Sale Rules[2] against any plaintiff or non-party for any conduct that occurs during the Stay Period. *See Massachusetts Restaurant Ass'n v. Healey*, No. 4:22-cv-11245-MLW, (ECF No. 17).

45.     It is unclear whether this means that any Whole Pork Meat[3] that existed in the supply chain prior to the expiration of the Stay Period (*i.e.,* the sow has already been inseminated, the offspring is in gestation, or the pig was born but not yet harvested) may be sold in Massachusetts after the Stay Period, and whether the court's order staying the Act and Regulations created, in effect, another Sell Through Provision.

46.     To date, the Defendants have not published any guidance regarding whether Whole Pork Meat that is already in the supply chain during the Stay Period, may be sold after that Stay Period expires, leaving Plaintiffs uncertain about whether Defendants intend to retroactively apply the Act and Regulations to prohibit the sale of Whole Pork Meat that did not comply with the Minimum Size Requirements during the Stay Period.

47.     Most Pork Meat intended for sale for Massachusetts at the time the Stay Period will expire is already alive, or at least is in gestation. The breeding cycle of the pigs is four months, followed by the piglets being raised for three to four weeks before they are weaned and, ultimately, farrow to finish takes approximately 24-26 weeks.

48.     Without an order confirming that the sale of Whole Pork Meat that is already in the supply chain up to and including the expiration of the Stay Period may be sold after the Stay Period, the Act and Regulations will force the unnecessary slaughter of these breeding pigs, the same pigs that Massachusetts voters were told the Act would help.

49.     The Regulations also create a procedure for certifications for any farm, farm owners, or farm operators who engage in commercial transactions within Massachusetts regarding the meat or products of a covered animal and for any other person who engages in a commercial

---

[2] Pork Sale Rules are defined as "a declaration that M.G.L. c. 129 App. § 1-3(C), 330 CMR § 35.04(1)(c), and the official guidance interpreting same."
[3] The Regulations define Pork Meat as any "meat of a pig of the porcine species that is intended for use as human food." 330 Mass. Code Regs. 35.02

**A30**

transaction within Massachusetts regarding the meat or products of a covered animal. 330 CMR 35.05.

50.     The Regulations announced, for the first time, that the Department or third-party validators may go beyond the boundaries of Massachusetts and inspect a farm "pursuant to any applicable authority" for compliance with the Minimum Size Requirements to ensure that "animals are not being Confined in a Cruel Manner."  330 CMR 35.06-.07.

51.     This means that Massachusetts intends to have Massachusetts state officials go to out-of-state farms to ensure that they comply with the Act and Regulations.

52.     If, during an inspection of a farm, the Department of Agricultural Resources or a third-party validator observes violations of the Act or the Regulations regarding the implementation of the Act, the Department may refer the violations to the Attorney General's Office.  330 CMR 35.06-.07.

53.     The Attorney General has exclusive authority to enforce the provisions of the Act. Mass. Gen. Laws App., § 1-6.  Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act.  Mass Gen. Laws App., § 1-6.

54.     No guidance has been issued to address what unit of enforcement the Defendants intend to utilize when assessing a civil fine or ultimately resorting to injunctive relief to potentially preclude a seller from importing Whole Pork Meat into Massachusetts.

55.     Regardless of how the unit of enforcement is ultimately applied by the Defendant Attorney General, the civil enforcement and injunctions authorized under the Act are tantamount to a penalty against any business owner or operator who operates within the pork production supply chain in several ways.

56.     The forced exclusion from the Massachusetts marketplace unless Farmer Plaintiffs convert their farm operations to meet Minimum Size Requirements is a penalty at the beginning of the pork production supply chain.

**A31**

57.     The exclusion from the Massachusetts marketplace operates as a sales embargo for out-of-state business owners and operators who cannot sell compliant Whole Pork Meat within Massachusetts due to the excessive restrictions imposed.

58.     The forced adjustments to the processor – like Triumph's – operations are penalties at the middle phase of the pork production supply chain.

59.     The risk of civil fines and injunctive relief by the Attorney General is a penalty at the end phase of the pork production supply chain for any member who engages in the sale of non-compliant Whole Pork Meat within Massachusetts, which arguably includes both Farmer Plaintiffs and Triumph.

60.     On information and belief, if a seller is precluded from importing Whole Pork Meat into Massachusetts, that seller runs a substantial risk of violating contractual obligations with Massachusetts businesses, state or federal agencies who rely upon the Whole Pork Meat.

## IMMEDIATE NATIONWIDE IMPACTS OF
## THE ACT AND REGULATIONS ON THE PORK INDUSTRY

61.     The sale of Whole Pork Meat is a nationwide, regulated commodity, and the interstate pork market is wholly interconnected. Not only do the Act and Regulations impact pig farmers, but their regulatory impact flows through the complex supply chain to pork processing operations and interferes with the federal government's role, who is already tasked with ensuring that any pork product that enters the interstate market is wholesome and fit for human consumption.

62.     The Act and Regulations' unconstitutional application to out-of-state farmers and processors will have a direct impact on farming practices, processing standards, nationwide pricing of pork, the national pork supply, and consumers nationwide.

63.     Despite making up a large percentage of the national consumer market, Massachusetts itself had as little as 1,500 breeding sows as of 2022, with only 6,000 total market hogs. Relatedly, Massachusetts also has a miniscule number of farms that produce pigs. As of 2017, the total number of pig farmers in Massachusetts was about 336. Of that amount, only one

farmer had a herd size greater than 1,000 head, while 264 farms have a herd size of 1-24 head. USDA, National Agricultural Statistics Service, *2017 Census of Agriculture – Massachusetts State and County Data* (April 2019). Only eight Massachusetts pig farmers had a herd size of 200 or more. This means that, as of 2017, about 78% of Massachusetts pig farmers have the smallest possible pig operation.

64.　In the first quarter of 2023, Missouri and Iowa—the two states that Triumph operates out of and receives a large quantity of its market hogs for processing from—had 450,000 breeding sows and 900,000 breeding sows, respectively. USDA, National Agricultural Statistics Service, *USDA Quarterly Hogs and Pigs* (March 2023*)*.

65.　Massachusetts is the fifteenth most populous state in the nation, representing 2.1% of the U.S. population and consuming approximately 356.8 million pounds of retail pork in 2022. The volume Massachusetts demands to feed its population would well exceed the amount of pork that Massachusetts can produce and sell intrastate from Massachusetts farms, given the small number of breeding sows in Massachusetts. That volume produced within Massachusetts, assuming it is sold and *remains in* Massachusetts, is estimated at only 1.9 million pounds of retail pork in 2022. Therefore, the burden of the Act falls almost entirely upon out-of-state producers and processors, and in effect, the Act regulates pork production and processing throughout the United States, not just in Massachusetts.

66.　As of 2016, when Question 3 was approved by Massachusetts, Massachusetts pig farmers did not use gestation crates for housing breeding sows. Andrea Shea, *Confinement of Farm Animals: A Primer on Question 3 in Mass.* (Sept. 20, 2016) https://www.wbur.org/morningedition/2016/09/20/farm-animal-containment-ballot-question. Given that no Massachusetts pig farmers confine breeding sows in a manner that is prohibited by the Act, the Act directly targeted out-of-state farmers only.

67.　The Act's Minimum Size Requirements are inconsistent with pork industry practices and standards, generations of farming experience, scientific research, and the consensus standards of other states. The Act will impose costly mandates that substantially interfere with

A33

commerce among the states in hog and Whole Pork Meat markets. It will impose enormous costs on pork farmers outside of Massachusetts, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in the Act.

68.     It will take years and cost at least hundreds of millions of dollars for pork farmers to come into compliance with the Act and Regulations or to fully convert farms to be compliant with the Act and Regulations to the extent needed in order to supply the quantity of pork into Massachusetts that is currently demanded.

69.     Most Farmer Plaintiffs, from which Triumph primarily sources its supply of pigs, are not currently in compliance with the Act. And compliance measures taken to date by the Farmer Plaintiffs have been instituted in order to satisfy California's Proposition 12 requirements only, which have been insufficient to meet the needs of California, let alone for the demand that will unquestionably arise for Question 3 compliant pork.

70.     Through the Act, Massachusetts seeks to unilaterally force changes across the national pork production industry and subject out-of-state individuals in the production market to Massachusetts' preferences. Currently, only a miniscule number of pig farmers nationwide could satisfy Massachusetts' onerous standards—something that Massachusetts lawmakers understood when they amended the Act in 2021. The number is even smaller when accounting for the fact that most of those pigs are already slated for processing pork for California.

71.     Due to the proportion of the national pork supply destined for Massachusetts—and the significant complexity of the national pork production and distribution system—it is neither feasible nor practical for farmers to segregate their product on a state-by-state basis. While some extraordinary accommodation has been made in the interim for Proposition 12 and Question 3, the situation is tenuous, and this cannot be done for all states across the country.

72.     Furthermore, upon information and belief, Massachusetts is a pork distribution hub for other New England states. In other words, the Act's prohibition on the sale of Whole Pork Meat that is not compliant with the Act within Massachusetts affects the production and sale of pork across an entire region. This means that a significant portion of Whole Pork Meat that enters

**A34**

Massachusetts does not stay in Massachusetts and goes to states in New England—including states that do not have sow confinement prohibitions similar to the Minimum Size Requirements in the Act. https://www.wsj.com/articles/massachusetts-wants-your-bacon-national-pork-producers-council-farm-regulations-11660080510

73.    The Act's assertion that non-compliant Whole Pork Meat "threatens the health and safety of Massachusetts consumers, and increases the risk of foodborne illness" is false and inconsistent with scientific studies surrounding housing breeding pigs in group pen settings.  The ballot initiative record for Question 3 and the Regulations implementing the Act are devoid of actual proof that the Act would accomplish the goals it intended (*i.e.,* to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to Massachusetts).

74.    As a result, Massachusetts is forcing massive changes to pig production and processing practices throughout the United States, and in so doing, substantially burdens the interstate pork market. Massachusetts has attempted to create a national regulation on breeding pig housing through the passage of Question 3.

75.    The Act and Regulations ultimately force compliance on farmers who cannot control whether to sell into the Massachusetts market, but due to the interconnected nature of the pork market, such products may still be sold within the stream of commerce in Massachusetts.

76.    Through the Federal Meat Inspection Act ("FMIA"), Congress designated the United States Department of Agriculture ("USDA") as the regulatory body to monitor meat processing. It regulates meat, poultry, and egg products and catfish through one of its own agencies, known as the Food Safety and Inspection Service ("FSIS").

77.    Ensuring that pork does not leave a plant that is at risk for "foodborne illness" is specifically a role assigned to the USDA through the Congressional enacted statutory requirements imposed by the FMIA and other implementing federal laws and regulations. The USDA also is charged with preventing pest or disease of livestock in interstate commerce.

78.     The USDA and FSIS are charged with ensuring that pork processors comply with federal law so that meat is "safe, wholesome, and properly labeled." *See, e.g.*, 21 U.S.C. § 602. The USDA is "one of the largest public health regulatory agencies in the U.S. Government."[4]

79.     The federal government published specific guidance to identify how the inspection and segregation process is to occur within the swine industry pursuant to the FSIS, which is identified as "part of a science-based national system to ensure food safety and food defense. FSIS ensures food safety through the authorities of the Federal Meat Inspection Act, the Poultry Products Inspection Act, as well as humane animal handling through the Humane Methods of Slaughter Act." *See* [About FSIS | Food Safety and Inspection Service (usda.gov)](usda.gov) (last visited July 22, 2023).

80.     Pursuant to the statutory requirements imposed by the FMIA, the USDA is required to be extensively and pervasively involved in performing inspections of the pork production process at all stages to ensure such products are wholesome and not adulterated.  The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 601.

81.     To ensure compliance with federal food safety laws, the USDA regulates and inspects the pigs before they enter the facility (ante-mortem) by either (a) directly inspecting every single pig or (b) otherwise delegating portions of that responsibility to trained employees at the establishment who support the USDA with the ante-mortem inspections through the USDA's segregation procedures set forth within FSIS Directive 6100.1, known as the "Voluntary Segregation Program" ("VSP"). *See* 9 C.F.R. Part 309; FSIS Directive 6100.1.  The USDA's inspection personnel are referred to as "IPP" as they are in the Inspection Personnel Program.  "As

---

[4] Food Safety and Inspection Service, U.S. Department of Agriculture, [https://www.fsis.usda.gov/](https://www.fsis.usda.gov/).

**A36**

required under the FMIA, IPP are to examine and inspect all livestock before slaughter to determine whether the animals are fit for slaughter for human food."  If animals are not presented for this purpose, or the processor is not otherwise fulfilling its responsibilities under the VSP, the pork products produced are not able to be marked by USDA as "inspected and passed."

82.　　The USDA continues to regulate and inspect the pigs after they have passed ante-mortem inspection and have entered the facility for processing (post-mortem).  After entering the facility and post-mortem phase, the USDA inspects at every phase of the pig's processing, while facility employees assist with these inspections throughout the line by adhering to the USDA's FSIS regulatory requirements.  *See* 9 C.F.R. § 310.26.

83.　　Specifically, to ensure that no adulterated products enter the interstate food supply chain, the USDA inspection process begins outside of the four walls of a FSIS processing facility. Pigs are transported by the farmer to a processing facility via truck or trailer. When the truck or trailer first arrives, farmers begin to unload their trucks carrying market pigs. Throughout this process, the USDA either directly or through their USDA VSP, begins observation for pigs that may qualify as adulterated. If a pig is identified on a truck as adulterated, then the pig will be euthanized on the truck and segregated from the delivery. Indeed, before pigs are even allowed to disembark and unload from a farmer's truck, the USDA is reviewing and inspecting the deliveries of pigs for disease, injury, and other factors to ensure that all pigs entering the plant are wholesome, unadulterated, and suitable for human consumption as final pork products.  This is the first element of this phase of inspection that the USDA will engage in for the purpose of preventing foodborne illness or adulterated pork products.

84.　　After this initial element of inspection on the farmers' trucks, the remainder pigs are offloaded into sorting pens and chutes that still remain *outside* the processing area of the facility for a further ongoing inspection by the USDA within the receiving alley.  If not previously identified as possibly adulterated, then they enter a third component of the ante-mortem inspection in the holding pen (or a barn), in which the USDA continues observations again.  These second and third components of ongoing ante-mortem inspection are for the same purpose – in addition

**A37**

to animal care, they are there to ensure that no pig exhibits any signs of disease specifically for the purpose of preventing any foodborne illness or adulterated pigs from entering the facility itself and ultimately in the pork distributed to the end-consumer.

85.     Once a pig enters the processing facility after ante-mortem inspection has been completed by the USDA, the USDA continues inspection within the facility during the complex post-mortem inspection phase.  During this lengthy phase through the full processing line, USDA inspectors are conducting observations and examinations of the head, viscera and carcass for any indication of disease, parasites, pathology, or any other signs of abnormalities. Indeed, this pervasive USDA inspection process endures from the moment the pigs enter inside the processing facility, through the harvesting process, and through the moment the finished pork products depart for the interstate market.  The USDA officials inspect every phase of the processing and the establishment's employees are regulated by the FSIS to fulfill specific and detailed requirements to support the USDA.  *See* FSIS Directive 6100.2.

86.     Title of a particular pig does not transfer to a processor and thus, does *not* qualify as a purchase by such processor, until the pig has passed complete and full inspection by the USDA both prior to entrance inspections at the processor and following the full inspections inside the facility.

87.     Yet, Massachusetts, through Question 3, dictates to the USDA and predetermines for the FSIS regulated facility that all pigs – unless their breeding pig met the Minimum Size Requirements – are adulterated, unfit for human consumption, and cannot be processed *for sale into Massachusetts*.  The determination of what is adulterated and unadulterated is specifically designated to the USDA.   The FSIS facility must then adapt their premises, processing lines and operations to account for the varying additional segregation requirements both ante-mortem and post-mortem as directed by the state to accomplish the Act's requirements.

88.     Pigs raised in compliance with Question 3 must be separated, and kept separated, from conventional pigs at all points during the processing process that occurs at the processing facility. Otherwise, the Question 3 qualified pigs and the conventional pigs that the Act has

A38

predetermined as "adulterated" for Massachusetts, will become unknowingly intermixed prior to entry into the processing facility, or throughout the processing line after entering.

89.     Due to the nature, depth and breadth of this federal inspection process, state inspection requirements like Question 3 also add or impose requirements different from those already implemented by the USDA and impede on the USDA's independent inspections. Further, given the nature of the national market for pork, it would not be feasible for federal inspectors to cooperate with potentially fifty different state inspection requirements; at a minimum, state regulation on the inspection processes described herein would impair the effective regulation of pork products, and create an obstacle to the accomplishment and execution of the FMIA in light of that statute's stated objectives. *See, e.g.*, 21 U.S.C. § 602. While processing plants like Triumph have tried to make some accommodation for laws like Question 3 and Proposition 12 for the interim, doing so for numerous states or fifty states would be crippling to processors, if not impossible.

90.     Massachusetts, like all states, purchases its pork from multiple suppliers. Due to the highly competitive pork industry, not to mention antitrust constraints, there is no practical or risk-free way, without running afoul of antitrust laws and regulations, for pork competitors to cross coordinate or allocate their sales by geographic market to aid in the coordinated supply to one or two states, or on a state-by-state basis. This leaves each processor left to try to fulfill its portion of sales to the state on its own. No one processor can fulfill the demand for Massachusetts or California, or any other specific states, and the competitors cannot organize together to do so. Furthermore, if certain processors were able to become single state suppliers, this would only further eliminate competition and result in local market concentration and likely drive-up pricing for individual states left to obtain their pork from one or two processors nationwide.

91.     The Act and its Regulations, in effect, denies market access to out-of-state pork farmers and processors, like Plaintiffs, unless their farming practices in states outside of Massachusetts comply with Massachusetts' dictates.

**A39**

92.     The Act and its Regulations will also increase retail pork prices for consumers in Massachusetts, and because Massachusetts imports at least 99.5% of the pork it consumes, the implementation of the Act and Regulations is likely to lead to periodic retail pork stockouts and shortages in Massachusetts.

93.     In addition, the implementation and enforcement of the Act would result in a substantial adjustment for pork prices for consumers *nationwide* and a shortage of pork available for purchase.

94.     More than one in five (21.6 percent) of the adults in the United States reported household food insecurity in the summer of 2022. Pork ranks third in the United States for meat consumption. Waxman E, Salas J, Gupta P, Karpman M, *Food Insecurity Trended Upward in Midst of High Inflation and Fewer Supports*, Robert Wood Johnson Foundation, https://www.rwjf.org/en/insights/our-research/2022/09/food-insecurity-trended-upward-in-midst-of-high-inflation-and-fewer-supports.html#:~:text=More%20than%20one%20in%20five,their%20White%20counterparts%20(17.3%25).

95.     In 2022, food prices overall in the United States increased by 9.9 percent, and food-at-home prices increased by 11.4 percent, according to the United States Department of Agriculture. The Act and its Regulations threaten to significantly increase the cost of pork for consumers, which will make it even more difficult for economically-distressed families and those already facing food insecurity to afford this critical source of protein.

96.     The Act and its Regulations also threaten the public supply of pork within Massachusetts and states to which Massachusetts service in New England, which is necessary to satisfy the needs of the businesses and state facilities, including hospitals, schools, prisons and other public agencies utilizing federal funding.

**A40**

## IMMEDIATE IMPACTS OF THE ACT AND REGULATIONS

## ON THE PLAINTIFFS

97.     Triumph receives its pig supply from the Farmer Plaintiffs and some additional pig farmers, none of which operate their farms in Massachusetts.

98.     The Farmer Plaintiffs and other farmers have each entered into an agreement with Triumph to sell pigs. These contracts are known as HPAs. The HPAs provide specific terms governing the sale of pigs by the Farmer Plaintiffs, including the annual supply volume of pigs required by each Farmer Plaintiff.

99.     Triumph receives its orders for pork through its exclusive marketer of pork, Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard") through a Marketing Agreement.

100.     Under that Marketing Agreement, Triumph processes pork products that Seaboard markets on Triumph's behalf. Seaboard has the exclusive right to market all Triumph pork, and Seaboard makes all sales decisions on behalf of Triumph for its pork products including who and where it sells the product. While Triumph does not market its pork, it certainly has knowledge, as do the Farmer Plaintiffs, that pork processed from their pigs is sold to Massachusetts, and they supply their pigs without any control to where the pork is distributed.  Massachusetts can take the position that farmers and processors who have such knowledge and supply, are "engaged in the sale" and culpable under the statute.  The statute as written creates risk and vagueness for the entire supply chain.

101.     Once Triumph receives the market hogs from the Farmer Plaintiffs and other farmers, it processes the pigs and ships the pork directly to the customer from Triumph's facility.

102.     Currently, Massachusetts customers demand more compliant product than what Triumph and the Farmer Plaintiffs have available or could possibly ever make available because Massachusetts' requirements are really a subset of California's, and the industry already does not have enough for California. Because Proposition 12 has been implemented and threatens criminal enforcement now, almost all Proposition 12 pork has been diverted to California. This leaves little

A41

Question 3 compliant pork available for Massachusetts, as the industry does not have sufficient volume of Proposition 12 compliant pork required to supply California's demand.

103.    Several Farmer Plaintiffs, such as APC and its members, cannot convert their operations to come into compliance with the Minimum Size Requirements by the expiration of the Stay Period, or potentially at all. Since the smaller Farmer Plaintiffs cannot produce compliant pigs, they will not be able to sell Triumph the required amount of market pigs, and they will risk incurring damages or defaulting under their HPAs.

104.    Compliance with the Act and Regulations requires significant and extremely costly changes to the farming operations of the country's pig farmers, including the Farmer Plaintiffs.

105.    Some Farmer Plaintiffs, such as Christensen Farms, have spent significant capital in converting a small portion of their operations to be compliant with the Minimum Size Requirements.

106.    These capital and operating investments to convert even a portion of operations to be compliant are not enough to supply the volume of pork required for Massachusetts.

107.    The conversions needed are not in the best interest of the breeding pig's animal welfare. Breeding pigs or sows are female pigs utilized for breeding and give birth to the piglets that ultimately become pigs sent to market.  Breeding pigs are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the breeding pigs, and to increase efficiency.  Breeding pigs are generally artificially inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned.

108.    An overwhelming majority of sow farms use some type of indoor confinement for breeding pig operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

109.    Only a small portion of the pigs that are harvested for meat are breeding pigs that have been kept for reproduction.

**A42**

110.     Pursuant to decades of scientific research, industry practice is that the vast majority of all farmers house pregnant breeding pigs in individual stalls for insemination, throughout pregnancy, and for the first 30 to 40 days after weaning. This practice protects the sow, helps prevent pregnancy loss, critically permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing.

111.     The individual stalls also permit breeding pigs to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

112.     Specifically, housing breeding pigs in individual stalls permits farmers to carefully provide each breeding pigs with the right amount of feed to achieve optimal nutrition. This is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning.

113.     Housing breeding pigs in a group pen also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals, placing the safety and lives of the workers in jeopardy.

114.     The Act imposes restrictions that are contrary to current time-tested, science-based, best practices for pig production. The Act, in practical effect, bans the use of individual stalls during breeding and most of the gestation period.

115.     The offspring of breeding pigs are raised to market weight in separate, specialized production facilities, including: (1) feeder pig farmers or nurseries; (2) feeder pig finishers; and (3) farrow-to-finish operations. Farrow to finish takes approximately 24-26 weeks.

116.     Once pigs reach harvest weight, they are sent to packing and processing facilities, like Triumph, throughout the country. Packing and processing facilities receive pigs from multiple farms, in multiple locations, operated by multiple farmers.

**A43**

117.    Triumph always aims to operate at full capacity. The plant processes harvested pigs into many different cuts of meat.  The meat is packed and shipped to customers throughout the entire country and abroad, including Massachusetts.

118.    Farmers and processors cannot realistically forego the Massachusetts market.  If forced to exit the Massachusetts market, many farmers' operations will become cost prohibitive based on loss in revenue from Massachusetts and/or regional consumers.  Any temporary increase of price of pork in Massachusetts will not be sufficient to offset the cost to come into compliance with the Act and Regulations.  This is because it is impossible to segregate which portions of meat will be sold into the Massachusetts market alone without undergoing significant efforts. While space and efforts were made at Triumph to facilitate some allocation for Massachusetts and California for this interim period while the constitutionality of such laws are addressed, it will be impossible to do so for every state's individual preferences on how breeding pigs of the offspring pigs coming into the plant are housed.  The increased cost to come into compliance cannot be recovered from Defendants due to Massachusetts' sovereign immunity, precluding the recovery of monetary damages by Plaintiffs. Or, alternatively, to come into compliance, many farmers will need to limit their supply so that their pigs will have more space, as many do not have the option to buy more real estate.  This means that the national pork supply will drop, again illustrating how the Act and Regulations are affecting the entire country's pork production.

119.    This process Triumph has instituted also increases substantial risk of recall and food waste, leading to additional lost revenue associated with a conventional pig being mistakenly intermingled with a lot of Question 3 compliant pigs ready for processing. This issue would result in the necessary recall of thousands of pounds of Whole Pork Meat destined for sale to Massachusetts.   This is true even though Triumph is a state-of-the-art facility and one of the best run facilities in the country.  Triumph – as are all processors – is at risk for this happening at any point with the deliveries from their farmers for product it attempts to segregate for California, or when Massachusetts deliveries (assuming there is any product available for Massachusetts), or any states that have similar regulatory preferences.

**A44**

120.     While Triumph is undertaking extraordinary efforts for the recent California and Massachusetts pig preferences, it is impossible to do so for numerous states across the country. Even for just these two states, product that is compliant for Massachusetts is not compliant for California.  As new states create their own version of the regulations, it will become more difficult for farmers and processors like Triumph to supply pork nationwide and internationally. Each new regulation would require new inventory management tools (e.g., stock keeping units, or bar codes), new sorting procedures, and new storage locations to keep each type of product separate. If enough states pass regulations like Question 3, Triumph will be forced to ration its products.

121.     Additionally, the full amount of pork produced from a compliant pig is not typically utilized to fulfill Proposition 12 or Question 3 compliant orders. Pork items for which there is no demand for Proposition 12 or Question 3 pork are sold into the commodity market without any premium to offset the increased cost of production for those products.

122.     The Act and Regulations' Minimum Size Requirements would require significant changes to Farmer Plaintiffs' farming operations, including significant structural changes and the requirement to reduce the number of pigs at the facility.

123.     The Minimum Size Requirements will also create negative impacts on the breeding pigs that are confined within a group pen, likely resulting in significant health risks and piglet loss. The Minimum Size Requirements create significant ongoing harm to breeding pigs.  Breeding pigs are subject to physical aggression, abuse, losing fetuses in utero, lameness, and the inability to obtain proper nutrition when confined in group systems.

124.     Due to not being able to build new barns or retrofit existing barns, it will not be feasible for Farmer Plaintiffs to ever come into full compliance with the Minimum Size Requirements for a variety of reasons, including lack of space and financial inability.  It is expected that smaller pig farmers like APC will be among those unable to comply with the Act, resulting in them being forcibly removed from the industry.  This will result in an acute consolidation of the industry into large farmers and processors who may be more adept to converting facilities or

**A45**

assuming the risk of decreasing their herd sizes and will ultimately significantly harm Farmer Plaintiffs' smaller or family-owned farms.

125.    Small farm operations are already threatened by bigger farmers and small farmers have been on the decline for the last twenty-five years.

126.    As of 2017, about 7% of pigs in the United States are on farms with less than 2,000 head in inventory; 20% of the inventory is on farms with 2,000-4,900 head; and 73% are on farms with 5,000 or more hogs. USDA, National Agricultural Statistics Service, *Census of Agriculture* (2017).

127.    Pork processors like Triumph will also suffer. The vast majority of pigs that are processed, packed, and distributed by Triumph is the product of an animal not housed in compliance with the Minimum Size Requirements. Pig farmers, such as the Farmer Plaintiffs, face significant financial consequences if they are unable to meet contractual obligations to produce pigs that are compliant with the Minimum Size Requirements.  Pork processors and distributors, including Triumph, may consequently be forced to severely restrict their supply of pigs by refusing to process non-compliant pigs—and therefore their products—or to risk being subjected to fines and/or injunctive relief outlined in the Act.

128.    Plaintiffs are also at risk of being subject to conflicting laws throughout the remaining United States, as evidenced by the passage of Proposition 12 in California. While Proposition 12 and Question 3 contain similar language at times, the statutes and regulations implementing the requirements in these two acts contain different definitions and different requirements.

129.    The states in which Triumph and Farmer Plaintiffs operate give farmers, including Farmer Plaintiffs, the right to confine breeding pigs in a manner that is expressly prohibited by the Act. This places Question 3 in direct conflict with state statutes for the actual states in which the breeding pigs are housed.  Further, the states in which Triumph operates do not prohibit the sale of Whole Pork Meat if it is the product of a sow not housed in compliance with the Minimum Size Requirements or is the offspring of such sow.

130. For example, the Missouri Constitution protects the "right of farmers and ranchers to engage in farming and ranching practices." Mo. Const. art. I, § 35.

131. Wyoming law provides that "the rights of farmers and ranchers to engage in farm or ranch operations shall be forever guaranteed in this state." Wyo. Stat. § 11-44-104. Further, Wyoming law provides that nothing in its "Protection of Livestock Animals" chapter prohibits "the use of Wyoming industry accepted agricultural or livestock management practices or any other commonly practiced animal husbandry procedure used on livestock animals…" Wyo. Stat. 11-29-115.

132. Indiana regulations, promulgated pursuant to Indiana statute, establish standards of care for livestock, including that persons responsible for caring for livestock must provide the animals with sufficient shelter from the weather; must take reasonable measures to protect the animals from injury or disease; and must provide the animals with an environment that can reasonably be expected to maintain the health of animals raised using the applicable production method. 345 Ind. Admin. Code 14-2-3 through 14-2-4.

133. Plaintiffs are uncertain whether pork already in the supply chain as of and including the expiration of the Stay Period, but which are the offspring of an animal not confined within the Minimum Size Requirements during the Stay Period, may still be sold after the Stay Period.

134. In Massachusetts, meat cannot be sold if it comes from a breeding pig that has been in confinement anywhere in the country that is contrary to the Act or its Regulations.

135. Thus, Plaintiffs face immediate and irreparable harm if the Act and Regulations continue to go into effect as planned and further enforced.  Injunctive relief will remedy this harm.[5]

## STANDING

136. Plaintiffs have suffered, and will continue to suffer, concrete and particularized injuries that are a direct result of the Act and the Regulations.  Their injuries will be redressed by a decision of this Court.

---

[5] Plaintiffs will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

A47

137.    Plaintiff APC specifically has associational standing to challenge the Act on behalf of its members and on behalf of the entity itself.

138.    One or more APC members has standing to bring this action in their own right because they are directly subject to the Act because they knowingly breed or raise pigs that are being sold into and within Massachusetts.

139.    APC's Mission Statement is to "support the actions of Triumph Foods by complying with production and ethical guidelines, balancing the relationship between members of Allied Producers' Cooperative receiving the maximum return per market hog delivered to Triumph Foods and the financial strength of Triumph Foods, and continuing the creation of expansion opportunities for all America's Premium Pork members."

140.    The interests APC seeks to protect are germane to APC's mission statement and purpose.

141.    Individual participation by APC's members is not required for the claims asserted or the relief requested.

142.    Farmer Plaintiffs, including APC's members, knowingly supply pigs to be processed into pork and sold into and within Massachusetts, and expect to continue to do so after the expiration of the Stay Period.  A civil enforcement by Defendants against Plaintiffs is not required to challenge the constitutionality of the Act.

143.    Farmer Plaintiffs have been unable to convert enough of their farming operations, due to both financial and time constraints needed to undertake the massive conversions required, in order to supply the quantity of hogs necessary for the demand required for Massachusetts.

144.    The Farmer Plaintiffs that actually can make conversions are faced with the imminent and irreparable Hobson's choice of: (1) being forced to expend significant capital to convert their operations to comply with the Minimum Size Requirements in which they know (a) are not supported by science or demonstrate best practices for the care of the sows; and (b) gamble the expenditure for laws which may be invalidated; (2) keeping their operations the same, but will risk defaulting under their HPAs with Triumph and face substantial injury as a result.

145.     Plaintiff Triumph risks substantial civil enforcement measures and injunctive relief for the sale and shipment of Whole Pork Meat products into Massachusetts after the expiration of the Stay Period because it is the entity that knowingly ships Whole Pork Meat directly into Massachusetts, rendering it the party that would be considered by Massachusetts as engaging in the sale of potentially non-compliant Whole Pork Meat into the state.

146.     This risk ultimately results in Triumph losing customers, both at an individual state and potentially national level and being cut out of entire states for the pork market.

147.     For example, if Seaboard is unable to supply an order that requires compliant Whole Pork Meat, Seaboard and Triumph risk losing the *entire* nationwide sale with those entities. The threat of this happening has already occurred in California, a state with the same or very similar confinement prohibitions through Proposition 12.

148.     The Minimum Size Requirements will be enforceable at the expiration of the Stay Period, thereby creating immediate risk of civil penalties or "injunctive relief" against Plaintiffs. The entire national market for pork is threatened to be irreparably harmed if the Act and Regulations are enforced, with impacts on nationwide consumers who had no involvement in the passage of Question 3.

149.     These injuries will be remedied by the relief sought in this action.

### FIRST CAUSE OF ACTION

### VIOLATION OF THE COMMERCE CLAUSE (42 U.S.C. § 1983)

150.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-149 as though fully set forth herein.

151.     Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

152.     The Act and its Regulations violate the Commerce Clause, as they discriminate in purpose and in effect against out-of-state farmers and processors.

153.    Massachusetts' voters approved the Act on November 8, 2016, which prohibits business owners and operators from engaging in the sale of Whole Pork Meat from offspring of breeding pigs confined in a cruel manner, regardless of where the animal was confined.

154.    The Regulations promulgated by the Department of Agricultural Resources acknowledge the Act is a protectionist trade barrier with a discriminatory purpose.

155.    For example, the Regulations acknowledge that the Act is intended to "reduc[e] potential fiscal" threats to Massachusetts consumers.  2022 MA REG TEXT 610066 (NS).  This, combined with one singular stated purpose within the Act to avoid "negative fiscal impacts to the Commonwealth of Massachusetts," portrays the discriminatory purpose.

156.    Additionally, prior to the election in which Question 3 was passed by voters, no Massachusetts pig farmer used gestation crates to confine breeding pigs or used practices that otherwise would be banned by Question 3. This shows that Question 3 was specifically intended to target out-of-state farmers, further illustrating the discriminatory intent behind the Act and its Regulations.

157.    Furthermore, the vast majority of pig farms in the United States are located in states other than Massachusetts and the vast majority of Whole Pork Meat is processed in states other than Massachusetts. Massachusetts has few pig farmers and few breeding sows, and the farmers that are in Massachusetts operate on a much smaller scale than Farmer Plaintiffs' farms. Given how few pig farmers, breeding sows, and general pork production operations are in Massachusetts, in-state pig farmers will be able to easily conform their operations to the Act compared to the Farmer Plaintiffs' operations.

158.    In comparison, out-of-state farmers like Farmer Plaintiffs must make conversions to their pig production facilities in order to continue to supply Pork Meat into Massachusetts.

159.    Again, Farmer Plaintiffs have been unable to convert enough of their farming operations, due to both financial and time constraints needed to undertake the massive conversions required, in order to supply the quantity of hogs necessary for the demand required for Massachusetts.

**A50**

160.     This forced conversion to adhere to a single state's moral and policy requirements operates as a substantial, forced burden in order to gain access to the Massachusetts marketplace.

161.     Massachusetts also has few USDA-certified pork processors and those that do exist provide Pork Meat primarily for export out of Massachusetts to the larger New England region and arguably do not even "engage in the sale" of Whole Pork Meat under the Act.

162.     Massachusetts' three USDA processors are inspected by the USDA for compliance with the FMIA. Under the Regulations implementing the Act, a sale that is undertaken at an establishment at which an inspection is provided under the FMIA is exempted from the Act's prohibitions of a "sale" involving noncompliant Whole Pork Meat.

163.     In-state processors may sell noncompliant Pork Meat from their FMIA and FSIS inspected facility if the buyer takes possession of the product at that establishment, effectively creating a loophole for in-state farmers. In comparison, out-of-state processors cannot have the sale of any noncompliant Whole Pork Meat be excluded from the definition of a "sale" because they are not located in Massachusetts and are shipping directly into the state from out-of-state facilities.

164.     The Act and the Regulations confer an advantage to in-state processors over out-of-state processors and creates an unfair advantage for in-state processors because they will not need to comply with the Act, given the exclusions in the regulatory definition of "sale."

165.     The Act and the Regulations will allow farmers to offload noncompliant pigs through Massachusetts processors, diverting business from out-of-state processors like Triumph.

166.     Given the regulatory definition of a "sale," in-state processors can buy noncompliant Whole Pork Meat and organize sales to occur at their in-state facilities, which would create a black market for non-compliant Whole Pork Meat and which subjects out-of-state processors to an undue, unfair, and discriminatory disadvantage.

167.     Therefore, the Act imposes disproportionate burdens on out-of-state pork processors in comparison to in-state pork processors. Such burdens far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

**A51**

168. The good-faith defense, dependent upon certifications provided for in the Regulations, will in effect force out-of-state merchants to seek regulatory approval within Massachusetts before undertaking a transaction in Massachusetts, or will result in purchasers in Massachusetts refusing to engage in commercial transactions with out-of-state suppliers, another example of the Act's discrimination against out-of-state suppliers.

169. Even further, the Regulations also require out-of-state farmers to open up their farms—regardless of where in the country they are located—to inspections by Massachusetts officials and potentially third-party certifiers. These Regulations were proposed in March of 2022 and indicated for the first time just how far beyond Massachusetts' borders the Act intends to reach. Furthermore, the Act places a substantial burden on Farmer Plaintiffs and the interstate pork market without sufficient justification. Such burdens far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

170. Specifically, the Regulations, and the Act itself, are tantamount to Massachusetts imputing a penalty onto out-of-state pork processors, like Triumph, and onto farmers, like the Farmer Plaintiffs. Through the Act, they are banning the industry wide accepted, and USDA approved, product through an upfront sales embargo or debarment – this itself is a penalty and functions as punitive.

171. Further, a regulatory scheme created *by a single state*, is controlling other states' access to *entire markets*, as Massachusetts is the primary thoroughfare for all New England states. Said another way, if processors and farmers are not Question 3 compliant, they are penalized not just by blocked access to Massachusetts, but by being excluded and cut out from the whole of New England markets (markets that the mid-west pork industry, including the out-of-state pork market, have operated in for decades). This further extends the out-of-bounds regulatory nature of commerce, not to mention sanction or penalty, by Massachusetts or other states both who are selling and receiving product.

172. A regulatory scheme created *by a single state* has direct economic implications that reach nationwide.

**A52**

173.     For example, if the Act goes into effect, and is enforced through the Regulations, it will have an impact on the national market of pork production, including: decreasing supply, forcing small pig farmers out of the market, consolidating pig production into large farmers, altering sales in all remaining states to conform to the Minimum Size Requirements, altering packers' practices to conform, and ultimately resulting in nationwide increases in the costs of Whole Pork Meat that will be passed along to consumers nationwide.

174.     In effect, Massachusetts is forcing the entire nation's pig production chain to adopt its Regulations for pig production and is no longer permitting each state to set its own regulatory scheme. The Act and Regulations, in practical effect, create a national regulation, and attempt to unilaterally impose Massachusetts' moral and policy preferences for pig farming and pork production on the rest of the nation in an extraterritorial manner in violation of the Commerce Clause. These substantial burdens on the nation's pig production supply chain far outweigh any legitimate local benefit that Massachusetts contends the Act and its Regulations advance.

175.     Question 3's ballot initiative record was devoid of actual proof that the Act would actually accomplish the goals it intended (*i.e.*, to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to Massachusetts). Furthermore, Congress has already charged a federal governing body, the USDA, and its regulatory agency, FSIS, with ensuring that meat is safe and that livestock in interstate commerce is pest and disease-free.

176.     These substantial burdens on commerce, which impact all stages of the national pork production market, are clearly excessive and outweigh any local benefit, which does not actually exist.

## SECOND CAUSE OF ACTION

## VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (42 U.S.C. § 1983)

177.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-176 as though fully set forth herein.

**A53**

178.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating rights under the Privileges and Immunities Clause at Article IV, Section 2 of the United States Constitution.

179.    Article IV, Section 2 of United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

180.    The right to pursue a common calling, such as to pursue a trade, practice an occupation, or pursue a common calling within the state is a fundamental right protected by the Privileges and Immunities Clause. The Privileges and Immunities Clause also restrains state efforts to discriminate against out-of-state citizens.

181.    Question 3 was passed on November 8, 2016, and targeted out-of-state farmers by subjecting them to the onerous Minimum Size Requirements in order to sell their pigs into and within Massachusetts.

182.    The Regulations reiterate the threat of enforcement if business owners or operators sell Whole Pork Meat into Massachusetts that violate the Minimum Size Requirements.

183.    Due to Massachusetts' inability to produce enough pork for the demand within its borders, combined with Massachusetts' small amount of pig farmers and pork processors, the burden of compliance with the Act's Minimum Size Requirements falls almost entirely on out-of-state pig farmers and pork processors to the benefit of in-state farmers and pork processors.

184.    The Act's discriminatory and disproportionate burden on out-of-state pig farmers and pork processors, to the benefit of in-state pig farmers and pork processors, violates the Privileges and Immunities Clause.

185.    The Act and its Regulations attempt to effectively regulate pig farming, manufacturing, and production in other states.

186.    Sufficient justification does not exist to discriminate against out-of-state farmers and pork processors.

**A54**

### THIRD CAUSE OF ACTION

### EXPRESS PREEMPTION BY FEDERAL MEAT INSPECTION ACT

#### (Declaratory Relief; Preemption)

187.    Plaintiffs incorporate the facts set forth in Paragraphs Nos. 1-186 as though fully set forth herein.

188.    Application of the Act and its Regulations to FSIS inspected processors, like Triumph's, violates the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

189.    The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

190.    The FMIA has an express preemption clause. The FMIA express preemption clause states that *"[r]equirements within the scope of this chapter with respect to premises, facilities and operations* of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia . . . ." 21 U.S.C. § 678 (emphasis added).

191.    The FMIA has many requirements with respect to the premises, facilities, and operations of FMIA-inspected facilities. For example, the FMIA requires that "[f]or the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce . . . ." 21 U.S.C. § 603. Accordingly, FMIA-inspected facilities accommodate the inspection process as implemented by FMIA inspectors.

**A55**

192.     Furthermore, the USDA is designated to "appoint from time to time inspectors to make examination and inspection of all amenable species, inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, . . . and said inspectors shall refuse to stamp, mark, tag, or label any carcass or any part thereof . . . until the same shall have actually been inspected and found to be not adulterated . . . ." 21 U.S.C. § 621.

193.     The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. . . . ." 21 U.S.C. § 601.

194.     Furthermore, under the FMIA, USDA inspectors are mandated to "examin[e] and inspect[]" "all amenable species before they shall be allowed to enter into any slaughter[house] or similar establishment." 21 U.S.C. § 603.

195.     In sum, the FMIA requires the USDA to complete and effectuate inspection processes at all stages of pork processing to ensure pork products that enter interstate commerce are not unwholesome or adulterated, and thus fit for human consumption.

196.     However, Question 3, in purpose and effect, interferes with the USDA's independent determination by examination or inspection: (a) that pigs must be adulterated (or otherwise not used for Massachusetts) that do not meet the Minimum Size Requirements; and (b) cause segregation of the pigs inside the FSIS inspected facility that do not meet the Minimum Size Requirements, when no such requirements are found within the FMIA or its implementing regulations governing post-mortem inspections.  Indeed, Question 3 preempts the USDA in making a determination before and after entrance into the plant, that the pig is not safe for human consumption and may not be processed for pork for Massachusetts due to risk for foodborne illness; and then forces the FSIS inspected facility to segregate the pigs from both the pigs designated by the USDA as unadulterated and otherwise deemed fit for human consumption.

197.    Question 3 has a direct effect on the operations of Triumph's FMIA regulated facility in both (a) the inspection and findings that are under the purvey of the USDA/FSIS and (b) the physical segregation process itself.

198.    Indeed, that Question 3 falls precisely within the scope of the FMIA's express preemption clause is shown by Question 3's stated justification, which is redundant and tracks to the FMIA's express purposes: "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, *which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness*, and have negative fiscal impacts on the Commonwealth of Massachusetts."

199.    While Question 3 attempts to dodge a preemption claim by stating that "sales" undertaken at FSIS facilities are excluded from regulation, this is empty rhetoric without meaning, as (1) the Question 3 "sales" definition specifically  excluded "sale" is *only* where the buyer takes physical possession at the processing plant, and sales for FSIS facilities do not take place at the FSIS plants, and thereby FSIS facilities, like Triumph, do not receive insulation; and (2) there is no way for an FSIS facility to comply with Question 3 without allowing the Act's requirements to directly interfere with the USDA's purview of inspections in by both their (a) inspection findings; and (b) the physical acts of segregation.

200.    As Question 3 places additional and different requirements from the inspection operations requirements imposed by the FMIA, Question 3 is in violation of the FMIA's express preemption clause.

201.    Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt the Act and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

202.    Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

**A57**

203. Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

<div align="center">

**FOURTH CAUSE OF ACTION**

**CONFLICT PREEMPTION BY FEDERAL MEAT INSPECTION ACT**

**(Declaratory Relief; Preemption)**

</div>

204. Plaintiffs incorporate the facts set forth in Paragraphs Nos. 1-203 as though fully set forth herein.

205. Application of the Act and its Regulations to FSIS inspected processors, like Triumph's, violates the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

206. The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

207. The federal government of the United States has a critical interest in overseeing the safety and fitness of meat produced for human consumption throughout the Nation.

208. In response to this critical interest, Congress enacted the FMIA. The express purposes, among others, are to ensure that meat products are "wholesome, not adulterated," to carry out the "effective regulation of meat and meat food products in interstate [] commerce," and to "protect the health and welfare of consumers." 21 U.S.C. § 602.

209. Reflective of this purpose, the FMIA states that the USDA shall appoint "inspectors to make examination and inspection of all amenable species, inspection of which is hereby provided for, and of all carcasses and parts thereof, and of all meats and meat food products thereof, . . . and said inspectors shall refuse to stamp, mark, tag, or label any carcass or any part thereof . . . until the same shall have actually been inspected and found to be not adulterated . . . ." 21 U.S.C.

**A58**

§ 621. In other words, the USDA is required to determine whether pork products – both before and after the pigs are harvested at the FMIA processing facility – are "adulterated."

210.     The word "adulterated" is a defined term within the FMIA, meaning a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health. . . ." 21 U.S.C. § 601.

211.     Consequently, the question of whether Whole Pork Meat is fit and appropriate for human consumption is a responsibility delegated and assigned to the USDA, as effectuated through the FMIA's inspection processes and USDA inspectors or designees through the USDA's as effectuated through the FMIA's inspection processes and USDA inspectors or by the establishment if it is implementing voluntary segregation procedures in accordance with FSIS Directive 6100.1.

212.     The inspection processes, including requirements as to inspectors themselves and how such inspections are to be carried out, have been further set forth by regulation by the USDA. *See* 9 C.F.R. Part 306; *see also* FSIS Directive 6100.1 & FSIS Directive 6600.1 (providing instructions to USDA inspectors regarding how to verify that facilities are producing ready-to-cook pork via ante-mortem and post-mortem inspections).

213.     The FMIA's extensive and detailed inspection processes reflect the FMIA's emphasis on ensuring uniformity of such inspections.

214.     Question 3 prohibits a business owner or operator from engaging in the sale of Whole Pork Meat from the offspring of an animal that was not confined in accordance with the Minimum Size Requirements.

215.     The FMIA or its associated regulations does not set any type of Minimum Size Requirement in the raising of breeding pigs or within the definition of what should constitute an "adulterated" product or in determining what is fit for human consumption.

**A59**

216. By banning sales downstream from the FMIA processing facility and designating all other pork as adulterated, or unfit for human consumption in Massachusetts, Question 3 preempts the inspection processes at FMIA-inspected facilities and infringes on the Congressionally delegated authority to the USDA, and therefore conflicts with the stated intentions of the FMIA.

217. Implementation of Question 3 predetermines, from the outset and on the alleged basis of protecting the health of consumers, what pigs are fit for purposes of human consumption. Such predetermination takes the matter out of the hands of the duly appointed federal inspectors in charge of making such decisions.

218. As a result, Question 3 presents an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as set forth in the FMIA.

219. Therefore, Question 3 is preempted by the FMIA under principles of conflict preemption.

220. Plaintiff Triumph is therefore entitled to a judgment declaring that the FMIA, 21 U.S.C. § 601 *et seq.*, and its implementing regulations, preempt the Act and its Regulations as applied to pigs and pork products derived from those pigs regulated by the FMIA.

221. Such declaration is necessary and appropriate at this time to determine the rights and obligations of the parties.

222. Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

## FIFTH CAUSE OF ACTION

## PREEMPTION BY PACKERS AND STOCKYARDS ACT

## (42 U.S.C. § 1983)

223. Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-222 as though fully set forth herein.

**A60**

224.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

225.    The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

226.    Massachusetts approved Question 3 on November 8, 2016, which prohibits the sale of Whole Pork Meat by any business owner or operator from an animal that was not confined in accordance with the Minimum Size Requirements.

227.    The Packers and Stockyards Act, 7 U.S.C. § 192, prohibits any meat packer/producer from providing any preference to a particular person or locality and from subjecting any particular locality to a "disadvantage" in the sale of meat. It also prohibits any processor from engaging in any unfair or unjustly discriminatory practice. Further, the Packers and Stockyards Act prohibits processors from taking action that will result in a restraint on trade.

228.    Triumph meets the definition of a "packer" under the Packers and Stockyard Act, contained at 7 U.S.C. § 191.

229.    The Act and the Regulations encourage processors and packers to either source their supply of pigs only from farmers who are completely compliant with the Act or to pay a premium to farmers who produce pigs that are compliant with the Act.

230.    This implicit advantage creates a conflict with the Packers and Stockyards Act because processors like Triumph would necessarily discriminate against farmers who are not compliant with the Act or its Regulations and would provide an unreasonable preference to particular farmers or localities, in violation of the Packers and Stockyards Act.

231.    These trade restraints will also impact the interstate pork industry including, but not limited to, through forcing small businesses out of the market, passing along increased costs to consumers, and reducing the supply of Pork Meat in the state, which also creates a conflict with

**A61**

the Packers and Stockyards Act.

232. Additionally, three USDA processors operate in Massachusetts. Those processors are inspected by the USDA for compliance with the Federal Meat Inspection Act (21 U.S.C. § 601 *et seq.*) ("FMIA"). Under the Regulations implementing the Act, a sale that is undertaken at an establishment at which an inspection is provided under the FMIA is exempted from the Act's prohibitions of a "sale" involving noncompliant Whole Pork Meat.

233. In-state processors may sell noncompliant Whole Pork Meat from their FMIA facility if the buyer takes possession of the product at that establishment, effectively creating a loophole for in-state farmers. In comparison, out-of-state processors cannot have the sale of any noncompliant Whole Pork Meat be excluded from the definition of a "sale" because they are not located in Massachusetts and are shipping directly into the state from out-of-state facilities.

234. The Act and the Regulations confer an advantage to in-state processors over out-of-state processors and creates an unfair advantage for in-state processors because they will not need to comply with the Act, given the exclusions in the regulatory definition of "sale."

235. The Act and the Regulations will allow farmers to offload noncompliant pigs through Massachusetts processors, diverting business from out-of-state processors like Triumph.

236. Given the regulatory definition of a "sale," in-state processors can buy noncompliant Whole Pork Meat and organize sales to occur at their in-state facilities, which would create a black market for non-compliant Whole Pork Meat, and which subjects out-of-state processors to an undue, unfair, and discriminatory disadvantage.

237. By organizing their sales in this way, in-state processors can essentially create a monopoly for pork processing because they can accept all meat—regardless of whether the meat complies with the Act and the Regulations —while out-of-state processors cannot.

238. Furthermore, the additional capital investments or contributions for equipment changes and facility conversions that Farmer Plaintiffs will need to undergo for compliance with the Minimum Size Requirements may create a significant obstacle for pork processors to have their pig supply needs met by farmers.

239.    Thus, it is impossible for pork processors to comply both with the Act, its Regulations and the Packers and Stockyards Act.

240.    At a minimum, the Act and the Regulations create hurdles to comply with the Packers and Stockyards Act and the Act.

241.    The Act is therefore preempted by the Packers and Stockyards Act.

242.    The Regulations are therefore invalid.

### SIXTH CAUSE OF ACTION

### VIOLATION OF THE FULL FAITH AND CREDIT CLAUSE (42 U.S.C. § 1983)

243.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-242 as though fully set forth herein.

244.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating these individual members' rights under the Full Faith and Credit Clause at Article IV, Section 1 of the United States Constitution.

245.    Under the Full Faith and Credit Clause, states are to respect the laws and judgments from other states.

246.    The laws of the states in which Farmer Plaintiffs operate their farms do not subject farmers to prohibitions that rise to the level of the Minimum Size Requirements in the Act, and therefore those states confer a right to Farmer Plaintiffs to house breeding pigs in a manner that is expressly prohibited by the Act and the Regulations.

247.    The laws of some states in which Farmer Plaintiffs operate their farms specifically give the Farmer Plaintiffs the right to engage in their farming practices or provide standards of care for livestock with which Farmer Plaintiffs comply.

248.    The laws of Missouri where Triumph operates its pork processing facility either confers a right to, or at least do not prohibit, Triumph to engage in the sale of Whole Pork Meat products that are expressly prohibited from being sold in Massachusetts by the Act.

A63

249. Even if Farmer Plaintiffs did not want to sell within Massachusetts, it is impossible to prevent pork products from being sold within Massachusetts given the interconnected nature of the pork industry and the logistics behind the production and packing of pork products.

250. Through the passage of Question 3 and implementation of the Act through the Regulations, Massachusetts is denying Plaintiffs the rights they are guaranteed under the laws in which they operate.

## SEVENTH CAUSE OF ACTION

## VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983)

## (FACIAL AND AS APPLIED CHALLENGE)

251. Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-250 as though fully set forth herein.

252. Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

253. The Act violates the Due Process Clause because it is unconstitutionally vague on its face because it is vague in all its applications.

254. The Act also violates the Due Process Clause as applied to Plaintiffs because it does not define the offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.

255. The Act makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Mass. Gen. Laws Ch. 129 App., § 1-3.

256. The Act and Regulations fail to define material words and terminology like "engage in the sale within the Commonwealth of Massachusetts."

257.   "Engaging in the sale" is the critical action prohibited by the Act and Regulations and yet no business owner or operator of ordinary intelligence can discern what it means to *be engaged in* the sale.

258.   When a term as central to the offense as "engage in the sale" is vague, the Act does not give business owners or operators a reasonable opportunity to know what conduct is prohibited and thus, is vague in all its applications.

259.   The Act and Regulations further fail to identify what Massachusetts interprets as compliant breeding pig housing specifications to meet the standards set forth in the Minimum Size Requirements.

260.   The square footage requirements for a breeding pig to turn around freely, without touching the sides of an enclosure or other animal can be interpreted in many different ways.

261.   For example, the ability of a sow to turn around in the manner specified in the Minimum Size Requirements is expressly dependent on how large the breeding pig actually is. The length of a sow is not a "one size fits all" size.

262.   The failure to define the square footage specifications makes the Act and its Regulations vague both on its face and as applied to the Farmer Plaintiffs' operations.

263.   The Act and Regulations' failure to define material words and terminology also makes the Act vague as applied to Plaintiffs.

264.   Plaintiffs are a pork processor and farmers located outside the Commonwealth of Massachusetts, but pigs raised and ultimately processed by Plaintiffs are shipped directly into Massachusetts.

265.   Because the Act and Regulations fail to define material words and terminology like "engage in sale within the Commonwealth of Massachusetts," and provide further specifications for compliance with the Minimum Size Requirements as set forth herein, Plaintiffs are unable to discern whether the shipment of their pork products into Massachusetts, if not compliant with the Minimum Size Requirements, is a prohibited conduct.

266.    Moreover, the Act and Regulations failure to define material words and terminology is insufficiently definite such that it will lead to arbitrary and discriminatory enforcement.

267.    In other words, the Act fails to provide explicit standards for enforcement and so, it is vague as applied to Plaintiffs.

268.    Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act.  Mass Gen. Laws App., § 1-6.

269.    While the Act purports to impose civil penalties only—fines and injunctive relief, the fines are so substantial that they are tantamount to criminal penalties.

270.    Moreover, the injunctive relief available to the Attorney General operates in the same manner as debarment—another criminal penalty.

271.    Accordingly, the Act is a quasi-criminal statute.

272.    For a statute to be unconstitutional for due process, enforcement is not required; enforcement must just be imminent or the legal authority to enforce must be available to the authorities.

273.    Enforcement in this context would carry the presumption that the Whole Pork Meat entering the State of Massachusetts is unfit for human consumption, unwholesome and adulterated.

274.    Plaintiffs have a constitutional right to liberty to be free from risk of enforcement, and associated penalties, of a vague law.

## EIGHTH CAUSE OF ACTION

## VIOLATION OF THE IMPORT-EXPORT CLAUSE (42 U.S.C. § 1983)

275.    Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-274 as though fully set forth herein.

276.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiffs, including by violating these individual

members' rights under the Import-Export Clause at Article I, Section 10, clause 2 of the United States Constitution.

277.     Article I, Section 10, clause 2 of the United States Constitution states, "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws."

278.     The Import-Export Clause may be interpreted to prevent states from imposing certain especially burdensome taxes and duties on imports from other states, or in interstate commerce, and not just on imports from foreign countries.

279.     The Act and the Regulations, in effect, levy a burdensome duty on out-of-state pork goods because the Act and the Regulations conditions the sale of a good within Massachusetts on the use of Massachusetts' preferred farming practices in the other states in which sows were farmed.

280.     In addition, the Act and the Regulations levy a duty on Triumph to require and confirm a valid certification exists from its Farmer Plaintiffs and other out-of-state pig farmers under the Regulations for all pigs it obtains that may ultimately be processed and distributed to Massachusetts.

281.     The Act and Regulations force Plaintiffs, as a pork processor and farmers, to incur a penalty, either through forced compliance with a regulatory scheme set by a single state to remain active in entire markets (Massachusetts and New England markets) or risk exclusion from those markets, including markets that the mid-west pork industry, including the out-of-state pork market, has operated in, sold to, and transacted in, for decades.

282.     Sufficient justification does not exist to levy a duty on Whole Pork Meat that was derived from breeding pigs not confined in compliance with the Minimum Size Requirements.

## NINTH CAUSE OF ACTION

## DECLARATORY RELIEF (28 U.S.C. § 2201)

283.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-282 as though fully set forth herein.

**A67**

284.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether, under the Stay Order, Defendants are allowing the sale of Whole Pork Meat after the expiration of the Stay Period so long as the offspring to be sold into Massachusetts was in gestation before the expiration of the Stay Period.

285.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the dormant Commerce Clause of the United States Constitution, as set forth in the First Cause of Action.

286.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate Plaintiffs' privileges and immunities under the Privileges and Immunities Clause of the United States Constitution, as set forth under the Second Cause of Action.

287.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Supremacy Clause of the United States Constitution, as set forth in the Third, Fourth and Fifth Causes of Action.

288.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Full Faith and Credit Clause of the United States Constitution, as set forth in the Sixth Cause of Action.

289.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Due Process Clause of the United States Constitution, as set forth in the Seventh Cause of Action.

290.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning whether the Act and its Regulations violate the Import-Export Clause of the United States Constitution, as set forth in the Eighth Cause of Action.

291.     The Act and its Regulations will be enforceable as of the date of the expiration of the Stay Period. Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law.

292.     Plaintiffs are therefore entitled to a judicial declaration of their rights and the duties of Defendants under 28 U.S.C. § 2201.

293.     Because the Defendants' actions cause harm that cannot be adequately compensated in damages, Plaintiffs request the Court issue preliminary and permanent injunctive relief enjoining the Defendants from enforcing the Act and its Regulations.

**TENTH CAUSE OF ACTION**

**JUDICIAL REVIEW OF VALIDITY OF REGULATIONS, PURSUANT TO G.L. c. 30A and G.L. c231A**

294.     Plaintiffs incorporate the facts set forth in Paragraph Nos. 1-293 as though fully set forth herein.

295.     The Commissioner of Agriculture promulgated the Regulations to govern the enforcement of the Act and guide the pig farming and pork production industry.

296.     The Regulations are found at 330 CMR 35.00.

297.     330 CMR 35.04 details the prohibition on the sale of products derived from covered animals who were confined in a cruel manner as set forth in 330 CMR 35.03, parroting the prohibitory sale language concerning the Minimum Size Requirements found within the Act.

298.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article I, Section 8 of the Constitution, as set forth more fully in Cause of Action I.

299.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article IV, Section 2 of the Constitution, as set forth more fully in Cause of Action II.

300.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article VI, Clause 2 of the Constitution, as set forth more fully in Count III – V.

301.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article IV, Section 1 of the Constitution, as set forth more fully in Cause of Action VI.

302.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates the Due Process Clause of the Fourteenth Amendment to the Constitutions, as set forth more fully in Cause of Action VII.

**A69**

303.     The prohibition of sale of Whole Pork Meat within 330 CMR 35.04 violates Article I, Section 10, clause 2 of the Constitution, as set forth more fully in Cause of Action VIII.

304.     330 CMR 35.05 details certification requirements for any person who engages in the sale of Whole Pork Meat within Massachusetts.

305.     These certification requirements are a precondition to the sale of Whole Pork Meat within Massachusetts.

306.     330 CMR 35.07 provides third-party validators authority to ensure compliance with the Act.

307.     The Act, however, provides the Attorney General's Office with exclusive authority to enforce any violations of the Act.

308.     No provision of the Act vests the Commissioner of Agriculture with the authority to delegate enforcement means away from the Attorney General and vest compliance actions within third-party validators.

309.     Because this is not authorized by the enabling Act, it is an unlawful delegation of authority, in excess of the Department's statutory authority, arbitrary or capricious, and otherwise not in accordance with law.

310.     Because of these constitutional violations, and unlawful delegation of authority, and pursuant to G.L. c. 30A, § 7 and G.L. c. 231A, the Regulations at 330 CMR 35 and any guidance issued thereunder must be declared invalid.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court set this matter for hearing on a preliminary injunction following review of Plaintiffs' separate Motion for Preliminary and Permanent Injunction to be submitted separately, and award the following relief:

1.     At a minimum, issue an immediate stay of enforcement of the Act until a final, non-appealable judgment is entered in this matter;

**A70**

2. Issue a preliminary and permanent injunction prohibiting the enforcement of the Act, its Regulations, its policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them;

3. Enter judgment declaring that the Act, its Regulations and related policies, practices and customs of the Defendants violate the United States Constitution and may not be lawfully enforced, both now and in the future;

4. Enter judgment declaring that the Regulations and related guidelines issued thereunder invalid pursuant to G.L. c 30A, § 7 and G.L. c. 231A;

5. Enter judgment declaring that Whole Pork Meat products derived from breeding pigs that have been in gestation prior to the expiration of the Stay Period, may be sold into and within Massachusetts after the expiration of the Stay Period or another date after that time as agreed upon by the Plaintiffs and Defendants;

6. Grant Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

7. Any further relief that the Court deems just and equitable.

Dated: July 31, 2023.                                          .

<div style="margin-left:40%">

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, in its official capacity and on behalf of its members, Plaintiffs.

By: */s/ Ryann A. Glenn*
Robert L. Peabody
MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320

</div>

**A71**

Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes (*admitted pro hac vice*)
Ryann A. Glenn (*admitted pro hac vice*)
Michael A. Raupp (*admitted pro hac vice*)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com

*Attorneys for Plaintiffs*

**A72**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | **Case No. 1:23-cv-11671-WGY** |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | **REQUEST FOR ORAL ARGUMENT** |
| Defendants. | |

Plaintiffs Triumph Foods, LLC ("Triumph"), together with Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers' Cooperative ("APC"), both in its official capacity and on behalf of their members (collectively, "Farmer Plaintiffs") will and hereby do move for an order granting preliminary injunction against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts ("Campbell") and Ashley Randle, in her official capacity as Massachusetts Commissioner of Agriculture ("Randle") (collectively, "Defendants").

Pursuant to Federal Rule of Civil Procedure 65(a) and L.R. 7.1, Plaintiffs hereby respectfully move this Court for a preliminary injunction order to prevent Defendants and their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with Defendants, from enforcing Massachusetts' Question 3 Minimum Size

**A73**

Requirements for Farm Animal Containment ("Question 3" or the "Act") against Plaintiffs and similarly situated pig farmers and pork processors. The justification for the requested preliminary injunction is more completely explained in the accompanying Memorandum of Points and Authorities in Support of this Motion, together with supporting Declarations.

For the sake of judicial efficiency and convenience, the summarized key facts and law relied upon in support of this request are as follows:

1.    The Act established minimum size requirements for egg-laying hens, breeding pigs, and calves raised for veal (the covered animals) to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ann. Ch. 129 App., § 1-1, *et seq.* It is unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat[1] that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." *Id.* at § 1-3. This sale prohibition, effective August 15, 2022, is without distinction regarding where the Whole Pork Meat originated. Acts (2021) Chapter 108 § 12. [2]

2.    Specifically, "[c]onfined in a cruel manner" means confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely" (the "Minimum Size Requirements"). *Id.* at § 1-5.

---

[1] "Whole pork meat", any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole pork meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.  Mass. Gen. Laws Ch. 129 App., § 1-5

[2] *See also* Matt Murphy, *House's Hen Welfare Bill Aims to Assure Egg Supply* (Oct. 6, 2021), https://www.statehousenews.com/news/20211859

3.      The Massachusetts Department of Agricultural Resources promulgated mandatory regulations for implementing the Act, becoming effective June 10, 2022 (the "Regulations"). *See* MA REG TEXT 610066 (NS). Even today, the Regulations are not final. Defendant Campbell's office continues to try and clarify the vagueness within the Act. Defendants agreed through ongoing dialogue to seek further amendment of the Regulations to allow for transshipment out of the state and an extension of the sell-through period to coincide with the expiration of the existing stay of enforcement, set to expire August 23, 2023.

4.      Triumph is a farmer-owned, pork processor producing high-quality pork products sold locally, nationally, and internationally. Ex. 1 ¶ 5. Triumph processes 5.7 million pigs annually, which produces 1.45 *billion* pounds of pork each year. *Id.* at ¶ 8. Each Farmer Plaintiff executes Hog Procurement Agreements ("HPAs") with Triumph, requiring the farmer to sell a quota of hogs commensurate with the farmer's equity ownership percentage or risk damages, even the loss of equity ownership in Triumph. *Id.* at ¶ 11.[3]

5.      Triumph sells its pork through a Marketing Agreement with Seaboard Foods ("Seaboard"), who makes all sales decisions, often on a national-account basis. *Id.* ¶¶ 15-18.[4] Triumph will process, package, and distribute the pork cuts directly into Massachusetts for those customers. *Id.* at ¶ 19. If Seaboard is unable to supply an order that demands compliant Whole Pork Meat[5], Seaboard and Triumph risk losing the profits realized from the entire nationwide contract with those entities. *Id.* ¶ 20.

---

[3] For example, Christensen Farms owns 42.1% of Triumph and therefore must provide 42.1% of the total hogs processed by Triumph on an annual basis. *See* Ex. 4, Declaration of Greg Howard ("Christensen Farms Decl.") ¶¶ 6, 20; Ex. 1 ¶ 13.
[4] Triumph cannot control whether Seaboard sells to California or Massachusetts under the existing Marketing Agreement. Ex. 1 ¶ 16. Triumph is specifically prohibited from engaging in any selling or marketing, directly or indirectly, any pork products produced by Triumph under the Marketing Agreement. *Id*
[5] "Pork Meat" carries the same definition as noted in the Plaintiffs' Complaint. See ECF No. 17, ¶ 32.

**A75**

6.      Most of Farmer Plaintiffs' operations do not – and cannot - comply with the Act. Ex. 4 ¶ 23.[6] Even though some of Farmer Plaintiffs' farms comply, it would not produce enough pork to sustain Triumph's Massachusetts' demand. Ex. 4 ¶ 22.  Seaboard is demanding more Proposition 12[7] pork than what Triumph and the Farmer Plaintiffs have available or could possibly make available. *Id.* at ¶ 30.

7.      Farmer Plaintiffs are using industry-best and science-based practices to protect the health of the breeding pig and offspring. *See* Ex. 7, Declaration of Dr. Janeen Salak-Johnson ("Johnson Decl."), ¶¶ 19-20. The Act will require group pens, which harm the health and welfare of the breeding pigs. *Id.* at ¶¶ 38, 44-46, 49, 62. Further, group confinement substantially harms farmer employees by threatening their safety. *Id.* at ¶ 70.

8.      Plaintiffs have brought an action under 42 U.S.C. § 1983 against Defendants, challenging the constitutionality of the Act and its Regulations. As shown in the Memorandum and within the materials submitted in support of this Motion, the Act directly targets out-of-state farmers and processors in violation of the dormant Commerce Clause of the United States Constitution, running afoul of the very antidiscrimination principle Justice Gorsuch reaffirmed as the central "core" to Commerce Clause jurisprudence in *NPPC v. Ross,* 143 S. Ct. 1142 (2023).

9.      Plaintiffs also have asserted constitutional violations under the United States Constitution's Privileges and Immunities Clause, Full Faith and Credit Clause, Due Process Clause, and Import-Export Clause.

10.     Plaintiffs further assert and request a declaration that the Act is preempted through the Supremacy Clause, Article VI, Clause 2 of the United States Constitution by the

---

[6] *See also* Ex. 2 ¶ 19, 22 (only approximately 11% of current operations); Ex. 5, Declaration of Kenny Brinker ("APC Decl."), ¶ 13; Ex. 6, Declaration of Mike Roth ("Eichelberger Decl."), ¶ 19.
[7] Laws like California's Proposition 12, require the same Minimum Size Requirements of Question 3 *plus* a minimum amount of usable floor space per sow. Cal. Health & Safety Code § 25991(e).

Federal Meat Inspection Act, as well as the Packers & Stockyards Act as it is expressly preempted by the express preemption clause identified at 21 U.S.C. § 678 and further violates conflict preemption principles.

11.    Plaintiffs further assert that the Regulations implemented to enforce the underlying Act, should be declared invalid under the Massachusetts Administrative Procedure Act, G.L. c. 30A and G.L. c. 231A.  Because Plaintiffs are likely to succeed on the merits in challenging the constitutionality of the underlying Act, they further should be entitled to a preliminary injunction staying the enforcement of the Regulations, too.

12.    Pursuant to Fed R. Civ. P. 65(a), a preliminary injunction may be entered on notice to the adverse party. In granting a preliminary injunction, a district court must consider the following factors: (1) a likelihood of success on the merits; (2) the likelihood of irreparable harm absent interim relief; (3) a balance of equities in the plaintiff's favor; and (4) service of the public interest. *Walters v. Bos. City Council*, No. CV 22-12048-PBS, 2023 WL 3300466, at *8 (D. Mass. May 8, 2023); *see also Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022) (same).

13.    Plaintiffs' Amended Complaint, together with its supporting Memorandum in Support of Motion for Preliminary Injunction and supporting Declarations, demonstrate Plaintiffs' entitlement to a preliminary injunction order preventing the implementation and enforcement of Question 3 and its Regulations before it wreaks devastating and unconstitutional irreparable harm upon Plaintiffs and the nationwide pork production industry at large.

<div align="center">**REQUEST FOR ORAL ARGUMENT**</div>

Plaintiffs hereby, pursuant to Local Rule 7.1(b)(4)(d), requests this Court fix a time and place for oral argument upon Plaintiffs' Motion.

**A77**

WHEREFORE, Plaintiffs respectfully request the Court enter a preliminary injunction order as set forth herein. Specifically, the Court should issue an order prohibiting the enforcement of Question 3, its policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them pending resolution of Plaintiffs' constitutional claims before this Court.

Dated: August 7, 2023.

> TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, Plaintiffs.

> By: */s/ Ryann A. Glenn*

> Robert L. Peabody
> MA #551936, NY #1990654
> HUSCH BLACKWELL LLP
> One Beacon Street, Suite 1320
> Boston, Massachusetts 02108
> Telephone: (617) 720-5090
> Facsimile: (617) 720-5092
> robert.peabody@huschblackwell.com

> Cynthia L. Cordes *(admitted pro hac vice)*
> Ryann A. Glenn *(admitted pro hac vice)*
> Michael T. Raupp *(admitted pro hac vice)*
> HUSCH BLACKWELL LLP
> 4801 Main Street, Suite 1000
> Kansas City, MO 64112
> Telephone: (816) 983-8000
> Facsimile: (816) 983-8080
> cynthia.cordes@huschblackwell.com
> ryann.glenn@huschblackwell.com
> michael.raupp@huschblackwell.com

> *Attorneys for Plaintiffs*

**A78**

**CERTIFICATE PURSUANT TO LOCAL RULE 7.1(a)(2)**

I certify that, on July 24 , 2023, I conferred with Defendants' counsel and attempted in good faith to reach agreement on this motion, but was unable to reach a resolution.

*/s/ Ryann A. Glenn*
Ryann A. Glenn

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 7th day of August 2023, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/Ryann A. Glenn*
Ryann A. Glenn

**A79**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | **"REQUEST FOR ORAL ARGUMENT"** |
| Defendants. | |

**A80**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

LEGAL STANDARD..........................................................................................1

ARGUMENT ......................................................................................................2

   I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .........................2

      A.  Plaintiffs Are Likely to Succeed on Their Commerce Clause Claim ...........................2

          1. The Act discriminates against interstate commerce..................................................3

          2. The Act burdens interstate commerce in a manner excessive to the local benefits.. 6

      B.  Plaintiffs are Likely to Succeed on Their Privileges & Immunities Claim....................8

      C.  Plaintiffs are Likely to Succeed on Their Preemption Claim Under the Federal Meat Inspection Act. ...............................................................................................9

          1. The Act is expressly preempted by the FMIA. ...................................................... 10

          2. The Act is preempted because it conflicts with the FMIA. .................................... 11

      D.  Plaintiffs are Likely to Succeed on Their Claim of Preemption by the Packers & Stockyards Act. ..............................................................................................13

      E.  Plaintiffs are Likely to Succeed on Their Full Faith and Credit Claim.......................14

      F.  Plaintiffs are Likely to Succeed on Their Due Process Claim.....................................15

      G.  Plaintiffs are Likely to Succeed on Their Import-Export Clause Claim.....................17

   II.  Plaintiff—and the Nation's Pork Production Sector as a Whole—Risk Suffering Immediate and Irreparable Harm Absent a Preliminary Injunction to Preserve the Status Quo .............................................................................................. 18

   III.  The Balance of the Equities Tips in Favor of Plaintiffs and a Preliminary Injunction is in the Public's Interest ............................................................................. 19

CONCLUSION..................................................................................................20

**A81**

## INTRODUCTION

Massachusetts' Question 3 Minimum Size Requirements for Farm Animal Containment ("Question 3" or the "Act") targets out-of-state farmers and processors who ensure the supply of pork into Massachusetts. Defendants have blocked a marketplace unless Plaintiffs adhere to an onerous regulatory scheme requiring massive facility overhauls at crippling expense. The Act dismantles generational industry practices for the political and moral views of a subset of Massachusetts voters who were intentionally misinformed and without knowledge of the Act's impact on Massachusetts and across the nation. The result is catastrophic for the Plaintiffs who steward a critical food staple for Massachusetts families and businesses, and by extension nationwide consumers.

## LEGAL STANDARD

In granting a preliminary injunction, a district court must find these four elements satisfied: (1) a likelihood of success on the merits; (2) the likelihood of irreparable harm absent interim relief; (3) a balance of equities in the plaintiff's favor; and (4) service of the public interest. *Walters v. Bos. City Council*, No. CV 22-12048-PBS, 2023 WL 3300466, at *8 (D. Mass. May 8, 2023); *see also Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022) (same). Plaintiffs need to prove only that a single claim is likely to succeed on the merits for this Court to issue injunctive relief. *Cormier*, 51 F.4th at 5 (district court found that challenge was likely to succeed on two grounds, but found it was unnecessary to address both on appeal). "To demonstrate likelihood of success on the merits, plaintiff[] must show 'more than mere possibility' of success— rather, [it] must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (citing *Respect Maine*

1

**A82**

*PAC v. McKee*, 622 F.3d 13, 15 (1st Cir.2010)).

<div align="center">**ARGUMENT**</div>

I.    **Plaintiffs Are Likely to Succeed on the Merits of Their Claims.**

      Plaintiffs have challenged the constitutionality of the Act and its Regulations.[1] The Court need only find a likelihood of success on the merits of a *single claim* to grant injunctive relief. Challenges to laws like the Act are not new, as the United States Supreme Court recently affirmed dismissal of a challenge to California's version of the Act, Proposition 12, in *NPPC v. Ross*, 143 S. Ct. 1142 (2023). However, Plaintiffs' constitutional claims do not overlap with those in *NPPC*. Plaintiffs heard the Court's suggestions to pursue absent claims in *NPPC v. Ross* to ensure "free private trade in the national marketplace" may proceed as the Founders intended. The gravity of harm if the Act remains in effect is not only incomprehensible but invites a national trade war.

<div align="center">A.  **Plaintiffs Are Likely to Succeed on Their Commerce Clause Claim.**</div>

      Individual states – like Massachusetts and California - are attempting to regulate conduct of other states based upon moral or policy reasons.  Article I, § 8 of the Constitution provides that Congress shall have the power to regulate commerce among the several states. States cannot take actions that limit, discriminate, or burden interstate commerce, known as the dormant Commerce Clause. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*,

---

[1] Plaintiffs seek to enjoin the Regulations from enforcement given the unconstitutionality of the underlying Act and the Regulations themselves. *See* 330 CMR 35.00. "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Defendant Campbell has exclusive authority to enforce any violations of the Act, yet the Regulations vest Defendant Randle with the authority to delegate enforcement means away from Campbell and vest compliance determinations within third-party validators' authority. 330 CMR 35.07. This unlawfully delegates authority in excess of statutory authority, is arbitrary or capricious, and otherwise not in accordance with law. *See Texas v. United States Env't Prot. Agency et al*, No. 3:23-CV-00017, 2023 WL 2574591, \*8 (S.D. Tex. Mar. 19, 2023) (granting preliminary injunction enjoining enforcement of regulations because regulations disregarded the enabling act's central requirement).

<div align="center">2</div>

<div align="right">**A83**</div>

550 U.S. 330 (2007); *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 206-07 (1994). A law violates the dormant Commerce Clause if: (1) it discriminates on its face, in its purpose or effects, against interstate commerce and favors in-state commerce; or (2) the law substantially burdens out-of-state commerce. *See generally Fam. Winemakers of California v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) ("Discrimination under the Commerce Clause 'means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter[.]'").[2] Discriminatory laws violate the core principle of Commerce Clause jurisprudence—the antidiscrimination principle. *NPPC*, 143 S. Ct. at 1152.

### 1. The Act discriminates against interstate commerce.

The Act discriminates against interstate commerce in favor of economic protectionism, rendering it *per se* invalid. The antidiscrimination principle has overturned laws "driven by ... 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (citing *Davis*, 553 U.S. at 337–338 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–274 (1988)).[3] Discrimination in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Id.* (quoting *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994)); *Jenkins*, 592 F.3d at 10.[4]

---

[2] *See also NPPC*, 143 S. Ct. at 1153 ("In its 'modern' cases, this Court has said that the Commerce Clause prohibits the enforcement of state laws "driven by . . . 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'") (citing *Department of Revenue of Ky. v. Davis*, 553 U. S. 328, 337-38 (2008)).

[3] *See also Tennessee Wine and Spirits Retailers Assn.* v. *Thomas*, 139 S. Ct. 2449, 2461 (2019) (observing this Court's cases operate principally to "safeguard against state protectionism.")

[4] In *Jenkins*, Massachusetts allowed "small" wineries to obtain a small winery shipping license to ship directly to consumers and through retail distribution, that "large" wineries could not obtain ("large winery shipping license" only allowed sales directly to Massachusetts consumers). *Id.* at 4. There were no "large" wineries within Massachusetts. *Id.* The statute "violate[d] the Commerce Clause because the effect of its particular gallonage cap [was] to change the competitive balance between in-state and out-of-state wineries in a way that benefits Massachusetts's wineries and significantly burden[] out-of-state competitors." *Id.* at 5. Specifically, "Massachusetts has used its 30,000 gallon grape wine cap to expand the distribution options available to 'small' wineries (all Massachusetts wineries), but not to

"Discriminatory laws motivated by simple economic protectionism are subject to a virtually *per se* rule of invalidity, which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *Id.* at 338-39 (internal citations omitted). Here, the Act instills discriminatory advantages that unconstitutionally secure state protectionism.

The Act targets out-of-state entities by benefiting in-state interests and burdening out-of-state interests. *Haulers*, 550 U.S. at 338. The Act was drafted with a protectionist intent and cloaked agenda. [5] In 2021, Massachusetts had as little as 1,500 breeding sows; yet today, Missouri had 450,000 breeding sows and Iowa had 900,000. ECF 17 ¶¶ 63–64. Farmer Plaintiffs maintain operations in both states. *Id.* at ¶ 64. As of 2017, the total number of Massachusetts pig farms was 336, eight of which having a herd size of 200 or more. *Id.* at ¶ 63. As of 2016 when the Act was passed, no Massachusetts pig farmers used gestation crates, meaning that the Act *only* targeted out-of-state farmers who did. *Id.* at ¶¶ 66, 156. [6] In comparison, Christensen Farms raises 140,000 breeding pigs, producing 3.6 million hogs each year and, to date, has only converted 12.5% of its total inventory to be compliant at a significant cost. Ex. 4, Christensen Farms Decl. ¶¶ 5, 24. Massachusetts only produced a pig crop of 12,000 head in 2022 and thus, most of its supply comes from out of state. Ex. 8, Declaration of Dr. Jayson Lusk ¶ 8; Ex. 1, Declaration of Matt England ¶ 8, 35. [7] This inability to satisfy its own pork needs from in-state production, represents an economic

---

similarly situated 'large' wineries, all of which are outside Massachusetts." *Id.*

[5] Question 3 is also explicitly discriminatory in its purpose. The Regulations acknowledge that the Act is intended to "reduc[e] potential fiscal" threats to Massachusetts consumers. 2022 MA REG TEXT 610066 (NS). This, combined with one singular stated purpose within the Act to avoid "negative fiscal impacts to the Commonwealth of Massachusetts," portrays the discriminatory purpose. S*ee e.g., Jenkins*, 592 F.3d at 5 ("Section 19F's statutory context, legislative history, and other factors also yield the unavoidable conclusion that this discrimination was purposeful.").

[6] Andrea Shea, *Containment Of Farm Animals: A Primer On Question 3 In Mass*., NPR, WBUR (September 20, 2016), https://www.wbur.org/morningedition/2016/09/20/farm-animal-containment-ballot-question ("And there are no farms here that use the other practices that would be banned by Question 3."); *see also*, Shira Schoenberg, At center of 2016 ballot dispute over cage-free eggs are 3,000 chickens in Western Mass. Town, MassLive (December 4, 2015), https://www.masslive.com/politics/2015/12/at_the_center_of_a_2016_ballot.html ("there are currently no Massachusetts farms using small cages for calves and pigs[.]").

[7] In comparison, within the first quarter of 2023, Missouri and Iowa—the two states that Triumph primarily operates

4

shelter for in-state farms at the expense of out-of-state farms providing capital cost increases between 18 to 94%. Ex. 8 ¶¶ 8, 18. Even if Farmer Plaintiffs converted all operations combined, it would not be enough to fulfill Triumph's Massachusetts' demand. Ex. 1 ¶ 32. Any out-of-state market representation will disappear when farms either must spend significant resources to comply with the Act or exit the marketplace. Ex. 5, Allied Producers' Cooperative Declaration, ¶ 23. It is conservatively estimated that the cost of providing compliant pork is 30% higher than the cost of current pork supplies to the state. Ex. 8 ¶ 19. Such favoritism runs afoul of the Constitution. *See e.g.*, *Jenkins*, 592 F.3d at 10. In addition to a protectionist intent, the voters were not informed of a hidden agenda targeting the elimination of factory farming all together.[8]

In addition, only three Massachusetts processors are United States Department of Agriculture ("USDA") certified, and Plaintiffs believe those processors ship primarily outside of the state. ECF No. 17, ¶¶ 161-62. The Act provides these processors a loophole for compliance, because when they sell intrastate, the facility is exempted from compliance if the sale occurs at the Federal Meat Inspection Act ("FMIA") facilities. *Id.* at ¶ 163.[9] Nationwide, this is not a practice that Triumph can engage in for the distribution of their product, especially when outside the state. Triumph ships directly to Massachusetts, and thus is arguably "engaged in the sale," which is not mirrored for in-state processors in effect.[10] This creates an unfair advantage for in-state processers

---

out of or receives a large majority of its pig supply from —had 450,000 breeding sows and 900,000 breeding sows, respectively. USDA, National Agricultural Statistics Service, USDA Quarterly Hogs and Pigs (March 2023).

[8] Stephanie Harris, the Campaign Director for Citizens for Farm Animal Protection (Yes on Question 3), has been a Senior Legislative Affairs Manager at the Animal Legal Defense Fund ("ALDF") since August 2019. *Stephanie Harris*, https://aldf.org/person/stephanie-harris/ (last visited Aug. 2, 2023). One legislative initiative ALDF supports is the Farm System Reform Act which, inter alia, seeks to "overhaul our broken food system by placing a moratorium on the largest factory farms – immediately prohibiting the creation or expansion of large factory farms and requiring the cessation of such operation by 2040." *Farm System Reform Act (Federal)*, https://aldf.org/project/farm-system-reform-act/ (last visited Aug. 2, 2023).

[9] *See also* 330 CMR 35.02 ("Sale: A commercial sale by a business that sells any item covered by St. 2021, c. 108, § 3, but does not include any sale undertaken at an establishment at which inspection is provided under the [FMIA]. [A] Sale occurs at the location where the buyer takes physical possession of an item covered by the Act.").

[10] *See* 330 CMR 35.02; Ex. 1 ¶ 46; 330 CMR 35.00 – FAQ, https://www.mass.gov/doc/330-cmr-3500-faq/download

and directly engages in what the dormant Commerce Clause was designed to prevent. Because the Act implicitly favors in-state business over out-of-state competition, it should be subjected to "rigorous scrutiny." *Haulers*, 550 U.S. 330 at 343 (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992)). Under such scrutiny, the Act violates the dormant Commerce Clause as discriminatory.

### 2. The Act burdens interstate commerce in a manner excessive to local benefits.

The Act imposes burdens on interstate commerce excessive in relation to the putative local benefits. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Courts have found the burden too high when "direct," "undue," "unreasonable," or "material."[11]  Justice Gorsuch in *NPPC v. Ross* recalled the *Pike* line of cases' analysis, stating "a law's practical effects may also disclose the presence of a discriminatory purpose." 143 S. Ct. 1142 at 1157. Even if the Act regulates even-handedly, its excessive burden on interstate commerce can exceed the local benefits and violate the Commerce Clause. *See Jenkins*, 592 F.3d at 9.[12]

The conclusion under *Pike* is simple upon review of the purported local benefits from the start, as there is a dearth of evidence that the Act will accomplish *any* stated purpose. *See* Mass. Gen. Laws Ann. Ch. 129 App., § 1-1. Marketed as an animal welfare law protecting breeding pigs and Massachusetts' pork consumers from foodborne illness, a review of the facts, existing federal law and science renders the law misleading on its face. First, the ballot initiative materials have *no*

---

[11] *See, e.g., Hall v. De Cuir*, 95 U.S. 485 (1877); *Public Utilities Commission v. R.I. of Attleboro Steam & Elec. Co.*, 271 U.S. 83 (1927); *Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349 (1951); *International Mill. Co. v. Columbia Transportation Co.*, 292 U.S. 511 (1934); *Real Silk Hosiery Mills v. City of Portland*, 268 U.S. 325 (1925).

[12] *See also NPPC*, 143 S. Ct. at 1168  (Roberts, C.J, concurring and dissenting in part) ("[W]e generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice.") (citing *Davis*, 553 U. S. at 353) (internal quotations omitted).

supporting scientific evidence that the Act protects breeding pigs.[13] The Minimum Size Requirements *harm* the breeding pigs and their offspring by making aggressive behavior and injured pigs a reality.[14] Ex. 7, Declaration of Dr. Salak-Johnson ¶ 34. Second, the record is devoid of proof that the Act prevents foodborne illness.[15] Indeed, the Act *allows* certain non-compliant, processed pork to be sold through an exemption to the definition of Whole Pork Meat.[16] The Act advances no health or safety benefit not already regulated by the USDA and the Food Safety and Inspection Service ("FSIS"), who ensure meat is not "adulterated"[17] and is "safe, wholesome, and properly labeled." 21 U.S.C. § 602.

The targeted effects not only "smoke out" the discrimination, but also demonstrate the burden. *NPPC*, 143 S.Ct. at 1158. The Act supports a "Massachusetts knows best" philosophy, despite its *de minimis* sow operations, recently analyzed with much skepticism. *See NPPC*, 143 S.Ct. at 1174 (Kavanaugh, J., dissenting and concurring in part) ("[California] has aggressively propounded a 'California knows best' economic philosophy—where California in effect seeks to regulate pig farming and pork production in *all* of the United States. California's approach undermines federalism and the authority of individual States by forcing individuals and businesses

---

[13] *Massachusetts Information for Voters, 2016 Ballot Questions*
https://archives.lib.state.ma.us/bitstream/handle/2452/427044/ocn690703544-2016.pdf?sequence=1&isAllowed=y
[14] In addition, the Act prohibits the sale of *offspring* of breeding pigs confined in a cruel manner, but does not directly regulate the confinement requirement of the offspring themselves who are being sold into Massachusetts.
[15] In California, the California Department of Food and Agriculture even admit Proposition 12, which includes Question 3 requirements, has no scientific support that it will prevent foodborne illness. *Final Statement of Reasons*, www.cdfa.ca.gov/AHFSS/pdfs/FSOR_Final_8.30.22.pdf, at 7.
[16] "Whole pork meat", any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole pork meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives. Mass. Gen. Laws Ch. 129 App., § 1-5.
[17] "Adulterated" is defined as a product that "consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food"; it also is defined as products that have been "prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health." 21 U.S.C. § 601; *See infra*, pp. 9-13; Ex. 4 ¶ 10, 13-17.

A88

in one State to conduct their farming, manufacturing, and production practices in a manner required by the laws of a different State."). One need only replace "California" for "Massachusetts." This philosophy also affects pork supply and pricing throughout Massachusetts, the New England regional area, and potentially the rest of the nation. Ex. 8 ¶¶ 14–15. The nationwide impacts to farmers, processors, and ultimately, consumers, constitute a burden on interstate commerce. *See e.g., Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 526 (1959).[18]

### B. Plaintiffs are Likely to Succeed on Their Privileges & Immunities Claim.

The Act violates the intent and text of the Privileges and Immunities Clause of the United States Constitution, which states, "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1.[19] The Supreme Court has utilized a two-part standard to analyze these challenges once the classification burdening out-of-staters is established: 1) courts must determine whether the classification strikes at the heart of an interest so "fundamental" that its derogation would "hinder the formation, the purpose, or the development of a single Union of [the] States" and; 2) if the classification burdens a fundamental right, the defendant must show a "substantial reason" for the difference in treatment. *Util. Contractors*, 236 F. Supp. 2d at 117-118.

Here, the Act burdens out-of-state farmers and processors in a manner that provides substantial hindrance to the successful operation of the nationwide pork industry. *See supra*, section 2-8. The Supreme Court revealed a state's self-interested burden and crippling effect laws like the Act have on the rest of the country. *NPPC,* 143 S. Ct. at 1153, 1175 (Gorsuch, J.) (holding

---

[18] ("[c]ost taken into consideration with other factors[,]" like safety concerns, time constraints, and labor requirements imposed by the statute, may relate to interstate commerce); *see also, Pike*, 397 U.S. at 142 (finding both compliance costs and consequential market harms cognizable in determining whether the law impermissibly burdened interstate commerce); *NPPC*, 143 S. Ct. at 1170-71 (Roberts, C.J., concurring and dissenting in part).

[19] "[T]he Privileges and Immunities Clause was intended to create a national economic union." *Silver v. Garcia*, 760 F.2d 33, 36 (1st Cir. 1985) (citing *Supreme Ct. of New Hampshire v. Piper*, 470 U.S. 274, 279-280 (1985)).

that the Privileges & Immunities Clause may house a better argument for disparate treatment of in-state and out-of-state entities). Plaintiffs' ability to participate in this nationwide industry must be considered a fundamental right protected by the Privileges and Immunities Clause. Ex. 1 ¶ 20. Thus, Massachusetts must prove a "substantial reason" for the difference in treatment for the burden imposed on out-of-state farmers and processors, and that no "less restrictive means" exist. *City of Worcester,* 236 F. Supp. 2d at 118 n. 4. Defendants cannot do so. *Supra*, section 1(A)(2). As the Act unconstitutionally interferes with the fundamental interest, Plaintiffs are likely to succeed.

### C. Plaintiffs are Likely to Succeed on Their Preemption Claim Under the Federal Meat Inspection Act.

The Act violates both express and conflict preemption principles as implicated by the FMIA. 21 U.S.C. § 601 *et seq*. The Supremacy Clause provides that the laws of Congress are the "supreme Law of the Land," which "overwhelms 'any Thing in the Constitution or Laws of any State to the Contrary.'" *Cormier,* 51 F.4th at 6 (citing U.S. Const. art. VI, cl. 2). Preemption has three branches: "express," "implied," and "conflict." *Id.*[20] Congress enacts a law that imposes restrictions or confers rights on private actors, followed by a state law that confers rights or imposes restrictions in conflict. The federal law takes precedence, and the state law is preempted. *Id.* (citing *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018)). "[T]he focus of the Court's preemption analysis must be on the effects of the challenged regulation rather than its purpose." *Ophir v. City of Bos.*, 647 F. Supp. 2d 86, 89 (D. Mass. 2009).[21]

---

[20] An offshoot of "conflict preemption" is "obstacle preemption," implicated when the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citing *Arizona v. United States*, 567 U.S. 387, 399 (2012) (internal quotations omitted).

[21] In *Ophir*, the presumption against preemption was not triggered, as the City of Boston failed to show that in passing the Energy Policy and Conservation Act of 1975, "Congress legislated in a field traditionally occupied by the states." *Id.* at 91-92 (*citing United States v. Locke*, 529 U.S. 89, 108 (2000)).

### 1. The Act is expressly preempted by the FMIA.

The FMIA has an express preemption clause. "Requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia …" 21 U.S.C. § 678 (emphasis added). The FMIA controls inspection processes on site. *See* 21 U.S.C. §§ 603, 621. *See also* Ex. 1 ¶ 43. Food safety is a field that the federal government has *heavily* occupied for over a century.[22] This field has been expanded by creation of the USDA and its agency, FSIS, which ensures food safety through the FMIA.[23] Therefore, no presumption against preemption can be claimed. *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (stating that where "statute contains an express pre-emption clause, [courts] do not invoke any presumption against preemption." (internal quotation marks omitted)).

Given the FMIA's extensive regulatory scheme, the Act is expressly preempted. First, the Act's purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, *increase the risk of foodborne illness*, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ann. ch. 129 App., § 1-1 (emphasis added). The FMIA's purpose is to ensure that meat products are "wholesome, not adulterated," and to carry out the "effective regulation of meat and meat food products in interstate [] commerce," and to "protect the health and welfare of consumers." 21 U.S.C. § 602. The FMIA inspection processes ensure "that meat and meat food products distributed to [interstate consumers] are wholesome, not

---

[22] The USDA was created in 1862 by President Abraham Lincoln and the FSIS (and its predecessor) was created in 1977. *See* Our History,  https://www.fsis.usda.gov/about-fsis/history (last visited July 30, 2023).
[23] *See* About FSIS | Food Safety and Inspection Service (usda.gov) (last visited July 22, 2023).

**A91**

adulterated" and "prevent[s] and eliminate[s] burdens on commerce by assuring that meat and poultry products are wholesome and properly labeled." *Animal Legal Def. Fund Bos., Inc. v. Provimi Veal Corp.*, 626 F. Supp. 278 (D. Mass.), *aff'd*, 802 F.2d 440 (1st Cir. 1986) (cleaned up). Yet, the Act predetermines what product is wholesome or safe for human consumption, directly preempting the USDA's determination, and supplanting its definition of adulteration.

Second, the Act creates additional or different requirements that conflict with FMIA inspection processes by creating additional requirements on how pigs are to be handled. Triumph must adapt its premises, lines, and operations. Ex. 1 ¶¶ 49-50. At the very least, Triumph must segregate pigs away from those that would otherwise pass USDA inspection. *Id.* at 49. This creates additional and/or different requirements for processors and must be preempted.[24]

### 2. The Act is preempted because it conflicts with the FMIA.

The Act's also implicates conflict preemption.[25] The Act targets interstate commerce, rather than reflecting Massachusetts' interests in ensuring the health and safety of solely its own citizens. *Supra*, section 1(A)(1)-(2). Conflict preemption is triggered "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 472–73 (1st Cir. 2009). And "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by

---

[24] In *Ophir*, this Court recognized the importance of local laws and regulations staying far from those areas in which the federal government has an important interest in regulating because "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." 647 F. Supp. at 94 (*citing Engine Manufacturers Association v. South Coast Air Quality Management District*, 124 S.Ct. 1756, 1762 (2004)).

[25] The presumption against preemption does not apply here either, as it only applies in cases where "Congress has legislated in a field which the States have traditionally occupied[.]" *Cormier*, 51 F.4th at 6 (quotation omitted). And while the health and welfare of state citizens is generally a prime example of an area of traditional state interest, it cannot be used as a carte blanche by a state government to regulate interstate commerce. *Pabst Brewing Co. v. Crenshaw*, 198 U.S. 17, 27 (1905); *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 441 n.15 (1978) ("many cases have distinguished between regulations that are an exercise of the State's police powers, and those that are regulations of commerce.").

examining the federal statute as a whole and identifying its purpose and intended effects." *Cormier*, 51 F.4th at 6 (cleaned up). The USDA has a critical interest in overseeing the safety of meat; hence the FMIA was enacted, and detailed inspection processes were mandated. *See* 9 C.F.R. Part 306; *see also* FSIS Directive 6100.1 & FSIS Directive 6600.1.

The FMIA does not require Minimum Size Requirements in the raising of breeding pigs or within the definition of what should constitute an "adulterated" product unfit for human consumption. By banning sales downstream and pre-determining all other pork as adulterated, the Act preempts the inspection processes at FMIA-inspected facilities. This infringes on USDA's authority and therefore conflicts with the FMIA. *See supra* section I(A)(1)(b); *see also Algonquin Gas Transmission, LLC v. Town of Weymouth*, 365 F. Supp. 3d 147, 157-158 (D. Mass. 2019).

Defendants' attempt to escape preemption by focusing on the "sale" of pork is clever, but not dispositive of the Act's constitutionality. In *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012), the Supreme Court held that a state regulation prohibiting a slaughterhouse from "holding" an animal that became injured after delivery and requiring the facility to slaughter quickly, preempted FMIA requirements. Although nothing in the FMIA required what the state regulation banned, it did not matter, given the FMIA's broad preemption clause covering not only conflicting, but additional, requirements. *Id.* at 132 S.Ct. 965 (the preemption clause "precludes States from imposing requirements that are 'within the scope' of the FMIA, relate to 'premises, facilities and operations,' and are 'in addition to, or different than those made under' the FMIA.").

Similar here, the plaintiffs in *Harris* argued the state regulation only covered sales, and that the FMIA was not "concerned with whether or how [the meat] is ever actually sold," and thus was only properly "motivat[ing] an operational choice without running afoul of the FMIA's preemption provision." *Id.* at 463. The Court rejected that argument. "The idea—and the inevitable effect—of

A93

the provision is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Id.* at 464. Further, "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.* Here, the Act predetermines what pigs are adulterated, removing conventional pigs by preventing the sale of their meat. Such predetermination presents an obstacle to the accomplishment and execution of the FMIA.

### D. Plaintiffs are Likely to Succeed on Their Claim of Preemption by the Packers & Stockyards Act.

The Act is also preempted by the Packers & Stockyards Act, 7 U.S.C. § 192 ("P&S Act"). The P&S Act prohibits any meat packer/producer from providing any preference to a particular person or locality, from subjecting any locality to a "disadvantage" in the sale of meat and from engaging in any unfair or unjustly discriminatory practice. 7 U.S.C. § 192(a-b). The purpose of the P&S Act is "to assure fair competition and fair-trade practices in livestock marketing and in the meatpacking industry." *London v. Fieldale Farms Corp.*, 410 F.3d 1295, 1302 (11th Cir. 2005).

The Act creates an obstacle to this purpose in at least three ways. First, Triumph must source pigs compliant with the Act to gain access to the Massachusetts marketplace and must pay a premium to farmers who meet the demand. Ex. 1 ¶ 53.[26] This encourages preference and unfair competition. The Act also creates an unfair advantage among processers through its "sale" exemption. *Supra*, section I(A)(1)(b)(1). Finally, additional capital investments or contributions for equipment changes and facility conversions presents an obstacle for compliance with the P&S

---

[26] This has been recognized nationwide, too, many reporting that The Act and Proposition 12 – compliant pork will be treated as a "specialty item" and carry a premium depending on supply and demand of the local market. *See* Keefe, Lisa M., Prop 12 and pork pricing: a DLR analysis, meatingplace.com, last visited June 5, 2023, https://www.meatingplace.com/Industry/News/Details/109993

Act. *See* 9 C.F.R. § 201.216(g), (h). Congress enacted the P&S Act to restrict unfair, deceptive, and discriminatory trade practices in the meat packing industry. The Act obstructs those goals.

### E.  Plaintiffs are Likely to Succeed on Their Full Faith and Credit Claim.

The Full Faith and Credit Clause states that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const. art. IV, § 1. This Clause preserves rights acquired or confirmed under the public acts and judicial proceedings of one state by requiring recognition of their validity in other states. *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of California*, 306 U.S. 493 (1939).

The Act regulates farming in states where Farmer Plaintiffs operate. *NPPC*, 143 S. Ct. at 1176 (Kavanaugh, J., concurring and dissenting in part) (citing M. Rosen, State Extraterritorial Powers Reconsidered, 85 Notre Dame L. Rev. 1133, 1153 (2010) ("[T]he Full Faith and Credit Clause is the more natural source for limitations on state extraterritorial powers because that clause at its core is concerned with extraterritoriality"). States in which the Farmer Plaintiffs operate do not impose Minimum Size Requirements. ECF No. 17, ¶¶ 129. For example, Missouri's Constitution protects the "Right to Farm," bestowing "the right of farmers and ranchers to engage in farming and ranching practices" that are "forever guaranteed in this state[.]" Mo. Const. art. I § 35.[27]Accordingly, Missouri confers a constitutional *right* for farmers to house breeding sows under their own industry practices, which are contrary to the Act. *Id.*

The clause "does not require one state to substitute for its own statute…the conflicting statute of another state, even though that statute is of controlling force in the courts of the state of

---

[27] There are other states that govern Farmer Plaintiffs' conduct which also confer a right to farm. *See e.g.*, W.S. § 11-29-115, Wyoming Protection of Livestock statute ("nothing in this chapter prohibits: [t]he use of Wyoming industry accepted agricultural or livestock management practices or any other commonly practiced animal husbandry procedure used on livestock animals[.]"); *See e.g.*, Wyo. Stat. § 11-44-104 ("the right of farmers and ranchers … shall be forever guaranteed in this state."); 345 Ind. Admin. Code 14-2-3 through 14-2-4 (regulations establishing standards of care for livestock). *see also* 345 Ind. Admin. Code 14-2 (1-5).

its enactment with respect to the same persons and events." *Pac. Emps. Ins*, 306 U.S. at 502; *See also supra* section I(A)(2).[28]  The Act fails to give full faith and credit to the state laws bestowed upon Farmer Plaintiffs, blatantly disregarding those laws.

**F.  Plaintiffs are Likely to Succeed on Their Due Process Claim.**

The Fourteenth Amendment to the United States Constitution provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). A statute is vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.*

As an initial matter, the Act is a quasi-criminal statute—meaning, the penalties purport to be civil and yet they function like criminal penalties.[29] Each violation is punishable by a civil fine up to $1,000 and the Attorney General may seek injunctive relief to prevent any further violations of the Act. Mass Gen. Laws App. Ch. 129, § 1-6. Also, the injunctive relief available to the Attorney General can act like debarment or loss of license to sell pork to state or federal entities within Massachusetts—another criminal penalty—if the Attorney enjoins a business owner from selling compliant pork following violation for non-compliance. *See One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 237 (1972) (holding debarment is a criminal penalty when "unreasonable or excessive").[30] Other federal circuits have found that significant civil penalties warrant quasi-criminal treatment. *See Women's Med. Ctr. of Nw. Houston v. Bell,* 248 F.3d 411,

---

[28] *See also* Ex. 2 ¶ 9; Ex. 3, Declaration of Mauricio Diaz ¶ 16; Ex. 5 ¶ 7; and Ex. 6, Eichelberger Farms Declaration ¶ 8.

[29] The Due Process Clause requires less clarity in purely civil statutes, but laws imposing criminal penalties are subject to a stricter standard. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-99 (1982).

[30] *See also Women's Medical Center of Northwest Houston v. Bell,* 248 F.3d 411, 422 (5th Cir. 2001) (finding loss of medical license to warrant quasi-criminal treatment).

A96

422 (5th Cir. 2001). And the Act itself was directly mirrored off of a criminal statute, Proposition 12. The stricter, quasi-criminal standard should apply.

The Act both facially violates due process and as applied to Plaintiffs. If a statute is "impermissibly vague in all its applications" such that "no standard of conduct is specified at all" then the statute is vague on its face. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 & n.7 (1982). For as-applied challenges, the Court must determine whether the statute defines the offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357 (1983).

The Act is vague as applied because it fails to define "engage in" the sale within Massachusetts with sufficient definiteness.[31] Due Process requires "that a person of average intelligence must have constitutionally adequate notice that his conduct was forbidden by the statute." *Butler v. O'Brien*, 663 F.3d 514, 519 (1st Cir. 2011) (citing *Kolender,* 461 U.S. at 357-58); s*ee also Rhode Island Med. Soc. v. Whitehouse*, 66 F. Supp. 2d 288, 311 (D.R.I. 1999), *aff'd,* 239 F.3d 104 (1st Cir. 2001) (finding a term "indispensable" when it defines what the Act proscribes and when that term is vague, the statute is unconstitutionally vague). Farmer Plaintiffs' have knowledge their pigs are sold into Massachusetts. Ex. 2, New Fashion Pork Declaration ¶ 15; Ex. 4 ¶ 19. Triumph ships directly to Massachusetts. Ex. 1 ¶ 51. Vagueness in "engaged in" leaves the entire pork supply chain to guess at its meaning and so, no business owner or operator is on notice of what conduct is proscribed. *See Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). The Act also fails to clearly define "confined in a cruel manner."[32] The requirement for breeding

---

[31] Ex. 2 ¶ 20; Ex. 3 ¶ 20.
[32] The Act defines it as confining "a breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely." Mass. Gen. Laws Ch. 129 App., § 1-5.

pigs to turn around *freely* has caused persons of common intelligence to differ as to its application, as the ability of a sow to turn around expressly depends on the sow's size, which is not "one size fits all," creating confusion on compliance.[33] *See City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (finding definition of forbidden conduct unclear and thus constitutionally vague). Because the Act fails to clearly define prohibited conduct, Plaintiffs cannot discern whether they violate the Act. Without definiteness, the Act "cannot validly be applied to any conduct," making the Act vague on its face. *See Bangor Baptist Church v. State of Me., Dept. of Educ. and Cultural Servs.*, 549 F. Supp. 1208, 1226 (D. Me. 1982).

Also, the Act fails to provide "minimal guidelines" to govern enforcement. *Kolender*, 461 U.S. at 358. Third-party validators and Defendants are no better able than those in the pork industry to discern the meanings of "engage in sale" or "turn around freely." Without standards, Defendants and inspectors have "virtually unrestrained power" to arbitrarily enforce against Plaintiffs. *See id.* at 360. The Act is vague as applied to Plaintiffs and on its face.

### G.  Plaintiffs are Likely to Succeed on Their Import-Export Clause Claim.

The Import-Export Clause provides, "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws[.]" U.S. Const. art. I, § 10, cl. 2. [34] The Supreme Court has recently read the Clause as potentially preventing states "'from imposing certain especially burdensome' taxes and duties on imports from other States—*not just on imports from foreign countries*." *NPPC*,

---

[33]   Ex.   5   ¶   19;   Ex.   4   ¶   22;   *see   also   Prop   12   Sow   Housing   Guide*, www.cdfa.ca.gov/AHFSS/AnimalCare/docs/sow_housing_guide.pdf.

[34] The Clause has been used to strike down taxes and duties imposed on goods in interstate commerce before. *Almy v. People of State of Cal.*, the Court struck down a stamp duty imposed by the California Legislature upon bills of lading for gold or silver transported from California to any port or place out of state. 65 U.S. 169, 172 (1860). The Court held that the stamp duty was a tax on exports and that had the duty been imposed on the goods themselves, it would clearly offend the Constitution. *Id.* However, this specific duty applied to the *bills of lading*, which, in substance, was the same as taxing the goods exchanged in interstate commerce, as every shipment comes with a bill of lading. *Id.* at 174.

**A98**

143 S. Ct. 1142, (Kavanaugh, J., concurring and dissenting in part) (citing *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 573 (2015)) (Scalia, J., dissenting); *Camps*, 520 U.S. at 621–637 (Thomas, J., dissenting); *Brown v. Maryland*, 25 U.S. 419, 438−439, 449, 6 L.Ed. 678 (1827) (emphasis added)).  Justice Thomas in *Camps* reasoned, as the Court here should, that the Framers did not limit this Clause only to goods from foreign countries, as if it did, they could have said as such. *Camps*, 520 U.S. at 624. Here, the Act conditions the sale of goods on a preferred method of farming, imposing a duty on these out-of-state goods. By conditioning every sale on a specific method of production, Massachusetts is imposing a tax or duty on the sale of meat within its borders. Justice Thomas and Scalia's interpretations should be extended here to find Plaintiffs likely to succeed on their claim under the Constitution's Import-Export Clause.

## II.     Plaintiffs—and the Nation's Pork Production Sector as a Whole—Risk Suffering Immediate and Irreparable Harm Absent a Preliminary Injunction.

To establish irreparable harm, it is enough if plaintiffs show that their legal remedies are inadequate. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996). Several situations demonstrate irreparable harm will occur if this Court denies the requested preliminary injunction.

First, sovereign immunity bars suits for damages in federal court against State officials in their official capacity unless the State waives its immunity or Congress abrogates it. *See e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985). Here, Massachusetts has not waived sovereign immunity and Congress has not abrogated it. Second, the inability to supply pork into Massachusetts creates an emergency and imposes additional harm to the contractual relationship between Plaintiffs. Ex. 1 ¶¶ 13-14, 20-23.[35] The First Circuit has recognized that the "inability to

---

[35] These are unavoidable risks for Plaintiffs. Seaboard controls the sales for Triumph, who demands pigs from its Farmer Plaintiffs and other independent pig farmers if necessary. Triumph and the Farmer Plaintiffs have no control or voice over where – or to whom – Seaboard markets Triumph (and Farmer Plaintiffs') pork. Ex. 1 ¶ 38; Ex. 5 ¶ 9;

supply a full line of products may irreparably harm a merchant by shifting purchasers to other suppliers." *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (citing *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 116–17 (1st Cir.1968)). Third, Plaintiffs face immediate harm of civil enforcement and blocking their entry into the Massachusetts market. The Act will become enforceable upon the expiration of the Stay Period in effect. *See supra,* p. 1. Fourth, breeding pigs also face irreparable harm in the face of enforcement. *See supra*, 7; Ex. 7 ¶ 29. Finally, Plaintiffs stand to permanently lose business they cannot recover from Defendants through monetary relief. *See e.g.,* Ex. 1 ¶¶ 20-23. The threat of unrecoverable economic loss qualifies as irreparable harm. *See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (holding that permanent loss of customers satisfies the irreparable injury prong) (abrogated on other grounds). Harm will also trickle to the Massachusetts and nationwide pork consumer. Ex. 8 ¶¶ 32–36.[36] These market, consumer, and compliance costs demonstrate irreparable harm. *See generally* Ex. 1 ¶ 55; Ex. 8 ¶¶ 15–31.

## III. The Balance of the Equities Tips in Favor of Plaintiffs and a Preliminary Injunction is in the Public's Interest.

"The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418 (2009); *see also Savino,*, 459 F. Supp. 3d at 331. To determine the balance of the equities, the court must weigh the possible harm caused by the requested injunctive relief. *Vaqueria*, 587 F.3d at 486. Because the

---

Ex. 6 ¶ 11. Accordingly, as it stands now, Plaintiffs must come into compliance with the Act and Regulations, even if they have no intent to sell into Massachusetts. *Id.*

[36] Keefe, Lisa M., *Prop 12 and pork pricing: a DLR analysis*, meatingplace.com, last visited June 5, 2023, https://www.meatingplace.com/Industry/News/Details/109993; The Daily Livestock Report recently reviewed the effects laws like the Act have on federal pricing programs, stating "Hogs and pork that meet the state laws' requirements by definition become a specialty item and will be treated as such by the Mandatory Price Reporting system, carrying a premium that will depend both on supply availability and demand in the local market[.]"

**A100**

only "harm" Massachusetts will face is its inability to enforce an unconstitutional law that would wreak economic harm across the national supply chain, the balance of harms supports Plaintiffs. Massachusetts' interests are not impeded by an injunction, as laws exist to protect the health and safety of human consumption of pork meat. *Supra*, sections I(G) & I(H). *See also Savino*, 459 F. Supp. 3d at 332 (holding that government's interests would not be hampered if preliminary injunction was issued). The Act harms Massachusetts agencies, businesses, and communities, and will force an immediate pork shortage within Massachusetts. Ex. 8 ¶ 6. Maintaining the status quo is a central justification for granting preliminary injunctive relief. *See Puerto Rico Conservation Found. v. Larson,* 797 F. Supp. 1066, 1073 (D.P.R. 1992). Because the Act will *harm* Massachusetts' consumers, no prejudice to Massachusetts exists and an injunction should issue until the constitutionality of the Act is evaluated.

## <u>CONCLUSION</u>

The motion for preliminary injunction should be granted as set forth herein.

Dated: August 7, 2023.

> TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, Plaintiffs.

> By: */s/ Ryann A. Glenn*
>
>    Robert L. Peabody

**A101**

MA #551936, NY #1990654
HUSCH BLACKWELL LLP
One Beacon Street, Suite 1320
Boston, Massachusetts 02108
Telephone: (617) 720-5090
Facsimile: (617) 720-5092
robert.peabody@huschblackwell.com

Cynthia L. Cordes *(admitted pro hac vice)*
Ryann A. Glenn (*admitted pro hac vice*)
Michael Raupp (*admitted pro hac vice*)
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8381
Facsimile: (816) 983-8080
cynthia.cordes@huschblackwell.com
ryann.glenn@huschblackwell.com
michael.raupp@huschblackwell.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 7th day of August 2023, the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Ryann A. Glenn*

**A102**

┌─────────────┐
│  **EXHIBIT** │
│   **1**     │
└─────────────┘

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **DECLARATION OF MATTHEW ENGLAND IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Matthew England, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.      I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.      I am the President and Chief Executive Officer of Triumph Foods, LLC ("Triumph") and have held this position since February 2022.

4.      Before I became President and Chief Executive Officer, I held multiple executive level positions with Triumph, including Executive Vice President and Chief Operating Officer from March 2020 through February 2022 and Chief Integration and Business Strategy Officer from October 2017 through March 2020.

1

5.     Triumph is a farmer-owned company and produces high-quality pork products that are sold locally, nationally, and internationally.

6.     Triumph was founded in 2003 by six of the largest independently owned pork producers in the country, including Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers Cooperative ("APC"), both in its official capacity and on behalf of their members (collectively, "Farmer Plaintiffs").  This farmer-owned processing facility makes Triumph especially unique in the pork supply chain and processing industry.  There is not a majority owner of Triumph and the owners of Triumph remain competitors on their farms and in the production side of the supply chain.

7.      Triumph is headquartered in St. Joseph, Missouri and receives its supply of pigs from the Farmer Plaintiffs and other independent pig farmers.

8.     Triumph processes approximately 5.7 million pigs annually, which results in 1.45 billion pounds of pork products being marketed and sold each year.  Triumph is a primary supplier of product to the country and to Massachusetts.

9.     Triumph processes whole pigs it receives largely from the Farmer Plaintiffs and then cuts them into a variety of meat cuts and products for consumption (*e.g.*, bacon, pork belly, pork chops, etc.) to be shipped nationally and internationally.

10.     The nationwide pork industry is a staple of the American food industry and economy.

11.     Each Farmer Plaintiff has a set of hog procurement agreements ("HPAs") with Triumph, which details how many pigs each Farmer Plaintiff is required to sell to Triumph that is commensurate with the percentage of Triumph that each member owns.

2

**A104**

12.     For example, APC is a founding member-owner of Triumph and owns a 13.5% interest in Triumph. APC members are therefore required to supply 13.5% of the pigs supplied by the Farmer Plaintiffs to Triumph.

13.     Pursuant to the Plaintiffs' HPAs, if a Farmer Plaintiff cannot fulfill Triumph's orders for pigs pro rata to its ownership interest, the Farmer Plaintiff pays damages and, if they cannot pay those damages, the farmer risks losing its equity interest in Triumph.

14.     Triumph is then responsible for covering any shortage from the Farmer Plaintiffs with purchases on the open market.  Triumph's goal is always to run at maximum capacity to fulfill demand. This agreement is detailed in the restated HPAs that Triumph has for each Farmer Plaintiff and other independent pig farmers.

15.     Once pigs pass full United States Department of Agriculture ("USDA") inspection both before and through processing, Triumph purchases the pigs from the Farmer Plaintiffs. Triumph's marketing of that pork is governed by a separate contractual agreement.  Specifically, Triumph is also a party to a Marketing Agreement with Seaboard Foods, ("Seaboard"), under which Seaboard markets pork that Triumph processes from the Farmer Plaintiffs and other independent pig farmers. Seaboard also markets the pork from the joint ventures owned in part by Triumph, Seaboard Triumph Foods and Daily's Premium Meats. Under the Marketing Agreement, Triumph produces pork products, fulfills the orders from Seaboard's marketing to the customers, and distributes it directly and indirectly to the customers, which are both large and small consumer-facing companies nationwide.

16.     Seaboard has the exclusive right to market and sell all of Triumph's whole pork, and in doing so, Seaboard makes all sales decisions on behalf of Triumph, including who the customer is that is purchasing Triumph's pork and ultimately where the pork is to be shipped.

A105

Accordingly, Triumph has no control over who Seaboard ultimately sells the pork which Triumph is required to supply, but yet still has direct knowledge of where the pork is shipped.

17.     Seaboard and Triumph have done their best to ration and supply small portions of compliant product to accommodate the predicament that laws like Question 3 and Proposition 12 have left customers in for these states.

18.     Seaboard often times will contract with customers on a national-account basis, meaning that any sales agreement necessarily covers a nationwide reach, as opposed to a state-by-state basis.

19.     Triumph will process, package, and distribute the pork cuts directly from Triumph's facility into Massachusetts.

20.     If Seaboard is unable to supply an order that requires Question 3 compliant Whole Pork Meat[1], Seaboard and Triumph risk losing the entire nationwide sale with those entities. The threat of this happening has already occurred in California, a state with the same or very similar confinement prohibitions through California's version of Question 3, known as Proposition 12. This would instantly cause Triumph a significant loss of national business, resulting in even more crippling losses for Triumph.

21.     Massachusetts customers – through Seaboard – are demanding more Question 3 compliant product than what Triumph could make available because Massachusetts' requirements are really a subset of California's, and Triumph already does not have enough to meet the demand for California customers. Because Proposition 12 has been implemented and threatens criminal enforcement now, almost all of the limited Proposition 12 pork has been diverted to California.

---

[1] "Whole Pork Meat" carries the same definition as noted in the Plaintiffs' Complaint. *See* ECF No. 17, ¶ 31.

22. National contracts for the supply of pork for customers can also be lost if we cannot provide the amount Question 3 compliant pork at the quantities requested for the state locations included within those nationwide contracts.

23. Contracts with other large consumer companies stand to face the same fate if they cannot provide Question 3 compliant pork. There is a risk of Triumph not being unable to supply Question 3 pork when it fully goes into effect, as Triumph has been attempting to fulfill orders for Proposition 12 compliant pork required *now*.

24. Massachusetts' pig farmers cannot alone sustain the pork demands of the Massachusetts people and businesses that rely upon out-of-state pork, such as hospitals, schools, prisons, and others. Foregoing the Massachusetts market is not a realistic option and given the reality of the national pork production system and complex supply chain, it's just not possible.

25. Massachusetts has a considerable demand for pork that simply cannot be met. Pork sold to large markets, like Massachusetts, are often sold in very large quantities that surpasses *millions* of pounds each year. For example, in the approximately last twelve months, Triumph and the pig farmers who supply pigs to Triumph have produced and distributed 11,482,655 lbs. of Pork Meat to Massachusetts (equating to approximately $16,855,664.00 in sales).

26. The process of segregating Pork Meat for what Massachusetts and California demand from the rest of the country, and keeping Massachusetts and California separate from one other, uses resources well above and beyond what is normally required to produce pork products within the industry. In order to accomplish this, costs are increased substantially and makes the processing operation less efficient overall. To do this for every individual state preference would be catastrophic for Triumph, like most, if not all, plants.

27.     Additionally, as discussed in more detail below, Triumph participates in the USDA's Voluntary Segregation Program ("VSP").  The requirements force the participants in the USDA VSP program to segregate hogs which meet the Massachusetts Question 3 requirements and those that do not, predetermining that these pigs are adulterated for any sale into Massachusetts, despite the fact that the USDA determines otherwise. Massachusetts and California pigs have to be further segregated from one another.

28.     Further, Triumph has to create a process required to differentiate between pork that meets the Massachusetts Question 3 requirements and the pork that does not, despite it being fully USDA approved.  Massachusetts and California pork must be further segregated as two separate states with different requirements and regulations, and the pork cannot be mixed with even one another.

29.     The risk for increasing harm to Triumph is heightened if the constitutionality of Question 3 is upheld and, as a result, more states continue to implement conflicting regulations on the farms, as already seen in Question 3 and Proposition 12. These Regulations have been implemented primarily to create negative impacts to our business under the guise of animal welfare and after being mandated by a ballot initiative only passed after directly misleading citizens of the state. Each new regulation requires new SKU's and new sorting procedures and storage locations within our facility. Ultimately, if enough states pass enough regulations, Triumph's processing capacity, along with the rest of the industry, would slow, and we would be forced to further ration our products. To date, Seaboard and Triumph have done their best to ration and supply small portions of compliant product to accommodate customers in the predicament caused by Question 3 and Proposition 12.

**A108**

30.    For Whole Pork Meat that has been distributed as Question 3 or Proposition 12 compliant, due to the nature of how pigs are processed and the lack of nation-wide consumer demand for the compliant product thus far, we have not been able to utilize the entirety of the pig to be sold at a higher specialty premium price. Instead, items for which there is no demand for utilization in California or Massachusetts are just sold into the commodity market without any premium to offset the cost of production, resulting in those products being sold at a loss.

31.    Massachusetts does not come close to the pork production infrastructure as states like Iowa, Missouri, Minnesota, Indiana, etc. and their participating enterprises.

32.    Even to the extent that some or part of Farmer Plaintiffs' facilities are compliant, it is not enough to sustain all the customers' demand for Question 3 compliant pork, and what product is compliant is already slated for distribution/sale into California as previously described. The industry as a whole cannot fulfill both California and Massachusetts' full demand for compliant product to their states and product will be rationed at best.

33.    The Minimum Size Requirements will be enforceable at the expiration of the Stay Period, thereby creating immediate risk of civil penalties or "injunctive relief" for Plaintiffs.  The entire national market for pork is threatened to be irreparably harmed if the Act goes into full effect and is enforced, with impacts on nationwide consumers who had no involvement in the passage of Question 3.

34.    Question 3 provides no clarification on what it means for "supply chain" for the Sell Through Provision. If the Sell Through Provision is not extended, it will create an abrupt halt of almost all product into Massachusetts on August 24, 2023.

35.    Due to the vagueness of  Question 3, the Massachusetts Attorney General can take the position that Triumph is directly subject to Question 3's Minimum Size Requirements because

7

**A109**

it processes pigs that are sold and ultimately distributed into and within Massachusetts by Triumph. There is no guidance whether Massachusetts will interpret this as being "engaged in the sale" as Triumph is last chain in the supply chain prior to entry into Massachusetts. Even if Massachusetts pivots and finally corrects the regulations to make it clear that Triumph is not "engaged in the sale," the nature of the pork supply chain is such that Question 3 forcibly requires each farmer, processor and distributor, including those like Triumph that are fully regulated by the USDA, to be compliant with Question 3.

36.     Like most plants, almost all sales do not take place at Triumph itself, and customers do not accept FOB for the sale until Triumph's product is delivered to each customer in their state.

37.     Triumph is at risk of the Massachusetts' Attorney General's Office pursuing penalties and/or injunctive relief for potential violations of Question 3, including selling non-compliant pork in Massachusetts.

38.     As previously noted, Triumph cannot control whether Seaboard sells Triumph's pork to California or Massachusetts under the existing Marketing Agreement. We have knowledge that our product is sold into Massachusetts, but we cannot control how or when. Accordingly, Triumph is forced to demand compliant pork from its farmer owners.

39.     Triumph does not control or have real-time access to the sales system or information for its sales.

40.     Question 3 places Triumph, as a processor, in a position to demand more of its Farmer Plaintiffs, or risk losing substantial volumes of business not only in Massachusetts, but nationwide. Triumph cannot just purchase Question 3 compliant pork from independent farmers apart from its Farmer Plaintiffs either, as there is insufficient product available needed to supply the pork demanded by Massachusetts consumers and businesses.

**A110**

41.     Triumph and Farmer Plaintiffs are facing a patchwork of compliance due to the varying state laws regarding hog confinement and its operations that reach nationwide. Specifically, in order to maintain processing operations, Triumph must require its Farmer Plaintiffs to be compliant with California's Proposition 12, of which requires the same Minimum Size Requirements as Massachusetts, plus an additional square footage requirement.

42.     Triumph will be forced to avoid farmers who are not compliant with Question 3 in order to remain in the Massachusetts market.

43.     Question 3 will not result in less foodborne illness or the spread of disease. Triumph is already required to comply with federal food safety laws, such as the Federal Meat Inspection Act ("FMIA") charged with regulating the both the pigs that arrive and the pork that is processed inside our facility.  Triumph works hand in hand with the USDA from before pigs even go inside our facility, and throughout every aspect of the processing line.

44.     Notably, Massachusetts Question 3 allows an exception for Whole Pork Meat that includes combination food products.   However, it is the same pork that goes in these products from the processing lines that goes into the Whole Pork Meat that they have banned.  If there was actual foodborne illness, or the risk for it, it would persist across any of these products.   All of it comes from the same pigs, and same processing lines.  But the ban of the Whole Pork Meat directly impacts Midwest processors like Triumph, along with Midwest farmers, and allowing the sale of these products aids in-state retailers.

45.     Specifically, the pigs that farmers sell to Triumph have to undergo multiple inspections by officials of the USDA's Food and Safety Inspection Service ("FSIS") before entering Triumph and throughout the entire processing line, and before Triumph takes title to the pig.  Before a farmer's pigs can even enter the plant, the law requires Triumph, like all processors,

A111

to present these pigs to USDA for ante mortem inspection.  This inspection is performed by an FSIS veterinarian or by an FSIS food inspector acting under FSIS veterinary supervision.  If this inspection is performed by an FSIS food inspector, the FSIS food inspector must notify the FSIS veterinarian of any disease conditions or signs of adulteration that are observed.   Triumph, like many plants, participates in the USDA's VSP and assists and supports the USDA inspection process to add to the resources for the inspection and review.

46.     When a farmer's delivery of pigs arrives at Triumph, trained plant officials on behalf of and pursuant to the USDA's VSP inspect the pigs on the farmer's delivery trucks for disease, injury, abnormalities or any other sign of adulteration before the pigs can be taken off the truck and delivered to the receiving alleys outside of the plant.  If any possible issues of adulteration are identified on the truck, the pigs are placed in an individual antemortem inspection holding pen and must be individually inspected by an FSIS veterinarian.  After the pigs pass this initial inspection and are unloaded into the receiving alley, the pigs are observed and monitored yet again through the FSIS program.  After this phase of observation, they are humanely moved to a barn for resting and for further inspection.

47.     If a pig clears the ante-mortem inspections, the pig may finally enter Triumph's processing facility. USDA officials continue to inspect the pig throughout every phase on the processing line (referred to as port-mortem inspections). They observe and examine the head, viscera, and carcass for any indication of disease, parasites, pathology, or other abnormalities. Triumph's employees are regulated by the USDA's FSIS during the processing and must fulfill specific requirements to support the USDA's inspection during processing.

48.     If Triumph's employees who are in the USDA VSP do not fulfill their responsibilities, or if the pigs otherwise are not presented for inspection ante-mortem or post-

mortem, the USDA will not mark pork products produced from those pigs as "inspected and passed."

49.     To comply with Question 3, Triumph had to establish a process to keep Question 3-compliant pigs separated from conventional pigs at all points during the processing and inspection process, ante-mortem and post-mortem because Massachusetts has predetermined that these pigs are unsafe for human consumption.  Triumph also had to establish a process to keep Proposition 12 pigs separate from Massachusetts Question 3.  If Triumph does not keep the compliant pigs separate from the non-compliant, the conventional pigs that Massachusetts has pre-determined are "adulterated" will be intermixed with conventional pigs either during the pre-processing procedures described above or throughout the processing line after they have entered the facility. Triumph would not be able to coordinate compliance if every state—or even a few more states—were to impose different confinement and adulteration standards above and beyond what is already required by FMIA. This would be incredibly difficult or impossible for the farmers and Triumph to coordinate.   This means separate trucks, separate unloading, separate receiving alleys, separate areas in the barns, separation through each and every aspect of the processing line inside the processing plant itself.  Then, of course, separate shipment to the final destination to Massachusetts or California.

50.     Additional, frivolous operational adjustments and responses also have to take place because of laws like Question 3. Because of the interference in the USDA segregation process, which will only increase if additional states like Massachusetts and California create their own version of preferences for pork, Triumph also has to react and waste product if there is ever an error by any farmer.  For example, in July, a farmer who provides both pigs which meet the requirements of Proposition 12 and Massachusetts Question 3, and also supplies the typical

conventional pigs, notified Triumph that they had inadvertently made an administrative error and one of their trucks they denoted as delivering Proposition 12/Massachusetts Question 3 product, was in fact offspring from pigs housed in traditional housing units.  At this point, the pigs had already passed full ante-mortem and post-mortem USDA inspection, were fully processed and the pork was headed to California.  Furthermore, the pigs had been mixed in with other pigs properly designated as Proposition 12/Question 3 pigs.   Triumph had to stop the trucks and call back all of the product,  essentially engaging in an unnecessary recall, wasting perfectly healthy, fresh, USDA approved product.   As farms try to comply with an increasing number of states, and if Question 3 also goes into effect, any farmer is at risk for this happening in the future.  Because of our processing system and supply chain, the result will not just impact that specific product, but any and all product processed with it.  In this situation, the state laws' required remedial actions once again override the USDA determinations, inspections and approvals.

51.     Triumph, and other out-of-state processors, cannot have the sale of any noncompliant Pork Meat be exempted from the definition of a "sale" under the Regulations because they are not located in Massachusetts and are shipping directly into the state from out-of-state facilities.

52.     Triumph operates its facilities in compliance with federal law and with the law of Missouri. Triumph has the right to process and distribute pork received from its member-owners in accordance with federal law (like the FMIA) and Missouri state law.

53.     Question 3 will create a cascading effect across the entire supply chain leading to pork shortages and significantly increase costs nationwide due to the premiums paid to Question 3 compliant farmers being passed on to consumers.

54.     Question 3 will create a nationwide rippling effect of unrecoverable economic loss

on consumers and increased production costs to Plaintiffs. Triumph's ongoing injuries would be redressed by a decision declaring Question 3 unconstitutional and/or vacating Question 3, as its requirements are not based in science or industry best practices.

55.     Triumph will face imminent and irreparable harm if Defendants are not enjoined as requested because it will face excessive burdens to come into compliance with Question 3 or face the risk of enforcement.

56.     The statements made in this Declaration are true and accurate statements.

57.     I declare under penalty of perjury and pursuant to the laws of the State of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th date of August 2023, at St. Joseph, Missouri.

_____
Matthew England

**A115**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,

     Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture,

    Defendants.

Case No. 1:23-cv-11671-WGY

**DECLARATION OF NEW FASHION PORK LLP IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Dr. Brad Freking, DVM, hereby state and declare as follows:

1.    I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the same.

2.    I am the Chief Executive Officer and Managing Partner of New Fashion Pork LLP ("NFP"). I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.    NFP is a limited liability partnership headquartered in Minnesota, with pig producing operations in Minnesota, Indiana, Iowa, Illinois, South Dakota, Wyoming, and Wisconsin.

4.    I founded NFP in 1994 and have a Doctorate of Veterinary Medicine (DVM). I have both studied, researched, and worked in animal care for the entirety of my career. The wellbeing, comfort and care of animals has always been at the forefront of my focus and the top priority in how NFP's raises, breeds and cares for pigs. NFP's priority and focus is built around

**A116**

raising healthy and productive animals, and this also has a direct correlation to the health and longevity of the business.  Our pigs are treated with dignity and respect.

5.      NFP is a farrow-to-finish pig farming operation. This means that NFP has breeding pigs, and after the breeding pigs give birth, it raises the pigs until they are ready for market.

6.      NFP markets approximately 1.4 million market hogs each year, equating to over one half million pigs that need constant monitoring and care each day.

7.      NFP is also a founding member-owner of Triumph Foods, LLC ("Triumph") and has a 10% interest in Triumph. NFP joined the other member-owners of Triumph to form the Midwest-based processor that is unique as being farmer-owned.

8.      NFP has utilized a number of industry accepted housing practices for sows, and studied the variation of success and technique.  Based on this, NFP has validated that individual sow housing currently utilized at NFP is a superior model as it pertains to animal wellbeing.   This is, in large part, based on a direct correlation with other models resulting in higher sow and offspring mortality.

9.      NFP operates its farms in accordance with the laws where the farms are located: Minnesota, Indiana, Iowa, Illinois, South Dakota, Wyoming, and Wisconsin, utilizing science-based and industry best practices.

10.      Part of NFP's best practices include that our employees and growers are trained to carefully monitor the animal's comfort and well-being on the farm, through daily observations, individual animal care, and humane animal handling.

11.      NFP also implements strict bio-security protocols to prevent disease entry into its herds.

12.      NFP requires all employees and growers to be PQA+® and TQA® certified, which flows over to the farm facilities themselves being PQA+® Site assessed to ensure the animals are well-cared for and all protocols are being followed at all times.

13.      In addition, NFP requires its employees and growers to comply with high standards of animal care that are set forth in our comprehensive Animal Welfare Policy Agreement.  The

**A117**

health and safety of our pigs is at the forefront of our operation.  We prioritize the health of our mothering pigs to protect both their health and safety and the health and safety of their litters.

14.    NFP is contractually bounded under Hog Procurement Agreement ("HPAs") with Triumph to sell hogs to Triumph. Under the HPAs, NFP is required to sell Triumph a number of hogs that correlates to its ownership percentage in Triumph. If NFP does not fulfill these contractual requirements, then NFP can sustain losses or damages, and can risk NFP's equity and ownership in Triumph.

15.    NFP has no control over what or where Seaboard Foods sells their product or which orders come through to Triumph. NFP does know that Seaboard sells Triumph product to Massachusetts, which includes NFP pigs.

16.    NFP is directly subject to Question 3's Minimum Size Requirements because it breeds or raises breeding pigs whose offspring are sold into and within Massachusetts.  Triumph, pursuant to Seaboard's sales, delivers NFP product directly into Massachusetts.

17.    NFP also has no control or say on where the pork from its pigs goes once processed and ultimately sold due to the nature of the pork processing industry. For example, one pig will be cut into various products and distributed across the country to different buyers.

18.    Triumph cannot support its current demand for Question 3 complying pork from Massachusetts while also attempting to fulfill even a portion of the demand for Proposition 12 complying pork in California.  The industry itself cannot support the demand that Massachusetts has for Question 3 complying pork in conjunction with fulfilling other states like California.

19.    The HPA between NFP and Triumph requires that NFP be in compliance with all laws.   NFP cannot convert its facilities to all meet the Prop 12 or Question 3 requirements. NFP cannot fulfill its contractually required quota of Question 3 product for Triumph.  NFP faces damages and losses to Triumph by not having Question 3 product or otherwise not being in compliance with a state law.  This is true even though state laws like Proposition 12 and Question 3 have been under challenge for some time.

20.    Without relief or clarification of the law, NFP also faces risk with the Attorney

**A118**

General's Office. NFP interprets Question 3 and the Regulations as making it unlawful to "engage in the sale" into Massachusetts a Whole Pork Meat product that comes from a breeding pig that was confined contrary to Question 3's requirements. Along with the rest of the farmers, we are uncertain as to what it means to be "engaging in the sale" of noncompliant pork product and know that NFP is at risk because under the plain language of the statute and regulations, Massachusetts officials can take the position that NFP is "engaged in the sale," especially, as Question 3 and the Regulations do not define what "engaging in the sale" means. For example, NFP has knowledge that Triumph ships its pork products directly into Massachusetts from its St. Joseph facility, and therefore that NFP's pork is sold into Massachusetts. Even though NFP has no control or say on where its pork is ultimately sold, it is unclear if NFP would somehow be considered to be "knowingly engag[ing] in the sale" of pork meat that is prohibited by Question 3 because it provides pork that goes to Massachusetts. Regardless of Massachusetts' interpretation, however, NFP will still be forced to comply with Question 3 due to the nature of the pork supply chain and the Regulations' requirements for certifications upstream from NFP.

21.    Compliance with Question 3's Minimum Size Requirements requires significant and extremely costly changes to NFP's operations. NFP has not been able to convert the entirety of its operations due to financial restraint, labor shortages and other economic impacts associated with the conversions.

22.    NFP has already felt the pressures of laws like Question 3. For example, California's Proposition 12 has the same Minimum Size Requirements that Massachusetts' Question 3 (along with additional square footage requirements). NFP has only been able to convert 11% of its operations to be Proposition 12 and Question 3 compliant due to the previously stated reasons and outcomes. This process took approximately twenty-eight (28) months (approximately sixteen (16) months from the commencement of conversion until the single location was ready to be populated and an additional twelve (12) months before offspring produced were ready for market). NFP has already incurred millions in losses for these conversions. Yet, even after best efforts, these conversions do not fulfill the demand for Proposition 12 and Question 3 pigs to

Triumph.    Moreover, Triumph is not able to fulfill its current demand to California or Massachusetts.

23.    It is estimated that to come into complete compliance with Proposition 12 and Question 3, will cost an approximate total of $126,942,500.00 in renovating the rest of its facilities. However, this figure does not include costs for training and educating employees on the new arrangements, increased production costs, and lost profits for the time that pork cannot be produced during the transition.

24.    These identified costs are not an exhaustive list. Conversion has caused significant increases in labor hours, additional training time, and job associated stresses upon NFP's labor force, resulting in higher employee turnover and increased operating costs to NFP.  Question 3 and Proposition 12 compliance requires longer work hours for employees in general due to increased complexity and difficulties of managing animals loosely housed in the pen (for example, making it more difficult to identify illness, injury, and other health or reproductive conditions of individual animals from outside the pen), requires increased skill and know-how in animal handling and movement because of loose housing, creates complexity and logistical challenges in individual animal care (as another example, if an individual animal needs care, NFP employee(s) need to get in the pen and isolate the animal), causes inefficiency from larger square footage (i.e., greater distances for animals and employees to travel and more square footage of facilities to maintain), results in greater injury risk to employees because mature and heavy weight animals are loosely housed in the pens creating a greater and more frequent opportunity for physical contact with employees, and causes higher sow mortality due to various factors, such as increased infighting and competition among animals, which then requires additional workload removing and handling the carcass. These factors increase the labor requirement needed to operate the farm causing increased workforce headcount and hours worked. The U.S. swine industry has historically suffered substantially high employee turnover at an annual rate between 30% and 50% and compliance with Question 3 and Proposition 12 makes the cost of training new, inexperienced employees even greater.

**A120**

25.     As for Proposition 12 and Question 3's impacts on animal husbandry practices, NFP has been experiencing significant challenges and increased risks associated with pregnant sow productivity and production inefficiencies, even so with its limited converted operations. Specifically, biologically, post conception, it is best for sows and gilts in gestation to be in an environment free of competition from other animals for approximately six to seven weeks, at minimum.  The impact of not allowing the animals to have this minimum period of isolation (which is what Question 3, in practice, demands) causes more miscarriages, increased sow mortality and other health challenges during gestation, smaller litter size, and overall greater risk of injury, which substantially decreases overall animal welfare to those animals.

26.     As for animal and employee safety, compliance with Proposition 12 and Question 3 inevitably, generally and through NFP's experiences with its partial compliance, increases injuries, mortality, and other health challenges to the pregnant animals in a material sense and degree due to typical swine behavior in a loose housing environment (i.e., increased infighting and competition among animals in the same pen) and greater risk of delay in identifying health issues as the production environment requires more skill and adds complexity. Further, compliance with Proposition 12 and Question 3 significantly increases safety risks to NFP employees due to the necessity of increased interaction with mature and heavy weight animals in loosely housed areas, more frequent need to move animals for individual treatment or disposal caused by escalated injuries, mortality, and other health challenges to the pregnant animals, and greater distance required to move animals because of increase facility size from increased square footage.

27.     Question 3's stated legislative purpose of animal welfare is not accomplished with the implementation of the Minimum Size Requirements. As stated above, based on NFP's personal experience, which is consistent with the empirical data and information gathered by various U.S.

**A121**

swine industry associations and advocates, Question 3 undermines and decreases swine animal welfare overall. Requirement stemming from an uninformed ballot initiative like Question 3 enhances opportunities for significant injury, miscarriage, mortality, and other negative health implications to pregnant sows.  In addition, each individual pregnant sow must now compete against other sows over the given amount of water and food at all times.  Accordingly, Question 3, ironically, causes an undeniable sense of insecurity and unsafety to those animals at increased risk and competition.

28.     Further, as currently written, the Regulations implementing Question 3 allows the Massachusetts Department of Agricultural Resources and/or a third-party validator to come to any of NFP's operations in the mid-west to inspect for compliance for Question 3. This means that NFP could be at risk of penalties and/or injunctive relief by the Massachusetts Attorney General's Office for any potential violations of Question 3 that are seen by third-party validators.

29.     The pigs that are candidates for sale by NFP to Triumph have to undergo multiple inspections by officials of the United States Department of Agriculture ("USDA")'s Food and Safety Inspection Service ("FSIS") to qualify for sale to the FSIS facility for processing.  Prior to the sale of our pigs, the USDA inspects our pigs on our delivery trucks for disease, injury, abnormalities or any other sign of adulteration. These health inspections of our pigs, as with all proposed pigs from farmers, begin *before* NFP's pigs even enter the plant and continue throughout the entire processing line after acceptance inside the facility. The primary purpose of each phase of inspection is to prevent disease or food born illness from being passed on to end consumers.

30.     Specifically, when NFP's delivery of pigs arrives at Triumph, trained plant officials on behalf of and pursuant to the USDA's Voluntary Segregation Program ("VSP") begin the inspection process.  If any of our pigs on our delivery trucks exhibit signs of disease, injury,

**A122**

abnormalities or any other sign of adulteration of the pigs inside the truck, both we or the VSP officials at the plant will pull and segregate the pig. For pigs that pass this initial evaluation, they are delivered to the receiving alleys outside of the plant and undergo further inspection and observation through the FSIS program. Upon not exhibiting signs of adulteration, they are humanely moved to a barn for resting and for further inspection.

31.     After pigs pass this full ante-mortem inspection, they then qualify for entrance into the plant for further USDA inspection during the post-mortem process. The USDA continues to inspect NFP's pigs during and throughout processing after entering the plant. Only after the pig makes it through the complete USDA inspection process that continues through the full processing line, will it qualify for sale, NFP will be paid, and title of the pig transfers from NFP to Triumph.

32.     NFP's ongoing injuries would be redressed by a decision declaring Question 3 unconstitutional and/or vacating Question 3, as its requirements are not based in science or industry best practices.

33.     NFP will face imminent and irreparable harm if Defendants are not enjoined as requested because it will face excessive burdens to come into compliance with Question 3.

34.     The statements made in this Declaration are true and accurate statements.

35.     I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August 2023, in Jackson County, Minnesota.

New Fashion Pork, LLP

Name: _Brad Freking_
_Managing Partner_

**A123**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

<div style="border:1px solid black; display:inline-block; padding:8px; text-align:center;">
**EXHIBIT**

**3**
</div>

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,

      Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture,

      Defendants.

Case No. 1:23-cv-11671-WGY

**DECLARATION OF MAURICIO DIAZ OF THE HANOR COMPANY OF WISCONSIN, LLC IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Mauricio Diaz, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the same.

2.      I am the President and CEO of The Hanor Company of Wisconsin, LLC ("Hanor") and submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.      Hanor is a limited liability company headquartered in Enid, Oklahoma, with pig producing operations in a total of seven different states including Wisconsin, Oklahoma, North Carolina, Iowa, and Illinois.

4.      Hanor operates farrow-to-finish farms responsible for raising breeding pigs until ready for market.

**A124**

5.      Hanor raises approximately 1.8 million pigs each year through its genetic breeding program supporting an integrated pig production system. Recently, Hanor was ranked among the top fifteen largest pig farmers within the U.S.

6.      Hanor became a member-owner of Triumph Foods, LLC ("Triumph") with the remaining Farmer Plaintiffs who formed Triumph to ensure there was a centralized processor available to the Farmer Plaintiffs to sell their pigs and – more importantly – a processor that is farmer-owned.  Hanor maintains a 25.3% ownership interest in Triumph.

7.      Hanor's farms have used science-based and best practices for confinement and housing of its breeding pigs for decades. Hanor has crated facilities and group housing facilities. All group housing conversions have targeted 20 square feet. If Massachusetts interprets turn around requirements to require 24 square feet – or more, like California - Hanor would have to decrease its sow herd by at least 20% or add substantially more facilities to make up for the added space.

8.      Hanor enters into Hog Procurement Agreements ("HPAs") with Triumph to sell pigs to Triumph. Under the HPA, Hanor is required to sell Triumph pigs based upon its ownership percentage in Triumph. Hanor must sell this volume of pigs to Triumph, or otherwise we risk sustaining losses and damages to Triumph. And if Hanor continues to not fulfill its obligations to Triumph, or default on those obligations, Hanor risks losing its equity ownership interest in Triumph.

9.      Triumph's product is marketed through Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard"). Seaboard markets Triumph's product nationwide and internationally, including into Massachusetts, and Triumph delivers the products, that in part, are from pigs supplied by Hanor. Hanor has no control over where Seaboard sells the

**A125**

pork product that comes from Hanor's pigs. This lack of control is due to the nature of the pork processing industry and the HPAs that manage Hanor's relationship with Triumph.

10.     Hanor's operations are heavily regulated by several federal programs, including, but not limited to, the United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"), which oversees and ensures domestic livestock health and animal welfare.

11.     Hanor's pigs are inspected multiple times by officials of the United States Department of Agriculture's ("USDA") Food and Safety Inspection Service ("FSIS"). The pigs must undergo these inspections to be qualified for sale to Triumph's FSIS facility. Before we can sell our pigs to Triumph, the pigs are inspected by the USDA on our trucks for signs of disease, injury, abnormalities, or signs of adulteration by USDA officials, which occurs before our pigs can even enter Triumph's plant for processing. Hanor understands that all pigs available to sell to Triumph, not just Hanor's, must go through these inspections. The purpose of these inspections is to prevent disease and foodborne illness from potentially being passed on to customers.

12.     USDA officials continue to inspect Hanor's pigs throughout the entire processing line, and only after the pigs make it through the full inspection process will they qualify for sale. Hanor is then paid for the sale of the pigs, and title of the pigs transfer from Hanor to Triumph.

13.     Despite compliance with these rigorous federal inspections, Massachusetts, through Question 3, has determined what pigs are "adulterated" for purposes of a sale to their state. Under Question 3, Hanor would have to deliver Question 3-compliant pigs to Triumph separately than its other pigs, and the USDA would have to observe and inspect compliant pigs separately at Triumph as well.

**A126**

14.     Because of Question 3 and Proposition 12, both Hanor and Triumph must engage in operational gymnastics to accommodate such state preferences.  In July, Hanor's conventional pigs were inadvertently mixed in with a set of pigs that were Proposition 12 compliant, due to an administrative error for Hanor's truck.   As discussed herein, Hanor has some limited Proposition 12 complaint pigs.   But this truck contained the regular, or conventional, pigs from the farm and were delivered to Triumph erroneously designated as Proposition 12 pigs.   These pigs were fully inspected and approved by the USDA as healthy and safe for consumption, as was every piece of processed meat that came from these pigs.  The product was properly labeled in accordance with federal law accordingly and shipped to California.  Hanor immediately discovered the error, and Hanor notified Triumph of the issue.  Triumph called back all of the product headed to California, thereby creating a waste of the healthy pigs and the pork meat not just from Hanor, but all of the other Proposition 12 compliant product that it was inadvertently processed with it.  This was a significant loss of nutritious food for consumers—and resulted in significant losses to both Hanor and Triumph, and of course, was a complete interference with the USDA's inspection and determinations of both the pigs and pork itself.

15.     Once Question 3 is in effect, these pigs that meet the California requirements would also have to be separated from Massachusetts.  The requirement for segregation on a state-by-state basis that laws like Question 3 and Proposition 12 create is not sustainable for farms or processing lines.

16.     Hanor has the right to operate its farms and safely house breeding pigs using industry best practices so long as they are in accordance with the federal and state laws in which Hanor operates its farms.

17.     Hanor is directly subject to Question 3's Minimum Size Requirements because it

4

**A127**

knowingly breeds or raises pigs that are ultimately sold into and within Massachusetts after processing by Triumph.

18.     Triumph cannot support its current demand for Massachusetts while also attempting to produce sufficient pork to California customers that is compliant with Proposition 12.  Hanor's designated supply for California is insufficient for California's demand, and yet, a subset of this has to be rationed off to provide any compliant product for Massachusetts if Question 3 goes into effect.  The pork industry cannot support the demand that Massachusetts has for pork while even attempting to fulfill a portion of other states' specific demands, like California.

19.     The HPA requires that Hanor be compliant with all laws.   However, Hanor cannot convert all of its facilities to be compliant with Proposition 12 and/or Question 3, and as a result, Hanor may not be able to fulfill, or continue to fulfill, its contractually required supply of product for Triumph.  This is true even though laws like Question 3 have been challenged and remain in flux.

20.     Question 3 and the Regulations[1] implementing Question 3 as prohibiting "engaging in the sale" within Massachusetts of any pork meat that a business owner knows or should know is the meat of a pig that was not housed in compliance with Question 3's Minimum Size Requirements. Despite this prohibition, Question 3 and the Regulations do not define what Massachusetts would consider to be "engaging in the sale" of non-compliant pork, and Massachusetts has not provided any guidance about what activities would constitute "engaging in the sale." Hanor does not know whether the shipment into Massachusetts of any pork it produces, if not compliant with the Minimum Size Requirements, is prohibited conduct that could result in fines assessed against it. Hanor is at risk of enforcement actions brought against it because the

---

[1] If not otherwise stated herein, any capitalized term not defined herein carries the same meaning as that set forth in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction.

A128

Massachusetts Attorney General's Office can take the position that Hanor may be "engaging in the sale" of non-compliant pork given the lack of clarification regarding what constitutes a violation of Question 3.

21. Ultimately, the prohibition of sale into Massachusetts based solely on confinement conditions affects Hanor, as our operations are just the first step in the supply chain. As stated above, Hanor has no control over what happens to its pigs once delivered and qualified for sale to Triumph. Hanor will still be required to comply with Question 3 and the Regulations' requirements for certifications upstream simply due to the nature of the pork supply chain and industry.

22. Complete compliance with Question 3's Minimum Size Requirements requires significant, costly changes to Hanor's operations, on top of the changes it has already made, ultimately making it impossible to comply and succeed as a business operation to fully convert. As such, only approximately 10% of Hanor's current operations are Question 3 compliant (approximately 8,000 sows).

23. Hanor interprets Question 3 and the Regulations as prohibiting a breeding pig from being confined in a manner that prevents the pig from lying down, standing up fully, extending its limbs, or turning around freely. However, there is no space or size specification provided. Because breeding sows are not a uniform size and Hanor does not interpret the Minimum Size Requirements as requiring specific square footage, Hanor understands that a breeding pig's enclosure is dependent on how large that individual pig is or on how large other pigs it is kept with. This is simply unworkable as a general principle for all Hanor's facilities and will result in forced group pen housing, rather than having uniform breeding pig enclosures like the industry currently maintains that protects the mother sow.

**A129**

24.     Even if Hanor were to construct all of its enclosures to be compliant with Question 3, that would not on its own render the enclosures compliant with the requirements of Proposition 12. Pigs compliant for each state would need to be delivered to Triumph separately, in addition to conventional pigs being separate. If every state were permitted to enforce separate rules regarding animal housing like California and Massachusetts have now done, Hanor will not be able to comply with each requirement or it will be untenable for Hanor to do so.

25.     Even having a portion of Hanor's pigs be Question 3 compliant has resulted in substantial risk and damage already to Hanor due to the exceptional burden laws like Proposition 12 and Question 3 places on farming operations to require strict segregation and recordkeeping in order to ensure no commingling of Proposition 12, Question 3 and conventional pigs occurs. As described above, Hanor experienced a direct injury after a delivery of Hanor's conventional pigs were mislabeled at the farm and delivered into the receiving alley of Proposition 12 pigs. Despite being USDA inspected and approved for healthy and safe processing and consumption, due to the state law requirements, once the error was realized, all of the complaint processed pork, along with the mixed conventional pork, had to be called back at Triumph's facility, functioning as an unnecessary recall.

26.     To come into full compliance with Question 3, and Proposition 12 for that matter, will require Hanor to either increase facility sizes, at a prohibitive cost to Hanor, or substantially decrease the number of pigs on its farms by approximately 23-25%. Either direction results in lost profits, waste, and ultimately, pork shortages and price increases that must be passed on in some fashion through the pork supply chain. If Hanor is required to decrease the number of sows on its farms by up to 25%, it will not be able to fulfill its market hog obligations that are demanded by Triumph. This is a critical harm, as it ultimately runs the risk of Hanor losing its membership

**A130**

interest in Triumph if it continues to be unable to fulfill its obligations under the HPAs.

27.     Another consideration is the high current construction costs that would be imposed in order for Hanor to create new sow confinement facilities to even remotely try to maintain its current production quantity. Hanor could not commit such an amount of capital to add new facilities. With the current market conditions and uncertainty that Hanor could derive enough premium to offset higher production costs from producing Prop-12 product, Hanor is deterred from converting any more facilities to become compliant with Question 3 that carries different confinement requirements.

28.     It took Hanor about 14 months to make the limited conversions it has already implemented for Proposition 12, considering time to plan, execute, and deliver results.  This is the same rationed product that will be used for Question 3.  This timing would have been greater had Hanor not had traditional group housing barns, which offered Hanor a benefit over other farmers. The breakdown of the timing of conversions is as follows:

    a.     Planning: at least 4 months

    b.     Executing changes: 4 months

    c.     Time to deliver results following conversion: 6 months.

29.     In order for Hanor to provide the pro rata amount for even a rationed portion of sales for Proposition 12 pork, it will cost over $8 million dollars. Hanor has already incurred significant costs in facility conversions, change in operational costs and lost profits to convert temporary systems to be compliant with Proposition 12.

30.     Converting a portion of Hanor's operations has also impacted training of employees and labor costs. Overall, it has been a tremendous learning curve for all individuals at the different levels of live production. Having to re-do everyday tasks, which had defined procedures that had

**A131**

been in place for years, has brought an enormous undertaking on training farm staff. The nature of the changes brought by Question 3 in how the breeding stock is bred and kept in group housing from the time they exit the farrowing house has translated to inefficiencies in maintaining production levels at reasonable standards. Metrics such as conception, culling, mortality, and farrowing rates have been negatively affected by attempting to stay compliant with laws like Question 3. In the nurseries and finishing operations, converted facilities have increased the level of detail in keeping up with group segregation, meaning that Hanor is having to follow closely Question 3 compliant flows and not mix them with non-compliant flows. Each change in husbandry practices have required more labor time, and Hanor has experienced a total increase in labor costs of at least 10% as a result.

31.     It is estimated that to fully come into compliance with Proposition 12 and Question 3, it will cost an estimated *additional* $210 million approximately.  This does not include secondary costs such as training and educating employees on the new arrangements, and lost profits for the time that pork cannot be produced during the transition.  Due to both the supply chain and the contractual requirements of Triumph and Seaboard, there is not a scenario where Hanor can just become Question 3 complaint alone.

32.     Hanor and the people who work for Hanor are very familiar with breeding sow behavior. Question 3 has also affected Hanor's animal husbandry practices surrounding the time period it typically utilizes for isolation of a sow after breeding. Sows have a strong hierarchy behavior. Hierarchy behavior is solved by the sows fighting to establish the groups' "pecking" order. Having breeding stock observe their acclimatization period in a group housing setting after they are removed from farrowing barns increases welfare issues, creates a challenge in maintaining a lower incidence of lameness, and other health issues ultimately increasing sow mortality. Also,

**A132**

having females be confined within a group setting within hours after being bred brings a challenge to achieving industry average conception rates. This is because sows are in a period of their estrus cycle which makes them more active in demonstrating their desire to breed, which again intensifies health conditions such as increase leg/hoof lesions and lacerations due to biting.

33.     As stated above, sows being active through the breeding period creates safety concerns for Hanor's employees. Hanor has had situations where sows have knocked employees down. Another component that creates safety concerns is when conducting routine health assessments or administering medications or vaccines because sows have ample room to move and could become aggressive, making it harder to administer medications or vaccines, and thus increasing safety concerns.

34.     Further, Hanor interprets the Regulations implementing Question 3 as allowing the Massachusetts Department of Agricultural Resources and/or a third-party validator to come to any of Hanor's operations to potentially inspect for compliance for Question 3. This causes great concern related to prevention of cross-contamination across farms, increasing substantial risk for bio-security events.

35.     My understanding is that Hanor could be at risk of penalties and/or injunctive relief by the Massachusetts Attorney General's Office for any potential violations of Question 3.

36.     Hanor requests a decision declaring Question 3 unconstitutional and/or vacating Question 3, as its requirements are not based in science or industry best practices. Significant harm will result if Defendants are not enjoined as requested because it will face excessive, if not impossible, burdens to come into compliance with Question 3 or risk civil penalties.

37.     The statements made in this Declaration are true and accurate statements.

38.     I declare under penalty of perjury and pursuant to the laws of the state of

A133

Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August 2023, at Enid, Oklahoma.

Name: Mauricio Diaz

**A134**

EXHIBIT

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,

      Plaintiffs,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture,

      Defendants.

Case No. 1:23-cv-11671-WGY

**DECLARATION OF GREG HOWARD OF CHRISTENSEN FARMS MIDWEST, LLC IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Greg Howard, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the same.

2.      I am the Executive Vice President, Chief Operating Officer of Christensen Farms Midwest, LLC ("Christensen Farms") and submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.      Christensen Farms is a family owned, Minnesota limited liability company that is headquartered in Minnesota, with additional operations in Iowa, Nebraska, Illinois, and South Dakota.

4.      Christensen Farms is a farrow to finish pig farmer that raises breeding pigs which ultimately produces pigs that are finished for market.

1

5.     Christensen Farms has approximately 140,000 breeding pigs across the entirety of its operations, and is responsible for providing pork to approximately 15 million people annually across the United States, including Massachusetts.  These operations result in Christensen Farms selling approximately 3.6 million hogs each year.

6.     Christensen Farms is also a member-owner of Triumph Foods, LLC ("Triumph"), and holds a 42.1% ownership interest in Triumph. Triumph is a farmer-owned company and produces pork products.

7.      Christensen Farms wanted to improve its sustainability and increase quality and safety assurance for consumers, and to achieve those aims, Christensen Farms became a founding member of Triumph.

8.     Christensen Farms' production facilities currently use industry best practices for confinement and housing of breeding pigs based upon the laws of Iowa, Nebraska, Illinois, and South Dakota where its farms are located.

9.     Based upon my experience in the pork industry, the pork supply chain in the United States and Canada depends on self-regulation of issues like animal welfare. My understanding is that the intention behind the self-regulation was to let producers drive what is best for their animals and to rally around common industry standards.

10.     The standards for animal welfare and pork production that Christensen Farms reviews and complies with in the United States are provided by the National Pork Board, and include Pork Quality Assurance (PQA), Transport Quality Assurance (TQA), and the Common Swine Industry Audit (CSIA). These standards are contained in Hog Procurement Agreements (HPAs) between Christensen Farms and Triumph.

11.     For example, my understanding is that the CSIA is the product of a task force of industry stakeholders—including producers, veterinarians, animal scientists, packers, processors, and retail and food service representatives—coming together to develop a workable, credible, and affordable common on-farm audit system for the swine industry. The CSIA allows packers and customers to verify that a pork production site complies with established standards for swine care

2

**A136**

and pre-harvest pork safety, while at the same time reducing potential costs and administrative burdens that would be imposed if producers were required to participate in multiple, redundant audits.

12. The CSIA includes 27 key aspects of swine care and pre-harvest pork safety through all phases of production. The CSIA administers an audit on pork production facilities to ensure compliance, which covers the full lifecycle of the pig while they are on the farm, and is designed to be independent of housing designs, size of operation, or geographical location. The audit focuses on four areas: records, animals, facilities, and caretakers.

13. Christensen Farms is also regulated by several USDA programs, including, but certainly not limited to, United States Department of Agriculture's ("USDA") Animal and Plant Health Inspection Service ("APHIS"), which oversees and ensures domestic livestock health and animal welfare when those pigs are destined for interstate commerce.

14. Christensen Farms transports pigs for delivery to Triumph by truck or trailer. The pigs that it seeks to sell to Triumph also has to be inspected by the USDA Food and Safety Inspection Service ("FSIS") officials to qualify for sale by Triumph. Upon arriving at Triumph, trained plant officials through the USDA's Voluntary Segregation Program ("VSP") inspect our pigs. They observe whether any pig appears to be showing any signs of adulteration, disease, or injury. These inspections occur before Christensen Farms' pigs are permitted to enter Triumph's plant. Christensen Farms understands the purpose of these inspections is to prevent disease and foodborne illnesses that could be passed on to customers.

15. Specifically, if any pig on our truck show signs of disease, injury, or other sign of adulteration, both VSP officials at the plant and Christensen Farms will segregate the pig from the rest of the delivery. To pass the initial inspection and evaluation, pigs are delivered to receiving alleys outside Triumph's plant and are further inspected through the FSIS program. If the pigs do not exhibit signs of disease, injury, or adulteration, they are moved to a barn for further inspection in a humane manner. This first set of inspections is referred to the ante-mortem inspections.

16. After the pigs pass the ante-mortem inspections, they may finally enter Triumph's

3

**A137**

plant for further USDA inspection during and throughout processing, referred to as the post-mortem process. Our pigs which qualify for Question 3 or Proposition 12, have to be segregated from one another, and segregated from the rest of the pigs in the plant. From our truck through the line, the entire regulated inspection process is to prevent disease and food born illness into the supply chain. Yet, Question 3 pre-designates all of our pigs as adulterated and cannot be sold into Triumph or processed for their state.

17.    A pig will only qualify for sale, meaning that Christensen Farms will be paid for the pig and title of the pig will transfer from Christensen Farms to Triumph, only after the pig goes through the complete USDA inspection process.

18.    Christensen Farms is required to certify compliance with Question 3's Minimum Size Requirements because it breeds or raises hogs that are being sold into and within Massachusetts through Triumph and Triumph's exclusive marketer of pork, Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard").

19.    Christensen Farms understands that Seaboard markets and sells the pork that Triumph processes, some of which comes from Christensen Farms' pigs. Christensen Farms also understands that Seaboard sells Triumph's product—and therefore Christensen Farms' product—nationally and internationally, including directly into Massachusetts.

20.    Christensen Farms is contractually bound under Hog Procurement Agreements (HPAs) with Triumph to sell hogs. Under the HPAs, Christensen Farms must sell to Triumph a number of hogs that correlates to Christensen Farms' ownership percentage in Triumph. If Christensen Farms fails to fulfill these contractual requirements, then Christensen Farms can risks losses or damages, and even places Christensen Farms' equity and ownership in Triumph at risk.

21.    Christensen Farms has no control over where its hogs are ultimately sold because of the nature of pork processing and because Seaboard is the entity that handles sales of Triumph's product. For example, one hog can ultimately be distributed to many different retailers or end-users, and to many different states as a result, after the various cuts are processed by Triumph. This does not even consider those additional cuts that are utilized in further processed pork

4

products through Triumph's separate business partner, Daily's® Premium Meats.

22.     Triumph simply cannot support its current demand for Massachusetts while also attempting to fulfill even a portion of California's demand. The industry cannot support demand for compliant Massachusetts pork, while also fulfilling other regulated states like California.

23.     The HPAs between Christensen Farms and Triumph require our farms to comply with all state and federal laws and regulations. However, laws like Question 3 require significant changes to Christensen Farm's operations that are both monetary and non-monetary in nature, which simply cannot be 100% made across all of Christensen Farms' farms that supply pigs to Triumph.

24.     For example, Christensen Farms has already expended significant costs, upwards of approximately $25.7 million dollars, to convert a small portion of its operations (approximately 12.5% of its total inventory) so that it may have some product that complies with California's Proposition 12 to ration product for California. Proposition 12 contains a portion of the same Minimum Size Requirements that Massachusetts' Question 3 does. This cost includes both $10.3 million dollars in capital projects to complete the conversions, as well as approximately $15.4 million dollars in operating costs to date incurred as a direct result of the conversions.  Based on my experience, these conversions do not have any benefit – and in fact, have negative consequences – on animal welfare, food safety and human laborer safety.

25.     Specifically, Christensen Farms converted 22,680 conventional breeding pigs into 17,910 Prop 12 or Question 3 compliant breeding pigs throughout six locations. This was a total reduction in Christensen Farms' breeding pig inventory of 4,770 sows. Five out of the six locations that were converted are permanent in nature, with the sixth location being temporary as of now due to the need for additional capital to convert the remaining 6,000 breeding pigs at that location. Additional capital to convert the remaining 6,000 breeding pigs at this location is estimated to be $4,440,200 dollars without any additional inflation on construction labor, building material and equipment costs accounted for.

26.     However, this portion of conversion is not enough to sustain all Question 3

**A139**

compliant pork for the State of Massachusetts that Triumph supplies, let alone sustain all Prop 12 compliant pork for California as well. This product was fully allocated by Triumph and Seaboard to ship to California. If Question 3 goes into effect, there is no separate product available just for Massachusetts; a small subset, if any, of the California product will have to be rationed off to try to assist the Massachusetts in their supply. While the HPA with Triumph requires the owners to be in compliance with all federal and state laws, Christensen Farms is not able to convert all of its facilities to be Proposition 12 and/or Question 3 compliant. Attempting to do would cost approximately $347 million. Such a requirement would bankrupt the industry.

27.    In addition to changing the physical nature of its operations to comply with the Minimum Size Requirements from Question 3, Christensen Farms also had to stop a portion of its producing operations during the time that it took to complete the conversions. This was not only required due to the actual physical change occurring on site to complete the conversions, but also due to the need for Christensen Farms to train its employees on new practices and methods for those breeding pigs, resulting in higher expenses and additional lost labor because maintaining Question 3 compliant sow housing is substantially different in labor requirements than traditional, individual sow housing that Christensen Farms is accustomed to. Based on our experience, Christensen Farms' employees have exhibited distress and frustration over the implementation of Question 3 compliant housing as it decreases, rather than enhances, animal welfare for the sows.

28.    The distress and frustration is, in large part, due to the safety disadvantages and higher risks of injury, to humans and the animals, that occur when breeding pigs are placed in group housing, which is what Question 3 requires in practice. When breeding pigs are initially grouped together at any time, they start establishing a pecking order at which time there is nothing that can be done to make this process more comfortable for the animal, they fight and establish dominance or submission. Each time a new sow or gilt is entered into a pen, the hierarchical process starts all over again and lasts for up to two weeks until the alpha and rank and file are established. Sows do this to determine who gets priority over resources like food, water, laying, and dunging areas. Injury and in some cases, death, can arise when sows are grouped together and

have to fight for resources. Dead sow removal is a process where we utilize specialized equipment, however with the increase in frequency, it too adds needless risk to our staff. When a sow is injured beyond recovery, we immediately humanely euthanize the sow; however, when in a pen and performing this process, it adds additional risk because of exposure of employees to the other aggressive sows in the pen.

29.     Christensen Farms has already felt the additional financial and production pressures of laws like Question 3. When other member-owners of Triumph have not been able to convert their operations to produce any Proposition 12 compliant hogs, Christensen Farms covers the shortfall from that producer's lack of compliant pigs. This increases the imminent risk of enforcement associated with Question 3 for Christensen Farms.

30.     Christensen Farms cannot continue to fill its own obligations plus the obligations of other Triumph member-owners without spending significantly more money on converting its operations, and will incur additional lost profits for the time that pork cannot be produced during the transition, as well as training and educating more employees on the new arrangements.

31.     It has taken Christensen Farms approximately three (3) years to convert the small percentage of its operations to be Proposition 12 and/or Question 3 compliant. Christensen Farms has experienced many obstacles in completing this conversion in that, specifically, because retrofitting its operations on this level is not something anyone has had to deal with prior to Proposition 12 and Question 3, it has led to extraordinary lead times for supplies, equipment and construction labor, repopulation, gilt (maiden female pigs) availability, execution of the building conversions/construction, and finally the normal pig production cycle itself.

32.     In short, Christensen Farms will need to substantially alter its practices to come into compliance with Question 3. This is because it is next to impossible to leave only a portion of sow operations as Question 3 compliant and leave the remainder as non-compliant, due to the recordkeeping requirements imposed by states like Massachusetts and California who have animal confinement laws that extend to the prohibition of sale of pork derived from non-compliant housing arrangements.

33.    This issue is further complicated by the risk of enforcement associated with Proposition 12. This is because it is impossible for Christensen Farms to comply with only the Minimum Size Requirements of Question 3 and not also comply with Proposition 12 that also demands minimum square footage of usable floorspace per sow.  It would place Christensen Farms out of business to maintain compliant sow housing based on a per-state arrangement for all 50 states that Christensen Farms supplies pork into.

34.    Christensen Farms understands that the Act makes it unlawful for a "business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any … Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Along with the rest of the farmers in the industry, Christensen Farms is uncertain about what actions it may take that would constitute "engaging in the sale" of Whole Pork Meat within Massachusetts.

35.    Due to the uncertainty of what it means to "engage in the sale" of Whole Pork Meat, and because Massachusetts has published no guidance on the subject, the Massachusetts Attorney General could take the position that Christensen Farms is engaged in the sale, leaving Christensen Farms at risk of the Massachusetts Attorney General's office either fining us or pursuing injunctive relief against our operations. Even with clarification, the sales ban overall significantly affects our operations as a producer at the beginning of the pork supply chain.

36.    Christensen Farms also understands that the Regulations permitted the sale of pork products that were already in the "supply chain" by August 15, 2022, and that the Act and Regulations now will not be enforced until after August 23, 2023. However, Christensen Farms is uncertain about the application of the Regulations after August 23, 2023. For example, it is unclear

**A142**

whether a market pig must be harvested and processed prior to August 23, 2023 to be Question 3 compliant or whether a market pig must have been harvested or processed prior to August 15, 2022 to be Question 3 compliant. Further, it's uncertain whether a pig in gestation prior to August 23, 2023 is Question 3 compliant, or whether a pig in gestation only prior to August 15, 2022 would be Question 3 compliant.

37.     Without clarification on what it means for products to be in the "supply chain" and the date that such products must be in the supply chain in order to be Question 3 compliant, Christensen Farms may be forced to slaughter breeding sows early.

38.     The "Minimum Size Requirements" as stated in Question 3 and in the Regulations prohibits a breeding pig from being confined in a manner that prevents it from "lying down, standing up fully, extending [its] limbs or turning around freely." But the enforcement authority can interpret this in several ways and presents a moving target for us. For example, a breeding pig that is seven foot in length would need a larger enclosure—or can be housed with fewer pigs—than a six foot breeding pig can in order to be able to lie down, stand up fully, extend its limbs and/or turn around freely. Breeding pigs vary in their size and there is no "one size fits all" for enclosures that could potentially need to vary depending on the size of the breeding pigs we have at that time.

39.     Due to the uncertainty regarding what it means for a pig to lie down, stand up fully, extend its limbs or turn around freely, Christensen Farms is also uncertain whether their pig enclosures would be considered prohibited conduct under Question 3, and therefore prohibiting the sale of any such whole pork meat from those pigs into Massachusetts.

40.     While Christensen Farms has already made conversions to its enclosures to comply with Prop 12, those same conversions may not be compliant with Question 3's Minimum Size

**A143**

Requirements because the enclosure permitted by the Minimum Size Requirements varies depending on the size of the breeding pig and is not a standard size. To be somehow forced to comply with two different enclosure size requirements would be even more costly to Christensen Farms. In sum, Christensen Farms is uncertain whether its enclosures—both the converted Proposition 12 enclosures and the unconverted enclosures—violate Question 3.

41.     Any market advantage for out-of-state pig producers will disappear if Christensen Farms is required to continue to spend significant resources to comply with the Minimum Size Requirements. This market advantage is further compromised by Proposition 12 and Question 3, not only by other domestic pork producers, but also by international pork producers. Specifically, both Proposition 12 and Question 3 are more restrictive than all the U.S.'s international competitors. Even the most aggressive standards in both the European Union and Canada allow for stalls up to 28- and 35-days post breeding respectively and in the case of Proposition 12 at less square footage by 36% in the case of gilts and 15% in the case of sows. All other export competing countries like Brazil, Chile, and Mexico use industry best practices like the U.S. utilizes today, which puts Proposition 12 and Question 3 standards at a competitive disadvantage to all our global competitors.

42.     Pork is part of a nutritious, healthy balanced diet and is affordable to all consumers, it plays a significant role in reducing food insecurity and national security. U.S. pork is sought after on the global stage and contributes to a positive U.S. trade balance. Proposition 12 and Question 3 reduce animal welfare, discriminates against low-income consumers, and compromises farm safety. It will increase the cost of pork to all U.S. consumers, disrupt the pork supply chain, reduce the industry's global competitiveness, and does not benefit the environment.

**A144**

43. The Massachusetts Attorney General takes the position that the Regulations implementing Question 3 allow the Massachusetts Department of Agricultural Resources and/or a third-party validator authorized by Massachusetts to come to any of Christensen Farms' operations to inspect for compliance for Question 3.

44. This means that Christensen Farms could be at risk of penalties and/or injunctive relief by the Massachusetts' Attorney General's Office for any potential violations of Question 3. If only a portion of Christensen Farms' operations are compliant, there is no guidance provided by Massachusetts concerning whether Christensen Farm would be subject to any penalty or not.

45. Christensen Farms' ongoing monetary and non-monetary injuries would be redressed by a decision declaring Question 3 unconstitutional and/or vacating Question 3.

46. Christensen Farms will face imminent harm if Defendants are not enjoined as requested because it will face excessive burdens to come further into compliance with Question 3 as described within this Declaration in further detail, including a potential requirement to cull breeding sows early during their primary productive years because there is currently no guidance on legal sell-through of Pork Meat that has been non-compliant during the Stay Period that will soon expire in August.

47. The statements made in this Declaration are true and accurate statements.

48. I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this Declaration was made on this 7th day of August 2023, at Sleepy Eye, Minnesota.

Greg Howard

11

**A145**

EXHIBIT

5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **DECLARATION OF KENNY BRINKER OF ALLIED PRODUCERS' COOPERATIVE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Kenny Brinker, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.      I am the President of the Allied Producers' Cooperative ("APC") and submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.      APC is a cooperative that consists of 22 farmer-members who are mostly multi-generational Midwestern family pig farms, most of which are farrow-to-finish farmers.  APC is headquartered in Iowa, but its members also operate in additional states throughout the Midwest including Minnesota, Missouri, Nebraska, and Kansas.

4.      APC members, collectively, sell approximately 2.6 million hogs annually and raises 96,034 breeding pigs.

5.      APC is a founding member-owner of Triumph Foods, LLC ("Triumph") and owns

A146

a 13.5% interest in Triumph.

6.     APC's members' production facilities, including its farrowing facilities, currently use science-based and industry best practices for confinement and housing of breeding pigs.

7.     APC members understand that they have the right to operate their pig farms and safely house breeding pigs using science-based and industry best practices in the states in which they specifically operate their pig production operations.   APC members run their facilities in compliance with all federal laws, and in compliance with all states where they operate.

8.     APC entered into a set of Hog Procurement Agreement ("HPAs") with Triumph to sell hogs to Triumph. Under the HPAs, APC members are required to sell Triumph a number of hogs that correlates to APC's ownership percentage in Triumph. APC members must sell this required volume of hogs to Triumph or risk sustaining losses and damages to Triumph. If APC continues to default in its obligations to Triumph, it runs the risk of losing its ownership equity interest in Triumph.

9.     Triumph sells it pork through a Marketing Agreement with Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard").  APC and its members have no control over where Seaboard sells the meat processed by Triumph, including meat from the pigs that APC members supplied Triumph. APC members know that their product is sold into Massachusetts and Triumph delivers pork products from APC members' pigs directly into Massachusetts. Due to the nature of the processing supply chain, product from APC pigs is sold all over the country.

10.    APC and its members believe that they are directly subject to Question 3's Minimum Size Requirements because they breed or raise hogs that are ultimately sold into and within Massachusetts.

11.    Triumph cannot support its current demand for pork products in Massachusetts while also attempting to fulfill even a portion of the demand of other states, including California. In fact, it is APC's belief that the pork industry itself cannot support the demand for compliant pork that Massachusetts requires in hand with fulfilling other states, again, like California.

**A147**

12.     APC's obligations under the HPA require that its members be in compliance with all laws.  As further described herein, under existing circumstances, APC's members cannot covert their facilities to meet all the Proposition 12 or Question 3 requirements. Further, because APC and its members cannot fulfill its contractually required quota of Question 3 product for Triumph, APC is at risk for damages and losses to Triumph by not having Question 3 compliant product or otherwise not being compliant with state laws. This is true despite state laws like Proposition 12 and Question 3 being challenged for some time.

13.     As smaller farmers, one member cannot carry the burden or otherwise be responsible for Question 3 pigs and the farms themselves are too small to carve out portions of the farms for one state.  Attempting to do so for multiple state statutory demands would be impossible.

14.     APC members understand Question 3 and the Regulations[1] implementing Question 3 as prohibiting engaging in the sale within Massachusetts of any pork meat that a business owner knows or should know is the meat of a pig that was not housed in compliance with Question 3's Minimum Size Requirements. Question 3 and the Regulations do not define what Massachusetts would consider to be "engaging in the sale" of non-compliant pork, and Massachusetts has not provided any guidance to farmers or other businesses about what activities would constitute engaging in the sale. APC members are uncertain whether the shipment into Massachusetts of any pork that was produced at its members' farms, if not compliant with the Minimum Size Requirements, is prohibited conduct that could result in fines assessed against APC members. APC members are therefore at risk of enforcement because the Massachusetts Attorney General's Office can take the position that APC members are "engaging in the sale" of non-compliant pork given the ambiguities about what constitutes a violation of Question 3.

15.     The prohibition of sale into Massachusetts based solely on confinement conditions affects APC's members, who are only the first step in the supply chain and have no control over what happens to the pigs they raise once delivered for processing inside the Triumph facility.

---

[1] If not otherwise stated herein, any capitalized term not defined herein carries the same meaning as that set forth in Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction.

A148

Because of the nature of the pork supply chain and industry, APC's members will still be required to comply with Question 3 and the Regulations' requirements for certifications upstream from APC.

16.     Compliance with Question 3's Minimum Size Requirements requires significant and extremely costly changes to APC's members' operations. As such, only one of APC's members has been able to begin operational conversions to be Question 3 compliant and product is not yet available due to the lengthy process and gestational length of the mothering sows.

17.     As smaller operations, to alter confinement practices to come into compliance with Question 3 will require either increasing the facility sizes, at a prohibitive cost to APC's members, or substantially decrease the number of pigs on their farms.  Either way, APC members would face significant loss in profits and if culling breeding pigs early, the ultimate result is a substantial shortage in pork available for the market. Other costs include "loss of production" costs, which come from sows being injured or killed in Question 3 compliant housing (which, in practice, requires group or large pen housing) and results in more miscarriages, lost piglets, and still births.

18.     Further, it is anticipated that it would take two to three years for APC's members to come into compliance with Question 3 and Proposition 12, and that is *if* the members could afford to come into compliance. However, most of APC's members cannot afford this or do not have the space to do so.

19.     Additionally, APC interprets Minimum Size Requirements in Question 3 and the Regulations as not providing any square footage specifications that APC's enclosures must be in order for the breeding pig to be housed in compliance with Question 3. Rather, APC interprets the Minimum Size Requirements as being based on the area required for an individual breeding pig to turn around. It is uncertain how farmers like APC's members can comply with the Minimum Size Requirements, given that breeding pigs are not all one size. This ultimately is resulting in a forced group pen housing system.

20.     Based upon APC members' own experiences, many contend that Question 3 compliant housing results in inhumane care of sows and unsafe working conditions for farm and

**A149**

animal caretakers.

21.     Complicating things further is the fact that a pig enclosure may be compliant with Question 3, but that does not automatically render it compliant with Proposition 12. These pigs also have to be delivered separately to Triumph.  If every state is permitted to enforce their own rules regarding pig housing like California and Massachusetts have done via Proposition 12 and Question 3, it will become untenable, and even impossible for farmers like APC's members, to comply with each separate requirement.

22.     It is estimated that to come into compliance with Question 3, it will cost an approximate total of $36,400,000.00 in renovating APC members' facilities, training and educating employees on the new arrangements, and lost profits for the time that pigs cannot be raised during the transition.

23.     Any market representation that APC members currently have will disappear when farmers have to spend significant resources to comply with the Minimum Size Requirements or exit the marketplace altogether because compliance would either be infeasible or impossible resulting in the loss of these family owned smaller farms.

24.     APC's farms are experts in the behavior of breeding sows.  Sows are aggressive creatures and when placed in group housing, sows will go through an aggressive pecking order in the pens where some sows get injured or killed on a daily basis. This is not what APC's members' farms and families have been taught for generations on caring for their livestock and is contrary to the goals of the industry.

25.     The first 42 days, or approximately the first six weeks, are the most critical time for sows.  These initial weeks after conception are when the mothering pigs are at highest risk for miscarriage, ie: losing the litter or having reduced size of a litter.  Placing them in group pens causes them to face aggression from other pigs and incur stress during this delicate time period.

26.     APC members' pigs must undergo multiple inspections by officials of the United States Department of Agriculture ("USDA")'s Food and Safety Inspection Service ("FSIS") to qualify for sale to the FSIS facility for processing.  Prior to the sale of pigs to Triumph, the USDA

5

will inspect the pigs on the delivery trucks for disease, injury, abnormalities or any other sign of adulteration. These health inspections of our pigs, begin before APC members' pigs even enter the plant. The health inspections continue throughout the entire time the pigs are on the processing line after acceptance inside the facility. The primary purpose of each phase of inspection is to prevent disease or foodborne illness from being passed on to consumers.

27.     Only after the pig makes it through the complete USDA inspection process will it qualify for sale. APC members are then paid and title of the pig transfers from the member to Triumph.

28.     Yet, despite the rigorous and USDA inspection process before and during processing, Question 3 now predetermines what pigs are adulterated just for Massachusetts. We would have to deliver qualifying APC hogs separately and the USDA would have to observe and inspect them separately at the plant.

29.     The Regulations also allow and facilitate the Massachusetts Department of Agricultural Resources and/or a third-party validator to come to any of APC's members' operations to inspect for compliance for Question 3.

30.     APC members could be at risk by the Massachusetts' Attorney General's Office seeking penalties and/or injunctive relief for any potential violations of Question 3.

31.     If APC members are at risk of civil or injunctive relief halting their operations, this ultimately harms APC, as a co-operative itself, because its members will be unable to fulfill their respective obligations to the co-operative.

32.     APC and its members request a decision declaring Question 3 unconstitutional, as its requirements are not based in science or industry best practices and the continued implementation and risk of enforcement run the risk of irreparable harm to APC and its members as previously described.

33.     APC will face imminent and irreparable harm if Defendants are not enjoined as requested because it will face excessive burdens to come into compliance with Question 3.

34.     Question 3's legislative intent of animal welfare is lost if Question 3 is enforced, as

**A151**

it will actually bring harm to the welfare of our sows.

35.     The statements made in this Declaration are true and accurate statements.

36.     I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August 2023, at Auxvasse, Missouri.

*Kenny Brinker*

_____
Kenny Brinker, President
Allied Producers' Cooperative

**A152**

EXHIBIT

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **DECLARATION OF EICHELBERGER FARMS, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Mike Roth, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.      I am an officer of Eichelberger Farms, Inc. ("Eichelberger") and serve as President Emeritus.  I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.

3.      Eichelberger is a pig farmer with farms in Iowa, Missouri, and Illinois.

4.      Eichelberger is one of the founding members of Triumph Foods, LLC ("Triumph") and owns a 6.3% interest in Triumph.[1] Having Triumph owned by pig farmers makes it especially

---

[1] If not separately stated in this Declaration, all defined terms carry the same meaning as set forth in the Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction.

A153

unique in the pork production and processing industry, providing different perspectives in order to ensure animal welfare integrity throughout the pork supply chain already.

5.  Eichelberger is a farrow-to-finish farmer, meaning that it starts with the mother sows which give birth to piglets, then it raises and cares for those pigs until they are ready for market.

6.  Eichelberger's production facilities, including its farrowing facilities, currently use science-based practices for confinement and housing of breeding pigs. Specifically, Eichelberger's current sow housing consists of 75% individual maternity pens (IMP), with the balance of the sows housed in an open pen gestation (OPG) environment.  Converting all the existing buildings to comply with Massachusetts Question 3 ("Q3"), and to maintain the level of production needed to fulfill our marketing contracts, would be a considerable capital expense.  It would not be possible to obtain the capital necessary to convert 100% of our farms to Q3 compliance.   In addition, some facilities' physical design would render them not a candidate for conversion.

7.  Currently Eichelberger has 60,000 breeding pigs (45k in IMP, 15k in OPG) and purchases wean pigs from the equivalent of 10,500 breeding pigs housed in IMP.

8.  Eichelberger operates its farms in accordance with the laws of Iowa, Missouri, and Illinois where it maintains sow housing operations that are operated using industry best practices that are rooted in science.

9.  Eichelberger has entered into Hog Procurement Agreements ("HPAs") with Triumph to sell pigs. Under the HPA, Eichelberger is required to sell Triumph a certain percentage of hogs that correlates to its ownership percentage in Triumph.  If Eichelberger fails to do so, then Eichelberger will suffer losses through damages that are sought by Triumph. If Eichelberger continues to default in its obligations under the HPA, it risks losing its ownership interest in

A154

Triumph.

10.    The pigs that Eichelberger sells to Triumph are marketed through Triumph's exclusive marketer, Seaboard Corporation, Seaboard Foods, LLC and Seaboard Foods of Missouri, Inc. ("Seaboard").

11.    Eichelberger has no control or say on where the pork products from its pigs are ultimately sold or delivered once processed, but it ultimately is aware that its pigs are processed into many different cuts, sold and distributed across the country and internationally.  This includes Massachusetts.

12.    The pigs that Eichelberger raises to sell to Triumph already have to undergo several inspections by officials of the United States Department of Agriculture's ("USDA") Food and Safety Inspection Service ("FSIS"). The main objective of these inspections is to prevent disease and foodborne illness from reaching the end consumer. For our pigs to qualify for sale to Triumph – or any other FSIS facility – the pigs must pass all USDA inspections. Before the sale of our pigs can occur, the USDA inspects the pigs while they are still on our delivery truck for any sign of adulteration and disease/injury, or abnormality. The inspections start before our pigs are even permitted to enter the plant and continue after the pigs enter the plant and throughout the entire processing line.

13.    After the pigs make it through the full USDA required inspection process, they qualify for sale. Only at this point, after the pigs pass all USDA inspections, will Eichelberger be paid for the sale and title of the pigs will transfer from Eichelberger to Triumph.

14.    Even though the USDA inspection occurs before and during processing, Q3 has now decided what pigs are "adulterated" for the state of Massachusetts. Under Q3, Eichelberger will have to deliver Q3 qualified pigs separate from conventional pigs, and then the USDA will

3

**A155**

have to inspect the Q3 pigs separately from the conventional pigs at the plant.

15.     Eichelberger understands that it is required to comply with Q3's Minimum Size Requirements because it breeds or raises pigs that are sold into and within Massachusetts through Triumph.

16.     Due to the lack of clarification regarding what it means to "engage in the sale" of non-compliant pork product into Massachusetts, Eichelberger is at risk of Massachusetts taking the position that the shipment into the state of any non-Q3 compliant pork that was produced at our farms is prohibited by Q3 and the state could seek violations of the statute or regulations, and pursue fines against us.

17.     Eichelberger understands that Triumph cannot support its current demand for Massachusetts while also attempting to fulfill even a portion of the demand for California, which requires Proposition 12 ("Prop 12") compliance.  The industry itself cannot support the demand that Massachusetts has for pork in conjunction with fulfilling other states' demand, like California.

18.     The HPA between Eichelberger and Triumph requires that Eichelberger be in compliance with all laws. We cannot convert all of our facilities to meet the Prop 12 or Q3 requirements. Because of this, we cannot fulfill our contractually required quota of product for Triumph that is Q3 complaint.  We face damages and losses to Triumph for not having enough, or any, Q3 product or otherwise not following a state law.  This is true even though state laws like Prop 12 and Q3 have been subject to litigation.

19.     Compliance with Q3's Minimum Size Requirements requires significant and extremely costly changes to Eichelberger's operations. As such, Eichelberger's current operations are not Q3 compliant.

20.     As a smaller operation, to alter its confinement practices to come into compliance

**A156**

with Q3 will require significant capital expenditures that are impossible for Eichelberger to complete. Capital costs for converting to Q3 arise from 3 areas:

    a)  Remodel cost of existing IMP facilities to open pen facilities.

    b)  Addition of new gestation facilities to add sows that are removed from existing facilities to meet the Minimum Size Requirements.

    c)  Addition of gestation facilities to add sows to replace the lost production of weaned pigs that are lower due to the loss in productivity from this type of system.

Items b) and c) are necessary to maintain the level of throughput in our system to meet the contractual obligations that we have with Triumph and other customers.

21.    Laws like Q3, in addition to requiring the sow to be housed in an open pen, also require that the sow be given more space than our current (OPG) sows.  In addition, these laws do not allow for a sow to be housed in an IMP during the time the sow is bred until confirmed pregnant This period is critical for embryo implantation and survivability and is also the time when fighting among sows is most intense due to higher levels of hormones.  Costs associated with the loss of production from these areas result from additional non-productive sow days because unbred sows are harder to identify when the animals are housed in pens and a lower number of pigs are born alive due to embryo implantation issue mentioned.

22.    Our understanding is that the impact of these items is a reduction in 1 to 2 pigs per sow per year, or approximately 5% of productivity (assuming 30 pigs per sow per year).

23.    The space allowed for our current IMP sows is 14 square feet per animal.  The OPG farms are currently housed at 15 to 20 square feet per head.  If Massachusetts interprets the turn around requirement to require 24 square feet of space, that requirement will reduce the number of sows that can be gestated.   In order to maintain the production (and fully utilize the farrowing

**A157**

rooms), approximately 25% of additional gestation space would need to be added to each farm in order to have 24 square feet of space per sow. We don't know what turn around freely means to Massachusetts for Q3, however.

24.     Conversion of all of our sow facilities (if capital were available) would take approximately 10 years (approximately 7,500 sow spaces per year). From the start of planning, to remodeling of existing facilities, to the breeding, feeding, and transport to Triumph would be approximately 2 years: 1 year for sow farm remodel, and 1 year from the 1st breed to market at Triumph.

25.     Even if Eichelberger has or could obtain sufficient capital to convert 100% of our farms to be Q3 compliant, which it cannot, it is unclear how exactly it could do that. Because Q3 and the Regulations do not provide a specific square footage requirement for the Minimum Size Requirements, and because breeding sows vary in size, Eichelberger is uncertain about how it can construct new enclosures to be compliant with Q3.

26.     Compliance with Q3 is further complicated by the fact that Massachusetts and California have different breeding pig housing requirements. A pig enclosure could be compliant with Q3 but not with Prop 12. Because the states have different requirements, Eichelberger would have to deliver these pigs separately to Triumph. It will become untenable or impossible for Eichelberger to comply with each state's separate requirement if every state is allowed to enact and enforce their own pig housing laws.

27.     It is estimated that to come into compliance with Q3 and Prop 12, it will cost an approximate total of *at least* $157,275,000.00 in renovating facilities, training and educating employees on the new arrangements, and lost profits for the time that pork cannot be produced during the transition. The total itemized capital cost to convert the entire system to be compliant

**A158**

with Q3 and Prop 12 would be:

    a)  Convert 45k owned and 10.5k sows of purchased pigs from IMP to OPG at an expected cost of $1,500 per sow = $83,250,000

    b)  Add 25% new gestation to get to the 24 square feet per head at an expected cost of $3,500/sow = $61,687,500.00 (70,500 * .25 * 3,500)

    c)  Add 5% new gestation to offset the loss in sow productivity.  $12,337,500. (70,500 * .05 * 3,500).

28.     In addition to capital costs noted above, our expectation is that total labor cost on a farm will remain the same, even though the sow numbers will decline.   If output of the farm is reduced by 25% with constant labor, thereby increasing our labor costs by 25%.

29.     Besides costs, there are significant animal welfare and employee safety concerns associated with conversion of our operations to be Q3 or Prop 12 compliant.

30.     As mentioned previously, we house animals after breeding until confirmed pregnant (approximately 40 days post breeding).  The time from weaning to breeding is a stressful time for a sow and being in a pen with other sows.  It results in more broken legs, lameness and fighting during this timeframe.   As noted above, this period of time is critical for the implantation of embryos in the uterus and also the time when the most severe fighting among animals occurs.

31.     Employee injuries increase on this type of farm due to having to work with the 300-500 lb. animals in a pen environment.  Day to day activities such as examining animals for health issues, vaccinations, heat checking, pregnancy checking, and feeding generates more injuries to the employees handling them.

32.     These forced practices differ significantly from current OPG industry standards. Current OPG industry standards do not significantly reduce the throughput or put the animals at

A159

risk during the post-weaning and breeding process. Further, Eichelberger interprets the Regulations implementing Q3 as allowing the Massachusetts Department of Agricultural Resources and/or a third-party validator to come to any of Eichelberger's operations to inspect for compliance for Q3.

33.    Eichelberger's ongoing injuries would be redressed by a decision declaring Q3 unconstitutional and/or vacating Q3, as its requirements are not based in science or industry best practices.

34.    Eichelberger will face imminent and irreparable harm if Defendants are not enjoined as requested because it will face excessive burdens to come into compliance with Question 3.

35.    The statements made in this Declaration are true and accurate statements.

36.    I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August 2023, at Wayland, Iowa.

Mike Roth
Eichelberger Farms, Inc.

**A160**

EXHIBIT

7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | **Case No. 1:23-cv-11671-WGY** |
| Plaintiffs, | |
| v. | **DECLARATION OF DR. JANEEN SALAK-JOHNSON, Ph.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Dr. Janeen Salak-Johnson, hereby state and declare as follows:

1.     I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the same.

**Qualifications**

2.     I received my Doctor of Philosophy degree in Animal Science with a minor in Neuroscience from Texas Tech University in Lubbock, TX.

3.     I received a 3-year National Institute of Health Postdoctoral Training Fellowship in Psychoneuroimmunology at the University of Minnesota.

4.     In late 1999, I joined the Animal Sciences faculty at the University of Illinois, where I held a research and teaching appointment and received tenure.

5.     In 2018, I joined the animal science faculty at Oklahoma State University, where I hold the Temple Grandin Endowed Professorship in Animal Behavior and Well-being.

1

**A161**

6.      Throughout my career, including at Oklahoma State University, I have served on several committees. These include Farm Animal Care Training & Auditing (FACTA), American Society of Animal Science (ASAS) Delegate to AAALAC International, Center for Food Integrity Expert Animal Care Review Panel, the University of Illinois Institutional Animal Care and Use Committee, and elected as Board of Director and Agricultural Animal Science sub-Committee to AAALAC International.

7.      I served as chair for the 3rd Edition (Swine Chapter; 2010) and 4th Edition (Environmental Enrichment Chapter; 2020) of the Guide for the Care and Use of Agricultural Animals in Research and Teaching, commonly known as the Ag Guide, and chaired the Sow Housing Section in Chapter 2 for the Swine Care Handbook, 2018 ed. Also, I served as chair or committee member for ASAS National Animal Behavior and Wellbeing Committee and ASAS Midwest Section on Animal Behavior and Housing Committee for multiple 3-year terms.

8.      I serve on numerous professional and industry-related advisory boards, provide animal care and well-being advice and regularly conduct on-farm animal welfare assessments for swine industry participants.

9.      At Oklahoma State University, I lead a research laboratory that is one of the most active interdisciplinary programs in the country, using the most innovative approaches contributing to alternative ways to improve pig well-being and safeguarding sow and piglet welfare.

10.     My research findings were some of the first in the country to show improved sow well-being based on multiple welfare metrics. In short, these studies identified some important physical (e.g., stall and floor space allowances) and biological components (e.g., nutrition, social rank) of housing environments that can affect sow and piglet well-being.

11.     Further information regarding my presentations and peer-reviewed articles that have been published are identified in the attached true and correct copy of my curriculum vitae attached hereto and incorporated by reference as Exhibit "A" to this Declaration.

**Assignment**

A162

12.     I have been asked by Plaintiffs to determine the impact Massachusetts' Question 3 ("Question 3") has on the well-being of breeding sows based upon my education, experience and training.

**Findings**

13.     Sows are female breeding pigs that give birth to piglets that ultimately become hogs finished and sent to market for both US and exported pork consumption. Under current operations, sows are maintained on sow-specific farms that are separated from other hog facilities.

14.     Sows' most productive "days," especially for low-prolific sows, are parity 2 to parity 6; with parities 2 through 4 being most productive.  This means the sow is most productive between the second and fourth times of being bred during her lifetime.

15.     The gestation length of a pig is about 114 days, and average farrowing will occur 114 days after breeding.  Piglets are generally raised for three to four weeks before weaned.

16.     It then takes another 24-26 weeks to continue raising and finishing the piglets until the piglets are ready to be slaughtered at a processing plant.

17.     Question 3 effectively prevents individualized stalls except during the five-day period prior to the expected day of giving birth, during nursing, and only for temporary periods of less than six hours for breeding and animal husbandry purposes.

18.     Question 3 prevents individualized stalls by imposing a requirement that all breeding pigs must be able to fully lie down, stand up, extend their limbs and turn around freely.

19.     Currently, most breeding pigs within the industry are confined in 14-16 square feet individualized gestation pens.

20.     Research shows that turn around stalls are not always voluntarily chosen by the sow or the best option for sows.

21.     Additionally, it is unrealistic to assume that the sow is capable of turning in a complete 360-degree manner, based on its anatomical and morphological features of being a pig (especially a pregnant pig) and its motivation.  It would not be able to perform this behavior, smoothly, easily, or often (if at all), and as pregnancy progresses it is almost null that it would

3

attempt to initiate turning around. Moreover, it is likely that if the sow was to even half turn around it would not be capable of doing this without touching another sow or the sides of the enclosure the sow is kept in. This is an arbitrary identified behavioral need—it is unrealistic to think that a sow could perform a full circle easily and/or naturally. In reality, when sows make postural changes they have to transition between postural behaviors. For example, a sow cannot simply go from standing to lying (vice versa), it has to transition to a sitting position with a time delay before attempting to progress to the next postural behavior. Performing this sequence of behaviors to transition from one postural behavior to another occurs regardless of the space per sow provided— it performs these sequences whether it is at 14, 16, 18, 24, 36, or 100 sq. ft. per sow.

22. Implementing turn around stalls does not equate to better welfare. The means by which sows are fed and the interactive effects between housing and feeding systems complicate the problem of identifying the best system. In fact, turn around and floor space allowance further exacerbates these problems. Making it more difficult for producers to comply especially when this turn around requirement is not based on science or improved welfare—housing systems are not a jigsaw puzzle—not all pieces fit appropriately together. So many other factors influence the effects of space allowance on welfare; these include group size, feeding system, management, etc. –just to name a few because they all influence one another – hence ambiguous outcomes. Data show that pregnant sows kept in a large space may have a sense of fear or insecurity, resulting in low productivity due to compromised welfare—Lee et al., 2016—thus mandating a number that is not scientifically validated could lead to poorer welfare because one cannot move the pendulum backwards.

23. It is not as simple as providing sows with the space to allow them to turn around; this provision requires changes to the entire infrastructure of the US Pork Production. The infrastructure does not enable pork to be segregated. It is unethical to ask producers to raise animals in a way that does not improve individual welfare and that restricts their ability to do what is best for the animal.

24. Since sow housing systems are not jigsaw puzzles there is a learning curve and

4

**A164**

there will be unintended negative consequences on the welfare of the animals—not only sows but piglets too.  It is important to note that providing sows and her piglets this much space can also result in unintended negative consequences such as increase in piglet mortality. Banning the confinement of breeding pigs unless provided enough space to fully lie down, stand up, extend their limbs, and turn around freely without touching the sides of an enclosure or another animal will increase pig mortality of crushing and lying on pigs. Increased floor space in farrowing is negatively correlated with survival rate of the piglets (Lee et al., 2016).

26.     State-by-state referendums results in a patchwork of inconsistent guidelines – problematic for farming enterprises that span more than one state and may limit access to markets exacerbating the problem – that is exactly what Question 3 is doing.  State by state referendums do not provide standards or criteria for farm animal care and the lack of consistency has implications for interstate commerce. Federal law equals a level playing field, disadvantages polarization, protracted political transactions, provides time to initiate change and decreases negative social stigma generated toward the affected industry. In comparison, state-by-state referendums provide the potential that politically negotiated animal welfare standards may either generate no net benefit to animals or not be practically achievable, and often have no new scientific or practical information to support the referendums.  In short, state laws similar to Question 3 seriously disadvantage farmers when marketing across state boundaries and make their jobs practically impossible to perform.

28.     Unfortunately, process regulations can have counterintuitive effects. In particular, process regulations often do not completely specify the alternative systems that could be adopted. Bans on production processes cannot guarantee improvements in farm animal welfare without other regulations. It is possible that open barn systems used for chickens kept for egg production achieve lower levels of hen welfare than some enhanced or enriched cage systems. Moreover, with the absence of trade restrictions, banning a practice in one state or location serves to change where food products come from but not how animals are raised (Sumner et al. 2008). This violates the ethical obligation of farmers, researchers, etc. Essentially, the state of Massachusetts legislators

A165

are dictating beyond their jurisdiction what is not just about space, they are arbitrarily redefining words and practices – some which also violate the swine care hand book.  This is not just about the amount of space you are giving them.

29.     There are significant effects that will be felt throughout the pork industry by implementing Question 3. For example, assume that no relief is provided to prevent enforcement of Question 3. In that case, it is plausible that it will result in unintended negative welfare consequences on sows and potentially their piglets.  Producers will face decisions that will impact their moral and ethical obligation to ensure sow and piglet well-being. Female pigs are born with most of the follicles that will become their future piglets. Again, their most productive days are parity 2 through 6. Some of their progeny will become replacement females. If Question 3 goes into full effect and is enforced, a producer may be forced to sacrifice the sow and her progeny because progeny from her can no longer be sold as a product to Massachusetts. As a result, it is also plausible that her female progeny that may be used for replacement gilts may also have to be sacrificed through early culling. This is more disturbing if the sow that farrows before the enforcement date is a younger sow, since her most productive days are 2 to 6 parities, and this is true whether a sow herd is considered high or low prolific. This is especially true with sows that are considered low prolific, meaning that their first litter is their least productive time.  Even feral sows naturally have two litters per year.  Another concern that needs to be considered in this scenario is that piglets may have to be weaned early. Once again, this results in welfare concerns mainly for the piglets but can also compromise sow welfare.  Weaning a pig prior to 21 days of age can negatively impact welfare.  This is especially so in terms of increased use of antibiotics, unwanted behaviors develop, and reduced growth.  Delaying weaning results in improved piglet welfare in the long term, less unwanted behaviors, and less use of antibiotics—to name a few benefits.

**Stockmanship Effects of Question 3 and Group Sow Housing**

30.     Question 3 will have significant effects on stockmanship skills and risks throughout the pork production industry.

6

**A166**

31.     Three essential skills for a successful stockperson are good observation skills to identify sow's problems, farm management knowledge, and skills to solve significant problems to promptly fix the given problem. There are substantial learning curves in stockmanship in managing groups of aggressive sows, identifying sick animals, and providing for their individual needs.

32.     Upon conversion from individual gestation stalls to group housing, several larger commercial producers have reported sow mortality rates of up to 30%.  Increased sow mortality rates in large sow populations are associated with caretaker experience (Supakorn et al., 2019); thus, those with less experience are less likely to recognize a sow at risk and intervene with treatment or decide to cull the sow.

33.     Welfare at the group level takes a whole different level of stockmanship that cannot be learned overnight. There will be a substantial increase in ill and injured stockpersons who are tasked with caring for these sows.

34.     In addition to the human risk of injury, sows housed in group-housed systems suffer more injuries when compared to sows housed in individual gestation stalls because of aggressive interactions such as vulva biting and fighting for feed to establish a new sow social hierarchy (Spoolder et al., 2009; Livestock Sci 125:1-14).  These injuries can be extended to the piglets as well. Too much space for the sow when housed with her piglets can also result in welfare concerns for the piglets because of the anatomical and morphological features of the sow; the more space she has in which the piglets can roam, the incidence of crushing her piglets increases resulting in increased piglet mortality.

35.     Although few studies have assessed the Stockperson factor, Willgert et al. 2014 (Prev Vet Med, 113:268-272), reported an increased risk of lameness when the number of sows per stockman is high, suggesting that stockman availability affects the detection and management of these disorders.

36.     Indeed, increasing the number of sows per stockman decreases the observation time available per animal, resulting in increased risk to the sows.

37.     Careful attention needs to be given to the location and design of the eating,

**A167**

drinking, dunging, lying, and walking areas to reduce aggressive interaction among sows within the pen. In poorly designed and managed indoor group-housing systems, there is great potential for very poor sow welfare.

38. Simply attempting to retrofit the gestational stall system to accommodate the turn around system takes time and, if not done properly, will have a direct negative impact on sow welfare, including increased lesion scores and aggression resulting in some sows having poorer welfare (Pacheco et al., 2021 Front Anim Sci 2:719136). Moreover, the well-being of sows that have been raised in gestation stalls can be compromised initially when moved into group pens as measured by reduced performance and productivity and greater stress responsiveness (DeDecker, 2011 University of Illinois, Thesis).

**Additional Common Welfare Risks in Group Sow Housing**

39. There are more risk factors associated with group housing systems than individual stall housing for reproductive performance. For example, the most common welfare challenges associated with group housing include aggression, lameness, body condition, and chronic stress.

40. Body condition is a physical assessment of body composition based on nutrition level, often visually scored on a scale of 1 (thin) to 5 (obese), with 3 being the desired score. This welfare measure is one of the most variable measures among group-housed sows due to aggression at feeding, which results in some sows consuming too much (5) and some consuming too little (1), which both scores equate to welfare concerns.

41. Moreover, body condition correlates with lameness, which inhibits or modifies an animal's gait. It is a clinical sign associated with a range of conditions and is used as a failure criterion for animal welfare audits.

42. Skin lesions result from aggression at mixing and feeding that result from sows fighting to establish social hierarchy and acquire limited resources. These are much more prevalent in group housing settings for sows.

43. Skin lesions are highly correlated with the level of aggression. Aggression is influenced by numerous animal, management, and housing factors. Aggression post-mixing is

8

largely attributed to aggressive animals engaging in fights for dominance (Verdon et al., 2016, J Anim Sci 94:1203-14), with those achieving dominant status following mixing continue to deliver aggression to lower-ranking conspecifics (Brouns and Edwards, 1994, Appl Anim Behav Sci 39:215-223; Verdon et al., 2016, J Anim Sci 94:1203-14). Unfortunately, the aggressive behavior sows display at mixing is related to their aggressive behavior throughout gestation (Verdon et al., 2016, J Anim Sci 94:1203-14).

44.     Sows compete for feed; aggression around feeding remains high at least a week post-mixing but does not stabilize until at least 28 days following mixing (Verdon et al., 2016, J Anim Sci 94:1203-14). Also, for sows in group pens with short feeding partitions, aggressive encounters continue until the end of the gestational period (Pacheco and Salak-Johnson, 2016, J Vet Res Anim Husb 1:103-110)

45.     Aggression and the associated fear and injury are among the main sources of stress and major welfare concern for group-housed sows. Aggression negatively impacts reproductive performance and lower litter performance (Tonepohl et al., 2013, Appl Anim Behav Sci 144:108-115).

46.     Sows moved from individual pens and mixed into group pens at 25 days post-breeding had higher lesion scores 3-weeks post mixing, poor reproductive performance, and more chronic stress (Logoda et al. 2021, Livestock Prod 246:104463).

47.     The chronic stress caused by sustained aggression negatively impacts the sow's reproductive performance, but can negatively impact the offspring (Kranendonk et al., 2008, Exp Clin Endocrinol Diabetes 116:413-422). Prenatal stress reduces the number of piglets born alive (Greenwood et al., 2019, Animals 9:658-678) and negatively affects offspring behavior, stress-coping abilities, and immune function, with these effects persisting throughout adult maturity (Rutherford et al., 2009, Biol Lett 5:452-454; Brajon et al., 2017, Appl Anim Behav Sci 197:15-23).

48.     Moreover, social rank and housing environment also compromise her progeny's stress and immune responsiveness, (Granger and Salak-Johnson, 2021, EC Vet Sci 6: 3-10),

A169

resulting in major welfare concerns of the future breeding animals.

49.     Lameness reduces sows' longevity and lifetime-performance measures, such as the number of parities at culling and lifetime piglets born alive (Sasaki and Koketsu, 2011, J Swine Health Prod 19:284-291).  Lame sows also have a higher risk of being culled within 350 days of diagnosis (Anil et al., 2009, JAVMA 235:734-738) and more mummified fetuses than non-lame sows (Pluym et al., 2013, Animal 7:1174-1181).  Therefore, preventing lameness is critical when housing sows in group pens because it severely compromises her health (Maes et al., 2016, Procine Health Management 2:17), subsequent longevity and lifetime performance.

50.     In another study discussing lameness in sows, there was higher sow mortality in a 5,200 sow herd than expected, with most sow deaths occurring in gestation and lactation phases. In gestation, 64% were euthanized for locomotor disturbances. About 45% of the sows were parity 1 and 2, and among parity 2, most of those sows were euthanized (Sanz et al. 2007, J Swine Health Prod 15:30-36).  This sets the stage for future productivity.

**Question 3 Sow Mixing Requirement is Detrimental to Sow Welfare**

55.     Science does not support moving sows immediately into group pens post-breeding (Koketsu and Iida, 2017, Mol Reprod Dev, 84:979-986).

56.     Appropriate housing for sows in early gestation is important for protecting embryos, pregnancy confirmation, and individual feeding management.

57.     Early is defined as the period from insemination to the first pregnancy check, which commonly occurs four weeks after breeding. Frequent pregnancy checks must be performed during 3 to 6 weeks post-breeding since 70% of rebreeds occur during this time (Iida and Koketsu, 2103, Anim Reprod Sci 139:115-120).

58.     Mixing pigs is not recommended during days 21 through 30 after breeding to avoid aggressive behavior, so individual stalls are used (Peltoniemi et al., 2016, Porcine Health Management, 2:15-20). Not only is early gestation critical, but so is late-gestation, a time when sufficient nutrients and energy are required to support rapidly growing fetuses.

59.     Most data implies that delaying until at least 35 days post-insemination results in

**A170**

reduced aggression, injuries, and stress, implying that the challenges associated with aggression, injuries, and stress at mixing are greater early after insemination than later (Stevens et al., 2015; Appl Anim Behav Sci 165:40-46). Mixing sows at 35 days (36-42 days) post-insemination instead of early (1 to 7 days) resulted in reduced aggression and cortisol and injuries (Stevens et al., 2015, Appl Anim Behav Sci 165:40-46).

60.    Farrowing and conception rates were reduced in sows mixed early post-insemination (within 1–14 days) compared to sows mixed late post-insemination (within 35–46 days) into large electronic-sow-feeder pens (Knox et al., 2014, J Anim Sci 92:1698-1707; Li & Gonyou, 20013, Can J Anim Sci 93:445-452). Based on these contradictory findings, the current consensus is to not mix sows before implantation, with the first 2–3 weeks post-insemination being the most vulnerable to stress.

61.    Most research has been conducted between days 30-35 post-breeding.  One reason is that sows tend to be more aggressive before implantation than after. For example, it has been shown that sows fought for a longer period of time and caused more injuries when they were grouped immediately after breeding than 5 weeks after breeding (Strawford et al., 2008; Can J Anim Sci 88:559-567). Unfortunately, aggression during early pregnancy can result in the loss of embryos (Spoolder et al., 2009, Lives. Sci. 2009; 125:1-14), partly due to the stress-induced aggression affecting hormone secretions, resulting in pregnancy failure.

62.    Others have shown that sows grouped in a housing system that includes an open pen area and a stall had substantially higher lesion scores up to 6 weeks post-grouping and remained higher through gestational day 110 when compared to sows that were housed in two different individual stall housing systems (Salak-Johnson et al., 2015, J Anim Sci 93:5006-5017). Also, older sows had greater lesions in this housing system than younger sows, and younger sows had higher piglet mortality suggesting they may be more vulnerable in group-pens with this level of aggression.

63.    Other measures such as lameness and inflammation have also been shown to be compromised in group-housed sows when mixed before day 35. Groups of sows mixed at day 35

**A171**

post-breeding had a lower percentage of lameness, inflammation, and vulva lesion scores than those mixed at 3- or 14-days post-breeding (Knox et al., 2014; J Anim Sci 92:1698-1707).

**Question 3 Increases Risk for Disease Among Sows**

64.    The most unknown and under-researched area is long-term effects on future progeny and disease transmission, and biosecurity incidence.

65.    One study reported that sows infected with PEDV during the first 30 days post-breeding had a reduced farrowing rate (78.5%) than those infected later than gestational day 31 (92.5%), and sows infected early were more likely to return to estrus (9.2%) or abort (3.4%) and farrow one less live piglet (Olanratmanee et al., 2010, Anim Reprod Sci 122:42-51).

66.    Very concerning evidence-based information is available on the relationship between group housing and disease transmission.

67.    However, it is well known that stressed animals are more susceptible to disease and have a higher incidence of shedding pathogens.

68.    In addition, sows in groups have more nose-to-nose, nose-to-genital, and body-to-body contact, as well as more oral contact with feces and urine.  These factors contribute to higher or faster transmission of pathogens among a herd.

69.    More contact with feces would result in a higher risk for infections with intestinal pathogens such as Brachyspira spp., Lawsonia intracellularis, Salmonella and Ascaris suum.

70.    Because of the harms to sow welfare and danger to workers associated with group confinement, the time-tested practice in the pork industry is to confine breeding sows in individual stalls.

71.    These findings and opinions are subject to revision should more materials, research or data become available.

72.    The statements made in this Declaration are true and accurate statements. The basis for the opinions offered here is my specialized education, training, knowledge and skill in the area of animal well-being and animal science. All of the opinions expressed here are opinions I hold to a reasonable degree of scientific certainty.

**A172**

73.     I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August, 2023, at Stillwater_____, Oklahoma.

Dr. Janyen Salak-Johnson

**Exhibit A**

**Janeen L. Salak-Johnson**
**Temple Grandin Endowed Chair**
**Associate Professor of Stress Immunophysiology, Behavior & Well-being**
Research Leader, Microbiome Initiative-Connecting the Microbiome to Health (HIBAR)
janeen.johnson@okstate.edu

### A. Education

| | | |
|---|---|---|
| 1994 | Ph.D. | Animal Sciences, Texas Tech University, Lubbock |
| 1990 | M.S. | Animal Sciences, Texas Tech University, Lubbock |
| 1987 | B.S. | Animal Sciences, Texas Tech University, Lubbock |

### B. List of Academic Positions since Final Degree

2020-present   Faculty Member, Interdisciplinary Toxicology, College of Veterinary Medicine and Graduate College, Oklahoma State University, Stillwater, OK.

2018–current   Associate Professor, Temple Grandin Endowed Chair, Department of Animal and Food Sciences, Oklahoma State University, Stillwater, OK.

2007–2017   Associate Professor, Department of Animal Sciences, University of Illinois at Urbana-Champaign. Urbana, IL.

1999–2007   Assistant Professor, Department of Animal Sciences, University of Illinois at Urbana-Champaign, Urbana, IL (*2 tenure-rollbacks, 2000; 2003*).

1998–1999   Postdoctoral Fellow, NeuroSystems Center and Departments of Preventive Sciences, Psychiatry, and Neuroscience and Cancer Center, University of Minnesota, Minneapolis, MN.

1994–1997   NIH Fellowship, Psychoneuroimmunology, Department of Clinical and Population Sciences, University of Minnesota, St. Paul, MN.

### C. Other Professional Employment

2016–2017   Triumph & Hanor Food Companies, Kansas City, MO

2014–2016   Consultant, Seaboard Foods, Guymon, OK

2014–current   Member, Scientific Advisory for Swine Care and Handling, Elanco, Indianapolis, IN

2013–2015   Member, Animal Well-being Advisory Board FarmCheck, Tysons Foods, Iowa Falls, SD

2012–2014   Consultant, Christensen Farms, Sleepy Eye, MN

2012–current   Member, 3rd party Expert, Animal Care, and Well-being Advisory Board, Iowa Select, Iowa Falls, IA

2011–2015   Consultant and Animal Care & Well-being Advisory Board, Murphy-Brown LLC, Warsaw, NC

2011–current   Member, Animal Agricultural Alliance OIE Scientific Animal Welfare Advisory Board, Washington, DC

2007–current   Member, Scientific Advisory Board for Farm Animal Care, Training, Auditing, FACTA, Frost, PLLC, Little Rock, AK

Salak-Johnson, J

## D. Honors, Recognitions, and Outstanding Achievements

Temple Grandin Professorship in Animal Behavior and Well-being, Oklahoma State University, 2018.

Academy of Teaching Excellence Award, College of Agricultural, Consumer, and Environmental Sciences, University of Illinois, 2016.

Karl E. Gardner Outstanding Undergraduate Advisor Award, College of Agricultural, Consumer, and Environmental Sciences, University of Illinois, 2016.

Certificate of Appreciation for service as Associate Editor for the American Society of Animal Science, 2008-2011.

Certificate of Excellence: Educational Materials Award, Council for Agricultural Science and Technology, 2009.

Hall of Fame Advanced Graduate of Distinction Award, Department of Animal and Food Sciences, Texas Tech University, 2009.

D.E. Becker Award for Excellence in Undergraduate Teaching and Counseling, Department of Animal Sciences, University of Illinois, 2008.

NIH NSRA Postdoctoral Fellowship in Pain, University of Minnesota, Minneapolis, 1998.

NIH Postdoctoral Training Fellowship in Psychoneuroimmunology, University of Minnesota, St. Paul, 1994-97.

Ellwood Graduate Award, Outstanding Doctoral Student, Texas Tech University, Lubbock, TX, 1994 (University-wide award).

Gamma Sigma Delta, Outstanding Doctoral Student in Animal Science & Food Technology, Texas Tech University, Lubbock, TX, 1994.

## E. Grants

### Oklahoma State University Funded (2018-current)

| Investigators | Agency and Title | Duration | Total Costs |
|---|---|---|---|
| Vallet, J, Foxcroft, G, **Salak-Johnson JL**, et al. [10 more] | National Pork Board, Animal Science, Sow Lifetime Productivity Consortium Research Team "Dietary effects on sow productivity to three parities." | 2016-19 | $919,916 $125,000 |
| **Salak-Johnson, JL (PI)**, Hagen, D (Co-I) | USDA-AFRI, "Influence of Prenatal Stress on Immune Function, Behavior and Welfare of Progeny." Submitted 2019 (*no cost extension requested in March 2022*) | 2020-22 | $200,000 |
| Beck, P (PI), **Salak-Johnson, JL (Co-PI)**, Biggs R, and Wilson B | Elanco Animal Health, "Lifetime Immunity of Backgrounded Calves: Modified live vaccine vs. Inactivated Viral Vaccine at Arrival." | 2020-21 | $90,300 |
| **Salak-Johnson JL** (PI) & Hagen (PI) | Internal Funds—OSU Ag. Experiment Station "Modernizing and Merging Space to Create a Multidisciplinary Team-based Research Laboratory" | 2020 | $270,000 |

Salak-Johnson, J

| Smith, B (PI), Lovern, P (PI), **Salak-Johnson JL (Mentor faculty; 1 of 33)** | NIH-NIGMS Training Grant (T32), "G-Rise at Oklahoma State University" | 2021-2025 | $3,147,131 |
|---|---|---|---|
| Beck, P (PI), **Salak-Johnson, JL (Co-PI)**, Chase, C (Co-PI, SDSU), et al. | USDA-AFRI, Partnership: Does the selection of beef cattle for growth and carcass traits impact post-weaning immunological phenotype and robustness traits | 2022-2025 | $800,000 |
| **Salak-Johnson (PI)**, Koehler (Co-PI, OSU-Tulsa), Moraes (Co-PI) | USDA-AFRI, Impact of prenatal stress on microbiome signature on progeny's immune response and welfare in pigs | 2023-2026 | $650,000 |

### Oklahoma State University (not funded)

| **Investigators** | **Agency and Title** | **Submitted** | **Total Costs** |
|---|---|---|---|
| **Salak-Johnson JL** (PI), Wilson B (Co-PI, OSU), Beck P (Co-PI, UA) | Industry-Texas Cattleman Feeder Assoc.; Evaluation of preconditiontioning on Beef calves behavior, health, wellbeing, and carcass traits: implications regarding animal auditing system | 2018 | $43,500 |
| Zhao (PI, UA), **Salak-Johnson JL (Co-PI, OSU)**, Radcliffe (Purdue), Maxwell (UA), Apple (UA) | FFAR-NPB Joint Initiative; A system approach to improving pig health, survival, wellbeing, and productivity. **Dr. Salak-Johnson initiated this proposal due to a lack of access to gestating/lactating sows; the University of Arkansas had the lead, and I agreed to be Co-PI** | 2018 | $2,000,000 |
| **Salak-Johnson JL** (Co-PI) Beck, P (Co-PI) et al., | Industry-VitaFerm; Effect of VitaFerm HEAT pre-calving on cow and calf performance and immunity | 2019 | $104,053 |
| Hagen (PI), Beck, Foote, Lalman, **Salak-Johnson** et al | USDA-SAS-CAP; Integrated program to create a more sustainable production system for beef and dairy | 2019 | $10,000,000 |
| Hagen D (PI), **Salak-Johnson JL**, Beck P, Wilson B | Industry-Texas Cattleman Feeder Assoc.; Effects of early-life nutrition on long-term efficiency, growth, musculature, and muscle gene-expression in finishing dairy x beef cross calves | 2020 | $25,450 |
| Santosh (PI, ISU-Dept-Engineering) et al., including **Salak-Johnson JL** | USDA-AFRI Foundational-Social Implications of Emerging Technologies; Understanding the need, perceptions, value, and risks of a deplorable sensor-based data-driven swine-health monitoring and prediction system **\*high priority—but plans for NSF** | 2021 | $650,000 |

4

**A176**

Salak-Johnson, J

| Investigator | Agency and Title | Duration | Total Costs |
|---|---|---|---|
| Beck, P and **Salak-Johnson JL (Co-PD)**, Biggs R | Industry-Chr. Hansen; Effect of feeding a combination of *B. lichen-formis* and *B. subtilis* on health, performance, and immune function of newly weaned calves | 2021 | $398,133 |
| USA: **Salak-Johnson JL (PI),** Smith B, Moares J; UK: Mellits (Co-PI), Connerton | Manipulation of the development and maturation of the gestational microbiome | 2021 | $1,375,660 |
| **Salak-Johnson (PI)**, Chase (Co-PI, SDSU), Lalman (Co-PI); Welsh (Co-PI, TAMU) | USDA-AFRI, Maternal environment impacts immune phenotype and epigenetic signature of heifers bred for growth/milk | 2022 | $300,000 |

### University of Illinois Funded Grants (2000-2017)

| Investigator | Agency and Title | Duration | Total Costs |
|---|---|---|---|
| **As Principal Investigator** | | | |
| Salak-Johnson, JL | Cargill Horizon Research Program, "Genetic impact of stress responsiveness and disease susceptibility in pigs." | 2001-04 | $300,000 |
| Salak-Johnson, JL | National Pork Board, Animal Welfare, "Effects of space allowance on group-housed dry sows." | 2002-04 | $88,868 |
| Salak-Johnson, JL, Dahl, G | National Pork Board, Animal Welfare, "Impact of early weaning and photoperiod manipulation on sow and piglet welfare." | 2003-05 | $47,848 |
| Salak-Johnson, JL, Curtis, SE, Miller, G | Illinois Pork Producers Association, "Impact of an auto-sort system on pig welfare and profitability." | 2005-06 | $81,743 |
| Salak-Johnson, JL | National Pork Board, Animal Welfare, "Impact of an auto-sort system on pig welfare." | 2006-07 | $64,344 |
| Salak-Johnson, JL, Crenshaw, T (U of Wisconsin) | National Pork Board, Animal Welfare, "Retrofit an optimized gestation stall system based on sow well-being: A pilot study. | 2007-09 | $77,529 |
| Salak-Johnson, JL | Illinois Pork Producers Association, "Impact of an auto-sort system on pig welfare and profitability." | 2007-08 | $33,500 |
| Salak-Johnson, JL | National Pork Board, Animal Welfare, "Impact of floor space and diet on behavior and physiology of sows." | 2008-10 | $89,870 |
| Salak-Johnson, JL | National Pork Board, Animal Welfare, "Retrofit an optimized gestation stall system based on sow | 2009-10 | $30,890 |

5

**A177**

Salak-Johnson, J

well-being

| | | | |
|---|---|---|---|
| Salak-Johnson, JL, Walker, P (ISU) | National Pork Board, Animal Welfare, "Optimized alternative housing and management strategies enhance sow well-being." | 2009-11 | $76,597 |
| Salak-Johnson, JL, Walker P (ISU) | CFAR External, "Comparison and evaluation of sow housing options during gestation." | 2009-11 | $139,500 |
| Salak-Johnson JL, Stein H | National Pork Board, Animal Welfare, "Optimized minimal floor-space for a group-pen system using diet strategy to improve well-being." | 2013-15 | $160,730 |

**Co-Investigator Role**

| | | | |
|---|---|---|---|
| Dahl, G, Salak-Johnson, JL, Morin, D | Council on Food and Agricultural Research, Competitive Grants Program, "Photoperiodic effects on immune responsiveness in transition dairy cows." | 2001-03 | $97,500 |
| Knox, R, Salak-Johnson, JL, Wang, X, Bhalearo, K | Council of Food and Agricultural Research, Sentinel Competitive Grants Program, "Effect of variability in gestation stall micro-environment on sow well-being, physiology, and productivity." | 2007-10 | $271,000 |
| Knox, R, Salak-Johnson, JL, Greiner, L, Connor, J | National Pork Board, Animal Welfare, "Effect of day of mixing on gestating sows on measures of reproduction and animal well-being." | 2009-11 | $82,619 |
| Vallet, J, Foxcroft, G, Salak-Johnson JL, et al. [10 more] | National Pork Board, Animal Science, Sow Lifetime Productivity Consortium Research Team "Dietary effects on sow productivity to three parities." | 2016-19 | $919,916 $125,000 |

**External Gift Research**

| | | | |
|---|---|---|---|
| ADM Alliance | Gift support-Research on sow and piglet welfare | 2005-06 | $14,900 |
| Choretime & Laake Co, Germany | Gift support-Research on gestating sows in free-access stalls (donated stalls and labor) | 2009-11 | $12,500 |

**Internal Grants (Competitive)**

| | | | |
|---|---|---|---|
| Salak-Johnson, JL | Animal Health & Disease Awards, Illinois Agricultural Exp Station, "Long-term consequences of early-weaned pig immune function." | 2003-05 | $36,610 |

F.  **Publications**

Salak-Johnson, J

### Articles in Journals

\# Denotes any publication derived from the candidate's thesis.

\* Denotes publication that has undergone stringent editorial review by peers.

\+ Denotes publication that was invited and carries special prestige and recognition

\~ Denotes publication senior-authored by candidate's graduate students

Oklahoma State University (2018-current)

**Salak-Johnson JL** and SR Webb. 2018. Short- and long-term effects of weaning age on pig innate immune status. Open J Anim Sci 8:137-50.\*+

**Salak-Johnson JL** and  SR Webb. 2018. Pig social status and chronic cold or crowd stressors differentially impacted immune response. Open J Anim Sci 8:280-93.\*+

DeDecker A, M Mandru,and  **JL Salak-Johnson**. 2018. Housing pregnant sows in turnaround stalls during gestation impacts behavior, immune, and well-being. Am J Anim Vet Sci 13(4):123-129. ~\*

Tucker, C, AR Green-Miller, RS Gates, S Myint, and **JL Salak-Johnson**. 2018. Behavioral responses of laying hens to atmospheric ammonia in an environmental chamber. Am Society Agric Biol Engineers: 1-8.

DeDecker, AE and  **JLSalak-Johnson**. 2020. Effect of social rank on well-being and space utilization of dry sows kept in a free access stall-pen housing environment. International Open J Anim Sci 10(2):287-300. **(invited). \*+~**

Lents, CA, C Supakorn, AE DeDecker, CE Phillips, RD Boyd, JL Vallet, GA Rohrer, GR Foxcroft, RV Knox, B Flowers, NL Trottier, **JL Salak-Johnson**, FF Bartol, and KJ Stalder. 2020. Dietary standardized ileal digestible lysine to energy ratios for managing growth and prepubertal development in replacement gilts. Appl Anim Sci 36:701-714.

**Salak-Johnson, JL**. 2020. The Ag guide serves as a primary standard for animal scientists and AAALAC accreditation of Ag research programs. J. Anim. Sci. 98:Suppl 4:71-72.

Lopez, M, E Pacheco, and **JL Salak-Johnson**. 2021. Dietary fiber source and length of feeding partitions differentially affected behavior, immune status, and productivity of group-housed dry sows. J Agriculture 11(1) 34-48.\*~

Granger, KL and **JL Salak-Johnson**. 2021. A pilot study on the effects of gestating sow nutrition and environment on piglet immune responsiveness to weaning stress. International EC Vet Sci Open Access 6:3-10. **(invited)**. ~

Pacheco E, M Lopez, and **JL Salak-Johnson**. 2021 Social status differentially affects behavioral and immunological outcomes of group-kept sows fed different dietary fiber using different length feeding barriers. Front Anim Sci, 2:719136.\*~

**Salak-Johnson, JL**, C Reddout, LP Hernandez, and A Visconti. 2022. Maternal supplementation of *Saccharomyces cerevisiae boulardii* during late gestation through lactation differentially modulated immune status and stress responsiveness of the progeny to farrowing and weaning stressors. Animals 12, 164-177. **(Invited**: Special Issue: Immune Response to Infective and Non-Infective Stressors). \*+

McNeff, CA, CA Robison, BK Wilson, FJ White, R Cauble, R Biggs, **JL Salak-Johnson,** and PA Beck. 2022. Modified-live versus inactivated respiratory viral vaccines for revaccinating beef calves at weaning. 2022. Applied Animal Science, TBC:1-13.

Sims, M, RN Cauble, J Powell, B Kegley, AP Foote, **JL Salak-Johnson**, and P Beck. 2023. Association of maternal temperament and offspring disposition on growth performance. Translational Animal Science 7, 1-9.

Matty, JM, C Reddout, J Adams, M Major, D Lalman, R Biggs, **JL  Salak-Johnson**, and P

7

**A179**

Salak-Johnson, J

Beck. 2023.The effects of respiratory vaccine type and timing on antibody-titers, immunoglobulin, and growth performance in pre-and post-weaned beef calves. Veterinary Sciences Invited article: Special Issue: Prevention, Diagnosis, and Management of Bovine Respiratory Disease.

Reddout, C, LP Hernandez, CC Chase, M Patterson, F White, P Beck, and **JL Salak-Johnson**. 2023. Vaccination protocol differentially influences the immune phenotype of weaned beef calves. *Submission to **Frontiers Veterinary Science**. #*~

Hernandez, LP, C Reddout, A Visconti, and **JL Salak-Johnson**. 2023. Maternal effects of *Saccharomyces cerevisiae* var. *boulardii supplementation* during late-gestation and lactation on development of the immune status of piglets. Submission to **Frontiers Animal Science**.*~

<u>Prior to Oklahoma State University</u>

**Salak JL**, JJ McGlone, JL Morrow, RJ Hurst, and RD Green.1989. Genetic variability in measures of beef cattle immune response. Texas J Agri and Natural Res 3:54-6. **#***

McGlone JJ, **JL Salak**, EA Lumpkin, RI Nicholson, ML Gibson, and RL Norman. 1993. Shipping stress and social status on pig performance, plasma cortisol, natural killer cell activity and leukocyte numbers. J Anim Sci 71:888-96.*

**Salak JL**, JJ McGlone, and M Lyte. 1993. The effects of in vitro ACTH, cortisol, and human recombinant interleukin-2 on porcine neutrophil function. Vet Immunol Immunopathol 39:327-37.*

McGlone JJ, **JL Salak-Johnson**, RI Nicholson, and TA Hicks. 1994. Evaluation of crates and girth tethers for sows: Reproductive performance, immunity, behavior, and ergonomic measures. Appl Anim Behav Sci 39:297-311.*

Morrow-Tesch JL, JJ McGlone JJ, and **JL Salak-Johnson.** 1994. Heat and social stress effects on pig immune measures. J Anim Sci 72:2599-2609.*

**Salak-Johnson JL**, JJ McGlone, and RL Norman. 1996. In vivo glucocorticoid effects on porcine natural killer cell activity and circulating leukocytes. J Anim Sci 74:584-92. **#***

**Salak-Johnson JL**, JJ McGlone, CS Whisnant, RL Norman RL and RR, Kraeling. 1997. Intracerebroventricular porcine corticotropin-releasing hormone and cortisol effects on pig immune measures and behavior. Physiol Beh 61:15-23. **#***

Peterson PK, SX Hu, **JL Salak-Johnson**, TW Molitor, and CC Chao. 1997. Differential production of and migratory response to beta chemokines by human microglia and astrocytes. J Infect Dis 175:478-81.*

Schwei MJ, P Honore, SD Rogers, **JL Salak-Johnson**, MP Finke, ML Ramnaraine, DR Clohisy, and PW Mantyh. 1999. Neurochemical and cellular reorganization of the spinal cord in a murine model of bone cancer pain. J Neurosci 19:10886-97.*

Honore P, SD Rogers, MJ Schwei, JL **Salak-Johnson**, NM Luger, MC Sabino, DR Clohisy, and PW Mantyh PW. 2000. Murine models of inflammatory, neuropathic, and cancer pain each generates a unique set of neurochemical changes in the spinal cord and sensory neurons. J Neurosci 98:585-98. *

Honore P, MJ Schwei, SD Rogers SD, **JL Salak-Johnson**, MP Finke, ML Ramnaraine, DR Clohisy, and PW Mantyh. 2000. Cellular and neurochemical remodeling of the spinal cord in bone cancer pain. Prog Brain Res 129:389-397.*

Auchtung TL,PE Kendall, **JL Salak-Johnson**, TB McFadden, and GE Dahl. 2003. Effects of

photoperiod and bromocriptine on prolactin receptor mRNA expression in bovine liver, mammary gland, and peripheral blood lymphocytes. J Endocrinol 179:347-56.*

McGlone JJ, EH von Borell, J Deen, AK Johnson, DG Levis, MC  Meunier-Salaun, J Morrow, D  Reeves, **JL Salak-Johnson**, and PL Sundberg. 2004. Review of scientific literature comparing housing systems for gestating sows and gilts using measures of physiology, behavior, and productivity. Professional Anim Scientist 20:105-117.*

Auchtung TL, **JL Salak-Johnson**, DE Morin, CC Mallard, and GE Dahl. 2004. Effects of photoperiod during the dry period on cellular immune function of dairy cows. J Dairy Sci 87:3683-89. *

Toepfer-Berg TL, J Escobar, WG Van Alstine, DH Baker, **JL Salak-Johnson**, and RW Johnson. 2004. Vitamin E supplementation did not affect growth performance of nursery pigs infected with porcine reproductive and respiratory syndrome virus. J Anim Sci 82:1942-51.*

**Salak-Johnson JL**, DL Anderson, and JJ McGlone. 2004.  Differential dose effects of central CRH and effects of astressin on pig behavior.  Physiol Beh 83:143-50.*

Sutherland MA, SL Rodriguez-Zas, M Ellis, and **JL Salak-Johnson**. 2005. Breed and age affect baseline immune traits, cortisol, and performance in growing pigs. J Anim Sci 83:2087-95.   *~

Sutherland MA, SR Niekamp, SL Rodriguez-Zas, and **JL Salak-Johnson**. 2006. Impacts of chronic stress and social status on various physiological and performance measures in pigs of different breeds. J Anim Sci 84:588-96.*~

Niekamp SR, MA Sutherland, GE Dahl, and **JL Salak-Johnson**. 2006. Photoperiod influences the immune status of multiparous gestating sows and their piglets. J Anim Sci 84:2072-82.* ~

Sutherland MA, SR Niekamp, RW Johnson, WG VanAlstine and **JL Salak-Johnson**. 2007. Heat and social rank impact behavior and physiology of PRRS-virus-infected pigs. Physiol Beh 90:73-81.*~

Niekamp SR, MA Sutherland, GE Dahl, and **JL Salak-Johnson**. 2007. Immune responses of piglets to weaning stress: Impacts of photoperiod. J Anim Sci 85:93-100.*~

**Salak-Johnson JL**, SR Niekamp, SL Rodriguez-Zas, M Ellis, and SE Curtis. 2007. Space allowance for dry sows in pens: Body condition, skin lesions, and performance. J Anim Sci 85:1758-69.*

**Salak-Johnson JL** and JJ McGlone. 2007 Making sense of apparently conflicting data: Stress and immunity in swine and cattle. J Anim Sci 85:E81-88.*+

Sutherland MA, K Erlandson, JF Connor, **JL Salak-Johnson**, P Matzat, JF Smith, JJ McGlone. 2008. Health of non-ambulatory non-injured pigs at processing. Livestock Sci. 116:237-45.*

Moyes KM, JK Drackley, **JL Salak-Johnson**, DE Morin, JC Hope, and JJ Loor. 2009. Dietary-induced negative energy balance has minimal effects on innate immunity during a Streptococcus uberis mastitis challenge in dairy cows during mid-lactation. J Dairy Sci 92:4301-4316.*

Ritter MJ, M Ellis, SE Curtis, NL Berry, L Anil*, E Berg, M Benjamin, D Butler, C Dewey, B Driessen, P DuBois, JD Hill. JN Marchant-Forde, P Matzat, J McGlone, P Mormede, T Moyer, K Pfalzgraf, **J Salak-Johnson**, M Siemens, J Sterle, C Stull, T Whiting, B Wolter, S Niekamp, and AK Johnson . REVIEW: Transport losses in market weight pigs: I. A Review of definitions, incidence, and economic impact. Professional Anim Scientist 25:404-414.

**\*Alphabetical order from this point forward.\***

**Salak-Johnson JL**. 2010. Adaptation and Stress: Neuroendocrine, Physiological, and Behavioral Responses. Encyclopedia of Animal Science, 2nd Edition (**invited**). *+

Graugnard DE, M Bionaz, E Trevisi, KM Moyes, **JL Salak-Johnson**, RL Wallace, JK Drackley, G Bertoni, and JJ Loor. 2012. Blood immunometabolic indices and polymorphonuclear neutrophil function in peripartum dairy cows are altered by level of dietary energy prepartum. J Dairy Sci 95:1749-58.*

**Salak-Johnson JL**, A DeDecker, MJ Horsman, SL Rodriguez-Zas, and SR Niekamp. 2012. Space allowance for gestating sows in pens: behavior and immune. J Anim Sci 90:3232-42.*

McAllister CM, BW Brigham, SE Speidel, RK Peel, JJ Wagner, H Van Campen, GH Loneragan, RL Weaber, **JL Salak-Johnson**, CCL Chase, E J Pollak, and RM Enns. 2012.* Characterization of bovine respiratory disease prevalence in feedlot steers and associated effects on carcass performance. J Anim Sci.*

Canaday DC, **JL Salak-Johnson**, AM Visconti, X Wang, K Bhalerao, and RV Knox. 2013. Effect of variability in lighting and temperature environments for mature gilts housed in gestation crates on measures of reproduction and animal well-being. J Anim Sci 91:1225-36. *~

DeDecker AE, AR Hanson, PM Walker, and **JL Salak-Johnson**. 2014. Space allowance and high fiber diet impact performance and behavior of group-kept gestating sows. J Anim Sci 92: 1666-74. *~

Knox R, **J Salak-Johnson**, M Hopgood, L Greiner, and J Connor. 2014. Effect of day of mixing gestating sows on measures related to reproductive performance, physiology, and well-being. J Anim Sci 92:1689-707.*

**Salak-Johnson JL**, AE DeDecker, AH Levitin, and BM McGarry. 2015. Wider stall space affects behavior, lesion scores, and productivity of gestating sows. J Anim Sci 93:5006-17. *~

Zverina LR, J Kane, TD Crenshaw, and **JL Salak-Johnson**. 2015. A Pilot Study: Behavior and Productivity of Gestating Sows in Width Adjustable Stalls. J Vet Sci & Anim Husb 2(2):1-5. (Special Issue on Animal Behavior and Welfare, **Invited**). *+~

Cockrum RR, SE Speidel, **JL Salak-Johnson**, CC Chase, PK Peel, RL Weaber, GH Loneragan, JJ Wagner, P Boddhireddy, and RM Enns. 2016. Genetic parameters estimated at receiving for circulating cortisol, immunoglobulin G, interleukin 8, and incidence of bovine respiratory disease in feedlot beef steers. J Anim Sci 94:2770-78.*

Pacheco E and **JL Salak-Johnson**. 2016. Social status affects welfare metrics of group-housed gestating sows. J Vet Res Anim Hub 1(1):103-110.*+~

Lopez M and **JL Salak-Johnson**. 2016. A Review: Aggression concerns with group-housed sow well-being. J Dairy Vet Anim Res 4(3):122-126.*+~

**Salak-Johnson JL**. 2017. Group housing effects on reproductive performance of pregnant sows. Special Issue: Mol Repro Dev 84:905-13.*+

**Salak-Johnson JL** and JP Shott. 2017. Social status impacts macrophage function of pigs. J Dairy Vet Sci. J Dairy Vet Sci 2(3):555590. doi: 10.19080/ JDVS.2017.02.555590 *+

Ritter MJ, AK Johnson, ME Benjamin, SN Carr, M Ellis, L Faucitano, T Grandin, **JL Salak-Johnson**, DU Thomson, MS Calvo-Lorenzo, CA Goldhawk. 2017. Review: Effects of Ractopamine Hydrochloride (Paylean) on the welfare indices of market weight pigs. Transl Anim Sci 1:533-58.*+

Salak-Johnson, J

**Abstracts**

Oklahoma State University

Reddout, C, P Beck, F, White, and JL Salak-Johnson. 2022. Vaccine protocol differentially influences immune phenotype of weaned beef calves. National Animal Sciences Meetings, Oklahoma City, OK. Journal of Animal Science Vol 100, Issue: Suppl. 3, page 19.

Hernandez, LP, CC Reddout, and JL Salak-Johnson. 2022. Effect of maternal supplementation of Saccharomyces cerevisiae var. boulardii during late gestation and lactation on progeny immune status from birth to 35 days-of-age. National Animal Sciences Meetings, Oklahoma City, OK. Journal of Animal Science, Vol. 100, Issue: Suppl. 3, page 144.

Sutton, J, M Habibi, CN Shili, A Beker, J Burch-Konda, JL Salak-Johnson, AP Foote, and A PezeshkiA. 2022. Gut and skeletal muscle control the effect of low protein diets on feed intake and thermal radiation of broilers during experimentally induced heat stress. National Animal Sciences Meetings, Oklahoma City, OK. Journal of Animal Science, Vol. 100, Issue: Suppl. 3, page 130.

Patterson, ME, LP Hernandez, C Reddout, JL Salak-Johnson. 2022. Prenatal stress alters progeny stress and behavioral responses. Biosciences: Ecology and Evolutionary Biology. Gulf Coast Undergraduate Research Symposium, Houston, TX. October 8, 2022.

Prior to Oklahoma State University (prior to 2007 = 36 abstracts)

Salak-Johnson JL, Suchomel JM, Niekamp SR, Block S, R Balsbaugh. 2007. Effect of short-term plant-extract on temperature and physiological responses of piglets challenged with LPS. J Anim Sci 85(Suppl 1):679.

DeDecker AE, Suchomel JM, Salak-Johnson JL. 2007. The effect of the autosort system on swine behavior. J Anim Sci 85(Suppl 1):363.

Suchomel JM, DeDecker AE, Salak-Johnson JL. 2007. Effect of autosort technology on pork production measures. J Anim Sci 85(Suppl 1):613.

Moyes KM, Salak-Johnson JL, Morin DE, Drackley JK, Loor JJ. 2007. The effect of negative energy balance on immune response to Streptococcus uberis mastitis challenge in dairy cattle during mid-lactation. J Dairy Sci 90(Suppl 1):366.

Gressley TF, Fried KK, Velasco JM, Reid ED, Hausman TC, Moyes KM, Salak-Johnson JL, Dahl GE. 2007. Effects of reduced freestall access during the dry period upon cellular immune function. J. Dairy Sci. 90(Suppl 1):369.

DeDecker AE, JM Suchomel, JL Salak-Johnson. 2008. The effect of autosort system on swine well-being. J Anim Sci Vol 86(E-Suppl 2):351.

Graugnard DE, M Bionaz, M Mukesh, KM Moyes, JL Salak-Johnson, JK Drackley, JJ Loor. 2008. Neutrophil function in response to level of dietary energy pre-partum and post-partum inflammatory challenge in dairy cows. J Dairy Sci Vol 91 (E-Suppl 1):541.

Meiwes BC, Loneragan GH, Brigham BW, Enns RM, Weaber RL, VanCampen H, Salak-Johnson JL, Chase CCL, Wagner JJ, McAllister CM, Pollak EJ. 2008. Factors Associated with Successful Treatment in Feedlot Cattle. 89th Annual Meeting of the Conference of Research Workers in Animal Diseases, December 7-9, 2008, Chicago, Illinois.

McAllister CM, BW Brigham, RM Enns, RL Weaber, H Van Campen, GH Loneragan, JL Salak-Johnson, CCL Chase, JJ Wagner, EJ Pollack. 2008. Effect of receiving weight on predicted days to onset of respiratory disease in feedlot steers. J Anim Sci Vol 86(E-Suppl 2):592.

Weaber RL, RM Enns, H Van Campen, GH Loneragan, JL Salak-Johnson, C Chase, JJ Wagner, EJ Pollack. 2008. Correlations among measures of temperament, weight, and gain

Salak-Johnson, J

of steers at placement and reimplant in commercial feed yard. J Anim Sci Vol 86( E-Suppl 2):592.

Pepper AR, RM Enns, RL Weaber, H Van Campen, GH Loneragan, JL Salak-Johnson, CCL Chase, JJ Wagner, EJ Pollack. 2008. The effect of exit velocity at receiving and re-implant on average daily gain and weight at re-implant. J Anim Sci Vol 86(E-Suppl 2):593.

Brigham W, RM Enns, RL Weaber, H Van Campen, GH Loneragan, JL Salak-Johnson, CCL Chase, JJ Wagner, CM McAllister, EJ Pollack. 2008. Effect of processing stress on feedlot cattle sickness. J Anim Sci Vol 86(E-Suppl 2):593.

Speidel SE, RM Enns, GH Loneragan, RL Weaber, H Van Campen, JL Salak-Johnson, CCL Chase, JJ Wagner, EJ Pollack. 2008. Effect of daily ambient temperature and wind speed on sickness of feedlot cattle. J Anim Sci Vol 86(E-Suppl 2):593.

Salak-Johnson JL. 2008. Making sense about stress and immunity. AAVI-ACVM Symposium, Conference of research workers in animal diseases (CRWAD).

Salak-Johnson JL. 2009. Current knowledge and understanding regarding sow welfare. #62. Midwest Animal Science Meetings, J Anim Sci Vol 87(E-Suppl 3).

Pepper, A. R., R. M. Enns, R. L. Weaber, H. Van Campen, G. H. Loneragan, J. L. Salak-Johnson, C. C. L. Chase, R. K. Peel, J. J. Wagner, D. H. Crews, Jr., and E. J. Pollak. 2009. Relationships of exit velocity and average chute score with carcass traits in feedlot steers. Proceedings, Western Section, American Society of Animal Science. Vol. 60:34-36.

Pepper, AR, Enns M, Weaber R, Van Campen H, Loneragan G, Salak-Johnson JL, Chase CCL, Peel RK, Wagner JJ, Crews DH, Pollack J E. 2009. Correlations of exit velocity and average chute score with carcass traits in feedlot steers. J Anim Sci Vol 87(E-Suppl 3):139.

Canaday D, Yantis B, Visconti A, Salak-Johnson J, Knox R. 2009. Effects of ambient temperature and light intensity on reproduction in mature gilts. #264 J Anim Sci Vol 87(E-Suppl 2)/ J Dairy Sci.

DeDecker AE, Salak-Johnson JL. 2009. Effects of alternative housing systems on dry sow well-being. Proceedings of 43rd Congress of the International Society for Applied Ethology. 210.

DeDecker AE, Crenshaw T, Salak-Johnson JL. 2009. The effects of a modified stall on gestating sow behavior and performance. Proceedings of 43rd Congress of the International Society for Applied Ethology. 540

Matthews LR, Loneragan GH, Norby B, Brigham BW, Enns RM, Weaber RL, Van Campen J, Salak-Johnson JL, Chase CCL, Wagner JJ, McAllister CM, Pollak EJ. 2009. Factors associated with mortality in feedlot cattle. # 31P, CRWAD Meetings, Chicago, IL.

DeDecker AE, AR Hanson, PM Walker, JL Salak-Johnson. 2010. Effects of fiber and floor space allowance on group kept dry sow wellbeing. J Anim Sci Vol 88(E-Suppl 2):461.

DeDecker AE, AR Hanson, PM Walker, JL Salak-Johnson. 2010. Effect of alternative individual and group housing on dry sow performance and physiology. J Anim Sci Vol 88(E-Suppl 2):461.

Visconti AM, DeDecker AE, AR Hanson, PM Walker, JL Salak-Johnson. 2010. Effect of alternative accommodations on sow behavior during gestation. J Anim Sci Vol 88(E-Suppl 2):462.

DeDecker AE, JL Salak-Johnson. 2010. Effects of alternative housing systems on the well-being of gestating sows. J Anim Sci Vol 88(E-Suppl 2):462.

Hanson AR, AE DeDecker, JL Salak-Johnson, PM Walker. 2010. Productivity and well-being of pregnant sows in loose housing is affected by floor space allowance and dietary fiber content. J Anim Sci Vol 88(E-Suppl 2):461.

Salak-Johnson, J

McAllister CM, BW Brigham, R K Peel, H Van Campen, GH Loneragan, RL Weaber, JL Salak-Johnson, CCL Chase. 2010. Methods to predict true disease prevalence in beef cattle. J Anim Sci Vol 88(E-Suppl 2):28.

Austin JK, JL Seabrook, T E Engle, RK Peel, CM McAllister, BW Brigham, RM Enns, RL Weaber, H Van Campen, GH Lonergan, JL Salak-Johnson, CLC Chase. 2010. The effect of morbidity on feedlot performance and carcass quality in feedlot steers J Anim Sci Vol 88: 10 (ESuppl 2).

Brigham BW, CM McAllister, R K Peel, H Van Campen, RL Weaber, GH Loneragan, JL Salak-Johnson, CCL Chase, EJ Pollack, RM Enns. 2010. Relationship of bovine respiratory disease and carcass ultrasound measures. J Anim Sci Vol 88(E-Suppl 2):41.

McAllister, C.M., B. W. Brigham, S. E. Speidel, R. K. Peel, J. J. Wagner, H. Van Campen, G. H. Loneragan, R. L. Weaber, J. L. Salak-Johnson, C. C. L. Chase, and R. M. Enns. 2011. Genetic Associations Between Bovine Respiratory Disease and Carcass Traits in Feedlot Steers. Proc. West. Sect. Am. Soc. An. Sci. 62:89-92

DeDecker AE, PM Walker, JL Salak-Johnson. 2011. Optimizing individual and group housing systems based on indicators of sow well-being. (Invited ASAS Animal Science Young Scholar). J Anim Sci Vol 89(E-Suppl 2):49.

Hanson AR, AE DeDecker, JL Salak-Johnson, PM Walker. 2011. A comparison of using pen versus individual sow as the experimental unit when evaluating data from sow housing studies. J Anim Sci Vol 89(E-Suppl 2):51.

Gasca SJ, AE DeDecker, JL Salak-Johnson, PM Walker. 2011. The effects of alternative housing methods on gestating sow welfare. J Anim Sci Vol 89(E-Suppl 2):75.

McAllister CM, BW Brigham, R K Peel, H Van Campen, GH Loneragan, RL Weaber, JL Salak-Johnson, CCL Chase. 2011. Methods to predict true disease prevalence in beef cattle. J Anim Sci Vol 89(E-Suppl 2):185.

Hopgood M, L Greiner, J Connor, J Salak-Johnson, R Knox. 2011. Effect of day of mixing gestating sows on measures of reproduction and animal well-being. J Anim Sci Vol 88(E-Suppl 1):686.

Thompson KM, Wagner JJ, McAllister CM, Brigham BW, Peel RK, Van Campen H, Loneragan GH, Weaber RL, Salak-Johnson JL, Chase CCL. 2012. The effect of morbidity on longissimus muscle area and subcutaneous and intramuscular adipose deposition in feedlot steers. Midwest American Society of Animal Science, J Anim Sci, Vol 90(Suppl 2):19.

Brigham BW, CM McAllister, RK Peel, RL Weaber, H VanCampin, GH Loneragan, JL Salak-Johnson, CCL Chase, JJ Wagner, RM Enns. 2012. Genetic parameters associated with feedlot bovine respiratory disease complex morbidity and mortality. National American Society of Animal Science, J Anim Sci, Vol 90(Suppl 3):228.

Bates KE, RL Weaber, JM Bormann, DW Moser, JL Salak-Johnson, CCL Chase, RK Peel, H Van Campen, GH Loneragan, JJ Wagner, P Bodhireddy, K Prayaga, RM Enns. 2013. Relationships among temperament, immune function, and carcass merit in beef cattle. Western Section Animal Science Meetings, J Anim Sci Vol 91(Suppl 2):486.

Speidel SE, RR Cockrum, JL Salak-Johnson, CCL Chase, MG Thomas, K Prayaga, RM Enns. 2013. Cortisol, interleukin 8, and immunoglobulin G ratios predict treatment for bovine respiratory disease in feedlot cattle. National American Society of Animal Science. J Anim Sci Vol 91(E-Suppl 2):486.

Cockrum RR, SE Speidel, JL Salak-Johnson, CCL Chase, RK Peel, RL Weaber, H Van Campen, GH, Loneragan, JJ Wagner, P Boddhireddy, MG Thomas, K Prayaga, RM Enns. 2013. Heritability and correlations of immune response parameters in cattle treated for

13

**A185**

bovine respiratory disease. National American Society of Animal Science. J Anim Sci, Vol 91(E-Suppl 2):70.

Speidel SE, RR Cockrum, J Salak-Johnson, C Chase, MG Thomas, RK Peel, RM Enns. 2014. Genetic analysis of receiving weight, ultrasound back fat, ultrasound ribeye area, ultrasound percent intramuscular fat, and bovine respiratory disease in feedlot cattle. 10th World Congress on Genetics Applied to Livestock Production. Vancouver, BC, Canada.

Salak-Johnson JL. 2014. Manipulating the immune status and stress-responsiveness of pregnant females and their progeny through dietary supplementation. J Clinic Cellul Immunol 5:5.

Pacheco E, M Lopez, JL Salak-Johnson. 2015. Effects of dietary fiber on the welfare of submissive multiparous sows. ADSA-ASAS Joint Annual Meeting. J Anim Sci, Vol 93 (E-Suppl 2):829.

Salak-Johnson, JL. 2016. Get along with your IACUC and help them to understand agricultural species research. ADSA-ASAS Joint Annual Meeting. J Anim Sci Vol 94 (E-Suppl 5):14.

Salak-Johnson, JL, K Granger. 2017. Effects of group-housed gestating sow nutrition, environment, and social rank on piglet immune responsiveness to weaning—International Conference on Immunology and Immunotechnology, Barcelona, Spain, November 2017.

<u>Bulletins, Reports, or Conference Proceedings</u>

Dahl GE, Auchtung TL, Salak-Johnson JL, Morin DE. 2003. Photoperiod and immune function in dairy cattle. Proceedings of the National Mastitis Council 42nd Annual Meeting. p. 175-181. Also published in: The Proceedings of 5th International Dairy Housing Conference (Ed. KA Janni) p. 20-25.

Salak-Johnson. 2004. Impact of early weaning and photoperiod manipulation on sow and piglet welfare. Animal Welfare, National Pork Board Research Report, November 3, 2004, p. 1-9.

Salak-Johnson. 2004. Effects of Space Allowance on Group-housed dry sows. Animal Welfare, National Pork Board Research Report, December 10, 2004, p. 1-7.

Salak-Johnson JL, Niekamp SR. 2004. Weaning age, lighting impact gains, immunity. National Hog Farmer, December 15, 2004, p. 14-15.

Salak-Johnson JL. 2006. Auto sort technology. Proceedings of 2006 National Pork Board Pork Academy. p. 1-10.

Salak-Johnson JL. Body language: provides temperature clues. Pork Magazine Online, June 1, 2007.

Salak-Johnson JL. 2007. The reality of sow stalls. Proceedings of 2007 Sow Housing Forum, National Pork Board. p. 1-10.

Salak-Johnson JL. 2007. Sow housing: are we switching lanes? Carthage Veterinary Service, 17th Annual Swine Conference Proceedings.

Salak-Johnson JL, Curtis SE. 2007. Managing grouped sows. Swine Nutrition Conference Proceedings. p. 6-12.

Salak-Johnson JL. 2007. Impact of auto-sort systems on pig welfare. Allen D. Leman Swine Conference Proceedings. p. 133-136.

Salak-Johnson JL. 2007. What is the reality of sow stalls? Proceedings of National Dairy Issues Forum, Professional Dairy Producers of Wisconsin.

McGlone JJ, Salak-Johnson J. Changing from Sow gestation crates to pens: problem or opportunity? 2008 Manitoba Swine Seminar. In: Proceedings of the Manitoba Swine Seminar. Winnipeg, Manitoba: Manitoba Pork Council; p. 47–53.

Salak-Johnson JL. 2008. Light as a potential management tool through nursery. National Hog Farmer, May 15, 2008.

Salak-Johnson JL. 2009. Retrofit an optimized gestation stall system based on sow well-being: A pilot study. Animal Welfare, National Pork Board Research Report, p 1-10.

Pepper, AR., RM Enns, RL Weaber, H. VanCampen, GH Loneragan, JL Salak-Johnson, CCL Chase, RK Peel, JJ Wagner, DH Crews, EJ Pollak. 2009. Relationships of exit velocity and average chute score with carcass traits in feedlot steers. Proceedings, Western Section, American Society of Animal Science 60:34-37.

Salak-Johnson JL, DeDecker A. 2009. Animal Welfare: Auto-sorting improves loading, sort loss, and growing pig physiology. National Hog Farmer, December 15, 2009.

Salak-Johnson JL, DeDecker A. 2009. Sow housing impacts productivity, and immune status. National Hog Farmer, December 15, 2009.

Canaday D, Visconti A, DeDecker A, Yantis B, Salak-Johnson J, Knox R. 2009. Impact of light, the temperature on gilt health, reproduction. National Hog Farmer, December 15, 2009.

Graugnard D, M Bionaz, E Trevisi, M Mukesh, M Ordonez, K Moyes, J Salak-Johnson, R Wallace, J Drackley, G Bertoni, J Loor. Immune Function And Metabolic Stress Due To Precalving Energy Level And Postcalving Mastitis Challenge In Dairy Cows, Illini DairyNet, August 3, 2010.

Salak-Johnson, JL. Sow Housing: A Research Update—Flex Stall offers Options. Pork Checkoff Report, Fall 2010 Issue.

Salak-Johnson, JL. Sow Housing: A Research Update—It's About Space and Fiber. Pork Checkoff Report, Fall 2010 Issue.

Hopgood M, L Greiner, J Connor, J Salak-Johnson, R Knox. 2011. Effect of day of mixing on reproductive fertility and animal well-being. Proceedings, Allen D. Leman Swine Conference, 38:199-202.

Salak-Johnson JL. Retrofit an optimized gestation stall systems based on sow well-being: A pilot study expanded. Animal Welfare, National Pork Board Research Report. p. 1-19.

Salak-Johnson JL. 2011. Impact of floor space and diet on behavior and physiology of sows. Research Review Pork Checkoff, May-June, 2011.

Hopgood M, L Greiner, J Connor, J Salak-Johnson, R Knox. 2011. Effect of day of mixing gestating sows on reproductive fertility and animal well-being. National Hog Farmer.

McAllister CM, BW Brigham, SE Speidel, RK Peel, JJ Wagner, H Van Campen, GH Loneragan, RL Weaber, JL Salak-Johnson, CCL Chase, RM Enns. 2011. Genetic associations between bovine respiratory disease and carcass traits in feedlot steers. Proceedings of the Western Section of the American Society of Animal Science. 62:89-92.

Salak-Johnson JL. 2012. Optimized alternative housing and management strategies enhance sow well-being. Animal Welfare, National Pork Board Research Report. p. 1-15.

Bates, KE, RL Weaber, JM Bormann, BW Moser, JL Salak-Johnson, CCL Chase, RK Peel, H Van Campen, GH Lonergan, JJ Wagner, P Boddhireddy, K Prayaga, RM Enns. 2013. Relationships among temperament, immune function, and carcass traits in beef cattle. Proceedings, Western Section, American Society of Animal Science, Vol 64, 169-173.

Speidel S, RR Cockrum, JL Salak-Johnson, CCL Chase, MG Thomas, RK Peek, RM Enns. 2014. Genetic analysis of receiving weight, ultrasound back fat, ultrasound ribeye area, ultrasound percent intramuscular fat, and bovine respiratory disease in feedlot cattle. Proceedings, 10th World Congress of Genetics Applied to Livestock Production.

Bates, K.E., R.L. Weaber, J.M. Bormann, D.W. Moser, J.L. Salak-Johnson, C.C.L. Chase, R.K. Peel, H. Van Campen, G.H. Loneragan, J.J. Wagner, P. Bodhireddy, K. Prayaga, and R.M.

Enns. 2014. Genetic relationships among temperament, immune function, and carcass merit in beef cattle. Kansas State University Beef Cattle Research Report. SRP1101:39-44.

Bates, K.E., R.L. Weaber, J.M. Bormann, D.W. Moser, J.L. Salak-Johnson, C.C.L. Chase, R.K. Peel, H. Van Campen, G.H. Loneragan, J.J. Wagner, P. Bodhireddy, K. Prayaga, and R.M. Enns. 2014. Temperament can be an indicator of feedlot performance and carcass merit in beef cattle. Kansas State University Beef Cattle Research Report. SRP1101:34-38.

## G.  Invited Lectures and Invited Conference Presentations

### Oklahoma State University (2018-current; Invited Speaker)

06/18/18. Presentation titled "Science of animal well-being should be at the forefront of cattle welfare issues." OSU/OVMA Summer Seminar. Center for Veterinary Health Sciences, Oklahoma State Veterinary School, Stillwater, OK.

06/29/18. Presentation title "Improving Pig Well-being Using Science." Oklahoma Pork Congress, Norman, OK.

08/16/18. Presentation title "Update on Swine and Cattle Welfare Issues." Advancing Animal Welfare Consortium, August 2018.

10/19/18. Presentation title "Animal Health and Well-being:" *Where do we go from here?* OSU Beef Industry Conference. Stillwater, OK, October 2018.

11/15/18. Presentation title "Scientific Research in Animal Well-being Essential to Advancing and Reacting to Industry and Consumer Needs." Sustainable Agriculture Summit Meeting in Advancing Animal Welfare Breakout Session. Denver, CO, November 2018.

12/14/18. Presentation title "Animal Care and Well-being: Essential to Beef Industry." Oklahoma Beef Board, Oklahoma City, OK, December 2018.

02/15/19. Presentation titled "Communicating with Science to Counteract the Emotional Message." Session: Interacting with Animal Rights Groups; Illinois Livestock Preparedness Symposium, Illinois State University, Normal, IL.

03/29/19. Presentation titled "Animal Well-being and Health: Science in the Real World" Current Issues and Advances in Food Animal Wellbeing Forum: 8th Annual Welfare Symposium, the University of Arkansas, Russellville, AR.

05/03/19. Presentation titled "Stress Responsiveness and Immune Status of Offspring is Modulated Maternally." OSU Health Science Center Seminar Series. Tulsa, OK.

07/20/19. Presentation titled "Cattle Welfare Top Priority for the Future": Session: Cattlemen's Educational Series Session 3. 67th Oklahoma Cattlemen's Association, Norman, OK.

09/27/19. Presentation: "Human-animal Relationships ONF of the Keys to Achieving High Welfare." AWCAA National Meeting and Cattle Show. Shawnee, OK.

10/09/19. Presentation titled: "Maternal Impact on Progeny Stress Responsiveness and Well-being." Michigan State University College of Veterinary Medicine, East Lansing, MI.

11/14/19. Presentation titled "Animal Welfare Must be At the Forefront." Oklahoma State University Vet. Med. Fall Conference, Stillwater, OK.

01/27/20. Presentation titled "Animal Activism and Beef Producers." Early Spring Roundup Program, OSU Extension, Ardmore, OK.

07/08/20. Presentation titled: "The Ag Guide serves as a primary standard for animal scientists and AAALAC accreditation of Ag Research programs": Contemporary and Emerging Issues in Public Policy. ASAS Annual Meetings, **Invited Speaker**, July 2020.

Salak-Johnson, J

04/22/21. Presentation titled "Systematic approach to understanding maternal prenatal stress effects on brain, behavior, and immunity of her progeny." Interdisciplinary Toxicology Symposium (*Virtual*), Oklahoma State University, Stillwater, OK, April 2021.

09/07/21. Presentation titled "Potential Enrichment Techniques for Livestock." USDA-ARS Midwest Regional Animal Care Workshop (*Virtual*; >125 ARS scientists & employees participated).

03/02/2022. "*Influence of prenatal stress on immune function, behavior, and welfare of the offspring*." USDA NIFA Welfare and Well-being of Agricultural Animals Program. Project Director's Meeting. Virtual

03/11/2022. "Prenatal stress affects the progeny immune status and welfare in short- and long-term." G-RISE Biomedical Sciences Seminar.

04/11/2022. "*Maternal stress affects immunological, behavioral, and well-being of the progeny in short- and long-term."* Global Conference on Animal Science and Veterinary Medicine, Porto, Portugal (Honorable Keynote speaker; changed to Virtual).

### University of Illinois (2007-2017; prior = 10)

*The Reality of Sow Stalls and Sows in Group Housing and the European Perspective on the Move from Stalls to Groups*. Illinois Pork Expo, Peoria, IL, January 2007.

*Research on Auto-sort Technology*. Illinois Pork Expo, Peoria, IL, January 2007.

*Stress, Immunity, and Wellbeing: Interdisciplinary Approach Essential*. Purdue University and USDA-ARS, West Lafayette, IN, March 2007.

*The Reality of Sow Stalls*. Sow Housing Forum, Des Moines, IA, June 2007.

*Impact of Auto-sort Technology on Swine Well-Being*. Illinois Pork Producers Association Research Meeting, Springfield, IL, June 2007.

*Science and Ethics: Drive the Changes*. Professional Dairy Producers of Wisconsin (PDPW), Madison, WI, November 2007.

*An Interdisciplinary Approach to Understanding Stress-Health Interactions is Essential!* National Beef Cattle Evaluation Consortium Conference, Dallas, TX, May 2007.

*The Reality of Sow Stalls.* National Sow Housing Forum, Des Moines, IA, June 2007.

*Sow Housing: Are We Switching Lanes?* Carthage Veterinary Service, Ltd. 17th Annual Swine Conference, Western Illinois University, Macomb, IL, August 2007.

*Managing Grouped Sows: Are We Ready?* Midwest Swine Nutrition Conference, Indianapolis, IN, September 2007.

*Impact of Auto-sort on Pig Welfares.* Leman Conference, St Paul, MN, September 2007.

*Stress and Disease.* Cattle Health Symposium-National Beef Cattle Evaluation Consortium Conference, Kansas City, Mo, December 2007.

*Sow Housing: Is it as simple as switching lanes*? Iowa Pork Congress, Des Moines, IA, January 2008.

*Sow Housing Options Based on Science, Reason, and Experience*. Illinois Pork Expo, Peoria, IL, February 2008.

*Sow Housing Impact on Swine Industry*. Vita-Plus Swine Summit, Morton, MN, March 2008.

*Stress and Disease: Health-Adaptability-Stress Responsiveness Determine Outcome.* Cattle Health Symposium-National Beef Cattle Evaluation Consortium Conference, Co-sponsored Pfizer Genetic Group, Omaha, NE, May 2008.

*Sow Housing Options*. The University of Illinois Advanced Swine Production Technology Course, June 2008.

Salak-Johnson, J

*Using Science, Ethics and Experience to Assess Animal Well-being*. Illinois Dairy Field Representative and Sanitarian Conference, Champaign, IL, September 2008

*Update on Autosort Technology*, Carthage Veterinary Service, Ltd. 18th Annual Swine Conference, Western Illinois University, Macomb, IL, September 2008.

*Alternative Sow Housing Options for Japanese Producers*. Carthage Veterinary Services, Urbana, IL, November 2008.

*Making Sense about Stress and Immunity*. Annual CRWAD Meeting AAVI-ACVM, Chicago, IL, December 2008.

*Multiple Stressors in the Life of Livestock and Ramifications on Immune System?* Stress in Livestock and Impact on Immune function: Expert Panel, Animal Health Conference, Chicago, IL, January 2009.

*Stress and Immunity*. Illinois Psychoneuroimmunology (PNIRS) Meeting, Northwestern University, Feinberg School of Medicine, Chicago, IL, January 2009

*Impact of Auto-sort on Pig Well-being*. National Pork Board Annual Animal Welfare Meeting, Raleigh, NC, February 2009.

*Optimizing auto-sort Systems for Pig Welfare and Profitability*. Illinois Pork Expo IPPA, Peoria, IL, February 2009.

*Group Housing—US perspective: What should we do*? Joint meeting: Illinois Pork Producer Association and the University of Illinois Swine Group, Urbana, IL, March 2009.

*Alternative Sow Housing Options: Impact on Swine Industry*. Animal Science 403, April 2009.

*Current Knowledge and Understanding Regarding Sow Welfare*. Sow Housing Symposium: **Keynote Speaker**, Midwest Animal Science Meetings, Des Moines, IA, March 2009

*Unraveling the Complexity of Stress-Immune Interaction: Why Differential Responses*? The University of Nottingham, School of Veterinary Medicine and Science, Nottingham, England, April 2009.

*Contemporary Societal Issues in Farm Animal Well-being*. External Advisory Committee, October 2009.

*Stress and Immune Responsiveness and Behavior.* Illinois Joint Psychoneuroimmunology Research Symposium, Loyola University, Chicago, IL, December 2009

*Effects of Alternative Housing Systems on Sow well-being*. Illinois Pork Expo, Peoria, IL, February 2010.

*Defending Animal Agriculture: A Consumer's View.* SCFB Livestock Industry Forum, March 2010.

*Challenges in Animal Agriculture*, ACES Council Expert Forum, Urbana, IL April 2010.

*Guide for the Care and Use of Agricultural Animals in Agricultural and Teaching: Swine Chapter*. BIO Livestock Biotech Summit, Sioux Falls, SD, September 2010

*Distance Learning: The Challenges of Teaching Online Courses with other Universities*. University of Illinois, Brown Bag Series, Urbana, IL, March 2011.

*Contemporary Issues in Animal Well-being*. Smithfield Foods Production and Research Conference, Guymon, OK, June 2011.

*Animal Rights and Welfare: Are you informed*? Illinois Farm Bureau Commodities Conference, Bloomington, IL, July 2011.

*Managing Photoperiod in the Environment of Pigs*. Swine Webinar Series, the University of Illinois Extension, September 2011.

Salak-Johnson, J

*Revised Curriculum: Educates and "Arms" Animal Science Students to Meet New Challenges*. Texas Tech University, Department of Food and Animal Sciences, Seminar Series, October 2011.

*Sow Housing and Environmental Considerations*. Sow Lifetime Productivity Task Force Conference sponsored by National Pork Board Animal Science Group. Des Moines, IA, December 2011.

*Need for Improvement but Welfare-friendly*. Illinois Farm Families—Field Moms Conference, Illinois Farm Bureau, Dekalb, IL, March 2012.

*Space Needs for Group-Housed Sows*. Gestation Sow Housing Webinar Federation of Animal Science Societies (FASS) and American Veterinary Medical Association (AVMA), May 2012.

*Ethics, Science, and Experts Should Drive the Train.* **Featured Speaker:** World Pork Expo SIP, Des Moines, IA, June 2012.

*Change Must be Based on Animal Well-being*. Annual Joint Stakeholders Conference with American Meat Institute, National Pork Producers Council, and National Pork Board, Chicago, IL, June 2012.

*Alternative Housing Systems: Pros and Cons*. National Pork Producer Council and Retailers Conference, Chicago, IL, July 2012.

*Animal Care: Seeing the Forest and the Trees Using Sow Housing*. Illinois Farm Bureau Executive Board of Directors Annual Meeting, Bloomington, IL, August 2012.

*Sow Housing—What Should I do for my sows?* 22nd Annual Swine Health and Production Conference, Macomb, IL, August 2012.

*A Scientific Perspective of Sow Housing Issue: Future and Options*. Emerging Leaders Pork Conference, 21st Century Strategic Forum, Chicago, IL, August 2102.

*Sound-Science and Animal Well-being Should Drive Decisions*. Animal Care-Demonstrating Doing What's Right—Expert Panel, Packer Processor Industry Council, Sacramento, CA, September 2012.

*Ethics of Animal Care. Panel on Ethics of Animal Research vs. Ethics of Care*. National Center for Professional and Research Ethics, University of Illinois, Urbana, IL October 2012.

*Science of Animal Wellbeing Must be at the Forefront.* **Featured Speaker:** Expert Animal Behavior & Welfare Panel, Pork Action Group Conference, Marco Island, FL, November 2012.

*Alternatives to Physical Castration*. Pfizer Animal Health Pork Chain Summit, Miami, FL, December 2012.

*Current Animal Care and Well-being Issues: Using Science of Sow Housing*. Illinois Agricultural Legislative Roundtable, Bloomington, IL January 2013.

*In Defense of Pork Producers: Seeing the Forest and Tress by Doing the Right Thing*. **Keynote Speaker:** Wisconsin Pork Producers Expo, Wisconsin Dells, WI, January 2013.

*Update: Sow Housing is a Continuum of Welfare-Related Issues*. Full Board Annual Meeting of Illinois Pork Producers, Peoria, IL February 2013.

*Sow Housing is a continuum of welfare-related issues, but choices should be made based on animal care and well-being*. Illinois Farm Bureau EU Animal Care Study tour briefing, April 2013.

*Animal Welfare Issues on the Farm, Center for one health Illinois*: Of Pugs, Pigs, and Pandas: Animal Welfare at home, farm lab, and zoo, College of Veterinary Medicine, Urbana, IL May 2013.

Salak-Johnson, J

*Animal Care and Animal Welfare Obligations for Farm Animals*. Animal Care Panel for Farm-in-the-Zoo, Lincoln Park Zoo, Chicago, IL May 2013.

*Animal Welfare Issues on the Farm*. Center for one health Illinois: Of Pugs, Pigs, and Pandas: Animal Welfare at home, farm lab, and zoo, Brookfield Zoo, Chicago, IL May 2013

*Improving Animal Well-being for Swine*. Dekalb Feeds Summer Seminar, Utica, IL June 2013.

*What science says about sow housing and well-being.* **Featured Speaker:** The State Ag and Rural Leaders 12th Annual Legislative Ag Chairs Summit, Vancouver, British Columbia, June 2013.

*Swine Stress: Immunity and Disease.* Conference on Stress, Health, and Livestock, Kalamazoo, MI, September 2013.

*Basics of Swine Behavior: Behavioral Adaptation a "Selection Tool"?* 2013 National Swine Improvement Federation Meeting, Nashville, TN, December 2013.

*Sow housing is a continuum of welfare-related issues: science must drive choice*. Stakeholders Tyson Foods Annual Meeting, Sioux, SD January 2014.

*Science behind animal welfare practices.* Costco National Headquarters Meeting, Seattle, WA, February 2014.

*What does science say about housing of gestating sows?* Seaboard Foods, Research, and Production Meeting, Guymon, OK, March 2014.

*Understanding Pig Well-being is Complex, but Improving Well-being Requires an Integrated Approach.* **Keynote Speaker**: Manitoba Pork Council: Annual General Meeting, Winnipeg, Manitoba, Canada, April 2014.

*Academic Perspective: Animal Well-being and Science should be at the forefront of animal welfare issues*. International Food and Agribusiness Management Association, Fair Oaks, IN, April 2014.

*Review of Research on Sow Housing: More dynamic space improves well-being*. Seaboard Foods Annual Research Meeting, Kansas City, KS, June 2014.

*A scientific perspective of sow housing and well-being*. NCSL Legislative Summit: Agriculture Task Force, Minneapolis, MN, August 2014.

*Manipulating Immune Status and Stress-Responsiveness of Pregnant Females and Progeny via Dietary Manipulation*. 3rd International Conference on Clinical & Cellular Immunology Baltimore, MD, September 2014.

*Scientific review of Indoor Gestation Housing Options.* Scientific Meeting for Swine Care Handbook Revision, National Pork Board, Chicago, IL, March 2015.

*Animal Care and Environmental Enrichment for all Species.* National FASS Animal Care Committee, Phoenix, AZ, May 2015.

*Sow Housing: Scientific Research Update on Stalls vs. Pens in Terms of Well-being*. Annual Scientific Conference Hanor/Triumph, Kansas City, MO, March 2016.

*Stress and Immunity in Swine*: Can we reprogram their offspring? VIII Feet First Swine Health Conference. **Presented:** Bologna, Italy; Castelldefels, Spain; Barcelona, Spain, April 2016.

*Science of Housing in Terms of Animal Well-being and Welfare Trade-offs*. CFI North American Conference on Animal Agriculture. Invited presentation & Panel participant. Chicago, IL, May 2016.

*Getting along with your IACUC: Help them understand Agriculture Species Research.* Symposium: Meeting Today's Animal Care Standards: Are you Ready? **Presented:** National Meetings for both PSA (New Orleans) and ASAS (Salt Lake City), July 2016

Salak-Johnson, J

*Animal Stress and Well-being: Applications and Impacts*. ARS-MARC Research Seminar Series, Clay Center, NE, May 2017.

*Using the Science of Animal Well-being to Establish Policy vs. Consumer Perception*. **Invited Speaker**, ARPAS symposium at National Animal Sciences Meeting, Baltimore, MD, July 2017.

*Swine Welfare and Behavior: Science drives change*. **Invited Speaker**, Animal Welfare Symposium: Advancing Animal Welfare Together, Dallas, TX, September 2017

*Effects of Group-housed Sows Nutrition, Environment, and Social Rank on Piglet Immune Responsiveness to Weaning*. **Featured speaker**, International Conference on Immunology and Immunotechnology, Barcelona, Spain, November 2017.

**G.  Service to Disciplinary and Professional Societies or Associations**

**Oklahoma State University, 2018-current**

Appointed American Society of Animal Sciences (ASAS) Board of Trustee Representative to AAALAC International, 2012-2019.

Associate Editor, Journal of Animal Science Production and Well-being, 2017-2021 (reappointed end of 2020).

Animals in Agricultural Research and Teaching, Federation of Animal Sciences Societies, 2018-2020. Chair of Environmental Enrichment Chapter 4 for the Revision of the Ag Guide. Leader of writing and editing the swine and horse sections and the entire chapter. Additionally, asked to edit and provide scientific information for the tail-docking section within the Sheep chapter of the Ag Guide.

Elected Nominating Committee AAALAC International, Vice-Chair, 2018; Chair, 2019.

Session Chair, Animal Behavior, and Well-being, ASAS-CSAS Annual Meetings, served as an abstract reviewer and organized for presentation and poster sessions, 2018.

Elected to the Board of Directors of AAALAC International, 2019-2020.

Appointed to AAALAC International Subcommittee for Agriculture, 2019-current

Guest Editor for a Special Issue titled "Impact of Environment and Stressors on Animal Welfare for International peer-reviewed publication *Animal*. Invited and selected authors to submit potential manuscripts to the special issue of 2019

Editorial Board, for International Journal: Animals, 2019–current.

Reappointed to AAALAC International as Delegate for the American Society of Animal Sciences (ASAS), 2021-2023.

Reviewer of All Chapters for the Revision of the Ag Guide, 2021.

Reappointed to Serve as a Delegate to AAALAC International for the American Society of Animal Sciences (ASAS), 2023-2026.

Ad-hoc Reviewer for numerous journals, including *AgriEngineering*, Agriculture, *Animals,* Anim. Biotechnol., Annals of Vet. Sci., Antioxidants, Appl. Anim. Behav. Brain, Behavior, Immunity, Genes, International Res. J. Public Health, J. Anim. Sci., J. Appl. Anim. Res., Livest. Sci., Molecular Reproduction Development, PLOS ONE, Vet.  Sci., Vaccines, J Adv. Med. Pharma. Sci., J. Sci. Res. Rep., Physiol. Behavior, and more.

**H.  Oklahoma State University, Department and University Service (2018-current)**

Research Committee Department of Animal and Food Sciences, 2018-current

Research Report Committee Department of Animal and Food Sciences, 2018-current.

HIBAR Microbiome Initiative, Team Member and Leader of Nutritional Group, 2019-current.

Salak-Johnson, J

Oklahoma State Scholar Society (OSSS) Faculty Selection Committee (Honors College), 2019.

Oklahoma State Scholar Society (OSSS) Faculty Interview Committee (Honors College), 2020, 2021.

Oklahoma State Scholar Society (OSSS) Faculty Selection Committee (Honors College), 2020, 2021.

Graduate Fellowship Review Committee Interdisciplinary Toxicology Program, 2020-current.

Search and Screening Committee for the Associate VP for Research and the Oklahoma Agricultural Experiment Station, 2020-21.

Search and Screening Committee for Animal and Food Sciences Department Professor and Head, 2021-22.

Microbiome Steering Committee Selection Committee for Research Project Leaders for NIH-COBRE Grant for Oklahoma Center for Microbiome Research, 2022-current.

Selection Committee for Faculty Mentors for OSU G-Rise NIH (T32) Training Grant, Graduate College, 2022.

General Seminar Committee Department of Animal and Food Sciences, 2023-current.

**\* The University of Illinois is not included at this time.**

## I. Books, Chapters in Books, and Other Creative Works

### Oklahoma State University (2018-current)

Sow and piglet welfare issue video segment for the HumaneWatch. Provided narrative from the scientific perspective and the facts to be reported, Oklahoma State University, Stillwater, OK. 2018.

Chair and Writer of Environmental Enrichment Chapter (4) for GUIDE: For the Care and Use of Agricultural Animals in Research and Teaching, 2018-19.

Reviewed and edited Environmental Enrichment Chapter (4) and all other species chapters for GUIDE: For the Care and Use of Agricultural Animals in Research and Teaching, 2019-2020.

### University of Illinois

Federation of Animal Sciences (FASS) Swine Training, Level 1:  An educational training video based on the FASS Agricultural Guide. Developer, writer, and scientific contributor to environmental requirements for swine and research techniques used in swine.  A significant participant in video-taping and writer of exam questions. (2002).

**Salak-Johnson JL**. 2004. Adaptation and stress: Neuroendocrine, physiological, and behavioral responses.  **In:** *Encyclopedia of Animal Science*, WG Pond, and AD Bell, eds. p 5-8. (**Invited contribution**).

Development and Validation of Material and Training Documents for the Swine Industry Pork Quality Assurance Program, Plus the verification process for the National Pork Board, which included both teaching tools and examination. (2010).

*Science before Legislation* video segment by Feedstuffs-FoodLink for Cable Channel, 2010, to provide the science behind the most contentious welfare issue facing the swine industry.

**Salak-Johnson JL**. 2010. Adaptation and stress: Neuroendocrine, physiological, and behavioral responses.**In:** *Encyclopedia of Animal Science*, Second Edition, Taylor and Francis, London.

Writing contributions in revising and implementing the Swine Industry Pork Quality Assurance

Program+ (PQA plus program—Pork Checkoff), (2005-2012).

Chair and Writer of Swine Chapter for GUIDE: For the Care and Use of Agricultural Animals in Agricultural Research and Teaching, 2010.

Animal Welfare Facts: Pregnant Sow and Piglet Safety video segment for the Center for Consumer Freedom. Development of scientific facts and academic representative for the video, (2012).

Sow Housing Facts video segment for the HumaneWatch. Provided narrative from the scientific perspective and the facts to be reported, University of Illinois, Champaign-Urbana, IL. (2014).

Chair and Writer of Revised Swine Care Handbook, Breeding and Gestation Indoor Housing, 2015-2017.

**Salak-Johnson, JL**. **Invited author**: *Contemporary Animal Issues in Food Animals*, Great River Learning, LLC, Dubuque, IA. 2016.

## J.  Supervision of Students

### Oklahoma State University (2018-current)

Supervision of Graduate Students

Cassidy Reddout, Animal Science, Ph.D. (1/2019 - ). **Admission to Doctoral Candidacy fall of 2022.** Recipient of: *Merck Animal Welfare Scholarship* (2021); *Recipient of Williams Endowed Graduate Scholarship* (2022-23).

Lily Hernandez, Animal Science, Ph.D. (8/2020 - ); **Admission to Doctoral Candidacy, fall of 2022**; Recipient of *Sitlington Enriched Graduate Scholarship* (2020-2023); *NIH-Training Fellowship* (2021-2024).

Alex Main, Animal Science, Ph.D. (8/2022 - ).

Sam Bacon, Animal Science, M.S.; Research mentor; Dr. Fitch is his advisor (anticipated graduation: May 2023).

Committee Member

Anna Goldkamp, Animal and Food Sciences, M.S., Advisor: Dr. Hagen (2020).
Qing Yang, Animal & Food Sciences, Ph.D., Advisor: Dr. Zhang (2021).
Nadia Firdausya, Human Development and Family Science, Ph.D., Advisor: Dr. Bishop (2021).
Julia Sutton, Animal & Food Sciences, M.S., Advisor: Dr. Pezeshki (2021).
Sierra Williams, Integrative Biology, Ph.D., Advisor: Dr. Grindstaff (current).
Michael Sims, Animal & Food Sciences, M.S., Advisor: Dr. Beck (2022).
Courtney Andersen, Animal & Food Sciences, M.S., Advisor: Kris Hiney (current).
Angela Hurst, International Agriculture Program M.S., Advisor: Dr. Rich (current).
Chris Johnson, Animal and Food Sciences, Ph.D., Advisor Dr. Beck (current).

Significant Mentoring Graduate Students, Non-Committee Member

Kelsey Bruno, Ph.D. (2019)
Katie Pierce, M.S. (2019)
Jeff Matty (formerly Robe), M.S. (2022)
Frank Kiyimba, Ph.D. (2022)

Undergraduate Research Scholars

Madi Baughman, 2019-2020
Nicole Stevens, 2019-2020
Reagan Wilson, 2019-2020

Salak-Johnson, J

Kassidy Diel, 2020
Rhiannon Curley, 2020-2021
Morgan Patterson, 2020-current
Cameron Fisher, 2021-2022 (Honor's Thesis)
Jarin Shirley, 2022-
Zoey Serapin, 2022-

**K**.  **Summary of Instruction Oklahoma State University (2018-current)**

**Primary Instructor:**

**ANSI 3623: Livestock Handling and Behavior.** Dr. Salak-Johnson has revised and updated this course significantly. The course takes an in-depth approach to understanding animal behavior and animal-environment interactions related to food animals' health, productivity, and overall well-being. Concepts are discussed as they relate to practical ways to improve housing accommodations and management strategies for animals we keep that will ultimately improve well-being and enhance the sustainability of agriculture.
**\*Request name change to Livestock Behavior and Environmental Science for spring 2021**

**ANSI 5123: Stress and Environmental Physiology:** Taught fall 2018 as ANSI 5010. Dr. Salak-Johnson has developed a new course for graduate students. The course provides graduate students in the animal sciences and other disciplines with an interdisciplinary basic science course that discusses interrelationships between the stress axis and other biological systems that can impact animals' and humans' health and well-being. The course covers general concepts of stress physiology, brain mechanisms, cellular pathways, intercommunication of physiology, behavior, immunology, growth and development, reproduction, health, and disease.

**ANSI 5623: Livestock Behavior and Environmental Science:** This graduate-level course will take an in-depth integrated approach to understand animal behavior and animal-environment interactions related to food animals' health, productivity, and overall well-being. Concepts will be discussed as they relate to practical ways to improve housing accommodations and management strategies for animals we keep and how to use behavior to assess the adaptability of animals in their environments**.**

**Other Teach Contributions:**
ANSI 4863**:** Animal Science Capstone. Guest lecturer—Spring 2018; Fall 2018; Fall 2021.
ANSI 4900: Honors. Guets Lecture—Fall 2020 (Dr. Stein).
ANSI 5753: Laboratory Techniques. Guest lecturer—Fall 2019, 2020.

**\* The University of Illinois is not included at this time.**

EXHIBIT
8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members, | Case No. 1:23-cv-11671-WGY |
| Plaintiffs, | |
| v. | **DECLARATION OF JAYSON L. LUSK, Ph.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Massachusetts Commissioner of Agriculture, | |
| Defendants. | |

I, Jayson L. Lusk, hereby state and declare as follows:

1.      I am over 18 years of age and competent to make this declaration.   I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could and would competently testify to the same.

2.      I submit this Declaration in support of Plaintiffs' Motion for Preliminary Injunction.  The basis for the opinions offered here is my specialized education, training, knowledge and skill in the area of agriculture economics.  All of the opinions expressed here are opinions I hold to a reasonable degree of scientific and economic certainty.

3.      I am currently a Distinguished Professor and Head of the Department of Agricultural Economics at Purdue University in West Lafayette, Indiana.  As a food and agricultural economist, my research has primarily centered on (1) food policy, (2) emerging food issues, (3) consumer behavior, (4) livestock and meat technology and marketing, and (5) research

methods.  After earning a Bachelor of Science degree in Food Technology from Texas Tech University in 1997, I earned a Ph.D. in Agricultural Economics from Kansas State University in 2000.  I have published more than 270 articles in peer-reviewed scientific journals on a wide assortment of topics ranging from the economics of animal welfare to consumer preferences for genetically modified food to the impacts of new technologies and policies on livestock and meat markets to analyzing the merits of new survey and experimental approaches eliciting consumer preferences.   In addition to my published articles, I have also authored or co-authored several books including *Experimental Auctions* published by Cambridge University Press in 2007 and an undergraduate textbook on agricultural marketing and price analysis published by Prentice-Hall. In 2011, I published a book co-authored on the economics of farm animal welfare published by Oxford University Press and also co-edited the *Oxford Handbook on the Economics of Food Consumption and Policy*.

4.     I have received numerous awards including the Borlaug Communication Award from the Council for Agricultural Science and Technology and the Lou Ann Aday award, Purdue University's most prestigious research award in the humanities and social sciences. I have served on the executive committee of the USDA National Agricultural Research, Extension, Education, and Economics (NAREEE) Advisory Board and have testified before the U.S. Congress on multiple occasions.  I am a fellow and past president of the Agricultural and Applied Economics Association.  A true and correct copy of my curriculum vitae is attached as Exhibit "1."

**Likelihood and Impacts of Pork Shortages in Massachusetts**

5.     I was requested to analyze the economic impact of the Massachusetts' Question 3 Minimum Size Requirements for Farm Animal Containment ("Question 3"), passed by Massachusetts voters on November 8, 2016.

2

**A198**

6.   Based upon my experience, education, and training, implementation of Question 3 would result in stockouts of covered retail pork items for a period of days, weeks and potentially months in some Massachusetts markets immediately after enforcement and implementation.

7.   According to the U.S. Department of Agriculture, there were only about 1,500 breeding sows and 6,000 market hogs in Massachusetts on December 1, 2022, representing just 0.024% of the total national pork breeding inventory and 0.009% of the total national market hog inventory.[1]   By contrast, Massachusetts represents 2.1% of the U.S. population.[2]   Assuming Massachusetts consumers have similar preferences as those in the rest of the United States, this would imply consumers in the state also consume about 2.1% of all pork. These data make clear that Massachusetts only produces a very small fraction of the pork it consumes, as its share of the pork consuming population is much greater than its share of pork production.

8.   To see this same point in a slightly different manner, note that USDA data indicate Massachusetts produced a pig crop of 12,000 head in 2022.[3]   The USDA estimates an average market live weight of about 291 lbs./pig.[4]   The USDA Economic Research Service estimates it takes 1.869 pounds of live hog to produce one pound of retail pork.[5]   Thus, each pig produces about 291/1.869 = 155.7 lbs. of retail pork. Taken together, these statistics indicate Massachusetts produced enough hogs for about 12,000*155.7 = 1.9 million lbs. of retail pork in 2022.   However, if Massachusetts residents consume the nationwide average per-capita consumption figure of 51.1 lbs. of pork/person/year, they would consume 356.8 million lbs. of retail pork.[6]   In short, Massachusetts farmers produce enough pigs for 1.9 million lbs. of retail pork, whereas

---

[1] https://downloads.usda.library.cornell.edu/usda-esmis/files/rj430453j/37721p56r/rn302c239/hgpg1222.pdf
[2] https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html
[3] https://downloads.usda.library.cornell.edu/usda-esmis/files/rj430453j/37721p56r/rn302c239/hgpg1222.pdf
[4] https://www.ers.usda.gov/data-products/livestock-and-meat-domestic-data/
[5] https://www.ers.usda.gov/data-products/meat-price-spreads/documentation/
[6] https://www.usda.gov/oce/commodity/wasde/wasde0623.pdf

**A199**

Massachusetts residents consume an estimated 356.8 million lbs. of retail pork. Massachusetts thus imports at least 99.5% of the pork it consumes, and the effects of Question 3 on pork producers primarily affect out-of-state producers.

9.   Not only is Massachusetts a heavy net importer of pork from other states, but estimates suggest there is currently insufficient supply of pork in the United States compliant with Question 3.[7]  Moreover, the impending implementation of Proposition 12 in California and Question 3 in Massachusetts is leading producers to cull breeding sows earlier than planned to meet new size requirements, which will ultimately reduce the volume of pork produced. Combined, these facts indicate that the implementation of Question 3 is likely to lead to periodic retail pork stockouts and shortages during the first few weeks and perhaps months after the implementation of Question 3.

10.   Even prior to implementation of Question 3, research reveals that meat items often have higher stockout rates than other food items in the grocery store.[8]  For example, Masta (2011) calculated that ham had a 13.1% stockout rate and pork roasts and picnics had a 10.5% stockout rate; these can be compared against an overall stockout rate for all grocery items of only 4.3%. More recently, McLaughlin et al. (2023) "documented large and sustained increases in weekly stock-out rates following the declaration of the national emergency concerning the COVID-19 pandemic on March 13, 2020. Among fixed-weight packaged items, stock-outs during the pandemic were the most concentrated in meat and poultry categories."  The perishability of meat

---

[7] McCracken, C.  "US Pork Supply Chain Locked in Limbo as Producers Await Legal Ruling."  Rabobank. RaboResearch.  February 2021. https://research.rabobank.com/far/en/sectors/animal-protein/us-pork-supply-chain-locked-in-limbo-as-producers-await-legal-ruling.html

[8] McLaughlin, P.W., Stevens, A., Arita, S. and Dong, X., 2023. Stocking up and stocking out: Food retail stock-outs, consumer demand, and prices during the COVID-19 pandemic in 2020. Applied Economic Perspectives and Policy. Forthcoming https://doi.org/10.1002/aepp.13362

Matsa, D. 2011. "Competition and Product Quality in the Supermarket Industry." Quarterly Journal of Economics126(3): 1539–91

A200

items and risk of spoilage is one explanation for the vulnerability to stockouts in this category (Matsa, 2011).

11.     When consumers cannot find items they wish to purchase because of stockouts and shortages, they experience economic harm. The harm arises from consumers being forced to forego the enjoyment they could have experienced had they been able to purchase the item, and the harm arising from the need to forego the purchase or find another alternative that is inferior, from the consumer's perspective, in terms of taste, quality, convenience, or affordability.

12.     To determine the potential losses that arise from a shortage or stockout of pork items, I adopt an approach similar to that used in the economics literature that estimates the value of new product introductions, as for example in Hausman and Leonard (2002) or Dhar and Foltz (2005).[9] The approach entails finding the virtual or reservation price that would drive consumption to zero, and calculating the consumer welfare change that would arise by moving from the current market price to the calculated virtual or reservation price.

13.     In particular, given an elasticity of demand, $\varepsilon$, a demand flexibility, $f = 1/\varepsilon$ can be calculated. By definition, a 1% reduction in the quantity available is associated with an $-f\%$ increase in price. Thus, a 100% reduction in quantity available (the amount needed to drive consumption to zero) is associated with an $-100f\%$ increase in price. If an initial product price is $p^0$, then the reservation price that would drive consumption to zero, is $p^1 = p^0(1 - f)$. The change in consumer surplus that would arise from this price change is $-0.5 * (p^1 - p^0)q^0$, where $q^0$ is the initial quantity consumed. This is the welfare change associated with a stockout or shortage of the item.

---

[9] Hausman, J.A. and Leonard, G.K., 2002. The competitive effects of a new product introduction: A case study. The Journal of Industrial Economics, 50(3), pp.237-263.
Dhar, T. and Foltz, J.D., 2005. Milk by any other name… consumer benefits from labeled milk. American Journal of Agricultural Economics, 87(1), pp.214-228.

5

**A201**

14. Table 1. reports the calculated reservation prices and estimated changes in consumer surplus that would arise from a week-long stockout of five different pork products. For example, although the market price of pork loin in 2022 in the Northeast was $4.16/lb., I estimate a reservation price of $8.25/lb. would drive consumption from 0.248 loins/person/week to approximately zero, assuming no demand shifts. The implication is that each individual subjected to the absence of pork loins resulting from implementation of Question 3 would be worse off by $0.51 for every week loin products are absent. If all Massachusetts consumers are unable to buy loins, aggregate state losses would be $3.5 million every week loins are absent. Estimated values are highest for bacon (aggregate loss of $5.88 million if all Massachusetts residents are without bacon for a week) and lowest for ribs (aggregate loss of $525,294 if all Massachusetts residents are without bacon for a week).

**Table 1**. Change in Consumer Surplus in Massachusetts Resulting from a Week-long Stockout of Five Different Retail Pork Products

| Product | Demand Flexibility[a] | Market Price ($/lb)[b] | Reservation Price ($/lb)[c] | Market Quantity (lbs/person/week)[d] | Change in Individual Consumer Surplus ($/person/week) | Change in Massachusetts Consumer Surplus ($/week)[e] |
|---------|------------------|-----------------|---------------------|----------------------------|----------------------------------------|------------------------------------------|
| Loin | -0.983 | $4.16 | $8.25 | 0.248 | -$0.51 | -$3,545,688 |
| Ribs | -0.832 | $3.81 | $6.98 | 0.047 | -$0.08 | -$525,294 |
| Shoulder | -0.794 | $3.81 | $6.83 | 0.212 | -$0.32 | -$2,235,657 |
| Bacon | -1.316 | $7.97 | $18.46 | 0.160 | -$0.84 | -$5,877,240 |
| Ham | -1.000 | $3.90 | $7.80 | 0.241 | -$0.47 | -$3,279,244 |

[a]Source: Tonsor and Lusk (2021) estimates for the Boston metro area except for ham, which is assumed to equal 1.[10]
[b]Source: Average retail prices in 2022 for the Northeast Region from the Bureau of Labor Statistics; Rib and shoulder prices correspond to "all other pork" prices.
[c]Source: Calculated from other values in the table; this is the estimated price that would drive consumption to zero, which is equivalent to a stockout.
[d]Source: Per-capita consumption of pork in the United States was 51.1 lbs/person in 2022 according to USDA.[11]
This total was apportioned to different pork products based on the product primal's share of the pork carcass based

---

[10] Tonsor, G.T. and J.L. Lusk. 2021. "Consumer Sensitivity to Pork Prices: A Comparison of 51 U.S. Retail Markets and 6 Pork Products." March 5, 2021.
https://www.agmanager.info/sites/default/files/pdf/TonsorLusk_PriceSensitivityReport_03-05-21.pdf
[11] https://www.usda.gov/oce/commodity/wasde/wasde0623.pdf

**A202**

on the shares described in figure 5 in the U.S. Department of Agriculture description of the pork cutout.[12] These amounts were divided by 52 to obtain weekly values.
ᶜPer-capita values were multiplied by the Massachusetts population in 2022 estimated by the Census Bureau.[13]

**Costs and Market Impacts of Implementation of Question 3**

15.    It is my opinion based upon my education, experience, and research that Question 3 will result in increased production costs for pork producers outside Massachusetts, will increase retail pork prices for consumers in Massachusetts, and will increase retail pork prices for consumers in states who rely on pork supplies warehoused and shipped through Massachusetts.

16.    Very little pork production in the United States uses sow housing systems that would be compliant with Question 3, and pork producers would incur costs to become compliant. About 30% of producers use open pen sow housing; however, even these systems would need modification to come into compliance with Question 3 by providing more space per sow.[14]  In the Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12 submitted on July 2, 2020 to the California Department of Food and Agriculture, Sumner et al. (2020) estimated the cost of adapting and modifying open pen systems to increase sow space minimums from 20 to 24 square feet per sow, a change that would likely be necessary to comply with Question 3.[15]

17.    Sumner et al. (2020) estimated that the increased space requirement within a group pen housing system would result in a 15% increase in total costs per weanling pig, or about $0.03/lb. of retail pork weight.  They went on to estimate additional costs from segregation and processing resulting from the need to differentiate conventional pork from pork meeting the new

---

[12] https://www.ams.usda.gov/sites/default/files/media/LMRPorkCutoutHandout.pdf
[13] https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html
[14] McCracken, C.  "US Pork Supply Chain Locked in Limbo as Producers Await Legal Ruling."  Rabobank. RaboResearch.  February 2021. https://research.rabobank.com/far/en/sectors/animal-protein/us-pork-supply-chain-locked-in-limbo-as-producers-await-legal-ruling.html
[15] https://dof.ca.gov/Forecasting/Economics/Major_Regulations/Major_Regulations_Table/documents/CDFA_Proposition_12_SRIA.pdf

space minimum ranging at between \$0.17 to \$0.21/lb.  When these segregation costs are combined with the extra weanling costs, total extra costs range from \$0.20 to \$0.24/lb.  Expressed relative to the farm price of hogs in their study, this represents a 25% to 30% increase in costs expressed at the farm level.  These estimates were made prior to the escalating construction and capital costs that have occurred since the onset of the COVID-19 pandemic.

18.     The cost estimates in Sumner et al. (2020) are an understatement of the effects of Question 3 because they only consider the impacts of an increase from 20 to 24 square feet, but the current industry standard relies on production systems providing 16 square feet, representing more than 60% of housing systems in the United States.[16]  Buhr et al. (2010) estimated the impact of transitioning from the more commonly used gestation stall system to different types of group pen systems.[17]  In his analysis, the lowest cost option under most conservative assumptions was associated with an 18% increase in total costs of production to transition from a gestation stall to a group pen system.  When he considered losses in productivity and alternative housing systems, his maximum estimate was a 94% increase in total costs of market hogs.  His most likely scenario was associated with a 32% cost of production increase.  Importantly, Buhr et al. (2010) considered the cost of the entire industry converting, and as such, he did not consider additional costs associated with the need to maintain a segregated supply chain. However, as indicated by Sumner et al. (2020), segregation costs are likely to be non-trivial.  Pork packing plant efficiencies are disrupted when the need arises to segregate and maintain separate systems for different types of pork.  The costs that would be associated with maintaining segregated supply chains in the pork

---

[16] McCracken, C.  "US Pork Supply Chain Locked in Limbo as Producers Await Legal Ruling."  Rabobank. RaboResearch.  February 2021. https://research.rabobank.com/far/en/sectors/animal-protein/us-pork-supply-chain-locked-in-limbo-as-producers-await-legal-ruling.html

[17] Buhr, B. L. (2010). Economic impact of transitioning from gestation stalls to group pen housing in the U.S. pork industry. Staff Paper P10-4. University of Minnesota, Department of Applied Economics. https://ageconsearch.umn.edu/record/61604?ln=en

A204

sector have been studied and estimated in a variety of contexts including food safety, origin, and sow housing.[18]

19.  Given the estimates in Sumner et al. (2020) and Buhr (2021), I conservatively estimate that the cost of providing Question 3 compliant pork to Massachusetts to be 30% higher than the cost of current pork supplies to the state.

20.  To understand how these extra production costs impact consumers and producers, I constructed an economic equilibrium displacement model of the disaggregate pork sector. I rely on Massachusetts-specific pork demand estimates and link these estimates with national pork supply. The model is constructed to make use of the data and analysis in Tonsor and Lusk (2021), who used retail grocery scanner data to estimate demand for 6 pork products in 51 U.S. markets, one of which includes the Boston metro area.[19] The model and data required to implement the model are fully described in Exhibit 2.

21.  The model utilized the 30% production cost increase for pork entering Massachusetts as an exogenous shock and traces the effects of this shock on retail prices and consumption in Massachusetts as well as 50 other retail markets, while also calculating aggregate effects on farm-level pork prices and quantities.

22.  Table 2. shows the estimated effects from the 30% production cost increase on retail prices and quantities in Massachusetts. Of the four products covered by Question 3, price increases range from 3.3% for bacon to 11.2% for shoulders. Moreover, consumers are estimated to reduce

---

[18] Hotes, S., Traulsen, I. and Krieter, J., 2012. The additional costs of segregated transport to slaughter to decrease Salmonella prevalence in pork—a simulation study. Preventive Veterinary Medicine, 104(1-2), pp.174-178.
Rude, J., Iqbal, J. and Brewin, D., 2006. This little piggy went to market with a passport: the impacts of US country of origin labeling on the Canadian pork sector. Canadian Journal of Agricultural, 54(3), pp.401-420.
Saitone, T.L., Sexton, R.J. and Sumner, D.A., 2015. What happens when food marketers require restrictive farming practices?. American Journal of Agricultural Economics, 97(4), pp.1021-1043.
[19] Tonsor, G.T. and J.L. Lusk. 2021. "Consumer Sensitivity to Pork Prices: A Comparison of 51 U.S. Retail Markets and 6 Pork Products." March 5, 2021.
https://www.agmanager.info/sites/default/files/pdf/TonsorLusk_PriceSensitivityReport_03-05-21.pdf

consumption of loins by 6.5%, ribs by 9.3%, shoulders by 14.1%, and bacon by 2.5%. Two products included in the model are likely not covered by Question 3, and the associated effects for these products in Massachusetts are close to zero.

**Table 2**. Estimated Retail Market Effects in Massachusetts of Implementation of Question 3

| Product | Price Change | Quantity Change |
|---|---|---|
| *Covered Products* | | |
| Loin | 6.4% | -6.5% |
| Ribs | 7.7% | -9.3% |
| Shoulder | 11.2% | -14.1% |
| Bacon | 3.3% | -2.5% |
| | | |
| *Products Not Covered* | | |
| Breakfast Sausage | 0.0% | 0.1% |
| Dinner Sausage | 0.0% | 0.0% |
| | | |
| Total Retail Pork in MA | 4.7% | -5.9% |

23.     The model includes four products likely covered by Question 3 but due to data limitations, does not include a few other products likely covered, such as ham. Similarly, the model includes some products not likely covered by Question 3 (breakfast and dinner sausage), but it does not include other pork products not covered (e.g., ground pork, frankfurters, pepperoni, etc.). Nonetheless, using the covered and uncovered products included in the model as representative of likely effects for all covered and uncovered products, the total (or weighted average) effects on prices and quantities are reliable. The bottom of the table shows the estimated total effects to be a 4.7% overall price increase and a reduction of 5.9% in pork purchases in Massachusetts following the implementation of Question 3.

24.     The estimates in table 2, when coupled with data on total estimated pork spending in the state of Massachusetts, indicate that Massachusetts consumer welfare will fall at least $81.71 million/year (see Exhibit 2 for details) as a result of implementation of Question 3. These

A206

adverse consumer effects arise because some consumers pay more for pork and because others forego pork consumption and resort to options that were not previously as desirable. I estimate nationwide, farm-level pork prices fall 0.18% and the volume of pork sold nationwide falls 0.03%, resulting in a $46.7 million loss per year to pork producers in the United States (see Exhibit 2 for details).

**The Price Effects of Question 3 Would Occur at a Time When There Have Been Significant Food Price Increases, Which Have Already Created Hardships for Food Consumers**

25.     If implemented in the near future, the effects of Question 3 would occur in the wake of a recent period of significant food price increases. As shown in Figure 1, since January 2018, all retail prices in the economy have increased 22.4%. Food prices have increased at an even faster rate. Overall food-at-home grocery prices have increased 26.1% and meat, poultry, fish, and egg prices have increased 29%, and pork prices have increased 23.3% since January 2018. As shown in Figure 1, consumers have experienced more rapid increases in pork prices than other items since 2018. Although consumers have experienced some relief in pork prices over the latter half of 2022 and the first half of 2023, it remains the case that retail pork prices have increased more since January 2018 than have other food prices as well as overall prices in the economy.

11



**Figure 1**.  Change in Prices for All Urban Consumers since January 2018 (source: Bureau of Labor Statistics)

26.     It has been 40 years since consumers experienced the rate of annual food price increases experienced during 2022.  Figure 2 further illustrates the point focusing specifically on food prices in the Boston-Cambridge-Newton, MA-NH metro area (note: the Bureau of Labor Statistics does not report pork-specific price index for this metro area).  During much of 2020 and 2022, consumers in the Boston-Cambridge-Newton, MA-NH metro area were paying 10% more for meat, poultry, fish, and eggs than they were the year prior.  As of March 2023, consumers in this metro area faced food prices that were 11.1% higher than they were the year prior.  By contrast, all items in the consumer price index increased only 4.7%, showing that food has become relatively expensive in the past couple years.

A208



**Figure 2**. Year over Year Change in Prices for Urban Consumers in Boston-Cambridge-Newton, MA-NH (source: Bureau of Labor Statistics)

27.     Figure 3 reinforces these points for specific pork products in the Northeast region of the United States.  Bacon prices increased from $5.57/lb. in January 2020 to $7.33/lb. in April 2023, a 31.5% increase.  Ham prices increased from $2.82/lb. in January 2020 to $4.02/lb. in April 2023, a 42.75% increase.  Pork chop prices increased 17.1% (from $3.47 to $4.07/lb.) and all other pork prices increased 64.1% (from $2.57 to $4.22/lb.) from January 2020 to April 2023.

13

**A209**



**Figure 3**. Monthly Retail Prices for Four Pork Products in the Northeast Region of the United States from January 2018 to April 2023 (source: Bureau of Labor Statistics)



**Figure 4**. Monthly Retail Prices for Pork Chops in Four United States Regions (Source: Bureau of Labor Statistics).

14

28.    As shown in Figure 4, there is strong integration across regional markets, implying cost or demand shocks in one market affect prices in all other markets.  The correlation between retail pork chop prices in the East and prices in the Midwest, South, and West are 0.82, 0.78, and 0.92, respectively.  The relationship is even stronger for bacon and ham.  For bacon, the correlation between retail prices in the East and prices in the Midwest, South, and West are 0.96, 0.97, and 0.90, respectively.  For ham, the correlation between retail prices in the East and prices in the Midwest, South, and West are 0.91, 0.93, and 0.90, respectively. What this means is that a higher price of pork in the East would have a direct correlation with prices of pork in the Midwest, South and West, respectively.

**Distributional and Food Security Consequences of Rising Food Prices**

29.    Rising food prices increase the likelihood of food insecurity. As indicated by Gregory and Coleman-Jensen (2013), who studied low-income households enrolled in the Supplemental Nutrition Assistance Program (SNAP), "We find that the average effect of food prices on the probability of food insecurity is positive and significant: a one-standard deviation increase in food prices is associated with increases of 2.7, 2.6, and 3.1 percentage points in household, adult, and child food insecurity, respectively. These marginal effects amount to 5.0%, 5.1%, and 12.4% increases in the prevalence of food insecurity for SNAP households, adults, and children, respectively."[20]

30.    The USDA Economic Research Service estimates that there were 2,812,000 households in Massachusetts, or 8.4% of the Massachusetts' population, who were food insecure

---

[20] Gregory, C.A. and Coleman-Jensen, A., 2013. Do high food prices increase food insecurity in the United States?. *Applied Economic Perspectives and Policy*, *35*(4), pp.679-707.

15

during the 2019-2021 period.[21]  Notably, this estimate was made prior to the sizable recent food price increases noted in Figure 1.  As show in Table 2, implementation of Question 3 is expected to increase pork prices in Massachusetts.  Given the findings in Coleman-Jensen (2013), implementation of Question 3 is thus expected to increase the rate of food insecurity in Massachusetts.  This is particularly true given that pork demand tends to be higher among lower income consumers who tend to be at most risk of food insecurity.  For example, Tonsor and Lusk (2021) find that locations with a greater share of households with incomes less than $50,000/year have significantly higher per-capita consumption of pork, implying low-income consumers are more affected by rising pork prices than are higher income consumers.

31.    Increasing food insecurity creates burdens for taxpayers and social safety net programs targeted at providing food assistance for low-income consumers.  Data from the USDA Food and Nutrition Service indicates that in March 2023 (the latest data available at the time of this writing), there were 651,799 Massachusetts households enrolled in the Supplemental Nutrition Assistance Program (SNAP).[22]  This represents 1,080,533 Massachusetts residents on SNAP, with an average monthly benefit of $265/person.[23]  In the fiscal year 2021, Massachusetts was home to 1,441 firms who had $2.8 billion in SNAP redemptions.[24]  Moreover, in February 2023, 114,757 individuals in Massachusetts were enrolled in Women, Infants, and Children (WIC) program, which provides food assistance for low-income pregnant women, breastfeeding women, and children under five, with an average monthly benefit of $47.31/person/month.[25]

---

[21] Coleman-Jensen, A., M.P. Rabbitt, C.A. Gregory, and A. Singh.  2022. "Household Food Insecurity in the United States."  U.S. Department of Agriculture, Economic Research Service.  Economic Research Report no. ERR-309.  https://www.ers.usda.gov/publications/pub-details/?pubid=104655

[22] https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap

[23] https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap

[24] https://fns-prod.azureedge.us/sites/default/files/resource-files/2021-snap-retailer-management-year-end-summary.pdf

[25] https://www.fns.usda.gov/pd/wic-program

A212

**Impacts of Question 3 on Consumers in Other States**

32.     Question 3 affects retail pork prices in Massachusetts, and it also affects retail prices paid by consumers in other states because Massachusetts is a distribution hub. While pork-specific data on interstate trade is not available, the U.S. Census Bureau and the Bureau of Transportation Statistics conduct a commodity flow survey (CFS) of shippers that has a category code related to "Meat, Poultry, Fish, Seafood, and Their Preparations." These data are used, in combination with other sources, by the U.S. Department of Transportation, Bureau of Transportation Statistics to construct the Freight Analysis Framework (FAF). These data have been used in a number of academic studies to analyze agriculture flows across the United States.[26]

33.     I make use of FAF Version 5.5 data to calculate outflows from Massachusetts for the commodity category "Meat, Poultry, Fish, Seafood, and Their Preparations" for the year 2021.[27] I focus on the five states neighboring Massachusetts. These data indicate Massachusetts sent 311.4 million, 44 million, 74.4 million, 51.5 million, and 7.9 million lbs. of "Meat, Poultry, Fish, Seafood, and Their Preparations" to Connecticut, New Hampshire, New York, Rhode Island, and Vermont, respectively. While the FAF5.5 dataset does not provide any finer delineation of meat types beyond "Meat, Poultry, Fish, Seafood, and Their Preparations," the CFS provides some information on this matter for the year 2012. In particular, CFS data indicate about 56% of the volume of "Meat, Poultry, Fish, Seafood, and Their Preparations" exported from Massachusetts to other states is fish and seafood.[28] The commodity category most related to pork, "meat fresh,

---

[26] Dall'Erba, S., Chen, Z. and Nava, N.J., 2021. US interstate trade will mitigate the negative impact of climate change on crop profit. American Journal of Agricultural Economics, 103(5), pp.1720-1741.
Lin, Xiaowen, Qian Dang, and Megan Konar. 2014. A Network Analysis of Food Flows Within the United States of America. Environmental Science & Technology 48: 5439–47
Lin, Xiaowen, Paul J Ruess, Landon Marston, and Megan Konar. 2019. Food Flows Between Counties in the United States. Environmental Research Letters 14: 084011.
[27] https://www.bts.gov/faf; https://faf.ornl.gov/faf5/dtt_domestic.aspx
[28] https://data.census.gov/table?q=cf1700a09&g=040XX00US25&comm=C0000.05

A213

chilled, or frozen (excludes poultry)" accounts for 31% of the volume of "Meat, Poultry, Fish, Seafood, and Their Preparations" exported from Massachusetts to other states. Assuming pork represents half of volume of the category "Meat fresh, chilled, or frozen (excludes poultry)" exported (or 15% of the aggregate category "Meat, Poultry, Fish, Seafood, and Their Preparations") indicates Massachusetts sent 46.7 million, 6.6 million, 11.2 million, 7.7 million, and 1.2 million lbs. of pork to Connecticut, New Hampshire, New York, Rhode Island, and Vermont, respectively. These amounts are far more than the volume amount of pork produced in the state, suggesting a significant volume of warehousing and wholesaling of pork was bought out-of-state and sent to other states.

34.     Assuming consumers in the states neighboring Massachusetts consume the national average 51.1 lbs./person/year for pork, I calculate the share of pork consumption in neighboring states coming through Massachusetts. These figures are show in table 3 and range from 25% for Connecticut to 1% for New York.

**Table 3**. Estimated Retail Market Effects of Implementation of Question 3 (Q3) on Consumers in States Neighboring Massachusetts

| State | Estimated % of State Pork Consumption Flowing through Massachusetts (lbs) | Estimated Price Impact from Q3 | Estimated Quantity Impact from Q3 | Change in Consumer Surplus ($/year) | Number of Individuals on SNAP |
|---|---|---|---|---|---|
| Connecticut | 25% | 0.92% | -0.60% | $8,322,128 | 393,179 |
| New Hampshire | 9% | 0.34% | -0.42% | $1,994,560 | 74,454 |
| New York | 1% | 0.04% | -0.03% | $1,378,958 | 2,953,655 |
| Rhode Island | 14% | 0.51% | -0.36% | $1,176,685 | 143,739 |
| Vermont | 4% | 0.13% | -0.16% | $211,201 | 71,363 |

35.     To estimate the price impact of implementation of Question 3 in states neighboring Massachusetts, I multiply the estimated share of pork consumed in a state that comes through

18

**A214**

Massachusetts by the 6.3%, which is the cost Sumner et al. (2020) estimated from segregating and separating pork from supply chains with different housing systems expressed relative to the retail price assumed in their study, by 58%, which is the estimated share of pork from whole muscle products that would be covered by Question 3 (Sumner et al. 2020). For example, in Connecticut, the price increase is estimated to be the amount of pork imported through Massachusetts (25%) times the increased segregation costs (6.3%) times the share of pork covered (58%), which yields an estimated 0.92% price increase. Quantity impacts are determined by multiplying the estimated price impacts by aggregate pork demand elasticities for each location estimated by Tonsor and Lusk (2021). As shown in Table 3, implementation of Question 3 is estimated to reduce pork consumption from 0.6% in Connecticut to 0.03% in New York. Consumer welfare losses from the higher prices are calculated using the same approach as described in Exhibit 2, and they range from $8.3 million/year in Connecticut to $211,201/year in Vermont. To provide some context for potential impacts on food insecurity, Table 3 reports the number of individuals in each state enrolled in the Supplemental Nutrition Assistance Program (SNAP).[29]

36.     Based on these data, it is my opinion that Question 3 would increase the cost of retail pork to consumers not just in Massachusetts but also in other states to which Massachusetts resells pork. Even if states who currently buy pork from Massachusetts find lower cost non-Question 3 compliant alternatives after implementation of Question 3, their costs would still rise as they must find new vendors who are not currently preferred.

37.     I declare under penalty of perjury and pursuant to the laws of the state of Massachusetts that the preceding is true and correct, and that this declaration was made on this 7th day of August 2023, at West Lafayette, Indiana.

---

[29] https://www.fns.usda.gov/pd/supplemental-nutrition-assistance-program-snap

_Jayson Lusk_

Jayson L. Lusk, Ph.D.

**A216**

<div align="right">**Exhibit 1**</div>

# Jayson L. Lusk

## Education

- Ph.D. Agricultural Economics, *Kansas State University*, 2000
- B.S. Food Technology, *Texas Tech University*, 1997

## Academic Positions

- Distinguished Professor and Head       2017 – present
  *Purdue University, Department of Agricultural Economics*
- Regents Professor and Willard Sparks Endowed Chair   2013 – 2017
  *Oklahoma State University, Department of Agricultural Economics*
- Professor and Willard Sparks Endowed Chair       2005 – 2013
  *Oklahoma State University, Department of Agricultural Economics*
- Visiting Researcher       2011
  *French National Institute for Agricultural Research (INRA)*, Paris
- Associate Professor       2003 – 2005
  *Purdue University, Department of Agricultural Economics*
- Assistant Professor       2000 – 2003
  *Mississippi State University Department of Agricultural Economics*
- USDA National Needs Graduate Fellow       1997 – 2000
  *Kansas State University, Department of Agricultural Economics*

## Awards, Honors, and Achievements

- Publication of Enduring Quality, Agricultural and Applied Economics Association, 2022
- Outstanding Article, *Choices Magazine*, 2022
- Lu Ann Aday Award, Purdue University's highest honor for excellence in humanities and social science research, 2020
- Outstanding Journal Article, *Applied Economic Perspectives and Policy*, 2019
- Borlaug Communication Award, Council for Agricultural Science and Technology (CAST), 2017
- Fellow, Western Agricultural Economics Association, 2017
- Senior Fellow, Breakthrough Institute, 2017
- Outstanding Journal Article, *Journal of Entrepreneurship and Public Policy*, 2016
- Fellow, Agricultural and Applied Economics Association, 2015
- Outstanding Journal Article, *European Review of Agricultural Economics*, 2015
- Samuel Roberts Noble Distinguished Fellow, Oklahoma Council of Public Affairs, 2013-2017
- Quality of Communication Award, Agricultural and Applied Economics Association, 2012
- Research Fellow, Organisation for Economic Co-Operation and Development (OECD), Co-operative Research Program Fellowship, 2011

- Regents Distinguished Research Award, Oklahoma State University, 2010
- Sarkeys Distinguished Professor Award, Division of Agricultural Sciences and Natural Resources, Oklahoma State University, 2010
- The Best Economics Paper, Food Safety and Nutrition Section, Agricultural and Applied Economics Association, 2009
- James A. Whatley Award of Merit for Excellence in Agricultural Research, Division of Agricultural Sciences and Natural Resources, Oklahoma State University, 2007
- Hall of Fame Horizon Award (Outstanding Alumni), Department of Animal and Food Sciences, Texas Tech University, 2007
- Outstanding Published Research Award, Western Agricultural Economics Association, 2007
- Outstanding Journal Article, *Journal of Agricultural and Resource Economics*, 2005
- Honorable Mention Outstanding Journal Article, *Review of Agricultural Economics*, 2005
- Outstanding Doctoral Dissertation, Gamma Sigma Delta, Kansas State University, 2001
- First Place, American Agricultural Economics Association Graduate Student Case Study Competition, 1998
- Outstanding Student, College of Agricultural Sciences & Natural Resources, Texas Tech University, 1997
- Highest Academic Achievement & Outstanding Student, Department of Animal Science & Food Technology, Texas Tech University, 1997

### Summary of Leadership and Administrative Experiences

- Head, Department of Agricultural Economics, Purdue University
  - Responsible for oversight and leadership of department ranked as high as fourth in the world, consisting of as many as 45 faculty, 45 staff, 140 graduate students, 550 undergraduates, and 8 affiliated centers; Responsible for annual expenditures of approximately $15 million. Key strategic initiatives and efforts include:
    - Raised funds to create six new endowed chairs or professorships;
    - Spearheaded effort and raised funds for an approximately $1 million facilities renovation focused on undergraduate advising and recruiting;
    - Reorganized department leadership including appointing new associate head, graduate coordinator, undergraduate coordinator, extension coordinator, and center directors while instituting new policies and procedures to elevate research profile and accountability;
    - Created two new online graduate programs and two new undergraduate concentrations;
    - Hired 20 new faculty and more than 20 new staff members;
    - Elevated department internal and external communications and integrated the department with college-wide initiatives.
- Past president and director, Agricultural and Applied Economics Association
  - Led activities of 2,600-member organization and trust with combined annual budgets of over $1.1 million and assets of over $6 million; Spearheaded efforts to improve public outreach; Developed programs and raised funds to promote engagement of early career professionals; Organized early career professionals' conference; Helped renegotiate contracts with new journal publishers and start the process of launching a new journal; Helped lead efforts to define and shape strategy and priorities.
- Public outreach on science-based food and agricultural decision making
  - Authored two popular trade books; Given over 250 invited lectures and keynote addresses for diverse audiences; Author of popular blog with about 100,000 average annual page views; Extensive media relations experience; Written and given interviews for *New York Times*, *Wall Street Journal*, *USA Today*, and *Washington Post*; Appeared on numerous leading national and cable television news shows.
- Board of directors, Western and Southern Agricultural Economics Associations
  - Helped managed association budgets, journal contracts, editors, and annual meetings; Played a role in transitioning to higher profile publisher; Assisted in dramatically increasing undergraduate student involvement in Southern meetings.
- University service and leadership
  - Department-level chair and division- and college-level member of promotion and tenure committees; Chaired division-level graduate recruiting committee; Chaired departmental seminar and awards committees; served on Institutional Review Board (IRB); Chaired faculty and department head search committees; Chair of College of Agriculture task-force on the future of work at the Land Grant; Member of Provost's Leadership Team for External Recognitions

- Leader in research and agricultural community
  - Widely recognized as leading food and agricultural economist
    - Published works cited more than 22,600 times with an H-index of 79
    - Listed in top 1% of economists worldwide in terms of citations, H-index, and number of publications according to IDEAS and RePEc
    - Listed among world's top 2% most cited scientists worldwide.
    - Most cited author in the *American Journal of Agricultural Economics* from 1999-2008 and from 2009-2018
    - One of the top 10 most productive researchers in agricultural economics graduating from 1987-2000
    - One of top five most influential authors in environmental and ecological economics from 2000-2009
  - Given testimony to the U.S. Senate Committee on Agriculture, Nutrition, and Forestry and the U.S. House Agriculture Committee; Served on advisory boards and participated in strategic planning meetings for government, private, and industry organizations such as U.S. Department of Agriculture, National Agricultural Research, Extension, Education, and Economics (NAREEE) Advisory Board; National Academies of Science; Supporters of Agricultural Research (SoAR); Foundation for Food and Agricultural Research (FFAR); French National Institute for Agricultural Research (INRA); Manna Partners; Center for Food Integrity – Consumer Trust Insights Council; Agrinovus Indiana; National Dairy Council; Council for Agricultural Science and Technology (CAST); National Pork Board; Noble Research Institute; EY Innovation Studio; Veylinx; Institute for the Advancement of Food and Nutrition Sciences (IAFNS)
  - Founder and director of the Center for Food Demand Analysis (CFDAS) at Purdue (2021-present) and the founder and director the Food Demand Survey (FooDS) project (2013-2017)
  - Planned and coordinated multiple conferences, including first ever joint seminar between American and European agricultural economics associations; Served on numerous international scientific advisory committees; Co-edited leading Oxford University Handbook on food demand; Served on editorial council of nine journals; Principle or Co-Director on $6.6 million in external grants; Authored or co-authored over 270 peer-reviewed journal articles and multiple books.
- Active community engagement
  - Board of directors of Agribusiness Council of Indiana; Board of directors of Indiana Council of Economic Education; Chair of finance committee for Stillwater Public School District; Served on finance committee of local church; Board member and treasurer of Stillwater K-LIFE; Served as fellow at the Oklahoma Council of Public Affairs.
- Teaching leadership
  - Co-creator of summer school with the University of Bologna, Italy running more than a decade; co-author of widely adopted undergraduate textbook on agricultural marketing; Created and taught new graduate and undergraduate courses; Major professor to over 30 graduate students successfully placed in agribusiness, government, and academia.

## Professional Service and Scholarly Societies

- Agricultural and Applied Economics Association, 1998-Present
  - President-elect, President, Past-president, 2015-2018
  - Director, 2011-2014
  - Co-Chair, AAEA/EAAE Seminar on "Food Environment," 2012
  - Chair, Food & Agricultural Marketing Policy Section, 2006
  - Faculty advisor, Graduate Student Section, 2004-2007
- U.S. Department of Agriculture, National Agricultural Research, Extension, Education, and Economics (NAREEE) Advisory Board
  - Board Member and Executive Committee, 2018-2021
- Council for Agricultural Science and Technology (CAST)
  - Board of Representatives, 2018-2020
  - Communications committee, 2019-2020
  - Animal Work Group member, 2018-2020
  - Co-editor, CAST Report on Economic Impacts of COVID-19 on Food and Agricultural Markets
- Supporters of Agricultural Research (SoAR) Foundation
  - Member, Science Advisory Committee, 2023-Present
- Foundation for Food and Agricultural Research (FFAR)
  - Member, Data Ad Hoc Advisory Council, 2020-Present
- Institute for the Advancement of Food and Nutrition Sciences (IAFNS)
  - Board of Trustees, 2021-Present
- American Association for the Advancement of Science, 2017-Present
- Editorial board memberships
  - *American Journal of Agricultural Economics* (2006-2009); *Journal of Environmental Economics and Management* (2009-2013); *Food Policy* (2015-present); *Journal of Consumer Affairs* (2012-2017); *Review of Agricultural, Food and Environmental Studies* (2018-Present); *Journal of Agricultural and Resource Economics* (2009-2012); *Journal of Agricultural and Food Industrialization Organization* (2005-Present; co-editor of special issue on neuroeconomics, 2015); *Agricultural and Resource Economic Review* (2008-2010); *Journal of Agricultural and Applied Economics* (2009-2015); *Journal of Economic Psychology* (co-editor of special issue on food consumption*, 2015)
- Farm Foundation Roundtable
  - Member, 2020-Present
- French National Institute for Agricultural Research, 2012-2015
  - Member, International Scientific Committee of Research on Diet Impacts
- Council on Food, Agricultural and Resource Economics (C-FARE)
  - Member, Blue Ribbon Expert Panel on Consumer Concerns about Food, Health and Safety, 2011-2015
- American Economic Association, 2000-Present
- Southern Agricultural Economics Association, 1998-Present
  - Director, 2009-2011
- Western Agricultural Economics Association, 1998-Present
  - Director, 2006-2009

## Research Summary

Lusk is a food and agricultural economist who studies what we eat and why we eat it. Since 2001, he has published more than 270 articles in peer reviewed academic journals, six books, and seven book chapters. According to googlescholar, his published works have been cited more than 22,600 times and he has an H-index of 79. His research has primarily centered on the following topics.

- *Food Policy*: Although food and agricultural policies are often motivated by noble intentions, economic analysis provides a framework for estimating consequences and understanding tradeoffs. Lusk has analyzed the consequences of various policies ranging from food labels, to bans on controversial agricultural technologies, to food assistance programs, to fat and soda taxes.
- *Emerging Food Issues*: Food preferences and technologies are constantly evolving, and as such, much of Lusk's research has focused on providing economic analysis and insight into consumer preferences for emerging food issues such as animal welfare, biotechnology, cloning, nanotechnology, growth promotants, local foods, etc.
- *Consumer Behavior:* Predicting consumers' responses to food marketing and policy initiatives requires an understanding of why people do what they do, which means studying preferences for risk, time, fairness, social status, etc. A key question driving much of Lusk's research is: why do consumers say they will do one thing in a survey but do something entirely different when shopping in the grocery store?
- *Livestock and Meat Technology and Marketing*: Animal agriculture represents the highest share of farm cash receipts, and as such, Lusk has researched livestock, poultry, and meat marketing and the impacts of technologies on these sectors.
- *Research Methods*: Lusk has created and improved experimental, survey, and statistical methods to better understand how consumers will react to food marketing and policy initiatives. He helped create new consumer research methods such as inferred valuation, incentive compatible conjoint, calibrated auction-conjoint, vignette conjoint, calibrated choice experiment, and basket-based choice experiment methods, and his work has led to further developments in best-worst scaling, choice experiments, and experimental auctions.

## Books

Lusk, J.L. *Unnaturally Delicious: How Science and Technology are Serving Up Super Foods to Save the World*.  New York: St. Martin's Press, 2016.  link

Lusk, J.L.  *The Food Police: A Well-Fed Manifesto about the Politics of Your Plate*.  New York: Crown Forum, 2013.  link

Lusk, J.L., J. Roosen, and J. Shogren. (editors). *Oxford Handbook of the Economics of Food Consumption and Policy*.  Oxford, UK: Oxford University Press, 2011.  link

Norwood, F.B. and J.L. Lusk.  *Compassion by the Pound: The Economics of Farm Animal Welfare*. Oxford, UK: Oxford University Press, 2011.  link

Norwood, F.B. and J.L. Lusk.  *Agricultural Marketing and Price Analysis*.  Upper Saddle River, NJ: Prentice-Hall, 2007.  link
        (translated into Greek: Μάρκετινγκ Τιμές Αυοτικών Προϊόντων, Nicosia, Cyprus: Broken Hill Publishers, 2013)
        (re-issued in 2018 by Waveland Press)
        (2nd edition released in 2022 with Norwood, Peel, and Riley)

Lusk, J.L. and J.F. Shogren.  *Experimental Auctions: Methods and Applications in Economic and Marketing Research*.  Cambridge, UK: Cambridge University Press, 2007.  link

**Articles Published in Refereed Journals** *(total = 272)*

*Forthcoming articles*

272. Kilders, V., V. Caputo, and J.L. Lusk. "Consumer Preferences for Food Away from Home: Comparing Consumption Patterns across Restaurant Dine-in and Delivery Settings." *American Journal of Agricultural Economics*. forthcoming.

271. Wahdat, A. and J.L. Lusk. "The Achilles Heel of the U.S. Food Industries: Exposure to Labor and Upstream Industries in the Supply Chain." *American Journal of Agricultural Economics*. forthcoming. link

270. Neuhofer, Z., J.L. Lusk, and S. Villas-Boas. "Can a Sustainability Facts Label Reduce the Halo Surrounding Organic Labels?" *Applied Economic Perspectives & Policy*. forthcoming. link

269. Tang, M., N. Thompson, C. Boyer, N.J. Widmar, and J.L. Lusk. "Implicit Market Segmentation and Valuation of Angus Bull Attributes." *Journal of Agricultural and Resource Economics*. forthcoming. link

*Published articles*

268. Taylor, H., G.T. Tonsor, J.L. Lusk, and T.C. Schroeder. "Benchmarking Plant-Based Protein and Beef Consumption and Perceptions in the U.S." *Applied Economic Perspectives & Policy*. 45(2023):22-43  link

267. Tonsor, G.T., J.L. Lusk, and T.C. Schroeder. "Impacts of New Plant-Based Protein Alternatives: Insights from Four U.S. Consumer Experiments." *Applied Economic Perspectives and Policy*. 45(2023):164-181. link

266. Polzin, S., J.L. Lusk, and A.Z. Wahdat. "Measuring Sustainable Consumer Food Purchasing and Behavior." *Appetite*. 180(2023):106369. link

265. Chenarides, L., C. Grebitus, J.L. Lusk and I. Printezis. "A Calibrated Choice Experiment Method." *European Review of Agricultural Economics*. 49(2022):971-1004. link

264. Caputo, V. and J.L. Lusk. "A Basket-Based Choice Experiment." *Food Policy*. 109(2022):102252. link

263. Neuhofer, Z and J.L. Lusk. "Most Plant-Based Meat Alternative Buyers Also Buy Meat: An Analysis of Household Demographics, Habit Formation, and Buying Behavior Among Meat Alternative Buyers." *Scientific Reports*. 12(2022):13062. link

262. Tonsor, G.T. and J.L. Lusk. "U.S. Perspective: Meat Demand Outdoes Meat Avoidance." *Meat Science*. 190(2022):108843. link

261. Schmiess, J. and J.L. Lusk. "Tradeoffs between Animal Welfare and Environmental Impacts of Beef Production: An Analysis of Presentation Effects on Consumer Choice." *Journal of Agricultural and Resource Economics*. 47(2022):278-299. link

260. Morrisette, K. and J.L. Lusk. "Keep Forgetting to Make a Shopping List? Don't Beat Yourself Up Over It." *Journal of Food Products Marketing*. 28(2022):69-86. link

259. Lusk, J.L., D. Blaustein-Rejto, S. Shah, G.T. Tonsor. "Impact of Plant-Based Meat Alternatives on Cattle Inventories and Greenhouse Gas Emissions." *Environmental Research Letters*. 17(2022):024035. link

258. He, X. and J.L. Lusk. "Bacon Causes Cancer: Do Consumers Care?" *Agricultural and Resource Economics Review*. 51(2022):130-155. link

257. Magnier, A., N. Kalaitzandonakes, and J.L. Lusk. "Changes in Consumer Preferences Towards Non-GM Foods Within an Information Rich Environment: The Case of the Washington State Ballot Initiative." *Applied Economic Perspectives and Policy*. 44(2022):489-510. link

256. Dennis, E.J., G.T. Tonsor, and J.L. Lusk. "Choosing Quantities Impacts Individuals'

Choice, Rationality, and Willingness to Pay Estimates." *Agricultural Economics*. 52(2021):945-962. link

255.  Malone, T., K.A. Schaefer, and J.L. Lusk.  "Unscrambling COVID-19 Food Supply Chains." *Food Policy*.  101(2021):102046. link

254.  Neuhofer, Z. and J.L. Lusk.  "Decomposing the Value of Food Labels on Chicken." *Journal of Agricultural and Applied Economics*. 53(2021):229-245. link

253.  Pappalardo, G., M. D'Amico, J.L. Lusk.  "Comparing the Views of the Italian General Public and Scientists on GMOs." *International Journal of Food Science and Technology*. 56(2021):3641-3650 link

252.  Lusk, J.L. and R. Chandra.  "Farmer and Farm Worker Illnesses and Deaths from COVID-19 and Impacts on Agricultural Output." *PLoS ONE*. 16(2021): e0250621. link

251.  Wahdat, A.Z., M.A. Gunderson, and J.L. Lusk.  "Farm Producers' Household Consumption and Individual Risk Behavior after Natural Disasters." *Agricultural and Resource Economics Review*. 50(2021):127-149. link

250.  Chenarides, L., C. Grebitus, J.L. Lusk and I. Printezis.  "Food Consumption Behavior During the COVID-19 Pandemic." *Agribusiness: An International Journal*. 37(2021):44-81. link

249.  Chenarides, L., C. Grebitus, J.L. Lusk and I. Printezis.  "Who Practices Urban Agriculture? An Empirical Analysis of Participation Before and During the COVID-19 Pandemic." *Agribusiness: An International Journal*. 37(2021):142-159. link

248.  Tonsor, G.T., J.L. Lusk, and S.L. Tonsor.  "Meat Demand Monitor during COVID-19." *Animals*. 11(2021):1040. link

247.  Lusk, J.L., G.T. Tonsor, an L.L. Schulz. "Beef and Pork Marketing Margins and Price Spreads during COVID-19." *Applied Economics Perspectives and Policy*. 43(2021):4-23. link

246.  Lusk, J.L. and G.T. Tonsor.  "Supply and Demand Indices and Their Welfare Implications." *Q Open*. 1(2021):1-22. link

245.  Ahn, S. and J.L. Lusk.  "Pecuniary and Non-Pecuniary Effects of Sugar-Sweetened Beverage (SSB) Taxes." *American Journal of Agricultural Economics*.  103(2021):53-69 link

244.  Wilson, L. and J.L. Lusk.  "Consumer Demand for Redundant Food Labels." *Food Policy*. 97(2020):101938. link

242.  Ortega, D.L., J.L. Lusk, W. Lin, and V. Caputo.  "Predicting Responsiveness to

Information: Consumer Acceptance of Biotechnology in Animal Products in the United States, China, and Europe." *European Review of Agricultural Economics*. 47(2020):1644-1667. link

243. Etumnu, C., K. Foster, N.O. Widmar, J.L. Lusk, and D.L. Ortega. "Does the Distribution of Ratings Affect Online Grocery Sales? Evidence from Amazon.com." *Agribusiness: An International Journal*. 36(2020):501-521. link

241. Lusk, J.L. and B. Ellison. "Economics of Household Food Waste." *Canadian Journal of Agricultural Economics*. 68(2020):379-386 link

240. Staples, A. C.J. Reeling, N.J.O. Widmar, and J.L. Lusk. "Consumer Willingness to Pay for Sustainability Attributes in Beer: A Choice Experiment Using Eco-Labels." *Agribusiness: An International Journal*. 36(2020):591-612. link

239. Caputo, V. and J.L. Lusk. "What Agricultural and Food Policies Do US Consumer Prefer? A Best-Worst Scaling Approach." *Agricultural Economics*. 51(2020):75-93. link

238. van Loo, E.J., V. Caputo, and J.L. Lusk. "Consumer Preferences for Farm-Raised, Lab-Grown, and Plant-Based Meat Products: Does Information Matter?" *Food Policy*. 95(2020):101931. link

237. Biedny, C., T. Malone, and J.L. Lusk. "Exploring Polarization in U.S. Food Policy Opinions." *Applied Economic Perspectives and Policy*. 42(2020):434-454. link

236. Caputo, V., Lusk, J.L., R.M. Nayga, Jr. "Am I Getting a Good Deal? Reference-Dependent Decision Making with the Reference Price is Uncertain." *American Journal of Agricultural Economics*. 102(2020):132-153. link

235. Yang, R., K. Raper, and J.L. Lusk. "Impact of Hormone Use Perceptions on Consumer Meat Preferences." *Journal of Agricultural and Resource Economics*. 45(2020):107-123. link

234. Ates, A. and J.L. Lusk. "Gluten Free: Where's the Beef?" *Journal of Agricultural and Applied Economics*. 52(2020):308–334.

233. Neill, C., R.B. Holcomb, and J.L. Lusk. "Estimating Potential Beggar-thy-Neighbor Effects of State Labeling Programs." *Agribusiness: An International Journal*. 36(2020):3-19. link

232. Drichoutis, A., J.L. Lusk. R. Nayga, and M. Canavari. "How to Run an Experimental Auction: A Review of Recent Advances." *European Review of Agricultural Economics*. 46(2019):862-922. link

231. Conley, K., J.L. Lusk, G. Tonsor, and J. Parcell. "Consulting Activities of Agricultural

Economists and Response to University Policies." *Applied Economic Perspectives and Policy*. 41(2019):650–667. link

230. Lusk, J.L., N. Thompson, and S.L. Weimer. "The Cost and Market Impacts of Slow Growth Broilers." *Journal of Agricultural and Resource Economics*. 44(2019):536-550. link

229. Lusk, J.L. "Income and (Ir)Rational Food Choice." *Journal of Economic Behavior and Organization*. 166(2019):630-645. link

228. Ramanathan, R., J.L. Lusk, R. Reuter, G.G. Mafi, and D.L. VanOverbeke. "Consumer Practices and Risk Factors that Predispose to Premature Browning in Cooked Ground Beef." *Meat and Muscle Biology*. 3(2019):526-531. link

227. Lusk, J.L. "Consumer Beliefs about Healthy Foods and Diets." *PLoS ONE*. 14(2019): e0223098. link

226. Sambucci O., J. Alston, K. Fuller, and J.L. Lusk. "The Pecuniary and Non-Pecuniary Costs of Powdery Mildew, and the Potential Value of Resistant Varieties in California." *American Journal of Enology and Viticulture*. 70(2019):177-187. link

225. Su, L., B.D. Adam, F.H. Arthur, J.L. Lusk, and J.F Meullenet. "The Economic Effects of *Rhyzopertha dominica* on Rice Quality: Objective and Subjective Measures." *Journal of Stored Products Research*. 84(2019):101505. link

224. Lusk, J.L. "Consumer Perceptions of 'Natural' Foods." *Food Technology*. 73(2019):43-46. link

223. Paul, A.S., J.L. Lusk, F.B. Norwood, and G.T. Tonsor. "An Experiment on the Vote-Buy Gap with Application to Cage-Free Eggs." *Journal of Behavioral and Experimental Economics*. 79(2019):102-109. link

222. Rong, R., T.C. Grijalva, J.L. Lusk, and W.D. Shaw. "Interpersonal Discounting." *Journal of Risk and Uncertainty*. 58(2019):17-42. link

221. Lin, W., D.L. Ortega, V. Caputo, and J.L. Lusk. "Personality and Consumer Acceptance of Controversial Food Technology: A Cross-Country Investigation of Genetically Modified Animal Products." *Food Quality and Preference*. 76(2019):10-19. link

220. Ates, A.M, J.L. Lusk, and B.W. Brorsen. "Forecasting Meat Prices using Consumer Expectations from the Food Demand Survey (FooDS)." *Journal of Food Distribution Research*. 50(2019):1-28. link

219. Maples, J.G., J.L. Lusk, and D.S. Peel. "Technology and Evolving Supply Chains in the Beef and Pork Industries." *Food Policy*. 83(2019):346-354. link

218. Malone, T. and J.L. Lusk. "Mitigating Choice Overload: An Experiment in the U.S. Beer

Market." *Journal of Wine Economics*. 14(2019):48-70. link

217. Conley, K. and J.L. Lusk. "What to Eat When Having a Millennial over for Dinner." *Applied Economic Perspectives and Policy*. 41(2019):56-70. link

216. Pappalardo, G., R. Selvaggi, and J.L. Lusk. "Procedural Invariance as a Result of Commitment Costs: Evidence from an Economic Experiment on Farmers' Willingness to Pay for Digestate." *Applied Economics Letters*. 26(2019):1243-1246. link

215. Lusk, J.L. "Consumer Preferences for Cage Free Eggs and Impacts of Retailer Cage Free Pledges." *Agribusiness: An International Journal*. 35(2019):129-148. link

214. Norwood, F.B., G.T. Tonsor, and J.L. Lusk. "I Will Give You My Vote but Not My Money: Preferences for Public versus Private Action in Addressing Social Issues." *Applied Economic Perspectives and Policy*. 41(2019):96-132. link

213. Malone, T. and J.L. Lusk. "Releasing the Trap: A Method to Reduce Inattention Bias in Survey Data with Application to U.S. Beer Taxes." *Economic Inquiry*. 57(2019):584-599. link

212. Lusk, J.L. "Consumer Preferences for and Beliefs about Slow Growth Chicken." *Poultry Science*. 97(2018):4159-4166. link

211. Ellison, B. and J.L. Lusk. "Examining Household Food Waste Decisions: A Vignette Approach." *Applied Economic Perspectives and Policy*. 40(2018):613-631. link

210. Malone, T. and J.L. Lusk. "If You Brew It, Who Will Come? Market Segments in the United States Beer Market." *Agribusiness: An International Journal*. 34(2018):204-221. link

209. Ortega, D., R.S. Shupp, R.M. Nayga, Jr., and J.L. Lusk "Mitigating Overbidding Behavior using Hybrid Auction Mechanisms: Results from an Induced Value Experiment." *Agribusiness: An International Journal*. 34(2018):887-893. link

208. Malone, T. and J.L. Lusk. "A Simple Diagnostic Measure for Discrete Choice Models: A Note." *European Review of Agricultural Economics*. 45(2018):455-462. link

207. Kim, S., J.L. Lusk, and B.W. Brorsen. "'Look at Me, I'm Buying Organic': The Effects of Social Pressure on Organic Food Purchases." *Journal of Agricultural and Resource Economics*. 43(2018):364-387. link

206. Grijalva, T.C., R. Rong, J.L. Lusk, and W.D. Shaw. "Convex Time Budgets and Individual Discount Rates in the Long Run." *Environmental and Resource Economics*. 71(2018):259-277. link

205. Lusk, J.L. "Separating Myth from Reality: An Analysis of Socially Acceptable Credence

Attributes." *Annual Review of Resource Economics*. 10(2018):65-82. link

204. Kolodinsky, J. and J.L. Lusk. "Mandatory Labels Can Improve Attitudes toward Genetically Engineered Food." *Science Advances*. 4(2018):eaaq1413. link

203. Malone, T. and J.L. Lusk. "An Instrumental Variable Approach to Distinguishing Perceptions from Preferences for Beer Brands." *Managerial and Decision Economics*. 39(2018):403-417. link

202. McFadden, B. and J.L. Lusk. "Effects of the National Bioengineered Food Disclosure Standard: Willingness to Pay for Labels that Communicate the Presence of Genetic Modification." *Applied Economic Perspectives and Policy*. 40(2018):259-275. link

201. Lusk, J.L., B.R. McFadden, and N. Wilson. "Do Consumers Care How a Genetically Engineered Food was Created or Who Created It?" *Food Policy*. 78(2018):81-90. link

200. Kalaitzandonakes, N., A. De Maisonneuve, and J.L. Lusk. "The Price of Non-Genetically Modified Food." *Food Policy*. 78(2018):38-50. link

199. Mullally, C. and J.L. Lusk. "The Impact of Restrictions on Farm Animal Housing on Egg Prices, Consumer Welfare, and Production in California." *American Journal of Agricultural Economics*. 100(2018):649-669. link [lead article]

198. Lusk, J.L, G.T. Tonsor, T.C. Schroeder, D.J. Hayes. "Effect of Quality Grade Labels on Consumer Demand for Pork Chops in the Short and Long Run." *Food Policy*. 77(2018):91-102. link

197. Jo, J. and J.L. Lusk. "If It's Healthy, It's Tasty and Expensive: Effects of Nutritional Labels on Price and Taste Expectations." *Food Quality and Preferences*. 68(2018):332-341. link

196. Lusk, J.L. and J. McCluskey. "Understanding the Impacts of Food Consumer Choice and Food Policy Outcomes." *Applied Economic Perspectives and Policy*. 40(2018):5-21. link

195. Depue S.M., M.M. Neilson, J.L. Lusk, G. Mafi, F.B. Norwood FB, R. Ramanathan, D. VanOverbeke. "Preference Evaluation of Ground Beef by Untrained Subjects with Three Levels of Finely Textured Beef." *PLoS ONE* 13(2018):e0190680. link

194. Caputo, V, J.L. Lusk, and R. Nayga. "Choice Experiments are Not Conducted in a Vacuum: The Effects of External Price Information on Choice Behavior." *Journal of Economic Behavior and Organization*. 145(2018):335-351. link

193. Maples, J.G., J.L. Lusk, and D.S. Peel. "Unintended Consequences of the Quest for Increased Efficiency in Beef Cattle: When Bigger Isn't Better." *Food Policy*. 74(2018):65-73. link

192. Malone, T. and J.L. Lusk. "Consequences of Participant Inattention with an Application to Carbon Taxes for Meat Products." *Ecological Economics*. 145(2018):218-230. link

191. Kim, S., J.L. Lusk, and B.W. Brorsen. "Not Everybody Prefers Organic Food: Unobserved Heterogeneity in U.S. Consumers' Preference for Organic Apple and Milk." *Applied Economics Letters*. 25(2018):9-14. link

190. Su, L., B.D. Adam, J.L. Lusk, and F. Arthur. "Anchoring, Information, and Fragility of Choice Experiments: An Application to Consumer Willingness to Pay for Rice with Improved Storage Management." *Journal of Agricultural and Resource Economics*. 42(2017):255-274. link

189. Andre, R. and J.L. Lusk. "Relief in Haiti after the Earthquake: Haitians' Preferences for Food and Other Basic Commodities." *Development Policy Review*. 35(2017):O303–O321. link

188. Bell, E., F.B. Norwood, and J.L. Lusk. "Are Consumers Willfully Ignorant About Animal Welfare?" *Animal Welfare*. 26(2017):399-402. link

187. Malone, T. and J.L. Lusk, "The Excessive Choice Effect Meets the Market: A Field Experiment on Craft Beer Choice." *Journal of Behavioral and Experimental Economics*. 67(2017):8-13. link

186. Thompson, N.M., B.W. Brorsen, E.A. Devuyst, and J.L. Lusk. "Genetic Testing to Signal Quality in Beef Cattle: Bayesian Methods for Optimal Sample Size." *American Journal of Agricultural Economics*. 99(2017):1287-1306. link

185. Muller, L., A. Lacroix, J.L. Lusk, and B. Ruffieux. "Distributional Impacts of Fat Taxes and Thin Subsidies." *Economic Journal*. 127(2017):2066-2092. link

184. Malone, T. and J.L. Lusk. "Taste Trumps Health and Safety: Incorporating Consumer Perceptions into Discrete Choice Experiments for Meat." *Journal of Agricultural and Applied Economics*. 49(2017):139-157. link

183. Lusk, J.L. "Evaluating the Policy Proposals of the Food Movement." *Applied Economic Perspectives and Policy*. 39(2017):387-406. link

182. Lusk, J.L. "Economics and Obesity Policy." *International Journal of Obesity*. 41(2017):831-834. link

181. Ellison, B. and J.L. Lusk. "A Note on Modeling Household Food Waste Behavior." *Applied Economics Letters*. 24(2017):1199-1202. link

180. Drichoutis, A.C., A. Vassilopoulos, J.L. Lusk, and R.M. Nayga, Jr. "Consumer Preferences

for Fair Labour Certification." *European Review of Agricultural Economics*. 44(2017) 455-474. link

179. Lusk, J.L. and A. Weaver. "An Experiment on Cash and In-Kind Transfers with Application to Food Assistance Programs." *Food Policy*. 68(2017):186-192. link

178. Lusk, J.L. "Consumer Research with Big Data: Applications from the Food Demand Survey (FooDS)." *American Journal of Agricultural Economics*. 99(2017):303-320. link [Presidential Address, Agricultural and Applied Economics Association]

177. Lusk, J.L. "Distributional Effects of Crop Insurance Subsidies." *Applied Economic Perspectives and Policy*. 39(2017):1-15. link

176. Lusk, J.L., J.M. Crespi. B. McFadden, J.B. Cherry, L. Martin, A. Bruce. "Neural Antecedents of a Random Utility Model." *Journal of Economic Behavior and Organization*. 132A(2016):93-103. link

175. Drichoutis, A. and J.L. Lusk. "What Can Multiple Price Lists Really Tell Us about Risk Preferences?" *Journal of Risk and Uncertainty*. 53(2016):89-106. link

174. Malone, T. and J.L. Lusk. "Brewing Up Development: Government Intervention in Beer." *Journal of Entrepreneurship and Public Policy*. 5(2016):325-342. link

173. Lusk, J.L. and G.T. Tonsor. "How Meat Demand Elasticities Vary with Price, Income, and Product Category." *Applied Economic Perspectives and Policy*. 38(2016):673-711. link

172. Jo, J., J.L. Lusk, L. Muller, and B. Ruffieux. "Value of Parsimonious Nutritional Information in a Framed Field Experiment." *Food Policy*. 63(2016):124-133. link

171. Malone, T. and J.L. Lusk. "Putting the Chicken before the Egg Price: An Ex Post Analysis of California's Battery Cage Ban." *Journal of Agricultural and Resource Economics*. 41(2016):518-532. link

170. Norwood, F.B. and J.L. Lusk. "Some Vegetarians Spend Less Money on Food, Others Don't." *Ecological Economics*. 130(2016):232-242. link

169. Drichoutis, A.C., J.L. Lusk, and V. Pappaz. "Elicitation Format and the WTA/WTP Gap: A Study of Climate Neutral Foods." *Food Policy*. 61(2016):141-155. link

168. Pappalardo, G. and J.L. Lusk. "The Role of Beliefs in Purchasing Process of Functional Foods." *Food Quality and Preference*. 53(2016):151-158. link

167. McFadden, B.R. and J.L. Lusk. "What Consumers Don't Know about GM Food and How that Affects Beliefs." *Federation of American Societies for Experimental Biology (FASEB) Journal*. 30(2016):3091-3095. link

166. Marette, S., J.L. Lusk, and F.B. Norwood. "Choosing for Others." *Applied Economics*.

48(2016):2039-2111. link

165. Thompson, N. M., E.A Devuyst, B.W. Brorsen, and J.L. Lusk. "Using Genetic Testing to Improve Fed Cattle Marketing Decisions." *Journal of Agricultural and Resource Economics*. 41(2016):286-306. link

164. Pendell, D.L., J.L. Lusk, T.L. Marsh, K.H. Coble, and S.C. Szmania. "Economic Assessment of Zoonotic Diseases: An Illustrative Study of Rift Valley Fever in the United States." *Transboundary and Emerging Diseases*. 63(2016):203-214. link

163. Crespi, J., J.L. Lusk, B.J. Cherry, L. Martin, B. McFadden, and A. Bruce. "Neural Activations Correlate with Food-Product Valuations Derived from an Economic Model of Decision Time." *American Journal of Agricultural Economics*. 98(2016):74-91. link

162. Drichoutis, A.C., J.L. Lusk, and R.M. Nayga, Jr. "The Veil of Experimental Currency Units." *Journal of the Economic Science Association*. 1(2015):182-196. link

161. Gbègbèlègbè D.S., J. Lowenberg-DeBoer, R. Adeoti, J.L. Lusk, O. Coulibaly. "The Estimated Ex Ante Economic Impact of Bt Cowpea in Niger, Benin and Northern Nigeria." *Agricultural Economics*. 46(2015):563-577. link

160. McFadden, B.R. and J.L. Lusk. "Cognitive Biases in the Assimilation of Scientific Information on Global Warming and Genetically Modified Food." *Food Policy*. 54(2015):35-43. link

159. Thompson, N.M., E.A Devuyst, B.W. Brorsen, and J.L. Lusk. "Yield Grade and Quality Grade Outcome Distributions Conditioned on Molecular Breeding Values for Commercial Beef Cattle." *Journal of Animal Science*. 93(2015):2045-2055. link

158. Pendell, D., T.L. Marsh, K.H. Coble, J.L Lusk, and S. Szmania. "Economic Assessment of FMDv Releases from the National Bio and Agro Defense Facility." *PLoS ONE*. 10(2015): e0129124. link

157. Francisco, A.J., A.S. Bruce, J.M. Crespi, J.L. Lusk, B. McFadden, J.M. Bruce, R.L. Aupperle, and S.L. Lim. "Are Consumers as Constrained as Hens are Confined? Brain Activations and Behavioral Choices after Informational Influence." *Journal of Agricultural and Food Industrial Organization*. 13(2015):113-119. link

156. McFadden, B., J.L. Lusk, J. Crespi, B.J. Cherry, L. Martin, R. Aupperle, and A. Bruce. "Can Neural Activation in Dorsolateral Prefrontal Cortex Predict Responsiveness to Information? An Application to Egg Production Systems and Proposition 2 Advertising." *PLoS ONE*. 10(2015), e0125243. link

155. Cherry, J.B., J.M. Bruce, J.L. Lusk, J.M. Crespi, S.L. Lim, and A.S. Bruce. "Neurofunctional Correlates of Ethical, Food-Related Decision-Making." *PLoS ONE*. 10(2015), e0120541. link

154. Rigby, D., M. Burton, and J.L. Lusk, "Journal Rankings in Agricultural and Environmental Economics." *American Journal of Agricultural Economics*. 97(2015):490-509. link

153. Vestal, M., J.L. Lusk, S. Cooper, and C. Ward. "What Are the Consequences of the Equine Slaughter Ban on Horse Prices?" *Journal of Agricultural and Applied Economics*. 47(2015):27-46. link

152. Lusk, J.L., B. McFadden, B.J. Rickard. "Which Biotech Foods Are Most Acceptable to the Public?" *Biotechnology Journal*. 10(2015):13-16. link

151. Avitia, J., M. Costa-Font, J.M. Gil, and J.L. Lusk. "A Calibrated Auction-Conjoint Experiment to Elicit Consumer Preferences for Sustainable Farming." *Food Quality and Preference*. 41(2015):1-11. link

150. Lusk, J.L., J.M. Crespi, J.B.C. Cherry, B.R. McFadden, L.E. Martin, and A.S. Bruce. "An fMRI Investigation of Consumer Choice Regarding Controversial Food Technologies." *Food Quality and Preference*. 40A(2015):209-220. link

149. Rousu, M., S. Marette, J. Thrasher, and J.L. Lusk. "The Economic Value to Smokers of Graphic Warning Labels on Cigarettes: Evidence from Combining Market and Experimental Auctions Data." *Journal of Economic Behavior and Organization*. 108(2014):123-134. link

148. Ellison, B., J.L. Lusk, and D. Davis. "The Impact of Restaurant Calorie Labels on Food Choice: Results from a Field Experiment." *Economic Inquiry*. 52(2014):666-681. link

147. Devuyst, E., M. Devuyst, and J.L. Lusk. "USDA Quality Grades May Mislead Consumers." *Journal of Animal Science*. 92(2014):3142-3148. link

146. Bruce, A.S., J.L. Lusk, J.M. Crespi, J.B.C. Cherry, B.R. McFadden, C.R. Savage, J.M. Bruce, W.M. Brooks, and L.E. Martin. "Consumer Brain Responses to Controversial Food Technologies and Price." *Journal of Neuroscience, Psychology, and Economics*. 7(2014):164-173. link

145. Lusk, J.L., J. Roosen, and A. Bieberstein. "Consumer Acceptance of Controversial New Food Technologies: Causes and Roots of Controversies." *Annual Review of Resource Economics*. 6(2014):381-405. link

144. Costanigro, M. and J.L. Lusk. "The Signaling Effect of Mandatory Labels on Genetically Engineered Food." *Food Policy*. 49(2014):259–267. link

143. Lusk, J.L. "Are You Smart Enough to Know What to Eat: A Critique of Behavioral Economics as Justification for Regulation." *European Review of Agricultural Economics*. 41(2014):355-373. link

142. Grijalva, T.C., J.L. Lusk, and Shaw, W.D. "Discounting the Distant Future: An Experimental Investigation." *Environmental and Resource Economics*. 59(2014):39-63. link

141. Lusk, J.L., T.C. Schroeder, and G.T. Tonsor. "Distinguishing Beliefs from Preferences in Food Choice." *European Review of Agricultural Economics*. 41(2014):627-655. link

140. Klain, T., J.L. Lusk, G. Tonsor, and T.C. Schroeder. "An Experimental Approach to Valuing Information." *Agricultural Economics*. 45(2014):635-648. link

139. Drichoutis, A. and J.L. Lusk. "Judging Statistical Models of Individual Decision Making Under Risk Using In- and Out-of-Sample Criteria." *PLoS ONE*. 9(2014)e102269 link

138. Thompson, N.M., E.A Devuyst, B.W. Brorsen, and J.L. Lusk. "Value of Genetic Information for Management and Selection of Feedlot Cattle." *Journal of Agricultural and Resource Economics*. 38(2014):139-155. link

137. Ellison, B., J.L. Lusk, and D. Davis. "The Effect of Calorie Labels on Caloric Intake and Restaurant Revenue: Evidence from Two Full Service Restaurants." *Journal of Agricultural and Applied Economics*. 46(2014):173-191. link

136. Jarmolowicz, D.P., J.B.C. Cherry, D.D. Reed, J.M. Bruce, J.M. Crespi, J.L. Lusk, A. Bruce. "Robust Relation between Temporal Discounting Rates and Body Mass." *Appetite*. 78(2014):63-67. link

135. Lusk, J.L., S. Marette, and F.B. Norwood. "The Paternalist Meets His Match." *Applied Economics Perspectives and Policy*. 26(2014):61-108. link

134. Smithson, K., Corbin, M., J.L. Lusk, and F.B. Norwood. "Predicting State-Wide Votes on Ballot Initiatives to Ban Battery Cages and Gestation Crates." *Journal of Agricultural and Applied Economics*. 46(2014):107-124. link

133. Lusk, J.L. "Are Sugar-Sweetened Beverage Taxes a Cost-Effective Means of Reducing Weight?" *Canadian Journal of Diabetes*. 38(2014):9-10. link

132. Lusk, J.L. "Lunch with Pigou: Externalities and the 'Hidden' Costs of Food." *Agricultural and Resource Economics Review*. 42(2013):419-435. link

131. Miller, J.C., K.H. Coble, and J.L. Lusk. "Evaluating Top Faculty Researchers and the Incentives that Motivate Them." *Scientometrics*. 97(2013)519-533. link

130. McFadden, B.R. and J.L. Lusk. "Effects of Cost and Campaign Advertising on Support for California's Proposition 37." *Journal of Agricultural and Resource Economics*. 38(2013):174-186. link

129. Tonsor, G.T., T.C. Schroeder, and J.L. Lusk. "Consumer Valuation of Alternative Meat Origin Labels." *Journal of Agricultural Economics*. 64(2013):676–692. link

128. Lusk, J.L. "Role of Technology in the Global Economic Importance and Viability of Animal Protein Production." *Animal Frontiers*. 3(2013):20-26. link

127. Vestal, M., J.L. Lusk, E.A. Devuyst, and J.R. Kropp. "The Value of Genetic Information to Bull Buyers: A Combined Revealed, Stated Preference Approach." *Agricultural Economics*. 44(2013):337-347. link

126. Grebitus, C. J.L. Lusk, and R. Nayga, Jr. "Explaining Differences in Real and Hypothetical Experimental Auctions and Choice Experiments with Personality." *Journal of Economic Psychology*. 36(2013):11-26. link

125. Lusk, J.L. and B. Ellison. "Who is to Blame for the Rise in Obesity?" *Appetite*. 68(2013):14-20. link

124. Kovalsky, K. and J.L. Lusk. "Do Consumers Really Know How Much They Are Willing to Pay?" *Journal of Consumer Affairs*. 47(2013):98–127. link

123. Ellison, B., J.L. Lusk, and D. Davis. "Looking at the Label and Beyond: The Effects of Calorie Labels, Health Consciousness, and Demographics on Caloric Intake in Restaurants." *International Journal of Behavioral Nutrition and Physical Activity*. 10(2013), Article 21. link

122. Grebitus, C. J.L. Lusk, and R. Nayga, Jr. "Local Foods – Is a Mile a Mile? Effect of Distance of Transportation on Willingness to Pay for Food." *Ecological Economics*. 88(2013):67–75. link

121. Brooks, K. and J.L. Lusk. "Public and Private Preferences for Animal Cloning Policies." *Journal of Agricultural and Resource Economics*. 37(2012):485-501. link.

120. Lusk, J.L. and S. Marette. "Can Labeling and Information Policies Harm Consumers?" *Journal of Agricultural and Food Industrial Organization*. 10(2012):1-13. link

119. Lusk, J.L. "The Political Ideology of Food." *Food Policy*. 37(2012):530-542. link

118. Lusk, J.L. and C. Schroeter. "When do Fat Taxes Increase Consumer Welfare?" *Health Economics*. 21(2012):1367-1374. link (see also the comment/reply)

117. Hilmer, C.E., M.J. Hilmer, and J.L. Lusk. "A Comparison of Salary Structures Between Economics and Agricultural Economics Departments." *Applied Economic Perspectives and Policy*. 34(2012):489-514. link

116. Lusk, J.L. and F.B. Norwood. "Speciesism, Altruism, and the Economics of Farm Animal Welfare." *European Review of Agricultural Economics*. 39(2012):189-212. link

115. Drichoutis, A., R.M. Nayga, J.L. Lusk, and P. Lazaridis. "When a Risky Prospect is Valued More than its Best Possible Outcome." *Judgment and Decision Making*. 7(2012):1-18. link

114. Corrigan, J.R., A.C. Drichoutis, J.L. Lusk, R.M. Nayga, M.C. Rousu. "Homegrown Value Auctions with Repeated Rounds and Price Feedback: An Adversarial Collaboration." *American Journal of Agricultural Economics*. 94(2012):97-115. link

113. Lusk, J.L. and F.B. Norwood. "Animal Welfare Economics." *Applied Economic Perspectives and Policy*. 33(2011):463-483. [invited feature article] link

112. Lusk, J.L. "The Market for Animal Welfare." *Agricultural and Human Values*. 28(2011):561-575. link

111. Norwood, F.B. and J.L. Lusk. "Social Desirability Bias in Real, Hypothetical, and Inferred Valuation Experiments." *American Journal of Agricultural Economics*. 93(2011):528-534. link

110. Brooks, K. and J.L. Lusk. "Consumers Attitudes towards Farm Animal Cloning." *Appetite*. 57(2011):483-492. link

109. DeVuyst, E.A., J.T. Biermacher, J.L. Lusk, R. Mateescu, J.B. Blanton, Jr., J.S. Swigert, J.D. Springer, J.D. Donnell, B.J. Cook, and R.R. Reuter. "Relationships between Fed Cattle Traits and Igenity Panel Scores." *Journal of Animal Science*. 89(2011):1260-1269. link

108. Lusk, J.L. and F.B. Norwood. "Non-Market Valuation by Prediction Markets." *Applied Economics Letters*. 18(2011):715-718. link

107. Norwood, F.B., and J.L. Lusk. "A Calibrated Auction-Conjoint Valuation Method: Valuing Pork and Eggs Produced under Differing Animal Welfare Conditions." *Journal of Environmental Economics and Management*. 62(2011):80-94. link

106. Lusk, J.L. and K. Brooks. "Who Participates in Home Scan Panels?" *American Journal of Agricultural Economics*. 93(2011):226-240. link

105. Lusk, J.L. "External Validity of the Food Values Scale." *Food Quality and Preference*. 22(2011):452-462. link

104. Lusk, J.L. and B.C. Briggeman. "Selfishness, Altruism, and Inequality Aversion towards Consumers and Farmers." *Agricultural Economics*. 42(2011):121-139. link

103. Ubilava, D., K.A. Foster, J.L. Lusk, and T. Nilsson. "Differences in Consumer Preferences

when Facing Branded vs. Non-Branded Choices." *Journal of Consumer Behavior*. 10(2011):61-70.  link

102.  Briggeman, B.C. and J.L. Lusk.  "Playing Fair in the Organic Food Supply Chain." *European Review of Agricultural Economics*. 38(2011):1-29.  link

101.  Chang, J.B. and J.L. Lusk.  "Mixed Logit Models: Accuracy and Software Choice." *Journal of Applied Econometrics*. 26(2011):167-172. link

100.  Weaber, R.L. and J.L. Lusk.  "The Economic Value of Improvements in Meat Tenderness by Genetic Marker Selection."  *American Journal of Agricultural Economics*. 92(2010):1456-1471.  link

99.  Chang, J.B., J.L. Lusk, and F.B. Norwood.  "The Price of Happy Hens: A Hedonic Analysis of Retail Egg Prices." *Journal of Agricultural and Resource Economics*.  35(2010):406-423. link

98.  Brooks, K. and J.L. Lusk.  "Stated and Revealed Preferences for Organic and Cloned Milk: Combining Choice Experiment and Scanner Data."  *American Journal of Agricultural Economics*.  92(2010):1229-1241. link

97. Gallardo, R.C., W.B. Brorsen, and J.L. Lusk.  "Prediction Markets: A Case Study on Forecasting Cattle on Feed." *Agricultural Finance Review*. 70(2010):414-426. link

96.  Naico, A.T.A. and J.L. Lusk.  "The Value of a Nutritionally Enhanced Staple Crop: Results from a Choice Experiment Conducted with Orange-Fleshed Sweet Potatoes in Mozambique." *Journal of African Economies*.  19(2010):536-558. link

95.  Ellison, B., J.L. Lusk, and B.C. Briggeman.  "Other-Regarding Behavior and Taxpayer Preferences for Farm Policy." *B.E. Journal of Economic Analysis & Policy*. 10(2010), Article 96. link

94.  Lusk, J.L. and D. Hudson.  "Bargaining over Losses."  *International Game Theory Review*. 12(2010):83-91. link

93.  Prickett, R.W., F.B. Norwood, and J.L. Lusk. "Consumer Preferences for Farm Animal Welfare: Results from a Telephone Survey of U.S. Households." *Animal Welfare*. 19(2010):335-347.  link

92.  Coble, K.H. and J.L. Lusk.  "At the Nexus of Risk and Time Preferences: An Experimental Investigation."  *Journal of Risk and Uncertainty*.  41(2010):67–79. link

91.  Lusk, J.L. and S. Marette. "Welfare Effects of Food Labels and Bans with Alternative Willingness to Pay Measures."  *Applied Economic Perspectives & Policy*. 32(2010):319-337. link

90.  Ellison, B.D, J.L. Lusk, and B.C. Briggeman.  "Taxpayer Beliefs about Farm Income and

Preferences for Farm Policy." *Applied Economic Perspectives & Policy*. 32(2010):338-354. link

89. Marette, S., J.L. Lusk, and J. Roosen. "Welfare Impact of Information with Experiments: The Crucial Role of the Price Elasticity of Demand." *Economics Bulletin*. 30(2010): 1585-1593. link

88. Lusk, J.L. "The Effect of Proposition 2 on the Demand for Eggs in California." *Journal of Agricultural and Food Industrial Organization*. 8(2010), Article 3. link

87. Ubilava, D., K.A. Foster, J.L. Lusk, T. Nilsson. "Effects of Income and Social Awareness on Consumer WTP for Social Product Attributes." *Technological Forecasting & Social Change*. 77(2010):587-593. link

86. Lusk, J.L. and F.B. Norwood. "Direct vs. Indirect Questioning: An Application to the Well-Being of Farm Animals." *Social Indicators Research*. 96(2010):551-565. link

85. Unnevehr, L., J. Eales, H. Jensen, J.L. Lusk, J. McCluskey, and J. Kinsey. "Food and Consumer Economics." *American Journal of Agricultural Economics*. 92(2010):506-521. [invited paper published as part of a special issue on the centennial celebration of AAEA]. link

84. Ehmke, M., J.L. Lusk, and W. Tyner. "Multidimensional Tests for Differences in Economic Behavior across Cultures." *Journal of Socio-Economics*. 39(2010):37-45. link

83. Toler, S., B.C. Briggeman, J.L. Lusk, and D.C. Adams. "Fairness, Farmers Markets, and Local Production." *American Journal of Agricultural Economics*. 91(2009):1272-1278. link

82. Chang, J.B. and J.L. Lusk. "Fairness and Food Choice." *Food Policy*. 34(2009):483-491. link

81. Lusk, J.L. and F.B. Norwood. "Some Economic Benefits and Costs of Vegetarianism." *Agricultural and Resource Economics Review*. 38(2009):109-124. link errata

80. Gallardo, R,C, J.L. Lusk, R. Holcomb, and P. Rayas-Duarte. "Uncertainty in Willingness-to-Pay Estimation: Mexican Millers' Demand for Wheat Quality and Consistency." *Journal of Agricultural and Applied Economics*. 41(2009):599-611. link

79. Rousu, M.C. and J.L. Lusk. "Valuing Information on GM Foods in a WTA Market: What Information is Most Valuable?" *AgBioForum*. 12(2009):226-231. link

78. Hilmer, C.E. and J.L. Lusk. "Determinants of Citations to the Agricultural and Applied

Economics Association Journals." *Review of Agricultural Economics*. 31(2009):677-694. link

77. Lusk, J.L. and M.D. Hudson. "Submission Patterns, Submission Policies, and Revealed Preferences for Agricultural Economics Journals." *Review of Agricultural Economics*. 31(2009):695–711. link

76. Chang, J.B., J.L. Lusk, and F.B. Norwood. "How Closely Do Hypothetical Surveys and Laboratory Experiments Predict Field Behavior?" *American Journal of Agricultural Economics*. 91(2009):518-534. link

75. Lusk, J.L. and F.B. Norwood. "Bridging the Gap between Laboratory Experiments and Naturally Occurring Markets: An Inferred Valuation Method." *Journal of Environmental Economics and Management* 58(2009):236–250. link

74. Lusk, J.L. and F.B. Norwood. "An Inferred Valuation Method." *Land Economics*. 85(2009):500-514. link

73. Arunachalam, A, S.R. Henneberry, J.L. Lusk, and F. B. Norwood. "An Empirical Investigation into the Excessive-Choice Effect." *American Journal of Agricultural Economics*. 91(2009):810-825. link

72. Lusk, J.L. and N. Parker. "Consumer Preferences for Amount and Type of Fat in Ground Beef." *Journal of Agricultural and Applied Economics*. 41(2009):75-90. link

71. Gunderson, M., J.L. Lusk, and B. Norwood. "Getting Something from Nothing: An Investigation of Beef Demand Expansion and Substitution in the Presence of Quality Heterogeneity." *Review of Agricultural Economics*. 31(2009):68-87. link

70. Lusk, J.L. and B.C. Briggeman. "Food Values." *American Journal of Agricultural Economics*. 91(2009):184-196. link

69. Ward, C.E., J.L. Lusk, and J.M. Dutton. "Extent and Type of Fresh Beef Branding in Grocery Stores." *Journal of the Food Distribution Research Society*. 39(2008)79-89. link

68. Ward, C.E., J.L. Lusk, and J.M. Dutton. "Implicit Value of Retail Beef Product Attributes." *Journal of Agricultural and Resource Economics*. 33(2008):364-381. link

67. Lusk, J.L. and F.B. Norwood. "Public Opinion about the Ethics and Governance of Farm Animal Welfare." *Journal of the American Veterinary Medical Association*. 233(2008):1121-1126. link

66. Tanner-Ehmke, M., J.L. Lusk, and J.A. List. "Is Hypothetical Bias a Universal

Phenomenon? A Multi-National Investigation." *Land Economics*. 84(2008):489-500. link

65. Lusk, J.L. and A. Rozan. "Public Policy and Endogenous Beliefs: The Case of Genetically Modified Food." *Journal of Agricultural and Resource Economics*. 33(2008):270-289. link

64. Schroeter, C. and J.L. Lusk. "Economic Factors and Body Weight: An Empirical Analysis." *Journal of Agricultural and Applied Economics*. 40(2008):523-538. link

63. Roberts, D., T. Boyer, and J.L. Lusk. "Preferences for Environmental Quality under Uncertainty." *Ecological Economics*. 66(2008):584-593. link

62. Lusk, J.L., D. Fields, and J. Prevatt. "An Incentive Compatible Conjoint Ranking Mechanism." *American Journal of Agricultural Economics*. 90(2008):487-498. link

61. Yee, W.M.S., W.B. Traill, J.L. Lusk, S.R. Jaeger, L.O. House, M. Moore, B. Morrow, and C. Valli. "Determinants of Consumers' Willingness to Accept GM Foods." *International Journal of Biotechnology*. 10(2008):240-259. link

60. Tanner-Ehmke, M., J.L. Lusk, and W. Tyner. "Measuring the Relative Importance of Country-of-Origin in Consumer Food Preferences in China, France, Niger, and the United States." *Agricultural Economics*. 38(2008):277-285. link

59. Schroeter, C., J.L. Lusk, and W. Tyner. "Determining the Impact of Food Price and Income Changes on Body Weight." *Journal of Health Economics*. 27(2008):45-68. link

58. Mayen, C., M. Marshall, and J.L. Lusk. "Fresh-Cut Melon – The Money is in the Juice." *Journal of Agricultural and Applied Economics*. 39(2007):597-609. link

57. Rozan, A., J.L. Lusk, and M. Campardon. "Acceptabilité des Consommateurs Face à un OGM de Seconde Génération: Le Riz Doré." *Revue d'Economie Politique*. 117(2007):843-852. link

56. Lusk, J.L., C. Alexander, and M. Rousu. "Designing Experimental Auctions for Marketing Research: Effect of Values, Distributions, and Mechanisms on Incentives for Truthful Bidding." *Review of Marketing Science*. 5(2007), article 3. link

55. Lusk, J.L. "Economic Value of Selecting and Marketing Cattle by Leptin Genotype." *Journal of Agricultural and Resource Economics*. 32(2007):306-329. link

54. Lusk, J.L. "Association of Single Nucleotide Polymorphisms in the Leptin Gene with Body Weight and Backfat Growth Curve Parameters for Beef Cattle." *Journal of Animal Science*. 85(2007):1865-1872. link

53. Lusk, J.L., L. McLaughlin, and S. Jaeger. "Strategy and Response to Purchase Intention Questions." *Marketing Letters*. 18(2007):31-44. link

52. Lusk, J.L., T. Nilsson, and K. Foster. "Public Preferences and Private Choices: Effect of Altruism and Free Riding on Demand for Certified Meat." *Environmental and Resource Economics*. 36(2007):499-521. link

51. Lusk, J.L. and A. Rozan. "Consumer Acceptance of Ingenic Foods." *Biotechnology Journal*. 1(2006):1433-34. link

50. Lusk, J.L., J.R. Pruitt, and F.B. Norwood. "External Validity of a Field Experiment." *Economics Letters*. 93(2006):285-290. link

49. Lusk, J.L., B. Norwood, and R. Pruitt. "Consumer Demand for a Ban on Subtherapeutic Antibiotic Use in Pork Production." *American Journal of Agricultural Economics*. 88(2006):1015-1033. link

48. Nilsson, T., K. Foster, and J.L. Lusk. "Marketing Opportunities for Certified Pork." *Canadian Journal of Agricultural Economics*. 54(2006):567-583. link

47. Lusk, J.L. and T.C. Schroeder. "Auctions Bids and Shopping Choices." *Advances in Economic Analysis & Policy*. 6(2006), No. 1, Article 4. link

46. Lusk, J.L., J. Brown, T. Mark, I. Proseku, R. Thomson, and J. Welsh. "Consumer Behavior and Country of Origin Labeling." *Review of Agricultural Economics*. 28(2006):284-292. link

45. Traill, W.B., W.M.S. Yee, J.L. Lusk, S.R. Jeager, L.O. House, B. Morrow, C. Vallli, M. Moore. "Perceptions of the Risks and Benefits of Genetically Modified Foods and their Influence on Willingness to Consume." *Food Economics*. 3(2006):12-19.

44. Lusk, J.L., W.B. Traill, L.O. House, C. Valli, S.R. Jaeger, M. Moore, B. Morrow,. "Comparative Advantage in Demand: Experimental Evidence of Preferences for Genetically Modified Food in the United States and European Union." *Journal of Agricultural Economics*. 57(2006):1-21. link

43. Norwood, B. and J.L. Lusk. "Instrument-Induced Bias in Donation Mechanisms: Evidence from the Field." *Contributions in Economic Analysis & Policy*. 5(2006), No. 2, Article 3. link

42. Lusk, J.L and B. Norwood. "Modeling Beef Quality Heterogeneity." *Journal of Agricultural and Applied Economics*. 37(2005):603-18. link

41. Lusk, J.L., L.O. House, C. Valli, S.R. Jaeger, M. Moore, B. Morrow, W.B. Traill "Consumer Welfare Effects of Introducing and Labeling Genetically Modified Food." *Economics Letters*. 88(2005):382-88. link

40. Lusk, J.L. and A. Rozan. "Consumer Acceptance of Biotechnology and the Role of Second Generation Technologies in the US and Europe." *TRENDS in Biotechnology*. 23(2005):386-87. link

39. Lusk, J.L. and B. Norwood. "Effect of Experimental Design on Choice-Based Conjoint Valuation Estimates." *American Journal of Agricultural Economics*. 87(2005):771-785. link

38. Hudson, D., K. Coble, and J.L. Lusk. "Consistency of Risk Premium Measures." *Agricultural Economics*. 33(2005):41-49. link

37. Lusk, J.L. and K.O. Coble. "Risk Perceptions, Risk Preference, and Acceptance of Risky Food." *American Journal of Agricultural Economics*. 87(2005):393-405. link

36. Lusk, J.L., M. Jamal, L. Kurlander, M. Roucan, L. Taulman. "A Meta Analysis of Genetically Modified Food Valuation Studies." *Journal of Agricultural and Resource Economics*. 30(2005):28-44. link

35. Feldkamp, T, T.C. Schroeder, and J.L. Lusk. "Determining Consumer Valuation of Quality Differentiated Beef Steak Attributes." *Journal of Muscle Foods*. 16(2005):1-15. link

34. Traill, W.B., S.R. Jeager, W.M.S. Yee, C. Vallli, L.O. House, J.L. Lusk, M. Moore, B. Morrow. "Categories of Risk-Benefit Perceptions and their Causes." *AgBioForum*. 7(2004):176-186. link

33. House, L., J.L. Lusk, S. Jaeger, W.B. Traill, M. Moore, C. Valli, B. Morrow, and W.M.S.Yee. "Objective and Subjective Knowledge: Impacts on Consumer Demand for Genetically Modified Foods in the United States and the European Union." *AgBioForum*. 7(2004):113-123. link

32. Lusk, J.L. and M. Gunderson. "Managing Input Price Volatility at Heritage Family Specialty Foods." *International Food and Agribusiness Management Review*. 7(2004):76-85.

31. Norwood, B., J.L. Lusk, and W. Brorsen. "Model Selection with Limited Dependent Variables: Better Statistics for Better Steaks." *Journal of Agricultural and Resource Economics*. 29(2004):404-419. link

30. Norwood, B., J.L. Lusk, and M. Roberts. "Ranking Crop Yield Models Using Out of Sample Likelihood Functions." *American Journal of Agricultural Economics*. 86(2004):1032-1043. link

29. Jaeger, S.R., J.L. Lusk, L.O. House, C. Valli, M. Moore, B. Morrow and W.B. Traill. "Acceptance of Genetically Modified Foods: Non-Hypothetical Experimental Markets." *Food Quality and Preference*. 15(2004):701-714. link

28. Hudson, D. and J.L. Lusk. "What You Don't Know Can Cost You: A Web Based Experiment in Price Discrimination." *Review of Agricultural Economics*. 26(2004):392-403. link

27. Lusk, J.L., L.O. House, C. Valli, S.R. Jaeger, M. Moore, B. Morrow, W.B. Traill. "Effect of Information about Benefits of Biotechnology on Consumer Acceptance of Genetically Modified Food: Evidence from Experimental Auctions in United States, England, and France." *European Review of Agricultural Economics*. 31(2004): 179-204. link

26. Roosen, J., J.L. Lusk, and J.A. Fox. "Transatlantic differences in Consumer Preferences." *Euro Choices*. 3(2004)26-32.

25. Lusk, J.L. and J.D. Anderson. "Effects of Country-of-Origin Labeling on Meat Producers and Consumers." *Journal of Agricultural and Resource Economics*. 29(2004):185-205. link

24. Lusk, J.L. and D. Hudson. "Effect of Monitor-Subject Cheap Talk on Ultimatum Game Offers." *Journal of Economic Behavior and Organization*. 54(2004):439-443. link

23. Lusk, J.L. and D. Hudson. "Willingness-to-Pay Estimates and Agribusiness Decision Making." *Review of Agricultural Economics*. 26(2004):152-169. link

22. Lusk, J.L. and E. Cevallos. "Factors Influencing Demand for a Producer-Owned Beef Retail Outlet." *Journal of Agricultural and Applied Economics*. 36(2004):97-112. link

21. Lusk, J.L. and T.C. Schroeder. "Are Choice Experiments Incentive Compatible? A Test with Quality Differentiated Beef Steaks." *American Journal of Agricultural Economics* 86(2004):467-482. link

20. Lusk, J.L., T. Feldkamp, and T.C. Schroeder. "Experimental Auction Procedure: Impact on Valuation of Quality Differentiated Goods." *American Journal of Agricultural Economics*. 86(2004):389-405. link

19. Hudson, D. and J.L. Lusk. "Activists and Corporate Behavior in Food Processing and Retailing: A Game Theoretic Approach." *Journal of Agricultural and Resource Economics*. 29(2004):79-93. link

18. Hudson, D. and J.L. Lusk. "Risk and Transaction Costs in Contracting: Results from a Choice-Based Experiment." *Journal of Agricultural and Food Industrial Organization*. 2(2004):1-17. link

17. Mark, D.R., J.L. Lusk, and M.S. Daniel. "Recruiting Agricultural Economics Graduate

Students:  Student Demand for Program Attributes.” *American Journal of Agricultural Economics*. 86(2004):175-184. link

16. Lusk, J.L.  “An Experimental Test of the Commitment Cost Theory.” *American Journal of Agricultural Economics*.  85(2003):1316-1322. link

15. Lusk, J.L. “Effect of Cheap Talk on Consumer Willingness-to-Pay for Golden Rice.” *American Journal of Agricultural Economics*.  85(2003):840-56. link

14. Lusk, J.L.  “Using Experimental Auctions for Marketing Applications: A Discussion.” *Journal of Agricultural and Applied Economics*.  35(2003):349-360. link

13. Lusk, J.L. R. Little, A. Williams, J. Anderson, and B. McKinley. “Utilizing Live Animal Ultrasound to Improve Livestock Marketing Decisions.”  *Review of Agricultural Economics*.  25(2003):203-217. link

12. Lusk, J.L. and J.A. Fox.  “Value Elicitation in Laboratory and Retail Environments.” *Economics Letters*. 79(2003):27-34. link

11. Lusk, J.L., J. Roosen, and J.A. Fox.  “Demand for Beef from Cattle Administered Growth Hormones or Fed Genetically Modified Corn: A Comparison of Consumers in France, Germany, the United Kingdom, and the United States” *American Journal of Agricultural Economics*.  85(2003):16-29. link

10. Roosen, J. J.L. Lusk, and J.A. Fox.  “Consumer Demand for and Attitudes Toward Alternative Beef Labeling Strategies in France, Germany, and the UK.”  *Agribusiness: An International Journal*. 19(2003):77-90. link

9. Lusk, J.L. and P. Sullivan.  “Consumer Acceptance of Genetically Modified Foods.” *Food Technology*. 56(2002):32-37.
Reprinted in: *Academic Universe: Research and Writing at Oklahoma State University.* Plymouth, MI: Hayden-McNeil, (2009):27-34.

8. Lusk, J.L. and J.A. Fox.  “Consumer Demand for Mandatory Labeling of Beef from Cattle Administered Growth Hormones or Fed Genetically Modified Corn.” *Journal of Agriculture and Applied Economics.*  34(2002):27-38. link

7. Lusk, J.L. and T.C. Schroeder.  “Effects of Meat Recalls on Futures Market Prices.” *Agricultural and Resource Economics Review.*  31(2002):47-58.  link

6. Lusk, J.L., A.M. Featherstone, T.L. Marsh, and A.O. Abdulkadri.  “Empirical Properties of Duality Theory.” *Australian Journal of Agricultural and Resource Economics*. 46(2002):45-68. link

5. Lusk, J.L., M. Moore, L. House, and B. Morrow. "Influence of Brand Name and Type of Modification on Consumer Acceptance of Genetically Engineered Corn Chips: A Preliminary Analysis." *International Food and Agribusiness Management Review.* 4(2002):373-383. link

4. Lusk, J.L., J.A. Fox, T.C. Schroeder, J. Mintert, and M. Koohmaraie. "In-Store Valuation of Steak Tenderness." *American Journal of Agricultural Economics*. 83(2001):539-550. link

3. Lusk, J.L., M.S. Daniel, D.R. Mark, and C.L. Lusk. "Alternative Calibration and Auction Institutions for Predicting Consumer Willingness-to-Pay for Non-Genetically Modified Corn Chips." *Journal of Agriculture and Resource Economics*. 26(2001):40-57. link

2. Lusk, J.L., T.L. Marsh, T.C. Schroeder, and J.A. Fox. "Wholesale Demand for USDA Quality Graded Boxed Beef and the Effects of Seasonality." *Journal of Agriculture and Resource Economics*. 26(2001):91-106. link

1. Lusk, J.L., J.A. Fox, and C.L. McIlvain. "Consumer Acceptance of Irradiated Meat." *Food Technology*. 53(1999):56-59.

## Discussion, Comments, and Replies Published in Academic Journals *(total = 12)*

12. Lusk, J.L. "The Costs and Benefits of Deception in Economic Experiments." *Food Policy*. 83(2019):2-4. link

11. Mullally, C. and J.L. Lusk. "The Impact of Farm Animal Housing Restrictions on Egg Prices, Consumer Welfare, and Production in California: Author Response to Comment." [discussion on lead article on the issue] *American Journal of Agricultural Economics*. 100(2018):674–675. link

10. Lusk, J.L. and M. Perugini. "Editorial for Special Issue on 'Food Consumption Behavior: Economic and Psychological Perspectives.'" *Journal of Economic Psychology*. 55(2016):1-3. link

9. Desrochers, P. and J.L. Lusk. "The Inability and Undesirability of Local Croplands to Meet Food Demand." *Frontiers in Ecology and the Environment*. 13(2015):409-410. link

8. Bruce, S.A., J.M. Crespi, and J.L. Lusk. "The Behavioral and Neuroeconomics of Food and Brand Decisions." *Journal of Agricultural and Food Industrial Organization*. 13(2015)1-4. link

7. Lusk, J.L. and C. Schroeter. "When Do Fat Taxes Increase Consumer Welfare? Reply to Neill." *Health Economics*. 22(2013):1284-1286. link

6. Lusk, J.L. "Discussion on Information, Prices and Healthy Lifestyle Choices of Adults." *American Journal of Agricultural Economics*. 93(2011):385-386. link

5. Lusk, J.L. and F.B. Norwood. "A Cautionary Note on the Design of Discrete Choice Experiments: Reply." *American Journal of Agricultural Economics.* 91(2009):1064-1066.

4. Lusk, J.L. "New Estimates of Demand for Food Safety: A Discussion." *American Journal of Agricultural Economics* 89(2007):1189-1190.

3. Norwood, F.B., M.C. Roberts, and J.L. Lusk. "Reply: Ranking Crop Yield Models." *American Journal of Agricultural Economics* 88(2006):1111-1112.

2. Hudson, D. and J.L. Lusk. "Graduate Agribusiness Management Programs: Supply Meets Demand." *Review of Agricultural Economics*. 26(2004):418-422.

1. Lusk, J.L. "A Comparison of Conjoint Analysis Response Formats: Comment." *American Journal of Agricultural Economics*. 84(2002):1165-71.

## Articles in Submission at Refereed Journals *(total = 13)*

13. Neuhofer, Z. and J.L. Lusk.  "Demand for Plant-Based Meat Alternatives and the Role of Habit Formation and Variety Seeking." *American Journal of Agricultural Economics*.  In first submission.

12. Wahdat, A.Z. and J.L. Lusk. "Spatial Vulnerability of the U.S. Meatpacking Industry." *Food Policy*.  In second submission.

11. Wahdat, A.Z. and J.L. Lusk.  "Extreme Weather Events and Consumers' Dynamic Food Shopping Behavior." *Nature*.  In first submission.

10. McFadden, B.R., J.L. Lusk, C. May, and E. Schlichtig.  "The Effect of Allowing an Escape Hatch on Internal Consistency and External Validity." *Public Opinion Quarterly*.  In first submission.

9. McFadden, B., J.L. Lusk, A. Pollack, J. Rumble, K. Stofer, and K. Folta. "A Randomized Group Approach to Identifying Label Effects." *Journal of Choice Modelling*. In second submission.

8. Cooper, J., V. Breneman, M. Ma, J. Lusk, J. Maples, S. Arita. "Econometric Assessment of the Effects of COVID-19 Outbreaks on U.S. Meat Production and Plant Utilization with Plant-level Data." *Food Policy*.  In second submission.

7. Huseynov, S., J. Kee, M. Palma, V. Caputo, and J.L. Lusk.  "Public or Private Funding of Controversial Technologies: The Case of Gene-Editing." *American Journal of Agricultural Economics*.  In second submission.

6. Jo, J. and J.L. Lusk. "The Intrinsic and Instrumental Values of Blockchain Technology to Provide Beef Traceability in Hong Kong, South Korea, and the United States." *Agricultural Economics*.  In first submission.

5. Caputo, V., V. Kilders, and J.L. Lusk. "Are Consumer Preferences and Demand for Gene-Edited Foods Product Dependent?  An Empirical Investigation of Plant- and Meat-Based Products." *Food Policy*.  In first submission

4. Morrisette, K., M. Mallory, J.L. Lusk.  "A Tale of Two Chicken Prices." *Journal of Agricultural and Applied Economics*.  In second submission.

3. Morrissette, K., J.L. Lusk, L. Mueller, and B. Ruffieux.  "Valuing Multiple Types of Information: A Non-Hypothetical Information Display Matrix." *Agricultural Economics*. In first submission.

2. Ellis, S.F., M. Kecinski, K.D. Messer, and J.L. Lusk.  "A Neuroeconomic Investigation of Disgust in Food Purchasing Decisions." *Journal of Economic Behavior and Organization*. In first submission.

1. Ma, M. and J.L. Lusk. "Retailers' Product Assortment Decisions during the Great Recession: Evidence from the U.S. Yogurt Market." *Food Policy*. In first submission

## Chapters in Books *(total = 8)*

8. Lusk, J.L., J. Tack, and N.P. Hendricks. "Heterogeneous Yield Impacts from Adoption of Genetically Engineered Corn and the Importance of Controlling for Weather." in *Agricultural Productivity and Producer Behavior*. W. Schlenker (ed.) University of Chicago Press, 2019. link

7. Lusk, J.L. "Consumer Information and Labeling." in *US Programs Affecting Food and Agricultural Marketing*. W.J. Armbruster and R.D. Knutson (eds). New York: Springer Science + Business Media, 2012.  link

6. Lusk, J.L. "Consumer Preferences for Genetically Modified Food." in *GM Food and Global Welfare*. C. Carter, G. Moschini, and I. Sheldon (eds). Frontiers of Economics and Globalization. Volume 10, Bingley, UK: Emerald, 2011.

5. Lusk, J.L.  "Experimental Auction Markets for Studying Consumer Preferences." in *Consumer Driven Innovation in Food and Personal Products*. H. MacFie and S. Jaeger (eds). Cambridge, UK: Woodhead, 2010.

4. Lusk, J.L. and K.O. Coble.  "Risk Aversion in the Presence of Background Risk: Evidence from the Lab" in *Risk Aversion in Experiments*. J.C. Cox and G.W. Harrison (eds). Research in Experimental Economics. Volume 12. Bingley, UK: Emerald, 2008.

3. Norwood, B., J.L. Lusk, and T. Boyer.  "Forecasting Hypothetical Bias: A Tale of Two Calibrations."  in *Experimental Methods, Environmental Economics*. T.L. Cherry, S. Kroll and J.F. Shogren (eds).  New York: Routledge, 2008.

2. Lusk, J.L. and M. Rousu.  "Market Price Endogeneity and Accuracy of Value Elicitation Mechanisms."  in *Using Experimental Methods in Environmental and Resource Economic*.  J.A. List (ed).  Northhampton, MA: Edward Elgar Publishing, 2006.

1. Purcell, W. and J.L. Lusk.  "Demand for Red Meats: Principles, Research Evidence, and Issues."  in *Economics of Red Meat and Dairy Industries*.  S. Koontz (ed).  The Veterinary Clinics of North America: Food Animal Practice. Volume 19. No. 2. Philadelphia, PA: W.B. Saunders Company, 2003.

## Selected Other Writings, Editorials, and Popular Press

Polzin, S. and J.L. Lusk. "Inflation Hasn't Increased US Food Insecurity Overall." *The Conversation*. January 19, 2023. link

Polzin, S., A. Wahdat, and J.L. Lusk. "Why Food Insecurity Among Gen Z Is So Much Higher than for Other Age Groups." *The Conversation*. August 2, 2022. link

Lusk, J.L. "What is Driving the Increase in Food Prices?" EconoFact.com. November 12, 2021. link

McFadden, B., A. Van Eenennaam, E. Goddard, J.L. Lusk, J. McCluskey, S.J. Smyth, F. Taheripour, W.E. Tyner. "Gains Foregone by Going GMO Free: Potential Impacts on Consumers, the Environment, and Agricultural Producers." Council of Agricultural Science and Technology (CAST). CAST Commentary, QTA2021-2, November 2021.

Ma, M. and J.L. Lusk. "Concentration and Resiliency in the U.S. Meat Supply Chains." *National Bureau of Economic Research (NBER)*. Working Paper 29103. July 2021. link

Lusk, J.L. and B.R. McFadden. "Consumer Food Buying During a Recession." *Choices*. Quarter 3, 2021. link

Malone, T., and J.L. Lusk. "No Yolk: Shortages and Spikes in the Time of COVID." Featured article at the Library of Economics and Liberty (EconLib). May 3, 2021. link

Lusk, J.L. and M. Boehlje. "For Farmers and Consumers, a Crazy Year in Food." December 16, 2020. *Wall Street Journal*. link

Lusk, J.L. "Time for Food Resilience." *City Journal*. August 7, 2020. link

Lusk, J.L. and J. Anderson (editors). "Economic Impacts of COVID-19 on Food and Agricultural Markets." Edited Volume for Council of Agricultural Science and Technology (CAST) and Agricultural and Applied Economics Association (AAEA). June 29, 2020. link

Lusk, J. and G. Tonsor. "America's Indispensable Industry: Long-term strategies are needed to keep the nation's meatpacking plants open and its food supply chain moving." *City Journal*. May 5, 2020. link

Lusk, J. and C. Croney. "Questions and Answers about the Road from Farm to Table." College of Agriculture, Purdue University. April 29, 2020. link

Lusk, J.L. "Time to Give Thanks for Affordable and Sustainable Turkey." *The Conversation*. November 20, 2019. link

Croney, C., J. Mench, W. Muir, J.L. Lusk, et al. "Scientific, Ethical, and Economic Aspects of Farm Animal Welfare." Council for Agricultural Science and Technology, Task Force Report No. 143. April, 2018. link

Lusk, J.L. "Why Industrial Farms are Good for the Environment." *New York Times*. September 25, 2016. link

Lusk, J.L. "The Evolving Role of the USDA in the Food and Agricultural Economy." Mercatus Research, Mercatus Center at George Mason University, Arlington, VA, June 2016. link

Lusk, J.L. "Making Hens Cage-Free? You'll Shell Out for Eggs." *Wall Street Journal*. May 19, 2016. link

Lusk, J.L. "The Future of Meat Lies In a $325,000 Lab-Grown Burger." *Quartz.com*. May 12, 2016. link

Lusk, J.L. "Can I Get That with an Extra GMO?" *Wall Street Journal*. April 26, 2016. link

Lusk, J.L. "Choosing to Cook - or Not." *Salon*. March 23, 2016. link

DeVuyst, E.A., J. Lusk, and C.S. Devuyst. "Eleven Things to Know about GMOs." Oklahoma Cooperative Extension Service Facts Sheet. AGEC-1059. 2016. link

Lusk, J.L. and S. Murray. "New Tool (FooDS) Identifies Consumers' Views on Food Safety." *Choices*. October, 2014. link

Lusk, J.L. "Should the Government Tax Sugary Soda? *Congressional Quarterly (CQ)*. October 3, 2014, pg 833. link

Lusk, J.L. "In Defense of Frankenfoods." *Milken Institute Review*. Fourth Quarter 2014, pg 30-41. link

Lusk, J.L. "Cheeseburgers Won't Melt the Polar Ice Caps." *Wall Street Journal*. August 18, 2014. link

Lusk, J.L. and H.I. Miller. "We Need GMO Wheat." *New York Times*. February 2, 2014. link

Lusk, J.L. "Horsemeat Burgers Not Likely in America." *The Oklahoman*. March 1, 2013. link

Norwood, F.B. and J.L. Lusk. "Animal Welfare and Food Safety." *Food Safety Magazine*. February/March, 2013. link

Lusk, J.L. "The Food Police are Routed at the Ballot Box." *Wall Street Journal*.  November 11, 2012. link

Kalaitzandonakes, N. and J. Lusk.  "Who Will Cover the Costs of California's Prop. 37?"  *Forbes.com*. November 2, 2012. link

Tonsor, G.T., J.L. Lusk, T.C. Schroeder. And M.R. Taylor.  "Mandatory Country of Origin Labeling: Consumer Demand Impact."  Kansas State University, Department of Agricultural Economics, Facts Sheet.  Publication: AM-GTT-2012.6, November 2012. link

Lusk, J.L. and B. McFadden.  "Californians Want to Know What Is in Their Food. We'll Tell Them."  *Huffington Post*. October 11, 2012. link

Corbin, M., J.L. Lusk, and F.B. Norwood.  "Nationwide Stall Ban Likely?"  *Feedstuffs*, May 18, 2012. link

Ellison, B. and J.L. Lusk.  "Taxpayer Preferences for USDA Expenditures." *Choices*.  July, 2011.  link

Norwood, F.B. and J.L. Lusk.  "What Consumers Think about Caging Livestock." *Editor's Pick*, Oxford University Press Blog.  July, 2011.  link

Lusk, J.L. and F.B. Norwood.  "The Locavore's Dilemma." Featured article at the *Library of Economics and Liberty* (*EconLib*). January 3, 2011. link
Reprinted in: *Academic Universe: Research and Writing at Oklahoma State University* 2nd ed.  Plymouth, MI: Hayden-McNeil, (2012):27-34.

Norwood, F.B. and J.L. Lusk.  "The Farm Animal Welfare Debate." *Choices*. Vol. 24, 3rd Quarter, 2009.

Lusk, J.L. and K. Brooks.  "Public Acceptance of Animal Cloning in the Food Supply Chain." *Feedstuffs*. Vol. 81, No. 17, April 27, 2009, pg 5.

Norwood, F.B., J.L. Lusk, and R. Prickett. "Consumers Share Views on Farm Animal Welfare."  *Feedstuffs* vol. 79, no. 42, October 8, 2007, pg. 14-17.

Dutton, J., C. Ward, and J. Lusk.  "Extent and Value of Retail Beef Brands."  Oklahoma Cooperative Extension Service Facts Sheet. AGEC-611.  2007.

Lusk, J.L. and J. Akridge, "Consumer Acceptance of GMOs in US and Europe and Strategic Implications." *Seed World*.  February 2004.

Lusk, J.L.  "Branded Beef.  Is It What's for Dinner?" *Choices*.  2nd Quarter, 2001, 27-30.

**Grant Activity** *(total funded research projects = 30; total award amount = $6,691,329)*

*Summary of Funded Research*

| Duration of Grant | Title | Source of Grant | Contract Amount | Collaborators | Role |
|---|---|---|---|---|---|
| 3/22-2/25 | [ad] | USDA NIFA | $649,517 | Tolhurst, Balagtas, Kilders | Co-PD |
| 10/22-9/23 | [ac] | USB[9]-FFAR | $742,293 | Rainey | PD |
| 8/22-11/22 | [ab] | USB[9] | $40,000 | --- | PD |
| 12/22-3/22 | [aa] | USB[9] | $20,000 | --- | PD |
| 9/21-10/23 | [z] | USDA ERS | $75,000 | --- | PD |
| 9/21-10/23 | [y] | USDA ERS | $95,000 | Widmar | Co-PD |
| 9/21-9/22 | [x] | USDA OCE | $70,000 | Ma | Co-PD |
| 8/20-12/20 | [w] | AgriNovus | $50,000 | Ernst and Young | PD |
| 8/20-7/22 | [v] | FFAR-Microsoft[8] | $506,743 | --- | PD |
| 4/19-4/22 | [u] | Texas A&M[7] | $83,482 | Palma, Caputo | PD |
| 5/19-5/22 | [t] | Miss State[6] | $45,163 | Maples, Peel, Tonsor | PD |
| 1/15-12/17 | [s] | USDA NIFA | $485,432 | Tonsor | PD |
| 1/15-12/17 | [r] | Kansas State[5] | $129,982 | Tonsor, Norwood et al. | PD |
| 9/11-8/15 | [q] | Cornell[4] | $145,762 | Reisch et al. | PD |
| 2/11-1/13 | [p] | USDA NIFA | $499,677 | Bruce, Crespi | PD |
| 1/11-12/15 | [o] | USDA NNF | $234,000 | Epplin et al. | Co-PD |
| 4/10-3/12 | [n] | Kansas State[3] | $96,513 | Tonsor et al. | PD |
| 8/08-7/09 | [m] | Texas Tech U[2] | $11,351 | Thompson et al. | PD |
| 8/09-7/14 | [l] | USDA NNF | $234,000 | Epplin et al. | Co-PD |
| 1/08-12/10 | [k] | USDA NRI | $205,379 | Briggeman | PD |
| 1/08-12/10 | [j] | USDA NRI | $201,049 | Norwood | Co-PD |
| 6/07-8/07 | [i] | Am. Farm Bur. | $23,961 | Norwood | Co-PD |
| 5/06-8/07 | [h] | OK Beef Co. | $8,610 | Ward | Co-PD |
| 10/03-9/04 | [g] | USDA RBCS | $1,000,000 | Akridge, Boelhje et al. | Co-PD |
| 6/04-5/06 | [f] | Purdue ARP | $32,000 | Tanner-Ehmke | PD |
| 9/03-8/05 | [e] | USDA NRI | $83,999 | Norwood | PD |
| 9/02-9/04 | [d] | NICPRE | $12,916 | --- | PD |
| 9/00-8/05 | [c] | USDA IFAFS[1] | $780,000 | House, Traill et al. | PD[1] |
| 6/01-6/03 | [b] | USDA NRI | $112,000 | Schroeder | PD |
| 3/01-3/02 | [a] | USDA ARS | $17,500 | --- | PD |
| **Total** | | | $6,691,329 | | |

[ab]Alternative Data to Measure Food-Away-from-Home Markets and their Resiliency; [ac]Economic Impact of Competing Soy Investment Alternatives; [ab]Modeling Food System Wide Impacts of Increase in Demand for Soybean Oil; [aa] Oil Passthrough Rates in Selected Retail Food Products; [z]Impacts of Shifts in Demand for Plant Based Meat on Land, Water, and Greenhouse Gas Emissions; [y]Market Assessment and Public Interest in Livestock and Poultry Products with Reduced Carbon Footprint; [x]Livestock and Meat Supply Chain Resilience and Constraints Project; [w]Impacts of COVID19 on Indiana Food Supply Chains; [v]Food and Agricultural Vulnerability Index; [u]Choice Behavior and Demand for Alternative Genetically Engineered Foods: A Neuro-economics Investigation; [t]Consumer and Societal Impacts of More Efficient Animal Protein Production; [s]Using Consumer Tracking Survey to Understand and Forecast Changes in Consumer Demand for Disaggregated Meat Products; [r] Causes and Consequences of the Unfunded Mandate Following Differences in Voting and Buying Behavior; [q]Accelerating grape cultivar improvement via phenotyping centers and next generation markers ;[p]Neuroeconomics of

Controversial Food Technologies; [o]Food and Agricultural Sciences National Needs Graduate Fellowships in Agricultural Management and Economics; [n]Ex Post Impact of MCOOL; [m]Pilot Program to Enhance U.S. Beef Exports to Vietnam; [l]Food and Agricultural Sciences National Needs Graduate Fellowships in Agricultural Management and Economics; [k]Consumer Preferences for Fairness and Distribution of Outcomes across the Agricultural Supply Chain and within the Farm Sector; [j]U.S. Consumer Preference for Farm Animal Well-Being; [i]Consumer Preferences for Farm Animal Welfare; [h]Consumers' Revealed Preferences for Branded Fresh Beef Products; [g]Agricultural Innovation and Commercialization Center; [f]Economic Dimensions of International Consumer Preferences; [e]Effects of a Ban on Antibiotic Drug Use in Livestock Production; [d]Effects of Beef Quality Heterogeneity on Commodity Promotion; [c]Acceptance of GM Food in the US and EU; [b]Experimental Auctions and External Validity; [a]Economics of Golden Rice Production; [1]:Lusk was PD prior to moving to Purdue; [2]Lusk is PD on subcontract, original source of funds ($102,000) is from USDA AMS. [3]Lusk is PD on subcontract, original source of funds ($376,341) is from USDA AFRI. [4] Lusk is PD on subcontract, original source of funds ($2,091,357) is from USCA SCRI; both amounts do not include matching. [5]Lusk is PD on subcontract, original source of funds ($484,414) is from USDA AFRI. [6]Lusk is PD on subcontract, original source of funds ($495,000) is from USDA AFRI. [7]Lusk is PD on subcontract, original source of funds ($495,000) is from USDA AFRI. [8]Listed amount includes $221,743 from Foundation for Food and Agricultural Research (FFAR) and a match from Microsoft. [9] USB is United Soybean Board.

**Presentations** (note: only presentations given by Lusk are listed)

*Invited and Keynote Presentations (total = 251)*

"The Future of Beef." Invited presentation in the "Future of the Beef Supply Chain" conference at Texas A&M University. April, 2023.

"Opportunities and Challenges for the Beef Industry." Keynote address for National Cattlemen's Beef Association, Beef Science Summit. Denver, CO. April, 2023.

251. Lusk, J.L. "Economic Factors Affecting the Frozen Food Industry. Keynote presentation to the American Frozen Food Institute annual convention. San Diego, CA. February 2023.

250. Lusk, J.L. "Consumer Trends Facing the Beef Industry." Keynote Presentation to the Indiana Beef Cattle Association annual convention. Indianapolis, IN. January 2023.

249. Lusk, J.L. "Consumer Trends Facing the Pork Industry." Keynote Presentation to the Midwest Pork Conference. Lebanon, IN. December 2022.

248. Lusk, J.L. "Consumer Trends Facing the Chicken Industry." Keynote Presentation to the National Chicken Council annual convention. Washington, DC. October 2022.

247. Lusk, J.L. "Understanding Food System Risks and Vulnerabilities through the COVID19 Disruptions." Invited presentation at Department of Homeland Security (DHS) Office of Health Security Health, Food, and Agriculture Resilience Directorate, University Consortium Meeting. West Lafayette, IN. October 2022.

246. Lusk, J.L. "US Agriculture and Global Food Security." Presentation to BASF U.S. Crop leadership team. West Lafayette, IN. October 2022.

245. Lusk, J.L. "#Meat: Social Media Conversations about Pork." Invited presentation to the National Pork Board. Des Moines, IA. October 2022.

244. Lusk, J.L. "Economic Issues Facing Egg Producers." Invited presentation at Shell Egg Academy. West Lafayette, IN. September, 2022.

243. Lusk, J.L. "Future of Food and Agriculture." Invited keynote presentation at Ivy Tech Community College Evening on the Farm Event. Lafayette, IN. September, 2022.

242. Lusk, J.L. "Socio-Economic Impacts of Increasing Alternative Protein Intake in the Diet." National Academies of Science, Engineering, and Medicine (NASEM) Food and Nutrition Board. Food Forum Workshop on Alternative Protein Sources: Balancing Food Innovation, Sustainability, Nutrition, and Health. Washington, DC. August 2022.

241. Lusk, J.L. "State of Indiana Ag Economy." Invited presentation to Indiana Legislative

Rural Caucus, Indiana State Fair, Indianapolis, IN.  August 2022.

240. Lusk, J.L.  "Global Agricultural Outlook and Impacts on US Crop Input Industry."  Invited Keynote Address.  Meristem Breakthrough to Excellence Conference, Delavan, WI.  August 2022.

239. Lusk, J.L.  "Food System Vulnerabilities."  Invited seminar, Department of Agricultural Economics, University of Arkansas, Fayetteville, AR.  July 2022.

238. Lusk, J.L. "The Future of Food."  Invited Keynote in Lecture Series in Honor of Bharat Ratna Professor C.N.R. Rao.  Indian Institute for Technology, Madras and Indian Institute for Technology, Delhi, India, May 2022.

237. Lusk, J.L. "Food System Vulnerabilities."  Invited presentation at US Cyberstructure and Infrastructure Security Agency Food and Agriculture Sector Joint Membership Meeting.  April 2022.

236. Lusk, J.L. "Current Challenges facing the Pork Industry."  Invited keynote presentation.  Iowa Pork Congress. Des Moines, IA. January 2022

235. Lusk, J.L. "Understanding Risks & Vulnerabilities via Food Systems Dashboards."  Invited Presentation for Purdue College of Agriculture, Digital Agriculture Seminar Series. West Lafayette, IN. December, 2021.

234. Lusk, J.L. "Market for Plant Based Meat Alternatives."  Invited Presentation for Alternatives Meat Lab, University of California, Berkeley.  October, 2021.

233. Lusk, J.L. "The Future of Beef and Cattle."  Invited presentation for Zoetis, Mexico.  October, 2021.

232. Lusk, J.L. "Food Price Inflation."  Invited webinar for U.S. Chambers of Commerce.  September 2021.

231. Lusk, J.L. "Food Price Inflation."  Invited webinar for Heritage Foundation.  September 2021.

230. Lusk, J.L. "Understanding Behavior in Response to Food Marketing and Policy Positions."  Invited Keynote Presentation for Pangborn Sensory Science Symposium.  August 2021.

229. Lusk, J.L. "Keeping Beef at the Center of the Plate" Invited Keynote Presentation for Cattlemen's College at National Cattlemen's Beef Association Annual Convention.  Nashville, TN.  August 2021.

228. Lusk, J.L. "Market for Plant Based Meat Alternatives."  Invited presentation for Good Food Institute small group roundtable.  August, 2021.

227. Lusk, J.L. Testimony before the U.S. House Committee on Agriculture. Washington D.C. July 2021.

226. Lusk, J.L. "Future Challenges." Invited presentation for Board of Directors for Co-Alliance. Indianapolis, IN. July 2021.

225. Lusk, J.L. "The Challenges and Opportunities of Defining and Improving Sustainability in Food and Agriculture." Invited presentation for Ospraie Ag Science. Park City, UT. July 2021.

224. Lusk, J.L. "Policy Responses to COVID-19." Invited presentation for International Consortium on Applied Bioeconomy Research. June 2021.

223. Lusk, J.L. "Lessons about Supply Chains from the Pandemic." Invited presentation for the National Council for Farmer Cooperatives, Board of Directors. June 2021.

222. Lusk, J.L. "Policies Affecting Meat Consumption." Invited presentation for European Association of Environmental and Resource Economists. June 2021.

221. Lusk, J.L. "Opportunities for Pork." Invited keynote address for National Pork Producer's Council at World Pork Expo. Des Moines, IA, June 2021.

220. Lusk, J.L. "Food Values." Invited seminar for the Organisation for Economic Co-operation and Development. May 2021.

219. Lusk, J.L. "5 Pork Supply Chain Disruptors in a Post-COVID World." Invited webinar for the National Pork Board. May 2021.

218. Lusk, J.L. "COVID Impacts on Livestock Supply Chains." Center for Animal Welfare Science Symposium, College of Veterinary Medicine, Purdue University, May 2021.

217. Lusk, J.L. "Consumer Preferences for and Market Potential of Plant-Based Meat Alternatives." Invited Research Seminar, University of California, Berkeley, Department of Agriculture and Resource Economics, April 2021.

216. Lusk, J.L. "The Future of Poultry." Invited presentation for Zoetis company meeting. April, 2021.

215. Lusk, J.L. "Economics, Nutrition, Society and Sustainability." Invited presentation in Purdue University Webinar on Cellular Agriculture, April 2021.

214. Lusk, J.L. "The Future of Beef and Dairy." Invited presentation for Zoetis company meeting. April, 2021.

213. Lusk, J.L. "Meat Alternatives." Invited presentation for Board of Directors, Indiana Soybean Alliance. March, 2021.

212. Lusk, J.L. "Diversification 101: Beyond Corn and Soy." Invited presentation for Indiana Farm Bureau and Indiana Agriculture Coalition for Renewable Energy. March, 2021.

211. Lusk, J.L. "Impact of COVID on the Cattle Industry." Invited keynote presentation for Cattlemen's Day, Department of Animal Science, Kansas State University. March, 2021.

210. Lusk, J.L. "The COVID Effect Are Consumers Still Hungry for Beef?." Invited keynote address for National Cattlemen's Beef Association, Cattlemen's College. February, 2021.

209. Lusk, J.L. "Impact of COVID19 on Food Consumers and U.S. Agriculture." Invited keynote address for Florida Agricultural Policy Outlook Conference, University of Florida. February, 2021.

208. Lusk, J.L. "Economic Factors Facing the Turkey Industry." Invited keynote address for National Turkey Federation annual conference. February, 2021.

207. Lusk, J.L. "Consumer Behavior Trends." Invited presentation for Illinois Farm Bureau, January, 2021.

206. Lusk, J.L. "Basket Based Choice Experiment." Invited research seminar Land, Environment, Economics, and Policy (LEEP) Institute, University of Exeter, UK, January 2021.

205. Lusk, J.L. "Plant Based Protein Trends." Invited presentation for Board of Directors, Open Prairie Ventures, January 2021.

204. Lusk, J.L. "Consumer Behavior is Changing. What Does It Mean for U.S. Agriculture?" Invited presentation, Top Farmer Conference, Center for Commercial Agriculture, Purdue University, January 2021.

203. Lusk, J.L. "The Pandemic and Consumer's Future Food Choices." Invited keynote address for Federal Reserve Bank of Chicago conference on Midwest Agriculture and Shifting Consumer Preferences, December 2020.

202. Lusk, J.L. "Purdue Food and Agricultural Vulnerability Index." Invited presentation at Johns Hopkins Bloomberg School of Public Health, Geographic Information Systems (GIS) symposium, November 2020.

201. Lusk, J.L. "Food Policy: The Good, the Bad, and the Ugly." Invited virtual keynote address to the China Agricultural Economic Review (CAER) – International Food Policy Research Institute (IFPRI) annual conference, Chongquin, China, October, 2020.

200. Lusk, J.L. "Food Policy." Invited presentation for Agriculture and Agri-food Canada, Ottawa, Canada, October, 2020.

199. Lusk, J.L. "Changes in Consumer Demand."  Invited virtual presentation for National Pork Board.  October, 2020.

198. Lusk, J.L. "Sustainability, Consumers, and Economics."  Invited presentation for the Food and Nutrition Conference and Expo (FNCE), Academy of Nutrition and Dietetics, October, 2020.

197. Lusk, J.L. "COVID19, Consumers and the Food Supply Chain."  Invited keynote address for the Delmarva Poultry Industry National Virtual Meeting, September, 2020.

196. Lusk, J.L.  "The Future of Agribusiness in a Volatile Environment."  Invited keynote address for the United States Soybean Export Council, Americas Agricultural Buyers Virtual Conference.  September, 2020.

195. Lusk, J.L. "Food and Agricultural Policy."  Invited presentation for the Indiana Agricultural Leadership Program.  Lafayette, IN, September, 2020.

194. Lusk, J.L. "COVID19 Impacts on Food and Agricultural Supply Chains."  Invited webinar for the North Central Regional Association, Mini Land-Grant Meeting.  July, 2020.

193. Lusk, J.L.  "COVID19 Impacts on Beef Markets."  Invited webinar for South Dakota Farm Bureau.  July, 2020.

192. Lusk, J.L.  "Economic Impacts of COVID19 on Food and Agricultural Markets."  Invited webinar for National Coalition for Food and Agricultural Research (NCFAR), Lunch-N-Learn Hill Research Seminar Series.  June, 2020.

191. Lusk, J.L.  "Meat Supply During the Pandemic and Beyond."  Invited webinar for the Heritage Foundation, Washington, D.C., June, 2020.

190. Lusk, J.L.  "Economic Impacts of COVID19 on Food and Agricultural Markets."  Invited webinar for International Food Information Council (IFIC).  May, 2020.

189. Lusk, J.L.  "Economic Impacts of COVID19 on Food and Agricultural Markets."  Invited webinar for Farmdoc, University of Illinois.  May, 2020.

188. Lusk, J.L.  "Consumer Drivers Affecting Agriculture."  Invited keynote address for Nebraska Cooperative Council.  Lincoln, NE, February, 2020.

187. Lusk, J.L.  "Challenges Facing Food and Agriculture.  Invited keynote address for FarmTech Conference.  Edmonton, Canada, January, 2020.

186. Lusk, J.L.  "To Infinity and Beyond: Meat."  Invited plenary address for Indiana Beef Cattle Association.  Indianapolis, IN, January, 2020.

185. Lusk, J.L.  "Challenges Facing Food and Agriculture." Invited keynote address for Indiana

Agribusiness Council.  Indianapolis, IN, January, 2020.

184.  Lusk, J.L.  "To Infinity and Beyond: Meat."  Invited keynote presentation for Tiffin Conference by Lethbridge College School of Agriculture.  Lethbridge, Canada, January 2020.

183.  Lusk, J.L.  "Meat the Future."  Invited presentation for Indiana Farm Bureau State Convention.  French Lick, IN, November, 2019.

182.  Lusk, J.L.  "The Future of Food."  Invited keynote address for the Missouri Farm Bureau State Convention.  Osage Beach, MO, November, 2019.

181.  Lusk, J.L. "Challenges and Opportunities for the Chicken Industry."  Invited plenary address for the National Chicken Council annual conference.  Washington, D.C., October, 2019.

180.  Lusk, J.L.  "Consumer Perceptions of Healthy Food."  Invited presentation for the Corn Refiners Association.  Washington, D.C., October, 2019.

179.  Lusk, J.L.  "Meat the Future."  Invited presentation for President's Council Back to School. Purdue University.  West Lafayette, IN, October 2019.

178.  Lusk, J.L. "Disruption in the Protein Sector."  Invited presentation for the Purdue Food and Agribusiness Executive Summit.  West Lafayette, IN, October 2019.

177.  Lusk, J.L. "Behavioral Economics and the Veterinary Profession." American Veterinary Medical Association Annual Economic Summit. Chicago, IL, October, 2019.

176.  Lusk, J.L. Testimony before the U.S. Senate Committee on Agriculture, Nutrition, and Forestry on livestock and poultry issues.  Washington D.C., September 2019.

175.  Lusk, J.L. "Future of Animal Agriculture."  Invited keynote address at Elanco Feedlot Forum.  Omaha, NE, August, 2019.

174.  Lusk, J.L.  "Consumer Trends and Impacts on the Agricultural Productivity and the Future Food System." Invited keynote address at Advancing Animal Welfare Together Symposium, a Merck Animal Health Event, Fair Oaks Farms, IN, August, 2019.

173.  Lusk, J.L. "Challenges in Food and Agriculture."  Tom Farms annual landlord dinner. Leesburg, IN, August, 2019.

172.  Lusk, J.L. "Future of Food and Agriculture: Trends, Opportunities, and Challenges Ahead." Invited keynote address at Mississippi Farm Bureau Summer Policy Conference. Starkville, MS, June 2019.

171. Lusk, J.L. "GMOs: From Farm to Fork." Invited keynote address at Indiana Life Sciences Collaboration Conference on the Intersection of Food, Diet, and Healthcare. Indianapolis, IN, May 2019.

170. Lusk, J.L. "Meat Your Future." Invited presentation for Corteva. Indianapolis, IN, May 2019.

169. Lusk, J.L. "Impact of Consumer Trends on Investment Opportunities in Agriculture." Invited keynote presentation at Food and Ag at the Intersection Conference. Omaha, NE, May, 2019.

168. Lusk, J.L. "Future of Food." Invited lecture for North Dakota State University Center for the Study of Public Choice and Private Enterprise, Fargo, ND, May 2019.

167. Lusk, J.L. "Diversification in Consumer Demands." Invited keynote presentation at University and Industry Consortium annual meeting. Madison, WI, April, 2019.

166. Lusk, J.L. "Consumer Trends and Impacts on Agricultural Productivity and the Future Food System." Gary-Filley Lecture, University of Nebraska, Lincoln, NE, April, 2019.

165. Lusk, J.L. "Animal Welfare Labels." Invited research presentation for the Center for Animal Welfare Science, College of Veterinary Medicine, Purdue University, February, 2019.

164. Lusk, J.L. "Unnaturally Delicious." Invited presentations at North Central Texas College as a part of the College's "common read" program. Denton, TX, March 2019.

163. Lusk, J.L. "The Food Police and the Future of Food." Invited presentation in the Series on Economic Prosperity, Department of Economics, Kansas State University, Manhattan, KS, February 2019.

162. Lusk, J.L. "Future of Food." Invited keynote address at the Kansas Women's Managing the Farm Conference. Manhattan, KS, February 2019.

161. Lusk, J.L. "Consumer Trends." Invited presentation at the Indiana Farm Bureau state convention, Ft. Wayne, IN, December 2018.

160. Lusk, J.L. "Future of Food." Invited keynote speaker at the Federal Reserve Bank of Atlanta Public Affairs Forum, Atlanta, GA. September 2018.

159. Lusk, J.L. "Effects of Retailer Regulation in the Egg Market." Invited research seminar at the Atlanta Federal Reserve Bank, Atlanta, GA. September, 2018.

158. Lusk, J.L. "Consumer Attitudes and Trends on Animal Agriculture Production and Pet Food." National Grain and Feed Association and Pet Food Institute Joint Conference, St. Louis, MO. September, 2018.

157. Lusk, J.L.  "Agricultural Outlook."  Invited keynote address at Nationwide Insurance Leadership Conference, Nemacolin, PA. July, 2018.

156. Lusk, J.L.  "Consumer Trends and Impacts on the Food System."  Invited keynote address at Indiana Farm Bureau company meeting, Atlanta, IN. June, 2018.

155. Lusk, J.L.  "Consumer Trends and Impacts on the Food System." Invited keynote address at CGB company-wide meeting, Chicago, IL. June, 2018.

154. Lusk, J.L. Economics of Biotech in Livestock."  Invited plenary address at International Consortium on Applied Bioeconomy Research (ICABR), World Bank, Washington, D.C. June, 2018.

153.  Lusk, J.L.  "Consumer Trends and Impacts on the Food System."  Invited address at Land O'Lakes. Minneapolis, MN. June, 2018

152.  Lusk, J.L.  "Food and Farm Policy."  Presentation to participants in Land O'Lakes Global Food Challenge, Minneapolis, MN. June, 2018

151.  Lusk, J.L.  "Economics of Agricultural Productivity."  Presentation to participants in Borlaug Summer Institute on Global Food Security, West Lafayette, IN. June, 2018

150.  Lusk, J.L. "Consumer Preferences for Cage Free Eggs and Slow Growth Chickens." Animal Agriculture Alliance, Washington, D.C., May, 2018

149.  Lusk, J.L. "The Politicization of Food Consumption and Communication."  Invited seminar in Department of Agricultural, Food, and Resource Economics at Michigan State University, East Lancing, MI., April, 2018.

148.  Lusk, J.L. "The Politicization of Food Consumption and Communication."  Presentation for Council of Agricultural Science and Technology, USDA, Washington, D.C., April, 2018.

147.  Lusk, J.L. "Consumer Preferences for Cage Free Eggs and Slow Growth Chickens."  Food Marketing Institute, Washington, D.C., April, 2018.

146.  Lusk, J.L.  "Emerging Trends Impacting Agricultural Markets."  Schrader Auction Company Annual Meeting.  Columbia City, IN.  March 2018.

145.  Lusk, J.L.  "Consumer Trends and Impacts on the Food System."  National Grain and Feed Association, Scottsdale, AZ. March, 2018

144.  Lusk, J.L.  "The Cost of Happy Hens."  TEDx event, Purdue University.  March 2018. link

143.  Lusk, J.L.  "Farm Bill Impacts on Agricultural Economy."  Bayer Forum, Anaheim,

CA. February, 2018.

142. Lusk, J.L. "Consumer Trends." Association of Agricultural Production Executives (AAPEX) annual meeting, New Orleans, LA, February, 2018.

141. Lusk, J.L. "Consumer Trends." Top Farmer Conference. West Lafayette, IN. January, 2018

140. Lusk, J.L. "Communicating about the Future of Food." AgriTrends, Calgary, Canada, December 2017.

139. Lusk, J.L. "Future of Food." George Morris AgriFood Policy Lecture, University of Guelph, Canada, November, 2017.

138. Lusk, J.L. "Economic Challenges in Communicating about the Future of Food." Borlaug CAST Communication Award Ceremony, Des Moines, IA, October, 2017.

137. Lusk, J.L. "Eating Sustainably." Invited plenary speaker at Breakthrough Dialog, San Francisco, CA, June 2017.

136. Lusk, J.L. "Challenges Facing the Beef Industry." Invited keynote address to the California and Arizona Cattlemen's Association annual meeting, San Diego, CA, May 2017.

135. Lusk, J.L. "Future of Food." Invited public lecture for Agricultural Awareness Week, College of Agriculture and Free Market Institute, Texas Tech University, April 2017.

134. Lusk, J.L. "Understanding Consumer Preferences to Enhance Well-being and Food Security." Invited presentation at the AAEA, CFARE release of priorities and solutions documents, National Press Club, Washington DC, April, 2017.

133. Lusk, J.L. "Economics of and Consumer Attitudes toward Sustainability." Invited presentation at National Cattlemen's Beef Association, Nutrition and Sustainability Symposium. Denver, CO, March 2017.

132. Lusk, J.L. "Food and Agricultural Controversies." Invited presentation in Distinguished Lecture Series. West Texas A&M University, Canyon, TX, February, 2017.

131. Lusk, J.L. "Future Directions for Consumer Research in Economics." Keynote presentation at Winter Workshop on Behavioral and Experimental Economics of Food Consumption. Autrans, France. January 2017.

130. Lusk, J.L. "Food Policy." Invited keynote address, GrowCanada Conference, Ottawa Canada, December 2016.

129. Lusk, J.L. "The Future of Food." M.L. Wilson Lecture, Montana State University,

November 2016.

128. Lusk, J.L. "Consumer Trends and Impacts on the Future Food System." J.W. Fanning Lecture, University of Georgia, November 2016.

127. Lusk, J.L. "The Future of Food." E.T. York Distinguished Lecturer, Auburn University, October 2016.

126. Lusk, J.L. "Am I Getting a Good Deal? Reference-Dependent Decision Making with the Reference Price is Uncertain." Invited presentation in departmental research seminar for Department of Agricultural Economics and Rural Sociology, University of Idaho, Moscow, ID, September 2016.

125. Lusk, J.L. "The Future of Food." Invited presentation at the K-State Cooperatives Symposium, Manhattan, KS, August 2016.

124. Lusk, J.L. "An Ex Post Analysis of the Cost of Animal Welfare Regulations." Invited presentation in departmental research seminar for Department of Agricultural Economics, Kansas State University, Manhattan, KS, August 2016.

124. Lusk, J.L. "Consumer Research with Big Data: Applications from the Food Demand Survey (FooDS)." Presidential Address, Agricultural and Applied Economics Association annual meeting, Boston, August 2016.

122. Lusk, J.L. "Consumer Trends Shaping the Future of Food." Invited keynote address at Farm Foundation Roundtable, Louisville, KY, June 2016.

121. Lusk, J.L. "Evaluating the Policy Proposals of the Food Movement." Invited presentation at Agricultural policy Workshop, American Enterprise Institute, Washington DC, May 2016.

120. Lusk, J.L. "Consumer Insights and Food Trends." Invited presentation at the FoodBev Forum, Miami, FL, May 2016.

119. Lusk, J.L. "Consumer and Food Issues." Invited presentation at the Priorities for Agricultural and Applied Economics workshop, Washington DC, May 2016.

118. Lusk, J.L. "The Food Demand Survey (FooDS)." Invited presentation in departmental research seminar for Department of Applied Economics, University of Minnesota, St. Paul, MN, February, 2016.

117. Lusk, J.L. "The Future of Agriculture." Invited keynote address, DuPont-Pioneer young farmer's conference, Minneapolis, MN, February, 2016.

116. Lusk, J.L.  "When a Foodie Meets and Economist."  Keith Campbell Distinguished Lecture given at the Australian Agricultural and Resource Economics Society annual meeting, Canberra, Australia, February, 2016.

115. Lusk, J.L. "Big Trends in Agriculture." Invited keynote presentation for the American Soybean Association's Soybean Leadership College.  Orlando, Florida, 2016.

114. Lusk, J.L. "Talking to Consumers." Invited keynote presentation for the Iowa Cattlemen's Association annual convention, Des Moines, Iowa, December, 2015.

113. Lusk, J.L. "Labeling and Consumer Behavior." Invited keynote address at the Conference on Coexistence between Genetically Modified (GM) and non-GM based Agricultural Supply Chains, Amsterdam, Netherlands, November, 2015.

112. Lusk, J.L. "The Food Demand Survey (FooDS)." Invited presentation in departmental research seminar for Department of Agricultural and Resource Economics, University of California, Davis, CA, November 2015.

111. Lusk, J.L. "An Ex Post Analysis of the Cost of Animal Welfare Regulations." Invited presentation in departmental research seminar for Department of Agricultural Economics University of Nebraska, Lincoln, NE, October 2015.

110. Lusk, J.L. "Consumer and Policy Trends that Could Affect Your Bottom Line." Southern Plains Beef Symposium. Ardmore, OK, August 2015.

109. Lusk, J.L. "Future Consumer and Economic Trends in Pork."  Zoetis Pork Value Chain Executive Forum, Naples, FL, April, 2015.

108. Lusk, J.L.  "Distributional Impacts of Fat Taxes and Thin Subsidies."  Invited presentation for the Free Market Institute, Texas Tech University, Lubbock, TX, April 2015.

107. Lusk, J.L. "Agricultural Controversies and the Fight for the Future of Food."  Invited keynote talk at Grocery Manufacturers Association Science Forum.  Washington D.C., April, 2015.

106. Lusk, J.L.  "The Economic Approach to Studying Consumer Behavior."  Invited keynote talk at AAEA-EAAE seminar on Consumer Behavior in a Changing World: Food, Culture, and Society, Naples Italy, March 2015.

105. Lusk, J.L. "Predicting Consumer Choice in Food Price-Technology Tradeoffs Using Functional Magnetic Resonance Imaging."  Invited presentation in departmental research seminar for Department of Agricultural and Resource Economics, University of Connecticut, Storrs, CT, February, 2015.

104. Lusk, J.L. "Alternative Visions for the Future of Food."  Invited University-wide lecture, University of Connecticut, Storrs, CT, February, 2015.

103. Lusk, J.L. "Navigating Controversy: Production Agriculture, Emerging Technologies and the Environmentally Conscious Food Consumer." Bentley Lecture for University of Alberta, Edmonton, Canada, February 2015.

102. Lusk, J.L. "Future of Food." Invited Keynote address to Iowa Farm Bureau Federation Young Farmer Conference. Des Moines, IA. January 2015.

101. Lusk, J.L. "Future of Food." Invited Keynote address to South Carolina Farm Bureau Annual Meeting. Myrtle Beach, SC, December 2014.

100. Lusk, J.L. "Economics of GMO Adoption and Labeling." Invited seminar for Department of Agriculture and Natural Resources, Langston University, Langston, OK, December 2014.

99. Lusk, J.L. "Industry Challenges." Invited address for the National Pork Producers Council, Pork Action Group meeting, Marco Island, FL, November 2014.

98. Lusk, J.L. "The Future of Food and Agriculture." Invited address for the Alpha Gamma Rho Founder's Day Banquet, Kansas State University, Manhattan, KS, October 2014.

97. Lusk, J.L. "Food Challenges and Opportunities." Invited Keynote address to the Pickle Packers International annual meeting and expo, Orlando, FL, October 2014.

96. Lusk, J.L. "The Food Police and the Future of Food." Invited Sigmund Weis Partners Lecturer. Sigmund Weis School of Business, Susquehanna University, Selinsgrove, PA, October, 2014.

95. Lusk, J.L. "Food System Challenges and Opportunities." Invited keynote address to American Feed Industry Association, Executive Leadership Summit. Amelia Island, FL, October, 2014.

94. Lusk, J.L. "Am I Getting a Good Deal? Reference-Dependent Decision Making with the Reference Price is Uncertain." Invited presentation in departmental research seminar for Department of Food and Resource Economics, University of Florida, Gainesville, FL, October 2014.

93. Lusk, J.L. "Predicting Consumer Choice in Food Price-Technology Tradeoffs Using Functional Magnetic Resonance Imaging." Invited presentation in departmental research seminar for Department of Agricultural and Applied Economics, Virginia Tech University, Blacksburg, VA, September 2014.

92. Lusk, J.L. "Consumer Trends as Measured by the Food Demand Survey (FooDS)." Presentation in departmental research seminar for Department of Agricultural Economics, Oklahoma State University, Stillwater, OK, September 2014.

91. Lusk, J.L. "Are You Smart Enough to Know What to Eat? A Critique of Behavioral Economics as Motivation for Public Policy." Invited plenary address for the European Association of Agricultural Economists triennial Congress. Ljubljana, Slovenia, August, 2014.

90. Lusk, J.L. "Strategies for Food Retailers." Invited keynote address for the Iowa Grocery Industry Association. Okoboji, IA, July, 2014.

89. Lusk, J.L. "Future of Food." Invited presentation for the Iowa Soybean Association, Food and Family Project. Ames, IA, July, 2014.

88. Lusk, J.L. "Strategic Directions for the Future of Food and Agriculture." Invited presentation at the American Farm Bureau Federation's Strategic Policy, Advocacy, Resources and Communications Conference. Kansas City, MO, June 2014.

87. Lusk, J.L. "Food Police." Invited keynote address presentation at the American Meat Science Association's Reciprocal Meats Conference. Madison, WI, June 2014.

86. Lusk, J.L. "America's Expanding Waistline: Should Government Intervene and If So, How?" Invited plenary address presentation at the American Association of Clinical Endocrinologist annual meeting. Las Vegas, NV, May 2014.

85. Lusk, J.L. "The Politics of Food." Invited plenary address for PIC Symposium. Nashville, TN, May 2014.

84. Lusk, J.L. "The Changing Food System: Forward or Backward?" Keynote talk to the Global Food Safety Conference, Anaheim, CA, February 2014.

83. Lusk, J.L. "The Challenges of Consumers and Consumer Activism for the Food Sector." Invited address at the American Farmers and Ranchers, Oklahoma Farmers Union annual convention. Norman, OK, February 2014.

82. Lusk, J.L. "GMO Labeling." Invited talk for the Oklahoma Soybean Association annual convention. Stillwater, OK February 2014.

81. Lusk, J.L. "The Future of Food." Invited seminar for the Department of Applied Economics and Statistics, University of Delaware, Newark, DE, January 2014.

80. Lusk, J.L. "Common Sense Food Regulation." Invited keynote address, Delaware Ag Week, Harrington, DE, January 2014.

79. Lusk, J.L. "The Role of Technology in the Fight for the Future of Food." Invited address, American Farm Bureau annual convention, San Antonio, TX, January 2014.

78. Lusk, J.L. "The Future of Food." Invited presentation for the College of Agriculture and Life Sciences, North Carolina State University, Raleigh NC, November 2013.

77. Lusk, J.L. "The Challenges of Consumers and Consumer Activism for the Food Sector." Invited presentation at the Rural Economic Outlook Conference. Oklahoma State University, Stillwater, OK, November, 2013.

76. Lusk, J.L. "The Future of Food." Invited presentation for the Noble Foundation's Profiles and Perspectives Community Enrichment Series. Ardmore, OK, October, 2013.

75. Lusk, J.L. "The Food Police." Invited presentation in the Free Enterprise Lecture Series, Department of Economics, The Ohio State University. Columbus, OH, October, 2013.

74. Lusk, J.L. "The Future of Food." Invited presentation to the Gilliam Center for Free Enterprise and Ethical Leadership, James Madison University. Harrisonburg, VA, October, 2013.

73. Lusk, J.L. "The Economics of Obesity." Invited keynote address at the Illinois Transdisciplinary Obesity Prevention Program. Champaign, IL, October, 2013.

72. Lusk, J.L. "The Future of Food." Invited presentation to the Truth about Trade and Technology board meeting, Ardmore, OK, August 2013.

71. Lusk, J.L. "The Future of Food." Invited presentation to the International Agriculture Leadership Alumni Conference, Oklahoma City, OK, August 2013.

70. Lusk, J.L. "Economic and Consumer Research on Mandatory Labeling of Genetically Modified Food." Invited presentation to the Farm Bureau Southern Region Legislative Conference, Durant, OK, July 2013.

69. Lusk, J.L. "Food Police." Invited keynote address presented at the Merck Cattle Feeders Business Summit, Denver, CO, July, 2013.

68. Lusk, J.L. "What Do Consumers Want? It's Not Always What They Tell You." Invited presentation at the Oscar Mayer Meat Science Summit, Madison, WI, July, 2013.

67. Lusk, J.L. "Lunch with Pigou: Externalities and the 'Hidden' Costs of Food." Invited plenary presentation given at the Northeastern Agricultural and Resource Economics Association annual meeting, Ithaca, NY, June 2013.

66. Lusk, J.L. Panel member at Food Dialogs event hosted by the U.S. Farmers and Ranchers Alliance, Chicago, IL, June, 2013.

65. Lusk, J.L. "An Overview of Approaches to Valuing Data and Information." Invited presentation given the Seminar on Value of USDA Data Products hosted by the Council on Food, Agricultural and Resource Economics (C-FARE), Washington, DC, May 2013.

64. Lusk, J.L. "Challenges Facing the Pork Industry." Keynote address given at the Retail Advisory Meeting of the National Pork Board, New Orleans, LA, April 2013.

63. Lusk, J.L. "Pork Perils." Keynote address given at the Oklahoma Pork Congress, Midwest City, OK, March 2013.

62. Lusk, J.L. "The Promises and Pitfalls of Agricultural Research." Invited presentation given at a departmental research seminar in the Department of Plant and Soil Sciences at Oklahoma State University, Stillwater, OK, February 2013.

61. Lusk, J.L. "Pink Slimed." Invited keynote address given at the Meat and Poultry Research Conference sponsored by the American Meat Institute at the International Production and Processing Expo, Atlanta, GA, January 2013.

60. Lusk, J.L. "The Economics and Politics of Obesity." Invited presentation given in the seminar series run by the Nutrition Obesity Research Center, University of Alabama Medical School, University of Alabama-Birmingham, Birmingham, AL, January 2013.

59. Lusk, J.L. "Ham and Egg-onomics." Public lecture given as the Fred Presant Visiting Lecturer in the Fred Presant Memorial Lecture Series hosted by the Campbell Centre for the Study of Animal Welfare, University of Guelph, Canada, November, 2012.

58. Lusk, J.L. "How Can Economics Help Us Understand Animal Welfare? Invited academic Seminar given as the Fred Presant Visiting Lecturer to the Ontario Agricultural College and the Ontario Veterinary College, University of Guelph, Canada, November, 2012.

57. Lusk, J.L. "A Neuroeconomic Analysis of Consumers' Choice of Food Produced With Controversial Technologies." Invited paper presented at a departmental research seminar at Department of Food, Agricultural, and Resource Economics, University of Guelph, Canada, November, 2012.

56. Lusk, J.L. "The Future of Food." Presentation at TEDx event hosted by Oklahoma State University, Stillwater, OK, November 2012.

55. Lusk, J.L. "The Future of Food." Invited Shepherd Lecture presented to the general public at Kenyon College, Gambier, OH, September 2012.

54. Lusk, J.L. "The Paternalist Meets His Match." Invited presentation given at a departmental research seminar in the Department of Economics at Kenyon College, Gambier, OH, September 2012.

53. Lusk, J.L. "Are You Smart Enough to Know What to Eat? A Critique of Behavioral Economics Applied to Public Policy." Invited presentation given at the Wageningen University School of Social Sciences annual seminar, Wageningen, Netherlands, May 2012.

52. Lusk, J.L. "Animal Welfare." Invited presentation given at the National Academies of Science, Institute of Medicine, Planning Committee on Exploring the True Costs of Food, Washington, D.C., April 2012.

51. Lusk, J.L. "Valuing Information in a Field Experiment." Invited presentation given at the INRA-IDEI Seminar on Quality Labels in the Agrofood Industry, Toulouse School of Economics, Toulouse, France, December, 2011

50. Lusk, J.L. "A Calibrated Auction-Conjoint Mechanism." Invited presentation given in the Department of Marketing and Consumer Research, Technical University of Munich, Freising, Germany, October, 2011.

49. Lusk, J.L. "A Calibrated Auction-Conjoint Mechanism." Invited presentation given at the Paris Environmental and Energy Economics Seminar, Université Paris-Descartes, Paris, France, October, 2011.

48. Lusk, J.L. "Are You Smart Enough to Know What to Eat? A Critique of Behavioral Economics Applied to Public Policy." Invited presentation given at the French National Institute for Agricultural Research (INRA), ALISS (alimentation et sciences socials), Ivry-Sur-Seine, France, September, 2011.

47. Lusk, J.L. "Eating Out and Overeating: Effects of 'Fat Tax' and Calorie Information on Restaurant Food Choices." Invited briefing given to congressional staffers as a part of the National Coalition for Food and Agricultural Research (NC-FAR) Lunch and Learn Seminar series. Washington, DC, May, 2011.

46. Lusk, J.L. "Are You Smart Enough to Know What to Eat? A Critique of Behavioral Economics Applied to Public Policy." Invited presentation at a departmental research seminar in the Department of Agricultural Economics, Texas A&M University, College Station, TX, May, 2011.

45. Lusk, J.L. "Selfishness, Altruism, and Inequality Aversion towards Consumers and Farmers." Invited presentation given in the Economy and Psychology seminar, Paris School of Economics, Paris, France, April, 2011.

44. Lusk, J.L. "Does Nutritional Information on Restaurant Menus Influence Food Choice? A Field Experiment." Invited presentation given at the French National Institute for Agricultural Research (INRA), ALISS (alimentation et sciences socials), Ivry-Sur-Seine, France, April, 2011.

43. Lusk, J.L. "Are You Smart Enough to Know What to Eat? A Critique of Behavioral Economics Applied to Public Policy." Invited presentation at a departmental research seminar in the Department of Agricultural and Applied Economics, University of Wisconsin, Madison, WI, February, 2011.

42. Lusk, J.L. "Influence of Identity and Market-Like Context on Selfishness, Altruism, and Inequality Aversion." Invited paper presented at a departmental research seminar at Department of Food, Agricultural, and Resource Economics, University of Guelph, Canada, October, 2010.

41. Lusk, J.L. "Inferred Valuation." Invited keynote address given at the 1st Conference of the French Association of Experimental Economics, Grenoble, France, September 2010.

40. Lusk, J.L. "Paternalistic Value Elicitation." Invited presentation given as part of Brain Korea's Distinguished Scholars' Lectures Series in the Department of Economics at Sungkyunkwan University, Seoul, South Korea, May, 2010.

39. Lusk, J.L. "Speciesism, Altruism, and the Economics of Farm Animal Welfare." Invited presentation at a departmental research seminar in the Department of Agricultural, Environmental, and Development Economics, The Ohio State University, Columbus, OH, April, 2010.

38. Lusk, J.L. "Food, Farmers, and Fairness." Invited presentation at a departmental research seminar in the Department of Rural Economy, University of Alberta, Edmonton, Alberta, Canada, February, 2010.

37. Lusk, J.L. "Farm Animal Welfare and the American Consumer." Invited keynote address given at a conference on Animal Welfare and Sustainability sponsored by Alberta Agriculture and Rural Development, Edmonton, Alberta, Canada, February 2010.

36. Lusk, J.L. "The Farm Animal Welfare Debate." Invited presentation given at the Kansas, Oklahoma, Missouri, Arkansas (KOMA) annual cattle conference. Dewey, OK, January, 2010.

35. Lusk, J.L. "Evolving Challenges from Consumers." Invited presentation given at Farm Foundation Conference on Agricultural Marketing Policy at the USDA, Economic Research Service, Washington, D.C., December, 2009.

34. Lusk, J.L. "Paternalistic Value Elicitation." Invited paper presented at a departmental research seminar at Department of Agricultural Economics and Agribusiness, University of Arkansas, Fayetteville, AR, October, 2009.

33. Lusk, J.L. "Developments in Experimental Auctions." Invited plenary address given at the Workshop on Valuation Methods in Agro-Food and Environmental Economics hosted by the Centre for Research on Agro-Food and Development Economics (CREDA), European Association of Agricultural Economics (EAAE), and the Spanish-Portuguese Association of Natural Resources and Environmental Economics (AERNA), Barcelona, Spain, July 2009.

32. Lusk, J.L. "Consumer Preferences for Livestock Cloning." Invited keynote address given at Consumer Market Demand Research Network, Ottawa, Canada, May 2009.

31. Lusk, J.L. "Influence of Identity and Market-Like Context on Selfishness, Altruism, and Inequality Aversion." Invited paper presented at a departmental research seminar at Department of Agricultural, Food, and Resource Economics, Michigan State University, East Lancing, MI, April 2009.

30. Lusk, J.L. "Bridging the Gap between Laboratory Experiments and Field Markets: An Inferred Valuation Method." Invited paper presented at a departmental research seminar at Department of Applied Economics and Management, Cornell University, Ithaca, NY, January 2009.

29. Lusk, J.L. "A Calibrated Auction-Conjoint Valuation Method." Invited plenary address given at the Journée du Pôle Alimentation Parisien conference on Food Choice Analysis and Experimental Methods hosted by Institut National de la Recherche Agronomique (INRA), Paris, France, December 2008.

28. Lusk, J.L. "Fairness in Context." Invited paper presented at a departmental research seminar at Department of Agricultural and Applied Economics, Texas Tech University, Lubbock, TX, November 2008.

27. Lusk, J.L. "A Calibrated Auction-Conjoint Valuation Method: Valuing Pork and Eggs Produced under Differing Animal Welfare Conditions." Invited paper presented at a departmental research seminar at Department of Agricultural and Resource Economics, North Carolina State University, Raleigh, NC, October 2008.

26. Lusk, J.L. "Fairness in Context." Invited paper presented in a departmental research seminar at Department of Agricultural Economics, Mississippi State University, Starkville, MS, September 2008.

25. Lusk, J.L. "Consumer Preferences for Farm Animal Welfare." International Symposium on Beef Cattle Welfare. Manhattan, KS, May 2008.

24. Lusk, J.L. "Global Biotechnology Acceptance: Strategic Alternatives." Invited presentation to the Soybean Checkoff Leaders Forum, Des Moines, IA, January 2008.

23. Lusk, J.L. "Global Biotechnology Acceptance: Strategic Alternatives." Invited presentation to the Board of Directors of the United Soybean Board. St. Louis, MO, December 2007.

22. Lusk, J.L. "Why People Lie on Surveys and How to Make Them Stop." Invited presentation in the Regents Professors seminar series. Oklahoma State University, Stillwater, OK, October, 2007.

21. Lusk, J.L. "Bridging the Gap between Laboratory Experiments and Field Markets." Invited paper presented in departmental research seminar at Department of Agricultural Economics, Oklahoma State University, February 2006.

20. Lusk, J.L. "Bridging the Gap between Laboratory Experiments and Field Markets." Invited paper presented in departmental research seminars at Department of Economics and Finance and Department of Agricultural Economics, University of Wyoming, November 2006.

19. Lusk, J.L. "A Tool to Utilize Genetic Information to Improve Livestock Marketing Decisions." Invited presentation given at Merial/Drovers Beef Functional Genomics Roundtable. Kansas City, MO, September 2006.

18. Lusk, J.L. "Value Elicitation with Experimental Auctions: Validity and Future Research Directions." Invited plenary address at the Journées d' Économie Expérimentale at Bureau d'Economie Théorique et Appliquée, Université Louis Pasteur, Strasbourg France, June 2006.

17. Lusk, J.L. "Prediction Markets for Non-Market Valuation." Invited paper presented in departmental research seminar at the Department of Agricultural Economics, Kansas State University, Manhattan, KS, April 2006.

16. Lusk, J.L. "Prediction Markets for Non-Market Valuation." Invited paper presented in departmental research seminar at the Department of Agricultural Economics, University of Georgia, Athens, GA. February 2006.

15. Lusk, J.L. "Prediction Markets for Non-Market Valuation." Invited paper presented in departmental research seminar at the Department of Resource Economics, University of Massachusetts, Amherst, MA. November 2005.

14. Lusk, J.L. "Prediction Markets for Non-Market Valuation." Invited paper presented in departmental research seminar at the Department of Economics, Oklahoma State University, Stillwater, OK. November 2005.

13. Lusk, J.L. "Public Policy and Endogenous Beliefs: The Case of Genetically Modified Food." Invited paper presented in departmental research seminar at the Department of Agribusiness and Applied Economics, North Dakota State University. Fargo, ND. October 2005.

12. Lusk, J.L. "Consumer Demand for a Ban on Subtherapeutic Antibiotic Use in Pork Production." Invited paper to be presented in departmental research seminar at the Department of Agricultural Economics, University of Nebraska. Lincoln, NE. November 2004.

11. Lusk, J.L. "Consumer Demand for a Ban on Subtherapeutic Antibiotic Use in Pork

Production."  Invited paper presented in departmental research seminar at the Department of Agricultural and Resource Economics, University of Maryland.  College Park, MD.  September 2004.

10. Lusk, J.L.  "Payoff Function Shape and Incentives for Truthful Bidding in Experimental Auctions."  Invited paper presented in departmental research seminar at Department of Agricultural Economics, Oklahoma State University.  Stillwater, OK.  August 2004.

9. Lusk, J.L.  "European Perspectives on Transgenic Grains in the Marketing Channel."  Invited plenary addresses at the International Quality Grains Conference.  Indianapolis, IN.  July, 2004.

8. Lusk, J.L. "Comparative Advantage in Demand: Experimental Evidence of Demand for Genetically Modified Food in the United States and European Union."  Invited paper presented in departmental research seminar at Department of Agricultural Economics, Michigan State University.  East Lansing, MI.  February 2004.

7. Lusk, J.L.  "Preferences, Procedures, and Payment: Effect on Valuation of Quality Differentiated Goods."  Invited research seminar presented at Department of Agricultural Economics, Purdue University. October 2003.

6. Lusk, J.L.  "Consumer Preferences as Impetus for Non Tariff Trade Barriers: Experimental Evidence of Demand for Genetically Modified Food in the United States and European Union."  Invited paper presented in departmental research seminar at Department of Agricultural and Consumer Economics, University of Illinois.  Urbana-Champaign, IL.  September 2003.

5. Lusk, J.L.  "Consumer Acceptance of Genetically Modified Foods in the U.S. and Europe."  Invited paper presented in research seminar at the University of Bologna, Department of Statistics.  Bologna, Italy, March, 2003.

4. Lusk, J.L. "Framing Effects and Procedural Invariance:  Evidence of Incentive Compatible Auctions and Choice Experiments."  Invited paper presented the University of Reading, Department of Food and Agricultural Economics.  Reading, England.  July 2002.

3. Lusk, J.L., J. Roosen, and J.A. Fox.  "Demand for Non-Genetically Modified and Non-Hormone Treated Foods in France, Germany, the United Kingdom, and the United States."  Invited paper presented at Department of Agricultural and Resource Economics, University of California, Davis, March 2002.

2. Lusk, J.L., J. Roosen, and J.A. Fox.  "Demand for Non-Genetically Modified and Non-

Hormone Treated Foods in France, Germany, the United Kingdom, and the United States." Invited paper presented at the Economics Sciences Symposium, Mississippi State University. October 2000.

1. Lusk, J.L. "Consumer Demand for Quality Differentiated Beef: Implications for the Industry." Invited presentation at the U.S. Department of Agriculture, Agricultural Outlook Forum. Washington, D.C. February 2001.

*Numerous other Invited Presentations and Selected Paper Presentations have been given at professional scientific conferences*

## Graduate Student Advising

*Completed Graduate Students (total = 87)*

1. Kurt Lacey, Ph.D., 2001, (Mississippi State University), committee member
2. Jody Hill, MABM[1], 2001, (Mississippi State University), major professor
3. Patrick Sullivan, MABM, 2001, (Mississippi State University), major professor
4. Ashley Renck, Ph.D., 2002, (Mississippi State University), committee member
5. Edgar Cevallos, MABM, 2002, (Mississippi State University), major professor
6. Clay Seale, MABM, 2002, (Mississippi State University), major professor
7. Ty Feldkamp, M.S., 2002, (Kansas State University), committee member
8. Mustafa Jamal, M.S., 2005, (Purdue University), committee member
9. Leatta McLaughlin, M.S., 2005, (Purdue University), major professor
10. Carlos Mayen, M.S., 2005, (Purdue University), committee member
11. Michael Meagher, M.S., 2005, (Purdue University), committee member
12. Tomas Nilsson, Ph.D., 2005, (Purdue University), committee member
13. Ross Pruitt, M.S., 2005, (Purdue University), major professor
14. Tim Zimmer, M.S., 2005, (Purdue University), major professor
15. Mariah Tanner Ehmke, Ph.D., 2005, (Purdue University), major professor
16. Dana Marchelino, M.S., 2006, (Purdue University), committee member
17. Christiane Schroeter, Ph.D., 2006, (Purdue University), major professor
18. Michael Gunderson, Ph.D., 2006, (Purdue University), committee member
19. Troyer, Andrea, M.S., 2006, (Oklahoma State University), major professor
20. Basu, Debasmita, M.S., 2007, (Oklahoma State University), committee member
21. Dutton, Jennifer, M.S., 2007, (Oklahoma State University), committee member
22. Tim Zimmer, Ph.D., 2007, (Purdue University), committee member
23. Wilson, Natalie, M.S., 2007, (Oklahoma State University), major professor
24. Karina Gallardo, Ph.D., 2007, (Oklahoma State University), committee member
25. Sika Gbegbelegbe, Ph.D., 2008, (Purdue University), committee member
26. Tong Zhang, Ph.D., 2008, (Oklahoma State University), committee member
27. Rob Prickett, M.S., 2008, (Oklahoma State University), committee member
28. Lacey Seibert, M.S., 2008 (Oklahoma State University), committee member
29. Stephen Toler, M.S., 2008 (Oklahoma State University), committee member
30. Helen Barela, M.S., 2008 (Oklahoma State University), major professor
31. Phumsith Mahasuweerachai, Ph.D., 2009. (Oklahoma State University), committee member
32. Abdul Naico, M.S., 2009 (Oklahoma State University), major professor
33. Jae Bong Chang, Ph.D., 2009 (Oklahoma State University), major professor
34. Brenna Ellison, M.S., 2009. M.S. (Oklahoma State University), major professor
35. Jae Hong Park, Ph.D., 2010. (Oklahoma State University), committee member
36. Mary Wilson, M.S., 2010. (Oklahoma State University), committee member
37. Freddy Ballen, M.S., 2010. (Oklahoma State University), committee member
38. Kate Brooks, Ph.D., 2010. (Oklahoma State University), major professor
39. Max Corbin, M.S., 2011 (Oklahoma State University), committee member
40. Matthew Padgett, M.S., 2011 (Oklahoma State University, committee member
41. Rock Andre, M.S., 2011 (Oklahoma State University), major professor
42. Tyler Klain, M.S., 2011 (Oklahoma State University), major professor

---

[1] MABM represents the Masters of Agribusiness Management program at Mississippi State

43. Lianfan Su, Ph.D., 2011 (Oklahoma State University), committee member
44. Hung-Ju Chien, Ph.D., 2012 (Oklahoma State University), major professor
45. Brenna Ellison, Ph.D., 2012 (Oklahoma State University), major professor
46. Kristen Kovalsky, M.S., 2012 (Oklahoma State University), major professor
47. Angelica Serrano Paez, Ph.D., 2012 (Oklahoma State University), committee member
48. Amanda Simpson, M.S., 2012 (Oklahoma State University), committee member
49. Mallory Vestal, Ph.D., 2012 (Oklahoma State University), major professor
50. Brian Williams, Ph.D., 2012 (Oklahoma State University), committee member
51. Trey Malone, M.S., 2013 (Oklahoma State University), committee member
52. Cole Lamson, M.S., 2013 (Oklahoma State University), committee member
53. Dhruba Bhandari, Ph.D., 2013 (Economics, Oklahoma State University), committee member
54. Lori Allmon, M.S., 2014 (Oklahoma State University), committee member
55. Katie Smithson, M.S., 2014 (Oklahoma State University), major professor
56. Brandon McFadden, Ph.D., 2014 (Oklahoma State University), major professor
57. Amanda Weaver, Ph.D., 2014 (Oklahoma State University), major professor
58. Lance Gagelman, M.S., 2015 (Oklahoma State University), committee member
59. Monika Ghimire, Ph.D., 2015 (Oklahoma State University), committee member
60. Seonwoong Kim, Ph.D., 2015 (Oklahoma State University), committee member
61. Molly Depue, M.S., 2015 (Oklahoma State University), committee member
62. Aaron Ates, M.S., 2015 (Oklahoma State University), major professor
63. Nathan Thompson, Ph.D., 2015 (Oklahoma State University), committee member
64. James Bishop, Ph.D., 2016 (Economics, Oklahoma State University), committee member
65. Amy Boline, M.S., 2016 (Oklahoma State University), committee member
66. David Davis, Ph.D., 2016 (Oklahoma State University), committee member
67. Josh Maples, Ph.D., 2016 (Oklahoma State University), co-major professor
68. Clint Neill, Ph.D., 2016 (Oklahoma State University), committee member
69. Andrew Paul, M.S., 2016 (Oklahoma State University), major professor
70. Jisung Jo, Ph.D., 2016 (Oklahoma State University), major professor
71. Ahmad Ghaith, Ph.D., 2017 (Oklahoma State University), committee member
72. Sara Lehman, M.S., 2017 (Oklahoma State University), committee member
73. Kelyn Jacques, M.S., 2017(Oklahoma State University), committee member
74. Trey Malone, Ph.D., 2017 (Oklahoma State University), major professor
75. Eryn Robert, M.S., 2017 (Oklahoma State University), committee member
76. Sunjin Ahn, Ph.D. (Oklahoma State University), committee member
77. Aaron Ates, Ph.D. (Oklahoma State University), committee member
78. Kelsey Conley, Ph.D. (Oklahoma State University), committee member
79. Ruoye Yang, Ph.D. (Oklahoma State University), committee member
80. Aaron Staples, M.S. (Purdue University), committee member
81. Jacob Schmiess, M.S. (Purdue University), major professor
82. Lacy Wilson, M.S. (Purdue University), major professor
83. Xiaoyang He, Ph.D. (Purdue University), committee member
84. Haseeb, Daudzai, M.S. (Purdue University), committee member
85. Chinonso Etumnu, Ph.D. (Purdue University), committee member
86. Ahmad Wahdat, Ph.D. (Purdue University), committee member
87. Kendra Morrissette, Ph.D. (Purdue University), major professor

*Current Graduate Students (total = 9)*
1. Alison Grant, Ph.D. (Purdue University), major professor
2. Chloe Henson, Ph.D. (Purdue University), co-major professor
3. Zach Neuhofer, Ph.D. (Purdue University), major professor
4. Jacob Schmiess, Ph.D. (Purdue University), major professor
5. Yizhou Hua, Ph.D. (Purdue University), committee member
6. Dong Moon, Ph.D. (Purdue University), committee member
7. Eugene Nuworsu, PhD. (Purdue University), co-major professor
8. Fei Qin, Ph.D. (Purdue University), committee member
9. Hyejin Kim, Ph.D. (Purdue University), committee member

## Courses Taught and Student Evaluation

*Courses Taught at Purdue University, 2017-Present*

| | | | Mean Evaluation Scores | | |
|---|---|---|---|---|---|
| Year | Course | Class Size | Improved Understanding[a] | Overall Course Rating[b] | Overall Instructor Rating[c] |
| 2022 Fall | AGEC 296 – Careers in Agribusiness and Ag Econ | 95 | 4.1 | 4.4 | 4.4 |
| 2021 Fall | AGEC 296 – Careers in Agribusiness and Ag Econ | 105 | 4.3 | 4.6 | 4.6 |
| 2020 Spring | AGEC 692 – Workshop in Applied Economics | 14 | n/a | n/a | n/a |
| 2020 Spring | AGEC 429 – Agribusiness Marketing Workshop | 34 | n/a | n/a | n/a |
| 2019 Spring | AGEC 692 – Workshop in Applied Economics | 9 | 5.0 | 5.0 | 5.0 |

[a]Mean response to statement: This course improves my understanding of concepts and principles in this field, 1 = strongly disagree; 5 = strongly agree; in 2021 the statement changed to "The assignments aid me in achieving the class objectives." 1=strongly disagree, 5= strongly agree
[b]Mean response to statement: Overall, I would rate this course as: 1 = very poor; 5 = excellent; in 2021 the statement changed to "The course is well organized." 1=strongly disagree, 5= strongly agree
[c]Mean response to statement: Overall, I would rate this instructor as: 1 = very poor; 5 = excellent; in 2021 the statement changed to "The instructor communicates clearly." 1=strongly disagree, 5=strongly agree

*Courses Taught at Purdue University, 2003-2004*

| | | | Mean Evaluation Scores | | |
|---|---|---|---|---|---|
| Year | Course | Class Size | Improved Understanding[a,d] | Overall Course Rating[b,e] | Overall Instructor Rating[c,e] |
| 2003 Fall | AGEC 596I - International Food and Agribusiness Marketing | 17 | 4.6 | 4.5 | 5.0 |
| 2004 Fall | AGEC 526 - International Food and Agribusiness Marketing | 18 | 4.1 | 4.1 | 4.6 |
| 2004 Fall | AGEC 692 – Quantitative Methods in Survey Research | 16 | 4.6 | 4.6 | 4.9 |

[a]Mean response to statement: This course improves my understanding of concepts and principles in this field.
[b]Mean response to statement: Overall, I would rate this course as:.
[c]Mean response to statement: Overall, I would rate this instructor as:.
[d]Responses on scale: 1 = strongly disagree; 5 = strongly agree
[e]Responses on scale: 1 = very poor; 5 = excellent

*Courses Taught at Oklahoma State University, 2006-2017*

| Year | Course | Class Size | Mean Evaluation Scores | | |
|------|--------|------------|-------------------------------|---------------------------|-----------------------------|
| | | | Improved Understanding[a,d] | Overall Course Rating[b,e] | Overall Instructor Rating[c,d] |
| 2016 Spring | AGEC 5101- Research Methodology | 9 | n/a | n/a | n/a |
| 2016 Spring | AGEC 5233 – Primary Data Collection and Analysis | 18 | n/a | n/a | n/a |
| 2016 Spring | AGEC 6300 – Advanced Demand Analysis | 9 | 4.00 | 4.00 | 4.00 |
| 2016 Spring | AGEC 5101- Research Methodology | 10 | 3.29 | 3.29 | 3.43 |
| 2016 Spring | AGEC 5233 – Primary Data Collection and Analysis | 14 | 3.75 | 3.75 | 3.83 |
| 2015 Spring | AGEC 5101- Research Methodology | 18 | 3.65 | 3.71 | 3.64 |
| 2015 Spring | AGEC 5233 – Primary Data Collection and Analysis | 14 | 3.83 | 3.92 | 3.75 |
| 2014 Spring | AGEC 6300 – Advanced Demand Analysis | 11 | n/a | n/a | n/a |
| 2014 Spring | AGEC 5101- Research Methodology | 14 | 3.79 | 3.86 | 4.00 |
| 2014 Spring | AGEC 5233 – Primary Data Collection and Analysis | 13 | 3.82 | 3.91 | 4.00 |
| 2013 Spring | AGEC 5101- Research Methodology | 11 | 3.86 | 3.86 | 3.83 |
| 2013 Spring | AGEC 5233 – Primary Data Collection and Analysis | 10 | 3.88 | 3.88 | 3.86 |
| 2012 Spring | AGEC 5101- Research Methodology | 15 | 3.79 | 3.86 | 3.62 |
| 2012 Spring | AGEC 5233 – Primary Data Collection and Analysis | 15 | 3.58 | 3.58 | 3.64 |
| 2011 Spring | AGEC 5101- Research Methodology | 20 | 3.71 | 3.71 | 3.62 |
| 2011 Spring | AGEC 5233 – Primary Data Collection and Analysis | 14 | 3.29 | 3.36 | 3.29 |
| 2010 Spring | AGEC 5101- Research Methodology | 15 | 3.64 | 3.57 | 3.50 |

| | | | | |
|---|---|---|---|---|
| 2010 Spring AGEC 5233 – Primary Data Collection and Analysis | 14 | 3.71 | 3.71 | 3.54 |
| 2009 Spring AGEC 5101- Research Methodology | 11 | 3.70 | 3.80 | 4.00 |
| 2009 Spring AGEC 5233 – Primary Data Collection and Analysis | 19 | 3.76 | 3.82 | 3.88 |
| 2008 Spring AGEC 5101- Research Methodology | 20 | 3.94 | 3.94 | 3.80 |
| 2008 Spring AGEC 5233 – Primary Data Collection and Analysis | 13 | 3.83 | 3.92 | 3.64 |
| 2007 Spring AGEC 5101- Research Methodology | 13 | 3.73 | 3.91 | 3.80 |
| 2007 Spring AGEC 5233 – Primary Data Collection and Analysis | 7 | 3.60 | 3.83 | 3.67 |
| 2006 Spring AGEC 5233 – Primary Data Collection and Analysis | 10 | 3.50 | 3.70 | 3.80 |

[a]Mean response to statement: I learned a lot in this course.; [b]Mean response to statement: Overall, this was a good course.; [c]Mean response to statement: Overall instructor appraisal; [d]Responses on scale: 0 = definitely no; 1 = no; 2 = not applicable, 3 = yes; 4 = definitely yes; [e]Responses on scale: 0 = very low, 1 = low, 2 = average, 3 = high, 4 = very high

*Extraneous Courses Taught*

- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Verona Italy (with M. Canavari, R. Nayga and A. Drichoutis), June 2022
- Survey Design and Experimental Methods in Applied and Agricultural Economics, hosted by Michigan State University (with C. Grebitus, V. Caputo, D. Just, and M. Rousu), May 2022
- Survey Design and Experimental Methods in Applied and Agricultural Economics, hosted by Arizona State University (with C. Grebitus, V. Caputo, D. Just, and M. Rousu), January 2021
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Montpellier France (with M. Canavari, R. Nayga and A. Drichoutis), July 2019
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Bolzano, Italy (with M. Canavari, R. Nayga and A. Drichoutis), July 2018
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Catania Sicily, Italy (with M. Canavari, R. Nayga and A. Drichoutis), July 2016
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Chania, Crete, Greece (with M. Canavari, R. Nayga and A. Drichoutis), July 2015
- Consumer Research Methods, hosted by University of Naples, Naples Italy, March 2015
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Imola, Italy (with M. Canavari, R. Nayga and A. Drichoutis), July 2013
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Imola, Italy (with M. Canavari, R. Nayga and A. Drichoutis), July 2012
- Experimental Auctions: Theory and Applications in Marketing and Consumer Preferences Analysis, hosted by University of Bologna in Bertinoro, Italy (with M. Canavari, R. Nayga and A. Drichoutis), July 2011

*Courses Taught at Texas Tech University, Kansas State University, and Mississippi State University, 1995-2002*

| Year | Course | Class Size | Mean Evaluation Scores | | |
|---|---|---|---|---|---|
| | | | Instructor Communicates Clearly[a,d] | Became More Competent[b,d] | Like to Have Instructor Again[c,d] |
| 1995-96 Fall | FD T 3304 – Fruit and Vegetable Processing[e] | varied | - | - | - |
| 1996-97 Spring | FD T 2302 – Elementary Food Analysis[e] | varied | - | - | - |
| 1999 Spring | AGEC 505 - Agricultural Market Structures[f] | 35 | 4.30 | 3.90 | - |
| 2001 Spring | AEC 3133 - Introductory Agribusiness Management[g,h] | 32 | 2.22 | 2.22 | 1.91 |
| 2001 Spring | AEC 8312 - Economic and Social Environment of Agribusiness Firms[g,i] | 13 | - | - | - |
| 2001 Fall | AEC 4113 - Agribusiness Firm Management[g] | 20 | 4.18 | 3.94 | 3.94 |
| 2001 Fall | AEC 8312 - Economic and Social Environment of Agribusiness Firms[g] | 10 | 4.71 | 4.43 | 4.86 |
| 2002 Fall | AEC 3133 - Introductory Agribusiness Management[g] | 37 | 4.03 | 3.89 | 3.86 |
| 2002 Fall | AEC 4113 - Agribusiness Firm Management[g] | 13 | 4.23 | 4.23 | 4.15 |
| 2002 Fall | AEC 8312 - Economic and Social Environment of Agribusiness Firms[g] | 10 | 4.70 | 4.70 | 4.80 |

[a]Mean response to statement: The instructor communicates clearly.
[b]Mean response to statement: I have become more competent in this area because of this instructor.
[c]Mean response to statement: If I take another course in this subject, I would like to have this instructor again.
[d]Responses on scale: 1 = strongly disagree; 5 = strongly agree
[e]Served as laboratory instructor for these courses at Texas Tech University; teaching evaluations unavailable.
[f]Course taught at Kansas State University
[g]Course taught at Mississippi State University
[h]This course was co-taught with another instruction; although Dr. Lusk only taught the first half of the course, evaluations are for the entire semester
[i]Due to a departmental administrative error, evaluations were not collected for this course

## Consulting Activities

- Various presentations and seminars to industry and academic audiences, 2001-present
- Plant Based Product Council, 2022
  - Studied knowledge and perceptions of biobased product terms
- United Egg Producers, 2022
  - Analyzed impacts of transition to cage-free production facilities
- National Pork Board, 2021-22
  - Analyzed location- and product-specific pork demand
- Food Marketing Institute Foundation, 2021
  - Analyzed demand responses to bioengineered food labels
- Breakthrough Institute, 2021
  - Analyzed impacts of changes in prices of plant-based meat alternatives
- Cattlemen's Beef Promotion & Research Board, 2020
  - Analyzed demand for plant-based meat alternatives
- Beef Cattle Research Fund, 2019
  - Analyzed trends in cattle productivity and impacts of research funding
- Corn Refiners Association, 2018
  - Studied consumer perceptions of food labels
- North American Meat Institute, 2018
  - Analyzed impact of reductions in processed meat demand
- Food Marketing Institute, 2017
  - Studied market potential for cage free eggs and slow growth chicken
- Cattlemen's Beef Promotion & Research Board, 2017
  - Analyzed demand determinants in the beef industry
- Indigo Agriculture, 2016
  - Analyzed trends in agricultural economy
- Golden Bison, 2016
  - Analyzed market dynamics in the bison industry
- National Pork Board, 2016
  - Determine impacts of meat quality labels
- Mercatus Center, 2014
  - Conducted analysis of impacts of selected food policies on food prices
- International Food Policy Research Institute, HarvestPlus, 2013
  - Provided advice on consumer research designed to determine consumer acceptance of biofortified crops in developing countries
- Council on Food, Agricultural, and Resource Economics, 2013
  - Assessed the value and cost of data collected by US Department of Agriculture
- Kenny Nachwalter, PA, 2013-2015
  - Provided expert advice on animal welfare issues in legal case
- World Society for the Protection of Animals, 2013-2014
  - Determined the market potential for enhanced animal welfare products

- Keystone Foods, 2012
  - Conducted assessment of the market for products from animals fed non-genetically modified feedstuffs
- Value Ag, 2011
  - Constructed economic model of the soybean sector to study effects of new product innovations
- Signature Science, 2010
  - Estimated economic effects of animal disease outbreaks
- Pfizer Animal Health, 2009
  - Constructed economic model to determine the value of genetic interventions to improve beef tenderness to consumers and the beef industry
- U.S. Department of Agriculture, Economic Research Service, 2008
  - Conducted surveys and analysis to determine consumer acceptance of use of cloning in meat and milk production; projected market impacts of cloned meat and milk
- Merial/igenity, 2005-2007
  - Determined economic value of genotypic information in feedlot cattle and developed a tool to forecast cattle profitability as a function of genotype
- Svenska Lantmännen, 2005
  - Conducted market analysis for vegetarian foods with emphasis on meat analogs

## Selected Service Activities

*Service to Purdue University*
- Chair, Task Force on the Future of Work in Land Grant Universities, 2022
- Chair, Search Committee, Food Science Department Head, 2020
- Search Committee, Associate Dean for Academic Programs, 2019
- Planning Committee for Conference on Global Hunger, 2018
- Departmental Graduate Committee, 2003-2005
- Grader for Graduate Preliminary Examinations, 2003, 2004, 2019
- Departmental Strategic Planning Committee, 2004
- Judge for Departmental Outstanding Dissertation, 2004
- Various Search Committees, 2003-2005

*Service to Oklahoma State University*
- Chair, Seminar Committee, 2011-2017
- Chair, Faculty P&T Committee, 2014-2015
- Member, Division P&T Committee, 2015-present
- Faculty P&T Committee, 2012-present
- Graduate Admissions Committee, 2005-present
- Graduate Examination Committee, 2005-present
- Chair, Faculty Communications Committee, 2008-present
- Alternative Member, Institutional Review Board (IRB), 2009-present
- Chair, Awards Committee, 2007-2011
- Awards Committee, 2005-2006
- Seminar Committee, 2005
- Various Search Committees, 2005-present
- Chair, DASNR Task Force for Graduate Student Recruitment, 2006-2007

*Service to Mississippi State University*
- Departmental Academic Program and Policy Committee, 2000-2003
- Departmental Graduate Screening and Evaluation Committee, 2000-2003
- Agricultural Economics Department Head Search Committee, 2001-2003

*Service on Advisory Boards and International Scientific Committees*
- National Academies of Science, Planning Committee for Diet Quality, Nutrition, and Sustainability of Alternative Protein Sources, 2022
- Member of International Scientific Committee, Seminar on Valuation Methods in Agrofood and Natural Resource Economics, Joint AAEA/EAAE Seminar, Barcelona, Spain, July 2016
- Member of International Scientific Committee, Seminar on Consumer Behavior in a Changing World: Food, Culture, and Society, Joint AAEA/EAAE Seminar, Naples, Italy, March, 2015.
- Member of Steering Committee, Workshop on Valuation Methods in Agro-food and Environmental Economics, Barcelona, Spain, June 2013

- Member of Advisory Board, Center for Agricultural & Food Industrial Organization - Policy Research Center Grant, University of Nebraska, 2012-2015
- Member of International Scientific Committee of Research Program on Diet Impacts French National Institute for Agricultural Research, France, 2012-2015
- Member of Blue Ribbon Expert Panel on Consumer Concerns about Food, Health and Safety, Council on Food, Agricultural and Resource Economics (C-FARE), 2011-2014
- Member of International Scientific Committee, Economics and Business of Chocolate, Leuven, Belgium, September 2012
- Co-Chair, Food Environment: The Effects of Context on Food, Joint AAEA/EAAE Seminar, Boston, MA, May 2012
- Member of International Scientific Committee, Consumer Behavior for a Sustainable Future, Bonn, Germany, July 2011
- Member of International Scientific Committee, The Economics of Food, Food Choice and Health, 115th EAAE seminar, Freising, Germany, October 2010
- Member of International Scientific Committee, The Economics and Policy of Diet and Health, 97th EAAE Seminar, Reading, UK, April 2005

**Reviewer for Peer Review Journals including**

American Journal of Agricultural Economics, Journal of Agricultural and Resource Economics, American Journal of Health Economics; Food Policy, Journal of Environmental Economics and Management, European Review of Agricultural Economics , Journal of Agricultural and Applied Economics, AgBioForum, Environmental and Resource Economics, Journal of Agricultural Economics , Agricultural Economics, Journal of Agricultural & Food Industrial Organization, Review of Agricultural Economics, Journal of Food Quality and Preference, Canadian Journal of Agricultural Economics, B.E. Journals in Economic Analysis & Policy, Agricultural and Resource Economics Review, Ecological Economics, Economic Inquiry, Journal of Economic Behavior and Organization, Marketing Science, American Economic Review, Contemporary Economic Policy, Land Economics, Agribusiness: An International Journal, Applied Economic Perspectives & Policy, Experimental Economics, Independent Review, International Food and Agribusiness Management Review, Journal of Agribusiness, Journal of Behavioral Decision Making, Journal of Economic Education, Journal of Health Economics, Management Science, American Journal of Public Health, Applied Economics, Australian Journal of Agricultural and Resource Economics, Decision Sciences, Econometrica, Empirical Economics, Economics and Human Biology, Health Economics, Journal of Applied Econometrics, Journal of Choice Modelling, Journal of Consumer Affairs, Journal of Law and Economics, Journal of Economic Psychology, Journal of Risk and Uncertainty, Meat Science, Obesity, Proceedings of the National Academies of Science, Public Opinion Quarterly, PLoS ONE, Resource and Energy Economics, Review of Economics and Statistics, Risk Analysis, Science, Southern Economic Journal, Theory and Decision

**Exhibit 2**

**Exhibit A. Economic Model of the Pork Sector**

*A.1. Overview*

This exhibit describes the construction and implementation of an economic model of the pork sector I created to estimate the effects of the implementation of Massachusetts Question 3 on U.S. hog prices and retail pork prices in Massachusetts. The model is system of supply and demand equations specified as changes from an initial equilibrium. Equilibrium displacement models are widely used in the economic literature to calculate ex ante effects of cost and demand shocks and are described in resources such as Alston (1991), Lusk and Anderson (2004), Okrent and Alston (2012), and Wohlgenant (2011).[1] The model is constructed to make use of the data and analysis in Tonsor and Lusk (2021), who used retail grocery scanner data to estimate demand for 6 pork products in 51 U.S. markets, one of which includes the Boston metro area.[2]

*A.2 Economic Model of the Pork Sector*

The foregoing describes an economic model of the pork sector linking retail demand for 6 pork products in 51 markets with the farm-level supply of hogs in the U.S. The description of the model starts at the retail level and works upstream in the pork supply chain back to the farm.

*Retail Demand*

There are 51 markets ($k$ = 1 to 51) and six pork products ($j$ = Loin, Ribs, Shoulder, Breakfast Sausage, Dinner Sausage, and Bacon). Thus, there are 51*6 = 306 demand equations, which can be expressed in differential form as:

(1)-(306)     $$\hat{Q}_k^j = \eta_k^j(\hat{P}_k^j + \delta_k^j) + \gamma_k^j \widehat{Pbeef} + \delta_k^j \widehat{Pchicken}$$

where $\hat{Q}_k^j$ is the proportionate change in retail quantity of pork product $j$ in location $k$ (i.e., $\hat{Q} = \Delta Q/Q \approx dlnQ/Q$), $\hat{P}_k^j$ is the proportionate change in retail price of pork product $j$ in location $k$, $\eta_k^j$ is the own-price elasticity of demand for product $j$ in location $k$. $\widehat{Pbeef}$ and $\widehat{Pchicken}$ are proportionate changes in prices of beef and chicken, respectively. $\delta_k^j$ can be interpreted as a proportionate price or ad valorem tax that drives a wedge between the price producers or sellers receive and the amount buyers pay. Here, I study the effects of Massachusetts Question 3 as an ad valorem tax equivalent equal to the extra cost (or tax) producers must pay (through higher production, segregation, and marketing costs) to enter the Massachusetts market.

---

[1] Alston, J.M., 1991. Research benefits in a multimarket setting: a review. Review of Marketing and Agricultural Economics, 59(430-2016-31351), pp.23-52.

Lusk, J.L. and Anderson, J.D., 2004. Effects of country-of-origin labeling on meat producers and consumers. Journal of Agricultural and Resource Economics, pp.185-205.

Okrent, A.M. and Alston, J.M., 2012. The effects of farm commodity and retail food policies on obesity and economic welfare in the United States. American Journal of Agricultural Economics, 94(3), pp.611-646.

Wohlgenant, M.K. 2011. "Consumer demand and welfare in equilibrium displacement models." In The Oxford Handbook of the Economics of Food Consumption and Policy (J.L. Lusk, J. Roosen, and J. Shogren, eds). Oxford: Oxford UK.

[2] Tonsor, G.T. and J.L. Lusk. 2021. "Consumer Sensitivity to Pork Prices: A Comparison of 51 U.S. Retail Markets and 6 Pork Products." March 5, 2021.
https://www.agmanager.info/sites/default/files/pdf/TonsorLusk_PriceSensitivityReport_03-05-21.pdf

*Inverse Supply of Retail Products from Packers*

Assuming constant returns to scale in production of retail pork products, there are six pork product in 51 market resulting in 306 supply equations of the form:

$(307) - (612) \quad \hat{P}_k^j = SR_k^j \hat{w}_{hogs} + (1 - SR_k^j) \hat{w}_{other}$

where $\hat{w}_{hogs}$ is an endogenous variable indicating the proportionate change in price of hogs, $SR_k^j$ is the share of the total cost of producing retail pork product $j$ attributable to hogs in location $k$, $(1 - SR_k^j)$ is the share of total cost of producing retail pork product $j$ attributable to other marketing inputs, and $\hat{w}_{other}$ is the proportionate change in the price of other marketing inputs to the pork sector.

*Aggregation across Locations*

While the model allows geographic- and product-specific heterogeneity in demand, I utilize the conventional approach of modeling the packing and farm sectors quantities as industry-level aggregates. The proportionate change in total quantity (across all locations) of product $j$ is defined as.

$(613)-(618) \quad \hat{Q}^j = \sum_{k=1}^{K} \left( \frac{Q_k^j}{Q^j} \right) \hat{Q}_k^j,$

where $\left( \frac{Q_k^j}{Q^j} \right)$ is the share of total quantity of product $j$ sold in location $k$.

It is possible to calculate the aggregate retail price effects for each of the six pork products in a given location or across the U.S. In levels, the quantity weighted-average national price of product $j$ is: $P^j = \sum_{k=1}^{K} P_k^j \left( \frac{Q_k^j}{Q^j} \right)$, where the latter term is the share of total quantity sold in location $k$. Expressed in differential form, the expression for proportionate change in the weighted-average price for the six pork products is:

$(619)-(624) \quad \hat{P}^j = \sum_{k=1}^{K} R_k^j \left( \hat{P}_k^j + \hat{Q}_k^j - \hat{Q}^j \right),$

where for product $j$, $R_k^j = \left( \frac{P_k^j Q_k^j}{P^j Q^j} \right)$ is the share of national revenue generated by location $k$ across all $K$ locations, $\sum_{k=1}^{K} R_k^j = 1$.

*Demand for Commodities Used in Pork Packing and Processing*

Assuming constant returns to scale and fixed proportions technology, two Hicksian demands for the commodities used in pork production take the form:

$(625) \quad \hat{x}_{hogs} = \sum_{j=1}^{6} SC_{hogs}^j \hat{Q}^j$

$(626) \quad \hat{x}_{other} = \sum_{j=1}^{6} SC_{other}^j \hat{Q}^j$

where $\hat{x}_{hogs}$ is the proportionate change in quantity of hogs, $SC_{hogs}^j$ is the share of the total cost of hogs used by retail pork product $j$, $\hat{x}_{other}$ is the proportionate change in quantity of other marketing inputs to the pork processing, and $SC_{other}^j$ is the share of the total cost of other marketing inputs used by retail pork product $j$.

*Supply of Farm Products and Marketing Inputs*

There are primary supply curves for hogs and for other inputs to meat packing and processing. These supply equations take the form:

(627)  $\hat{x}_{hogs} = \varepsilon_{hogs} \hat{w}_{hogs}$

(628)  $\hat{x}_{other} = \varepsilon_{other} \hat{w}_{other}$

where $\varepsilon$'s are the own-price elasticities of supplies of hogs and other inputs, respectively.

*Equilibrium and Welfare Calculations*

The model consists of a total of 628 endogenous variables: proportionate changes in 306 retail quantities for 6 pork products in 51 locations, $\hat{Q}_k^j$, 306 retail prices for 6 pork products in 51 locations, $\hat{P}_k^j$, geographic quantity-weighted-average prices for six pork products, $\hat{P}^j$, aggregate retail quantities for six pork products, $\hat{Q}^j$, two farm-commodity quantities, $\hat{x}_k$, and two farm-commodity prices, $\hat{w}_k$. Exogenous shocks consist of ad valorem tax equivalents. The model can be solved with matrix algebra. Let the 628x1 vector of endogenous variables be represented by **Y**, the 628x1 vector of exogenous shocks be given by **Z**, and **B** be an 628x628 matrix of model parameters, such that the aforementioned equations can be written as **YB**=**Z**. The values for the endogenous variables (changes in prices and quantities) are given by: **Y**=**B⁻¹Z**.

Once the model is solved, changes in the economic well-being of producers and consumers can be calculated. For consumers, consumer surplus is calculated. This value is, approximately, the amount of money that would need to be given to consumers to make them as well off as before the implementation of Question 3; it is also, approximately, the amount consumers would pay to avoid implementation of Question 3. This value would include any extra expenditures consumers have to pay following the demand shock and it includes an estimate of the loss that occurs from consumers now choosing a less desirable bundle of products. For producers, the change in so-called producer surplus is calculated. Producer surplus is equal to economic profits ignoring fixed costs that do not vary with the volume of production. Producer surplus includes the losses to all producers and upstream suppliers to the producers in question.

*A.3 Data and Model Calibration*

To implement the model, values need to be assigned for all elasticity and share values. All demand elasticities specified in equations (1)-(306) come from Tonsor and Lusk (2021) (see their table 6).

Equations (307) – (612) require estimates of the share of the total cost of producing retail pork product $j$ attributable to hogs. To determine these values, I divided the retail price of pork product $k$ in location $j$ (as reported by Tonsor and Lusk (2021) in their table A6) by \$0.63/lb, which is the average market price of lean hogs (51-52%) as reported by the U.S. Department of Agriculture from January 2016 to December 2020, which is the same time period covered by the retail prices studied by Tonsor and Lusk (2021). In the Boston metro area, the estimated share of total cost of retail pork products (i.e., the farmer share of the retail dollar) ranged from 0.112 for bacon to 0.376 for pork shoulder.

Quantity shares in equations (613)-(618) come from market quantities reported in Tonsor and Lusk (2021) table A8. Their per-capita consumption values are multiplied by the population in each market to arrive at total quantities, which are used to calculate shares.

Equation (625) requires estimates of the share of the total cost of hogs used by retail pork product $j$. To estimate this value, I used data in Tonsor and Lusk (2021) to calculate total consumer expenditures on all pork products across all markets. I then calculated the share of total expenditure going toward each of the six pork products. These values are 0.271 for loin, 0.138 for ribs, 0.056 for shoulder, 0.100 for breakfast sausage, 0.113 for dinner sausage, and 0.322 for bacon. The share of total costs of other inputs in equation (626) was assumed evenly spread across all pork products, with a value of 1/6 for each product.

Finally, equations (627) and (628) require estimates of own-price supply elasticities. Following Lusk et al. (2022), the elasticity supply of marketing inputs to the packing sector is set at 1.[3] The elasticity of supply of hogs is set at the value of 0.15 based on the estimates in Suh and Moss (2017).[4]

### A.4. Specification of Model Shocks and Outcomes

To implement the model, values for the ad-valorem tax equivalents (or the change in costs of entering the Massachusetts market), $\delta_k^j$, must be specified. For all locations outside Massachusetts, these values are set to zero. In Massachusetts, the values for the two sausage products, representing about 21% of expenditures, are set to zero because these are assumed not to be covered by Question 3. Let the percent increase in production and segregation costs associated with producing Question 3 compliant pork, expressed relative to the farm value, be denoted as $\theta$. The retail-equivalent ad valorem tax associated with the cost of entering the Massachusetts market is equal to $\delta_k^j = \theta SR_k^j$. For example, if there is a 30% increase in the cost of producing and segregating pork associated with Question 3 and the farmer share of the retail dollar for pork loins in Boston is 0.21, then the retail-tax equivalent effect of Question 3 on loins in Boston is $\delta_k^j = 0.3 \times 0.21 = 0.063$.

Once these shocks are specified for a given cost increase, the model can be solved to determine changes in prices and quantities in each location. To determine aggregate impacts, I assume the changes from the model calculated for the Boston metro area are representative of the changes in prices and quantities in the whole state.

To determine aggregate impacts for all of Massachusetts consumers, I aggregate over all pork products in the state. The model includes some products covered by Question 3 (e.g., loin, bacon, ribs) but omits a few other products likely covered (e.g., ham). Similarly, the model includes some products not likely covered by Question 3 (breakfast and dinner sausage), but the model does not include some pork products not covered (e.g., ground pork, frankfurters,

---

[3] Lusk, J.L., Blaustein-Rejto, D., Shah, S. and Tonsor, G.T., 2022. Impact of plant-based meat alternatives on cattle inventories and greenhouse gas emissions. Environmental Research Letters. 17(2):024035.
[4] Suh, D.H. and Moss, C.B., 2017. Decompositions of corn price effects: implications for feed grain demand and livestock supply. Agricultural Economics, 48(4), pp.491-500.

**A293**

pepperoni, etc.). Nonetheless, interest is mainly in the net (or weighted average) effect on prices and quantities, and as long as the sales of covered products omitted from the model are similar to the sales of the uncovered products omitted, the aggregate price and quantity changes will be accurate. Under this assumption, the aggregate price impact in the state is specified as: $\hat{P}^{MA} = \sum_{k=1}^{K} SS_k^{MA}(\hat{P}_k^{MA} + \delta_k^{MA})$, where $SS_k^{MA}$ is the share of retail sales in Massachusetts from pork product $k$. Based on data in Tonsor and Lusk (2021), these values are set to 0.33, 0.14, 0.05, 0.03, 0.15, and 0.29 for loin, ribs, shoulder, breakfast sausage, dinner sausage, and bacon, respectively. Similarly, the total change in pork quantity consumed in Massachusetts is $\hat{Q}^{MA} = \sum_{k=1}^{K} SQ_k^{MA} \hat{Q}_k^{MA}$ where $SQ_k^{MA}$ is the share of retail quantity in Massachusetts from pork product $k$. Based on data in Tonsor and Lusk (2021), these values are set to 0.38, 0.20, 0.09, 0.03, 0.14, and 0.17 for loin, ribs, shoulder, breakfast sausage, dinner sausage, and bacon, respectively.

The change in consumer spending on pork in Massachusetts from Question 3 is $\hat{Q}^{MA} + \hat{P}^{MA}$. To express this value in dollar (rather than percent change) terms, the following calculation is made: $Q^{MA,0} P^{MA,0} (\hat{Q}^{MA} + \hat{P}^{MA})$, where $Q^{MA,0}$ is the total quantity of retail pork consumed in Massachusetts prior to implementation of Question 3 and $P^{MA,0}$ is the retail price of pork in Massachusetts prior to implementation of Question 3. The U.S. Department of Agriculture estimates that per-capita consumption of pork in the United States was 51.1 lbs/person in 2022.[5] Moreover, the U.S. Census Bureau estimates there were 6,981,974 people living in Massachusetts in 2022.[6] Together, these data imply consumers in Massachusetts consumed 356,778,871 lbs of pork in 2022. The U.S. Department of Agriculture, Economic Research Service estimates the aggregate retail price of pork in 2022 was $4.89/lb. Thus, in 2022, Massachusetts consumers are estimated to have spent $Q^{MA,0} P^{MA,0} = 356{,}778{,}871$ x $\$4.89 = \$1{,}744{,}648{,}681$ on pork. The change in consumer welfare, or consumer surplus is calculated as: $\Delta CS^{MA} = -Q^{MA,0} P^{MA,0} \hat{P}^{MA} (1 + 0.5 \hat{Q}^{MA})$.

Aggregate changes in pork producer surplus are: $\Delta PS_k = w_{k,0} x_{k,0} (\hat{w}_k)(1 + 0.5 \hat{x}_k)$, where $w_{k,0} x_{k,0}$ are the value of production of commodity $k$ prior to implementation of Question 3, and $\hat{w}_k$ and $\hat{x}_k$ are determined by the solution to the model. For pork, the U.S. Department of Agriculture estimates 27.011 billion lbs of pork were produced in the United States in the year 2022.[7] Data reported by the U.S. Department of Agriculture, Economic Research Service, indicate there were 125.3 million head of hogs slaughtered with an average weight of 289.4 lbs/head, indicating 36.268 billion lbs of pork on a live weight basis was produced in the U.S. in 2022.[8] The U.S. Department of Agriculture, Economic Research Service also report an average live price of hogs in 2022 of $0.71/lb.[9] Together, these data imply farmers produced $25.75 billion worth of pork in 2022 at the farm level. Thus, $w_{pork,0} x_{pork,0} = \$25.75$ billion.