**No. 24-1759**

IN THE

# United States Court of Appeals for the First Circuit

---

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. AND ALLIED PRODUCERS' COOPERATIVE, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS, AND ASHELY RANDLE, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS COMMISSIONER OF AGRICULTURE,

*Defendants-Appellants*,

---

On Appeal from the United States Court
for the District of Massachusetts

Case No. 1:23-cv-11671-WGY, The Honorable William G. Young

---

## BRIEF OF APPELLANTS

---

RYANN A. GLENN
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
(402) 964-5000
ryann.glenn@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com

*Counsel to Appellants*

## DISCLOSURE STATEMENT

Plaintiffs-Appellants Triumph Foods, LLC ("Triumph"), together with Christensen Farms Midwest, LLC ("Christensen Farms"), The Hanor Company of Wisconsin, LLC ("Hanor"), New Fashion Pork, LLP ("NFP"), Eichelberger Farms, Inc. ("Eichelberger"), and Allied Producers' Cooperative ("APC"), both in its official capacity and on behalf of their members ("Farmer Appellants") (all together, "Appellants"), respectfully submit this corporate disclosure statement pursuant to Federal Rule of Appellate Procedure 26.1: Farmer Appellants consist of several limited liability companies, a limited partnership and cooperative. Hanor has a parent holding company identified as HK USA Holdings, Inc. None of the remaining Appellants have parent companies and no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ..................................................................i

TABLE OF AUTHORITIES ....................................................................v

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD.................1

INTRODUCTION ...................................................................................2

JURISDICTIONAL STATEMENT .........................................................4

STATEMENT OF THE ISSUES..............................................................4

STATEMENT OF THE CASE .................................................................6

I.    Massachusetts Passes the Act .......................................................6

II.   Appellants Sue and Move For Preliminary Injunction; the Court
      Consolidates Proceedings ...........................................................7

III.  The Court Dismisses Nine out of Ten Claims Without Analysis
      or Written Order...........................................................................8

IV.   The Court Grants Summary Judgment *Sua Sponte* Against
      Appellants on their *Pike* Claim ...............................................10

V.    The Court Strikes the Slaughterhouse Exception ........................13

VI.   The Court Grants Summary Judgment to Massachusetts ...........13

SUMMARY OF THE ARGUMENT .......................................................14

ARGUMENT .........................................................................................17

I.    The Court Erred by Dismissing Nine of Appellants' Ten Claims
      Without Any Stated Reasoning ...................................................18

      A.    The Court Erred in Dismissing the Claims ..........................19

1.   *Privileges and Immunities Clause* ............................... 19

2.   *Express and Conflict Preemption by FMIA* ................. 22

3.   *Preemption by Packers and Stockyards Act* ................ 22

4.   *Full Faith and Credit Clause* ....................................... 23

5.   *Due Process Clause* ....................................................... 24

6.   *Import-Export Clause* ................................................... 26

7.   *Declaratory Relief and Judicial Review* ...................... 27

B.   At The Very Least, This Court Should Remand for a Sufficient Ruling ...................................................................... 28

II.   The Court Erred When It Sua Sponte Rejected Most of Appellants' Dormant Commerce Clause Theories ......................... 30

A.   The court improperly entered *sua sponte* judgment against Appellants on their *Pike* claims ............................ 32

1.   *The Court violated Rule 56(f)* ...................................... 32

2.   *Setting aside the procedural error, the court improperly entered judgment on Appellants'* Pike *claims* ................................................................................ 36

B.   The court erred in granting summary judgment to Massachusetts on Farmer Appellants' direct-discrimination claim ............................................................. 38

1.   *Legal Background* .......................................................... 38

2.   *The Act Carries Discriminatory Effect* ........................ 41

3.      *Massachusetts Cannot Meet Their Burden To Establish A Legitimate Local Purpose, Much Less That No Nondiscriminatory Alternatives Are Available* ........................................................................ 47

III.   The Court Erred in Holding That the Act Is Not Preempted by the FMIA ...................................................................... 50

A.    Background of Federal Preemption and the FMIA ............. 51

B.    The Court Misapplied *Harris* to conclude the Act is not expressly preempted ............................................... 53

1.      *The* Harris *Decision* ..................................... 53

2.      *The Court Erred in Holding the Sales Ban Does Not Regulate a Slaughterhouse* ........................................ 55

3.      *The Act Is Within the Scope of the FMIA* .................... 60

C.    The Court Erred in Dismissing Appellants' Conflict Preemption Claims ................................................. 61

IV.   The Path Forward ................................................... 64

CONCLUSION ............................................................ 67

CERTIFICATE OF COMPLIANCE .............................................. 69

CERTIFICATE OF SERVICE ................................................. 69

ADDENDUM

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge,*
403 U.S. 274 (1971) ............................................................... 62

*Anvar v. Dwyer,*
82 F.4th 1 (1st Cir. 2023) ....................................................... 40

*Associated Indus. of Massachusetts v. Snow,*
898 F.2d 274 (1st Cir. 1990) ................................................... 52

*ATC Realty, LLC v. Town of Kingston, New Hampshire,*
303 F.3d 91 (1st Cir. 2002) ..................................................... 32

*Berkovitz v. Home Box Office, Inc.,*
89 F.3d 24 (1st Cir. 1996) ...................................................... 34

*Bodfish v. State,*
No. A-10070, 2009 WL 3233716 (Alaska Ct. App. Oct. 7, 2009) ......... 25

*Borges ex rel. S.M.B.W. v. Serrano-Isern,*
605 F.3d 1 (1st Cir. 2010) ...................................................... 32

*Carrasquillo v. United States,*
818 F. Supp. 2d 385 (D. Mass. 2011) ...................................... 30

*Cook & Co. v. Volunteer Firemen's Ins. Servs.,*
657 F. App'x 1 (1st Cir. 2016) ............................................... 29

*Crosby v. Nat'l Foreign Trade Council,*
530 U.S. 363 (2000) ............................................................. 62

*Dunn v. Attorney General,*
474 Mass. 675, 54 N.E.3d 1 (2016) ........................................ 46

*Fam. Winemakers of Cal. v. Jenkins,*
    592 F.3d 1 (1st Cir. 2010) ........................................ 40, 43, 47

*Foisie v. Worcester Polytechnic Inst.,*
    967 F.3d 27 (1st Cir. 2020) ................................................ 19

*Forrest v. Parry,*
    930 F.3d 93 (3d Cir. 2019) ................................................. 33

*Francis v. Goodman,*
    81 F.3d 5 (1st Cir. 1996) .................................................... 29

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) ........................................................... 62

*González v. Vélez,*
    864 F.3d 45 (1st Cir. 2017) ................................................ 18

*Hunt v. Washington State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ......................................................... 45

*In re Pub. Offering PLE Antitrust Litig.,*
    427 F.3d 49 (1st Cir. 2005) ................................................ 29

*Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. &*
    *Apostolic Church,*
    499 F.3d 32 (1st Cir. 2007) ................................................ 51

*Leyva v. On the Beach, Inc.,*
    171 F.3d 717 (1st Cir. 1999) .............................................. 33

*Maine Forest Prod. Council v. Cormier,*
    51 F.4th 1 (1st Cir. 2022) ............................................. 62, 65

*Martone Place, LLC v. City of Springfield,*
    No. 16-CV-30170-MAP, 2017 WL 5889222 (D. Mass. Nov. 29, 2017)
    *aff'd*, No. 18-1020, 2018 WL 11231884 (1st Cir. Dec. 19, 2018) .......... 28

*Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández,*
  58 F.4th 5 (1st Cir. 2023) ........................................................ 51

*Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.,*
  467 U.S. 461 (1985) ............................................................... 51

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.,*
  385 F.3d 72 (1st Cir. 2004) ..................................................... 29

*Minnesota v. Clover Leaf Creamery Co.,*
  449 U.S. 456 (1981) ............................................................... 45

*Napier v. Atlantic Coast Line R. Co.,*
  272 U.S. 605 (1926) ............................................................... 62

*National Meat Association v. Harris,*
  565 U.S. 452 (2012) ...................................................... passim

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ...................................................... passim

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine,*
  45 F.4th 542 (1st Cir. 2022) ................................................... 39

*New Energy Co. of Indiana v. Limbach,*
  486 U.S. 269 (1988) ............................................................... 47

*Nken v. Holder,*
  556 U.S. 418 (2009) ............................................................... 65

*Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of Cal.,*
  306 U.S. 493 (1939) ............................................................... 23

*Paraflon Invs., Ltd. v. Fullbridge, Inc.,*
  960 F.3d 17 (1st Cir. 2020) ..................................................... 29

*Pfizer Inc. v. Ajix, Inc.*,
2005 U.S. Dist. LEXIS 15984 (D. Conn. 2005) .................................... 25

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ........................................................................ 3, 7

*Pleasantdale Condos., LLC v. Wakefield*,
37 F.4th 728 (1st Cir. 2022) .............................................................. 32

*Portland Pipe Line Corp. v. City of S. Portland*,
288 F. Supp. 3d 321 (D. Me. 2017) ..................................................... 52

*Public Service Co. of N.H. v. Town of W. Newbury*,
835 F.2d 380 (1st Cir. 1987) .............................................................. 66

*Rodríguez-Reyes v. Molina-Rodríguez*,
711 F.3d 49 (1st Cir. 2013) ............................................................... 18

*Roque-Rodriguez v. Lema Moya*,
926 F.2d 103 (1st Cir. 1991) .............................................................. 29

*Sanchez v. Triple-S Mgmt. Corp.*,
492 F.3d 1 (1st Cir. 2007) ................................................................. 34

*SEC v. Tambone*,
597 F.3d 436 (1st Cir. 2010) .............................................................. 18

*Sola Commc'ns, Inc. v. Bailey*,
2003-905 (La. App. 3 Cir. 12/10/03), 861 So. 2d 822 ........................... 25

*Souza v. Pina*,
53 F.3d 423 (1st Cir. 1995) ............................................................... 28

*SPGGC, LLC v. Ayotte*,
488 F.3d 525 (1st Cir. 2007) .............................................................. 51

viii

*Stafford v. Wallace,*
   258 U.S. 495 (1922) ..................................................................22

*Stella v. Town of Tewksbury, Mass.,*
   4 F.3d 53 (1st Cir. 1993) ....................................................18, 33

*Tobin v. Fed. Express Corp.,*
   775 F.3d 448 (1st Cir. 2014) .................................................52

*Toomer v. Witsell,*
   334 U.S. 385 (1948) ..........................................................19, 20

*Trailer Marine Transp. Corp. v. Rivera Vazquez,*
   977 F.2d 1 (1st Cir. 1992) .......................................................44

*Triantos v. Guaetta & Benson, LLC,*
   91 F.4th 556 (1st Cir. 2024) ..................................................30

*Tyler Pipe Indus., Inc. v. Washington State Dept. of Revenue,*
   483 U.S. 232 (1987) .................................................................20

*United States v. Johnson,*
   467 F.3d 56 (1st Cir. 2006) .....................................................37

*Ward v. State,*
   79 U.S. 418 (1870) ...................................................................20

*Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt.
   Council,*
   589 F.3d 458 (1st Cir. 2009) ..................................................22

*Wightman v. Springfield Terminal Ry. Co.,*
   100 F.3d 228 (1st Cir. 1996) ..................................................51

## **Statutes**

7 U.S.C. § 192(b) .........................................................................22

21 U.S.C. § 601.............................................................................50

ix

21 U.S.C. § 602 ................................................................. 60

21 U.S.C. § 603-06 ......................................................... 60

21 U.S.C. § 608 ................................................................. 60

21 U.S.C. § 678 ............................................................ 3, 52

28 U.S.C. § 1291 .................................................................. 4

28 U.S.C. § 1331 .................................................................. 4

Mass. Gen. Laws Ann. Ch. 129 App., §§ 1-1 *et seq.* ............................... 1, 6

Mass. Gen. Laws Ann. ch. 129 App., § 1-2 ................................. 41

Mass. Gen. Laws Ann. ch. 129 App., § 1-3 ........................ 6, 41, 48, 64

Mass. Gen. Laws Ann. ch. 129 App., § 1-5 ........................... 6, 7, 64

Mass. Gen. Laws ch. 30A, § 7 .......................................... 27

Mass. Gen. Laws ch. 231A ............................................... 27

Mo. Const. art. I, § 35 .................................................... 24

U.S. Const. art. I, § 8, cl. 3 ....................................... 38, 39

U.S. Const. art. I, § 10, cl. 2 ........................................

U.S. Const. art. IV, § 2, cl. 1 ........................................ 19

Wyo. Stat. § 11-29-115 .................................................. 24

Wyo. Stat. § 11-44-104 .................................................. 24

## Rules

D. Mass. Local Rule 7.1(b)(2) .......................................................... 33

D. Mass. Local Rule 56.1 ................................................................. 33

Fed. R. Civ. P. 8(a)(2) .................................................................... 18

Fed. R. Civ. P. 52(a)(3) .................................................................. 28

Fed. R. Civ. P. 56(f) .................................................................. passim

## Regulations

9 C.F.R. § 309 ................................................................................. 60

345 Ind. Admin. Code 14-2-3 ......................................................... 24

345 Ind. Admin. Code 14-2-4 ......................................................... 24

## Other Authorities

Br. for United States, *National Meat Association v. Harris,* 2011 WL
    3821398, at *17 (Aug. 29, 2011) ............................................. 57

Order of Court, *Carrasquillo v. United States*, No. 10-1489 (1st Cir.
    Sept. 26, 2011) ...................................................................... 30

## REASONS WHY ORAL ARGUMENT SHOULD BE HEARD

This appeal presents important questions involving various provisions of the Constitution and federal law. State action attempting to regulate industries and conduct in *other states* invites retaliatory action, increasingly leading the Nation toward interstate trade warfare, something the Framers specifically sought to avoid. Given the importance of the legal issues implicated in this appeal and the ongoing irreparable harm caused by Mass. Gen. Laws Ann. Ch. 129 App., §§ 1-1 *et seq*. and the district court's delay, oral argument will assist the Court— on a matter of first impression—in resolving this appeal.

Given the number of claims involved, and the complex procedural posture of the various rulings on appeal, Appellants respectfully suggest that argument of twenty minutes per side may be helpful to the Court.

## INTRODUCTION

No different than Iowa telling New England's lobstermen how they must trap lobster, Massachusetts passed a law telling Midwestern pig farmers how they must raise pigs. Don't farm how we tell you to? Then you can't sell here. So says Massachusetts.

That's unconstitutional. It encourages tit-for-tat trade wars among the States. And it extensively disrupts the Nation's pork supply chain. So, a group of family-owned, Midwestern pig farmers, and a Midwestern pork processor, sued and sought a preliminary injunction. It wasn't for 353 days that they received an appealable order on that requested relief.

Unfortunately, that near-year-long struggle produced several errors. Most egregiously, the court dismissed 90% of Appellants' claims without a written order, and without any reasoning on the record. And, in any event, the detailed complaint shows Appellants stated a claim under each of those legal theories.

Things didn't improve from there. The one claim that survived was Appellants' challenge under the dormant Commerce Clause—a claim divided into two legal theories: (1) direct discrimination; and (2) the unlawful burden test articulated by the Supreme Court in *Pike v. Bruce*

*Church*, 397 U.S. 137 (1970). At summary judgment, the court entered judgment *sua sponte* against Appellants under Rule 56(f) on nearly every theory under that claim, despite Defendants never having moved for such and despite the court had never given Appellants the required prior notice of a *sua sponte* ruling. The court used that same procedure to enter judgment against Appellants on their *Pike* theory, even though Appellants *had not moved for summary judgment on that portion of the claim*, due to the many factual disputes requiring further adjudication. Additionally, the legal ruling was simply wrong. The court based its decision on a "holding" from a recent Supreme Court case, but the portion of the opinion the court cited was joined by only three Justices.

Next, on the narrow dormant Commerce Clause issue that remained, the court properly concluded one portion of the statute directly discriminated against out-of-state processors, and thus severed it (a ruling Massachusetts does not challenge on appeal). The question then became whether the Act is preempted by the Federal Meat Inspection Act, which broadly preempts requirements "in addition to, or different than those made under this chapter." 21 U.S.C. § 678. The Supreme Court analyzed the breadth of this preemption clause in *National Meat*

3

*Association v. Harris*, 565 U.S. 452 (2012), and the court's conclusion that the Act is not preempted runs directly afoul of that binding precedent.

Finally, this Court should consider that, throughout this extended process, Appellants had a motion for preliminary injunction pending for almost a year. The district court's consolidation of that request with the merits does not remedy the irreparable harm being suffered. And as this brief will demonstrate, Appellants are likely to succeed on the merits.

This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction under 28 U.S.C. § 1331, and the court granted final judgment on July 22, 2024. Add.71. This Court has jurisdiction under 28 U.S.C. § 1291. Appellants timely filed a notice of appeal on August 13, 2024. A2197.

## STATEMENT OF THE ISSUES

I.    Did the court err in summarily dismissing nine of Appellants' claims by failing to accept all of Appellants' allegations as true, and further entering dismissal without analysis or written order?

II.    Did the court err in entering summary judgment *sua sponte* against Appellants for their dormant Commerce Clause claim premised

upon *Pike v. Bruce Church* without notice or opportunity under Fed. R. Civ. P. 56(f) and where there were disputed material facts concerning the Act's burden on interstate commerce?

III.     Did the court err in entering *sua sponte* summary judgment against Farmer Appellants for their direct-discrimination dormant Commerce Clause claim by holding the Act does not discriminate against Farmer Appellants and without providing notice or opportunity under Fed. R. Civ. P. 56(f)?

IV.     Did the court err in holding that the Act is not preempted, through express or implied means, by the Federal Meat Inspection Act following severance of the unconstitutional sales exemption?

## STATEMENT OF THE CASE

### I.    Massachusetts Passes the Act.

On November 8, 2016, Massachusetts voters approved Mass. Gen. Laws Ann. Ch. 129 App. §§ 1-1 *et seq.* (the "Act"). Add.72-85. Relevant here, the Act bans a "business owner or operator to knowingly engage in the sale within Massachusetts of any . . . Whole Pork Meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Mass. Gen. Laws Ann. ch. 129 App., § 1-3; Add.74. It defines "confined in a cruel manner" as confinement that "prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely." *Id.* § 1-5; Add.76. Breeding pigs are "covered animals" in the Act. *Id.* § 1-5; Add.76.

The sales ban contained an exception by defining "sale" as "a commercial sale by a business" of covered Whole Pork Meat,[1] but then

---

1 "Whole pork meat" definition itself excepted all "combination food products," like pepperoni and sausage, which are made from the sow being regulated here. Mass. Gen. Laws Ann. ch. 129 App., § 1-5; A1352, A1363.

excluded all sales "undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act[.]" *Id.* § 1-5; Add.76. After multiple extensions and delayed enforcement, due in part to the Supreme Court's decision concerning a similar legal challenge to a California law, *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 409 (2023), the Act became enforceable against breeding pigs on August 24, 2023. A2045.

## II.  Appellants Sue and Move for Preliminary Injunction; the Court Consolidates Proceedings.

On July 25, 2023, Triumph and Farmer Appellants[2] sued to preliminarily and permanently enjoin the Act. A22-102. Appellants asserted ten claims: (1) dormant Commerce Clause violations by directly discriminating against out-of-state commerce and by unduly burdening interstate commerce as described in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970); (2) Privileges and Immunities Clause violations; (3) preemption under the Federal Meat Inspection Act (the "FMIA"); (4) implied preemption under the FMIA; (5) preemption under the Packers

---

[2] Triumph is a farmer-owned pork processor producing high-quality pork products sold nationally (including within Massachusetts). A25. The Farmer Appellants are a collection of family-owned farmers who breed pigs to supply Triumph's pork processing operations. A25-26.

and Stockyards Act (the "PSA"); (6) Full Faith and Credit Clause violations; (7) Due Process Clause violations; (8) Import-Export Clause violations; (9) declaratory relief on unconstitutionality; and (10) judicial review of the Act's regulations. A22.

On September 6, 2023, the court held a hearing and immediately collapsed the motion for preliminary injunction with a trial on the merits under Rule 65(a)(2). Add.1-2. In response, Appellants requested a trial be held "as soon as possible." Add.4. The court "expressed hope" that instead of cross-motions for summary judgment, the parties could place "the agreed-upon record . . . before the Court." Add.8. The court set a pretrial hearing for October 10, 2023. Add.5.

## III. The Court Dismisses Nine out of Ten Claims Without Analysis or Written Order.

On September 14, 2023, the parties filed a joint status report. A465. Massachusetts—for the first time—objected to the October 10 pre-trial conference, arguing it provided insufficient time to prepare for trial. A468-70. Massachusetts also requested the October 10 conference be continued and a motion to dismiss briefing schedule. A467.

Over Appellants' objections, the court set that "schedule" and ordered Massachusetts to file its motion by Thursday, September 28,

with the motion hearing for Monday, October 2—*a mere four days later*. A10. The order didn't address whether, when, or how Appellants could oppose the motion prior to the hearing. A10.

On September 28, Massachusetts moved to dismiss *all* ten claims under Rules 12(b)(1) & 12(b)(6). A475-500. Appellants filed an opposition less than 24-hours later. A701.

The court heard the motion on October 2. Add.7-14. After instructing the parties to argue only the dormant Commerce Clause claim (Count I) at the hearing, the court orally granted the motion to dismiss as to the other nine counts, from the bench, without argument. Add.9-12. The sole reasoning appears in a single line in the transcript:

> I'm going to dismiss them [Appellants' claims] except for the dormant Commerce Clause claim, and I'm going to dismiss them because Massachusetts has every right, as against your other claims, to pursue its own approach to animal housing.

Add.9; *see also* Add.7. All that survived was Appellants' dormant Commerce Clause claim (under both legal theories), despite the Supreme Court indicating several of Appellants' pled claims likely to be viable under similar legal challenges. Add.11-12; *Ross*, 598 U.S. at 370, 376, 408. The court ordered the parties to discuss how to proceed to trial on

9

the remaining claim, again suggesting a case-stated proceeding. A902-09. The court set the final pretrial conference for October 10, 2023. Add.7.

## IV. The Court Grants Summary *Judgment Sua Sponte* Against Appellants on their *Pike* Claim.

The parties submitted a joint pre-trial memorandum in early October, as amended. A730, A805. Appellants explained they were ready to proceed to trial, but considering the court's suggestions, they were amenable to moving for partial summary judgment on its direct-discrimination claim, so long as the *Pike* claim could proceed later on a case-stated (or trial) basis. *See* A805. But Appellants made clear they wanted a speedy resolution, or that at the very least, be awarded a preliminary injunction. A808. The court then issued an order allowing Appellants to file a motion for early *partial* summary judgment and set a hearing for November 14, 2023. A14, A962.

Accordingly, Appellants filed their motion for *partial* summary judgment. *See* A1328. Appellants explained that there are "two ways for a plaintiff to demonstrate a violation of the dormant Commerce Clause": direct discrimination, and alternatively, that a "law violates the balancing test the Supreme Court announced in *Pike*." A1335. Appellants stated that "the first basis—discrimination—is the sole focus of this

partial motion for summary judgment" and reserved its *Pike* claim for trial. A1335 n.1. As a result, Appellants submitted no evidence or statement of undisputed material facts in support of the *Pike* claim. A1356.

Massachusetts did not cross-move for summary judgment. *See* Add.16. Instead, within their opposition brief filed on November 7, Massachusetts requested—in a single sentence—that the court not only deny Appellants' motion, but also grant summary judgment *sua sponte* to Massachusetts on the direct-discrimination theory. A1388-89. Massachusetts also requested *sua sponte* summary judgment on Appellants' *Pike* claim, *despite Appellants expressly reserving that theory within their own partial motion for summary judgment*. A1371, A1388-89.

Appellants replied five days later, *again* making clear they were only moving on the direct-discrimination claim, not on *Pike*. A1437-38. At no time before the November 14 hearing did the court provide Rule 56(f) required notice. *See* A1437-38.

At the November 14 hearing, the court committed the parties to submitting the "slaughterhouse exemption" issue—*i.e.*, the sale of non-

compliant pork meat from FMIA-inspected facilities—on a case-stated basis. Add.15-16. It then heard the Farmer Appellants' argument on their remaining direct-discrimination issues. Add.15-16.

The court - without written order or reasoning - denied Appellants' partial motion, *but then proceeded to grant summary judgment to Massachusetts,* dismissing all *Pike* claims and Farmer Appellants' direct-discrimination claim. *See* Add.13. When Appellants' counsel explained that neither party had moved on the *Pike* theories, and that no evidence was submitted on that claim, the court only stated its belief that Massachusetts' opposition "was an outright, um, opposition, and I think they're properly before me, and in any event I reject it." Add.17-19. It then issued a text-only order, stating that the "[p]arties agree to case stated solely as to pork producer slaughterhouse issue. Commonwealth's opposition motion for summary judgment allowed solely as to farmers." Add.13.

Appellants filed a written objection once the court clarified it was dismissing ***all*** *Pike* claims. A1440. The court's only response to this objection came months later, when the court—during a hearing on a separate motion—said "I reject the *Pike* analysis" and "I think the briefs

fairly raise the issue, and since on the merits I reject the analysis, I don't think it's a question of notification or the like. And I thought I was being fair to all parties. So I don't think I need anymore." Add.22. The court later stated (in a different order involving a different motion) that Appellants' objection was "of no practical moment (as the Court sought to explain during a busy motion session). The legal issue had been fully briefed and the *Court's resolution obviated the need for evidence*." Add.37. (emphasis added).

## V.    The Court Strikes the Slaughterhouse Exception.

The court then set the case-stated hearing on Triumph's direct-discrimination claim concerning the "slaughterhouse issue." Add.13. The court ruled on February 5, 2024, that the sales exemption violated the dormant Commerce Clause, and ordered that exemption severed. Add.24. Because the Act's sales ban now applied to all FMIA facilities, the court reinstated Appellants' FMIA preemption claims, and ordered Appellants to move for summary judgment on them. Add.24.

## VI.    The Court Grants Summary Judgment to Massachusetts.

Triumph moved for summary judgment per the court's order. A1736. Although the court only authorized Triumph to move for

summary judgment, Massachusetts cross-moved as well, but not until 30 days *after* Appellants' motion. A1874. The motions were fully briefed, and the court held a hearing. A1736-2196.

On July 22, 2024—353 days after Appellants moved for a preliminary injunction, and 323 days after the court's consolidation—the court denied Triumph's motion and granted Massachusetts,' finding the Act was not preempted by the FMIA. Add.52.

This appeal follows.

## SUMMARY OF THE ARGUMENT

This appeal presents several unique options for this Court to halt unconstitutional state regulation of industry outside its own borders. Triumph, a pork processor providing federally regulated pork nationwide, and the Farmer Appellants who raise and supply pigs to Triumph, request this Court take action to preserve the Constitution and prevent further irreparable harm caused by Massachusetts' extraterritorial over-regulation based upon voters' moral or policy judgment.

This Court must *at least* reverse and remand due to the procedural and substantive failures of the court, with direction to enter a

preliminary injunction order to stay enforcement of the Act and regulations nationwide. First, Appellants don't know why the court summarily dismissed nine claims, because the court provided no reasoning or written order. Furthermore, if this Court analyzes those nine claims dismissed pursuant to the correct standard of review, Appellants sufficiently pled each claim through their 310 well-pled allegations in the Complaint.

The court's errors continued, as it ultimately entered summary judgment *sua sponte* against Farmer Appellants without notice or opportunity under Rule 56(f) on most of the remaining dormant Commerce Clause theories. Again, the court dismissed Farmer Appellants' claim without reasoning or written order, and despite overwhelming evidence that the Act's effect creates a scheme of economic protectionism for in-state farmers detrimental to out-of-state farmers' interests. But the court did not stop there, and instead further erred in entering summary judgment against *all* Appellants on their *Pike* claims. This came despite no party briefing the issue in detail, no evidence being presented, and disputed key material facts permeating the record. The *Pike* claims must be fully developed and presented to the court at trial.

Finally, the two narrow issues on which the district court made substantive rulings present this Court with the most efficient route to decision here. This Court should direct judgment to be entered in Appellants' favor, finding the sales ban is unconstitutional for two reasons. First, it discriminates in effect against the Farmer Appellants and those similarly situated across the Nation. The Act regulates conduct occurring *only* at out-of-state farms, thus providing a distinct advantage to in-state farmers. Moreover, legislative committee hearing members had direct knowledge of this discrimination, with one even recognizing a strong risk of the Act violating the dormant Commerce Clause.

Second, with the Act's sales exemption now stricken by the court as unconstitutional, the Act is preempted by the FMIA. The Act directly regulates FMIA regulated facilities. The Act's effects impose additional and different requirements on Triumph, which the Supremacy Clause (and the FMIA's express preemption clause) prohibits. And those additional requirements fall within the FMIA's scope, preventing Massachusetts from supplanting its own determination of what constitutes "safe" pork for its consumers while disregarding what the

USDA has long-implemented to ensure the free flow of safe, unadulterated meat throughout interstate commerce.

Massachusetts may regulate its own in-state farmers, but that's where its authority stops. This Court should reverse, and direct judgment be entered for Appellants. If, however, this Court disagrees, then *at minimum* this Court should reverse and remand for further proceedings concerning the remaining claims summarily dismissed by the court, allow Appellants' *Pike* claims to be set for determination at trial, and direct a preliminary injunction be entered pending further proceedings.

## ARGUMENT

This argument proceeds in four parts. The first three sections mirror the procedural stages at which the errors occurred: (1) dismissal of nine claims without reasoning; (2) summary judgment to Massachusetts on the *Pike* claims and Farmer Appellants' direct-discrimination claim; and (3) summary judgment to Massachusetts on FMIA preemption. Finally, the fourth section reiterates the procedural posture in which this case began—a motion for preliminary injunction—and discusses how this case should proceed from here.

## I.    The Court Erred by Dismissing Nine of Appellants' Ten Claims Without Any Stated Reasoning.

Without a written order or any substantive reasoning, the court dismissed 90% of Appellants' claims. That is error both on substance and procedure. First, on each of the dismissed claims, the Amended Complaint establishes that the factual allegations at least state a claim under the pled legal theories. Second, at the very least, the court's deficient adjudication of these claims warrants remand for further analysis.

This Court reviews dismissals under Rule 12(b)(6) *de novo*, *González v. Vélez*, 864 F.3d 45, 50 (1st Cir. 2017), evaluating whether the complaint contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint need not include "exhaustive factual allegations," only "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *SEC v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (en banc) (quotations omitted). The Court accepts "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013) (quotation omitted). The Court may supplement

these facts and inferences with information gathered from "matters of public record" and "facts susceptible to judicial notice." *Foisie v. Worcester Polytechnic Inst.*, 967 F.3d 27, 44 (1st Cir. 2020).

## A.    The Court Erred in Dismissing the Claims.

No one knows why the court dismissed the nine claims. All Appellants can assume is the dismissal was based on the arguments Massachusetts asserted in its motion. But had the court appropriately considered the allegations in the Amended Complaint and applied the correct standard, it would have never dismissed those claims for the reasons discussed below. This Court should reverse.

### 1.    *Privileges and Immunities Clause*

The Privileges and Immunities Clause provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2, cl. 1; *Ross*, 598 U.S. at 370. "The primary purpose of this clause . . . was to help fuse into one Nation a collection of independent, sovereign States" and "designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948); It guards "against rank discrimination against citizens of other States[.]"

*Tyler Pipe Indus., Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part). Thus, the Clause protects several fundamental rights, including the right to practice a trade or profession. *Toomer*, 334 U.S. at 388, 403; *Ward v. State*, 79 U.S. 418, 430 (1870). (stating the clause "plainly and unmistakably secures and protects the right of a citizen of one State to pass into any other State of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation").

Rank discrimination inviting retaliation and preventing out-of-state farmers from engaging in their chosen profession is what the Amended Complaint alleges. The Act "directly and intentionally targets and seeks to regulate out-of-state activity that is permissible in the states in which it occurs" and represents an attempt to "effectively regulate pig farming, manufacturing, and production in other states." *See* A24, A54.

And the Amended Complaint extensively alleges this charge of discrimination. For example, "the burden of compliance with the Act's Minimum Size Requirements falls almost entirely on out-of-state pig farmers and pork processors to the benefit of in-state farmers and pork processors." A32-33, A54. Further, "Massachusetts pig farms did not use

20

gestation crates for housing breeding sows" when the Act was approved, and thus "directly targeted out-of-state farmers only." A33; *see also* A1491.

Additionally, the Amended Complaint describes how the Act impacts out-of-state farmers and will preclude them from pursuing their trade and profession. *See, e.g.*, A32-34, A44-46 (stating it is "neither feasible nor practical for farmers to segregate their product on a state-by-state basis" as doing so would mean "many farmers' operations will become cost prohibitive" due to "lack of space and financial inability."). Of course, to the extent the court doubted any of these allegations, the pleadings are not the appropriate stage to address it.

Finally, in analyzing whether the Amended Complaint sufficiently pled discrimination among citizens of different states, look no further than the court's *own ruling* on the "slaughterhouse exception." The court found that this portion of the Act discriminated against out-of-state processors in favor of in-state processors. Add.41. ("The slaughterhouse exception has a discriminatory effect."). This demonstrates the Amended Complaint sufficiently alleges discrimination.

### 2.    *Express and Conflict Preemption by FMIA*

The court dismissed the FMIA-preemption claim, but later reinstated it and adjudicated it on summary judgment. To avoid duplication, Appellants address this claim in Section III, *infra*.

### 3.    *Preemption by Packers and Stockyards Act*

For conflict preemption, one must allege that the "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council*, 589 F.3d 458, 472-73 (1st Cir. 2009). Here, the PSA prohibits any "packer or swine contractor" from "giv[ing] any undue or unreasonable preference or advantage to any particular person or locality." *See* 7 U.S.C. § 192(b). Thus, any state law that conflicts with the PSA—which is intended to prevent "unfair, discriminatory, or deceptive practices" in the packing industry, *Stafford v. Wallace*, 258 U.S. 495, 514-15 (1922)—is preempted.

Once again, this is exactly what Appellants allege. Triumph must now source compliant pigs to gain access to the Massachusetts marketplace and thus must pay a premium to farmers who meet the

demand. A61. This plainly favors Massachusetts farmers who never used the farming methods now banned. A33, A61.

In opposition, Massachusetts simply regurgitated its argument that the Act does not encourage discriminatory practices, and it provides no undue or unreasonable preference or restraint on trade for a pork processor to source compliant meat. In addition to being issues to address through fact-finding as opposed to the pleadings, if the *state law* is discriminatory, *compliance* with that state law necessarily encourages discrimination. This plausibly alleges a conflict with the PSA. The Court should reverse the dismissal of this claim.

### 4. *Full Faith and Credit Clause*

The Full Faith and Credit Clause preserves rights acquired or confirmed under the public acts and judicial proceedings of one state by requiring recognition of their validity in other states. *Pac. Emps. Ins. Co. v. Indus. Accident Comm'n of State of Cal.*, 306 U.S. 493 (1939). Massachusetts moved to dismiss, arguing (1) that there cannot be a standalone claim under the Clause, and (2) that the Amended Complaint didn't allege that the Act constituted a "'policy of hostility to the Public Acts' of another state." A497. Both arguments reveal Massachusetts'

23

misunderstanding of the Amended Complaint. Appellants' claim merely sought to enforce the "Right to Farm" laws that exist in several states in which Appellants operate. A25-26; Mo. Const. art. I, § 35.[3] And because the Act bans a particular farming practice expressly used (and regulated) in those states, the "[the Act] [is] in direct conflict with state statutes for the actual states in which the breeding pigs are housed." A46, A63-64. This alleges that the Act runs afoul of those laws, and thus the Clause. *See, e.g.*, *Ross*, 598 U.S. at 409 (Kavanaugh, J., concurring and dissenting in part) (collecting supporting sources for the theory and recognizing it as a viable claim).

The Amended Complaint plainly alleges a claim under the Full Faith and Credit Clause.

### 5.     *Due Process Clause*

Appellants alleged that the Act is unconstitutionally vague in violation of the Due Process Clause because it fails to define what it means to "engage in the sale" of the prohibited pork product. A65. Also, the Act and its attendant regulations failed to specify the square footage

---

[3] And there are others. *See, e.g.*, Wyo. Stat. § 11-29-115; Wyo. Stat. § 11-44-104; 345 Ind. Admin. Code 14-2-3 through 14-2-4.

requirements for a breeding pig to "turn around freely." A65. In response, Massachusetts claimed these terms are ordinary terms capable of understanding. A497-98. That disregards the allegations in the Amended Complaint, is more akin to a factual dispute at summary judgment, and misses the main thrust of Appellants' theory. *Ross*, 598 U.S. at 376.

First, due to the interconnectedness of the national supply chain, knowingly "engaging" in the sale could mean anyone up and down that supply chain. To be sure, if Massachusetts wanted to enforce the Act only against those who "sell," it would have worded the Act that way. But it didn't. Instead, the Act's wording is much broader; so broad, in fact, that courts have specifically held the word "engage" to be unconstitutionally vague in a variety of contexts. *See, e.g., Bodfish v. State*, No. A-10070, 2009 WL 3233716, at *5 (Alaska Ct. App. Oct. 7, 2009); *Pfizer Inc. v. Ajix, Inc.*, 2005 U.S. Dist. LEXIS 15984, *12 (D. Conn. 2005); *Sola Commc'ns, Inc. v. Bailey*, 2003-905 (La. App. 3 Cir. 12/10/03), 861 So. 2d 822, 829 (Ezell, J., concurring).

Second, it's vague to simply say a pig must be able to "turn around freely" to be compliant with the Act. Indeed, Appellants alleged they are "unable to discern whether the shipment of their pork products into

Massachusetts, if not compliant with the [the Act], is a prohibited conduct." A65. And this is because the ability of a sow to turn around varies, in part because of variations in the sow's size. As Appellants specifically alleged (and which should be obvious) sows are not "one size fits all." A65.

To the extent there was any doubt about the impact of the regulations at Appellants' farms, that is fodder for discovery and summary judgment, *not* a basis to dismiss on the pleadings. The constitutional-vagueness challenge under the Due Process clause is validly pled.

### 6.  *Import-Export Clause*

The Import-Export Clause states that "[n]o State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws." U.S. Const. art. I, § 10, cl. 2. While the Clause has historically applied to international trade issues, several Justices have indicated that such a reading "may be mistaken as a matter of constitutional text and history: Properly interpreted, the Import-Export Clause may also prevent States 'from imposing certain especially burdensome' taxes and

duties on imports from other States—not just on imports from foreign countries." *Ross*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part) (citations omitted).

Here, as alleged, the Act essentially imposes a duty or tax on out-of-state goods through its imposition of a particular method of raising pigs that is unquestionably more burdensome and more expensive, but only for out-of-state entities. To gain access to the Massachusetts marketplace, Appellants *must* adjust their practices. For the Farmer Appellants, this requires a substantial, costly overhaul to their farming practices. A67. For Triumph, this requires segregation, labeling, and processing-line adjustments. A67. And, once again, to the extent the court or Massachusetts doubted the veracity of these costs and disruptions, that should be addressed later in the case.

### 7.    *Declaratory Relief and Judicial Review*

Lastly, Count IX and Count X[4] are unique, in that they seek injunctive and declaratory relief based upon constitutional challenges to

---

[4] Defendants argued that Count X—which sought to challenge the Act under Massachusetts state law, Mass. Gen. Laws ch. 30A, § 7 and ch. 231A—was barred by the Eleventh Amendment. But at least part of the declaratory relief sought under that count relates to violations of the federal constitution. *See* A68. Regardless, federal courts have

the Act and its regulations. Appellants are entitled to the declaratory and injunctive relief sought, whether pled as a separate count or just a form of relief.

Had the court applied the correct motion to dismiss standard, it would not have dismissed these detailed, well-pled claims. This Court should reverse.

## B.    At The Very Least, This Court Should Remand for a Sufficient Ruling.

As discussed, this Court should reverse dismissal of the nine claims, as those claims are plainly sufficient on the face of the Amended Complaint. But, if the Court is unable to do so based on the lack of sufficient (or any) reasoning from the court, this Court should remand.

Although it is not a technical requirement for a court to "state findings or conclusions when ruling on a motion under Rule 12," Fed. R. Civ. P. 52(a)(3), this Court strongly prefers it to allow for meaningful appellate review. *Souza v. Pina*, 53 F.3d 423, 424 n.4 (1st Cir. 1995) ("some explication of the trial court's reasoning will often prove valuable

---

"jurisdiction to evaluate a claim under th[at] Massachusetts statute and to award relief*." Martone Place, LLC v. City of Springfield*, No. 16-CV-30170-MAP, 2017 WL 5889222, at \*25 (D. Mass. Nov. 29, 2017), *aff'd*, No. 18-1020, 2018 WL 11231884 (1st Cir. Dec. 19, 2018).

to both the litigants and to the reviewing court"); *Roque-Rodriguez v. Lema Moya*, 926 F.2d 103, 105 n.3 (1st Cir. 1991) (same at summary judgment); *see also Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) ("There is no question that a trial judge can facilitate the appellate task by spelling out his rationale, and we encourage such elaboration").

This case involves ten counts and detailed factual allegations. Yet the court provided no analysis; it is entirely unclear why it dismissed these claims. The court did not "lucidly articulate[] its reasoning in support of dismissal." *Cook & Co. v. Volunteer Firemen's Ins. Servs.*, 657 F. App'x 1, 3 (1st Cir. 2016). And the single statement from the bench that "Massachusetts has every right, as against your other claims, to pursue its own approach to animal housing," Add.9, is in no way "clear enough to permit meaningful appellate review." *Paraflon Invs., Ltd. v. Fullbridge, Inc.*, 960 F.3d 17, 32 (1st Cir. 2020); *Francis v. Goodman*, 81 F.3d 5, 7 (1st Cir. 1996) (remanding as order was "not amenable to reliable appellate review under any standard, since the findings of fact and subsidiary conclusions of law are not discernible"); *In re Pub. Offering PLE Antitrust Litig.*, 427 F.3d 49, 53 (1st Cir. 2005) ("we need

the benefit of the [] court's reasoning" due to the "variety of issues" and the "sensitive balancing of interests . . . that has hitherto not been addressed").

Thus, at the very least, this Court should reverse and remand for sufficient adjudication of the motion to dismiss.[5]

## II. The Court Erred When It *Sua Sponte* Rejected Most of Appellants' Dormant Commerce Clause Theories.

The one claim remaining—Appellants' challenge under the dormant Commerce Clause—proceeded to adjudication on Appellants' *partial* motion for summary judgment. Key to keeping the claims and rulings straight through this analysis is understanding that each set of Appellants—Triumph (a processor) on the one hand, and the Farmer Appellants, on the other—asserted both a direct-discrimination claim and a *Pike* claim.

---

[5] This district court is aware of this issue. *See, e.g., Triantos v. Guaetta & Benson, LLC*, 91 F.4th 556, 564 (1st Cir. 2024) (remanding due to "deficiencies [that] make it difficult for us to conduct meaningful appellate review"); *Carrasquillo v. United States*, 818 F. Supp. 2d 385, 386 (D. Mass. 2011) (quoting Order of Court, *Carrasquillo v. United States*, No. 10-1489 (1st Cir. Sept. 26, 2011)) (remanding as "we are not able to discern the reasons for the dismissal.").

Appellants moved for summary judgment on *only* the direct-discrimination claims. As Appellants explained, the *Pike* claims were extremely fact intensive and remained for adjudication at trial. Massachusetts did not move for summary judgment on any claim.

Nevertheless, the court *sua sponte* entered summary judgment against Appellants **on their Pike claims** without the notice or opportunity required by Rule 56(f). This alone justifies reversal on the *Pike* theory; the court never received *any* evidence with respect to that theory, it never addressed disputed material facts plainly found in the record, nor did it even receive any substantive material briefing. And even if that procedural error was somehow not enough, the court's legal reasoning (cursory as it is) was also flawed.

Further, the court improperly granted *sua sponte* judgment against Farmer Appellants on their direct-discrimination claim. That, too, was error, both on procedure and on substance.

 Summary judgment is appropriate when there remains no dispute of material fact, *i.e.*, there is no factual determination which a "rational factfinder" could make as to the "existence or nonexistence" of a fact that "has the potential to change the outcome of the suit"—such that "the

moving party is entitled to judgment as a matter of law." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 4-5 (1st Cir. 2010). This Court reviews summary judgment rulings *de novo* and draws all inferences in favor of the party against whom summary judgment was entered. *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 732-33 (1st Cir. 2022). Finally, when there is no dispute as to the material facts in the record, this Court may not only reverse a grant of summary judgment for one party, but direct its entry to the other. *See, e.g.*, *ATC Realty, LLC v. Town of Kingston, New Hampshire*, 303 F.3d 91, 99 (1st Cir. 2002).

## A. The court improperly entered *sua sponte* judgment against Appellants on their *Pike* claims.

### 1. *The Court violated Rule 56(f)*

Although a court may issue *sua sponte* rulings, adversely affected parties must receive notice from the court and an opportunity to respond before such a ruling may issue. Fed. R. Civ. P. 56(f). Generally speaking, "the notice requirement for *sua sponte* summary judgment demands at the very least that the parties (1) be made aware of *the court's intention* to mull such an approach, and (2) be afforded the benefit of the [then-applicable] minimum 10-day period mandated by Rule 56." *See Stella v.*

*Town of Tewksbury, Mass.*, 4 F.3d 53, 56 (1st Cir. 1993).[6] Failure to provide this required notice is reversible error. *Leyva v. On the Beach, Inc.*, 171 F.3d 717, 720 (1st Cir. 1999); *see also Forrest v. Parry*, 930 F.3d 93, 113 (3d Cir. 2019).

Here, the first time Appellants received any notice from the court[7] of a possible *sua sponte* ruling was the *sua sponte* ruling itself. Rule 56(f) simply does not allow this. It deprived Appellants of putting their "best foot forward" in opposing such an order, *Leyva*, 171 F.3d at 720 (cleaned up), and this Court should reverse on this basis alone.

---

[6] Here, as a proxy for a "reasonable time to respond," the local rules permit a party 14 days to file oppositions or replies in typical summary-judgment practice. *See* D. Mass. Local Rules 7.1(b)(2) & 56.1.

[7] Defendants suggest that because their opposition brief suggested a ruling under Rule 56(f), that provided "notice." A1471-75. Not so. First, that's textually inaccurate—the *court* must provide notice. Fed. R. Civ. P. 56(f) ("After **giving notice** and a reasonable time to respond, **the court** may . . . grant summary judgment for a nonmovant."); *see also Leyva*, 171 F.3d at 720. And that makes sense. A suggestion by an opposing party in a brief is, of course, far different than notice from a court that it is entertaining such a ruling, *especially* on a claim that was not even raised by the moving party in the operative motion. Nor would Defendants' "notice" have provided Appellants a "reasonable time" to respond on a claim that was not even at issue in the motion. That opposition brief suggesting a *sua sponte* ruling was filed on November 7, just seven days before the hearing, and five days before Appellants submitted their reply on the claims actually at issue in the partial motion.

Moreover, granting summary judgment on a claim without considering the relevant evidence separately runs afoul of Rule 56(f). *See, e.g., Sanchez v. Triple-S Mgmt. Corp.*, 492 F.3d 1, 7 (1st Cir. 2007) (in order for Rule 56(f) to be triggered, the "discovery process must be sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts" (cleaned up)); *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir. 1996). Here, it is impossible for the court to have made any factual evaluation whatsoever, as it never had the requisite facts before it. When moving for *partial* summary judgment, Appellants explicitly reserved the right to pursue the *Pike* claims at trial because disputed facts already existed, and the parties were engaged in discovery with respect to *those very claims* at the time of the hearing and thereafter. *See* A1356. Indeed, Massachusetts contended that extensive discovery was required to address factual issues on the record. *See, e.g.*, A907; *see also* A814. Thus, no evidence was ever submitted; both parties *jointly represented* this to the court. *See, e.g.*, A821-22 (Massachusetts confirming the following were *contested facts*: the "alleged economic or other burden on the interstate pork market imposed by the Massachusetts law," the "nature of the local benefit of the

Case: 24-1759    Document: 00118193135    Page: 47    Date Filed: 09/23/2024    Entry ID: 6669407

law and/or the justification for it," and the "extent to which there is any evidence of discriminatory purpose or effect").

In response to Appellants' objections as to the *sua sponte* ruling, all the court said was that it thought the issue was appropriately "before" it, that the briefs "fairly raise[d] the issue," and that it thought it was "being fair to all parties." Add.19-22. This is insufficient under Rule 56(f) and factually inaccurate. Massachusetts' opposition brief argued (without citation to *any* evidence or *any* facts) that the "claim fails as a matter of law because the Supreme Court's decision in *Ross* forecloses it" as "[Appellants] make materially indistinguishable factual assertions and legal arguments here." A1388. Appellants' reply described that Massachusetts mischaracterized *NPPC v. Ross* but didn't fully brief the issue for the obvious reason that it was never on notice from the court that it was entertaining *sua sponte* judgment on this claim. That's especially so given Appellants' express reservation of the *Pike* claims for trial, making Massachusetts' opposition briefing on *Pike* outside the scope of what was before the court. A1437-38.

The court granted summary judgment, *sua sponte*, without providing notice to the adverse party, without considering any evidence

in support of the claim, without the claim being properly before the court and without providing any ability to Appellants to submit evidence or brief the issue. This is patent error, and the Court should reverse and remand all *Pike* claims accordingly.

> ### 2. Setting aside the procedural error, the court improperly entered judgment on Appellants' **Pike** claims

Absent any Rule 56(f) error, the court erred as a matter of law in dismissing Appellants' *Pike* claims. Again, the court initially provided no reasoning on his entry of judgment on the *Pike* claims. Add.13-19. Months later, in an order on another motion, the court said it thought the *Pike* claims were foreclosed by *Ross*, and so it simply "decline[d] to engage in *Pike* balancing" entirely:

> The Supreme Court ruled that "harm to some producers' favored methods of operation" did not rise to a "substantial harm to interstate commerce," and that "increased production expenses" cannot be compared by a court to "noneconomic" state benefits. Further, the Court explained, "judges often are 'not institutionally suited to draw reliable conclusions of the kind that would be necessary . . . to satisfy [the] *Pike'* test as petitioners conceive it."

Add.35-37 (quotation omitted).

That's not the law. The court took this "understanding" from Part IV-B of the *Ross* opinion—and directly quoted that Part of the opinion as

36

coming from "the Court"—but that Part was joined by *only three justices*. To the contrary, **a six-to-three majority** of the Court confirmed that *Pike* remains good law and provides a framework to determine whether state laws are invalid under the dormant Commerce Clause. *Ross*, 598 U.S. at 403 (Kavanaugh, J., concurring in part and dissenting in part) (confirming that a six-Justice majority "affirmatively retain[ed] the longstanding *Pike* balancing test"). Put simply, the court erroneously based its ruling on the Supreme Court *minority*.

Since the First Circuit looks to all opinions—including dissenting and concurring opinions—"to find the ground of decision embraced by a majority of the Justices," *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006), it was error to refuse to engage in any *Pike* analysis. And it was especially inappropriate to dismiss that claim here, as *no party* moved on the claim due to evidentiary and factual disputes. This Court should reverse, clarify that *Pike* remains good law, and remand for the court to consider this claim on its merits at trial.

**B.    The court erred in granting summary judgment to Massachusetts on Farmer Appellants' direct-discrimination claim.**

The court also *sua sponte* entered summary judgment against the Farmer Appellants on their direct-discrimination claim. To begin, the court erred procedurally in entering judgment under Rule 56(f). *See supra*. Here, too, the lack of notice from the court is reversible error on the direct-discrimination claim.

But because the Farmer Appellants briefed the direct-discrimination claim in the partial motion, the record demonstrates that the court should have entered judgment *in favor* of the Farmer Appellants. The court's sole reasoning for its decision was: "the fact that the burden of the Act falls entirely on out-of-state pig farmers does not, on its own under the controlling law, substantiate a claim under the dormant commerce clause." Add.18. But this fails as a matter of law, and on this record, this Court should reverse and direct entry of judgment in favor of Appellants.

### 1.    *Legal Background*

The Commerce Clause provides that "Congress shall have [the] [p]ower . . . [t]o regulate Commerce . . . among the several States." U.S.

Const. art. I, § 8, cl. 3. This affirmative endowment of power also carries "a negative, self-executing limitation on the power of the [s]tates to enact laws [that place] substantial burdens on [interstate] commerce." *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 545 (1st Cir. 2022) (quotation omitted). Referred to as the "dormant Commerce Clause," it "protects interstate commerce from the evils of economic isolation and protectionism that state regulation otherwise could bring about." *Id.* at 546 (quotation omitted). Thus, "the very core of [the Supreme Court's] dormant Commerce Clause jurisprudence" is "antidiscrimination," and thus the Clause bars "state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Ross*, 598 U.S. at 369 (cleaned up).

The Clause certainly prohibits laws that facially discriminate against out-of-state commerce, *see, e.g.*, *Ne. Patients Grp.*, 45 F.4th at 544, but that's not required; all that matters is the "discriminatory *character* of [a] challenged state regulation[.]" *Ross*, 598 U.S. at 377 (emphasis added). To make that determination, the court must examine not only the face of the statute, but also whether the law discriminates

"in effect, or in purpose—against interstate commerce." *Anvar v. Dwyer*, 82 F.4th 1, 8 (1st Cir. 2023). Discrimination in purpose or effect simply means "'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter,' as opposed to state laws that 'regulate[] evenhandedly with only incidental effects on interstate commerce[.]'" *Fam. Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (quotation omitted).

This inquiry is holistic; the Court may consider "statutory context, legislative history, and other factors" in determining whether a statute is discriminatory in effect. *Id.* at 5. A challenging party bears the initial burden of showing the discriminatory effects or purpose of a state law. *See, e.g., id.* at 9. When that burden is met, the burden then shifts to the state as the law "is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." *Id.* (citation omitted). This "exacting standard" is "rarely satisfy[ied]" for state laws that are discriminatory in purpose or effect. *Id.*

## 2.    *The Act Carries Discriminatory Effect*

Here, there was no genuine issue of material fact that the Act "impos[es] disproportionate burdens on out-of-state interests and confer[s] advantages upon in-state interests[,]" and that its purpose was "'motivated by an intent to discriminate against interstate commerce.'" *Anvar*, 2023 WL 5765847 at *6 (quotation omitted). Indeed, Massachusetts defined the sales ban (and the farming practices prohibited) in a manner that applied to *none* of their farmers, but only to out-of-state farms supplying Massachusetts pork.

The Act makes it "unlawful for a farm owner or operator within Massachusetts to knowingly cause any covered animal to be confined in a cruel manner," defined as confining a "breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely[.]" Mass. Gen. Laws Ann. ch. 129 App., § 1-2. So far, so good. Massachusetts may regulate its own farms without running afoul of the dormant Commerce Clause.

But Massachusetts didn't stop there. Instead, it included a sales ban on any Whole Pork Meat derived from sows confined in a "cruel" manner as defined, *no matter where the farm is located. Id.* § 1-3. But it

is uncontroverted that ***not a single pig farmer in Massachusetts*** was using gestation crates—the type of housing proscribed by the Act and used by Appellants (as well as other large farmers nationwide)—at the time the Act was before the voters. A1398-99, A1402-3l, A1491. In other words, Massachusetts defined farming methods not used by any farmer within Massachusetts as "cruel," instead targeting practices used only by out-of-state farms. And by implementing a sales ban, it burdens out-of-state economic interests in favor of in-state interests, as Massachusetts' farmers could continue business as usual to sell their pigs within Massachusetts, gaining a larger market share uninterrupted by any cost, delay, or burden associated with the Act.

Public, uncontested data demonstrates the magnitude of this discrimination. Consider, for example, that as of 2022, Massachusetts had as few as 1,500 breeding sows and approximately 6,000 total market hogs, and Massachusetts farmers raised 12,000 market hogs in 2022—enough hogs for about 1.9 million pounds of retail pork. A199, A780, A1490. By contrast, Missouri and Iowa in 2022 had 450,000 breeding sows and 900,000 breeding sows, respectively. A33, A780, A859, A1490. Massachusetts requires over 350 million pounds of pork annually. A199-

200, A1490. Thus, not only are out-of-state farmers burdened more by the sales ban because their farming operations are much larger than those in Massachusetts; Massachusetts farms are not burdened at all because they never utilized non-compliant housing in the first place. The natural effect of the Act, then, is to target exclusively out-of-state commerce, giving in-state farmers a newfound economic advantage.

Making in-state farmers more competitive while forcing out-of-state farmers from the market is the type of invidious discrimination this Court invalidated in *Jenkins*. 592 F.3d at 1. There, a Massachusetts law only allowed "small wineries"—subjectively defined as those producing less than a certain number of gallons of grape wine per year—to obtain a "small winery shipping license." *Id.* at 4. This license allowed a "small winery" to sell wine to Massachusetts consumers using three different distribution channels; "large" wineries, on the other hand, were required to choose from two. *Id.*

This Court recognized the law was "neutral on its face; it does not, by its terms, allow only Massachusetts wineries to distribute their wines through a combination of direct shipping, wholesaler distribution, and retail sales." *Id.* at 5. But it nonetheless violated the dormant Commerce

43

Clause because Massachusetts' in-state wineries qualified as "small wineries" under the definition chosen by Massachusetts; thus, only out-of-state entities were impacted by the law. *Id.* at 4. Consequently, "the effect" of the law was to "cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market," *id.* at 10, and thus "change[d] the competitive balance between in-state and out-of-state wineries in a way that benefits Massachusetts's wineries and significantly burdens out-of-state competitors[.]" *Id.* at 5.

So too here. Massachusetts subjectively defined the prohibited farming practices to impact only out-of-state farms, to the direct economic benefit of its own in-state farms. A "state law is discriminatory in effect when, in practice, it affects similarly situated entities in a market by imposing disproportionate burdens on out-of-state interests and conferring advantages upon in-state interests." *Id.* at 10; *see also Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 11 (1st Cir. 1992). That is the case here.

Even if that analysis—grounded in binding First Circuit authority—is not enough, the Act's legislative underpinnings confirm its

44

discriminatory effect on out-of-state farmers was a central goal. *See, e.g.,* *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 352 (1977) (legislative history is a relevant factor in determining discriminatory impact or purpose); *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 465-68 (1981) (looking to a senator's and representatives' statements during floor debates as probative evidence of purpose).

Here, statements from legislators and the public confirm the Act's goal of dictating out-of-state farming practices to create a nationwide policy and benefit in-state farmers. During a committee hearing, public commentators, including then-Representative Anne Gobi, recognized that "we do not use gestation crates in Massachusetts." A1134, A1308. Nonetheless, one commentator recognized the need for the sales ban because "Massachusetts uses a lot of meat that is produced out of state in farms that use these cruel tactics." A1132. Another testified that "[t]his bill protects animals outside of Massachusetts that are sold and brought into the state." A1132.

Representative Gobi even expressed a concern that the Act violated the dormant Commerce Clause: "There were also lots of farms and

organizations who did not endorse this bill[]. When you know there is a [gestation] problem in other states, why isn't there more emphasis on fixing that problem in other states?" A1134; *see also* A1309 ("Now we're treading on interstate commerce and there are some constitutional issues that I think are rather large and could be a hurdle to get over.").

In fact, Massachusetts' own state courts recognized that in-state farmers' economic benefit is a central purpose of the Act, explaining it "protects Massachusetts farmers who comply with the law by preventing Massachusetts businesses from selling . . . pork obtained from out-of-State farmers who confine their animals in a cruel manner and who, by doing so, *may be able to underprice their Massachusetts competitors*." *Dunn v. Attorney General*, 474 Mass. 675, 681, 54 N.E.3d 1, 7 (2016) (emphasis added). The Court continued, explaining that the Act "protects . . . pigs in other States (and other nations) by providing non-Massachusetts farmers with an economic incentive not to confine their animals in a cruel manner if they wish to sell their . . . pork in the Massachusetts market." 474 Mass. at 681, 54 N.E.3d at 7. This type of obvious economic discrimination and market manipulation is exactly

what the Act intends to accomplish, but what the dormant Commerce Clause prevents.

The Act burdens exclusively out-of-state farmers to the direct benefit of in-state farms. This violates the dormant Commerce Clause's "core" antidiscrimination principles that the Supreme Court recognized but could not address in *Ross*, as no discrimination claim was pled. This Court should conclude that the Act discriminates.

### 3. *Massachusetts Cannot Meet Their Burden To Establish A Legitimate Local Purpose, Much Less That No Nondiscriminatory Alternatives Are Available*

As the Act discriminates for the reasons above, it "is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." *Jenkins*, 592 F.3d at 5 (citation omitted). Again, the burden is on Massachusetts, which may not rely on either "mere speculation" or "unsupported assertions" but, rather, must proffer "concrete evidence" demonstrating that the main effect of the law is the advancement of valid local interests, not economic protectionism. *Id.*; *see also New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 280 (1988) (holding that "health and commerce justifications amount to no more

47

than implausible speculation, which does not suffice to validate this plain discrimination against products of out-of-state manufacture.").

As set forth above, the court erroneously determined there was no disparate impact, and thus did not analyze less discriminatory alternatives at all. But this Court need not remand on this issue, as Massachusetts cannot articulate any plausible local benefit. *See, e.g.*, A1415-38. For example, the Act dictates how breeding sows are to be housed based upon a purported "animal cruelty" benefit and bans the sale of the meat from the offspring of these sows if not housed in accordance with the Act. Mass. Gen. Laws Ann. ch. 129 App., § 1-3. But as sows are generally processed into ground sausage, a product which is exempt from the Act, the alleged local benefit asserted by Massachusetts is a perverse one, where the alleged "cruelty" can apparently be ground out of the meat and made acceptable. That this situation exists demonstrates that Massachusetts has no legitimate local interest in this matter and is instead attempting to implement an unconstitutional trade restriction.

This Court should reverse the grant of summary judgment in favor of Massachusetts, and direct entry of judgment in favor of Appellants.

\*   \*   \*

48

The Nation is now entering a new phase where individual states are attempting to regulate conduct of other states based upon moral or policy reasons specific to that state. Our constitutional design, and the Tenth Amendment in particular, provide great leeway to states to regulate within their borders. But when states abuse that power and impose substantial burdens on the citizens of sister states, the dormant Commerce Clause responds to preserve free interstate markets.

The hypotheticals don't have to go too far afield before becoming truly alarming. Recall that Massachusetts and other states are attempting to justify its enforcement of these laws based on "moral" judgments around pig farming. So could states condition the sale of certain products on the minimum wage that out-of-state companies' pay their workers; or their parental or sick leave policies; or the immigration status of their employees; or the type of health insurance they offer? And it encourages tit-for-tat reprisals, with legislatures targeting top products for greater leverage. This is a dangerous slippery slope, and this Court should halt it.

## III. The Court Erred in Holding That the Act Is Not Preempted by the FMIA.

Triumph's direct-discrimination claim proceeded to a case-stated proceeding, in which the court ruled that the "slaughterhouse exception" is unconstitutional and must be severed. Add.24. Massachusetts did not challenge that ruling on appeal, so it is now final.

That's significant, because Massachusetts *admitted* to the court that the reason the slaughterhouse exception was included in the Act was to avoid federal preemption under the FMIA. A890-91; 21 U.S.C. § 601. With that exception severed, the Act is clearly preempted by the FMIA, because it creates additional, or different, requirements governing what constitutes safe, wholesome, and unadulterated pork products entering interstate commerce. That directly violates the FMIA's express preemption clause or, at minimum, presents an obstacle to the FMIA objectives and goals of the need for uniformity and safety among the states' handling of meat. The court erred in concluding otherwise. This Court should reverse and direct entry of judgment in favor of Appellants.

This issue was presented to the court on cross-motions for summary judgment. The summary-judgment standard of review is discussed *supra* at Section II, and "[c]ross motions for summary judgment do not change

50

the standard." *Latin Am. Music Co. v. Archdiocese of San Juan of Roman Cath. & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007). The Court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996).

### A. Background of Federal Preemption and the FMIA

Grounded in the Supremacy Clause, federal law "may preempt a state regulatory scheme in three relevant ways": express, implied, and conflict. *Michigan Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd*, 467 U.S. 461, 469 (1985); *SPGGC, LLC v. Ayotte*, 488 F.3d 525, 530 (1st Cir. 2007). Express and conflict preemption are solely at issue in this appeal.

To determine whether a state law is expressly preempted, the Court "focuses on the plain wording of [any express preemption] clause, which necessarily contains the best evidence of Congress' preemptive intent." *Medicaid & Medicare Advantage Prods. Ass'n of P.R., Inc. v. Emanuelli Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted). The Court also examines "statutory structure, purpose, and history" of the federal

law and any preemption clause to determine its preemptive reach. *Tobin v. Fed. Express Corp.*, 775 F.3d 448, 452 (1st Cir. 2014). The Court looks to the "*effect* of the [state] regulatory scheme," rather than its stated purpose, to determine whether it is preempted. *Associated Indus. of Massachusetts v. Snow*, 898 F.2d 274, 279 (1st Cir. 1990) (emphasis added). Thus, what matters most for the challenged state regulation is "the effect . . . the local law [has] on that federal law's goals." *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 433-34 (D. Me. 2017).

The FMIA's express preemption clause preempts all state "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter[.]" 21 U.S.C. § 678. According to the Supreme Court, the FMIA's preemption clause "sweeps widely" and "prevents a State from imposing any additional or different—*even if non-conflicting*—requirements that fall within the scope of the [FMIA] and concern a slaughterhouse's facilities or operations." *Harris*, 565 U.S. at 459-60 (emphasis added).

52

Using these principles, this Court's *de novo* review evaluates: (1) whether the Act's sales ban, by way of its effects, imposes different or additional requirements that concern an FMIA establishment's premises, facilities, or operations; and if so, (2) whether those requirements are within the scope of the FMIA as informed by what regulations the pertinent agencies in charge of administering the FMIA (the United States Department of Agriculture ("USDA") or Food Safety and Inspection Service ("FSIS")) have issued—or even *could* issue. If so, the Act is expressly preempted by the FMIA. If not, this Court must still determine whether the Act conflicts with the FMIA.

## B. The Court Misapplied *Harris* to conclude the Act is not expressly preempted.

Below, the court largely held that there was no express-preemption problem based on *Harris*. But it materially misconstrued *Harris* in doing so.

### 1. *The* Harris *Decision*

In *National Meat Association v. Harris*, the Court analyzed a state regulation requiring a slaughterhouse to immediately kill a nonambulatory pig and prevented the animal from being processed for food. 565 U.S. at 460-61. Like the Act here, the state law in *Harris* didn't

53

impose this requirement directly; it did so through a sales ban on the food products. *Id.* at 462-63. The *Harris* defendants argued the law could not be preempted by the FMIA because it regulated only the *sale* of the product, which occurred "prior to delivery, away from the slaughterhouse itself"; thus, the sales ban did "not involve a slaughterhouse's 'premises, facilities and operations.'" *Id.* at 462. The *Harris* defendants also argued the sales ban did not violate the FMIA's preemption clause because "[o]nce meat from a slaughtered pig has passed a post-mortem inspection, the [FMIA] 'is not concerned with whether or how it is ever actually sold'" and thus could not affect any onsite operations of the facility. *Id.* at 463.

The *Harris* Court unequivocally rejected these arguments: "The idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Id.* at 464. The sales ban "functions as a command to slaughterhouses to structure their operations in the exact way the [state law] mandates" and "regulates how slaughterhouses must deal with non-ambulatory pigs on their premises." *Id.* Thus, the state law was preempted; to hold otherwise would allow "any State [to] impose any

regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.*

Lastly, the *Harris* defendants contended that the law fell outside the FMIA's scope because it excluded a class of animals—nonambulatory pigs—from the slaughtering process and did not relate to the onsite slaughtering process of a FMIA facility. *Harris*, 565 U.S. at 464. The Court rejected this, too, explaining the FMIA itself "exclude[d] many classes of animals from the slaughtering process." *Id.* at 465. Yet, nonambulatory pigs were not included in that list. *Id.* at 465-66. And this omission proved that the state had imposed requirements different from the FMIA—not evidence that the state requirement fell outside the FMIA's scope. *Id.* at 466. Thus, the state law fell within the scope of the FMIA because the state law "endeavors to regulate the same thing, at the same time, in the same place—except by imposing different requirements." *Id.* at 468.

## 2. *The Court Erred in Holding the Sales Ban Does Not Regulate a Slaughterhouse*

In construing *Harris*, the court held that "the Act here only bans the sale of noncompliant pork meat; it does not regulate how a slaughterhouse operates." Add.64. It went on to reason that a

"[s]laughterhouse[] may still operate in the same way they did previously—noncompliant pork processing is not only allowed, but slaughterhouses are not even required to segregate noncompliant pork from compliant pork." Add.64. It concluded that "the Act requires changes in operations for pig farmers, which the FMIA does not cover, slaughterhouses may continue to operate as they did previously . . .." Add.65-66.

In addition to being factually inaccurate (discussed *infra*), that's the very same argument *Harris* rejected. And *Harris*'s broad discussion invalidated the sales ban because "[t]he idea—and the inevitable effect—of the [sales ban] is to make sure that slaughterhouses remove nonambulatory pigs from the production process (or keep them out of the process from the beginning) by criminalizing the sale of their meat." *Harris*, 565 U.S. at 464. So too here. The "inevitable effect" of the sales ban is that noncompliant pork *must be* segregated by processors.

The court also cited to a single line in *Harris*'s opinion, stating that the "FMIA's express preemption clause does not usually foreclose 'state regulation of the commercial sales activities of slaughterhouses.'" Add.63 (citing *Harris*, 565 U.S. at 463).

56

But this Court need only review the next few lines of the federal government's amicus brief cited in *Harris* (the portion ignored here by the district court):

> That said . . . to some extent the FMIA preempts state judgments about what finished meat and meat products are fit for commerce and human consumption, in that the FMIA defines certain conditions that render such products "adulterated"), bans commerce in adulterated products), and authorizes concurrent state enforcement on that subject only when "consistent with requirements under [the FMIA]". ***[The state law]'s sale ban could reasonably be characterized as an impermissible effort to add a class of adulteration unrecognized in federal law.***

Br. for United States, *National Meat Association v. Harris,* 2011 WL 3821398, at *17 (Aug. 29, 2011) (emphasis added). Far from establishing that a state sales ban may dictate what finished meat products are fit for commerce and human consumption, or how a slaughterhouse operates, *Harris* specifically held that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved. That would make a mockery of the FMIA's preemption provision." *Harris*, 565 U.S. at 464 (2012).

This is the *exact* upshot of the district court's ruling. Somehow, it held that the sales ban *doesn't* impact a FMIA-inspected

slaughterhouse's operations (and thus falls outside the scope of the FMIA), even though it *directly regulates* what Triumph can sell into Massachusetts, and adds a class of adulteration unrecognized in federal law by predetermining what meat may be sold premised on "health concerns" identified in the ballot language and the Act's purpose. Mass. Gen. Laws Ann. ch. 129 App., § 1-1.

The origin of the court's errant analysis is its fundamentally incorrect ruling that "slaughterhouses may continue to operate as they did previously[.]" Add.66. Nothing could be further from the truth based on undisputed evidence submitted by Triumph. Without the FMIA sales exemption, the sales ban *directly* creates additional or different requirements on FMIA establishments (like Triumph). First, it bans a FMIA establishment from selling USDA approved pork within Massachusetts. Add.74. Second, the Act's effects necessitate additional or different operational procedures from those within the FMIA and FSIS regulations. A1490 ("Triumph has implemented physical segregation procedures, and additional tracking and inventory management tools (*e.g.*, stock keeping units, or bar codes), new sorting procedures and new storage locations for purposes of ensuring Question 3 Whole Pork Meat

58

remains segregated from conventional, non-compliant Whole Pork Meat.")).

The court rejected these undisputed facts because it was "unclear on the record why that would be required under the Act." Add.65. But this ignores this Court's binding direction to analyze the *effects* of the Act, which the court recognized was *accurate*. Add.66. Any additional or different requirements, *i.e.*, "changes for storage and distribution," Add.65, is prima facie evidence of the triggering of the express preemption clause.[8]

Indeed, this precise fact was elucidated by the court itself during the hearing. In response to Massachusetts' arguments that the Act itself didn't require segregation, or that it only required action Triumph was already taking, the court pointed out that the Act required Appellants to "warrant that the [pork is] compliant with Massachusetts standards" and that the only way to do that is "to segregate it, one imagines, at minimum." A2192-93. And this was different from other products that Triumph was voluntarily segregating because it was not "voluntary";

---

[8] At the very least, there is a material fact issue that should have precluded summary judgment from being entered against Appellants.

instead "Massachusetts require[d] that." *Id.* at 18. That's exactly right, and the court shouldn't have waivered from its instinct.

### 3.    *The Act Is Within the Scope of the FMIA*

The Act's requirements fall within the scope of the FMIA. The FMIA was enacted given concerns that unhealthy meat products "impair[ed] the effective regulation of meat and meat food products in interstate or foreign commerce," and thus aimed "to prevent and eliminate burdens upon such commerce [and] to effectively regulate such commerce . . . ." 21 U.S.C. § 602. For this reason, the FMIA and its implementing regulations contain inspection and handling procedures for both live and postmortem pigs at the FMIA facility. 21 U.S.C. § 603-06, 608; *see, e.g.*, 9 C.F.R. § 309.1-.2, & .19.

A natural extension of FSIS regulations is a determination that they already accommodate for differing state regulations about how pork is processed. The FSIS *could* identify the conditions in which a pig was raised as relevant to how they are to be segregated and treated before and during slaughter, for purposes of determining whether those pigs are fit to enter the human food supply. **But it has not**. And this simply means the Act's "requirements [merely] differ from those of the FMIA—

not that [the Act's] requirements fall outside the FMIA's scope." *Harris*, 565 U.S. at 466.

The Supreme Court's foreshadowing in *Harris* has come to fruition. The Act's sales ban now applies to all FMIA facilities. Without compliant pork, Triumph cannot sell products into Massachusetts. A1492. This functions as a command to FMIA facilities to structure their operations to remove noncompliant Whole Pork Meat, just as the nonambulatory-pig statute operated in *Harris*. If Triumph does nothing to adjust its procedures, it will sell non-compliant pork into Massachusetts and risk civil prosecution or potential embargo from selling into Massachusetts. The FMIA express preemption clause does not allow this. *See* A1736-66, 2164-2175.

### C.   The Court Erred in Dismissing Appellants' Conflict Preemption Claims.

The Act is also preempted because it conflicts with, and obstructs, the objectives of the FMIA.

The court erred by merely comparing the purpose of the FMIA with the purpose of the Act (and, to be frank, only a portion of the purpose of the Act). *See* Add.68. But the analysis is not whether the two laws conflict in *purpose*; the question is whether the *effect* of the state law conflicts

61

with the "natural effects" of the federal legislation. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000). Thus, it matters not whether the purported goal of the Act is similar or dissimilar to those goals of the FMIA, for "[e]ven a state law that 'attempts to achieve one of the same goals as federal law' may be preempted when it 'involves a conflict in the method' of execution.". *Maine Forest Prod. Council v. Cormier,* 51 F.4th 1, 11 (1st Cir. 2022). Indeed, "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 287 (1971). Thus, health and safety laws that are stricter than federal counterparts may be preempted. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 106 (1992) (reasoning that "[i]t would defeat the purpose of [a federal law] if a state could enact measures stricter than [the federal measures] by asserting a . . .purpose [different from the federal law] for the legislation."); *see also Napier v. Atlantic Coast Line R. Co.*, 272 U.S. 605, 612 (1926).

This misunderstanding of the applicable standard led the court to disregard material evidence about how the Act's sales ban conflicts with the FMIA. Stated summarily, the FMIA has a detailed regulatory

framework for what constitutes adulterated meat and what is safe for human consumption. And therein lies the conflict: pork that has passed USDA inspection and approved for sale, is now otherwise deemed unfit for human consumption within Massachusetts and unable to be sold. This is the definition of a conflict.

And the effect of the Act's sales ban is uncontroverted on the record. For example, the record reflects instances where a farmer erred in denoting pigs as compliant to Triumph when they were not, resulting in USDA-inspected and passed pigs out for shipment being withdrawn from the market, wasting perfectly healthy, fresh pork. A113-14.[9] The FMIA was intended to overcome these burdens on interstate commerce by allowing USDA-approved product to ship interstate without interference.

Fifty different state preferences as to what type of meat is fit for human consumption, and 50 separate segregation and inspection

---

[9] For this reason, the court erred in its determination that "[t]here is nothing in the record to indicate that since the Act's enactment, obstacles have occurred in ensuring safe and healthy pork in the Massachusetts market through the FMIA." Add.68-69. Same with its conclusion that "slaughterhouses can easily comply with both federal requirements imposed by the Act because the Act does not impose any new requirements on slaughterhouses within the scope of the FMIA." Add.69.

processes to comply. The court's holding endorses this. This Court should reverse and direct judgment in favor of Appellants.

## IV. The Path Forward.

Given the court's several errors at a variety of procedural stages, the question then becomes how this Court should posture this case moving forward. The most straightforward option—and one that avoids much of the procedural morass—is for this Court to direct that judgment be entered for Appellants on either the FMIA preemption claim, or on the Farmer Appellants' direct-discrimination claim under the dormant Commerce Clause. That ruling would result in full judgment for Appellants. And let's pause for a moment to describe the effect of that ruling on the Act. Appellants seek, and have always sought, only to enjoin the Act's sales ban. Mass. Gen. Laws Ann. ch. 129 App., § 1-3. Any relief on appeal would have no impact on the Act's regulation of farming practices within Massachusetts, a position Appellants have never asserted. Mass. Gen. Laws Ann. ch. 129 App., § 1-5.

If this Court does not direct judgment, it should remand claims to the district court for further adjudication. To be sure, that could include both claims discussed above if this Court concluded that no party is

entitled to judgment and that a trial is necessary to resolve fact issues. A remand should also include all claims improperly dismissed under Rule 56(f) as well as the claims improperly dismissed without any basis at the beginning of the proceedings.

Finally, any remand for further proceedings should be mindful of the Appellants' request for a preliminary injunction. Although that request was consolidated with the merits of the case, that doesn't resolve the urgent issues and ongoing irreparable harm suffered by Appellants. Thus, if there is a remand for further proceedings, this Court should direct that a preliminary injunction issue for the pendency of those proceedings, or at least direct the court to promptly, and separately, adjudicate that request.

A preliminary injunction is certainly warranted[10] on this record. Plaintiffs' likelihood of success on the merits is established by the previous arguments *supra*. And even the temporary loss of a

---

[10] Based on the familiar four factors: (1) a likelihood of success on the merits; (2) the likelihood of irreparable harm absent interim relief; (3) a balance of equities in the plaintiff's favor; and (4) service of the public interest. *Cormier*, 51 F.4th at 5. "The third and fourth factors, harm to the opposing party and the public interest, merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418 (2009).

constitutional right may be a form of irreparable harm if the "temporary deprivation is viewed of such qualitative importance as to be irremediable by any subsequent relief." *See Public Service Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). That is the case here, and Appellants' briefing and evidence below established substantial tangible irreparable harm as well. A99-100, 105-107. And such harm caused by the substantial burden imposed on interstate commerce and additional deprivation of Constitutional rights remains ongoing, which Appellants were unable to submit evidence on due to the court's summary dismissal and *sua sponte* rulings in this case. Because the only "harm" Massachusetts will face is its inability to enforce an unconstitutional law that would wreak economic harm across the national supply chain, the balance of harms supports Appellants. Massachusetts' interests are not impeded by an injunction, as federal law exists to protect the health and safety of Massachusetts' consumers. On the other hand, the Act harms Massachusetts agencies, businesses, and communities, and will create a pork shortage within Massachusetts.

To be sure, there are many possible variations on the above possibilities for relief. But, what is abundantly clear is that this Court's intervention is urgently needed.

## CONCLUSION

This court should reverse and direct that judgment be entered in favor of Appellants. In the alternative, this Court should remand all Appellants' claims for further adjudication. In the event of remand for further proceedings, this Court should direct issuance of a preliminary injunction, or direct the court to promptly, and separately, adjudicate that motion.

Dated: September 20, 2024    Respectfully submitted,

*/s/ Michael T. Raupp*
MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER A. TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
spencer.tolson@huschblackwell.com

RYANN A. GLENN

67

Husch Blackwell LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
ryann.glenn@huschblackwell.com

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 12,890 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point type.

*/s/ Michael T. Raupp*
*Attorney for Appellants*
Dated: September 20, 2024

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this Friday, September 20, 2024 the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Michael T. Raupp*

69

No. 24-1759

IN THE

# United States Court of Appeals for the First Circuit

_____

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC. AND ALLIED PRODUCERS' COOPERATIVE, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS, AND ASHELY RANDLE, IN HER OFFICIAL CAPACITY AS MASSACHUSETTS COMMISSIONER OF AGRICULTURE,

*Defendants-Appellants*,

_____

On Appeal from the United States Court
for the District of Massachusetts

Case No. 1:23-cv-11671-WGY, The Honorable William G. Young

_____

## APPELLANTS' ADDENDUM

_____

RYANN A. GLENN
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
(402) 964-5000
ryann.glenn@huschblackwell.com

MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com

*Counsel to Appellants*

# **TABLE OF CONTENTS**

| Doc. No. | Description | Page |
|---|---|---|
| 40 | Transcript Excerpts from 9/6/23 Preliminary Injunction Hearing | Add.1 |
| 42 | Docket Text Order dated 9/6/23 | Add.5 |
| 66 | Docket Text Order dated 10/2/23 | Add.7 |
| 78 | Transcript Excerpts from 10/2/23 Motion Hearing | Add.8 |
| 99 | Docket Text Order dated 11/15/23 | Add.13 |
| 103 | Transcript Excerpts from 11/14/23 Summary Judgment Hearing | Add.14 |
| 118 | Transcript Excerpts from 12/19/23 Case-Stated Hearing | Add.20 |
| 125 | Memorandum and Order dated 2/5/24 | Add.24 |
| 169 | Transcript Excerpts from 5/15/24 Summary Judgment Hearing | Add.47 |
| 171 | Memorandum and Order dated 7/22/24 | Add.52 |
| 172 | Judgment dated 7/22/24 | Add.71 |
| N/A | Prevention of Farm Animal Cruelty Act, M.G.L.A. 129 App. §§ 1-1 *et seq.* | Add.72 |

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS (Boston)

 3                        No. 1:23-cv-11671-WGY

 4

 5   TRIUMPH FOODS, LLC, Individually and
     on Behalf of its Members,
 6                Plaintiffs

 7
     vs.
 8

 9   ANDREA JOY CAMPBELL, Attorney General of Massachusetts,
     et al,
10                Defendants

11                        * * * * * * * * *

12

13

                          For Hearing Before:
14                     Judge William G. Young

15
                       Preliminary Injunction
16

17                     United States District Court
                       District of Massachusetts (Boston)
18                     One Courthouse Way
                       Boston, Massachusetts 02210
19                     Wednesday, September 6, 2023

20

21                        * * * * * * * *

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                     Official Court Reporter
                     United States District Court
24       One Courthouse Way, Room 5510, Boston, MA 02210
                       bulldog@richromanow.com
25
```

**Add.1**

```
 1          P R O C E E D I N G S
 2          (Begins, 10:00 a.m.)
 3          THE CLERK:  Now hearing Civil Matter 23-11671,
 4     Triumph Foods versus Campbell.
 5          THE COURT:  This is before the Court on a motion
 6     for a preliminary injunction.  I have read the papers.
 7     Would counsel identify themselves starting with the
 8     plaintiff.
 9          MR. PEABODY:  Good morning, your Honor, Bob
10     Peabody on behalf of the plaintiffs, Triumph Foods, and
11     I'm at counsel table with my colleagues, Ryann Glenn
12     from the Des Moines office of Husch Blackwell, a firm
13     that I'm with, Michael Raupp, from Husch Blackwell but
14     in Kansas City, and Cynthia Cordes, also from our firm
15     based in Kansas City, they'll do most of the talking.
16          THE COURT:  Good morning and welcome to you all.
17          MS. GOHLKE:  Good morning, your Honor, Grace
18     Gohlke, Assistant Attorney General, appearing on behalf
19     of the defendants.
20          MS. ARSLANIAN:  Good morning, your Honor, Vanessa
21     Arslanian, Assistant Attorney General, also appearing on
22     behalf of the defendants.
23          THE COURT:  Good morning to both of you.
24          Very well.  Further hearing of this motion is
25     combined with the trial on the merits pursuant to
```

1    Federal Rule of Civil Procedure 65(a)(1).

2         When do you want to go to trial?  Plaintiff.

3         MR. RAUPP:  As soon as possible, your Honor.

4         THE COURT:  Well "as soon as possible" is this

5    afternoon.

6         (Laughter.)

7         THE COURT:  Do you have many witnesses?

8         MR. RAUPP:  We'll probably have, I would say, five

9    witnesses would be a good estimate.

10        THE COURT:  Um, I appreciate that.

11        MR. RAUPP:  Sure.

12        THE COURT:  And this is jury-waived, so I intend

13   to give it a prompt hearing.

14        Talking practically, in my mind the best -- and by

15   "best" I mean the most just way to proceed, is to see if

16   you can't sit down with the Commonwealth and in essence

17   agree upon a record, stipulate -- much of this is

18   statutory interpretation --

19        MR. RAUPP:  Absolutely, your Honor.

20        THE COURT:  -- and the dormant commerce clause and

21   your briefs suggest the issues.  But perhaps there's

22   some evidence, the due process claim.

23        Again, if you sit down with them, and now looking

24   at the Commonwealth, I would think that you would be

25   amenable to agreeing rather than going through some sort

```
 1          THE COURT:  Well that's a good question.
 2          My expressed hope is -- when I say the phrase
 3     "case-stated," at least here in this District and the
 4     First Circuit, that's a recognized procedure, and it
 5     would require that the agreed-upon record be placed
 6     before the Court.  I always recommend it when I have
 7     parties who make cross-motions for summary judgment.
 8     This is different than that, but it lends itself to
 9     that.
10          One example where we did that and I think
11     successfully was, um, the Department of Education had
12     promulgated rules about sexual assault and, um, an
13     appropriate interest group challenged those rules and I
14     made the same proposal, it was agreed, you can look at
15     the opinion that ultimately resulted.  That procedure
16     was followed in much the same time period because the
17     challengers to the rule-making of the Secretary wanted
18     to nip it in the bud, as you do, rather than have it
19     drag on.
20          If you want to start talking testimony, that's
21     fine, but that's a jury-waived case and we might not --
22     I'm not -- if by agreement you would say "We want to put
23     in this expert report," there's levels of agreement,
24     they can agree that you do that without agreeing to the
25     expert's conclusions, opinions --
```

**Add.4**

| 09/06/2023 | 42 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 9/6/2023 re 26 MOTION for Preliminary Injunction filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. The Court enters an order collapsing 26 Motion for Preliminary Injunction with trial on the merits in accordance with Rule 65(a)(1). Further hearing set for October 10, 2023 at 2:00 PM. The Court will proceed case stated if the parties agree. Counsel shall notify the Court on how they wish to proceed. (Hearing set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.) (Court Reporter: Richard Romanow |

**Add. 5**

at bulldog@richromanow.com.)(Attorneys present: Attorneys Peabody, Glenn, Cordes and Raupp for the plaintiffs and Attorneys Arslanian and Gohlke for the defendants) (Gaudet, Jennifer) (Entered: 09/12/2023)

| 10/02/2023 | 66 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 10/2/2023 re 53 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Dismiss Count X for Lack of Jurisdiction* filed by Ashley Randle, Andrea Joy Campbell. After hearing arguments of counsel, the Court enters an order granting in part and denying in part 53 Motion to Dismiss for Failure to State a Claim; the motion is denied as to count 1 (commerce clause) and granted as to all other counts. A final pretrial conference is set for Tuesday, October 10, 2023 at 10:00 AM. (Final Pretrial Conference set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.); ( Final Pretrial Conference set for 10/10/2023 02:00 PM in Courtroom 18 (In person only) before Judge William G. Young.). (Court Reporter: Richard Romanow at rhrbulldog@aol.com.) (Gaudet, Jennifer) (Entered: 10/06/2023) |

**Add. 7**

1

```
 1                UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS (Boston)

 3                         No. 1:23-cv-11671-WGY

 4

 5   TRIUMPH FOODS, LLC, Individually and
     on Behalf of its Members,
 6              Plaintiffs

 7
     vs.
 8

 9   ANDREA JOY CAMPBELL, Attorney General of Massachusetts,
     et al,
10              Defendants

11
                          * * * * * * * * *
12

13
                        For Hearing Before:
14                    Judge William G. Young

15
                        Motion Hearing
16

17                    United States District Court
                      District of Massachusetts (Boston)
18                    One Courthouse Way
                      Boston, Massachusetts 02210
19                    Monday, October 2, 2023

20

21                        * * * * * * * *

22
                   REPORTER: RICHARD H. ROMANOW, RPR
23                       Official Court Reporter
                      United States District Court
24        One Courthouse Way, Room 5510, Boston, MA 02210
                          bulldog@richromanow.com
25
```

**Add.8**

1    can stay in this court on the dormant commerce clause

2    claim, do you think you can win on summary judgment on

3    the face of it?

4         MS. GLENN:  On the face of it?

5         THE COURT:  On the face of this statute and

6    regulation?

7         MS. GLENN:  We do, your Honor.

8         THE COURT:  You do?

9         MS. GLENN:  Well with respect to discrimination --

10   as we have pled, your Honor.

11        THE COURT:  No, no, as I always do, I try to think

12   practically.

13        I've been through this.  You've got a lot of

14   claims, and I say this with respect, I'm going to

15   dismiss them except for the dormant commerce clause

16   claim, and I'm going to dismiss them because

17   Massachusetts has every right, as against your other

18   claims, to pursue its own approach to animal housing.

19   The dormant commerce clause is, however narrow it may

20   be, it is part of the jurisprudence of the United States

21   Constitution and under the Supremacy Clause the United

22   States Constitution is going to be enforced out of this

23   Court as it must be.

24        So leaning all -- and I said this to the

25   defendants when first we met for -- to plan out how

**Add.9**

1    we're going to handle this.  You want a motion to

2    dismiss, I have to lean all Triumph's way, and I am.  So

3    you're in court.  Now that means we'll have a final

4    pretrial conference on the 10th.

5         But I'm wondering, do you think it's so -- summary

6    judgment does not lean all Triumph's way, summary

7    judgment, if as plaintiff you brought it, I would have

8    to disregard every factual allegation that is not

9    admitted by the Commonwealth defendants.  Just disregard

10   it.  So I wouldn't be too quick to say you could win on

11   summary judgment, but maybe you can.  The statute is

12   what it is.

13        (Pause.)

14        THE COURT:  Well anything more to be said?

15        MS. GLENN:  With respect to, um, if your Honor has

16   any additional questions concerning the discrimination

17   aspect concerning Triumph Foods, I'm happy to answer

18   those.  I think you have certainly picked up on the

19   "meat" of our -- no pun intended, the meat of our

20   argument concerning that aspect of the discrimination

21   claim, your Honor.  And however, um -- so setting -- I

22   guess so setting that aside for just a moment, um, we

23   certainly would be happy to answer any additional

24   questions concerning the remaining claims that we have

25   pursued, as we certainly do, um, feel strongly that the

**Add.10**

```
 1    plaintiffs have plausibly alleged grounds under

 2    especially the federal Meat Inspection Act preemption

 3    claims, your Honor.

 4         THE COURT:  Um, I've parsed the language, I --

 5    again, respectfully, I just disagree.  I think that they

 6    have not, as this is drafted, come in conflict with that

 7    Act, and I'm not sure they come in conflict with any

 8    Act.

 9         But the motion to dismiss is -- while it is

10    allowed as to all aspects of the plaintiff's complaint,

11    it is denied as to the claim under the dormant commerce

12    clause.  I believe that's Count 1, correct?

13         MS. GLENN:  Yes, your Honor.

14         THE COURT:  All right.  And we will hold a final

15    pretrial conference on the 10th of October.

16         (Pause.)

17         THE COURT:  Oh, we're ready to proceed on the

18    10th.

19         MS. GOHLKE:  Your Honor, if I could just ask a

20    couple of housekeeping questions on the motion to

21    dismiss order, just to make sure I understand.

22         Is your Honor denying the motion to dismiss as to

23    Count 1 both as to the discrimination and as to the

24    burden and interest balancing, the *Pike* portion?

25         THE COURT:  A good question.  And on this record,
```

```
 1   yes.

 2          MS. GOHLKE:  And the second housekeeping matter.

 3   How would your Honor like the defendants to handle and

 4   answer, given -- the question of the pretrial conference

 5   and what sort of schedule we're looking at, whether, um,

 6   we would ask perhaps to be relieved of the obligation to

 7   answer -- enter a general denial, obviously plaintiffs

 8   are aware of our positions on their various --

 9          THE COURT:  Yes, I will -- again a good question,

10   and I will accept that.  We'll take it that you deny all

11   facts, and we're going to have to sort out this standing

12   business, though as counsel has represented, for the

13   moment I accept counsel's representation.

14          Now, Ms. Gaudet properly points out to me that I

15   set this down for an evidentiary hearing on the 10th of

16   October.  In essence I have now called my own bluff in

17   that criminal cases go before civil and I am due --

18          (Talks to Clerk.)

19          So we're not going to start on the 10th.  I start

20   a criminal case on the 10th.  I follow that with another

21   criminal case.  I follow that with the Department of

22   Justice's antitrust case against Spirit and JetBlue,

23   that will go a month.  That doesn't mean we couldn't

24   start before all those cases are done, but I'd have to

25   do mornings and afternoons.  I can do that, but not for
```

**Add.12**

| 11/15/2023 | 99 | Electronic Clerk's Notes for proceedings held before Judge William G. Young: Motion Hearing held on 11/14/2023 re 87 MOTION for Partial Summary Judgment *Expedited Briefing Schedule and Oral Argument* filed by Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, Triumph Foods, LLC, Allied Producers' Cooperative, New Fashion Pork, LLC, Eichelberger Farms, Inc. Parties agree to case stated solely as to pork producer slaughterhouse issue. Commonwealth's opposition motion for summary judgment allowed solely as to farmers. (Court Reporter: Richard Romanow at rhrbulldog@aol.com.)(Attorneys present: Glenn, Peabody, Reynolds, Arslanian) (PSSA, 5) (Entered: 11/15/2023) |

**Add. 13**

1

```
 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS (Boston)

 3                           No. 1:23-cv-11671-WGY

 4

 5   TRIUMPH FOODS, LLC, Individually and
     on Behalf of its Members,
 6               Plaintiffs

 7
     vs.
 8

 9   ANDREA JOY CAMPBELL, Attorney General of Massachusetts,
     et al,
10               Defendants

11
                           * * * * * * * * *
12

13
                         For Hearing Before:
14                     Judge William G. Young
                  At Boston University Law School
15

16                      Summary Judgment

17
                     United States District Court
18                   District of Massachusetts (Boston)
                     One Courthouse Way
19                   Boston, Massachusetts 02210
                     Tuesday, November 14, 2023
20

21
                           * * * * * * * *
22

23             REPORTER: RICHARD H. ROMANOW, RPR
                      Official Court Reporter
24                United States District Court
          One Courthouse Way, Room 5510, Boston, MA 02210
25                   bulldog@richromanow.com
```

**Add.14**

```
 1    the -- well between the bar stools.
 2         Now if they say "No," that's fine too, I'm not the
 3    least offended, but I need an answer.
 4         Do you want to do it case-stated or not, as to
 5    this slaughterhouse exemption for pork -- dealing with
 6    the pork processes?
 7         MS. ARSLANIAN:  You're Honor, may I confer?
 8         THE COURT:  Sure.
 9         Are you okay with that?
10         MR. RAUPP:  We're okay with the case-stated basis.
11         THE COURT:  I thought so.
12         MS. ARSLANIAN:  To be argued subsequently, your
13    Honor, or right now?
14         THE COURT:  To be argued subsequently.
15         MS. ARSLANIAN:  Yes, we'd be happy to proceed on a
16    case-stated basis --
17         THE COURT:  Okay, then that takes care of that.
18         Now, so we're not dealing with the slaughterhouse
19    exemption today, we're not dealing with the pork
20    processors, though we will schedule it and we'll
21    schedule it very promptly.  Respectfully I don't have
22    Ms. Gaudet here and so you're going to have to wait for
23    her to schedule it.
24         Now as to -- then we're dealing with the
25    Commonwealth's motion for summary judgment as to the
```

1    other plaintiffs.  And I'll hear you.

2         MS. ARSLANIAN:  And, your Honor, just to clarify,

3    this was plaintiffs' motion, a partial motion for

4    summary judgment and --

5         THE COURT:  Well you want summary judgment taken

6    against them, that puts them on notice that summary

7    judgment may be taken against them, of course I must

8    lean all -- as to factual matters, I must lean all

9    against the Commonwealth now, but I'm familiar with

10   that.  And you bear the burden so I will hear you first.

11        MS. ARSLANIAN:  Thank you, your Honor.

12        THE COURT:  Go right ahead.

13        MS. ARSLANIAN:  So, your Honor, it's the

14   defendants' view that plaintiffs have failed to carry

15   their burden on summary judgment to show that the

16   Massachusetts act to prevent cruelty to farm animals

17   discriminates against interstate commerce in violation

18   of the dormant commerce clause.  They have failed to

19   show that the law discriminates on its face, they have

20   failed to show it discriminates in its purpose, and have

21   failed to show that it discriminates in --

22        THE COURT:  Well it's clearly established, is it

23   not, that this is going to pose additional costs on pig

24   farmers, it is, and as a practical matter those costs

25   are going to impact pig farmers in other states where

1 statute itself that there's a discriminatory purpose

2 illustrated with respect to the definition of "farming

3 practices."

4     THE COURT:  How does this statute do that?

5     MR. RAUPP:  It defines as one of its purposes to

6 protect the --

7     THE COURT:  But how does the statute effectuate

8 that?

9     MR. RAUPP:  The statute effectuates that by

10 defining what is cruel and what is not cruel in a way

11 that affects only out-of-state farmers and no in-state

12 farmers.

13     THE COURT:  All right.

14     MR. RAUPP:  So the other point I want to make

15 here, I just want to be clear about what we're here

16 today on and what we're not.  We're here today on a

17 partial motion for summary judgment with respect to the

18 discrimination claim, so we have not furthered arguments

19 under *Pike vs. Bruce Church,* and again we believe that

20 those are, at this point, are properly saved for trial

21 as there's extensive discovery going back and forth on

22 issues related to that.

23     But with respect to the discrimination claim,

24 which the Supreme Court confirmed in *Ross*, one, was not

25 an issue in *Ross*, and stands at the cornerstone of the

1    Supreme Court's jurisprudence, we believe it's clear on

2    this record, and with no further factual development

3    necessary, that there's discrimination both as to effect

4    and as to purpose.

5         THE COURT:  Thank you.

6         All right.  I have reflected on this carefully and

7    I'm going to grant the Commonwealth's opposition motion

8    for summary judgment against the pork farmers and this

9    is the Court's essential reason, because I accept much

10   of the factual statements that you made, the plaintiffs,

11   but the fact that the burden of the Act falls entirely

12   on out-of-state pig farmers does not, on its own under

13   the controlling law, substantiate a claim under the

14   dormant commerce clause.  It's as simple as that.

15        Now this case is significant, it's going to

16   require a written opinion, and we'll deal with that when

17   we deal with the case-stated, but this is not "I

18   tentatively think" and "I tentatively thought," the

19   motion is granted -- the Commonwealth's motion for

20   summary judgment is granted now as to the pig farmers.

21   We will schedule a case-stated hearing on the

22   interesting wrinkle of the slaughterhouse exception just

23   as soon as we can.  That's the order of the Court.

24        MR. RAUPP:  May I ask one point of clarification?

25        THE COURT:  Yes.

 1          MR. RAUPP:  With respect to the claims under **Pike**
 2  **vs. Bruce Church**, which I don't think were moved on,
 3  certainly not by us --
 4          THE COURT:  Well theirs was an outright, um,
 5  opposition, and I think they're properly before me, and
 6  in any event I reject it.
 7          All right, we'll stand in recess.
 8          THE CLERK:  All rise.
 9          THE COURT:  And now we're in recess, but please be
10  seated.
11          (Ends, 3:15 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

|    |                                                                    |
|----|--------------------------------------------------------------------|
| 1  | UNITED STATES DISTRICT COURT                                       |
| 2  | DISTRICT OF MASSACHUSETTS (Boston)                                 |
| 3  | No. 1:23-cv-11671-WGY                                              |
| 4  |                                                                    |
| 5  | TRIUMPH FOODS, LLC, Individually and                              |
|    | on Behalf of its Members,                                          |
| 6  | Plaintiffs                                                  |
| 7  |                                                                    |
|    | vs.                                                                |
| 8  |                                                                    |
| 9  | ANDREA JOY CAMPBELL, Attorney General of Massachusetts,           |
|    | et al,                                                             |
| 10 | Defendants                                                   |
| 11 |                                                                    |
| 12 | * * * * * * * * *                                        |
| 13 |                                                                    |
| 14 | For Hearing Before:                                        |
|    | Judge William G. Young                                     |
| 15 |                                                                    |
| 16 | Case-Stated Hearing                                        |
| 17 | United States District Court                               |
|    | District of Massachusetts (Boston)                         |
| 18 | One Courthouse Way                                         |
|    | Boston, Massachusetts 02210                                |
| 19 | Tuesday, December 19, 2023                                 |
| 20 |                                                                    |
| 21 | * * * * * * * *                                          |
| 22 |                                                                    |
|    | REPORTER: RICHARD H. ROMANOW, RPR                          |
| 23 | Official Court Reporter                                    |
|    | United States District Court                               |
| 24 | One Courthouse Way, Room 5510, Boston, MA 02210           |
|    | rhrbulldog@aol.com                                         |
| 25 |                                                                    |

**Add.20**

1    always been, because institutionally I believe that

2    courts should be the most public and transparent of

3    institutions.  Routinely we accept things under seal in

4    criminal cases due to ongoing criminal investigations.

5    Then we found, after everything got online, that -- and

6    I'm not saying the District of Massachusetts, but there

7    was a hack somewhere in our nationwide system and we in

8    the judiciary were all a twitter about that.

9        So now we have the supersecret sealing, which in

10    essence goes back to paper copies which we put in a safe

11    somewhere and lock the safe.  It's more cumbersome and

12    more difficult and I try to make an end run by not

13    having things under seal.  What's proposed is perfectly

14    acceptable assuming I can fairly and impartially decide

15    the issues I have to decide.

16        I think that's all we need to talk about.

17        MS. REYNOLDS:  Your Honor, I'm sorry?

18        THE COURT:  Yes.

19        MS. REYNOLDS:  Your Honor, may me and my

20    colleagues have another moment of your time please

21    before we conclude the proceedings this morning?

22        THE COURT:  Yes.

23        MS. GOHLKE:  The parties have put forth competing

24    understandings of what was decided at summary judgment

25    and we wanted to clarify --

1       THE COURT:  Oh, here, um -- I'm not going to be

2   held to this, but I've read all of that.  My answer to

3   that is -- and this is the part I'm not held to because

4   I'm just saying it roughly, and when I decide, I will

5   decide the procedural issues as well.

6       I reject the **Pike** analysis and I will support

7   that, and of course I'm perfectly -- how can I be

8   otherwise, I'm perfectly amenable to being reviewed on

9   that.  I think the briefs fairly raise the issue, and

10  since on the merits I reject the analysis, I don't think

11  it's a question of notification or the like.  And I

12  thought I was being fair to all parties.  So I don't

13  think I need any more.

14      But that all will be decided when I write up the

15  partial summary judgment -- well maybe I don't have to

16  do anything.  If you win on what I most recently have

17  been talking about, on standing, I will say "Thank you

18  all very much, but the courthouse doors are closed to

19  you," and my reasoning is unavailable, even were it to

20  go the Commonwealth's way, to the -- even if you're

21  right.  But that's for another day.  But that's my

22  answer to the question.

23      MS. GOHLKE:  Thank you, your Honor, that was our

24  understanding as well.

25      THE COURT:  Yeah, right.  I'll explain it all, for

**Add.22**

```
 1      good or not, and I welcome the appeal.  And I do thank

 2      you, it's been very very helpful.  And we'll recess.

 3              (Ends, 11:30 a.m.)

 4

 5                  C E R T I F I C A T E

 6

 7          I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

 8      do hereby certify that the foregoing record is a true

 9      and accurate transcription of my stenographic notes,

10      before Judge William G. Young, on Tuesday, December 19,

11      2023, to the best of my skill and ability.

12

13

14
        /s/ Richard H. Romanow 12-26-23
15      _____
        RICHARD H. ROMANOW  Date
16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
TRIUMPH FOODS, LLC,                 )
CHRISTENSEN FARMS MIDWEST, LLC,     )
THE HANOR COMPANY,                  )
OF WISCONSIN, LLC,                  )
NEW FASHION PORK, LLP,              )
EICHELBERGER FARMS, INC.,           )
ALLIED PRODUCERS' COOPERATIVE,      )
individually and on behalf          )
of their members,                   )
                                    )          CIVIL ACTION
                   Plaintiffs,      )          No. 23-11671-WGY
                                    )
         v.                         )
                                    )
ANDREA JOY CAMPBELL, in her         )
official capacity as Attorney       )
General of Massachusetts,           )
ASHLEY RANDLE, in her official      )
capacity as Massachusetts           )
Commissioner of Agriculture,        )
                                    )
                   Defendants.      )
_____     )

YOUNG, D.J.                                    February 5, 2024

**MEMORANDUM & ORDER**


**I.    PROCEDURAL HISTORY**

     The Plaintiffs Triumph Foods, LLC, Christensen Farms

Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion

Pork, LLP, Eichelberger Farms, Inc., and Allied Producers'

Cooperative (collectively, the "Pork Producers") filed their

amended complaint, ECF No. 17, on July 31, 2023.  The complaint

alleged ten causes of action, most under the dormant Commerce

**Add.24**

Clause of the United States Constitution, against the
Defendants, the Massachusetts Attorney General and the
Massachusetts Commissioner of Agriculture (collectively, "The
Commonwealth"), due to the Prevention of Farm Animal Cruelty Act
("the Act"), Mass. Gen. Laws Ann. ch. 129 App., § 1-1.  See Am.
Compl., ECF No. 17.  The Pork Producers requested a preliminary
injunction and, after a motion hearing on September 6, 2023, the
Court collapsed that motion with trial on the merits in
accordance with Rule 65(a)(2).  Electronic Clerk's Notes, ECF
No. 42.  The Commonwealth then filed a motion to dismiss.  Mot.
Dismiss, ECF No. 53; see also Mem. Supp. Mot. Dismiss, ECF No.
54.  The Court granted the Commonwealth's motion to dismiss with
respect to Counts II - X but denied the motion to dismiss with
respect to Count I, alleging a violation of the dormant Commerce
Clause.  See Electronic Clerk's Notes, ECF No. 66.

The Pork Producers then brought a motion for partial
summary judgment on Count I.  Mot. Summ. J., ECF No. 87; see
also Mem. Supp. Mot. Summ. J., ECF No. 88.  The parties fully
briefed the issues and the Commonwealth requested that summary
judgment be entered against the Pork Producers pursuant to Fed.
R. Civ. P. 56(f)(1).  See Mem. Opp'n Summ. J., ECF No. 94.  On
November 14, 2023, the Court heard oral argument on the motion
for summary judgment.  See Electronic Clerk's Notes, ECF No. 99.
The Court entered summary judgment sua sponte, per the request

[2]

**Add.25**

of the Commonwealth, against all Plaintiffs aside from Triumph
Foods, LLC ("Triumph"), id., on all claims under a Pike theory
of discrimination.  Id.; see Hr'g Tr. 16:1-7,[1] ECF No. 103; see
also Pike v. Bruce Church, Inc., 397 U.S. 137 (1970).

The parties agreed to proceed on a case stated basis as to
Triumph's claim under Count I with respect to the sales
provision of the Act (the "slaughterhouse exception").  Id.  The
parties have briefed the slaughterhouse exception issue of Count
I on a case stated basis.  Defs.' Br. Case Stated, ECF No. 109;
Pl.'s Br. Case Stated, ECF No. 110.

On December 18, 2023, the Commonwealth filed a motion to
dismiss for lack of jurisdiction.  See Mot. Dismiss, ECF No.
114; see also Mem. Supp. Mot. Dismiss, ECF No. 115.  The parties
have briefed that issue fully.  See Opp'n. Mot. Dismiss, ECF No.
121.

## II.  FINDINGS OF FACT

In 2016, Massachusetts enacted the Act through ballot
initiative.  Am. Compl. ¶ 25.  The Act's purpose is to "prevent
animal cruelty by phasing out extreme methods of farm animal
confinement, which also threaten the health and safety of

---

[1] PLAINTIFFS' COUNSEL (Mr. Raupp): With respect to the claims
under Pike vs. Bruce Church, which I don't think were moved on,
certainly not by us -
  THE COURT: Well theirs was an outright [] opposition, and I
think they're properly before me, and in any event I reject it
[i.e., the argument based on Pike].

**Add.26**

Massachusetts consumers, increase the risk of foodborne illness,
and have negative fiscal impacts on the Commonwealth of
Massachusetts."  Mass. Gen. Laws Ann. ch. 129 App., § 1-1.  The
Act makes it unlawful "for a farm owner or operator within the
Commonwealth of Massachusetts to knowingly cause any covered
animal to be confined in a cruel manner."  Id. § 1-2.  The Act
defines "confined in a cruel manner" as confining a "breeding
pig in a manner that prevents the animal from lying down,
standing up, fully extending the animal's limbs or turning
around freely" ("Minimum Size Requirements").  Id. § 1-5.  The
Act also makes it unlawful for a "business owner or operator to
knowingly engage in the sale within the Commonwealth of
Massachusetts of any . . . [w]hole pork meat that the business
owner or operator knows or should know is the meat of a covered
animal that was confined in a cruel manner, or is the meat of
the immediate offspring of a covered animal that was confined in
a cruel manner."  Id. § 1-3.  A sale is defined in the Act as "a
commercial sale by a business that sells any item covered by
section 3 [of the Act]," but does not include "any sale
undertaken at an establishment at which inspection is provided
under the Federal Meat Inspection Act."  Id. § 1-5(M).  The
definition goes on to state that "for purposes of this section,
a 'sale' shall be deemed to occur at the location where the

[4]

**Add.27**

buyer takes physical possession of an item covered by . . . section 3 [of the Act]." Id.

The Attorney General has exclusive authority to enforce the provisions of the Act. Id. § 1-6. Each violation of the Act is punishable by a civil fine up to $1,000, and in addition, the Attorney General may seek injunctive relief to prevent any further violations of the Act. Id.

The Pork Producers here are a combination of pig farmers ("the Farmer Plaintiffs") and one pork processor, Triumph. Collectively, the Pork Producers are located outside the Commonwealth of Massachusetts, in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana. Am. Compl. ¶¶ 12-19. The Farmer Plaintiffs allege that the Act will force them to "convert their farm operations to meet Minimum Size Requirements." Id. ¶ 56. Triumph alleges that the adjustments it will need to make as a pork processor in order to comply with the Act are "penalties." Id. ¶ 58.

### a. Triumph's Business Model and Sales

Triumph, a farmer-owned company headquartered in St. Joseph, Missouri, is a processor and producer of pork products. Id. ¶ 12. Triumph largely receives its supply of pigs from its member-owners, many of whom were its fellow plaintiffs in this case (prior to summary judgment entering against them). Id.;

**Add.28**

see Electronic Clerk's Notes, ECF No. 99.  Pork produced by
Triumph is sold into Massachusetts as well as throughout the
country.  Am. Compl. ¶ 117.  In 2022, Triumph processed over
eleven million pounds of pork meat sold into Massachusetts.
Joint Mot. Clarification Expedited Status Conf., Attach. A,
Partial Stipulation of Facts ¶ 4, ECF No. 107-1.  Triumph has
made efforts to adjust its business model and structure in order
to comply with the Act.  Am. Compl. ¶ 120.

Triumph receives its orders for pork products through what
it refers to as its "exclusive pork marketer," Seaboard
Corporation, Seaboard Foods, LLC, and Seaboard Foods of
Missouri, Inc. ("Seaboard" or "SBF").  Id. ¶ 99.  Triumph and
Seaboard's relationship is governed by a contract between the
two ("the Marketing Agreement") which states that "[Triumph]
shall produce pork products at the TF Plant and that [Seaboard]
shall purchase, market and sell such products pursuant to this
Agreement."[2]  Mem. Supp. Mot. Dismiss, Declaration, Ex. A,
Marketing Agreement § 2.01, ECF No. 115-2; Mem. Supp. Mot.
Dismiss 3.  The Marketing Agreement further states that "SBF
shall have the exclusive right to, and shall be obligated to,
market and sell on behalf of TF all TF Plant Products."  Mem.
Supp. Mot. Dismiss, Declaration, Ex. A, Marketing Agreement §

---

[2] "TF Plant" refers to Triumph's pork processing plant.
"SBF" refers to Seaboard, and "TF" refers to Triumph.

**Add.29**

6.01(a). "SBF shall use its commercially reasonable efforts (taking into account customer needs and requirements) to schedule, market, and sell to customers all of the TF Plant Products." Id. Finally, the Marketing Agreement states that Triumph agrees to produce "pork products that conform to the relevant quality standards and specifications made available by SBF to TF (the "Quality Standards") . . . , as amended from time to time." Id. § 7.02(a). "TF shall be solely responsible and liable for any Losses arising out of the production and sale of products produced at the TF Plant that do not meet the Quality Standards." Id. § 7.02(b). "TF Plant Products that do not, in the Reasonable Good Faith Determination of SBF, meet the applicable Quality Standards ("Non-Conforming Products") shall be marketed and sold to customers by SBF as it deems appropriate in its sole discretion." Id. § 7.02(c).

**b. The Act's FMIA Exception ("Slaughterhouse Exception")**

A processing facility is inspected under the Federal Meat Inspection Act ("FMIA") when the United States Department of Agriculture Food Safety and Inspection Service examines the product, facilities, and records of such pork processing plant. See Am. Compl. ¶¶ 76-86. Triumph is an FMIA-inspected facility. See Mem. Supp. Mot. Summ. J. 12. There are three pork processing facilities that are FMIA-inspected within the Commonwealth of Massachusetts. See Pl.'s Br. Case Stated 3.

[7]

**Add.30**

Outside Massachusetts, there are 101 other FMIA-inspected facilities that package and distribute such products for sale. See id.

 As stated above, see p.4, supra, the Act here provides an exemption from its requirements for pork products when those products are sold on the premises of an FMIA-inspected facility.

The exemption only occurs for the sale at the inspected facility.  If, for instance, a Massachusetts FMIA-inspected pork processer sold non-compliant pork on its premises to a grocery store, that sale would be exempt; however, the store's attempts to then sell that non-compliant pork in-store, off the premises of the FMIA-inspected facility, would be covered under the Act. Were that same pork processor to sell directly to the consumer at its facility, however, whether a family purchasing pork for dinner or a hospital chain purchasing pork to be served, not sold, to hundreds of patients, there would be no further sale of the pork after the sale on the facility's premises, and the noncompliant pork sale would therefore be entirely exempt from the Act.

## III. ANALYSIS

### A.  The Commonwealth's Motion to Dismiss

The Commonwealth, in its motion to dismiss, argues that because Seaboard, not Triumph, markets and sells Triumph pork product into Massachusetts, Triumph "has not substantiated harm

**Add.31**

to Triumph causally connected" to the Act.  Mem. Supp. Mot. Dismiss 1-2 (emphasis in original).  This is a distinction without a difference, however, and the Commonwealth's motion to dismiss is denied.

### 1. Standard of Review

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), granting such a motion "is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003); see also MSP Recovery Claims Series 44, LLC v. Bunker Hill Ins. Co., No. CV 22-11681-WGY, 2023 WL 4744739, at *3 (D. Mass. July 25, 2023).  "When a district court considers a Rule 12(b)(1) motion, it must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).  "In addition, the court may consider whatever evidence has been submitted, such as the depositions and exhibits submitted in this case." Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996).  "While the court generally may not consider materials outside the pleadings on a Rule 12(b)(6) motion, it may consider such materials on a Rule 12(b)(1) motion." Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002), as corrected (May 8, 2002).

## 2. Standing under Article III

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case -- in other words, standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." Id. (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)).

The Commonwealth characterizes Triumph's relationship with Seaboard to that of a buyer and seller. As the Commonwealth describes it, Triumph sells its pork products to Seaboard, and Seaboard then, as now-owner of these products, markets and sells them into Massachusetts. Mem. Supp. Mot. Dismiss 6-7. Triumph disputes this characterization, however, instead describing Seaboard as a contractor Triumph engages to market its products. See Opp'n. Mot. Dismiss 10. Drawing every reasonable inference in favor of Triumph as the plaintiff, the contractual relationship between Seaboard and Triumph does not prevent Triumph from suffering injury under the Act. Triumph's pork products can only be sold into Massachusetts when they are

**Add.33**

compliant with the Act; who markets the products and creates relationships with customers does not change that fact.

In order to produce compliant pork, Triumph must (and in fact, has begun to) restructure its processing facility and procedures, segregating pork that meets the requirements of the Act.  See Am. Compl. ¶ 89.  Without compliant pork, Triumph is unable to sell its products into Massachusetts at all.  These are both concrete, particularized injuries to Triumph.  See, e.g., Gustavsen v. Alcon Labs., Inc., 903 F.3d 1, 8 (1st Cir. 2018) ("[A]ctual economic loss . . . is the prototypical concrete harm.").

This injury to Triumph is also imminent and actual economic harm.  See Lujan, 504 U.S. at 555.  The Commonwealth argues that Seaboard is required "to sell all of Triumph's product."  Mem. Supp. Mot. Dismiss 8 (emphasis in original).  With this claim, however, the Commonwealth misreads the Marketing Agreement. Seaboard is only required to sell all of Triumph's product that meets the Quality Standards set forth by Seaboard.  Product that fails to meet these Quality Standards is only sold at Seaboard's discretion, and Triumph is responsible for any loss suffered due to the sale or failure to sell such products.  Seaboard designs its Quality Standards based on the needs of its consumers; consumers in Massachusetts likely have more stringent

requirements due to the Act. Triumph, therefore, must produce pork compliant with the Act in order to make its sales.

Triumph has standing to challenge the Act. The Commonwealth's motion to dismiss is denied.

### B. The Pork Producers' Claims under <u>Pike</u>

Triumph and its co-plaintiffs have attempted to reserve argument of their claims under <u>Pike</u>. <u>See Pike</u>, 397 U.S. at 142. Under this argument, the Pork Producers argue that "the burdens on interstate commerce outweigh the putative local benefits of the statute." <u>See</u> Mem. Supp. Mot. Summ. J. v. The Court entered summary judgment against this claim at oral argument; the Pork Producers, however, continue to raise it. The claim is foreclosed by the recent Supreme Court decision in <u>National Pork Producers Council</u> v. <u>Ross</u>, 598 U.S. 356, 371 (2023), and the Court therefore entered summary judgment against the Pork Producers on this argument. In <u>Ross</u>, two organizations of pork producers filed suit on behalf of their members to challenge Proposition 12, a California state statute that is nearly identical to the Act. <u>Id.</u> at 367. The Supreme Court ruled that "harm to some producers' favored methods of operation" did not rise to a "substantial harm to interstate commerce," and that "increased production expenses" cannot be compared by a court to "noneconomic" state benefits. <u>Id.</u> at 385-87 (internal quotation marks omitted); <u>id.</u> at 380-81. Further, the Court explained,

[12]

**Add.35**

"judges often are 'not institutionally suited to draw reliable conclusions of the kind that would be necessary . . . to satisfy [the] <u>Pike</u>' test as petitioners conceive it."  <u>Id.</u> at 380 (quoting <u>Department of Revenue of Kentucky</u> v. <u>Davis</u>, 553 U.S. 328, 353 (2008)).  Triumph apparently wants the Court to attempt to apply the <u>Pike</u> balancing test to the facts of its case.  As the Supreme Court notes, however, "[t]he competing goods are incommensurable. . . . In a functioning democracy, policy choices like these usually belong to the people and their elected representatives."  <u>Id.</u> at 382.

"[C]ourts should not be in a position to choose between different substantive moral positions based on an inchoate balancing test.  Instead, the question should be whether the state has a genuine and well-founded conscience concern underlying its law."  Note, <u>The Dormant Commerce Clause and Moral Complicity in a National Marketplace</u>, 137 Harv. L. Rev. 980, 1001 (2024) ("The Dormant Commerce Clause and Moral Complicity").  As the Act here is the result of Massachusetts citizens petition process, <u>see</u> Sec'y of the Commonwealth of Mass., <u>Information for Voters, Massachusetts 2016 Ballot</u>, 8–11 (2016),[3] these "social norms . . . have won out in the political process of [Massachusetts]."  <u>The Dormant Commerce Clause and</u>

---

[3] https://www.sec.state.ma.us/divisions/elections/download/information-for-voters/IFV_2016-English.pdf.

[13]

Moral Complicity, supra, at 1000-01.  Accordingly, this Court
declines to engage in Pike balancing and rejects the Pork
Producers' argument.

The Pork Producers complain that summary judgment should
not have entered against them on this point as the Court gave
inadequate warning of that result.  See Fed. R. Civ. P. 56(f)
("After giving notice and a reasonable time to respond, the
court may (1) grant summary judgment for a nonmovant . . . .").
The point is of no practical moment (as the Court sought to
explain during a busy motion session).  The legal issue had been
fully briefed and the Court's resolution obviated the need for
evidence.

### C.  Constitutionality of the "Slaughterhouse Exception"

Finally, Triumph and the Commonwealth proceeded on a case
stated basis regarding Triumph's last claim, the so-called
slaughterhouse exception.

#### 1. Standard of Review

"In a case stated, the parties waive trial and present the
case to the court on the undisputed facts in the pre-trial
record."  Sánchez-Rodríguez v. AT&T Mobility P.R., Inc., 673
F.3d 1, 10-11 (1st Cir. 2012) (quotation and citation omitted).
"'Case-stated' resolution is appropriate 'when the basic dispute
between the parties concerns only the factual inferences that
one might draw from the more basic facts to which the parties

[14]

have agreed, and where neither party has sought to introduce
additional factual evidence or asked to present witnesses.'"
Id. at 11 (quoting United Paperworkers Int'l Union, Local 14 v.
International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).  In a
case stated procedure, "the Court approaches the issues as a
neutral adjudicator and is entitled to 'engage in a certain
amount of factfinding, including the drawing of inferences.'"  A
& W Maint., Inc. v. First Mercury Ins. Co., 91 F. Supp. 3d 113,
118 (D. Mass. 2015) (citation omitted).

   **2. Analysis**

   The Act defines "sale" as: "a commercial sale by a business
that sells any item covered by section 3 [of the Act]; provided,
however, that 'sale' shall not include any sale undertaken at an
establishment at which inspection is provided under the Federal
Meat Inspection Act."  Mass. Gen. Laws Ann. ch. 129 App., § 1-5.
The Act provides further that "for purposes of this section, a
'sale' shall be deemed to occur at the location where the buyer
takes physical possession of an item covered by said section 3."
Id.  Sales covered under the Act must occur within the
Commonwealth of Massachusetts.  Id. § 1-3.  The Act therefore
exempts sales "undertaken" at federally inspected establishments
within the Commonwealth of Massachusetts, so long as the "buyer

**Add.38**

takes physical possession" of the covered items while on the premises of the inspected establishment.

Triumph alleges that as an out-of-state pork processor, it cannot take advantage of this exemption, even though it operates entirely federally inspected facilities, because it ships its product into the Commonwealth from out-of-state and, therefore, its buyers do not "take physical possession" of its product while at its facilities. See Am. Compl. ¶¶ 232-37. Meanwhile, the federally inspected pork processors in Massachusetts could operate within this exception. Id. For instance, "a large end-user of pork in Massachusetts -- a hospital system, the state prison system, a large school district, etc. -- who has for decades been buying and taking shipment of millions of dollars of pork each year," could now purchase and take possession of cheaper, noncompliant pork on the premises of an in-state facility. Mem. Supp. Mot. Summ. J. 12, ECF No. 88. In contrast, Triumph would have no way to provide that same customer with its noncompliant pork, because it does not have an in-state, federally inspected facility.

The Commonwealth does not dispute Triumph's analysis of the regulation's exemption. See Mem. Supp. Mot. Dismiss 10. Instead, it argues that this "limited exception . . . does not evince an unconstitutional aim to advantage in-state businesses," id., and that "the law operates to give in-state

[16]

**Add.39**

and out-of-state slaughterhouses the same access to
Massachusetts consumers." Defs.' Br. Case Stated 8. It is true
that the Commonwealth may not have had a discriminatory purpose
or intent in legislating this exception.

    The dormant Commerce Clause, however, also asks the Court
to decide whether the Act results in a discriminatory effect.
"A state law is discriminatory in effect when, in practice, it
affects similarly situated entities in a market by imposing
disproportionate burdens on out-of-state interests and
conferring advantages upon in-state interests." Family
Winemakers of Cal. v. Jenkins, 592 F.3d 1, 10 (1st Cir. 2010)
(citing Oregon Waste Sys., Inc. v. Department of Env't Quality
of State of Or., 511 U.S. 93, 99 (1994)). "If the effect of a
state regulation is to cause local goods to constitute a larger
share, and goods with an out-of-state source to constitute a
smaller share, of the total sales in the market . . . [,] the
regulation may have a discriminatory effect on interstate
commerce." Exxon Corp. v. Governor of Maryland, 437 U.S. 117,
126 n.16 (1978) (citing Hunt v. Washington State Apple Advert.
Comm'n, 432 U.S. 333, 347 (1977); Dean Milk Co. v. City of
Madison, Wis., 340 U.S. 349, 352 (1951)).

    Triumph alleges that, under the Act, in-state processors
could "create a monopoly for pork processing because they can
accept all meat-- regardless of whether the meat complies with

**Add.40**

the Act and the Regulations-- while out-of-state processors

cannot." Am. Compl. ¶ 237. The Commonwealth counters only that

this is "pure speculation," and that in-state slaughterhouses

could not "accommodate that sudden skyrocketing demand." Mem.

Supp. Mot. Dismiss 10; Defs.' Br. Case Stated 10.

The slaughterhouse exception has a discriminatory effect.

The only way Triumph would be able to take advantage of the

slaughterhouse exception would be to open its own federally

inspected facility within the Commonwealth of Massachusetts,

which the Supreme Court has held violates the Commerce Clause.

See Granholm v. Heald, 544 U.S. 460, 475 (2005). Instead,

Triumph and other out-of-state pork processors must face higher

costs to sell pork into Massachusetts than those of their

counterparts in Massachusetts, similar to the issue in Hunt.

See Hunt, 432 U.S. at 351 ("North Carolina apple producers,

unlike their Washington competitors, were not forced to alter

their marketing practices in order to comply with the statute. .

. . Obviously, the increased costs imposed by the statute would

tend to shield the local apple industry from the competition of

Washington apple growers . . . .").

As the slaughterhouse exception is discriminatory, it "is

virtually per se invalid . . . and will survive only if it

advances a legitimate local purpose that cannot be adequately

served by reasonable nondiscriminatory alternatives." Jenkins,

**Add.41**

592 F.3d at 5 (citing Davis, 553 U.S. at 338). The Commonwealth fails to demonstrate that the provision advances a legitimate local purpose. The Court takes no position on whether the Act itself serves a legitimate local purpose, see Ross, 598 U.S. at 382,[4] but the slaughterhouse exception itself does not appear to meet the Act's purported local purpose, as it does not prevent noncompliant pork meat from sale in the Commonwealth of Massachusetts. The Court, therefore, rules that the slaughterhouse exception violates the dormant Commerce Clause because it discriminates against out-of-state commerce.

### D. Severability

Although the slaughterhouse exception violates the dormant Commerce Clause, it does not render the entire Act unconstitutional; instead, the provision may be severed from the rest of the Act. Severability is governed by state law. See Schwann v. FedEx Ground Package Sys., 813 F.3d 429, 440 (1st Cir. 2016). In Massachusetts, there is a "a well-established judicial preference in favor of severability and a recognition that 'the Legislature has announced its own preference in favor of severability' as well." Id. (quoting Peterson v. Comm'r of Revenue, 444 Mass. 128, 138 (2005)); see Mass. Gen. Laws ch. 4,

---

[4] The Commonwealth argues that the local purpose of the Act is to "promot[e] animal welfare and remov[e] inhumane products and their negative effects from its markets." Defs.' Br. Case Stated 10.

§ 6, Eleventh (setting forth statutory rule of construction that "the provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof[]").

The question of severability turns on legislative intent.[5] As the Act was passed by popular vote, the Court therefore must decide whether Massachusetts voters "would have enacted the particular bill without the [invalid] provision, or whether, in the absence of the [invalid] provision, the [voters] would have preferred that the bill have no effect at all." Mass. Gen. Laws ch. 4, § 6 (quoting Peterson, 444 Mass. at 138). "Severability entails a two-step examination in which [the court] determine[s], first, whether the invalid portion of the statute is 'capable of separation' and, second, whether 'upholding the statute as severed would frustrate the legislative purpose.'"

---

[5] Notably, the Act here contains a severability clause, Mass. Gen. Laws Ann. ch. 129 App., § 1-9, indicating the voters' intent to save any portion of the Act that could be upheld in the case of a constitutional challenge. See Opinion of the Justices, 330 Mass. 713, 726 (1953) ("Where the statute contains a severability clause . . . , this is a declaration by the Legislature that it intends to have the principle of severability invoked wherever possible.").

**Add.43**

K.J. v. Superintendent of Bridgewater State Hosp., 488 Mass.
362, 373 (2021) (citation omitted).

The slaughterhouse exception is "capable of separation"
from the rest of the statute.  A statute is "capable of
separation" when the "severed [portion] is not so connected with
and dependent upon other clauses of the act as to constitute an
essential factor of the whole."  Id. at 374-75 (internal
quotation marks omitted).  The provision here is a discrete
clause and, were it severed, the Act can still function as
intended.

Second, the statute as severed would not frustrate the
legislative purpose of the Act.  In fact, were the
slaughterhouse exception severed, the Act would only become
enforceable in more locations.  If anything, therefore, severing
the slaughterhouse exception from the Act only serves to bolster
its purpose.

**E.  Preemption under the Federal Meat Inspection Act**

Triumph argues that the slaughterhouse exception cannot be
severed from the Act since "absent the exception, the Act is
unquestionably preempted by the FMIA."  Pl.'s Br. Case Stated
13.  This Court, however, has a number of questions before
reaching that conclusion.  Indeed, having declared the
slaughterhouse exemption unconstitutional, it necessarily must
revisit its dismissal of the Pork Producers' claim that the Act,

[21]

**Add.44**

as originally drafted, was preempted by the FMIA.  Am. Compl.,
Count III, ¶ 200.  The Court thus vacates that dismissal and
grants the Pork Producers 30 days from the date hereof to move
for summary judgment on the ground that the Act -- with the
slaughterhouse exemption severed -- is now preempted by the
FMIA.

### IV.  CONCLUSION

The Commonwealth's motion to dismiss, ECF No. 114, is
**DENIED**.  The Court concludes that the slaughterhouse exemption
violates the dormant Commerce Clause, and orders that provision
**SEVERED** from the rest of the Act.

The Court entered summary judgment against all Plaintiffs
on all counts and claims save for a dormant Commerce Clause
claim regarding the slaughterhouse exemption of the Act.  See
Electronic Clerk's Notes, ECF No. 99.

That order must now be **VACATED in part** to allow the Court
to consider whether the Act -- with the slaughterhouse exemption
severed -- is now preempted by the FMIA.

**SO ORDERED.**

**Add.45**

/s/ William G. Young
WILLIAM G. YOUNG
    JUDGE
    of the
UNITED STATES[6]

---

[6] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.

**Add.46**

1            UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS (Boston)

3                    No. 1:23-cv-11671-WGY

4

5   TRIUMPH FOODS, LLC, Individually and
    on Behalf of its Members,
6            Plaintiffs

7
    vs.
8

9   ANDREA JOY CAMPBELL, Attorney General of Massachusetts,
    et al,
10           Defendants

11
                        * * * * * * * * *
12

13
                    For Hearing Before:
14              Judge William G. Young

15
                    Summary Judgment
16

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Wednesday, May 15, 2024

20

21                    * * * * * * * *

22
                REPORTER: RICHARD H. ROMANOW, RPR
23                  Official Court Reporter
                United States District Court
24      One Courthouse Way, Room 5510, Boston, MA 02210
                    rhr3tubas@aol.com
25

1    sales regulation and it's a law of general

2    applicability.  It is not aimed at slaughterhouses

3    specifically.  It doesn't tell them anything about how

4    they need to inspect meat.  It doesn't tell them

5    anything about how they need to slaughter animals.  It's

6    acting entirely outside that scope.  And how Triumph

7    operates its business and maximizes its efficiency, if

8    it has chosen these particular procedures to be the

9    easiest and most cost-effective way to create meat that

10   it chooses to sell in Massachusetts, that is not --

11        THE COURT:  Well if you have to segregate the, um,

12   the pork that you receive, that hardly seems the most

13   efficient way to proceed.

14        Suppose Triumph or any slaughterhouse, um,

15   receives pork, some compliant with Massachusetts

16   standards and some not, does its function, completely

17   satisfying the federal government, and then has a cut of

18   meat and, um -- ground meat or whatever, that's pork,

19   and someone says, "Is this compliant with

20   Massachusetts?"  And they say "Honestly we don't know,

21   um, we're -- but we're certainly compliant with the

22   federal standards, this is perfectly healthy meat," can

23   you bar them from selling that?

24        MS. GOHLKE:  Yes, your Honor, because what we're

25   barring is a product and it is not the -- the

**Add.48**

```
 1   qualification for that product --

 2        THE COURT:  So what you're saying to them is they

 3   have to warrant that the -- that the actual edible food,

 4   if it's pork, comes from a farm, at least into their

 5   hands, compliant with Massachusetts standards?  They

 6   have to -- or like people say organic garlic, for

 7   instance, it commands a premium over garlic that may not

 8   be organic.  That type of thing.

 9        The slaughterhouse has to do that?

10        MS. GOHLKE:  It would need practically -- it's

11   true it would need some mechanism to identify meat that

12   is compliant.

13        THE COURT:  Right.  And it's going to cost them,

14   isn't it?

15        MS. GOHLKE:  Well but it's not occurring within

16   the scope of the FMIA.

17        THE COURT:  Why not?

18        MS. GOHLKE:  Because it's not related to either

19   the inspection or the slaughter regime.  It's not

20   telling them -- so if compliant and noncompliant meat

21   comes to the slaughterhouse, although they do have to

22   know which is which, they don't have to change anything

23   about their inspection process or their slaughter

24   process --

25        THE COURT:  Well they have to segregate it, one
```

**Add.49**

1   imagines, at minimum.

2       MS. GOHLKE:  Or have some other mechanism to

3   identify it, whether that's tattoos or RFID --

4       THE COURT:  And I take it that the reason, for

5   instance, that Halal meat and Kosher meat is perfectly

6   consistent with the requirements of the federal Act is

7   that, um, the slaughterhouses both comply and then

8   warrant that they've complied because they want to serve

9   that market voluntarily.  It's not satisfactory, as a

10  business matter for them, to say to a, um, a believer of

11  those types, "Well we don't know," because then the

12  believer will not buy the meat.  What's different here

13  though is Massachusetts -- what you've just said,

14  Massachusetts requires that.

15      Aren't you trenching where Congress has already,

16  um, both -- both trod and then preempted others from

17  trodding, um, or vetting?

18      MS. GOHLKE:  No, your Honor, it's not -- it is not

19  within the scope of the FMIA whether a product that has

20  some qualification that has nothing to do with the

21  inspection or the slaughter, so the qualification has to

22  do with the confinement on the farm, it's not a

23  qualification that requires any change in the inspection

24  or the slaughter process or the handling at the

25  slaughterhouse, it's -- so it's operating outside that

**Add.50**

```
 1    scope is much more similar to all kinds of reasons that
 2    slaughterhouses undertake segregation procedures or
 3    tracing procedures that can come in a variety of forms,
 4    whether that's for religious reasons, whether that's for
 5    humane standards, whether that's for their own branding
 6    purposes, you know different premium quality of meat,
 7    they're doing this type of -- this type of tracing all
 8    the time.
 9          THE COURT:  I grant you that, and they're doing it
10    because that will maximize their profits.  They want to
11    do that.
12          MS. GOHLKE:  Correct.
13          THE COURT:  You're telling them to do that.
14    That's different.
15          MS. GOHLKE:  Well only if they want to sell in
16    Massachusetts.  And that's one other difference from
17    *Harris*.  *Harris* was saying to slaughterhouses in
18    California, "Here's what you can or cannot do with your
19    pigs."  Triumph is free to continue slaughtering
20    noncompliant pigs, they cannot offer them for sale in
21    Massachusetts, but Massachusetts is not telling them
22    what they can slaughter, it's merely saying "Once a
23    product reaches our market, we want to be sure that it
24    meets our standards," and that standard is entirely
25    unrelated to anything within the FMIA.
```

**Add.51**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
TRIUMPH FOODS, LLC,             )
CHRISTENSEN FARMS MIDWEST, LLC, )
THE HANOR COMPANY               )
OF WISCONSIN, LLC,              )
NEW FASHION PORK, LLP,          )
EICHELBERGER FARMS, INC.,       )
ALLIED PRODUCERS' COOPERATIVE,  )
individually and on behalf      )
of their members,               )
                                )          CIVIL ACTION
              Plaintiffs,       )          No. 23-11671-WGY
                                )
         v.                     )
                                )
ANDREA JOY CAMPBELL, in her     )
official capacity as Attorney   )
General of Massachusetts,       )
ASHLEY RANDLE, in her official  )
capacity as Massachusetts       )
Commissioner of Agriculture,    )
                                )
              Defendants.       )
_____)

YOUNG, D.J.                                  July 22, 2024

**MEMORANDUM & ORDER**

**I.    INTRODUCTION**

This case is about pork: how it is raised and where it may

be sold for human consumption.  The Plaintiffs, Triumph Foods,

LLC ("Triumph"), Christensen Farms Midwest, LLC, The Hanor

Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger

Farms, Inc., and Allied Producers' Cooperative (collectively,

the "Pork Producers"), seek to stop the enforcement of the

Massachusetts Prevention of Farm Animal Cruelty Act ("the Act")

[1]

**Add.52**

by suing Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts, and Ashley Randle, in her official capacity as Massachusetts Commissioner of Agriculture (collectively, the "Commonwealth"). Am. Compl., ECF No. 17. The Plaintiffs allege that the Federal Meat Inspection Act ("FMIA") preempts the Act's enforcement. Id.

Along with pork, this case is about how a state may regulate its own commerce while continuing fully to participate in the national economy. See generally National Pork Producers Council v. Ross, 137 Harv. L. Rev. 330 (2023). The Constitution and our federal laws provide a framework for each state to follow in regulating certain industries, but, provided they do not interfere with that framework, states may still introduce and enforce their own laws and regulations. Today, the industry in question is pork; tomorrow, it could be shellfish. See Amicus Br. Iowa, ECF No. 71. The industry is, to some extent, irrelevant, so long as the state's statutory scheme does not conflict with that of the federal government. "The preemption of state laws represents 'a serious intrusion into state sovereignty.'" Virginia Uranium, Inc. v. Warren, 587 U.S. 761, 773 (2019) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 488 (1996) (plurality opinion)). As Congress has not preempted the state law in question here summary judgment is granted to the Commonwealth.

**Add.53**

## II.   PROCEDURAL HISTORY

The Pork Producers filed their amended complaint on July 31, 2023.  See Am. Compl.  The amended complaint alleged ten causes of action, most arising under the United States Constitution.  See id.  The Pork Producers requested a preliminary injunction, and after a hearing on September 6, 2023, the Court collapsed the motion with a trial on the merits in accordance with Rule 65(a)(1).  See Massachusetts Lobstermen's Ass'n, Inc. v. National Marine Fisheries Serv., No. CV 24-10332-WGY, 2024 WL 2194260, at *3 n.5 (D. Mass. Apr. 16, 2024) (appeal pending).  The Commonwealth then filed a motion to dismiss.  Mot. Dismiss, ECF No. 53; see also Mem. Supp. Mot. Dismiss Compl., ECF No. 54.  The Court granted the Commonwealth's motion to dismiss with respect to Counts II-X but denied the motion to dismiss with respect to Count I, alleging a violation of the Dormant Commerce Clause.  See Elec. Clerk's Notes, ECF No. 66.

The Pork Producers then moved for partial summary judgment on the remaining Dormant Commerce Clause claim.  Pls.' Mot. Partial Summ. J., ECF No. 87; see also Mem. Reasons Supp. Pls.' Mot. Partial Summ. J., ECF No. 88.  In opposition, the Commonwealth requested that summary judgment be entered against the Pork Producers pursuant to Fed. R. Civ. P. 56(f)(1).  See Mem. Opp'n Pls.' Mot. Summ. J. & Req. Summ J., ECF No. 94.  On

**Add.54**

November 14, 2023, the parties agreed to proceed on a case
stated basis on the remaining claim.

On December 19, 2023, after oral argument, the Court took
the matter under advisement.  See Elec. Clerk's Notes, ECF No.
117.  On February 5, 2024, the Court entered a memorandum and
order which severed the provision of the Act ("the
slaughterhouse exemption") that violated the Dormant Commerce
Clause from the rest of the statute and vacated in part the
Court's previous dismissal of Count III in the Pork Producer's
amended complaint, which claimed that the Act was preempted by
the FMIA.  See Memorandum and Order, ECF No. 125.

The Pork Producers now move for summary judgment on the
ground that the Act, with the slaughterhouse exemption severed,
is now preempted by the FMIA.  See Pls.' Mot. Summ. J., ECF No.
126 ("Pls.' Mot."); see also Pl.'s Mem. Reasons Supp. Pls.' Mot.
Summ. J., ECF No. 127 ("Mem. Supp. Pls.' Mot.").  The
Commonwealth cross-moves for summary judgment on the ground that
the Act is not preempted by the FMIA.  See Defs.' Mot. Summ. J.,
ECF No. 136 ("Defs.' Mot."); see also Mem. Supp. Mot. Summ. J.,
ECF No. 137 ("Mem. Supp. Defs.' Mot.").  The parties have fully
briefed the issues.  Id.; Pls.' Reply Supp. Pls.' Mot. Summ. J.
& Opp. Defs.' Mot. Summ. J. ("Pls.' Reply"), ECF No. 158.

**Add.55**

### III. UNDISPUTED FACTS

The Pork Producers are a combination of pig farmers ("the Farmer Plaintiffs") and one pork processor, Triumph. Collectively, the Pork Producers are located outside the state of Massachusetts, in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana. Am. Compl. ¶¶ 12-19. The Farmer Plaintiffs allege that the Act will force them to "convert their farm operations to meet Minimum Size Requirements." Id. ¶ 56. Triumph alleges that the adjustments it will need to make as a pork processor to comply with the Act are "penalties." Id. ¶ 58.

#### A. The Act

In 2016, Massachusetts enacted the Prevention of Farm Animal Cruelty Act, Mass. Gen. Laws ch. 129 App., § 1, through ballot initiative. Id. ¶ 25. The Act's purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Id. § 1-1. The Act makes it unlawful "for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner." Id. § 1-5. The Act defines "confined in a cruel manner" as confining a "breeding pig in a manner that prevents

[5]

**Add.56**

the animal from lying down, standing up, fully extending the
animal's limbs or turning around freely" ("Minimum Size
Requirements").  Id.  The Act also makes it unlawful for a
"business owner or operator to knowingly engage in the sale
within the Commonwealth of Massachusetts of any . . . Whole Pork
Meat that the business owner or operator knows or should know is
the meat of a covered animal that was confined in a cruel
manner, or is the meat of the immediate offspring of a covered
animal that was confined in a cruel manner."  Id. § 1-3.  A sale
is defined in the Act as "a commercial sale by a business that
sells any item covered by Section 3."  Id. § 1-5(M).  The
definition goes on to state that "[f]or purposes of this
section, a sale shall be deemed to occur at the location where
the buyer takes physical possession of an item covered by
Section 3."  Id.

The Attorney General has exclusive authority to enforce the
provisions of the Act.  Id. § 1-6.  Each violation of the Act is
punishable by a civil fine up to $1,000 and, in addition, the
Attorney General may seek injunctive relief to prevent any
further violations of the Act.  Id.

### B.  The FMIA

The FMIA was enacted in 1906 "in light of concerns that
unhealthy meat products impaired the effective regulation of
meat and meat food products in interstate or foreign commerce."

**Add.57**

Pls.' St. Undisputed Material Facts Supp. Pls.' Mot. Summ. J. ¶ 40, ECF No. 128 ("Pls.' SOF") (internal quotation marks and brackets omitted).  Under the FMIA, pigs are inspected prior to entering a slaughterhouse, while in a slaughterhouse facility, and post-slaughter.  Id. ¶¶ 47-49.  The FMIA does not regulate pig farmers, only slaughterhouses.  The FMIA contains an express preemption clause, which states that "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under this chapter may not be imposed."  Id. ¶ 46; see also 21 U.S.C. § 678.

In 1967, Congress amended the FMIA due to a "need for stronger, more effective and more uniform State inspection programs . . . [to] provide consumer protection for all citizens, regardless of where their meat originates."  Pls.' SOF ¶ 41.  The FMIA was meant to "[c]larify and broaden [federal] authority over meat and meat products capable of use as human food," and "help bring the requirements of Federal and individual State meat inspection programs into closer conformity toward eventual elimination of the multiple and conflicting requirements presently encountered," as "[w]ithout such a coordinated network of Federal and State inspection programs, the health of the consumer cannot adequately be protected, nor can continued confidence in our meat supply be assured."  Id.

**Add. 58**

The FMIA is enforced by the Food Safety and Inspection
Service ("FSIS"), an agency of the United States Department of
Agriculture ("USDA").  Id. ¶ 43.  For each pig and pork product,
the FSIS requires all slaughterhouses to keep records of the
following: bills of sale, invoices, receiving and shipping
papers, descriptions of all livestock, net weight of all
livestock, names and addresses of all buyers, methods of
shipment, names and addresses of carriers, and the contact
information for any previous owner of the livestock, as well as
serial numbers and identification for each animal.  9 C.F.R. §
320.1(b).

**C.  Triumph's Business Model and Sales**

Triumph, a farmer-owned company headquartered in St.
Joseph, Missouri, is a processor and producer of pork products.
Am. Compl. ¶ 12.  Triumph largely receives its supply of pigs
from its member-owners, many of whom were its fellow plaintiffs
in this case (prior to summary judgment entering against them).
Id.; see Elec. Clerk's Notes, ECF No. 99.  Pork produced by
Triumph is sold into Massachusetts as well as throughout the
country.  Am. Compl. ¶ 117.  In 2022, Triumph processed over
eleven million pounds of pork meat sold into Massachusetts.
Joint Mot. Clarification & Exped. Status Conf., Attach. A,
Partial Stipulation Facts ¶ 4, ECF No. 107-1.  Triumph has made

**Add.59**

efforts to adjust its business model and structure in order to comply with the Act.  Am. Compl. ¶ 120.

Triumph has over 1,000 product codes for its products, including for specific grocery stores, brands, pork byproducts, and type of pig ("open pen gestation", "grass-fed", "premium", etc.).  Defs.' St. Facts Supp. Defs.' Mot. Summ. J. ¶¶ 26-31, ECF No. 138 ("Defs.' SOF").  To differentiate between different pigs in order to ensure they are classified with the correct product code, Triumph requires its pig farmers to deliver pigs at specific times, segregates them from other groups of pigs, keeps a count of all pigs in the group, and, after processing, maintains them in separate storage prior to shipment.  Id. ¶ 34. Triumph estimates it is processing approximately 58,000 pigs per month in compliance with the Act, which Triumph estimates to be about 700,000 compliant pigs (or 70 million pounds) per year available through Triumph.  Id. ¶ 35.

Due to the Act, Triumph has created a process to differentiate between pork that meets the Act's requirements and pork that does not.  Pls.' SOF ¶ 62.  Triumph has also implemented new product codes, sorting procedures, and storage locations within its facility in order to ensure compliance with the Act.  Id. ¶ 63.

**Add.60**

## IV.   ANALYSIS

### A.  Standard of Review

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Materiality depends on the substantive law, and only factual disputes that might affect the outcome of the suit can preclude summary judgment.  Id.  In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  This Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151.

"The [summary judgment pleading standard is] the same where, as here, both parties have moved for summary judgment." Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002).  The fact that both parties have moved for summary judgment on the same issues, "neither dilutes nor distorts" the summary judgment standard of review.  See Hartford Fire Ins. Co. v. CNA Ins. Co., 633 F.3d 50, 53 (1st Cir. 2011).  When courts

**Add.61**

are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." AJC Int'l, Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015) (quoting D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co., 640 F.3d 27, 34 (1st Cir. 2011)). "Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply 'require [the Court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" Wells Real Estate Inv. Tr. II, Inc. v. Chardón/Hato Rey P'ship, 615 F.3d 45, 51 (1st Cir. 2010) (quoting Adria Int'l Grp., Inc. v. Ferré Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001)). The Court must "in each instance [determine] whether the moving party has met its burden under Rule 56." Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F.Supp. 194, 197–98 (D. Mass. 1991) (Caffrey, J.).

### B. The Act Is Not Preempted by the FMIA.

The Pork Producers argue that the Act is preempted by the FMIA via both express preemption and conflict preemption. See Mem. Supp. Pl.'s Mot. These arguments misconstrue the Supreme Court's holding in National Meat Ass'n v. Harris, the scope of the Act, and the text of the FMIA. National Meat Ass'n v. Harris, 565 U.S. 452 (2012).

[11]

**Add.62**

**1. Express Preemption**

In Harris, the Court reviewed whether a California provision (the "California Act") that regulated slaughterhouses within the state was preempted by the FMIA.  Id. at 455.  The California Act had three provisions: 1) a provision banning any slaughterhouse from buying, selling, receiving "a nonambulatory animal"; 2) a provision banning the "process, butcher, or [sale of] meat or products of nonambulatory animals for human consumption"; and 3) a provision against "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize the animal."  See Cal. Penal Code § 599f(a)-(c).  The Court ruled that the California Act was expressly preempted by the FMIA because the California Act "substitutes a new regulatory regime for the one the FMIA prescribes."  Harris, 565 U.S. at 460.  The Court further held that although "the FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses," [the California Act's] sales ban was "a criminal proscription calculated to help implement and enforce each of the section's other regulations," and was therefore preempted by the FMIA. Id. at 463-64.

The Pork Producers argue that the Act in question here functions in much the same way; because the Act's sales ban imposes additional conditions for FMIA regulated establishments,

**Add.63**

Triumph argues it "functions as a command to slaughterhouses to structure their operations in the exact way the [Act] mandates." Mem. Supp. Pls.' Mot. 17 (quoting Harris, 565 U.S. at 464).  The Act, however, differs from the California Act in Harris in a fundamental way: the Act has no provision requiring any action by a slaughterhouse other than its sales ban.

In Harris, the Court noted that California "may motivate an operational choice without running afoul of the FMIA's preemption provision."  565 U.S. at 463.  It was the fact that the sales ban functioned "as a command to slaughterhouses to structure their operations **in the exact way the remainder of [the California Act] mandate[d].**"  Id. at 464 (emphasis added). By contrast, the Act here only bans the sale of noncompliant pork meat; it does not regulate how a slaughterhouse operates. As the Commonwealth argues, "the practical result of the Act is that a slaughterhouse that wishes to sell whole pork meat in Massachusetts must be able to identify whether that meat originated from a compliant pig."  Mem. Supp. Defs.' Mot. 18. Slaughterhouses may still operate in the same way they did previously -- noncompliant pork processing is not only allowed, but slaughterhouses are not even required to segregate noncompliant pork from compliant pork.  See, e.g., Virginia Uranium, 587 U.S. at 790-91 (Ginsburg, J., concurring) ("The distinction drawn in National Meat thus supports this

**Add.64**

conclusion: A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field.").

The Pork Producers also argue that Triumph has had to make "changes to how pork is physically stored at and shipped from Triumph's facility," but it is unclear on the record why that would be required under the Act -- these changes for storage and distribution may make Triumph's tracking and organization of compliant pork easier and more manageable, but they are not required under the law. Pls.' Reply 15. As the FSIS already requires, a slaughterhouse must be able to identify where its pork meat came from.[1] See supra, p. 7-8. Organizing and storing the pork to ensure that the Act -- compliant pork is shipped together is no different than the storage procedures that Triumph is already following –- it segregates organic, grass-fed, or otherwise "specialty" pork. Though the Act requires

---

[1] The Pork Producers raise, for the first time in their reply, that the Act imposes on farmers and slaughterhouses a recordkeeping requirement, "under the penalty of perjury," so different than those of the FMIA that it must be preempted. Pls.' Reply. This requirement, for certifications of how pig suppliers confine breeding pigs, however, is far outside the scope and purpose of the FMIA; again, these records are made in order to determine the treatment of the animals prior to slaughter, not to determine whether the animals are fit for human consumption. This requirement therefore sits far outside the scope of the FMIA, and consequently, the Pork Producers have not met their burden in demonstrating that the requirement is preempted.

changes in operations for **pig farmers**, which the FMIA does not cover, slaughterhouses may continue to operate as they did previously -- they are simply only allowed to ship compliant pork meat for sale in Massachusetts.[2]

Finally, the Pork Producers argue that the Act "[overrides] the USDA's inspection and approval of the [pork] for sale" because Massachusetts has independently found that the pork is "adulterated, not fit for human consumption." Mem. Supp. Pl.'s Mot. 14. The Pork Producers argue that because one of the stated purposes of the Act is to protect "the health and safety of Massachusetts consumers," in banning the sale of certain pork products, the Act creates additional requirements for the same stated purpose as that of the FMIA. Mass. Gen. Laws ch. 129 App., § 1-1. As the Pork Producers also correctly explain, however, this Court must "look . . . to the effect of the regulatory scheme." Associated Indus. of Mass. v. Snow, 898 F.2d 274, 279 (1st Cir. 1990). It is not the stated purpose of the state statute, but the operation of that statute, that determines whether it is preempted by federal law. Here,

---

[2] The Pork Producers also argue that the other cases cited by the Commonwealth are inapplicable because those cases involved wholesale bans on types of meat, not simply bans on how that meat "was produced or processed." Pls.' Reply 8. The Pork Producers, however, have only shown that the ban here affects how pork is "produced", which is a function of the pig farmers, and not how pork is "processed", which is a function of Triumph and other slaughterhouses. The argument, therefore, fails.

**Add.66**

preventing consumption of adulterated products is the purpose of the FMIA, but it is not the purpose of the Act.  The Act's purpose is to prevent animal cruelty.  The language otherwise is just that -- language -- and in practice, the Act has no effect on health and safety in the Commonwealth.

The Court, therefore, determines that the Act is not expressly preempted by the FMIA.

### 2. Conflict Preemption

The Pork Producers also argue that the Act's sales ban is preempted under principles of conflict preemption because the sales ban "conflicts with, and obstructs, the objectives of the FMIA."  Mem. Supp. Pl.'s Mot. 23.  Conflict preemption is triggered "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Weaver's Cove Energy, LLC v. Rhode Island Coastal Res. Mgmt. Council, 589 F.3d 458, 472-73 (1st Cir. 2009). Should a statute have a preemption provision, as the FMIA does, a conflict preemption analysis is generally inappropriate. See English v. General Elec. Co., 496 U.S. 72, 79 (1990) (conflict preemption analysis applies in the "absence of explicit statutory language.").  A presumption against preemption applies generally to such an analysis as well.  See Medicaid & Medicare Advantage Prod. Ass'n of P.R., Inc. v. Emanuelli Hernandez, 58

**Add.67**

F.4th 5, 11 (1st Cir. 2023).  The Court here, however, will continue to conduct such an analysis.

A state law is preempted by conflict preemption when "it is impossible for a private party to comply with both state and federal requirements" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  English, 496 U.S. at 79 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  Maine Forest Prod. Council v. Cormier, 51 F. 4th 1, 6 (1st Cir. 2022) (citing Crosby v. National Foreign Trade Council, 530 U.S. 363, 373 (2000)).

The purpose of the FMIA is "adequately" to "protect" "the health of the consumer" through the intended effect of "a uniform framework" of federal and state meat inspection programs.  Pls.' SOF ¶ 41.  The Act, in contrast, seeks to prevent the sale of pork raised in inhumane conditions, without concern for whether that meat is safe to eat (in other words, an otherwise healthy pork product could be noncompliant with the Act, not because it is considered unhealthy, but because the policy preferences of the Massachusetts voters demand it not be eligible for sale).  There is nothing in the record to indicate that since the Act's enactment, obstacles have occurred in

ensuring safe and healthy pork in the Massachusetts market
through the FMIA.

Further, as explained above, slaughterhouses can easily
comply with both federal requirements and the requirements
imposed by the Act because the Act does not impose any new
requirements on slaughterhouses within the scope of the FMIA.
As the Act does not impose any new requirements on
slaughterhouses within the scope of the FMIA, it cannot, by
definition, stand as an obstacle to the accomplishment or
execution of Congress's objectives under the FMIA.

The Pork Producers argue that because there is "pork meat
product that has passed FMIA inspection and is approved for sale
by the USDA [that] is now unable to be sold," the Act conflicts
with the FMIA. Pls.' Reply 19.

Although the Pork Producers point to instances in the
record where a farmer, in providing both compliant and non-
compliant pigs to a processor, erred in denoting pigs as
compliant, resulting in pigs that had passed full USDA
inspection being withdrawn from the market, such instances do
not interfere with the objectives of the FMIA.[3] If the farmer
had erred in labeling pigs delivered as "grass-fed", and such an

---

[3] The objective of the FMIA is to ensure safe pork enters
the market. The FMIA, however, does not **require** that all safe
pork available to the market be able to enter the market.

error was discovered after packaging and shipment, the
mislabeled pork products would also have been withdrawn from the
market to prevent misleading customers.  The FMIA's purpose, to
protect the health of consumers through uniform meat inspection
regulations, is in no way precluded by the Act's recording
requirements.  The Court, therefore, determines that the Act is
not preempted by the FMIA via conflict preemption.

### V.   CONCLUSION

After tremendously helpful briefing and oral argument, the
Court took the parties' cross motions for summary judgment under
advisement.  The Court now, after careful consideration,
determines that the Act is not preempted by the FMIA, and
therefore **GRANTS** the Commonwealth's motion for summary judgment,
ECF No. 136, and **DENIES** the Pork Producers' motion for summary
judgment, ECF No. 126.  Judgment shall enter for the
Commonwealth.

**SO ORDERED.**

/s/ William G. Young
WILLIAM G. YOUNG
JUDGE
of the
UNITED STATES[4]

---

[4] This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents.  Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 46 years.

**Add.70**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**


**Triumph Foods, LLC et al**

_____
                                    **Plaintiffs**

                                                    **CIVIL ACTION**
              **V.**                                **NO. 23cv11671-WGY**

**Andrea Joy Campbell, in her official**
**capacity as Attorney General of Massachusetts**

**Ashley Randle in her official capacity**
**as Massachusetts Commissioner of**
**Agriculture.**

_____
                                    **Defendants**



                          **JUDGMENT**


**YOUNG, D. J.**


        In accordance with the Court's MEMORANDUM AND ORDER entered on
July 22, 2024, JUDGMENT is hereby entered for the Commonwealth, Andrea Joy
Campbell and Ashley Randle.




                                    **By the Court,**

**JULY 22, 2024**                    **/s/Matthew A. Paine**

_____                      _____
        **Date**                              **Deputy Clerk**


**Add.71**

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XIX. Agriculture and Conservation (Ch. 128-132b)
            Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-1

§ 1-1. Purpose

Currentness

The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts.

**Credits**

Added by St.2016, c. 333, § 1, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-1, MA ST 129 App. § 1-1
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XIX. Agriculture and Conservation (Ch. 128-132b)
         Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-2

§ 1-2. Knowing confinement of covered animal in cruel manner

Currentness

Notwithstanding any general or special law to the contrary, it shall be unlawful for a farm owner or operator within the Commonwealth of Massachusetts to knowingly cause any covered animal to be confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 2, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-2, MA ST 129 App. § 1-2
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Add.73** 1

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
      Title XIX. Agriculture and Conservation (Ch. 128-132b)
         Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-3

§ 1-3. Sale of products of covered animals confined in cruel manner

Currentness

Notwithstanding any general or special law to the contrary, it shall be unlawful for a business owner or operator to knowingly engage in the sale within the Commonwealth of Massachusetts of any:

(A) Shell egg and other egg products that the business owner or operator knows or should know is the product of a covered animal that was confined in a cruel manner.

(B) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner.

(C) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 3, eff. Jan. 1, 2022 and Aug. 15, 2022. Amended by St.2021, c. 108, § 1, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-3, MA ST 129 App. § 1-3
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. **Add.74** 1

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
       Title XIX. Agriculture and Conservation (Ch. 128-132b)
         Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-4

§ 1-4. Circumstances not deemed to be confined in a cruel manner

Currentness

For the purposes of this Act, a covered animal shall not be deemed to be "confined in a cruel manner" during:

(A) Transportation.

(B) State or county fair exhibitions, 4-H programs, and similar exhibitions.

(C) Slaughter in accordance with any applicable laws, rules, and regulations.

(D) Medical research.

(E) Examination, testing, individual treatment or operation for veterinary purposes, but only if performed by or under the direct supervision of a licensed veterinarian.

(F) The five (5) day period prior to a breeding pig's expected date of giving birth, and any day that the breeding pig is nursing piglets.

(G) Temporary periods for animal husbandry purposes for no more than six (6) hours in any twenty-four (24) hour period; provided, however, that in the case of egg-laying hens, for not more than 24 hours total in any 30-day period.

**Credits**
Added by St.2016, c. 333, § 4, eff. Jan. 1, 2022. Amended by St.2021, c. 108, § 2, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-4, MA ST 129 App. § 1-4
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XIX. Agriculture and Conservation (Ch. 128-132b)
      Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-5

§ 1-5. Definitions

Currentness

For purposes of this act, the following terms shall, unless the context requires otherwise, have the following meanings:

"Breeding pig", any female pig of the porcine species kept for the purpose of commercial breeding.

"Business owner or operator", any person who owns or controls the operations of a business.

"Cage-free housing system", an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted, are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes and dust bathing areas, and within which farm employees can provide care while standing within the hens' usable floor space; provided, however, that "cage-free housing system" shall include, to the extent that such systems comply with the requirements of this definition, multi-tiered aviaries, partially-slatted systems, single-level all litter floor systems and any future systems that will comply with the requirements of this definition; provided further, that "cage-free housing system" shall not include systems commonly described as "battery cages", "colony cages", "enriched cages", "enriched colony cages", "modified cages", "convertible cages" or "furnished cages" or other similar cage systems.

"Calf raised for veal", any calf of the bovine species kept for the purpose of commercial production of veal meat.

"Confined in a cruel manner", confining: (i) a calf raised for veal or a breeding pig in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely; or (ii) an egg-laying hen in an enclosure other than a cage-free housing system or with less than:

(A) 1 square foot of usable floor space per hen in multi-tiered aviaries, partially-slatted cage-free housing systems or any other cage-free housing system that provides hens with unfettered access to vertical space; or

(B) 1.5 square feet of usable floor space per hen in single-level, all-litter floor cage-free housing systems or any other cage-free housing system that does not provide hens with unfettered access to vertical space.

"Covered animal", any breeding pig, calf raised for veal or egg-laying hen that is kept on a farm.

"Egg-laying hen", any female domesticated chicken, turkey, duck, goose or guinea fowl kept for the purpose of commercial egg production.

"Egg products", eggs of an egg-laying hen broken from the shells, intended for human food, whether in liquid, solid, dried or frozen form, whether raw or cooked, and with the yolks and whites in their natural proportions or with the yolks and whites separated, mixed or mixed and strained; provided, however, that "egg products" shall not include combination food products,

including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream or other similar food products that are comprised of more than egg products, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers and similar food additives.

"Enclosure", any cage, crate or other structure used to confine a covered animal or animals; provided, however, that "enclosure" shall include what is commonly described as a "gestation crate" or "stall" for pigs during pregnancy, a "veal crate" for calves raised for veal and a "battery cage", "enriched cage" or "colony cage" for egg-laying hens.

"Farm", the land, building, support facilities and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food; provided, however, that "farm" shall not include live animal markets, establishments at which inspection is provided under the Federal Meat Inspection Act or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act.

"Farm owner or operator", any person who owns or controls the operations of a farm.

"Fully extending the animal's limbs", fully extending all limbs without touching the side of an enclosure.

"Meat", the part of the muscle of any cattle, sheep, swine or goats, which is skeletal or which is found in the tongue, in the diaphragm, in the heart or in the esophagus, with or without the accompanying and overlying fat, and the portions of bone, skin, sinew, nerve and blood vessels which normally accompany the muscle tissue and which are not separated from it in the process of dressing; provided, however, that "meat" shall not include the muscle found in the lips, snout or ears.

"Multi-tiered aviary", a cage-free housing system in which hens have unfettered access to multiple elevated platforms that provide hens with usable floor space both on top of and underneath the platforms.

"Partially-slatted system", a cage-free housing system in which hens have unfettered access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.

"Person", any individual, firm, partnership, joint venture, limited liability corporation, estate, trust, receiver, syndicate, association or other legal entity.

"Pork meat", meat of a pig of the porcine species intended for use as human food.

"Sale", a commercial sale by a business that sells any item covered by section 3; provided, however, that "sale" shall not include any sale undertaken at an establishment at which inspection is provided under the Federal Meat Inspection Act or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act; provided further, that for purposes of this section, a "sale" shall be deemed to occur at the location where the buyer takes physical possession of an item covered by said section 3.

"Shell egg", a whole egg of an egg-laying hen in its shell form and intended for use as human food.

"Single-level all litter floor system", a cage-free housing system bedded with litter and in which hens have limited or no access to elevated flat platforms.

"Turning around freely", turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

"Uncooked", requiring cooking prior to human consumption.

"Usable floor space", the total square footage of floor space provided to each egg-laying hen, as calculated by dividing the total square footage of floor space provided to the hens in an enclosure by the number of hens in that enclosure; provided, however, that "usable floor space" shall include both ground space and elevated level or nearly level flat platforms upon which hens can roost; provided further, that "usable floor space" shall not include perches or ramps.

"Veal meat", meat of a calf raised for veal and intended for use as human food.

"Whole pork meat", any uncooked cut of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole pork meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or other similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

"Whole veal meat", any uncooked cut of veal, including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin or cutlet, that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives; provided, however, that "whole veal meat" shall not include combination food products, including soups, sandwiches, pizzas, hot dogs or similar processed or prepared food products, that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives and similar meat additives.

**Credits**
Added by St.2016, c. 333, § 5, eff. Jan. 1, 2022. Amended by St.2021, c. 108, § 3, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-5, MA ST 129 App. § 1-5
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
    Part I. Administration of the Government (Ch. 1-182)
        Title XIX. Agriculture and Conservation (Ch. 128-132b)
            Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-6

§ 1-6. Enforcement

Currentness

The Attorney General shall have exclusive authority to enforce the provisions of this Act. Each violation of this Act shall be punished by a civil fine not to exceed one thousand dollars ($1,000). The Attorney General may also seek injunctive relief to prevent further violations of this Act.

**Credits**

Added by St.2016, c. 333, § 6, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-6, MA ST 129 App. § 1-6
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XIX. Agriculture and Conservation (Ch. 128-132b)
Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-7

§ 1-7. Good faith reliance upon written certification or guarantee by supplier

Currentness

It shall be a defense to any action to enforce this act that a business owner or operator relied in good faith upon a written certification or guarantee by the supplier that the shell egg, egg products, whole pork meat or whole veal meat at issue was not derived from a covered animal that was confined in a cruel manner or from the immediate offspring of a female pig that was confined in a cruel manner.

**Credits**

Added by St.2016, c. 333, § 7, eff. Jan. 1, 2022. Amended by St.2021, c. 108, § 4, eff. Jan. 1, 2022.

M.G.L.A. 129 App. § 1-7, MA ST 129 App. § 1-7
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XIX. Agriculture and Conservation (Ch. 128-132b)
      Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-8

§ 1-8. Application

Currentness

The provisions of this Act are in addition to, and not in lieu of, any other laws protecting animal welfare. This Act is not intended, and should not be construed to limit any other state law or rules protecting the welfare of animals or to prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations that are more stringent than this section.

**Credits**
Added by St.2016, c. 333, § 8, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-8, MA ST 129 App. § 1-8
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. Add.81    1

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XIX. Agriculture and Conservation (Ch. 128-132b)
      Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-9

§ 1-9. Severability

Currentness

The provisions of this Act are severable and if any clause, sentence, paragraph or section of this Act, or an application thereof, shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair, or invalidate the remainder thereof but shall be confined in its operation to the clause, sentence, paragraph, section or application adjudged invalid.

**Credits**

Added by St.2016, c. 333, § 9, eff. Dec. 8, 2016.

M.G.L.A. 129 App. § 1-9, MA ST 129 App. § 1-9
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XIX. Agriculture and Conservation (Ch. 128-132b)
      Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-10

§ 1-10. Regulations

Currentness

The department of agricultural resources, in consultation with the attorney general, shall promulgate rules and regulations for the implementation of this act not more than 6 months after the effective date of this act. Any authorized use of third-party validators in such rules or regulations to assist with compliance under this act shall be jointly approved by the secretary of energy and environmental affairs and the attorney general.

**Credits**

Added by St.2016, c. 333, § 10, eff. Dec. 8, 2016. Amended by St.2021, c. 108, § 5, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-10, MA ST 129 App. § 1-10
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XIX. Agriculture and Conservation (Ch. 128-132b)
      Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-11

§ 1-11. Effective dates

Currentness

Section 2, clause (A) and clause (B) of section 3 and sections 4 to 7, inclusive, shall take effect on January 1, 2022.

**Credits**

Added by St.2016, c. 333, § 11, eff. Dec. 8, 2016. Amended by St.2021, c. 108, § 6, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-11, MA ST 129 App. § 1-11
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  **Add.84**

Massachusetts General Laws Annotated
   Part I. Administration of the Government (Ch. 1-182)
     Title XIX. Agriculture and Conservation (Ch. 128-132b)
       Appendix to Chapter 129 Prevention of Farm Animal Cruelty Act (Refs & Annos)

M.G.L.A. 129 App. § 1-12

§ 1-12. Effective date of clause (C) of section 3

Currentness

Clause (C) of section 3 shall take effect on August 15, 2022.

**Credits**

Added by St.2021, c. 108, § 6, eff. Dec. 22, 2021.

M.G.L.A. 129 App. § 1-12, MA ST 129 App. § 1-12
Current through Chapter 129 of the 2024 2nd Annual Session. Some sections may be more current, see credits for details.

---

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this Friday, September 20, 2024 the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.


*/s/ Michael T. Raupp*