No. 24-1759

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

TRIUMPH FOODS, LLC, individually and on behalf of its
members; CHRISTENSEN FARMS MIDWEST, LLC, individually
and on behalf of its members; THE HANOR COMPANY OF
WISCONSIN, LLC, individually and on behalf of its members;
NEW FASHION PORK, LLC, individually and on behalf of its
members; EICHELBERGER FARMS, INC., individually and on
behalf of its members; ALLIED PRODUCERS' COOPERATIVE,
individually and on behalf of its members,
Plaintiffs-Appellants,
v.
ANDREA JOY CAMPBELL, Attorney General of Massachusetts;
ASHLEY RANDLE, Massachusetts Commissioner of Agriculture,
Defendants-Appellees

Appeal from the United States District Court
for Massachusetts, No. 1:23-cv-11671-WGY

**BRIEF OF IOWA, ALABAMA, GEORGIA, LOUISIANA,
KANSAS, MISSOURI, MISSISSIPPI, MONTANA,
NEBRASKA, NORTH DAKOTA, NEW HAMPSHIRE, OHIO,
OKLAHOMA, SOUTH CAROLINA, SOUTH DAKOTA,
TEXAS, UTAH, WEST VIRGINIA, AND WYOMING AS
*AMICI CURIAE* IN SUPPORT OF APPELLANT AND
REVERSAL**

BRENNA BIRD
Attorney General of Iowa

September 30, 2024

ERIC WESSAN
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Amicus Iowa Attorney General's Office*
*(Additional counsel listed after signature block)*

## TABLE OF CONTENTS

INTRODUCTION & INTERESTS OF THE AMICI CURIAE ........1

ARGUMENT ...................................................................4

I.    Question 3 Sets of the Stage for States' Racing to the Bottom.4

II.   Question 3 Will Harm Agricultural States and Consumers.....9

III.  Question 3 Violates the Constitution. ....................................15

CONCLUSION ................................................................18

CERTIFICATE OF COMPLIANCE ..............................................19

CERTIFICATE OF FILING AND SERVICE................................20

# TABLE OF AUTHORITIES

## Cases

*Brown v. Maryland,*
  12 Wheat. 419 (1827) ..................................................................... 16

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997) ...................................................................... 16

*Carroll v. Lanza,*
  349 U.S. 408 (1955) ...................................................................... 17

*Comptroller of Treasury of Md. V. Wynne,*
  575 U.S. 542 (2015) ...................................................................... 16

*CTS Corp. v. Dynamics Corp. of Am.,*
  481 U.S. 69 (1987) ........................................................................ 10

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ............................................................... 4, 9, 13

*Woodruff v. Parham,*
  75 U.S. 123 (1869) ........................................................................ 16

## Statutes

Mass. Gen. Laws Ch. 129 App., § 1–5 ........................................... 2, 18

## Other Authorities

*2020 Iowa Pork Industry Report* (May 2020) ...................................... 3, 11

Barry K. Goodwin, *California's Proposition 12and its Impacts on the
  Pork Industry* (May 13, 2021) .............................................................. 5

Brian Deese, *Addressing Concentration inthe Meat-Processing Industry
  to Lower Food Prices for American Families,*The White House (Sept. 8,
  2021) .................................................................................................... 7

Chris Lisinski, *New Mass. Law on Pork SalesTakes Effect This Month*
  (Aug. 8, 2023), NBCBOSTON .............................................................. 11

Elizabeth R. Rumley, *States' Farm Animal Confinement Statutes,* Nat'l
  Agric. Law Ctr. .................................................................................. 18

*Equal Citizens of Equal and Territorial States: The Constitutional
  Foundations of Choice of Law,*
  92 Colum. L. Rev. 249 (1992) ............................................................ 17

Erica Shaffer, *Rabobank*: *California's Prop 12 a Call to Lead on Animal*

*Welfare*, Meat+Poultry (2021) ................................................................4

Jennifer Shike, *Here's a Look at Pork Price Spreads*, PORK BUSINESS (May 15, 2023)...................................................................................7

Robert G. Natelson, *What the Constitution Means by "Duties, Imposts, and Excises"—and "Taxes" (Direct or Otherwise)*, 66 Case W. Rev. 297, 320 (2015)..........................................................................................16

*State Extraterritorial Powers Reconsidered*, 85 Notre Dame L. Rev. 1133 (2010)........................................................................................17

The Editorial Board, *Massachusetts Want Your Bacon*, WALL STREET JOURNAL, (Aug. 10,2022) .....................................................................7

iv

## INTRODUCTION & INTERESTS OF THE *AMICI* CURIAE

Suppose Iowa voters began to worry about overfishing and the inhumane harvesting of Atlantic shellfish. So the Iowa Legislature passes a law about how lobsters, claims, and steamers must be harvested to be lawfully sold in the State. For example, lobsters must be able to comfortably turn around and lay down in the lobster cages that capture them. Perhaps the Atlantic fishermen think that the rules are unworkable and would dramatically raise the cost of otherwise ethical fishing. Iowa neither employs nor consults experts within the field—the Atlantic fishing community in Iowa is simply not that large. And so, without fishermen to raise their concerns with local legislators or voters, this new hypothetical law is enacted—and applies equally to all lobster fisherman in the Atlantic and in the Mississippi.

While that law equally affects Atlantic fishermen across the country, it likely would impose greater compliance costs on States that have a more meaningfully sized shell-fishing industry than Iowa. Even more so if other Midwestern states joined the ethical crusade. And imagine the harm if fresh—but noncompliant—Maine and

Massachusetts lobsters could not even transit through those Midwestern States.

That is no different from the current approach of some States that do not raise hogs trying to impose unworkable restrictions in States that do. And while consumers in the regulating States will pay higher prices as a result, the economic implications are far greater—and more troubling.

The States of Iowa, Alabama, Georgia, Louisiana, Kansas, Missouri, Mississippi, Montana, Nebraska, North Dakota, New Hampshire, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, West Virginia, and Wyoming submit this brief supporting Plaintiffs. *See* Circuit Rule 29(a)(2). Because that is what Massachusetts is doing here—imposing a detrimental and overly burdensome regulatory scheme on the almost entirely out-of-Massachusetts pig farmers and pork processors in their respective States.

One part of Question 3, the Prevention of Farm Animal Cruelty Act, governs "farm owner[s and] operators within the Commonwealth of Massachusetts." Mass. Gen. Laws Ch. 129 App., § 1–2. But Question 3 also makes it unlawful for a business to sell within Massachusetts

"any . . . [w]hole pork meat that the business owner or operator knows or should know is the meat of a covered animal [or]of the immediate offspring of a covered animal" if the covered animal was "confined in a cruel manner," as defined by the Question. *Id*. § 1–3. "Whole pork meat" includes uncooked pork, like bacon, ham, roast, and brisket. *Id*. § 1–5.

On its face, Question 3 appears only to regulate sales of pork that occur in Massachusetts. But its reach is much broader. Question 3's application and accompanying regulations will deny market access to out-of-state pork farmers and processors unless their farming practices comply with Massachusetts's dictates.

Question 3's broad sweep will harm agricultural states. Iowa, for example, is the top pork-producing and -exporting state in the United States. *2020 Iowa Pork Industry Report* 7 (May 2020), *available at* https://perma.cc/3DFZ-SV5N. The pork industry employs more than 147,000 Iowans and contributes billions of dollars annually to Iowa's economy. *Id*.

Beyond Iowa, hog farmers are critical to many States' economies. Massachusetts Question 3 will disrupt the pork industry by imposing stringent requirements inconsistent with industry practices on hog

farmers and pork processors across the country. Those mandates will substantially burden the interstate pork market and increase the price of pork for all Americans. For these reasons, these States have a critical interest in the outcome of this litigation—which should be decided for Plaintiffs.

## ARGUMENT

### I.    Question 3 Will Harm Agricultural States and Consumers.

Question 3 will force out-of-state farmers to face enormous compliance costs. Economic studies conducted on California's less onerous law, Proposition 12, are instructive. Those studies estimated that complying will cost hog producers in the United States between $294 million and $348 million. Brief of Iowa Pork Producers Ass'n, *et al.* as Amici Curiae, p. 17, *Nat'l Pork Producers Council*, 598 U.S. 356.

To contextualize those numbers, an "average barn might cost $1,600 to USD 2,500 per sow, or $3 million to $4.5m million in total." Erica Shaffer, *Rabobank*: *California's Prop 12 a Call to Lead on Animal Welfare*, MEAT+POULTRY (2021), https://perma.cc/TUZ5-SX5V. But Proposition 12 will raise those costs to "average[e] as much as $3,400 per sow." *Id*. That potential doubling of cost for farmers will put some out of

business and will dramatically raise costs for consumers. And it stems from law changes like Question 3's "elevated building costs." *See id.*

Small, independent hog farmers will be hardest hit. Most pig farmers operate independent farms with 52,964 independent pig farms holding 25.6 million pigs in inventory, according to the 2022 Agricultural Census. Nat'l Agric. Stat. Serv., 2022 Census of Agriculture: U.S. Nat'l Level Data, Table 23, https://perma.cc/M3FE-KJA9. Of those farms, about 90 percent had fewer than 100 pigs in inventory. *Id.*

Question 3 will disproportionately affect small farmers because they generally have "a lower return to investments and therefore will likely realize less favorable terms of credit," and "will be the least able to undertake the changes that would make facilities comfortable." Barry K. Goodwin, *California's Proposition 12 and its Impacts on the Pork Industry* (May 13, 2021), at 8–9. Question 3 thus places an added burden on an already contracting segment of the industry: The number of independent farms with herds of fewer than 100 pigs already had dropped by about 9 percent between 2017 and 2022. *Compare* Nat'l Agric. Stat. Serv., 2022 Census of Agriculture: U.S. Nat'l Level Data, Table 23 *and* Nat'l Agric. Stat. Serv., 2017 Census of Agriculture: U.S. Nat'l Level

Data, Table 23, https://perma.cc/D3TY-62EJ. Costly regulations could "hasten the concentration of the hog Industry, with smaller farmers exiting the sector, leaving a US hog industry that has fewer but larger farms." Goodwin, at 10.

Indeed, the problem is not isolated to Massachusetts. The potential financial effect on farmers will increase if other States impose similar unworkable regulations with their own idiosyncrasies inconsistent with those in Massachusetts. For example, farmers in Iowa could invest millions of dollars to remodel their hog farms to comply with Massachusetts's requirements only to find New York enacting a law imposing larger housing requirements per pig. *See* Brief of Iowa Pork Producers Ass'n, *et al.* as Amici Curiae, p. 17. Even worse—what if States impose *conflicting* requirements. How many States must hog farmers comply with? Do they have to choose if each State without a meaningful pork industry imposes seemingly neutral but mutually exclusive and unworkable regulations? There is a real risk of forcing those farmers to continuously "invest millions of dollars in capital expenditures" to "comply with everchanging standards that other states choose." *Id.* at 18.

While Question 3 is expensive, non-compliance may cost the pork

industry more. If farmers and pork processors do not adjust to the new rules, they may be shut out of New England entirely. Massachusetts wants to impose its new requirements on any pork transiting through the State. Because Massachusetts "is [the] distribution hub for Vermont, New Hampshire, Rhode Island, and Maine," Question 3 "could affect the production and sale of pork across a broad swath of the country." The Editorial Board, *Massachusetts Want Your Bacon*, WALL STREET JOURNAL, (Aug. 10, 2022), https://perma.cc/9HR8-9KDQ.

Moreover, hog farmers are not necessarily those who will be hardest hit. The increased costs on pig farmers and pork processors will make American consumers squeal about higher pork prices. Pork prices are already high enough. In 2021, pork prices rose 12.1 percent from the previous year. Brian Deese, *Addressing Concentration in the Meat-Processing Industry to Lower Food Prices for American Families*, The White House (Sept. 8, 2021), https://perma.cc/AJ7F-XFAA. And in October 2022, pork prices hit a record level of $5.05 per pound. Jennifer Shike, *Here's a Look at Pork Price Spreads*, PORK BUSINESS (May 15, 2023), https://perma.cc/N23H-CA5H.

Costly regulations are not helping. Indeed, early data on

California's Proposition 12 already shows that consumers are seeing higher pork prices at the grocery store. Three USDA economists analyzed preliminary retail scanner data and found that pork prices in California rose 20 percent on average since July 1, 2023, when the state began implementing the new regulations. *See* Hannah Hawkins, Shawn Arita, and Seth Meyer, *Proposition 12 Pork Retail Price Impacts on California Consumers,* University of Calif. Giannini Found. of Agric. Econ., ARE Update 27(3), 5–8 (2024), *available at* https://perma.cc/Z8ET-D4Q4. The price of some pork products increased even more with the price of pork loins rising by more than 40 percent. *Id.* This means California consumers are paying an extra $1.04 per pound for bacon, $0.54 per pound more for ribs, and an additional $1.42 per pound for pork loin— the three most-purchased pork products by California consumers. *Id.* These price increases continued even after the regulations were fully implemented on January 1, 2024. Massachusetts's out-of-touch regulations will only continue to inflate prices.

High pork prices will disproportionately impact low-income households. Laws like Question 3 and Proposition 12 may "lead to a decline in the number of options" and "make certain pork products too

expensive for lower-income people." Alicia Wallace, *Pork Is Already Super Expensive. This New Animal-Welfare Law Could Push Prices Higher*, CNN BUSINESS (Oct. 17, 2021), https://perma.cc/42YJ-CF7J. That shift will hurt the pocketbooks of folks who have long relied on pork as a low-cost, high protein option for feeding their families.

Question 3 also jeopardizes Americans' health and safety. Scientific literature suggests that animal-confinement regulations, like those mandated by Question 3, could worsen animal health and welfare and risk standardized sanitary practices. For example, housing hogs in larger spaces may increase the risk of disease transmission. Those bigger confines mean that pigs are more likely to come into nose-to-nose contact and share water and feeding systems. *See* Brief for American Association of Swine Veterinarians as Amicus Curiae, p. 4–19, *Nat'l Pork Producers Council*, 598 U.S. 356. Unfortunately, Question 3 leads to real risks to human health.

## II. Question 3 Sets the Stage for States' Racing to the Bottom.

The Framers' "central concern . . . for calling the Constitutional Convention" was "the conviction that in order to succeed, the new Union would have the avoid the tendencies toward economic Balkanization that

had plagued relations among the colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325–26 (1979). "One of the major defects of the Articles of Confederation . . . was the fact that the Articles essentially left the individual States free to burden commerce both among themselves and with foreign countries very much as they pleased." *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 283 (1976).

Yet, Question 3—and ballot initiatives like it—reinvigorate those isolationist tendencies to undermine the economic union the Framers created. "The entire Constitution was framed upon the theory that the peoples of the several states must sink of swim together, and that in the long run, prosperity and salvation are in union not division." *Healy v. Beer Inst., Inc.*, 491 U/S/ 324, 336 n.12 (1989) (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935)).

Question 3 sews this division in multiple ways:

*First*, Question 3, creates a "risk of inconsistent regulation by different States." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987). Here, Massachusetts's requirements for pig farms and pork processors deviate from lawful industry practices across the country.

Massachusetts itself has few hog farmers or pork producers—most live elsewhere. That means, in effect, that the State is regulating a market in which it lacks expertise and economic stake.

Iowa, for example, produces a lot of pork. In 2020, the pork industry contributed $40.8 billion in output, and more than 147,000 jobs to Iowa's economy. *2020 Iowa Pork Industry Report*, at 7. Hogs generated $893 million in state and local taxes and $1.3 billion in federal taxes. *Id*. That same year, Iowa had more than 5,400 pig farms and housed nearly one third (over 24 million) of the nation's hogs. *Id*.

Contrast Iowa with Massachusetts, which purchases nearly all pork sold in within its borders from other states. Chris Lisinski, *New Mass. Law on Pork Sales Takes Effect This Month* (Aug. 8, 2023), NBC BOSTON, https://perma.cc/24J7-NE2M. Its residents annually consume 396 million pounds of pork but produce only 1.9 million pounds in state. Thus, Massachusetts produces less than one-half of one percent of the pork it eats. *Id*. Yet Question 3 directs pork-producing States to reorganize their industries based on the so-called "moral" sensibilities of its voters—the equivalent of Iowa, a land-locked state, passing a law on the "humane" harvesting of shellfish.

11

This moral imposition comes at a cost and will affect every link on the supply chain. As occurred in California after Proposition 12, to continue selling pork products in New England, "U.S. grocery retailers, meat wholesalers, and pork processors will need to split the pork supply chain into two separate classes of product; 1) pork products that are compliant with [Massachusetts's Question 3] and destined only for that market, and 2) traditional pork products that make no claims about compliance." Goodwin, at 3. Those tiers will create artificial scarcity and skyrocketing prices in New England, while creating an artificial glut and price collapse in other markets. *Id.* at 3–40. This market segmentation directly undermines the "maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce" that the Framers sought to create. *See Healy*, 491 U.S. at 335–36 n.12.

*Second*, upholding Question 3 could drag other States into a regulatory "race to the bottom" that extends beyond just pork. As Justice Cardozo once warned, allowing one State to project its regulation into another would mean "the door had been opened to rivalries and reprisals that were meant to be averted by subjecting commerce between the states to the power of the nation." *Baldwin*, 294 U.S. at 522.

For example, imagine Washington—the State with the highest minimum wage—refusing to allow sale of products from States with a lower minimum wage. Or imagine a State prohibiting "the retail sale of goods from producers that do not pay for employees' birth control or abortions." Brief of Indiana and 25 Other States as Amici Curiae, p. 33, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). Upholding Question 3 invites States to upend national markets based on "flavor of the day" policy preferences and so "effectively force other States to regulate in accordance with those idiosyncratic state demands." *Nat'l Pork Producers Council*, 598 U.S. at 407 (Kavanaugh, J., concurring in part and dissenting in part).

State appeals to health and economic welfare are not a justification. "To give entrance to that excuse would be to invite a speedy end to our national solidarity." *Baldwin*, 267 U.S. at 523.

Indeed, State efforts to exert unilateral control over large sectors of the national economy are increasingly common. For example, in the field of energy regulation, Oregon and California regulate greenhouse gas emissions along the electricity supply chain leading to those states. Cal. Code. Regs. Tit. 17, § 95481; Or. Admin. R. 340-253-0040; *see also* James

W. Coleman, *Importing Energy, Exporting Regulation*, 83 Fordham L. Rev. 1357 (2014). Meanwhile, Colorado regulates the renewable energy portfolios of power companies selling electricity for the State's use. Colo. Rev. Stat. § 40-2-124. Law and ballot initiatives like Question 3 thus invite States to revert to a time when "each state would legislate according to its estimate of its own interests, the importance of its own products, and the local advantages or disadvantages of its position in a political or commercial view." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 533 (1949) (internal quotation omitted).

*Third*, "California's low-carbon fuel standard demonstrates how even well-intentioned regulation presents a temptation toward protectionism." Coleman, 83 Fordham L. Rev. at 1386. During its implementation, California altered the standard to break ethanol into two geographic categories, "California" and "Midwest," assigning a higher carbon intensity score to Midwest ethanol compared to ethanol produced the same way in California. *Id.* at 1386–87.

State policy "experiments" like Question 3 are "fertile grounds for protectionist measures that would at best forfeit the efficiency and reliability benefits of integrated . . . markets, and at worst, could ignite

14

state-to-state and even international trade wars." *Id.* at 1399.

## III.   Question 3 Violates the Constitution.

Beyond the Commerce Clause, laws like Question 3 may also implicate other constitutional provisions like the Import-Export Clause and the Full Faith and Credit Clause. *See Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part).

Under the Import-Export Clause, "No State shall, without the Consent of Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws." Art. I, § 10, cl. 2. "The Import Export Clause was the principal remedy proposed by the Philadelphia Convention to remedy the commercial strife that characterized the relations among the states under the Articles of Confederation." Boris I. Bittker & Brannon P. Denning*, The Import Export Clause*, 68 Miss. L.J. 521, 521 (1998). In particular, the Clause was designed to stop the "exploitation of the inland states by the seaboard states," which were imposing taxes on arriving goods destined for other states. *Id.* at 522.

Recent opinions reveal that the Supreme Court may be ready to

apply the Import-Export Clause to interstate commerce, consistent with that Clause's original meaning. *See Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part); *Comptroller of Treasury of Md. V. Wynne*, 575 U.S. 542, 573 (2015) (Scalia, J., dissenting); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 621–637 (1997) (Thomas, J., dissenting); *Brown v. Maryland*, 12 Wheat. 419, 438−439, 449 (1827); *but see Woodruff v. Parham*, 75 U.S. 123 (1869) (limiting the Import-Expert Clause to foreign trade). Indeed, "not all duties were taxes: Some were imposed not for revenue but merely to regulate (or effectively prohibit) trade in particular articles." Robert G. Natelson, *What the Constitution Means by "Duties, Imposts, and Excises"—and "Taxes" (Direct or Otherwise)*, 66 Case W. Rev. 297, 320 (2015).

Justices Scalia and Thomas have explained that the Import-Export Clause prevents States "from imposing certain especially burdensome" taxes and duties on imports from other States and not just from foreign countries. *Wynne*, 575 U.S. at 573.

Here, Question 3 conditions the sale of pork on "the use of preferred farming, manufacturing, or production practices in another State" where

the pork originated. *Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part). That conflicts with the Import-Export Clause's original meaning and warrants reconsideration. *See id*.

Question 3 also violates the Full Faith and Credit Clause, which requires each State to afford "Full Faith and Credit" to the "public Acts" of "every other State." Art. IV, § 1. That Clause prevents States from "adopting any policy of hostility to the public Acts" of another State. *Carroll v. Lanza*, 349 U.S. 408, 413 (1955). According to Justice Kavanaugh, "[a] State's effort to regulate farming, manufacturing, and production practices in another State (in a manner different from how that other State's laws regulate those practices) could in some circumstances raise questions under that Clause." *Nat'l Pork Producers Council*, 598 U.S. at 408 (Kavanaugh, J., concurring in part and dissenting in part); *see also* Mark D. Rosen, *State Extraterritorial Powers Reconsidered*, 85 Notre Dame L. Rev. 1133, 115 (2010); Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law*, 92 Colum. L. Rev. 249, 290, 296–301 (1992). While the Full Faith and Credit Clause does not have so broad a

scope as to encompass any law that has extraterritorial effect, the Full Faith and Credit Clause is implicated when an agricultural regulation conflicts with another State's laws about how pork may be produced in that State.

Massachusetts creates the precise scenario about which Justice Kavanaugh warns. Question 3 regulates pork production in States, like Iowa, in a manner different from how those States regulate pork production. *See* Elizabeth R. Rumley, *States' Farm Animal Confinement Statutes*, Nat'l Agric. Law Ctr., https://perma.cc/C9GZ-PZ3U. Indeed, Question 3 explicitly prohibits certain States from engaging in otherwise legal practices encouraged by those States' laws if they want to sell pork in Massachusetts. Mass. Gen. Laws Ch. 129 App., § 1–3. Thus, the Full Faith and Credit Clause should preclude Massachusetts from enacting its regulations that conflict with Iowa's laws and that of other top pork-producing states.

## CONCLUSION

For all these reasons, amici curiae ask this Court to reverse the district court and enter an injunction against enforcing Question 3 on pork farmers and consumers across America.

Dated: September 30, 2024     Respectfully submitted,

BRENNA BIRD                              /s/ Eric H.Wessan
*Attorney General of Iowa*            Eric H. Wessan
                                      *Solicitor General*
                                      Office of the Attorney
                                      General
                                      305 E Walnut Street, 2nd
                                      Floor
                                      Des Moines, Iowa 50319
                                      (515) 823-9117
                                      eric.wessan@ag.iowa.gov

                                      **Counsel for Amicus Curiae
                                      State of Iowa**

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit Rules 29 and 32-1 because this brief contains 4,204 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Furthermore, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(5) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: September 30, 2024

                                      /s/ Eric H. Wessan
                                      Solicitor General

## CERTIFICATE OF SERVICE

I certify that on September 30, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via email in PDF format.

*/s/ Eric Wessan*
Eric Wessan

*Counsel for Additional* Amici *States*

STEVE MARSHALL
Alabama Attorney General

CHRIS CARR
Georgia Attorney General

LIZ MURRILL
Louisiana Attorney General

KRIS KOBACH
Kansas Attorney General

LYNN FITCH
Mississippi Attorney General

ANDREW T. BAILEY
Missouri Attorney General

AUSTIN KNUDSEN
Montana Attorney General

MICHAEL T. HILGERS
Nebraska Attorney General

DREW WRIGLEY
North Dakota Attorney General

JOHN FORMELLA
New Hampshire Attorney
General,

DAVE YOST
Ohio Attorney General

GENTNER DRUMMOND
Oklahoma Attorney General

ALAN WILSON
South Carolina Attorney General

MARTY JACKLEY
South Dakota Attorney General

KEN PAXTON
Texas Attorney General

SEAN D. REYES
Utah Attorney General

PATRICK MORRISEY
West Virginia Attorney General

BRIDGET HILL
Wyoming Attorney General