No. 24-1759

In The

# United States Court of Appeals for the First Circuit

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., AND ALLIED PRODUCERS' COOPERATIVE, INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MASSACHUSETTS, AND ASHLEY RANDLE, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE MASSACHUSETTS DEPARTMENT OF AGRICULTURAL RESOURCES,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Massachusetts, No. 23-cv-11671-WGY (Hon. William G. Young)

## BRIEF FOR DEFENDANTS-APPELLEES

Maryanne Reynolds
*Assistant Attorney General*
MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL
Government Bureau
10 Mechanic Street, Suite 301
Worcester, MA  01608
(774) 214-4407
maryanne.reynolds@mass.gov

Vanessa A. Arslanian
Grace Gohlke
*Assistant Attorneys General*
MASSACHUSETTS OFFICE OF THE ATTORNEY GENERAL
One Ashburton Place
Boston, MA  02108
(617) 963-2107
vanessa.arslanian@mass.gov
grace.gohlke@mass.gov

*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................4

INTRODUCTION ..........................................................................10

QUESTIONS PRESENTED ..............................................................14

STATEMENT OF THE CASE ...........................................................14

    I.    The Massachusetts Act ..........................................................14

    II.   Procedural History ...............................................................16

           A.   Prior Litigation Challenging the Act..........................16

           B.   The *Ross* Decision ....................................................17

           C.   Appellants' Claims ....................................................21

           D.   Appellants' Initial Waiver of Discovery and Immediate Readiness for Trial ...................................25

           E.   The Court's Decision on the Motion to Dismiss ..........26

           F.   The Court Signals Appellants' Dormant Commerce Clause Claim Is in Jeopardy, Enters Summary Judgment on that Claim, and Appellants Object ...................................................27

           G.   The Court's Summary Judgment Decision (FMIA Preemption)...............................................................30

SUMMARY OF THE ARGUMENT ......................................................31

ARGUMENT .................................................................................34

    I.    This Court Should Affirm Summary Judgment for the Commonwealth on Appellants' Dormant Commerce Clause Claim Pursuant to Rule 56(f)...................................34

           A.   The "Direct Discrimination Theory" Related to Farmer-Plaintiffs Fails as a Matter of Law ...............35

1.    Appellants Failed to Show the Act
Discriminates in Purpose, Which Is to
Prevent Cruelty to Animals in
Massachusetts's Food Supply ............................. 36

2.    Appellants Failed to Show the Act Has an
"Actual Discriminatory Effect" ........................... 39

3.    The Act Reflects a Legitimate Local Interest ..... 47

B.    Appellants' *Pike* Theory Fails as a Matter of Law,
and the Court's Rule 56(f) Ruling Was
Appropriate ................................................................ 48

1.    Appellants' *Pike* Theory Is Materially
Identical to the Claim Rejected in *Ross* .............. 49

2.    Rule 56(f) Was Satisfied Because Appellants
Needed No Further Discovery and Received
Adequate Notice and the Opportunity to
Present their *Pike* Evidence ............................... 52

a.    Discovery Was Sufficiently Advanced
for Summary Judgment to Enter ............. 52

b.    Appellants Had Adequate Notice .............. 54

c.    Any Procedural Error Was Harmless ........ 57

II.    This Court Should Affirm Summary Judgment for the
Commonwealth on Appellants' Express and Conflict
FMIA Preemption Claims .................................................... 59

A.    Statutory Framework .................................................. 60

B.    *Harris* Affirmed that State Regulation of
Slaughterhouses' Commercial Sales Generally Is
Permissible as Outside the FMIA's Scope .................. 61

C.    The Act Imposes No Requirements Within the
Scope of the FMIA ....................................................... 63

D. Record-Keeping Requirements Are Exempt from the FMIA's Preemption Clause.....................................67

E. Appellants' FMIA Conflict Preemption Claim Fails as a Matter of Law.............................................68

III. The Court Correctly Dismissed Appellants' Remaining Claims.........................................................................69

A. Privileges and Immunities Clause ............................70

B. Packers And Stockyard Conflict Preemption.............70

C. Full Faith and Credit Clause.....................................72

D. Due Process Vagueness.............................................73

E. Import-Export Clause ...............................................74

F. Declaratory Relief and State Law Judicial Review.....75

IV. No Injunction Should Issue in the Event of Remand...........75

CONCLUSION ........................................................................76

CERTIFICATE OF COMPLIANCE.........................................78

CERTIFICATE OF SERVICE.................................................79

ADDENDUM ..........................................................................1

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Alliance of Auto. Mfrs. v. Gwadosky*,
    430 F.3d 30 (1st Cir. 2005)............................................................ 36

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*,
    33 F.4th 1107 (9th Cir. 2022).................................................. 62, 64

*Baldwin v. Fish & Game Comm'n of Montana*,
    436 U.S. 371 (1978) .................................................................... 70

*Bates v. Dow Agrosciences LLC*,
    544 U.S. 431 (2005) .................................................................... 66

*Berkovitz v. Home Box Off., Inc.*,
    89 F.3d 24 (1st Cir. 1996)............................................................ 34

*Block Island Fishing, Inc. v. Rogers*,
    844 F.3d 358 (1st Cir. 2016).......................................................... 57

*Buck v. American Airlines, Inc.*,
    476 F.3d 29 (1st Cir. 2007).......................................................... 75

*Capron v. Office of Att'y Gen. of Mass.*,
    944 F.3d 9 (1st Cir. 2019)............................................................ 71

*Cherry Hill Vineyard, LLC v. Baldacci*,
    505 F.3d 28 (1st Cir. 2007)...................................................... 39, 40

*Cramer v. Harris*,
    591 F. App'x 634 (9th Cir. 2015) .................................................. 74

*CTS Corp. v. Dynamics Corp. of Am.*,
    481 U.S. 69 (1987) ...................................................................... 43

*D'Onofrio v. Vacation Pubs., Inc.*,
    888 F.3d 197 (5th Cir. 2018) ........................................................ 58

*Dunn v. Att'y Gen.*,
    474 Mass. 675, 54 N.E.3d 1 (2016) ........................................ 38, 39

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*,
    476 F.3d 326 (5th Cir. 2007) ........................................................ 64

*Exxon Corp. v. Governor of Md.*,
    437 U.S. 117 (1978) ............................................................... *passim*

*Family Winemakers of Cal. v. Jenkins*,
    592 F.3d 1 (1st Cir. 2010)...................................................... *passim*

*Futures Trading Comm'n v. JBW Capital, LLC*,
    812 F.3d 98 (1st Cir. 2016)........................................................... 54

*Iowa Pork Producers Ass'n v. Bonta* (IPPA),
    2024 WL 3158532 (9th Cir. 2023) ............................... 44, 70, 72, 74

*Leyva v. On the Beach, Inc.*,
    171 F.3d 717 (1st Cir. 1999)......................................................... 55

*Marks v. United States*,
    430 U.S. 188 (1977) ...................................................................... 51

*Mass. Restaurant Ass'n v. Healey*,
    No. 1:22-cv-11245 (D. Mass. Aug. 3, 2022) .................................. 16

*McCoy v. Town of Pittsfield*,
    59 F.4th 497 (1st Cir. 2023) ............................ 34, 52, 54, 55, 57, 73

*Medicaid & Medicare Advantage Prods. Ass'n*
*of P.R., Inc. v. Emanuelli-Hernández*,
    58 F.4th 5 (1st Cir. 2023) ............................................................. 60

*Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*,
    385 F.3d 72 (1st Cir. 2004) ........................................................... 69

*Nat'l Expositions, Inc. v. Crowley Maritime Corp.*,
    824 F.2d 131 (1st Cir. 1987) ......................................................... 56

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) .............................................................. *passim*

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) .............................................................. *passim*

*Núñez Colón v. Toledo-Dávila*,
    648 F.3d 15 (1st Cir. 2011) ........................................................... 69

*Oahn Nguyen Chung v. StudentCity.com, Inc.*,
    854 F.3d 97 (1st Cir. 2017) ........................................................... 58

*O'Brien v. Mass. Bay Transp. Auth.*,
    162 F.3d 40 (1st Cir. 1998) ........................................................... 75

*Pac. Emp'rs Ins. Co. v. Indus. Accident Comm'n*,
    306 U.S. 493 (1939) ...................................................................... 72

*Pennhurst State Sch. & Hosp. v. Halderman*,
    465 U.S. 89 (1984) ........................................................................ 75

*Pfizer Inc. v. Ajix, Inc.*,
    2005 WL 1828830 (D.Conn. 2005) ............................................. 73

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) .................................................... 11, 27, 48

*Sanchez v. Triple-S Mgmt., Corp.*,
    492 F.3d 1 (1st Cir. 2007) ............................................................. 53

*Simmons v. Galvin*,
    575 F.3d 24 (1st Cir. 2009) ........................................................... 38

6

*Smith v. Perkins Bd. of Educ.*,
    708 F.3d 821 (6th Cir. 2013) ........................................................ 58

*Sola Commc'ns, Inc. v. Bailey*,
    861 So.2d 822 (La.App. 3 Cir. 2003) ............................................. 73

*Stafford v. Wallace*,
    258 U.S. 495 (1922) ....................................................................... 71

*Stella v. Town of Tewksbury*,
    4 F.3d 53 (1st Cir. 1993) ............................................................... 55

*Sun Oil Co. v. Wortman*,
    486 U.S. 717 (1988) ....................................................................... 72

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) ....................................................................... 74

*Terry v. Tyson Farms, Inc.*,
    604 F.3d 272 (6th Cir. 2010) ......................................................... 71

*Toomer v. Witsell*,
    334 U.S. 385(1948) ........................................................................ 70

*Tyler v. Michaels Stores, Inc.*,
    840 F. Supp. 2d 438 (D. Mass. 2012) ........................................... 75

*United States v. Johnson*,
    467 F.3d 56 (1st Cir. 2006) ........................................................... 51

*United States v. Manubolu*,
    13 F.4th 57, 67 n.20 (1st Cir. 2021) ............................................. 51

*W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*,
    451 U.S. 648, 656 (1981) .............................................................. 70

*Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*,
    615 F.3d 45 (1st Cir. 2010) ........................................................... 58

*Woodruff v. Parham,*
  75 U.S. 123 (1869) ........................................................................ 74

*Wyeth v. Levine,*
  555 U.S. 555 (2009) ...................................................................... 60

## **Constitutional Provisions**

U.S. Const., art. I, § 8, cl. 3 (Commerce Clause) ........................... *passim*

U.S. Const., art. I, § 10, cl. 2 (Import-Export Clause) .................... 22, 74

U.S. Const., art. IV, § 1 (Full Faith and Credit Clause) ................. 22, 72

U.S. Const., art. IV, § 2 (Privileges and Immunities Clause) ......... 21, 70

U.S. Const., art.VI, cl. 2 (Supremacy Clause) ................................ *passim*

U.S. Const., amend. XIV, § 1 (Due Process Clause) ........................ 22, 73

## **Statutes**

Mass. Gen. Laws ch. 129 App §§ 1-1 through 1-12 ......................... *passim*

7 U.S.C. § 192(b) ........................................................................... 71

21 U.S.C. § 642 ............................................................................. 67

21 U.S.C. § 601 ............................................................................. 60

21 U.S.C. § 603 ............................................................................. 61

21 U.S.C. § 604 ............................................................................. 61

21 U.S.C. § 605 ............................................................................. 61

21 U.S.C. § 661(a) ......................................................................... 60

21 U.S.C. § 678 ........................................................................... 59, 67

28 U.S.C. § 2201 ......................................................................... 22, 75

**Rules and Regulations**

Fed. R. Civ. P. 52(a)(3) ..................................................................... 69

Fed. R. Civ. P. 56(f) ................................................................... *passim*

Fed. R. Civ. P. 65(a)(2) ..................................................................... 25

Fed. R. App. P. 8(a)(2) ...................................................................... 75

7 C.F.R. § 205.239(a) ........................................................................ 37

9 C.F.R. § 320.1(b) ........................................................................... 67

## INTRODUCTION

This case concerns Massachusetts's "Act to Prevent Cruelty to Farm Animals" (the "Act"), which voters adopted resoundingly in 2016. The Act prohibits the use of gestation crates—individual stalls that confine breeding pigs so tightly that they cannot turn around, lie down, or fully extend their limbs—on pig farms in Massachusetts. It also prohibits the sale, within Massachusetts, of certain pork products derived from pigs confined in gestation crates. The law imposes identical requirements on all sales of pork within Massachusetts, regardless of whether the originating breeding pig is located in- or out-of-state.

Appellants are a set of out-of-state pig farmers (the "farmer plaintiffs") and the pork processor (slaughterhouse) they co-own, Triumph. Together, they sued to challenge the Act in 2023, raising ten claims. The district court dismissed, at the Rule 12(b)(6) stage, all but appellants' dormant Commerce Clause claim. Later, the court entered summary judgment in favor of the Commonwealth on that claim as well as on preemption claims. These decisions were substantively and procedurally correct. This Court should affirm.

The core of appellants' complaint is that the Act offends the dormant Commerce Clause on two theories. The self-described "heart" of their claim is that the Act intentionally discriminates against interstate commerce. Alternatively, they assert that the Act poses a "substantial burden" on interstate commerce and fails the balancing test derived from *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). Both theories are premised on the argument that the Act impermissibly burdens only out-of-state actors, causing compliance costs, harm to the interstate pork market, and non-economic harms.

The district court rightly entered summary judgment in favor of the Commonwealth on this claim, finding that the Act is non-discriminatory as to pig farmers. As to appellants' *Pike* theory, that claim repackages the same allegations rejected by the Supreme Court in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). In *Ross*, a group of pig farmers and pork processors challenged California's Proposition 12 (which is materially identical to the Act) on the basis that it exclusively burdens the out-of-state pork industry and inflicts compliance costs, harm to the interstate pork market, and non-economic harms. *Ross* forecloses appellants' *Pike* theory as a matter of law

because *Ross* established that the *type* of burden on interstate commerce appellants allege does not give rise to a dormant Commerce Clause claim.  The district court rightly followed that precedent.

On appeal, appellants object to how the district court entered summary judgment against them, particularly as to their *Pike* theory. But the rules permit the district court to enter summary judgment *sua sponte*.  And when it did so here, appellants were on notice that the court was considering doing so; appellants had repeatedly asserted that their evidentiary submission on this claim was complete; and the parties had fully briefed the *Pike* theory twice previously.

Appellants separately claim that the Federal Meat Inspection Act ("FMIA"), which regulates certain activities at slaughterhouses to ensure safe meat and humane slaughter, preempts the Act, expressly and by conflict.  The district court properly concluded the FMIA does not preempt the Act.  The Act may motivate certain methods of production on pig farms, but it does not impose any requirements on slaughterhouses, nor conflict with the FMIA's inspection regime or food safety determinations.

Lastly, the district court correctly dismissed appellants' remaining claims for violations of various constitutional provisions for failure to state a claim. Appellants seek reversal because the court did not issue a written memorandum explaining its reasoning. But Rule 52 does not require a district court "to state findings or conclusions when ruling on a motion under Rule 12." Here, the court made clear it carefully considered the complaint, parsed the language of the relevant statutes, and gave due consideration to the parties' arguments. It committed no error.

Ultimately, appellants give noticeably light treatment to the merits of their claims, hinging their appeal on creating an overall impression of procedural mismanagement. But none of appellants' complaints, even if valid or cured in the way appellants insist, would change the outcome. And it is the merits with which this Court is concerned in a *de novo* review of motions to dismiss and for summary judgment. A review of the merits shows that the district court reached the correct result on each claim. This Court should affirm.

## QUESTIONS PRESENTED

1. Did the district court correctly grant summary judgment to the Commonwealth on appellants' dormant Commerce Clause claim, where appellants' motion for summary judgment failed to demonstrate either that the Act was discriminatory or that it imposed an unconstitutional burden on interstate commerce?

2. Were the procedural requirements of Rule 56(f) satisfied before the district court entered summary judgment against appellants, where the district court gave notice to appellants that their claim was in jeopardy before they moved for summary judgment, advised them at the hearing it was considering summary judgment against them, and where the procedural circumstances of the case made clear the court could reach the issue?

3. Did the district correctly grant summary judgment to the Commonwealth on appellants' claim of preemption under the Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.*, where the Massachusetts Act does not impose any "additional or different requirements" on a slaughterhouse's facilities, premises, or operations, nor conflict with the FMIA's dual goals of safe meat and humane slaughter?

4. Did the district court correctly dismiss appellants' remaining constitutional and state-law claims, where appellants failed to state any of those claims?

## STATEMENT OF THE CASE

### I.    The Massachusetts Act

In 2016, with the support of 77% of participating voters,

Massachusetts enacted "An Act to Prevent Cruelty to Farm Animals" by

initiative petition.  Mass. Gen. Laws ch. 129, App. §§ 1-1 to 1-12 ("Act"),

Plaintiffs-Appellants' Addendum ("Add.") 72-85; A376-77.[1]  The Act's purpose is to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Act § 1-1.  The Supreme Court has identified the Act as an example of traditional state laws, dating back to colonial times, "aimed at protecting animal welfare."  *Ross*, 598 U.S. at 365.

The Act prohibits a pig farmer within Massachusetts from knowingly causing a breeding pig "to be confined in a cruel manner," defined in relevant part as "in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely."  Act §§ 1-2, 1-5.

Section 3 of the Act also makes it unlawful for a "business owner or operator to knowingly engage in the sale within [Massachusetts] of any … Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a

---

[1] The Act covers breeding pigs, veal calves and egg-laying hens. The Legislature amended the Act in 2021 in ways not relevant here.  A390-97.

15

cruel manner, or is the meat of the immediate offspring of a covered

animal that was confined in a cruel manner." *Id.* § 1-3. A sale is

defined as "a commercial sale by a business that sells any item covered

by section 3" and "shall be deemed to occur at the location where the

buyer takes physical possession of [the covered] item[.]" *Id.* § 1-5.[2]

## II.  Procedural History

### A.  Prior Litigation Challenging the Act

This case follows prior challenges to the Act. Notably, in 2022, a

group of plaintiffs including the National Pork Producers Council filed

suit to enjoin enforcement of the Act until the Supreme Court decided

*Ross*, which they recognized was "a dormant Commerce Clause

challenge to a materially identical California statute." *Mass.*

*Restaurant Ass'n v. Healey*, No. 22-cv-11245 (D. Mass. Aug. 3, 2022),

ECF No. 1 at 2. The parties agreed to stay the case pending the *Ross*

decision, and it remains stayed pending state-agency rulemaking on an

issue not relevant to this appeal. *Id.*, ECF Nos. 21-22 (A555-60).

---

[2] The Act previously contained, but the district court severed, an
exemption referred to below as the "slaughterhouse exception" for sales
"undertaken at an establishment at which inspection is provided under
the Federal Meat Inspection Act." Act § 1-5. As a result, the Act now
covers sales made on-premises at federally inspected slaughterhouses
within Massachusetts.

**B.    The *Ross* Decision**

In *Ross*, the Supreme Court rejected a dormant Commerce Clause challenge to Proposition 12 by two groups—the National Pork Producers Council and American Farm Bureau Federation—on behalf of their members who "raise and process pigs."  598 U.S. at 367.

The *Ross* plaintiffs conceded that California's law was not discriminatory because it "imposes the same burdens on in-state pork producers that it imposes on out-of-state ones."  *Id.* at 370.  Instead, they argued the law violated the dormant Commerce Clause in two other ways.  *Id.* at 371.  The first theory—which the Court unanimously rejected—was that Proposition 12's sales ban violated the so-called "extraterritoriality doctrine," in which state laws that have the "practical effect of controlling commerce outside the State" are unconstitutional, even if they "do not purposely discriminate against out-of-state economic interests."  *Id.*  The Court noted that it has long recognized that "virtually all state laws create ripple effects beyond their borders."  *Id.* at 390.

The second theory was "associate[d] with" *Pike*.  *Id.* at 377.  The *Ross* plaintiffs asserted that, under *Pike*, even if a law is nondiscriminatory, courts must assess whether the law poses a

17

"substantial burden" on interstate commerce and strike it down if that burden is "clearly excessive in relation to the [law's] putative local benefits." *Id.*

The *Ross* plaintiffs alleged that Proposition 12 was "forcing massive changes to pig-farming and pork-production practices throughout the United States," *id.* at 406 (Kavanaugh, J., concurring-in-part and dissenting-in-part), particularly considering California's miniscule in-state pork production (1,500 commercial sows) compared to out-of-state production and its inability to meet its own pork demand. A564(¶¶16-20).  The alleged harms included substantial costs to comply with Proposition 12, harms to the interstate pork market, and others. *Ross*, 598 U.S. at 367.[3]

With respect to compliance costs, plaintiffs alleged that pork producers would need to spend "hundreds of millions (if not billions)" of dollars to modify sow housing, *id.* at 405-06 (Kavanaugh, J.); A600(¶215), and that pork processing firms would likewise need to "make substantial new capital investments."  *Ross*, 598 U.S. at 367.

---

[3] The harms alleged in Ross were markedly similar to the allegations in this case.  *See infra* at pp.22-24.

The *Ross* plaintiffs alleged these increased production costs would be passed on to California pork consumers and consumers nationwide. *Id.* at 406-07 (Kavanaugh, J.); A565, A584, A588(¶¶28, 84, 105).

With respect to the interstate market, the *Ross* plaintiffs alleged that the pork market is "so interconnected" that producers will be "forced to comply" with Proposition 12, *id.* at 399-400 (Roberts, C.J., concurring-in-part and dissenting-in-part), because it would be "all but impossible" and "prohibitively expensive" for pig farmers to segregate pigs based on their destination; and, given California's share of the consumer pork market, it was economically unfeasible for pig farmers and pork producers to exit its market. *Id.* at 405 (Kavanaugh, J.).

With respect to other harms, the *Ross* plaintiffs alleged that Proposition 12 would, as a practical matter, force pig farmers to convert to group housing, upending "industry practices and standards, generations of producer experience, scientific research, and the standards set by other states" and harming animal welfare by putting sows at greater injury risk in group housing. A565(¶28); *id.* at 400-01 (Roberts, C.J.). The plaintiffs also alleged Proposition 12 would harm workers. *Id.* at 406 (Kavanaugh, J.); A585(¶90), A625(¶402).

The Court concluded that these allegations failed to state a plausible dormant Commerce Clause claim under *Pike* and affirmed dismissal, with five Justices concurring in that judgment. *Ross*, 598 U.S. at 391. The Court noted first that "'no clear line' separates the *Pike* line of cases from our core antidiscrimination precedents" and that, indeed, *Pike* itself involved a law whose "'practical effect[s]' … revealed a discriminatory purpose." *Id.* at 377-78 (citations omitted). While the Court left the "door open" to certain "challenges premised on … 'nondiscriminatory burdens,'" the Court held the claim at issue fell "well outside *Pike*'s heartland." *Id.* at 379-80.

A plurality of four Justices further recognized that while "a shift from one set of production methods to another promises some costs," "the dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.'" *Id.* at 385-86 (Gorsuch, J., joined by Thomas, Sotomayor, Kagan, JJ.) (quoting *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 119-20 (1978)). The plurality noted that many pork producers "have already converted to some form of group housing," and while "the complaint plausibly alleges that *some* out-of-state firms may face difficulty complying (or may choose not to comply) with Proposition 12,

… from all anyone can tell, *other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void." *Id.*

Because the burden alleged in *Ross* amounted only to "harm to some producers' favored 'methods of operation,'"—and any further harm was "nothing more than a speculative possibility"—the plurality concluded that the dormant Commerce Clause claim was properly dismissed. *Id.* at 386-87 (quoting *Exxon*, 437 U.S. at 127). The fifth justice concurring in the judgment (Barrett, J.) would have affirmed dismissal on the ground that judges categorically cannot weigh economic burdens against noneconomic local benefits under *Pike*. *See id.* at 393-94.

## C.    Appellants' Claims

After *Ross*, the Act became effective on August 24, 2023. A2045. Shortly before, appellants filed suit, alleging causes of action based on (1) the dormant Commerce Clause; (2) the Privileges and Immunities Clause; (3) express preemption by the Federal Meat Inspection Act ("FMIA"); (4) conflict preemption under the FMIA; (5) conflict preemption under the Packers and Stockyard Act; (6) the Full Faith and Credit Clause; (7) the Due Process Clause; (8) the Import-Export

Clause; (9) the declaratory judgment statute, 28 U.S.C. § 2201; and (10) Massachusetts state law.  A22-72.  Appellants brought all claims on behalf of all appellants.  *See, e.g.,* A73-78, A701-727.

With respect to their dormant Commerce Clause claim, appellants advanced two theories.  First, the "heart" of their claim was the theory, not advanced in *Ross*, that the Act discriminated against out-of-state interests.[4]  A708.  Second, appellants' alternative theory was that the Act placed a "substantial burden" on interstate commerce and failed *Pike* balancing—*i.e.*, the second argument advanced by the *Ross* plaintiffs.  A711.

Appellants' factual allegations in support of their dormant Commerce Clause claim—and most other constitutional claims—closely track those of the *Ross* plaintiffs.  Appellants alleged that through the Act, Massachusetts was "forcing massive changes to pig production and processing practices throughout the United States," A35(¶74),

---

[4] The discrimination theory comprised two separate forms of discrimination:  first, that the Act discriminates against out-of-state farmers because no Massachusetts farmers used gestation crates when the Act passed; and second, that the Act's later-severed "slaughterhouse exception" discriminated against out-of-state slaughterhouses, which is not on appeal.  *See, e.g.,* A1338-39.

particularly considering Massachusetts's limited in-state pork production—with only about 1,500 commercial sows—compared to out-of-state production and inability to meet its own in-state demand. A32-33(¶¶63-64); *compare Ross*, 598 U.S. at 406 (Kavanagh, J.) (describing *Ross* complaint in identical manner).

The complaint likewise alleged that the Act will impose compliance costs, harm to the interstate market, and other harms. With respect to compliance costs, appellants alleged that pork producers would need to spend years and "hundreds of millions of dollars" to modify sow housing, A34(¶68), that those costs would increase production costs, and that producers would pass those costs on to consumers in Massachusetts and nationwide. A40(¶¶92-93); c*ompare Ross*, 598 U.S. at 399 (Roberts, C.J.) & A588(¶¶24, 88, 105) (identical allegations in *Ross* complaint).

With respect to the interstate market, appellants alleged that the pork market is so "interconnected" that producers will be forced to comply with the Act, A64(¶249), because it would be "impossible" for pig farmers and pork producers to segregate pigs based on their ultimate destination; and, given Massachusetts's consumer market share, pig

farmers and pork producers could not "realistically forgo" its market. A44(¶118); *compare Ross*, 598 U.S. at 399-400 (identical allegations in *Ross* complaint).

With respect to other harms, appellants alleged that the Act would, as a practical matter, force producers to convert to group housing, A43(¶114), which upends "pork industry practices and standards, generations of farming experience, scientific research, and the consensus standards of other states," A33-34(¶67), and which would harm animal welfare, not help it, by putting sows at greater risk of injury in group housing, A45(¶123), and also would harm workers. A43(¶113); *compare Ross*, 598 U.S. at 400-01 & A565(¶28) (identical allegations in *Ross* complaint).

Appellants distinguished their allegations from the *Ross* plaintiffs' complaint based on the "nationwide" character of their allegations, A713, *i.e.*, that the Act would cause nationwide pricing impacts and pork shortages. A40(¶¶92-93), A44(¶118). These claims were contradicted by appellants' later-filed economic expert declaration[5] and

---

[5] Appellants' expert opined only that "some Massachusetts markets" could see pork shortages "in the first few weeks and perhaps months"
(footnote continued)

have not materialized, even though the Act has been in effect since August 24, 2023.

### D. Appellants' Initial Waiver of Discovery and Immediate Readiness for Trial

After filing the operative complaint on July 31, 2023, appellants moved for a preliminary injunction on August 7, 2023, accompanied by eight witness declarations, which they later supplemented. A22-72, A73-294, A295-299, A449-452. At the September 6, 2023, motion hearing, the court consolidated the motion with a trial on the merits pursuant to Rule 65(a)(2). A455-56. Appellants stated their readiness for trial, and the Commonwealth stated it would move to dismiss the complaint. A456, A458.

A week later, on September 14, 2023, the parties filed a joint status report. A465-74. There, appellants stated they had willingly waived discovery—and that discovery by the Commonwealth was unnecessary—because appellants already had submitted fact and expert witness declarations with their preliminary injunction motion that reflected their intended evidentiary submission at trial. A468.

---

after implementation, A199-200(¶¶6, 9), and that any price impact would be regional, at most. A203(¶15).

The Commonwealth reiterated its intent to move to dismiss, but stated that, if its motion were denied, it would seek discovery on appellants' surviving factual allegations.  A467-68.

### E.    The Court's Decision on the Motion to Dismiss

The Commonwealth moved to dismiss the amended complaint on September 28, 2023.  A475-554.  With respect to appellants' dormant Commerce Clause claim, the Commonwealth argued both that the Act plainly did not discriminate facially, in purpose or effect; and that *Ross* foreclosed appellants' *Pike* theory.  A484-90.

At the October 2, 2023, hearing on the Commonwealth's motion to dismiss, the district court stated that it had reviewed the parties' submissions and "parsed" the relevant statutes.  A902.  The court granted the motion with respect to all claims except the dormant Commerce Clause claim.  A12.

Because the court allowed the dormant Commerce Clause claim to proceed, the Commonwealth served limited, expedited discovery.  A807.  In the interim, the parties filed an amended joint pre-trial memorandum on October 10, 2023.  A805-84.  Appellants stated they were ready for trial that day or "as soon as the court will allow," objected to the Commonwealth's proposed three-month discovery period,

and summarized their intended evidence on the Act's "burdens," which mirrored their preliminary injunction submission. A808, A811-13.

The court set trial to begin on December 4, 2023. A13.

**F.    The Court Signals Appellants' Dormant Commerce Clause Claim Is in Jeopardy, Enters Summary Judgment on that Claim, and Appellants Object**

By late October, the Commonwealth repeatedly had advanced its argument with respect to appellants' *Pike* theory—that, absent a showing of discrimination, it was foreclosed by *Ross*. A310-11, A484-86. And on October 25, 2023, the district court issued a discovery order highlighting this same legal issue:

> [T]he Court must say frankly that the more it examines the jurisprudence of the "dormant commerce clause," the less the Court understands why the economic impact of Massachusetts's popularly mandated legislation is material to the analysis. *But see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Supreme Court most recently spoke to these issues in *National Pork Producers v. Ross*, 598 U.S. 356, 371 (2023). Plaintiffs and their amici frequently cite Justice Kavanaugh's opinion in that case. It is the dissenting opinion.

A963.

Nevertheless, appellants thereafter filed a motion for "partial" summary judgment arguing the Act discriminated against out-of-state interests, and purporting to reserve to a later date whether the Act's effects presented a "substantial burden" under *Pike*. A1335. The

27

Commonwealth opposed the motion and, pursuant to Rule 56(f), requested that the court enter summary judgment both on appellants' discrimination theory and also on their alternative *Pike* theory, for the same reasons the Commonwealth had consistently argued: *Ross* foreclosed it.  A1388-89.

Appellants filed a 20-page reply.  A1415-39.  They did not object to the Commonwealth's request under Rule 56(f) for lack of notice or ability to respond, but instead called the request "inappropriate" because appellants had not moved on that theory.  A1437-38.

At the motion hearing, the district court announced it was considering summary judgment against appellants.  A1456.  At the court's invitation, the parties agreed to carve out consideration of the "slaughterhouse exception," *supra* p.16 n.2, which formed the basis for the "direct discrimination" theory related to slaughterhouses like Triumph, for a case-stated procedure.  A1453-55.  Following argument, the court ruled from the bench that summary judgment would enter against the farmer plaintiffs on their entire dormant Commerce Clause claim.  A1464.  Appellants reiterated that they had not moved for summary judgment with respect to *Pike* but again raised no objection

28

for lack of notice or ability to respond, nor requested a continuance or supplemental briefing.  A1463, A1465.

More than two weeks later, appellants filed an "Objection" to the Rule 56(f) ruling, arguing the court failed to provide adequate notice. A1440-48.  Appellants did not request leave to submit supplemental briefing or identify discovery they required on their *Pike* theory, either in that initial objection or in a later-filed further response.  *Id.*; *see also* A1477-83.

In a written ruling issued February 5, 2024, the court explained its rejection of appellants' *Pike* theory as a matter of law.  Add.35-37.[6] Like the four-Justice plurality in *Ross*, the district court recognized that "'harm to some producers' favored methods of operation' [does] not rise to a 'substantial harm to interstate commerce[.]'"  Add.35.  In addition, like Justice Barrett reasoned in *Ross*, the district court concluded that the competing interests presented by the Act were "incommensurable" and thus incapable of judicial balancing.  Add.35-37.

---

[6] That order also severed the "slaughterhouse exception," a ruling which is not on appeal.  Add.37-44.

In response to appellants' objection that they had "inadequate warning," the district court explained, "[t]he legal issue had been fully briefed and the [district court's] resolution obviated the need for evidence."  Add.37.

## G. The Court's Summary Judgment Decision (FMIA Preemption)

After severing the slaughterhouse exception in the February 5, 2024 order, the court vacated its prior dismissal of appellants' preemption claim under the FMIA and allowed the parties to move for summary judgment on that claim.  Add.44-45.

The district court concluded that the FMIA does not preempt the Act.  Add.52-70.  The court reasoned, first, that the Act fundamentally differs from the law struck down by the Supreme Court in *National Meat Association v. Harris*, 565 U.S. 452 (2012), because the Act does not regulate how a slaughterhouse operates or prohibit a slaughterhouse from processing meat that does not comply with the Act.  Add.63-65.  Second, the FMIA does "not cover" confinement of breeding pigs, so any operational changes required of *pig farmers* is outside the scope of the FMIA.  Add.65-66.  Third, the Act's purpose relates to animal welfare and does not undermine or conflict with the FMIA's

adulteration determinations.  Add.66-67.  Finally, there was no conflict preemption, because the Act does not interfere with ensuring safe and healthy meat reaches Massachusetts consumers.  Add.67-70.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's orders and final judgment.

*First*, the district court correctly entered summary judgment pursuant to Rule 56(f) on both theories of appellants' dormant Commerce Clause claim.  As to the first theory—that the Act discriminates against interstate commerce with respect to out-of-state pig farmers—the district court properly concluded the Act is not discriminatory.  Appellants concede the Act does not facially discriminate, and no evidence in the record suggests Massachusetts voters harbored protectionist, discriminatory intent in passing the law. And appellants' sole evidence of discriminatory effect is that, at the time the Act passed, no Massachusetts farmers used gestation crates, a fact that presents no meaningful factual distinction from *Ross* (in which few, if any, California farmers used gestation crates when their act was passed) or prior precedent like *Exxon Corp. v. Governor of Maryland*,

437 U.S. 117 (1978) (where only out-of-state entities engaged in the prohibited business practice). As a matter of law, appellants failed to demonstrate that the Act imposes differential treatment on in-state and out-of-state economic interests.

*Second*, the district court also correctly granted summary judgment against appellants on their alternative *Pike* theory—that the Act poses a "substantial burden" on interstate commerce and fails *Pike* balancing—on the merits and procedurally. As to the merits, appellants premised their theory on materially indistinguishable allegations from those rejected in *Ross*, and *Ross* forecloses the claim.

Procedurally, there was also no error. The court gave notice to appellants that their *Pike* theory was in jeopardy before they moved for summary judgment and then advised appellants at the hearing that it was considering entering summary judgment against their entire claim. Appellants' *Pike* theory rests on an evidentiary submission which, by their own insistence, was already complete, and the parties had fully briefed that issue twice previously. Any factual disputes existing between the parties, while genuine, are not "material" disputes, because the claim fails as a matter of law under *Ross*.

*Third*, the district court also correctly concluded that the FMIA does not preempt the Act, expressly or by conflict.  The FMIA prohibits States from imposing "additional or different requirements" on slaughterhouse operations "within the scope" of the FMIA.  The Act does not impose requirements on slaughterhouses, instead acting "at a remove" from them, at most motivating conduct on pig farms which the FMIA does not regulate.  And while appellant-Triumph (the slaughterhouse or "processor"), has adapted its tracking and distribution processes to ensure it may sell compliant pork into Massachusetts, these changes are not "requirements" "within the scope" of the Act.  The district court also correctly concluded that appellants failed to show that the Act conflicts with the FMIA, where the Act stands as no obstacle to the FMIA's objectives of safe meat and humane slaughter.

*Finally*, the district court correctly dismissed appellants' other constitutional and state-law claims.  Rule 52 does not require the district court "to state findings or conclusions when ruling on [the Commonwealth's] motion under Rule 12," so the absence of a written

memorandum is not reversible error, where the court gave due consideration to the claims.

## ARGUMENT

### I.     This Court Should Affirm Summary Judgment for the Commonwealth on Appellants' Dormant Commerce Clause Claim Pursuant to Rule 56(f)

This Court reviews a *sua sponte* grant of summary judgment under the same *de novo* standard as any other grant of summary judgment.  *Berkovitz v. Home Box Off., Inc.*, 89 F.3d 24, 30 (1st Cir. 1996).  Accordingly, this Court should affirm if "the record, viewed in the light most favorable to the [appellants], discloses 'no genuine dispute as to any material fact'" and shows that the Commonwealth is "entitled to judgment as a matter of law."  *McCoy v. Town of Pittsfield*, 59 F.4th 497, 504 (1st Cir. 2023).

The district court correctly entered summary judgment for the Commonwealth on appellants' dormant Commerce Clause claim under Rule 56(f) because (A) appellants failed to show that the Act discriminates against out-of-state interests, and (B) *Ross* forecloses appellants' alternative theory that the Act fails *Pike* balancing.  The court also complied with the procedural requirements of Rule 56(f), and any error would be harmless.

## A.    The "Direct Discrimination Theory" Related to Farmer-Plaintiffs Fails as a Matter of Law

Appellants do not meaningfully dispute that the district court properly reached the self-described "heart" of their dormant Commerce Clause claim, A708, which relied on purported discrimination against out-of-state farmers.  Brief of Appellants ("Br.") 38 (asserting Rule 56(f) judgment was "error" but acknowledging issue fully briefed).

The "very core" of the dormant Commerce Clause is an "antidiscrimination principle" that prohibits state laws "driven by economic protectionism." *Ross*, 598 U.S. at 369-70 (citation and quotations omitted).  Discrimination under the dormant Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," as opposed to state laws that "regulate[] evenhandedly with only incidental effects on interstate commerce." *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (citation omitted).  "Plaintiffs bear the initial burden of showing discrimination." *Id.*  As the district court correctly concluded, appellants failed to meet their burden.

Appellants effectively concede the Act is not facially discriminatory.  Br.39.  Further, they do not squarely argue the Act

35

discriminates in purpose, Br.41-47, which it does not for the reasons below.  Nor did appellants show that the Act's "practical effects in operation … disclose purposeful discrimination against out-of-state businesses."  *Ross*, 598 U.S. at 379.  This Court should therefore affirm.

### 1.    Appellants Failed to Show the Act Discriminates in Purpose, Which Is to Prevent Cruelty to Animals in Massachusetts's Food Supply

Appellants suggest in passing that the Act's "legislative underpinnings" show that "discriminatory effect … was a central goal." Br.44-47.  Contrary to this claim, the Act's nondiscriminatory purpose is plain from its text: "The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm animal confinement[.]"  Act § 1-1.  The Act furthers this non-discriminatory purpose by imposing the same requirements on all in-state pork sales.  *Id.* § 1-3.

Further, the Act is closely tailored to its stated purpose of targeting a particular extreme method of farm animal confinement— gestation crates.  *See Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 38 (1st Cir. 2005) (finding no discriminatory purpose where challenged law "plugs [a] loophole … with perfect precision"); A2104 (photograph of gestation crates).  Massachusetts voters did not "subjectively" target

out-of-state interests to advantage their own farmers,[7] Br.44, but rather adopted a definition of "cruel" confinement that is consistent with other States' and federal standards.[8] *Ross*, 598 U.S. at 365 (collecting state laws); *see also* Add.35-36. This standard is unlike, for example, the winery classification scheme in *Jenkins*, discussed further below, which had "unusual" features that did not track industry standards but did track the local industry's "unique attributes." 592 F.3d at 16.

Appellants offer only two, unpersuasive points to suggest discriminatory purpose. First, appellants cite the comments of a state legislator and public comment during a legislative hearing that reflect awareness that Massachusetts farmers did not use gestation crates. Br.45-46. But here, where the Legislature did not act on the proposed law and it was instead enacted by voters, the "Information for Voters Guide" is a better source of legislative intent than stray legislators' comments. *See Simmons v. Galvin*, 575 F.3d 24, 45 (1st Cir. 2009); *see*

---

[7] Indeed, the Massachusetts Farm Bureau and its 6,000 members opposed the Act and submitted written testimony in opposition. A1311.

[8] *See* 7 C.F.R. § 205.239(a)(4)(i), (8)(i) (requiring livestock be afforded "sufficient space and freedom to lie down, turn around, stand up, fully stretch their limbs" to be certified as USDA Organic).

37

A970-74 ("Voter Guide").  Regardless, these comments evince no intent to protect or benefit Massachusetts pig farmers.  *Contrast*, *e.g., Jenkins*, 592 F.3d at 7 (bill's sponsor stated, "[W]e are really still giving an inherent advantage to the local wineries").  Instead, the weight of public comment reflects concern with gestation crates; including concerns that a Massachusetts pig farmer was considering using them and that the law was needed to prevent their use in the future.  A1131-36.

Second, appellants claim dicta from a single state-court decision shows that the Act's "central purpose" was to economically benefit in-state farmers.  Br.46 (citing *Dunn v. Att'y Gen.*, 474 Mass. 675, 54 N.E.3d 1 (2016)).  *Dunn* considered whether the Attorney General had properly certified the Act for the ballot in accordance with state constitutional requirements, including whether the proposed law satisfied a "relatedness" requirement, *i.e.*, whether each of the proposed law's provisions had a meaningful relationship to "a common purpose." 74 Mass. at 681-82, 54 N.E.3d at 7.  *Dunn* concluded that the confinement and sale provisions shared "a common purpose of preventing farm animals from being caged in overly cramped conditions, consistent with the statement of purpose."  474 Mass. at

681, 54 N.E.3d at 7. Appellants seize on the court's speculation about one way, among several, in which the two provisions were "related," but that dicta does not override the Act's stated purpose in Section 1-1 or the Voter Guide, in which proponents explained the sales provision would "remove inhumane and unsafe products from the Massachusetts marketplace." A972.

In sum, no record evidence identifies protectionist intent by Massachusetts voters, who adopted the Act without regard to any particular economic impact.

### 2. Appellants Failed to Show the Act Has an "Actual Discriminatory Effect"

Nor did appellants "present evidence as to why the law discriminates in practice." *Jenkins*, 592 F.3d at 11. Appellants must show "an actual discriminatory effect"; "[d]iscriminatory *potential* is not enough." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 37 (1st Cir. 2007).[9]

---

[9] The plaintiffs in *Baldacci* conceded that the challenged law bore no discriminatory purpose and were required to show "substantial evidence" of discriminatory effect at summary judgment. 505 F.3d at 33, 37; *see Jenkins*, 592 F.3d at 11 n.11. Given the complete absence of evidence of discriminatory purpose, appellants should have to meet the same evidentiary standard here. Regardless, appellants have failed to show *any* "actual discriminatory effect."

To be discriminatory, the Act must "impos[e] disproportionate burdens on out-of-state interests *and* confer[] advantages upon in-state interests." *Jenkins*, 592 F.3d at 10 (emphasis added). That the Act burdens *some* out-of-state producers is insufficient, because a law that shifts market share from one group of out-of-state producers to another is permissible under the dormant Commerce Clause. *Exxon,* 437 U.S. at 127; *see also Ross*, 598 U.S. at 378 ("[I]n *Exxon* …, the Court keyed to the fact that the effect of the challenged law was only to shift business from one set of out-of-state suppliers to another.").

Appellants assert that the Act's effects are *per se* discriminatory because only out-of-state farmers used "cruel confinement" methods when the Act passed, thereby allowing in-state farmers to "gain[] a larger market share uninterrupted by any cost, delay, or burden associated with the Act." Br.42-44.[10] This "naked appeal" to the "logic" that discrimination "must result" from the Act "cannot take the place of proof." *Baldacci*, 505 F.3d at 39.

---

[10] Appellants have now had eight years to respond to the Act, so the suggestion of sudden disruption to their business is implausible. Add.84.

Instead, appellants' evidence showed—at most—that the Act will benefit one group of out-of-state producers (who do not use gestation crates) over another (those who do). Massachusetts's pork-production industry is modest, producing less than 1% of pork consumed annually in the state by appellants' calculations. Br.42; A975-80, A1490. And appellants attested that Massachusetts's in-state pork production cannot meaningfully expand due to geographic and other limitations. A1412 ("Massachusetts does not have conditions conducive to pork production in the state").

In contrast, many out-of-state pork producers already have adjusted their production methods in response to consumer demand and changing state laws, some investing millions over the past decade. *Ross*, 598 U.S. at 367 (over one-quarter of producers already converted to increase space for sows in response to consumer demand); 385 n.3 (both "smaller" and "large" out-of-state pork producers have complied, or intend to comply, with Proposition 12); *see also* A609(¶¶284-86), A613(¶312). Accordingly, most producers who have been or soon will be producing compliant pork—and will therefore benefit from the Act—are out-of-state.

41

Farmer plaintiffs are no different. Years ago, they began implementing different production methods on their own farms, presumably to access markets opened by evolving demand. A2137-42(¶¶11-20). Indeed, in 2016, one farmer plaintiff converted its facilities to meet humane production standards called "GAP 1" that exceed those of the Act, A1958-59, A2009, and other farmer plaintiffs adopted "open pen gestation" methods, which use gestation crates only until a breeding pig is confirmed pregnant, and then moves her to a group pen. A154(¶6), A2020, A2107. Most farmer plaintiffs have converted certain facilities to be Proposition 12-compliant. *E.g.,* A119-20(¶22), A129(¶22), A139(¶24), A2017, A2020. And farmer plaintiffs' processor, Triumph, ships "Prop 12 compliant" pork into Massachusetts. *See, e.g.,* A1489(¶4), A2010-16.

Appellants' own evidence thus shows that out-of-state actors who produce compliant pork will more likely "fill the void" of any new market share, not the limited Massachusetts pork industry. *See Ross*, 598 U.S. at 385. That resulting shift in market share between one out-of-state business model to another does not amount to a Commerce

Clause violation, whether cast as "discriminatory effects" or a "substantial burden." *See Exxon*, 437 U.S. at 126-27.

By asserting that the Act is discriminatory because Massachusetts farmers were not using gestation crates when the Act passed, appellants merely replicate, under a "discrimination" theory, the same factual claims rejected in *Ross*: that few, if any, California farmers were not already in compliance with Proposition 12 when the law passed, and that its burden therefore fell exclusively on out-of-state pig farmers. *Ross*, 598 U.S. at 384; *see* A694. There is no constitutionally meaningful distinction between all in-state farmers being in compliance with the Act and *nearly* all in-state farmers being in compliance with Proposition 12. "The fact that the burden of a state regulation falls on *some* interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon*, 437 U.S. at 126 (emphasis added); *see also CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88 (1987) (rejecting argument that "statute is discriminatory because it will apply most often to out-of-state entities").

*Exxon*, which appellants do not address,[11] is instructive: there, Maryland prohibited petroleum refiners, all of which happened to be located out-of-state, from operating retail gas stations. *Exxon*, 437 U.S. at 120-21. This was not discriminatory because, while "refiners [would] no longer enjoy their same status in the Maryland market, in-state independent retailers [would] have no competitive advantage over out-of-state dealers." *Id*. at 126. The same is true here. While out-of-state non-compliant pig farmers "no longer enjoy their same status in the [Massachusetts] market," in-state compliant pig farmers have no competitive advantage over out-of-state compliant pig farmers— including farmer plaintiffs. *See id*. Accordingly, even if in-state farmers were to feel "less impact" because they already complied with the Act, that would not amount to "discriminat[ion] against out-of-state producers." *Iowa Pork Producers Ass'n v. Bonta* ("IPPA"), 2024 WL 3158532, at *2 (9th Cir. 2023) (non-precedential) (affirming dismissal of discrimination challenge to Proposition 12).

---

[11] Appellants previously suggested that *Exxon* only applies where there is absolutely "no local market to benefit" at all. A1427 n.3 (citing *Jenkins*, 592 F.3d at 13). But this is an incomplete reading of *Jenkins*'s discussion of *Exxon*; here, the Act does not operate to the "competitive benefit" of in-state pig farmers. *See* 592 F.3d at 13.

44

The Act's effects are therefore distinguishable from the plain benefit provided to local industry by the challenged law in *Jenkins*, on which appellants rely. Br.43-44. To start, the law in *Jenkins* was enacted as a replacement for a facially discriminatory law recently struck down as unconstitutional. 592 F.3d at 7. Further, the new law's "statutory context, legislative history, and other factors … yield[ed] the unavoidable conclusion" that its "discrimination was purposeful." *Id.* at 5, 13-17. As discussed *supra*, Part II.A.1, such evidence is entirely absent here.

Moreover, the law in *Jenkins* had an actual discriminatory effect by providing a distinct and ongoing economic advantage to Massachusetts wineries. The law created two separate sets of distribution options depending on whether a winery qualified as "small" or "large." *Id.* at 8-9. Based on definitions tailored to the "unique attributes" of the local industry, all Massachusetts wineries qualified as "small." *Id.* Far from treating all businesses "evenhandedly," the law explicitly treated "small" wineries more favorably by allowing them to access a more favorable set of distribution options than "large" wineries, all located outside the state. *See id.*

Importantly, the *Jenkins* plaintiffs also supplied "substantial evidence" of the law's protectionist impact, showing that Massachusetts wineries immediately took advantage of the favorable distribution channels. *Id.* at 11-12. Nearly ninety percent of Massachusetts's "small" wineries applied for the new license, whereas less than one percent of out-of-state "small" wineries did. *Id.* at 11. And in the first year the law was in effect, Massachusetts wineries distributed the majority of their wine via the distribution method unavailable to out-of-state "large" wineries. *Id.*

In contrast, the Act bears none of the hallmarks of the law in *Jenkins*. It creates a single standard, which aligns with state and federal law, applicable to all producers who sell pork in Massachusetts. Act § 1-3. Appellants offer no actual evidence that in-state farmers have benefitted or realistically can benefit from the Act, nor that the out-of-state share of the Massachusetts pork supply has changed in any respect. Instead, the record shows Massachusetts's limited pork industry is unable to meet any fill left by non-compliant out-of-state producers. *See* A1412. Indeed, in-state producers will more likely face increased competition in the sale of compliant pork, not less, because

46

large out-of-state operations, like appellants here, can take advantage of efficiency gains and economies of scale.

If anything, the Act limits the options of Massachusetts farmers, who must raise pigs in compliance with the Act regardless of where their resulting pork products are eventually sold. Act § 1-2. Out-of-state farmers, on the other hand, have a choice: they need only comply with the Act's standards if they want their pork products to be sold into Massachusetts. *Compare id.* § 1-3; *see also Ross*, 598 U.S. at 384 (describing "choices" available to "out-of-state farmers and vertically integrated processors"). The evidence shows that the Act does not operate to the "competitive benefit" of Massachusetts farmers.

Because appellants failed to present any "evidence as to why the law discriminates in practice," *Jenkins*, 592 F.3d at 11, this Court should affirm.

### 3. The Act Reflects a Legitimate Local Interest

As to the validity of the Act's local benefit, appellants argue that the Act does not serve a legitimate local purpose because it sets standards for breeding pigs, rather than their offspring (the market hogs that become pork meat). Br.48.

47

But Massachusetts has an interest in eliminating from its market products derived from a practice the voters consider inhumane, and "States (and their predecessors) have long enacted laws aimed at protecting animal welfare," *Ross*, 598 U.S. at 365. The scope of the law is appropriately tailored to a particular practice affecting only the breeding pigs at the center of pork production.

### B. Appellants' *Pike* Theory Fails as a Matter of Law, and the Court's Rule 56(f) Ruling Was Appropriate

Summary judgment correctly entered on appellants' alternative theory that, even absent discrimination, the Act "unduly burden[s] interstate commerce as described in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)." Br.7. [12] *Ross* foreclosed appellants' *Pike* claim as a matter of law, and there was no error in the district court's entry of summary judgment under Rule 56(f), on the merits or procedurally.

---

[12] Following entry of summary judgment, appellants asserted for the first time that Triumph maintained an independent *Pike* claim. A1443 n.2; Br.30. The district court correctly described the *Pike* theory as a single "claim" brought by all appellants, Add.35-37, which corresponds with appellants' prior descriptions of a singular "*Pike* claim" affecting the entire pork supply chain. A1437-38; *see also, e.g.,* A89 (burden comprises "impacts to farmers, processors, and ultimately, consumers"), A711 ("Plaintiffs" adequately alleged "a violation" under *Pike*).

1. **Appellants' *Pike* Theory Is Materially Identical to the Claim Rejected in *Ross***

In *Ross*, the Court rejected the pork industry's attempt to challenge Proposition 12 by invoking the "*Pike* balancing test," under which courts "assess the burden imposed on interstate commerce by a state law and prevent its enforcement if the law's burdens are clearly excessive in relation to the putative local benefits." 598 U.S. at 377 (citing petitioners' brief) (quotations omitted).

Just like the *Ross* plaintiffs, appellants base their *Pike* theory on factual allegations that the Act causes "a litany" of "compliance costs and consequential harms" to the interstate pork market, including millions of dollars to convert housing, forced compliance in light of the "interconnected" nature of the pork market, and harm to "animal welfare and industry practice." *Supra* pp.17-24; *Ross*, 598 U.S. at 377.

The district court concluded that the *Pike* theory fails as a matter of law for the reasons set forth in *Ross*'s plurality and the concurring opinion of the fifth Justice. Add.35-37; *Ross*, 598 U.S. at 385 (plurality op.) ("the dormant Commerce Clause does not protect a 'particular structure or metho[d] of operation.'") (quoting *Exxon*, 437 U.S. at 127); *id.* at 393-94 (Barrett, J., concurring in part) (no cognizable *Pike* claim

49

where "the benefits and burdens" of California's law are "incommensurable").

Ross affirmed that appellants' purported "substantial burden" is not cognizable under *Pike*. Just as in *Ross*, appellants are but one set of industry participants who have structured their operations in a particular way.[13]  *See Ross*, 598 at 367, 384-85.  But as the *Ross* plurality noted, "many producers have already converted to some form of group housing," and while that complaint plausibly alleged that "*some* out-of-state firms may face difficulty complying (or may choose not to comply) with Proposition 12, … from all anyone can tell, *other* out-of-state competitors seeking to enhance their own profits may choose to modify their existing operations or create new ones to fill the void." *Id.* at 386-87 (quoting *Exxon*, 437 U.S. at 127).  That assessment remains true in this case, where mostly out-of-state producers—including appellants here—will supply compliant pork to

---

[13] Appellants' claim to speak for the entire pork industry is even weaker than that of the *Ross* plaintiffs, who were trade associations representing pork producers and processors nationwide.  A567-68(¶¶38-39).

Massachusetts.  Appellants' claim of industry-wide harm remains

fatally speculative.

Appellants claim that a "six-to-three majority" of the Court

confirmed *Pike* remains good law, citing Justice Kavanaugh's dissent.

Br.37.  However, the issue here is not whether *Ross* overruled *Pike*.

The issue is how *Pike*—whatever its precise contours in other

contexts—applies to "cases like this one."  *Ross*, 598 U.S. at 389 n.4.[14]

The district court correctly concluded appellants' claim fails because the

*type* of burden they assert—even assuming they could prove the

burden's existence and scope at trial—does not qualify as an

unconstitutional burden on commerce under *Ross*.  This is especially

true here, where the claimed burden, challenged law, and industry are

all materially indistinguishable from *Ross*.

---

[14] This Court has applied different tests for determining which opinion
within a fragmented Supreme Court decision constitutes the
"controlling" holding.  *Compare U.S. v. Manubolu*, 13 F.4th 57, 67 n.20
(1st Cir. 2021) (citing *Marks v. U.S.*, 430 U.S. 188, 193 (1977)), *with
U.S. v. Johnson*, 467 F.3d 56, 64-66 (1st Cir. 2006) (citation omitted),
*and with Ainsworth v. Stanley*, 317 F.3d 1, 4 (1st Cir. 2002).  Under any
of these tests, the result here is the same.  A majority of the *Ross* Court
affirmed the Rule 12(b)(6) dismissal of a *Pike* challenge to California's
materially identical law.  Appellants' *Pike* challenge, based on
indistinguishable allegations and evidence, was therefore correctly
rejected.

### 2. Rule 56(f) Was Satisfied Because Appellants Needed No Further Discovery and Received Adequate Notice and the Opportunity to Present their *Pike* Evidence

Appellants also assert that the district court committed procedural error by entering judgment on their *Pike* claim.  Br.32-36.  But there was no error, let alone any that prejudiced appellants.

A district court may enter summary judgment *sua sponte* under Rule 56(f) when: (1) discovery is "sufficiently advanced to afford the parties a reasonable opportunity to glean the material facts" and (2) "the targeted party" has "been given notice and a chance to present its evidence on the essential elements of the claim[.]"  *McCoy,* 59 F.4th at 504-05 (citations omitted).  Here, appellants needed no further discovery, had submitted their evidence regarding the claimed burden under *Pike*, and received notice that the court may reach the issue.

#### a. Discovery Was Sufficiently Advanced for Summary Judgment to Enter

Appellants do not claim that they "did not have a reasonable opportunity for discovery."  *McCoy,* 59 F.4th at 504 (quotation omitted).  Indeed, in the September 14, 2023 status report, appellants asserted that their preliminary injunction declarations and exhibits would be "fully incorporated into the trial record" and that discovery was

unnecessary because those declarations provided a "very thorough idea already of what [appellants'] witness[es] will testify to at trial." A468, A470. Appellants' claim that the district court "never had the requisite facts before it" contradicts the record, where appellants represented that their evidentiary submission was complete. Br.34.

Further, the district court's legal ruling on appellants' *Pike* theory was independent of any contested, material facts. *See* Add.37 (resolution of "legal issue" on *Pike* theory "obviated the need for evidence"). This Court has affirmed "summary judgment entered sua sponte before *any* discovery had taken place, where the decision was based on legal conclusions independent of any potentially available evidence." *Sanchez v. Triple-S Mgmt., Corp.*, 492 F.3d 1, 7-8 (1st Cir. 2007) (citation omitted).

Appellants claim the *sua sponte* ruling was premature because the Commonwealth continued to test appellants' factual assertions through discovery. Br.34. But those efforts did not preclude the district court from making a legal decision that the appellants' claim was foreclosed by *Ross*, regardless of whether they could establish their claimed "substantial burden" at trial. Add.35-37. While the factual disputes

between the parties were genuine, they were not *material* to the legal analysis in light of *Ross*. *See Commodity Futures Trading Comm'n v. JBW Capital, LLC*, 812 F.3d 98, 110 (1st Cir. 2016) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.") (quotation omitted).

### b.     Appellants Had Adequate Notice

Appellants were on notice that the district court may enter summary judgment on their *Pike* theory—both directly from the district court and considering the procedural circumstances.

Here, the district court gave sufficient notice by announcing at the hearing, after the Commonwealth had briefed the *Pike* issue and requested judgment under Rule 56(f), that it was considering summary judgment outright. A1455-56; *see McCoy,* 59 F.4th at 505 (describing as "ample notice" district court's statement at hearing that it was considering summary judgment on second of two theories of plaintiff's claim, which neither party had briefed). That notice would be sufficient, but appellants were on notice even earlier.

Two days before appellants filed their motion for partial summary judgment, the court issued a discovery order signaling that appellants'

54

*Pike* theory was in jeopardy. The court stated that the Act's economic

effects were not "material to the analysis" and that the *Ross* Court had

addressed these same issues, questioning appellants' citation to a

dissenting opinion in support of their *Pike* theory. A963, *supra* p.27.

This order put appellants on notice that their *Pike* theory was

vulnerable.[15] Appellants therefore already knew the district court was

"mulling" a ruling that *Ross* foreclosed their *Pike* theory when they

moved for summary judgment. *See Stella v. Town of Tewksbury*, 4 F.3d

53, 56 (1st Cir. 1993).[16]

---

[15] Contrast the district court's conduct in *Leyva v. On the Beach, Inc.*,
171 F.3d 717 (1st Cir. 1999), on which appellants rely. Br.33. There,
the district court confirmed by margin order that its "decision would
conform to the limited scope" of defendants' partial motion for summary
judgment, took the motion under advisement without any indication it
might change course, and only later issued an opinion *sua sponte*
ordering summary judgment against all plaintiffs' claims. *Leyva*, 171
F.3d at 719-20. Here, the district court signaled skepticism of the *Pike*
claim, announced it was considering summary judgment inclusive of
that claim, and then issued judgment on it.

[16] Appellants rely on *Stella* to assert that a 10-day (or 14-day) notice
period is required. Br.32-33. But *Stella* predated Rule 56(f)'s 2010
codification and recent cases have not imposed a strict notice period.
*See, e.g., McCoy*, 59 F.4th at 504-05.

Even assuming the district court did *not* provide express notice
(which it did), Rule 56(f) does not require a formal statement by the
district court.  As then-Judge Breyer explained,

> [B]eing on notice does not mean that [the moving party] had to
> receive a formal document called 'notice' or … even that the court
> had to explicitly tell [the moving party], 'I am thinking of ordering
> summary judgment for [the nonmoving party] *sua sponte*.'
> Instead, the question is whether, given the procedural
> circumstances of the case, 'the original movant … has had an
> *adequate opportunity* to show that there is a genuine issue and
> that his opponent is not entitled to judgment as a matter of law.'

*Nat'l Expositions, Inc. v. Crowley Maritime Corp.*, 824 F.2d 131, 133-34
(1st Cir. 1987) (citation omitted).

Here, appellants briefed their *Pike* theory twice previously,
including in their motion for a preliminary injunction, A87-89, and their
opposition to the Commonwealth's motion to dismiss, A711-15.  In
pretrial memoranda, appellants confirmed that their preliminary
injunction materials reflected their intended trial evidence on the *Pike*
theory, stating that their witness declarations "outlin[ed] the scope of
each witness's testimony."  A807, A812-13.

Then, appellants moved for summary judgment.  The
Commonwealth expressly requested a Rule 56(f) ruling on the *Pike*
theory, reiterating its argument that *Ross* squarely applied, and the

court then announced it was considering summary judgment outright. A1371, A1388-39, A1455-56. If appellants had further evidence they had not yet presented to "support[] the elements" of their *Pike* theory, they had an "obligation to bring forth" that evidence. *McCoy*, 59 F.4th at 505. But they did not. Appellants neither addressed the argument in their 20-page reply memorandum, nor at the hearing. *See supra* pp.28-30. They objected that notice was insufficient weeks later. And they never requested more time to develop additional facts supporting their *Pike* theory. *See* A1415-1439, A1440-49, A1463-65, A1477-88.

Appellants ignored the warnings that their *Pike* theory—which was deficient as a matter of law from the outset—was ripe for adjudication. It is implausible that they had "no reason to know" the issue could be reached at summary judgment. *Compare*, *e.g., Block Island Fishing, Inc. v. Roger*s, 844 F.3d 358, 364 (1st Cir. 2016) (nonmoving party "had no reason to know" issue would be reached at summary judgment).

### c.    Any Procedural Error Was Harmless

The procedural safeguards of Rule 56(f) are not intended to artificially shield a party from judgment where the record reflects that party's complete evidentiary showing, but the district court found it

deficient as a matter of law. Because appellants had the opportunity "to present evidence in support of [their] position," they were "not procedurally prejudiced," so any "failure to provide notice is harmless error." *Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Rey P'ship, S.E.*, 615 F.3d 45, 52 (1st Cir. 2010); *see also D'Onofrio v. Vacation Pubs., Inc.,* 888 F.3d 197, 210 (5th Cir. 2018) ("harmless error" from lack of 56(f) notice if "nonmoving party admits that he has no additional evidence anyway" or "appellate court evaluates all of the nonmoving party's additional evidence and finds no genuine issue of material fact").

For the same reasons, appellants cannot show prejudice on appeal from lack of notice because they point to no additional evidence or material factual dispute that would have changed the legal outcome. *See Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 105 (1st Cir. 2017) (suggesting, without deciding, "that it may be necessary to show prejudice when seeking to vacate a *sua sponte* summary judgment"). Absent prejudice, a remand "would merely entail an empty formality with no appreciable possibility of altering the judgment." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (citation omitted).

This Court should affirm the district court's entry of judgment on the dormant Commerce Clause claim.

## II. This Court Should Affirm Summary Judgment for the Commonwealth on Appellants' Express and Conflict FMIA Preemption Claims

The district court also correctly granted summary judgment for the Commonwealth on appellants' claims for express and conflict preemption under the Federal Meat Inspection Act ("FMIA").

The FMIA expressly preempts state "[r]equirements" "within the scope" of the FMIA with respect to "premises, facilities and operations" of any slaughterhouse inspected pursuant to the FMIA, which are "in addition to, or different than" those made under the FMIA.  21 U.S.C. § 678.  Appellants' express preemption argument fails because they identify no "requirements" "within the scope" of the FMIA that the Act imposes on slaughterhouses.  *See id.*

As the district court correctly reasoned, the Act's sales provision is a commercial sales regulation outside the "scope" of the FMIA's regulation of safe meat production and humane slaughter.  Add.69. And while the Act may motivate production practices on *farms*, it is silent as to slaughterhouse premises, facilities, or operations.  Add.64. The Act therefore operates "at a remove" from slaughterhouses and is

not preempted.  *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 467 (2012).  At most, the Act's incidental effect on slaughterhouses amounts to a recordkeeping requirement that the FMIA's preemption clause expressly allows states to impose.

Finally, there is no conflict preemption because the Act does not obstruct the FMIA's objectives of safe meat and humane slaughter.

### A.     Statutory Framework

Congressional intent is "the ultimate touchstone in every pre-emption case."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted).  To determine the scope of an express preemption provision, a court "rel[ies] on the plain language of the statute and its legislative history to develop a reasoned understanding of the way in which Congress intended the statute to operate."  *Medicaid & Medicare Adv. Prods. Ass'n of P.R., Inc. v. Emanuelli-Hernández*, 58 F.4th 5, 11 (1st Cir. 2023) (quotation omitted)).

The FMIA, 21 U.S.C. §§ 601 *et seq.*, aims "to protect the consuming public from meat and meat food products that are adulterated or misbranded and to assist in efforts by State and other Government agencies to accomplish this objective."  21 U.S.C. § 661(a).  Accordingly, the FMIA regulates specified "activities at slaughterhouses

60

to ensure both safety of meat and humane handling of animals."
*Harris*, 565 U.S. at 455.  It prescribes a system of meat inspection that
requires inspection of live animals prior to entry into a slaughterhouse
("ante-mortem" inspection), humane handling on-premises, and
inspection of carcasses after slaughter ("post-mortem" inspection), to
evaluate whether the animals or their meat show signs of disease,
decay, or other adulteration.  *See* 21 U.S.C. §§ 603-605.  The Food
Safety and Inspection Service ("FSIS"), an agency within the United
States Department of Agriculture ("USDA"), promulgates regulations to
implement the FMIA.   *See* 9 C.F.R. §§ 300.1 *et seq.*  Neither the FMIA
nor FSIS regulations govern pig farmers.  Add.58.

> **B.    *Harris* Affirmed that State Regulation of
> Slaughterhouses' Commercial Sales Generally Is
> Permissible as Outside the FMIA's Scope**

The district court properly applied the "general rule" from *Harris*
that "the FMIA's preemption clause does not usually foreclose state
regulation of the commercial sales activities of slaughterhouses,"
Add.63 (quoting *Harris*, 565 U.S. at 463), to conclude that the Act is a
permissible commercial sales regulation.  Add.64-70.

In *Harris*, upon which appellants rely, Br. 53-55, a California
state law prohibited slaughterhouses from buying, selling, or receiving

a nonambulatory animal; from "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize" it; and from processing, butchering, or selling meat or products from nonambulatory animals for human consumption. *Harris*, 565 U.S. at 458-59. In other words, the law imposed conditions directly on slaughterhouses, and then sought to further enforce those conditions through a sales ban. *Id.* The FMIA preempted the law, including its sales ban, "not because it was a sales ban but because it operated as a 'command to slaughterhouses to structure their operations'" in the way the complementary provisions of the law required. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1115 (9th Cir. 2022) (quoting *Harris,* 565 U.S. at 464).

Appellants argue that any sales regulation is *per se* preempted by *Harris* because "it directly regulates what Triumph can sell into Massachusetts" [17] and "adds a class of adulteration unrecognized in

---

[17] Appellants assert that severance of the exception meant the Act now "directly" regulates slaughterhouses. Br.16. But the Act always regulated the commercial sales of out-of-state slaughterhouses, like Triumph, into Massachusetts. *See* A1428.

federal law." Br.58.[18]  Yet *Harris* was clear that the FMIA preempted the sales ban in that case not only because it was a sales ban, but because it was part of a state law that required slaughterhouses to structure their operations in a specific way.  565 U.S. at 464.

Here, the Act fundamentally differs from the challenged law in *Harris*.  It includes no requirement that a slaughterhouse take, or forebear from taking, any action; indeed, the Act's definition of "cruel confinement" expressly excludes confinement during slaughter.  Act § 1-4.  And the sales ban does not function to "command" a slaughterhouse to operate in any specific way.  It only regulates a slaughterhouse's commercial sales, which is not a *per se* "additional or different requirement" preempted by the FMIA.  *See Harris,* 565 U.S. at 463 (citation omitted).

## C. The Act Imposes No Requirements Within the Scope of the FMIA

Nor does the Act impose any other "additional or different requirements" "within the scope of" the FMIA that would be preempted.

---

[18] Appellants rely only on an excerpt of the United States' *amicus* brief in *Harris*.  Br.57.  They omit the next sentence of the *amicus* brief, which rejects the characterization appellants advance.  2011 WL 3821398, at *17–18.  Neither did the *Harris* Court adopt it.

It is undisputed that the FMIA does not regulate the housing of sows. Br.60.[19]  By only motivating conduct on farms, the Act therefore "works at a remove from the sites and activities the FMIA most directly governs" and falls outside the FMIA's preemptive sweep.  *See Harris*, 565 U.S. at 467 (distinguishing California law from state horse meat bans); *see also, e.g.*, *Ass'n des Éleveurs,* 33 F.4th 1107, 1115 (upholding state law banning force-fed foie gras because ban tied to method of farm production "work[s] at a remove" from sites and activities governed by federal law); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 553-54 (7th Cir. 2007) (upholding state ban on horse meat); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333-34 (5th Cir. 2007) (same).

Appellants point to Triumph's operational changes to trace and distribute compliant pigs as "requirements" imposed by the Act.  Br.58-59.  Yet as a matter of course, Triumph tracks its supply of pigs and implements procedures to market and distribute differentiated products

---

[19] Appellants insist that the FSIS *could* regulate sow housing.  But they acknowledge FSIS has not regulated sow housing and neither cite supportive authority nor advance an interpretation of the FMIA supporting that position.  Br.60-61; *see also* A2130-33.

to customers nationwide and internationally, all consistent with the FMIA's inspection regime.  A2136(¶5).  For example, Triumph tracks the number of pigs delivered to it by the farmer plaintiffs and the more than 1,500 independent farmers from whom it sources pigs to ensure those suppliers fulfill their contractual obligations.  A2136-37(¶9).  Triumph also markets products under its own brands, and under private labels.  A2144(¶25).  Triumph has over 1,000 product codes for specific cuts of pork meat, for byproducts, for specific brands and grocery stores, and for the breeding sow confinement methods used on originating farms—like "open pen gestation" or Proposition-12 compliant.  A2144-45(¶¶25-30), A2114-15.

Though Triumph voluntarily adopted procedures to trace and segregate compliant pork so it may sell into California and Massachusetts, the district court properly concluded that these changes amount to inventory management practices outside the scope of the FMIA's inspection requirements, and that nothing in the Act or its regulations "required" Triumph to undertake these specific measures.  Add.65.  The word "requirements" makes clear that a state law must "compel" or "instruct" a preempted course of action.  *See Harris*, 565

U.S. at 460, 461; *see also Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005) ("requirement" is "a rule of law that must be obeyed" and not "an event … that merely motivates an optional decision").  But the Act neither requires segregation nor prohibits commingling of compliant and non-compliant product at any stage prior to slaughter or during shipment, so long as the products can be identified.  *See generally* Act § 1-1 *et seq.*  Triumph is free to decide the most efficient way to structure its business operations while serving the Massachusetts market.[20]  The Act does not "command" it to adopt any specific procedures, in contrast to the clear "command" in *Harris* that slaughterhouses immediately euthanize nonambulatory pigs on their premises.  565 U.S. at 464, 466.

The Act accordingly "works at a remove" from slaughterhouses by focusing on farm practices and does not "reach into the slaughterhouse's facilities" by requiring or even incentivizing any method of inspection, slaughter, processing, packaging, or labelling.  Appellants' attempt to

---

[20] Triumph's procedure requires pigs to be delivered at certain times of day, counted, run as a group on the kill floor, and their processed meat kept in separate storage before shipment.  A2143-2144(¶24), A2146-2147(¶¶33-34).  Triumph asserted that its process is "proprietary."  A2146(¶33).  Other slaughterhouses may use different procedures.  A2065.

circumvent the clause's plain language by replacing the term
"requirements" with any impact, however indirect, should be rejected.
Otherwise, no state could regulate pig farming because some
downstream effect on a slaughterhouse could result.

### D.    Record-Keeping Requirements Are Exempt from the FMIA's Preemption Clause

Even if an effect of the Act—*i.e.*, that a slaughterhouse must be
able to identify whether meat originated from a compliant pig before
selling into Massachusetts—could be construed as a "requirement," it
would be a permissible record-keeping requirement.

The FMIA's preemption clause expressly permits States to impose
record-keeping requirements consistent with the FMIA's record-keeping
provisions.  *See* 21 U.S.C. § 678.  Those provisions require
slaughterhouses to keep records of the "descriptions of all livestock, net
weight of all livestock, names and addresses of all buyers … the contact
information for any previous owner of the livestock, as well as serial
numbers and identification for each animal."  Add.59 (citing 9 C.F.R.
320.1(b)); *see also* 21 U.S.C. § 642.  Measures to identify and track
inventory fall comfortably within these record-keeping requirements.

### E.  Appellants' FMIA Conflict Preemption Claim Fails as a Matter of Law

The district court also correctly concluded that appellants' conflict preemption claim failed as a matter of law.  Add.67-70.  Appellants must show the Act "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Maine Forest Prod. Council v. Cormier*, 51 F.4th 1, 6 (1st Cir. 2022) (citation omitted).  Appellants have failed to do so here.  Br.61-64.

The FMIA has dual objectives of "safe meat and humane slaughter."  *Harris*, 565 U.S. at 456.  As described, *supra*, Part II.C, and as the district court reasoned, Add.67-70, there is no overlap between the Act's and FMIA's requirements and no conflict between them.  Indeed, Triumph produces and sells compliant pork into Massachusetts.  A2011-16, A2147(¶35).  Appellants argue that a labeling error, in which a farmer mistakenly identified pigs as Proposition 12-compliant when they were not, resulting in Triumph recalling them, shows a conflict.  Br.63.  The district court correctly concluded that human error does not prove a conflict with the FMIA, because presumably Triumph would have done the same thing had it made any other labeling error resulting in shipment of the wrong product.  Add.69-70.  As the district court

correctly reasoned, the FMIA's objective is to ensure that meat in the marketplace is safe for human consumption, but "does not **require** that all safe pork available to the market be able to enter the market." Add.69 n.3.

Appellants accordingly failed to demonstrate conflict preemption.

## III. The Court Correctly Dismissed Appellants' Remaining Claims

This Court reviews dismissal "de novo, taking as true the well-pleaded facts in the complaint and drawing all reasonable inferences in favor of [the non-moving party]." *Núñez Colón v. Toledo-Dávila*, 648 F.3d 15, 19 (1st Cir. 2011).  To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

While it is preferable for a district court to explain its reasoning in dismissing a complaint, it is not required to do so.  Fed. R. Civ. P. 52(a)(3); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004).  This Court "may assume that the judge gave careful consideration to the motion and weighed the appropriate factors," *id.,*

especially where the court indicated that it gave careful consideration after thorough briefing.  Add.9.

### A.    Privileges and Immunities Clause

The Privileges and Immunities Clause "guarantees to citizens of State A [] that of doing business in State B on terms of substantial equality with the citizens of that State."  *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)*; see also Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371 (1978).  The district court correctly dismissed appellants' claim under this Clause.  First, the Clause "is inapplicable to corporations" such as the appellants.  *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 656 (1981).  Second, the Act does not prevent appellants from farming pigs or producing pork in Massachusetts on the same footing as Massachusetts citizens.  *Id.*; *see also IPPA*, 2024 WL 3158532, at *5 (rejecting Privileges and Immunities challenge to Proposition 12).

### B.    Packers And Stockyard Conflict Preemption

The district court correctly dismissed appellants' Packers and Stockyard Act ("PSA") conflict preemption claim.[21]  Appellants bear the

---

[21] The PSA has a preemption clause, 7 U.S.C. § 228c, but appellants do not argue express preemption.

burden to establish preemption. *Capron v. Office of Att'y Gen. of Mass.*, 944 F.3d 9, 26 (1st Cir. 2019).

The PSA regulates "packers" (*i.e.*, slaughterhouses or processors) and forbids them from engaging "in unfair, discriminatory, or deceptive practices" in commerce, or subjecting "any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business." *Stafford v. Wallace*, 258 U.S. 495, 513 (1922). The PSA is "essentially an antitrust statute" "to protect competition and, therefore, only those practices that will likely affect competition adversely violate the Act." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 277 (6th Cir. 2010).

Appellants argue the Act is preempted by conflict based on 7 U.S.C. § 192(b). Section 192(b) makes it unlawful for any packer, with respect to livestock, to "[m]ake or give any undue or unreasonable preference or advantage," or subject "to any undue or unreasonable prejudice or disadvantage" any "particular person or locality," in any respect.

Triumph alleges that, as a packer, it will pay a premium to farmers that produce compliant pigs; and that the premium may

compensate them for facility conversions.  A61-62(¶¶228-29, 238).

Accepted as true, these facts do not show that the Act legally requires or

encourages "undue or unreasonable" preferences or prejudices.  As no

facts support Triumph's claim that its compliance with the Act conflicts

with, or is an obstacle to, the PSA, the district court properly dismissed

it.  *See IPPA*, 2024 WL 3158532, at *5 (rejecting PSA preemption

challenge to Proposition 12).

### C.    Full Faith and Credit Clause

The district court correctly dismissed appellants' Full Faith and

Credit Clause claim.  Appellants contend the Clause prevents

enforcement of the Act in Massachusetts because their states regulate

farming.  Br.24.  They are wrong for at least two reasons.  First, as a

threshold matter, the Full Faith and Credit Clause "does not give rise to

an implied federal cause of action."  *Thompson v. Thompson*, 484 U.S.

174, 182-83 (1988).  Second, the Clause "does not compel 'a state to

substitute the statutes of other states for its own statutes dealing with

a subject matter concerning which it is competent to legislate.'"  *Sun Oil*

*Co. v. Wortman*, 486 U.S. 717, 722 (1988) (quoting *Pac. Emp'rs Ins. Co.*

*v. Indus. Accident Comm'n*, 306 U.S. 493, 501 (1939)).

### D.    Due Process Vagueness

The district court correctly dismissed appellants' Due Process Clause claim because the Act is not unconstitutionally vague, either facially or as-applied.  The Act's prohibitions against "knowingly engag[ing]" in a sale and preventing pigs from "turn[ing] around freely" apprise "a person of ordinary intelligence of fair notice of what is prohibited" and is not "so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *See McCoy*, 59 F.4th at 509 (citation omitted).  Moreover, the Act is accompanied by civil (not criminal) penalties, and therefore is "held to a less exacting vagueness standard because the consequences of imprecision are qualitatively less severe."  *Id.* (quotation omitted).

Appellants' assertions that ordinary persons cannot comprehend "engaging," and that "courts have specifically held the word 'engage' to be unconstitutionally vague in a variety of contexts," overstate their own cited authority considerably.  Br.25; *see Pfizer Inc. v. Ajix, Inc.*, 2005 WL 1828830 (D.Conn. Aug. 2, 2005) (opinion does not use term "vague" or conclude unconstitutional); *Sola Commcn's, Inc. v. Bailey*, 861 So.2d 822 (La.App. 3 Cir. 2003) (same); *Bodfish v. State*, 2009 WL 3233716 at *4 (Alaska Ct. App.) (unpublished) (addressing probation

73

condition prohibiting "engag[ing] in an intimate relationship with any person" not "engage" on its own); *see also IPPA*, 2024 WL 3158532, at *4 (Proposition 12's use of "engage in" not vague).

Likewise, "turn around freely" is readily comprehensible.  It is defined as "turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal."  Act § 1-5.  The fact that sows can be different sizes does not render this term incomprehensible.  *See Cramer v. Harris*, 591 F. App'x 634, 635 (9th Cir. 2015) (non-precedential) (whether animal can "turn around freely" "readily discerned using objective criteria").

## E.    Import-Export Clause

The district court also correctly dismissed appellants' claim under the Import-Export Clause.  Appellants acknowledge that controlling law limits the application of that clause "to imports from foreign countries." *Ross*, 598 U.S. at 408 (Kavanaugh, J.) (citing *Woodruff v. Parham*, 75 U.S. 123 (1868)); *see also Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 516 (2019) ("[T]he Import-Export Clause was long ago held to refer only to international trade."); Br.26.  They assert it "may be interpreted" to apply to "interstate commerce," A67(¶278), but the Supreme Court has said otherwise.

**F.    Declaratory Relief and State Law Judicial Review**

The district court correctly dismissed appellants' claims for declaratory relief and state law judicial review.  Appellants' declaratory relief claim under federal law fails for two reasons.  First, 28 U.S.C. § 2201(a) "creates a remedy, not a cause of action."  *Buck v. American Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007).  Second, "dismissal of [the other claims] requires dismissal of the claim for declaratory relief." *Tyler v. Michaels Stores, Inc.*, 840 F.Supp.2d 438, 452 (D. Mass. 2012).

Appellants' state-law claim under Mass. Gen. Laws ch. 30A and ch. 231A fails because federal courts "may not supervise state officials' compliance with state law."  *O'Brien v. Mass. Bay Transp. Auth.*, 162 F.3d 40, 44 (1st Cir. 1998); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984).

**IV.   No Injunction Should Issue in the Event of Remand**

Appellants request that this Court direct issuance of a preliminary injunction should it remand the case.  Br.65-67.  Appellants did not seek an injunction pending appeal under Fed. R. App. P. 8(a)(2). This Court should not grant interim relief without a showing that it is warranted.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district

court's judgment.

Respectfully submitted.

October 21, 2024          */s/ Vanessa A. Arslanian*

Vanessa A. Arslanian, 1st Cir. No. 1186571
Grace Gohlke, 1st Cir. No. 1204282
*Assistant Attorneys General*
MASSACHUSETTS OFFICE OF THE ATTORNEY
GENERAL
Government Bureau
One Ashburton Place
Boston, MA  02108
617-963-2107
vanessa.arslanian@mass.gov
617-963-2527
grace.gohlke@mass.gov


Maryanne Reynolds, 1st Cir. No. 121697
*Assistant Attorney General*
MASSACHUSETTS OFFICE OF THE ATTORNEY
GENERAL
Constitutional and Administrative Law
Division
10 Mechanic Street, Suite 301
Worcester, MA  01608
774-214-4407
maryanne.reynolds@mass.gov

*Counsel for Defendants-Appellees Andrea Joy Campbell, as Attorney General;* and *Ashley Randle, as Commissioner of the Department of Agricultural Resources*

## CERTIFICATE OF COMPLIANCE

1.     This brief is 12,682 words and complies with the word limit set forth by Fed. R. App. P. 32, excluding the parts exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(b) because the brief has been prepared in Microsoft Word using 14-point New Century Schoolbook font, a proportionally spaced typeface.

*/s/ Vanessa A. Arslanian*
Vanessa A. Arslanian
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, Vanessa A. Arslanian, Assistant Attorney General, hereby certify that pursuant to Fed. R. App. P. 25 that I caused the foregoing to be filed through this Court's CM/ECF system, which will serve as notice of electronic filing on all registered users, including counsel for Plaintiffs-Appellants.

/s/ Vanessa A. Arslanian
Vanessa A. Arslanian
Assistant Attorney General

Dated: October 21, 2024

# ADDENDUM

The Commonwealth's Addendum consists exclusively of materials which were not included in Plaintiffs-Appellants' Addendum.

| | |
|---|---|
| 21 U.S.C. § 603 | Comm.Add.1 |
| 21 U.S.C. § 604 | Comm.Add.2 |
| 21 U.S.C. § 605 | Comm.Add.3 |
| 21 U.S.C. § 642 | Comm.Add.4 |
| 21 U.S.C. § 678 | Comm.Add.6 |
| 7 U.S.C. § 192 | Comm.Add.7 |
| A2104<br>(Exhibit AC – Photograph, Pigs in Gestation Crates) | Comm.Add.9 |

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 12. Meat Inspection (Refs & Annos)
      Subchapter I. Inspection Requirements; Adulteration and Misbranding

21 U.S.C.A. § 603

§ 603. Examination of animals prior to slaughter; use of humane methods

Currentness

**(a) Examination of animals before slaughtering; diseased animals slaughtered separately and carcasses examined**

For the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce; and all amenable species found on such inspection to show symptoms of disease shall be set apart and slaughtered separately from all other cattle, sheep, swine, goats, horses, mules, or other equines, and when so slaughtered the carcasses of said cattle, sheep, swine, goats, horses, mules, or other equines shall be subject to a careful examination and inspection, all as provided by the rules and regulations to be prescribed by the Secretary, as provided for in this subchapter.

**(b) Humane methods of slaughter**

For the purpose of preventing the inhumane slaughtering of livestock, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of the method by which amenable species are slaughtered and handled in connection with slaughter in the slaughtering establishments inspected under this chapter. The Secretary may refuse to provide inspection to a new slaughtering establishment or may cause inspection to be temporarily suspended at a slaughtering establishment if the Secretary finds that any cattle, sheep, swine, goats, horses, mules, or other equines have been slaughtered or handled in connection with slaughter at such establishment by any method not in accordance with the Act of August 27, 1958 (72 Stat. 862; 7 U.S.C. 1901-1906) until the establishment furnishes assurances satisfactory to the Secretary that all slaughtering and handling in connection with slaughter of livestock shall be in accordance with such a method.

**CREDIT(S)**

(Mar. 4, 1907, c. 2907, Title I, § 3, formerly 1st par., 34 Stat. 1260; renumbered § 3 and amended Pub.L. 90-201, §§ 1, 3, 12(a), (b), Dec. 15, 1967, 81 Stat. 584, 588, 592; Pub.L. 95-445, § 2, Oct. 10, 1978, 92 Stat. 1069; Pub.L. 109-97, Title VII, § 798[(a)](1), Nov. 10, 2005, 119 Stat. 2166.)

Notes of Decisions (39)

21 U.S.C.A. § 603, 21 USCA § 603
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**WESTLAW**  © 2024 Thomson Reuters. No claim to original U.S. Government Works.    1

**Comm.Add.1**

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 12. Meat Inspection (Refs & Annos)
      Subchapter I. Inspection Requirements; Adulteration and Misbranding

21 U.S.C.A. § 604

§ 604. Post mortem examination of carcasses and marking or labeling; destruction of carcasses condemned; reinspection

Currentness

For the purposes hereinbefore set forth the Secretary shall cause to be made by inspectors appointed for that purpose a post mortem examination and inspection of the carcasses and parts thereof of all amenable species to be prepared at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment in any State, Territory, or the District of Columbia as articles of commerce which are capable of use as human food; and the carcasses and parts thereof of all such animals found to be not adulterated shall be marked, stamped, tagged, or labeled as "Inspected and passed"; and said inspectors shall label, mark, stamp, or tag as "Inspected and condemned" all carcasses and parts thereof of animals found to be adulterated; and all carcasses and parts thereof thus inspected and condemned shall be destroyed for food purposes by the said establishment in the presence of an inspector, and the Secretary may remove inspectors from any such establishment which fails to so destroy any such condemned carcass or part thereof, and said inspectors, after said first inspection, shall, when they deem it necessary, reinspect said carcasses or parts thereof to determine whether since the first inspection the same have become adulterated, and if any carcass or any part thereof shall, upon examination and inspection subsequent to the first examination and inspection, be found to be adulterated, it shall be destroyed for food purposes by the said establishment in the presence of an inspector, and the Secretary may remove inspectors from any establishment which fails to so destroy any such condemned carcass or part thereof.

**CREDIT(S)**

(Mar. 4, 1907, c. 2907, Title I, § 4, formerly 2nd par., 34 Stat. 1260; renumbered § 4 and amended Pub.L. 90-201, §§ 1, 3, 4, 12(a) to (d), Dec. 15, 1967, 81 Stat. 584, 588, 592; Pub.L. 109-97, Title VII, § 798[(a)](1), Nov. 10, 2005, 119 Stat. 2166.)

Notes of Decisions (3)

21 U.S.C.A. § 604, 21 USCA § 604
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Comm.Add.2**

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 12. Meat Inspection (Refs & Annos)
      Subchapter I. Inspection Requirements; Adulteration and Misbranding

21 U.S.C.A. § 605

§ 605. Examination of carcasses brought into slaughtering or packing establishments,
and of meat food products issued from and returned thereto; conditions for entry

Currentness

The foregoing provisions shall apply to all carcasses or parts of carcasses of amenable species or the meat or meat products thereof which may be brought into any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, and such examination and inspection shall be had before the said carcasses or parts thereof shall be allowed to enter into any department wherein the same are to be treated and prepared for meat food products; and the foregoing provisions shall also apply to all such products, which, after having been issued from any slaughtering, meat-canning, salting, packing, rendering, or similar establishment, shall be returned to the same or to any similar establishment where such inspection is maintained. The Secretary may limit the entry of carcasses, parts of carcasses, meat and meat food products, and other materials into any establishment at which inspection under this subchapter is maintained, under such conditions as he may prescribe to assure that allowing the entry of such articles into such inspected establishments will be consistent with the purposes of this chapter.

**CREDIT(S)**

(Mar. 4, 1907, c. 2907, Title I, § 5, formerly 3rd par., 34 Stat. 1261; renumbered § 5 and amended Pub.L. 90-201, §§ 1, 5, 12(a), Dec. 15, 1967, 81 Stat. 584, 588, 592; Pub.L. 109-97, Title VII, § 798[(a)](1), Nov. 10, 2005, 119 Stat. 2166.)

21 U.S.C.A. § 605, 21 USCA § 605
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**
© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Comm.Add.3**

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 12. Meat Inspection (Refs & Annos)
      Subchapter II. Meat Processors and Related Industries

21 U.S.C.A. § 642

§ 642. Recordkeeping requirements

Currentness

**(a) Classes of persons bound; scope of disclosure; access to places of business; examination of records, facilities, and inventories; copies; samples**

The following classes of persons, firms, and corporations shall keep such records as will fully and correctly disclose all transactions involved in their businesses; and all persons, firms, and corporations subject to such requirements shall, at all reasonable times upon notice by a duly authorized representative of the Secretary, afford such representative access to their places of business and opportunity to examine the facilities, inventory, and records thereof, to copy all such records, and to take reasonable samples of their inventory upon payment of the fair market value therefor--

**(1)** Any persons, firms, or corporations that engage, for commerce, in the business of slaughtering any cattle, sheep, swine, goats, horses, mules, or other equines, or preparing, freezing, packaging, or labeling any carcasses, or parts or products of carcasses, of any such animals, for use as human food or animal food;

**(2)** Any persons, firms, or corporations that engage in the business of buying or selling (as meat brokers, wholesalers or otherwise), or transporting in commerce, or storing in or for commerce, or importing, any carcasses, or parts or products of carcasses, of any such animals;

**(3)** Any persons, firms, or corporations that engage in business, in or for commerce, as renderers, or engage in the business of buying, selling, or transporting, in commerce, or importing, any dead, dying, disabled, or diseased cattle, sheep, swine, goats, horses, mules, or other equines, or parts of the carcasses of any such animals that died otherwise than by slaughter.

**(b) Period of maintenance**

Any record required to be maintained by this section shall be maintained for such period of time as the Secretary may by regulations prescribe.

**CREDIT(S)**

(Mar. 4, 1907, c. 2907, Title II, § 202, as added Pub.L. 90-201, § 14, Dec. 15, 1967, 81 Stat. 593.)

Notes of Decisions (6)

**Comm.Add.4**

21 U.S.C.A. § 642, 21 USCA § 642
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 21. Food and Drugs (Refs & Annos)
    Chapter 12. Meat Inspection (Refs & Annos)
      Subchapter IV. Auxiliary Provisions

21 U.S.C.A. § 678

§ 678. Non-Federal jurisdiction of federally regulated matters; prohibition of additional or different requirements for establishments with inspection services and as to marking, labeling, packaging, and ingredients; recordkeeping and related requirements; concurrent jurisdiction over distribution for human food purposes of adulterated or misbranded and imported articles; other matters

Currentness

Requirements within the scope of this chapter with respect to premises, facilities and operations of any establishment at which inspection is provided under subchapter I of this chapter, which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of section 642 of this title, if consistent therewith, with respect to any such establishment. Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement [1] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

**CREDIT(S)**

(Mar. 4, 1907, c. 2907, Title IV, § 408, as added Pub.L. 90-201, § 16, Dec. 15, 1967, 81 Stat. 600.)

Notes of Decisions (25)

---

**Footnotes**

1       So in original. Probably should be "requirements".

21 U.S.C.A. § 678, 21 USCA § 678
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

End of Document                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Comm.Add.6**

United States Code Annotated
   Title 7. Agriculture (Refs & Annos)
      Chapter 9. Packers and Stockyards (Refs & Annos)
         Subchapter II. Packers Generally
            Part A. General Provisions

7 U.S.C.A. § 192

§ 192. Unlawful practices enumerated

Effective: September 30, 2005
Currentness

It shall be unlawful for any packer or swine contractor with respect to livestock, meats, meat food products, or livestock products in unmanufactured form, or for any live poultry dealer with respect to live poultry, to:

**(a)** Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

**(b)** Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect; or

**(c)** Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

**(d)** Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

**(e)** Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

**(f)** Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

**(g)** Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e).

**CREDIT(S)**

Comm.Add.7

(Aug. 15, 1921, c. 64, Title II, § 202, 42 Stat. 161; Aug. 15, 1921, c. 64, Title V, § 503, as added Aug. 14, 1935, c. 532, 49 Stat. 649; Pub.L. 85-909, § 1(1), Sept. 2, 1958, 72 Stat. 1749; Pub.L. 94-410, § 3(a), Sept. 13, 1976, 90 Stat. 1249; Pub.L. 100-173, § 3, Nov. 23, 1987, 101 Stat. 917; Pub.L. 102-237, Title X, § 1008(1), Dec. 13, 1991, 105 Stat. 1898; Pub.L. 106-78, Title IX, § 912, Oct. 22, 1999, 113 Stat. 1205; Pub.L. 107-171, Title X, § 10502(b)(1), (2)(A), May 13, 2002, 116 Stat. 509, 510.)

### AMENDMENT OF SECTION

<For termination of amendment by Pub.L. 106-78, § 942, see Termination Date of 1999 Amendment note below.>

Notes of Decisions (90)

7 U.S.C.A. § 192, 7 USCA § 192
Current through P.L. 118-106. Some statute sections may be more current, see credits for details.

---

**End of Document**                                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

**Comm.Add.8**



DEDESIGNATED PER ECF NO. 143

**Comm.Add.9**

A2104
TF0005388