NO. 24-1759

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER FARMS, INC., and ALLIED PRODUCERS' COOPERATIVE, individually and on behalf of its members,
*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of Massachusetts, and ASHLEY RANDLE, in her official capacity as Commissioner of the Massachusetts Department of Agricultural Resources,
*Defendants-Appellees.*

On Appeal From the United States District Court for the District of Massachusetts, No. 1:23-cv-11671-WGY (Hon. William G. Young)

## *AMICI CURIAE* BRIEF OF ANIMAL WELLNESS ACTION AND THE CENTER FOR A HUMANE ECONOMY IN SUPPORT OF APPELLEE'S BRIEF AND AFFIRMATION OF THE DISTRICT COURT'S ORDER

Jessica L. Blome
Cal. Bar No. 314898
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
(510) 900-9502
jblome@greenfirelaw.com

*Attorney for Amicus Animal Wellness Action and the Center for a Humane Economy*

# TABLE OF CONTENTS

I.    Introduction and *Amici Curiae*'s Statement of Interest ...................................1

III.   Argument ...........................................................................4

    A.    The Massachusetts Act to Prevent Cruelty to Farm Animals does not violate the dormant Commerce Clause. ................................4

        1.    Farmer plaintiffs' claim of "direct discrimination" or "discriminatory effect" fails as a matter of law........................5

        2.    Appellants' *Pike* dormant Commerce Clause claim also fails, given the Supreme Court's recent clarifications on *Pike's* reach. ...............................................................13

    B.    The Act is not preempted by the FMIA.............................................16

        3.    The FMIA does not expressly preempt the Act.......................18

        4.    The FMIA also does not impliedly preempt the Act. ..............25

IV.   Conclusion ..........................................................................27

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008)..........................................16

*Associated Industries of Massachusetts v. Snow,*
   *717 F. Supp. 951 (D. Mass. 1989)* ..........................................22, 23

*Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021)...................20

*Chamber of Commerce v. Whiting*, 563 U.S. 582 ...........................25, 26

*Compare Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017)...................................................26

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
476 F.3d 326 (5th Cir. 2007)....................................................17

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978)..............11, 14, 15

*Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064 (N.D. Iowa 2020)...........20

*Foster Poultry Farms, Inc.*, 61 Cal. App. 5th 203 (2021).......................27

*Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88 (1992)...............26

*Hines v. Davidowitz*, 312 U.S. 52 (1941)..............................................27

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996).........................................16

*Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981).............................14

*Nat'l Meat Ass'n v. Harris*, 565 U.S. 452 (2012) ...........................passim

*National Pork Producers Council v. Ross*, 598 U.S. 356 (2023)....................passim

*Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997)...........................23

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).......................................13, 14, 15

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947)..........................................16

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
550 U.S. 330 (2007) ...............................................................14

*United States v. Agnew*, 931 F.2d 1397 (10th Cir. 1991)......................................16

*Wyeth v. Levine*, 555 U.S. 555 (2009).................................................16

# STATUTES

15 U.S.C. § 1331 ....................................................................................23, 24

21 U.S.C. § 601 ..................................................................................1, 4, 16

21 U.S.C. § 610(b) ........................................................................................17

21 U.S.C. § 678 .............................................................................................18

21 U.S.C. §661(a) .........................................................................................16

7 U.S.C. § 1901 ............................................................................................17

Ariz. Rev. Stat. Ann. § 13-2910.07 .............................................................8

Cal. Penal Code Ann. § 599f(a)–(c) ..........................................................18

Colo. Rev. Stat. § 35-50.5-102 ....................................................................8

Mass. Gen. Laws Ch 129 § 1-2 ...........................................................3, 6, 7

Mass. Gen. Laws Ch. 129 § 1-1 ..................................................................25

Mass. Gen. Laws Ch. 129 § 1-3 .......................................................3, 5, 6, 7

Mass. Gen. Laws Ch. 129 § 1-6 ....................................................................6

Me. Rev. Stat. Ann. tit. 7, § 4020 ...............................................................8

Mich. Comp. Laws Ann. § 287.746(2) .........................................................8

N.J. Admin. Code § 2:8-7.4 ...........................................................................8

N.J. Stat. Ann. § 4:22-16.2 ...........................................................................8

Ohio Admin. Code 901:12-8-02 ....................................................................8

Or. Rev. Stat. § 600.150 ................................................................................7

R.I. Gen. Laws § 4-1.1-3 ...............................................................................8

# RULES

Fed. R. App. P. 26.1 ......................................................................................vi

Fed. R. App. P. 29(a) .....................................................................................1

Fed. R. App. P. 32 ........................................................................................29

# REGULATIONS

21 C.F.R. § 1140 .....................................................................................23, 24

## <u>STATE CONSTITUTIONAL PROVISIONS</u>

Fla. Const. art. X, § 21 ...........................................................................8

## <u>OTHER AUTHORITIES</u>

*Animal Health & Welfare*, Restaurant Brands Int'l,
   https://www.rbi.com/sustainability/responsible-sourcing/animal-welfares/.10

*Animal stewardship, including the care and humane treatment of animals, is one of
   our most important values*, Hormel Foods (Jan. 31, 2017),
   https://www.hormelfoods.com/newsroom/press-releases/hormel-foods-
   responds-supplier-
   video/#:~:text=As%20it%20relates%20to%20the,Hormel%20Foods%20Per
   sonnel%20Announcement. ...........................................................................10

*Animal Welfare Policy*, Kroger Co. (Aug. 2022),
   https://www.thekrogerco.com/wp-content/uploads/2022/08/The-Kroger-
   Co_AnimalWelfarePolicy.pdf.....................................................................11

*Animal Well-Being*, Albertson's Cos., https://www.albertsonscompanies.com/our-
   impact/products/animal-well-being/default.aspx .........................................11

Aramark, Aramark Global Sustainable Sourcing Policy 4 (Nov. 2023),
   https://www.aramark.com/content/dam/aramark/en/environmental-social-
   governance/climate-impact/source-
   responsibly/Aramark%20Sustainable%20Sourcing%20Policy%20-
   %20November%202023.pdf........................................................................11

*Conagra Brands: Frequently Asked Questions*, ConAgra,
   https://www.conagrabrands.com/frequently-asked-questions ......................11

*Farm Animal Welfare Policy*, Stop & Shop, https://stopandshop.com/pages/farm-
   animal-welfare-policy/ ................................................................................11

*Food Animal Welfare Commitments*, Target,
   https://corporate.target.com/sustainability-governance/responsible-supply-
   chains/animal-welfare ................................................................................11

*Frequently Asked Questions*, Niman Ranch, https: //www.nimanranch.com/faq/;
   *Making Prop 12 Compliant Pork Accessible*, PR News Wire (Sept. 20,
   2021), https://www.prnewswire.com/news-releases/making-prop-12-
   compliant-pork-accessible-301380630.html.................................................10

Katie Doherty, *Smithfield: on Track for Crate-Free Sows by '17*, Arkansas
   Democrat Gazette (Jan. 2013).......................................................................9

Massachusetts Animal Cruelty Task Force, Animal Cruelty and Protection Task Force: Findings and Recommendations 10 (July 2016)................................20

*Smithfield Foods Recommends Its Contract Growers Convert to Group Housing for Pregnant Sows*, Globe Newswire (Jan. 7, 2014).......................................9

*Sow Housing*, Tyson Foods, https://www.tysonfoods. com/news/viewpoints/sow-housing .................................................................................................................9

Starbucks, Starbucks Policy Statement (2021), https://content-prod-live.cert.starbucks.com/binary/v2/asset/143-71875.pdf.............................11

Stephanie Strom, *McDonald's Set to Phase Out Suppliers' Use of Sow Crates*, New York Times (Feb. 13, 2012) ..................................................10

Tim Carman, *Pork Industry Gives Sows Room to Move*, The Washington Post (May 29, 2012)............................................................................10

*Walmart Policies and Guidelines*, Walmart, https://corporate.walmart.com/policies .................................................................................................................10

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record for *amici curiae* certifies that neither Animal Wellness Action, a 501(c)(4) nonprofit corporation nor the Center for a Humane Economy, 501(c)(3) nonprofit corporation, as of this date, has a parent corporation and that no publicly held corporation holds 10% or more of their stock.

## RULE 29 CERTIFICATION

I, Jessica L. Blome, undersigned counsel for Animal Wellness Action, a 501(c)(4) nonprofit corporation; Animal Wellness Foundation, a 501(c)(3) nonprofit corporation; and the Center for a Humane Economy, a 501(c)(3) nonprofit corporation (collectively "Animal Advocates") certify that a party's counsel did not author this brief in whole or in part; neither a party nor a party's counsel contributed money that was intended to fund preparing or submitting this amicus curiae brief; and no person, other than the *amici curiae*, its members, or its counsels, contributed money that was intended to fund preparing or submitting the brief.

Dated: October 28, 2024

*/s/ Jessica L. Blome*
Jessica L. Blome

## ANIMAL ADVOCATES' AMICI CURIAE BRIEF
## IN SUPPORT OF APPELLEE'S BRIEF

Animal Wellness Action, a 501(c)(4) nonprofit corporation and the Center for a Humane Economy, a 501(c)(3) nonprofit corporation (collectively "Animal Advocates") respectfully request leave to file the accompanying *amici curiae* brief in support of appellees. Animal Advocates support appellee's brief because, first, the law in question does not violate the dormant Commerce Clause, and second, the law in question is not preempted, whether expressly or impliedly, by the Federal Meat Inspection Act, 21 U.S.C. § 601 *et seq*. Animal Advocates respectfully request that this Court uphold the district court's judgment.

Per Rule 29(a), counsel for Animal Advocates asked the parties for their consent to the filing of this brief, and both Appellees and Appellants consented to the filing of this brief. Animal Advocates therefore respectfully request leave of this Court to file this brief.

## I. Introduction and *Amici Curiae*'s Statement of Interest

Animal Wellness Action, a 501(c)(4) nonprofit corporation and the Center for a Humane Economy, a 501(c)(3) nonprofit corporation (collectively "Animal Advocates") have a special interest in this litigation and can offer their perspective on the balance between the federal and the state authority with regards to farmed animal issues generally, and intensive confinement and bans on its products specifically.

Animal Wellness Action, a 501(c)(4) nonprofit headquartered in Washington, D.C., works to promote animal welfare by advocating for the passage and enforcement of laws that protect animals from cruelty. It champions policies that alleviate the suffering of all animals, including pigs. Through its staff, extensive network of members and supporters, and collaborating organizations, Animal Wellness Action battles systemic forms of animal exploitation by advocating for the passage of laws that will protect animals from unnecessary cruelty, encouraging the enforcement of existing animal protection laws, lobbying for the election of candidates who care about animal causes, and building partnerships with groups, agencies, and other stakeholders.

The Center for a Humane Economy (the Center) is a 501(c)(3) nonprofit headquartered in Maryland. It is the first nonprofit of its kind, focusing specifically on influencing the conduct of corporations to forge a more humane economy. Its efforts include corporate engagement, advocacy campaigns, consumer education, and research and analysis of business practices. In a society where consumers, investors, and stakeholders consistently report a preference for the humane treatment of animals, the Center works to make these desires for social responsibility a reality.

In addition, the founder of Animal Wellness Action and the Center for a Humane Economy, Wayne Pacelle, has specialized knowledge and expertise in this

area, as Mr. Pacelle was personally involved in the creation of Question 3 while in his previous role as President and CEO of the Humane Society of the United States. Mr. Pacelle also initiated Proposition 12, the analogous California measure that survived Supreme Court review in 2023.

Animal Advocates file this brief to provide the court with their considered perspective on the balance between federal and state authority vis-à-vis prohibitions against the sale of products that arise out of intensive confinement practices. Animal Advocates have previously filed *amici curiae* briefs in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*NPPC v. Ross*") and in the lower court for this case. Both Question 3 and Proposition 12 were ballot initiatives intended to address certain concerns regarding the cruel confinement of certain animals. Question 3, also called the Massachusetts Act to Prevent Cruelty to Farm Animals ("the Act"), passed by a large margin in 2016. It accomplished two goals: first, prohibiting the in-state extreme confinement of breeding pigs, veal calves, and egg-laying hens; and second, banning the sale of products arising out of these specified animals, no matter where the production occurs. Mass. Gen. Laws 129 App. §§ 1-2, 1-3.

Animal Advocates do not address the procedural claims made by Triumph Foods and co-plaintiffs ("plaintiffs"). Animal Advocates additionally limit their argument to matters in which Animal Advocates have considered perspective and

special interest; specifically, the application of the dormant Commerce Clause with respect to sales bans and federal preemption under the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq*.

## III.     Argument

Plaintiffs bring this appeal seeking, on the one hand, to overturn a firmly-grounded district court decision related to federal preemption under the FMIA and, on the other, attempting to expand the preemptive reach of the dormant Commerce Clause, the argument for which the United States Supreme Court rejected just one year ago. *See NPPC v. Ross*, 598 U.S. at 35. In *NPPC v. Ross*, the National Pork Producers challenged California's Proposition 12, an almost identical state law regulating the in-state sale of animal products derived from cruelly confined animal, and not one of the nine Supreme Court justices sided with the pork industry and its attempt to circumvent fundamental state rights. In addition, contrary to the position taken by plaintiffs in this matter, the majority of Supreme Court justices decisively rejected the National Pork Producer's dormant Commerce Clause argument when it dismissed its challenge to Proposition 12.  For the reasons cited below, plaintiffs' appeal must fail as a matter of this clear and already established law.

### A.   The Massachusetts Act to Prevent Cruelty to Farm Animals does not violate the dormant Commerce Clause.

Plaintiffs have alleged that the Act and its regulations "discriminate in purpose and in effect against out-of-state farmers and processors impermissibly." Pls.' Am. Comp. 28. However, plaintiffs' arguments here defy common sense, Supreme Court precedent, and First Circuit law. The dormant Commerce Clause is meant to act as an appropriately tailored limit on states' protectionist impulses. However, plaintiffs would use it as a Constitutional cudgel that for-profit corporations can set upon state laws that they deem adverse to their business interests, even if the same state law would benefit other out-of-state business interests.

### 1. Farmer plaintiffs' claim of "direct discrimination" or "discriminatory effect" fails as a matter of law.

Plaintiffs argue that "Massachusetts defined the sales ban (and the farming practices prohibited) in a manner that applied to *none* of their farmers, but only to out-of-state farms supplying Massachusetts pork." Appellants' Br. 41. But this is an incorrect and misleading statement of how the Act's language operates.

First, the Act's prohibition against sale applies to any "[w]hole pork meat that…is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Mass. Gen. Laws 129 App. § 1-3. The application of the Act's sales ban turns solely on the nature of sow confinement, rather than any extra- or intra-state concern. In other words, the sales ban does not discriminate against "out-of-state" farmers, but rather evenhandedly regulates – as it may lawfully do –

sellers who would retail pork products from farmers, regardless of what state in which they may be located, who confine their animals in a "cruel" manner.

Second, despite farmer plaintiffs' claims to the contrary, the sales ban *does* apply to pork produced in-state. After all, a law prohibiting certain activity (namely, cruelly confining sows within the boundaries of Massachusetts) does not magically render that activity infeasible within state boundaries. A farmer located in Massachusetts could very well violate Section 1-2 of the Act, *id.* at § 1-2, by producing pork from intensively confined sows. This farmer would be culpable of violating only the functional prohibition contained within Section 1-2, which properly applies only to farm owners and operators located in Massachusetts. This farmer would be subject to a possible civil fine and/or injunctive relief for their violation, per Section 1-6 of the Act. *Id.* at § 1-6. Plaintiffs' claim that no pork producers in the state *currently* engage in cruel confinement practices does not alter that analysis, nor render the law discriminatory.

However, without Section 1-3 of the Act, the pork produced by that unlawful farmer could *still lawfully be sold within the confines of the state*. Therefore, the prohibition against the sale of that pork, then, is an *additional and separate* offense, and one that applies not to the entity raising the pigs but rather to "a business owner or operator knowingly engag[ing] in the sale" of prohibited products. *Id.* at § 1-3.

In this way, the sales ban does apply to products produced by in-state farmers, too, as an additional mechanism preventing pork produced from pigs raised by a Massachusetts farmer who violated Section 1-2 from entering the Massachusetts retail market. It only takes the intellectual exercise of removing Section 1-3 from the Act to illustrate how in-state pork produced in an unlawful manner could still be sold, *lawfully,* in the state, absent the sales ban. It is the sales ban that renders the sale, specifically, of these products unlawful, whether they were produced in-state or out. Were Section 1-2 to simultaneously prohibit the in-state use of gestation crates and the sale of that Massachusetts-produced pork, then Section 1-3 could be read to apply only to out-of-state producers. But that is not how the statute was constructed.

In addition to treating pig producers that cruelly confine sows anywhere, in any state, equally, the Act also does not discriminate against out-of-state farmers who do not use gestation crates, whether by choice or by function of law.

At least ten states other than Massachusetts ban the use of gestation crates within state boundaries. Appellants are correct in stating that no farmer in Massachusetts uses them. However, appellants omit the fact that no farmer in Arizona, California, Colorado, Florida, Maine, Michigan, Oregon, Rhode Island, or New Jersey may lawfully use them either, and come 2026, pig farmers in Ohio must cease this barbaric and cruel practice. *See* Or. Rev. Stat. § 600.150 (a 2007

Oregon statute phasing out in-state use of gestation crates by 2012); Colo. Rev.
Stat. § 35-50.5-102 (a 2008 Colorado statute phasing out in-state use of gestation
crates by 2018); R.I. Gen. Laws § 4-1.1-3 (a 2012 Rhode Island statute phasing out
in-state use of gestation crates by 2013); Ariz. Rev. Stat. Ann. § 13-2910.07 (a
2006 Arizona statute phasing out in-state use of gestation crates by 2012); Me.
Rev. Stat. Ann. tit. 7, § 4020 (a 2009 Maine statute phasing out in-state use of
gestation crates by 2011); Fla. Const. art. X, § 21 (a 2002 amendment to the
Florida constitution phasing out in-state use of gestation crates by 2008); Mich.
Comp. Laws Ann. § 287.746(2) (a 2009 statute phasing out in-state use of
gestation crates by 2019, but later extended to 2020); N.J. Stat. Ann. § 4:22-16.2
and N.J. Admin. Code § 2:8-7.4 (a statute passed in 2023 requiring the Department
of Agriculture to develop rules prohibiting the in-state use of gestation crates, and
the subsequent regulation); and Ohio Admin. Code 901:12-8-02 (a 2011 regulation
phasing out the in-state use of gestation crates by 2026). Here again, the Act
cannot be said to discriminate against these entirely out-of-state farmers.

Furthermore, even in the absence of any local legal requirement, many pork
farmers across the nation choose to raise their pigs outside of intensive
confinement either because they are small independent farmers choosing to raise a

premium product[1] or because because they supply to a large pork producer who requests or demands it.

Many of the biggest pork companies supply both gestation-crate-free pork and conventional pork, including Smithfield, Tyson, and Perdue,[2] and have been doing so on a large scale for well over a decade. As long ago as 2013, Smithfield, the largest pork supplier to the United States' domestic market, announced that nearly forty percent of sows in the company's United States-based farms were group-housed.[3] By 2014, the number of Smithfield sows out of crates had risen above fifty percent, and Smithfield was asking its contract farmers to do the same.[4] Tyson Foods states that as of December 2018, over half of all sows on farms supplying to Tyson were group-housed, "and [they] expect this number to grow."[5]

---

[1] In *NPPC v. Ross*, a coalition of "small and independent farming businesses, state farmers unions, and farm advocacy organizations," including but not limited to the Indiana Farmers Union, Iowa Farmers Union, Northwest Farmers Union, Pennsylvania Farmers Union, American Grassfed Association, Organic Farmers Association, Callicrate Pork, Gunthorp Farms, North Country Smokehouse, Ranch Foods Direct, Walnut Hill, and White Oak Pastures, filed an *amici curiae* brief before the Supreme Court in support of Proposition 12, describing the law as farmer-friendly.

[2] Perdue, d/b/a Niman Ranch, also filed an *amicus curiae* brief before the Supreme Court in support of Proposition 12.

[3] Katie Doherty, *Smithfield: on Track for Crate-Free Sows by '17*, Arkansas Democrat Gazette (Jan. 2013).

[4] *Smithfield Foods Recommends Its Contract Growers Convert to Group Housing for Pregnant Sows*, Globe Newswire (Jan. 7, 2014).

[5] *Sow Housing*, Tyson Foods, https://www.tysonfoods. com/news/viewpoints/sow-housing (last visited Oct. 20, 2024).

Some pork companies supply only Act-compliant pork: for example, all pork sold by Niman Ranch (over 750 family farms) and duBreton (over 300 farms) is gestation-crate free.[6]

The trend of major pork producers' forgoing the use of gestation crates is wholly unsurprising, given how many of the biggest corporate *buyers* of pork in the United States have publicly stated their intent to transition away from intensively confined pork, or have already done so. This includes McDonald's[7]; Walmart[8]; Hormel Foods[9]; Burger King[10]; Popeye's[11]; Tim Hortons[12]; Safeway[13];

---

[6] *See Frequently Asked Questions*, Niman Ranch, https: //www.nimanranch.com/faq/ (last visited Oct. 21, 2024); *Making Prop 12 Compliant Pork Accessible*, PR News Wire (Sept. 20, 2021), https://www.prnewswire.com/news-releases/making-prop-12-compliant-pork-accessible-301380630.html.

[7] Stephanie Strom, *McDonald's Set to Phase Out Suppliers' Use of Sow Crates*, New York Times (Feb. 13, 2012).

[8] *Walmart Policies and Guidelines*, Walmart, https://corporate.walmart.com/policies (last visited Oct. 21, 2024).

[9] *Animal stewardship, including the care and humane treatment of animals, is one of our most important values*, Hormel Foods (Jan. 31, 2017), https://www.hormelfoods.com/newsroom/press-releases/hormel-foods-responds-supplier-video/#:~:text=As%20it%20relates%20to%20the,Hormel%20Foods%20Personnel%20Announcement.

[10] Tim Carman, *Pork Industry Gives Sows Room to Move*, The Washington Post (May 29, 2012).

[11] *Animal Health & Welfare*, Restaurant Brands Int'l, https://www.rbi.com/sustainability/responsible-sourcing/animal-welfares/ (last visited Oct. 21, 2024).

[12] *Id*.

[13] Carman, *supra* note 10.

Wendy's[14]; Kroger[15]; Stop & Shop[16]; Target[17]; ConAgra[18]; Aramark[19]; Starbuck's[20]; Denny's[21]; and Albertson's,[22] among others.

Therefore, the sales ban will benefit some out-of-state farmers and close the Massachusetts market to other out-of-state farmers. The dormant Commerce Clause is not meant to protect certain farms over others, however. *See NPPC v. Ross*, 598 U.S. at 384 (distinguishing between a state law that shifts market share from one set of out-of-state firms to another set, as in *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), and a state law that serves state protectionist impulses). Rather, its purpose is to protect interstate commerce more generally against any single state's protectionist aims. Plaintiff farmers would have only themselves, a specific subset of farmers who happen to reside in various locations,

---

[14] *Id.*

[15] *Animal Welfare Policy*, Kroger Co. (Aug. 2022), https://www.thekrogerco.com/wp-content/uploads/2022/08/The-Kroger-Co_AnimalWelfarePolicy.pdf.

[16] *Farm Animal Welfare Policy*, Stop & Shop, https://stopandshop.com/pages/farm-animal-welfare-policy/ (last visited Oct. 21, 2024).

[17] *Food Animal Welfare Commitments*, Target, https://corporate.target.com/sustainability-governance/responsible-supply-chains/animal-welfare (last visited Oct. 21, 2024).

[18] *Conagra Brands: Frequently Asked Questions*, ConAgra, https://www.conagrabrands.com/frequently-asked-questions (last visited Oct. 21, 2024).

[19] Aramark, Aramark Global Sustainable Sourcing Policy 4 (Nov. 2023), *available at* https://www.aramark.com/content/dam/aramark/en/environmental-social-governance/climate-impact/source-responsibly/Aramark%20Sustainable%20Sourcing%20Policy%20-%20November%202023.pdf.

[20] Starbucks, Starbucks Policy Statement (2021), *available at* https://content-prod-live.cert.starbucks.com/binary/v2/asset/143-71875.pdf.

[21] Carman, *supra* note 10.

[22] *Animal Well-Being*, Albertson's Cos., https://www.albertsonscompanies.com/our-impact/products/animal-well-being/default.aspx (last visited Oct. 21, 2024).

protected against the Act's so-called "discrimination" – but many of their out-of-state farmer colleagues would lose the benefits they gain from the Act, should plaintiff farmers' discrimination claim succeed. Plaintiff farmers seek protection only of their own business economic interests, which are not what the Commerce Clause is intended to guard.

Perhaps the most fatal blows to plaintiffs' discrimination argument is delivered by the Supreme Court itself which has already weighed in on the discrimination issue. *NPPC v. Ross,* 598 U.S. at 370-71. The National Pork Producers Council, an industry lobbying group purportedly representing the interests of hog producers across the country, moreover, has already conceded that California's Proposition 12—a law that, for all intents and purposes, is identical to Question 3—is not discriminatory.

As the *NPPC v. Ross* majority stated:

> Even under our received dormant Commerce Clause case law, petitioners begin in a tough spot. They do not allege that California's law seeks to advantage in-state firms or disadvantage out-of-state rivals. In fact, petitioners *disavow* any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones. As petitioners put it, "the dormant Commerce Clause . . . bar on protectionist state statutes that discriminate against interstate commerce . . . is not in issue here.

598 U.S. at 370-71.

Nor is it an issue here. The "tough spot" the pork industry found itself in during the Proposition 12 litigation is the same tough spot in which plaintiffs find themselves here. The Court must reject their discrimination claim.

> **2. Appellants' *Pike* dormant Commerce Clause claim also fails, given the Supreme Court's recent clarifications on *Pike's* reach.**

Plaintiff farmers also misapprehend the relevance of discriminatory effects in the context of analysis dormant Commerce Clause analysis, especially with regards to *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) and its ilk.

In *NPPC v. Ross*, the Supreme Court's majority clarified longstanding questions about the myriad forms a violation of the dormant Commerce Clause may take. After firmly rejecting the pork producer's vision of an "extraterritoriality" application of the dormant Commerce Clause, 598 U.S. at 371-376, the majority turned to petitioners' *Pike* argument.

Here, the Court's majority devoted substantial time – indeed the entirety of Part IV-A – to thoroughly explaining that an analysis determining whether a state law violates the dormant Commerce Clause due to the law's discriminatory practical effect *is in fact a* Pike *analysis*:

> As this Court has previously explained, "no clear line" separates the Pike line of cases from our core antidiscrimination precedent. … While many of our dormant Commerce Clause cases have asked whether a law exhibits "'facial discrimination,'" "several cases that have purported to apply [*Pike*,] including *Pike* itself," have "turned in whole or in part on the discriminatory character of the challenged

state regulations." [] In other words, if some of our cases focus on whether a state law discriminates on its face, *the* Pike *line serves as an important reminder that a law's practical effects may also disclose the presence of a discriminatory purpose.*

*Id.*, 598 U.S. at 377 (citations omitted) (emphasis added). The Court then provided a litany of case law, each of which, the Court explains, illustrates how any *Pike* analysis is fundamentally an interrogation of discriminatory purpose and character. *Id.*, 598 U.S. at 377-280 (citing *Pike* itself; *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456 (1981); *Exxon Corp.*, 437 U.S. 117; and *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007), among others). Finally, the Court concluded by referring to "many scholars" who have "identified the core congruity between our core [antidiscrimination] dormant Commerce Clause precedents and the *Pike* line," and credited Harvard professor Richard Fallon's "observ[ation] that that *Pike* serves to 'smoke out' a hidden protectionism." *Id.*, 598 U.S. at 379 (citing R. Fallon, The Dynamic Constitution 311 (2d ed. 2013)).

The Court's clarification of the relationship between the *Pike* line of cases and discriminatory effects was not necessary, since, as the Court stated, the petitioners in *NPPC v. Ross* had not "suggest[ed] that practical effects in operation would disclose purposeful discrimination against out-of-state businesses." *Id.*, 598 U.S. at 379. Possibly the Court, in a rare instance of judicial initiative, chose to

clarify fundamental questions about dormant Commerce Clause jurisprudence given the confusion that had mired dormant Commerce Clause analyses for years.

Plaintiffs' *Pike* claim fails here as a matter of law for the same reasons. Namely, per the *NPPC v. Ross* majority, the analysis under *Pike* is, at its core, an analysis of whether the law in question has discriminatory effects that turn on in-state versus out-of-state character. "In each of these cases and many more, the presence or absence of discrimination in practice proved decisive," the Court majority stated plainly. *Id.* at 378. In other words, the balancing for which the *Pike* test strives allows the court to determine whether a law has a discriminatory purpose when that law is facially neutral.

The intent of the Act here is not Massachusetts economic protectionism; rather, it is the protection of Massachusetts citizens' interests in consuming humanely raised pork products. Therefore, the lower court did not need to conduct fact-finding on the *Pike* claims because plaintiffs' argument that the Act is discriminatory fails as a matter of both common sense and established law. Because the Act does not discriminate against out-of-state actors *because of* their out-of-state character, a court need not proceed to balance competing interests in order to "smoke out" whether discriminatory protectionism lies underneath. *See also Exxon Corp.*, 437 U.S. at 127-28 (holding that, despite the Maryland statute's

burden falling entirely on interstate firms, the statute nevertheless does not violate

dormant Commerce Clause).

### B.    The Act is not preempted by the FMIA.

Even before any inquiry into preemption begins, plaintiffs face a steep uphill

battle due to the strong presumption against federal preemption of state law and,

more broadly, the well-balanced federalism our system guards, especially with

respect to historic police powers of states. See *Altria Grp., Inc. v. Good*, 555 U.S.

70, 77 (2008) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The "two cornerstones" of preemption analysis are, first, "Congressional intent [as]

the ultimate touchstone," and second, a strong presumption against preemption.

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518

U.S. at 494 (alteration in original) (internal quotation marks omitted).

The FMIA's intent is plainly stated within the statutory language itself: "[i]t

is the policy of the Congress to protect the consuming public from meat and meat

food products that are adulterated or misbranded and to assist in efforts by State

and other Government agencies to accomplish this objective." 21 U.S.C. §661(a).

Under the FMIA, an "adulterated" product is one which has become or been

rendered unhealthy, dangerous, or otherwise unfit for human consumption for

safety and health reasons, and nothing more.  21 U.S. Code § 601(m); *see, e.g.*,

*United States v. Agnew*, 931 F.2d 1397, 1404 (10th Cir. 1991), *cert. denied*, 112

S.Ct. 237 (1991) (finding that the term "adulterated" clearly means meat that is unfit for human consumption due to potentially being unsafe, rather than any other issue with it, despite the possible alternative meanings of terms such as "unsound").

In 1978, Congress inserted a newly expanded Humane Methods of Slaughter Act of 1978 ("HMSA"), 7 U.S.C. § 1901 *et seq.*, into the FMIA framework. 21 U.S.C. § 610(b); *see Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 456 (2012) ("*Harris*"). Congress narrowly confined the purpose of HMSA, however, to slaughter. Accordingly, the HMSA ensures that "the slaughtering of livestock and the handling of livestock in connection with slaughter shall be carried out only by humane methods." 7 U.S.C. § 1901. The HMSA does not apply until animals destined for slaughter step off the transport truck at the slaughterhouse. Neither the HMSA nor any other provision within the FMIA addresses transportation of live animals, pre-slaughter confinement, or any aspect of animal husbandry outside of a connection to slaughter. Congress did not intend, and the FMIA cannot be read, to preempt state animal protection or anti-cruelty laws outside of the slaughterhouse, including laws governing which types of meat may be sold for, whether it be meat from horses or cruelly confined pigs. *See Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) (finding that a ban on horsemeat is not preempted; the FMIA directs "meat packaging, inspection and

labeling regulations" due to a need for nationwide uniformity, but "there is no similar need for uniformity with regard *to what types of meat states permit to be sold*" (emphasis added)).

### 3. The FMIA does not expressly preempt the Act.

The FMIA's express preemption clause prohibits states from "impos[ing]" "[r]equirements *within the scope* of [the FMIA] *with respect to premises, facilities and operations of any establishment at which inspection is provided under* . . . [the FMIA] which are in addition to, or different than those made under [the FMIA]." 21 U.S.C. § 678 (emphases added). Plaintiffs argue that because the Act falls within the scope of the FMIA and "regulates" plaintiffs, the Act runs afoul of the FMIA's proscription against express preemption. Neither is true.

As a preliminary matter, plaintiffs repeatedly deploy *Harris* to assert that the Act is preempted by the FMIA. But *Harris* is easily distinguishable from the facts here, as the lower court correctly ascertained. The California law at issue in *Harris* prohibited slaughterhouses from "buy[ing], sell[ing], or receiv[ing] a nonambulatory animal"; "process[ing], butcher[ing], or sell[ing] meat or products of nonambulatory animals for human consumption"; or "hold[ing] a nonambulatory animal without taking immediate action to humanely euthanize the animal." Cal. Penal Code Ann. § 599f(a)–(c).

The *Harris* Court found that this law was preempted for two reasons. First, the FMIA and implementing regulations *explicitly* address the handling of nonambulatory livestock during the slaughter process, so the many prohibitions contained in the California law "in essence … substitute[d] a new regulatory regime" in place of the FMIA's and FSIS's. *Harris*, 565 U.S. at 460. Second, the sales ban *operated impermissibly within* the rest of the statute. Despite the Court's acknowledgement that "the FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses," *id.* at 463 (quoting Br. for United States as *amicus curiae*, at 17), the Court still found the sales ban unlawful due to the sales ban's placement within the broader statute and function as an enforcement mechanism for the statute's other rules on what to do (or not to do) with nonambulatory animals – in other words, an enforcement mechanism for a whole "new regulatory regime." *Id.* at 463–64 (describing the sales ban as "a criminal proscription calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia").

Massachusetts' Act, in contrast, exists in a space wholly untouched by the FMIA: the regulation of on-farm conditions of confinement. The Act therefore falls outside the scope of the FMIA and can be easily distinguished from the law analyzed in *Harris*. Indeed, the Act reflects new regulation in an unregulated area

of farmed animal production practices; there is no "old" regulatory regime to supplant. *See, e.g.*, *Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064, 1083 (N.D. Iowa 2020), *aff'd sub nom. Buljic v. Tyson Foods, Inc.*, 22 F.4th 730 (8th Cir. 2021) (finding that Covid-19 pandemic safety procedures to be outside the scope of the FMIA, despite Food Safety and Inspection Service regulations regarding infectious diseases).

States began formulating laws against animal cruelty hundreds of years ago (indeed Massachusetts has one of the oldest, if not the oldest, in the nation[23]), and these laws are now part of the typical fabric of state governance. They address a range of legitimate local interests about activities occurring in their state: from malicious cruelty and animal fighting, to commercial puppy mills, to canine rabies vaccinations, to wildlife trafficking and zoonotic disease prevention, and many more. In the face of these advancements, Congress has remained silent on the subject of farmed animal confinement, much less humane husbandry or sales of products from intensively confined animals. Humane standards for the raising of farmed animals remain entirely within states' purview; right now, fifteen states (and counting) have laws addressing the intensive confinement of farmed animals. Even in *NPPC v. Ross*, Justice Gorsuch pointedly remarked that "Congress has yet

---

[23] Massachusetts Animal Cruelty Task Force, Animal Cruelty and Protection Task Force: Findings and Recommendations 10 (July 2016).

to adopt any statute that might displace Proposition 12 or laws regulating pork production in other States," and cited a host of unadopted federal bills. *NPPC v. Ross*, 598 U.S. at 368.

Second, while plaintiffs contend that "the sales ban *directly creates* additional or different requirements on FMIA establishments," and "the Act's effects *necessitate* additional or different operational procedures from those within the FMIA and FSIS regulations," Appellants' Br. 58 (emphases added), these claims are not just overstated but are also incorrect.

The *Harris* Court explained that "[t]he FMIA's preemption clause expressly focuses on 'premises, facilities and operations'—at bottom, the slaughtering and processing of animals at a given location … and the distinction between a slaughterhouse's site-based activities and its more far-flung commercial dealings … is a fundamental feature of the FMIA's preemption clause." *Harris*, 565 U.S. at 463. In other words, the FMIA does not generally preempt laws that impact a slaughterhouse's "more far-flung commercial dealings," i.e., any potential sales activity that could be impacted by the Act. *Harris* represents the *exception*, rather than the *rule*, and this the plaintiffs fail to understand.

The Act here does not regulate the handling of pigs around the point of slaughter. Nor does it speak to the pre- or post-mortem inspection of carcasses, nor the act of slaughter itself. In fact, the ethical concerns that are the impetus for, and

implicated by, the Act are concerns over pigs that are the *most* removed, both in a spatial and temporal sense, from the slaughter process. Mother pigs protected by the Act breed the piglets who will be slaughtered eventually. These piglets are primarily purposed for slaughter, whereas the mother pigs' primary purpose was to breed.

Along with plaintiffs' misreading of *Harris*, plaintiffs also misapply First Circuit case law to support their preemption argument. However, despite plaintiffs' flawed references to First Circuit cases, *see* Appellants' Br. 52, First Circuit law does not stand for the proposition that a law's broad collateral effects on other actors or subjects is the focus of a preemption inquiry. Rather, the preemption inquiry looks to the effect of the local law on the local law's own stated purpose(s), which is a narrower and more circumspect effects analysis. In *Associated Indus. of Massachusetts v. Snow*, the First Circuit explains, "[r]ather than attempt to divine the Massachusetts Legislature's intent in enacting its asbestos legislation, we look instead to the effect of the regulatory scheme. That is, we examine *the effect that the Massachusetts standards have on their two stated purposes*, the protection of 'the general public and the occupational health and safety of workers.'" 898 F.2d 274, 279–80 (1st Cir. 1990) (emphasis added). The *Snow* court also gave a reason for adopting this preemption inquiry methodology: "[t]he Massachusetts Legislature does not publish an official record of the hearings, debates, drafts and

redrafts which constitute the legislative history of a statute." *Snow*, 898 F.2d at 279 n.5. In other words, given the absence of legislative history, a court should look to the law's effect on its own goals as a substantive and observable expression of said law's intent. *Id.*

*Philip Morris Inc. v. Harshbarger*, 122 F.3d 58 (1st Cir. 1997), is another instructive First Circuit case. In *Harshbarger*, the cigarette company plaintiff challenged Massachusetts' Disclosure Act, which required tobacco product manufacturers to disclose additives and nicotine-yield ratings of their products to a Commonwealth agency. These disclosures to the agency would become public. Plaintiff alleged that the Disclosure's Act requirement to disclose product ingredients and nicotine ratings violated 1) the Federal Cigarette Labeling and Advertising Act's ("FCLAA") express preemption clause mandating that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes," and 2) an analogous express preemption clause in the Smokeless Tobacco Act. *Id.* at 69.

The First Circuit's preemption holding rested on the resolution of a single dispute: whether the Disclosure Act's requirements were "with respect to the advertising or promotion of any cigarettes." *Id.* at 71-77. Similar to plaintiffs here, the cigarette manufacturers argued that "although styled as an agency reporting requirement, [the Disclosure Act] essentially compels them to communicate

additional smoking and health information to the public because the health department will make the information publicly available." *Id.* at 72. In other words, the *Harshbarger* plaintiffs alleged that the broad and inevitable effects of the law on the cigarette industry would amount to a state requirement "with respect to the advertising…of cigarettes." It was this, plaintiffs argued, that rendered the Disclosure Act preempted by the FCLAA and the Smokeless Tobacco Act. *Id.* at *Id.* at 71-72.

The First Circuit disagreed: "There would arguably appear to be little difference between requiring manufacturers to disseminate ingredient information directly to the public and requiring them to file such information with a state agency, which, in turn, will make the information publicly available," the court stated. *Id.* at 75. "*Nevertheless, there is a difference, and we are unpersuaded by the manufacturers' argument that the difference is not substantively important*." *Id.* at 75 (emphasis added). Next, the First Circuit "look[ed] to the *actual* effect of the state law," and found that the law's actual effect – requiring report filing to the state public health agency – did not "*require*" changes in advertising activities, and therefore the Disclosure Act was not preempted. *Id.* at 77 (emphases added). Notably, this was even though the Disclosure Act would likely lead to the disclosure of so-called trade secrets that were protected as confidential under the language of the FCLAA. *Id.* at 65. Federal protection against such information

being revealed by the *federal* agency, however, did not mean that a state a could not publicly disclose the same information in an effort to better protect the health and safety of its citizens. *Id.* at 65.

In sum, the correct preemption inquiry within the First Circuit is an examination of the narrow effect of a state law on that law's stated purpose, rather than engage in speculation about long-arm impacts on actors and industries elsewhere. With respect to the Act, this Court must examine what narrow effect the Act has on its purpose to "prevent animal cruelty by phasing out extreme methods of farm animal confinement," Mass. Gen. Laws 129 App. § 1-1. If the effect is to accomplish the prevention of animal cruelty from intensive confinement in an arena where there are no federal standards – which it certainly is – then the Act is not preempted. *See Snow*, 898 F.2d at 280 ("If the effect is to protect the public, the state regulation is not preempted. If the effect is solely to protect workers, the OSHA Standard prevails and the state regulation falls. If the effect is to protect the public by regulating workers and work[]places, the regulation stands because its ultimate effect is protection of the public").

### 4.  The FMIA also does not impliedly preempt the Act.

In *Chamber of Commerce v. Whiting*, a four-Justice plurality warned that "implied preemption analysis does not justify a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" which "'would

undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (quoting *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). The plurality then formally adopted a "high threshold" burden challengers like plaintiffs must overcome to establish implied federal preemption of state law.

Plaintiffs have failed to meet this high threshold in their argument for obstacle preemption (which can either be considered a subtype of conflict preemption, as implied by *Gade*, 505 U.S. at 98, or a separate third type of implied preemption). Plaintiffs claim that it "is the definition of a conflict" for "pork that has passed USDA inspection and approved for sale, is now otherwise deemed unfit for human consumption within Massachusetts and unable to be sold." Appellants' Br. 62.

First, the Act does not deem any products "unfit for human consumption" or "create additional, or different, requirements governing what constitutes safe, wholesome, and unadulterated pork products." Appellants' Br. 50. By its plain language, the Act prohibits the sale of certain products for numerous reasons, including, predominantly, animal cruelty concerns. *Compare Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1147-8 (9th Cir. 2017) (finding that the California state ban on products made by force-feeding birds was

not preempted by the Poultry Products Inspection Act [PPIA] because the force-feeding aspect, having nothing to do with physical composition of the product itself, was not an "ingredient requirement" under the PPIA's preemption clause) with *Leining v. Foster Poultry Farms, Inc.*, 61 Cal. App. 5th 203, 216 (2021), *as modified* (Mar. 15, 2021) (finding that a humane labelling claim was preempted by the PPIA because the FSIS had already determined that the meaning of the word "humane" should be left to the certifier).

Finally, there is no obstacle here. The Act does not "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the FMIA, given that the Congressional purpose and objectives behind the FMIA were only to ensure meat product food safety and humane slaughter. *See Hines v. Davidowitz*, 312 U.S. 52, 67, 70-71 (1941) (holding that a Pennsylvania naturalization law is preempted because federal power in the field of foreign relations is supreme; there has been enacted a broad and comprehensive federal naturalization system; there is a fundamental importance of immigration and naturalization laws to personal liberties; and there has been a history of political upheavals engendered by registration and naturalization laws).

## IV.     Conclusion

In summary, Animal Advocates respectfully request that the Court affirm the District Court's grant of summary judgment in favor of appellees.

Respectfully submitted this 28th day of October 2024.

_____

Jessica L. Blome
(Cal. Bar No. 314898)
GREENFIRE LAW, PC
2748 Adeline Street, Suite A
Berkeley, CA 94703
Ph/Fx: (510) 900-9502
Email: jblome@greenfirelaw.com

*Attorney for Animal Wellness Action and the Center for a Humane Economy*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32 because it has been prepared in 14-point Times New Roman, a proportionally spaced font. I further certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. 32 because it contains 6,272 words, excluding exempt material, according to the count of Microsoft Word.

Dated: October 28, 2024

*/s/ Jessica L. Blome*
Jessica L. Blome

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2024, I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the First Circuit by using the appellate CM/ECF system.

Dated: October 28, 2024

*/s/ Jessica L. Blome*
Jessica L. Blome