No. 24-1759

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC,
THE HANOR COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP,
EICHELBERGER FARMS, INC. AND ALLIED PRODUCERS' COOPERATIVE,
INDIVIDUALLY AND ON BEHALF OF ITS MEMBERS,

*Plaintiffs-Appellants*,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL
OF MASSACHUSETTS, AND ASHLEY RANDLE, IN HER OFFICIAL CAPACITY AS
MASSACHUSETTS COMMISSIONER OF AGRICULTURE,

*Defendants-Appellees*

On Appeal from the United States Court for the District of
Massachusetts, Case No. 1:23-cv-11671-WGY,
The Honorable William G. Young

## BRIEF OF ANIMAL PROTECTION ORGANIZATIONS AS
## *AMICI CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES

Bruce A. Wagman
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone: (415) 275-8540
Facsimile: (415) 275-8551
bwagman@rshc-law.com

Melissa Alpert
Rebecca Cary
The Humane Society of the
United States
1255 23rd St. NW, Suite 450
Washington, DC 20037
Telephone: (202) 452-1100
malpert@humanesociety.org
rcary@humanesociety.org

*Counsel for Amici Curiae*

*Counsel for Amicus Curiae The
Humane Society of the United States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

DISCLOSURE STATEMENT ..................................................................1

INTEREST OF *AMICI CURIAE*............................................................2

INTRODUCTION......................................................................................2

ARGUMENT .............................................................................................4

I.   The FMIA Does Not Preempt State Laws Regulating Activities Outside Slaughterhouses...................................................................5

   A.   The FMIA's Express Preemption Clause Does Not Bar State Laws like Question 3, Even if They Incidentally Affect Slaughterhouses.................................................................6

      1.   The FMIA's Scope Does Not Cover On-Farm Activities..........8

      2.   Question 3 Imposes No Requirement on FMIA "Premises, Facilities, or Operations" "In Addition To, or Different Than" Federal Requirements .............................................................10

      3.   The FMIA Authorizes the State Regulations Appellants Complain About ...................................................................14

      4.   Appellants Misrepresent *National Meat Association v. Harris* 15

   B.   The FMIA Does Not Impliedly Preempt All State Laws Affecting Meat.......................................................................16

II.   Appellants' Dormant Commerce Claim Seeks to Relitigate *Ross* 19

   A.   Question 3 Does Not Discriminate Against Interstate Commerce ......................................................................................19

      1.   This Discrimination Claim Has Already Been Rejected .......20

      2.   *Amici* Drafted Question 3 For Animal Protection, Not Economic Protection.............................................................21

3.    Appellants' Discriminatory Effect Argument Was Rejected in *Ross*..............................................................................................24

B.    Appellants' *Pike*-Based Challenge is Foreclosed by *Ross*.........28

1.    Appellants Have the Same *Ross* Facts but Want Different Results...................................................................................29

2.    Question 3 Imposes No "Excessive Burden" Relative to "Putative Benefit" Under *Pike*................................................30

III.    Appellants' Remaining Arguments Are Equally Meritless........34

CONCLUSION ........................................................................................35

CERTIFICATE OF COMPLIANCE .......................................................36

CERTIFICATE OF SERVICE.................................................................37

# TABLE OF AUTHORITIES

## CASES

*Animal Legal Def. Fund v. USDA*,
No. 12-cv-04028, Dkt. 26-1 (C.D. Cal. Nov. 28, 2012) .......................... 8

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*,
870 F.3d 1140 (9th Cir. 2017), *cert denied*, 139 S. Ct. 862 (2019) 8, 10, 18

*Barbuto v. Advantage Sales & Mktg., LLC*,
477 Mass. 456, 78 N.E.3d 37 (Mass. 2017)........................................ 22

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005)..................................................................... 11, 12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................ 34

*Cavel Int'l, Inc. v. Madigan*,
500 F.3d 551 (7th Cir. 2007)....................................................... 10, 17

*Cherry Hill Vineyard, LLC v. Baldacci*,
505 F.3d 28 (1st Cir. 2007) ............................................................... 20

*Cresenzi Bird Importers, Inc. v. State of New York*,
658 F. Supp. 1441 (S.D. N.Y. 1987), *aff'd sub nom.* 831 F.2d 410 (2d Cir. 1987)............................................................................................ 32

*Dunn v. Attorney General*,
474 Mass. 675, 54 N.E.3d 1 (Mass. 2016) ........................................ 24

*Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*,
476 F.3d 326 (5th Cir. 2007)................................................ 10, 17, 18

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978).............................................................. 25, 27, 31

*Fam. Winemakers of California v. Jenkins*,
592 F.3d 1 (1st Cir. 2010) ...................................................... 19, 24, 28

iv

*Hayslett v. Tyson Foods, Inc.*,
    No. 1:22-CV-1123, 2023 WL 3666091 (W.D. Tenn. May 25, 2023).... 13

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ................................................................. 16

*Iowa Pork Producers Ass'n v. Bonta*,
    No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) ........ *passim*

*Marrache v. Bacardi U.S.A., Inc.*,
    17 F.4th 1084 (11th Cir. 2021) ......................................... 18

*McKiver v. Murphy-Brown, LLC*,
    980 F.3d 937 (4th Cir. 2020) (Wilkinson, J., concurring) ................ 33

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................. 6

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ............................................................... 26

*N. Am. Meat Inst. v. Becerra*,
    No. 19-cv-08569, Dkt. 83 ....................................................... 21

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012) ............................................................ *passim*

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ............................................................ *passim*

*People v. Santorsola*,
    170 Cal. Rptr. 3d 819 (Cal. App. Dep't Super. Ct. 2014) .................. 10

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ............................................................ *passim*

*Truesdell v. Friedlander*,
    80 F.4th 762 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 1344 (2024)..... 25

*U.S. v. Stevens*,
    559 U.S. 460 (2010) ............................................................... 32

v

*Virginia Uranium, Inc. v. Warren,*
   587 U.S. 761 (2019) ............................................................ 9

*Williamson v. Lee Optical of Oklahoma Inc.,*
   348 U.S. 483 (1955) .......................................................... 34

*Wine And Spirits Retailers, Inc. v. Rhode Island,*
   481 F.3d 1 (1st Cir. 2007) ............................................... 26

**STATUTES**

21 U.S.C. § 601(m) ............................................................. 17

21 U.S.C. § 603 .................................................................... 8

21 U.S.C. § 678 ................................................ 7, 11, 13, 14

Cal. Health & Safety Code §§ 25990 ............................... 21

Cal. Health & Safety Code §§ 25991(e) ........................... 21

21 U.S.C. §§ 601 *et seq.* ................................................... 5, 8

M.G.L.A. 129 App. § 1-1 .............................................. 22, 33

M.G.L.A. 129 App. §§ 1-1–1-12 ......................................... 2

M.G.L.A. 129 App. §§ 1-2 ............................................. 5, 11

M.G.L.A. 129 App. §§ 1-3 ............................................. 5, 11

M.G.L.A. 129 App. §§ 1-5 ................................................... 5

M.G.L.A. §  129 App. 1-4 ................................................. 12

**RULES**

Fed. R. Civ. P. 12(b)(6) ..................................................... 34

**OTHER AUTHORITIES**

9 C.F.R. §§ 300.1 *et seq.* ...................................................... 8

84 Fed. Reg. 71359 (Dec. 27, 2019) .................................. 8

87 Fed. Reg. 48562 (Aug. 5, 2022)........................................................... 33

## DISCLOSURE STATEMENT

None of the *Amici Curiae* has a parent corporation. No publicly held company owns more than ten percent of stock in any of *Amici Curiae's* organizations.

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* The Humane Society of the United States, Animal Legal Defense Fund, Animal Equality, The Humane League, Farm Sanctuary, Compassion in World Farming USA, Animal Outlook, Massachusetts Society for the Prevention of Cruelty to Animals, and Animal Rescue League Boston were the primary proponents and advocates of the ballot initiative at issue in this case (now codified at M.G.L.A. 129 App. §§ 1-1–1-12; herein, "Question 3"). These animal protection organizations drafted and spent significant resources advocating for the passage of Question 3. *Amici* have substantial interest in the enforcement of this law, which is directly relevant to their core organizational missions. *Amici* can also provide unique perspective regarding the text and purpose of this law.

# INTRODUCTION

This case is an attempt by a segment of the pork industry to relitigate claims against common-sense state animal cruelty laws—

---

[1] Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief. No portion of the brief was authored by counsel for a party. No party, party's counsel, or any person other than *Amici* or their counsel contributed money intended to fund preparing or submitting this brief.

claims that have consistently and repeatedly failed in multiple federal courts, including the Supreme Court.

In 2016, Massachusetts voters enacted Question 3, the Prevention of Farm Animal Cruelty Act, a ballot initiative addressing animal cruelty by cleansing the state market of products derived from cruel animal confinement—including pork from "gestation crates" so small that sows are virtually immobilized their entire lives. Over six years later, Appellants filed this lawsuit to invalidate this popular state law. They asserted a litany of constitutional and statutory claims that all boil down to the same core complaint: that Question 3's sales ban has upstream effects on out-of-state companies keeping pigs in cruel confinement. But applicable law does not preclude states from passing even-handed laws that may inconvenience companies in other states. The Supreme Court recognized this principle last year when upholding California's materially indistinguishable law, Proposition 12. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023). And the Ninth Circuit recently upheld that law against challenges from the same law firm representing Appellants here, rejecting many of the same arguments advanced here.

3

*Iowa Pork Producers Ass'n v. Bonta*, No. 22-55336, 2024 WL 3158532 (9th Cir. June 25, 2024) (non-precedential) ("*IPPA*").

With no helpful facts or law, Appellants and their *Amici* make policy appeals, urging this Court to rule contrary to precedent—all because of a supposed threat that Question 3 will incite trade wars and collapse markets. *See, e.g.*, Br.[2] at 49, 66; *see generally* States *Amici* Br. But laws like Question 3 have been in effect for years now, and the pork market has not collapsed. The pork industry could not convince Congress to invalidate laws like Question 3, and now wants this Court to implement its preferred policy. This Court should not take the bait. "While the Constitution addresses many weighty issues, the type of pork chops [Massachusetts] merchants may sell is not on that list." *See Ross*, 598 U.S. at 364.

## ARGUMENT

Question 3 is an animal protection and public health measure, enacted pursuant to the state's police powers to regulate for the public health and morals. It prohibits in-state farmers from confining their breeding sows "in a manner that prevents the animal from lying down,

---

[2] "Br." means Appellants' brief, while "App.Br." means Appellees' brief.

standing up, fully extending the animal's limbs or turning around freely" and prohibits business operators from "knowingly engag[ing] in the sale within the Commonwealth" of covered meat products that are derived from animals confined in that manner. M.G.L.A. 129 App. §§ 1-2, 1-3, 1-5.

Like the many unsuccessful challenges to California's materially-identical law, Appellants' arguments are meritless, and the lower court's judgment should be affirmed. The Federal Meat Inspection Act, 21 U.S.C. §§ 601 *et seq.* ("FMIA"), a statute regulating slaughter and meat inspection at slaughterhouses, does not preempt a state sales ban barring cruelly-produced products. The dormant Commerce Clause, an implied negative power concerned with economic protectionism, likewise does not invalidate this even-handed law that imposes the same sales conditions on in-state and out-of-state producers alike. Appellants' assorted other arguments, largely derived from the dissenting opinion of a single Justice in *Ross*, are implausible.

## I.    The FMIA Does Not Preempt State Laws Regulating Activities Outside Slaughterhouses

"Despite the persistent efforts of certain pork producers, Congress has yet to adopt any statute that might displace . . . laws regulating pork

production." *Ross*, 598 U.S. at 368. This includes the FMIA. The lower court correctly held that Question 3 is not preempted as a matter of law.

Appellants essentially argue that Question 3 is preempted by the FMIA because, by implicating activities upstream and downstream of the slaughterhouse (on-farm animal treatment and in-state commercial sales), it impermissibly regulates the slaughterhouse's commercial tracing practices. This argument misunderstands the regulatory scheme the FMIA implements: a system of slaughter and meat inspection at regulated facilities, not a full federalization of the national meat market. It disregards the Act's express preemption language, which does not cover—and explicitly exempts—laws like Question 3. Appellants' attempt to bolster these fallacies with a misreading of *National Meat Association v. Harris*, 565 U.S. 452 (2012) ("*NMA*"), also fails.

### A.     The FMIA's Express Preemption Clause Does Not Bar State Laws like Question 3, Even if They Incidentally Affect Slaughterhouses

Congressional purpose is "the ultimate touchstone" in preemption analysis and "primarily is discerned from the language of the preemption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up, internal quotation

omitted). The FMIA's narrow preemption clause clearly does not cover Question 3.

The FMIA expressly preempts state "[r]equirements within the scope of [the FMIA] with respect to premises, facilities and operations of any establishment at which inspection is provided under . . . this chapter, which are in addition to, or different than those made under this chapter." 21 U.S.C. § 678.[3] This clause also expressly exempts two categories of state "[r]equirements" from preclusion: recordkeeping requirements, and other state actions consistent with the FMIA. *Id.*

Question 3 easily falls outside of this clause because it operates outside of FMIA's scope and imposes no legal mandates on FMIA-regulated activities—and in any case, would be permissible under the Act's two exemptions. Appellants ignore the FMIA's limited regulatory scheme and misread *NMA* to attempt to expand the FMIA's preemptive reach.

---

[3] The FMIA also contains labeling and ingredient provisions not at issue here.

7

### 1.   The FMIA's Scope Does Not Cover On-Farm Activities

Appellants seek to radically expand the FMIA's narrow purview by implying the Act reaches all aspects of the interstate meat market. It does not. The FMIA simply establishes a system of slaughter and meat inspection at designated facilities ("slaughtering, packing, meat-canning, rendering, [and] similar establishment[s]") covering slaughter of livestock and the "use in commerce" of "adulterated" meat products. 21 U.S.C. § 603.

The FMIA does not regulate animal welfare on farms, and the USDA and the Food Safety and Inspection Service ("FSIS") (the agency implementing this statute) have consistently disavowed the authority to regulate on-farm practices under the FMIA. *See generally* 21 U.S.C. §§ 601 *et seq.*; 9 C.F.R. §§ 300.1 *et seq.*; *see also* 84 Fed. Reg. 71359, 71361 (Dec. 27, 2019) ("FSIS does not have the authority to regulate on-farm animal production"); *cf. Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1148 (9th Cir. 2017), *cert denied*, 139 S. Ct. 862 (2019) (Poultry Products Inspection Act's ("PPIA's") identical preemption clause "cannot be read to reach animal husbandry practices"); *Animal Legal Def. Fund v. USDA*, No. 12-cv-04028, Dkt. 26-

1, Thaler Decl. ¶ 6 (C.D. Cal. Nov. 28, 2012) (disclaiming the "authority to regulate farm productions practices" under PPIA). This is consistent with the principle that a Congressional choice to regulate one element of a supply chain does *not* extend preemptive reach to the entire chain. *See Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 790-91 (2019) (Ginsburg, J., concurring) ("A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field.") (citing *NMA*); *id.* at 765 (opinion of Court) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

Appellants' assertion that "FSIS *could*" regulate on-farm activities is wrong. Br. at 60 (emphasis in original). But it is also irrelevant. Although Question 3 differentiates products based on how they were produced, its sales ban only regulates commercial conduct downstream of the farm, and of the slaughterhouse: in-state sales of cruel products. The Supreme Court has already rejected a claim that such a law regulates on-farm activity. *Ross*, 598 U.S. at 374 (rejecting challenge to Proposition 12 based on argument that it had "the 'practical effect' of 'controlling' extraterritorial commerce").

9

The Supreme Court made clear that the FMIA does not govern the "commercial sales activities of slaughterhouses," and its preemption clause generally does not foreclose state regulation of these activities. *NMA*, 565 U.S. at 463. Instead, it is focused on "at bottom, the slaughtering and processing of animals at a given location." *Id.*

Courts routinely find that laws governing conduct at a remove from FMIA facilities and FMIA-regulated activities fall outside the FMIA's preemptive scope. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007) (state ban on sale, import or export of horsemeat not preempted); *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007) (state ban on processing, sale or transfer of horsemeat not preempted); *People v. Santorsola*, 170 Cal. Rptr. 3d 819, 823 (Cal. App. Dep't Super. Ct. 2014) (animal cruelty charges at livestock auction not preempted); *cf. Canards*, 870 F.3d at 1150 (foie gras sales ban not preempted by PPIA). This Court should do the same.

### 2.  Question 3 Imposes No Requirement on FMIA "Premises, Facilities, or Operations" "In Addition To, or Different Than" Federal Requirements

The *Amici*—proponents and authors of Question 3—can state categorically that their ballot measure was never designed or intended to

regulate FMIA-inspected slaughterhouses. The measure originally included an exemption for sales at FMIA slaughterhouses. Appellants then litigated to excise that exemption from the statute, and succeeded. *See* Dkt. 125. Appellants now argue that, as a result of the exemption's removal, slaughterhouses' sales are impermissibly regulated by the statute in violation of the FMIA. They are wrong: Question 3 is still not aimed at slaughterhouses and still imposes no "requirements" there.

Appellants identify no viable Question 3 "requirement" "with respect to premises, facilities, or operations," let alone one that is "in addition to, or different than" a federal requirement under the FMIA. 21 U.S.C. § 678. Question 3 imposes no requirement on relevant "premises, facilities, or operations," which encompass only "the slaughtering and processing of animals at a given location." *NMA*, 565 U.S. at 463. A "requirement," for purposes of FMIA preemption, is a "rule of law that must be obeyed." *Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 445 (2005). A state law that may have an incidental effect, or "motivate[ ] an optional decision is not a requirement." *Id.* But Question 3's only "rules" apply far from slaughterhouses: banning in-state on-farm cruel confinement and sale of cruel products. M.G.L.A. 129 App. §§ 1-2, 1-3.

11

Appellants' attempts to conjure an applicable "requirement" fail. First, they allege that Question 3 prohibits slaughterhouses from selling non-compliant meat into Massachusetts (after their excision of the slaughterhouse sales exception). Br. at 58.[4] But, as Appellees' brief aptly explains, an FMIA-regulated facility's "far-flung commercial dealings" and "commercial activities" are specifically *not* the slaughtering and processing "operations" at issue in the preemption clause. App.Br. at 61–63; *NMA*, 565 U.S. at 463 & 467 n.10.

Second, Appellants allege that the inventory management changes they made to trace compliant pork are a Question 3 "requirement." Br. at 58. This is no "requirement"—no one is required to sell pork in Massachusetts, and Question 3 does not require or mandate "any particular way" of tracing if they do. *Cf. Bates*, 544 U.S. at 444. Voluntary change to business practices to accommodate clients is not a

---

[4] Appellants' fixation on Question 3's "slaughterhouse exception" as some kind of admission of preemption, Br. at 50, highlights their misunderstanding of that provision. This exception, along with the exclusion of confinement during slaughter from the definition of "cruel confinement," M.G.L.A. § 1-4, make clear that proponents of the law had no intention to regulate slaughterhouse activities. *Amici* disagree that the provision was discriminatory; however, Question 3 is not preempted with or without that exception.

"requirement"—and also falls squarely within the recordkeeping exception to the preemption clause, *infra* § I.A.3.[5]

Moreover, Appellants have not identified *any* federal requirement that Question 3 "requirement[s]" are allegedly "additional to or different than." 21 U.S.C. § 678. They must do so with specificity. *See Hayslett v. Tyson Foods, Inc.*, No. 1:22-CV-1123, 2023 WL 3666091, at *12–13 (W.D. Tenn. May 25, 2023) (rejecting FMIA preemption challenge based on "nothing more than the broad notion that COVID-19 vaccination falls within the scope of 'infectious disease'"). On that basis alone, their argument fails.[6]

---

[5] Appellants quote a colloquy with the district court, claiming the court found the tracing procedure was not "voluntary." Br. at 59-60 (quoting A2192-93). But the court's actual finding rejected Appellants' argument: "FSIS already requires[ ] a slaughterhouse [to] be able to identify where its pork meat came from" and "[o]rganizing and storing the pork to ensure that the Act[-]compliant pork is shipped together is no different than the storage procedures that Triumph is already following." Dkt. 171 at 14.

[6] Appellants now appear to have abandoned their vague invocation of a Voluntary Segregation Program that related entirely to *slaughter inspection* procedures, not to business-related tracking and segregation. *See* Dkt. 133 at 12 (*Amici* brief explaining inapplicability).

### 3.    The FMIA Authorizes the State Regulations Appellants Complain About

Question 3 is not preempted because it operates out of FMIA's scope and imposes no requirements on FMIA-regulated activities. But even if it did, it falls within the preemption clause's two exceptions. Appellants continue to ignore these on-point exceptions.

The recordkeeping exemption excludes state "recordkeeping and other requirements within the scope of section 642 of [the FMIA], if consistent therewith." 21 U.S.C. § 678. Appellants at most complain that they have made changes to business processes to trace Question 3-compliant pork—in other words, "recordkeeping" to track product.[7] As Appellees explained, even if Question 3 *were* to impose traceability requirements on slaughterhouses (which it does not), it would be permitted to do so under this exception. App.Br. 67.

The savings clause specifies that the FMIA "shall not preclude any State . . . from making requirement[s] or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 678. States thus may take "action[s]" that impact

---

[7] Triumph also admits it has adopted these measures and does not allege it is FMIA non-compliant, suggesting "consisten[cy]" with the FMIA.

slaughterhouses so long as they do not conflict with FMIA requirements: the FMIA distinguishes between state laws aimed at the same conduct as the FMIA (*e.g.*, slaughter) and those that only incidentally impact slaughterhouses. *NMA*, 565 U.S. at 467 n.10. Because Question 3 is "consistent with" the FMIA—and in fact regulates matters entirely outside of its scope—it falls under this savings clause.

### 4. Appellants Misrepresent *National Meat Association v. Harris*

Appellants' attempts to analogize Question 3's sales ban to the law at issue in *NMA*, which was directly aimed at slaughterhouses' slaughter decisions, are disingenuous at best. *NMA* invalidated a California law requiring slaughterhouses to humanely euthanize non-ambulatory animals, even though the FMIA permitted their slaughter for food. 565 U.S. at 460. That law was not a simple sales ban. *Cf.* Br. at 53–54. It also mandated slaughterhouses' euthanasia of non-ambulatory animals, and barred slaughterhouses from butchering non-ambulatory animals' meat for human consumption, effectively "substitut[ing] a new regulatory scheme for" FSIS's. *Id.* at 458–60. The sales ban in *NMA* was only invalidated because it was "calculated to help implement and enforce each of the section's other regulations." *Id.* at 463–64. Question 3 (a

simple sales ban on cruel products that facially *exempted* slaughterhouses) is not comparable to the law in *NMA*.

Moreover, *NMA* distinguished the California law from other laws not directed at core FMIA-regulated activity, because slaughterhouses are not immune from "laws of general application" or regulation of their "'commercial sales activities.'" *Id*. at 463, 467 n.10 (quoting United States' *Amicus* brief). It held: "the distinction between a slaughterhouse's site-based activities and its more far-flung commercial dealings is . . . a fundamental feature of the FMIA's preemption clause." *Id*. at 463. Question 3's impact on slaughterhouses, *if any*, is on the "commercial," non-core-FMIA activity that falls outside of the preemption clause. *NMA* also expressly distinguished the California law from laws that operate "at a remove from the sites and activities that the FMIA most directly governs," *id*. at 467—which is exactly what Question 3 covers with its sales ban based on on-farm treatment. *See also* App.Br. at 61-63.

## B.    The FMIA Does Not Impliedly Preempt All State Laws Affecting Meat

A state law is conflict-preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Question 3 poses

no obstacle to the FMIA's system of slaughter and meat inspection at regulated facilities. Appellants ignore statutory text with their unsupported theory of a totally federalized meat market.

First, Question 3 does not redefine the term "adulterated" under the FMIA. *Cf.* Br. at 62-63. "Adulterated", under the FMIA, means "filthy, putrid, or decomposed." 21 U.S.C. § 601(m). Question 3 in no way affects that determination. Massachusetts citizens voted for Question 3 because they did not want to be complicit in cruel farming practices, or have their health threatened by cruel products, even if the products are not "adulterated."

Second, Appellants misstate "the full purposes and objectives" of the FMIA, which establishes a system of slaughter and meat inspection, not a federalized interstate meat market. *Cf.* Br. at 63. "Congress did not intend to preempt the entire field of meat commerce under the FMIA." *Empacadora*, 476 F.3d at 334. The FMIA does not prevent states from passing laws that may impact the market, nor require that states make all products leaving slaughterhouses available for sale. The FMIA "in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." *Id.* at 333; *see also Cavel*,

17

500 F.3d at 554 (FMIA "is concerned with inspecting premises at which meat is produced for human consumption," not "preserving the production of particular types of meat"); *cf. Canards*, 870 F.3d at 1150. Federal approval of a product does not prevent state regulation of its sale. *See Empacadora*, 476 F.3d at 333; *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1095 (11th Cir. 2021) (federal approval of food additive did not "mandate[ ] individual states to allow the sale of alcohol containing [that additive]").

It is easy to comply with both the FMIA and Question 3, and Question 3 poses no obstacle to the FMIA's purposes. Appellants' only evidence of an "obstacle" is a single example of a farmer erroneously mislabeling pork as Question 3-compliant. Br. at 63. But the FMIA's "objectives" are not frustrated by human error. Appellants—and their *Amici*—also offer dire insupportable predictions of "economic harm across the national supply chain." Br. at 63, 66. Regardless of the dubious legal relevance of these suppositions, one year after Question 3 took effect, there is still no evidence this has happened.

The FMIA does not impliedly insulate Appellants from having to comply with laws they do not like in states where they choose to do

18

business. It simply prevents states from regulating FMIA activities: slaughter and inspection in slaughterhouses.

## II.    Appellants' Dormant Commerce Claim Seeks to Relitigate *Ross*

In *Ross*, the Supreme Court rejected a dormant Commerce Clause challenge to the materially-identical Proposition 12, and Appellants cannot distinguish this case from *Ross*. They offer hollow claims of "discrimination," but Question 3 (like Proposition 12) equally bars cruel products from in-state and out-of-state pork producers. Appellants' *Pike* claim is entirely foreclosed by *Ross*—and like in *Ross*, mistakes disparate impact claims for a burden on interstate commerce.

### A.    Question 3 Does Not Discriminate Against Interstate Commerce

Appellants admit that Question 3 is facially neutral, but nevertheless baselessly argue it has a discriminatory purpose and effect. *See* Br. at 38-48. Appellants bear the burden of proving that Question 3 imposes "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Fam. Winemakers of California v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (internal citation omitted). Appellants must adduce "substantial"

evidence of discrimination, not merely discriminatory "potential." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 37 (1st Cir. 2007).

Appellants do no such thing. As Question 3's biggest proponents, these *Amici* can attest that they expended considerable efforts advocating for this law in order to address cruel animal confinement—not to advance some clandestine farmer-protectionist agenda. And the law's actual text and history confirm this purpose: cleansing the market of products of animal cruelty. Appellants advance no viable theory of discriminatory effects—merely a disparate impact theory that courts have roundly rejected. Their dormant Commerce Claim is baseless.

### 1. This Discrimination Claim Has Already Been Rejected

This script has been rerun several times—always with the same result. Several cases challenged California's materially-identical Proposition 12, and discrimination claims were either rejected or recognized as futile.

Proposition 12, like Question 3, prohibits the in-state sale of whole pork meat derived from breeding pigs that are "confined in a cruel manner" (preventing them from "lying down, standing up, fully

extending [their] limbs, or turning around freely"), regardless of where the pigs are raised. Cal. Health & Safety Code §§ 25990, 25991(e).

Pork producers in *Ross* challenged Proposition 12 on dormant Commerce Clause grounds, but expressly "*disavow[ed]* any discrimination-based claim, conceding that Proposition 12 imposes the same burdens on in-state pork producers that it imposes on out-of-state ones." 565 U.S. at 370 (emphasis in original). North American Meat Institute had launched a similar discrimination-based challenge to Proposition 12, but voluntarily dismissed the suit following *Ross*. *N. Am. Meat Inst. v. Becerra*, No. 19-cv-08569, Dkt. 83, Stip. of Dismissal (June 15, 2023). Yet another pork trade-group (represented by Appellants' law firm) challenged Proposition 12 on discrimination grounds, making essentially the same arguments advanced here (that the law was discriminatory because in-state farmers were previously compliant). The Ninth Circuit affirmed the district court's firm rejection of those claims. *IPPA*, 2024 WL 3158532, at *1–*2.

### 2. *Amici* Drafted Question 3 For Animal Protection, Not Economic Protection

A law drafted by animal protection organizations, banning the sale of cruel products regardless of where they originate, and banning in-state

farmers from cruelly confining their animals, unsurprisingly has a purpose of animal protection, not economic protectionism. Appellants muster nothing to contradict this clear nondiscriminatory purpose.

The best evidence for a ballot measure's purpose is its text and its explanation in the Voter Guide. *Barbuto v. Advantage Sales & Mktg., LLC*, 477 Mass. 456, 469, 78 N.E.3d 37, 49 (Mass. 2017). Question 3's stated purpose is "to prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." M.G.L.A. 129 App. § 1-1. Its provisions are tailored to this purpose: (i) imposing an evenhanded sales ban on cruelly confined pork, wherever the animals were raised, and (ii) prohibiting in-state farmers from using cruel confinement. *Id*. §§ 1-2–1-3. The Voter Guide likewise explained that "a YES vote prevents cruel treatment of animals" and will "remove inhumane and unsafe products from the Massachusetts marketplace." A972.

Far from a law "designed to benefit in-state economic interests," *Ross*, 598 U.S. at 369, if anything, Question 3's confinement ban

22

*disadvantages* in-state farmers. It bars in-state cruel confinement practices even when in-state farmers sell pork out-of-state (where they may be undercut by out-of-state farmers' cheaper cruelly-confined sows). *See IPPA*, 2024 WL 3158532, at *1 n.2 (Proposition 12's similar provision "may place in-state farms at a competitive disadvantage with respect to sales to out-of-state buyers."). It also prevents in-state farmers from switching to intensive confinement practices—even if, as one farmer reported, they may want the "freedom to be able to use [gestation crates]" in the future.[8]

History also belies any protectionist claims. Massachusetts farmers overwhelmingly *opposed* Question 3: their trade association, the Massachusetts Farm Bureau, led the charge to defeat the initiative, and reported that their "6,000 members . . . are voting against the initiative."[9]

---

[8] Dkt. 95 at 12 (*Amici* brief citing Christian Wade, *Farm Cage Ban Bill Draws Opposing Views*, Daily News (Apr. 26. 2014), https://www.newburyportnews.com/news/local_news/farm-cage-ban-bill-draws-opposing-views/article_fa4bb25c-0aa3-5513-b286-3e76a7696b10.html.)

[9] *See* A1312-15 (Andrea Shea, *Containment Of Farm Animals: A Primer On Question 3 In Mass.*, WBUR (Sep. 20, 2016)).

If Question 3 was a conspiracy to benefit in-state farmers, why didn't any of them know—and why does it disadvantage them?

Appellants' snippets of quotes from a legislator and two unnamed "commentators," Br. at 45, are entirely irrelevant. Appellants' mischaracterization of dicta in *Dunn v. Attorney General*, 474 Mass. 675, 54 N.E.3d 1 (Mass. 2016), a state court case analyzing whether Question 3 was properly certified under the state's "related subjects" requirement for ballot initiatives, is no more probative. Br. at 46–47. If anything, *Dunn* confirmed that the law's confinement and sales provisions work together to accomplish "a common purpose of preventing farm animals from being caged in overly cramped conditions." 54 N.E.3d at 7.

### 3.    Appellants' Discriminatory Effect Argument Was Rejected in *Ross*

Question 3 has no discriminatory effects, because it does not "differential[ly] treat[ ]" in-state and out-of-state interests, and it is not protectionist. *Jenkins*, 592 F.3d at 9. It treats all suppliers even-handedly, barring cruel products regardless of origin.

To establish discriminatory effects, Appellants need to show that Question 3 "alter[s] conditions of competition" to boost in-state competitors' market share. *Id*. at 10. Appellants come nowhere close.

24

They merely complain that Question 3 disparately impacts out-of-state suppliers, because (i) out-of-state suppliers provide 99.5% of Massachusetts' pork, and (ii) in-state farmers already abandoned the cruel practices prohibited by the sales ban. *See* Br. at 41-43. These arguments have been rejected by other courts and fail as a matter of law.

Question 3 is not discriminatory merely because out-of-state farmers supply 99.5% of Massachusetts' pork supply. Br. at 42. A law is not discriminatory simply because most, or *all*, of its compliance costs are borne out-of-state. *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26 (1978) (the fact that "the burden of the divestiture requirements falls solely on interstate companies . . . does not lead, either logically or as a practical matter, to a conclusion that the State is discriminating against interstate commerce at the retail level"). Whenever a state "regulate[s] a market made up of primarily out-of-state suppliers[,] . . . *any* regulation of that market will affect more out-of-state suppliers than in-state ones." *Truesdell v. Friedlander*, 80 F.4th 762, 771 (6th Cir. 2023), *cert. denied*, 144 S. Ct. 1344, 1346 (2024) (emphasis in original). Instead, Appellants must show the law creates an affirmative protectionist advantage. They cannot. Laws that regulate even-handedly "without

regard to whether [the regulated products] are from outside the State" do not create a protectionist advantage. *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471-72 (1981); *see also IPPA,* 2024 WL 3158532, at *1-*2 (Proposition 12 not discriminatory).

Nor is Question 3 discriminatory because Massachusetts farmers do not employ the prohibited cruel confinement. *See IPPA*, 2024 WL 3158532, at *2 ("in-state producers may have felt less impact from Proposition 12 because they were already subject to the turnaround provisions of Proposition 2, [but] that does not demonstrate that Proposition 12 discriminates against out-of-state producers"). Question 3 establishes no advantage for in-state farmers—its sales ban on cruelly produced products applies equally to in-state and out-of-state producers. *See Wine And Spirits Retailers, Inc. v. Rhode Island*, 481 F.3d 1, 14 (1st Cir. 2007) (no discrimination where "no evidence of any carve-out or other device that would enable in-state entities to evade the challenged restrictions"). If anything, as noted *supra* § II.A.2, Question 3 *disadvantages* Massachusetts farmers by completely barring their use of cruel confinement methods.

26

Out-of-state suppliers are equally able to sell their products in-state, so long as they don't use cruel methods. Out-of-state producers have been on notice of Question 3's requirements since its 2016 passage, and many are already compliant. In 2023, "28% of the[ ] [pork] industry has already converted to some form of group housing for pregnant pigs" (instead of using gestation crates), 598 U.S. at 367, and many large pork suppliers have already confirmed their ability to comply with laws including Question 3.[10] Shifts in market share from noncompliant to compliant out-of-state producers raise no dormant Commerce Clause concern. *See Ross*, 598 U.S. at 384-85 (citing *Exxon*, 437 U.S. at 128).

Appellants offer nothing to indicate (let alone "substantial[ly]" establish), a discriminatory market shift. *See, e.g.*, A1356–64 (Appellants' Statement of Undisputed Material Facts complaining compliance costs will be "exclusively" borne out-of-state; no mention of market share shift); A197–216 (Appellants' expert report opining Question 3 will raise prices; no mention of market share shift). Given Appellants' allegations that in-

---

[10] Dkt. 56 at n.2 (*Amici* brief citing publications and statements from major pork suppliers, including Hormel Foods reporting "no risk of material losses from compliance" with Proposition 12 and Question 3, and Smithfield stating it will comply with these laws as a "leader in group housing").

state farmers can meet only 0.5% of in-state demand, Br. at 42, it is difficult to imagine any scenario where in-state farmers substantially overtake market share as compared to out-of-state suppliers. Appellants' imaginings that Question 3 could have some vague impact on "market share," *id.*, is not evidence.

Question 3 is thus entirely distinguishable from the facts of *Jenkins*, on which Appellants heavily rely. 592 F.3d at 1. There, the law's discriminatory purpose was clear from its gerrymandered definition of "small winery" and legislators' statements. *Id.* at 7. And its discriminatory effects were substantiated by evidence showing how the law advantaged in-state wineries with new distribution avenues. *Id.* at 11-12. Nothing in Question 3's plain text, history, or practical effect supports a finding of discriminatory purpose or effect.

### B.   Appellants' *Pike*-Based Challenge is Foreclosed by *Ross*

Appellants argue that the district court erred because it declined to perform the *Pike* analysis foreclosed by *Ross*. Br. at 36–37. The Ninth Circuit has already rejected this counsel's attempt to relitigate *Ross* on behalf of a different group of pork farmers, *IPPA*, 2024 WL 3158532, at *2-*3, and so should this Court.

28

### 1. Appellants Have the Same *Ross* Facts but Want Different Results

Appellants' "interstate burden" claim in this case is on all fours with that in *Ross*. *Ross* Appellants challenged the materially-identical Proposition 12 under the dormant Commerce Clause, arguing that (i) the law was *per se* invalid because it had the "practical effect of controlling commerce outside the State," and (ii) the law failed the *Pike* test because its burden on interstate commerce was "clearly excessive" in relation to its putative local benefits. *See Ross*, 598 U.S. at 371, 377; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). To support this argument, *Ross* plaintiffs made the same arguments Appellants make here: disputing the law's animal-protection and public health benefits and arguing it burdened interstate commerce because out-of-state firms would bear the majority of compliance costs. *Ross*, 598 U.S. at 367, 381.

The *Ross* Court rejected both arguments. It declined to adopt a *per se* extraterritoriality test, and it held Proposition 12 was not invalid under *Pike*. *Id*. at 382–86, 391.

Appellants do not explain why they should succeed on a *Pike* claim that failed in *Ross*. They merely complain that the district court should have conducted a kind of reverse-engineering of the *Ross* opinions to

29

determine how individual justices *might have* voted on a subset of issues purportedly presented by Question 3, and then re-assemble a new analysis finding Question 3 violates the dormant Commerce Clause. But their argument is futile. Even if *Ross* did preserve *some Pike* claims, it specifically rejected *this one*—with essentially the same arguments about essentially the same law.

### 2.    Question 3 Imposes No "Excessive Burden" Relative to "Putative Benefit" Under *Pike*

Appellants do not explain the substance of their *Pike* claim here, *see* Br. at 36-37, but as prior briefing showed, it is similar to the claim in *Ross* and equally meritless. Critically, like Proposition 12, Question 3 is an even-handed law that falls outside of the *Pike* heartland: protectionist laws. 598 U.S. at 380. Antidiscrimination is the "core" of all dormant Commerce Clause jurisprudence, and *Pike* analysis primarily assesses whether "a law's practical effects may also disclose the presence of a discriminatory purpose." *Id*. at 377.

Appellants just repeat the rejected claims from *Ross*. First, they imply the rejected "*per se*" extraterritoriality concerns. *See* Br. at 14 ("request[ing] this Court . . . prevent further irreparable harm caused by Massachusetts' extraterritorial over-regulation"); A713 (opposing Motion

to Dismiss *Pike* claims on the basis that "the Amended Complaint alleges broad, market-wide, and national impact the Act will have" and "how [Question 3] effectively creates a national regulation on pig-farming practices"); A52–53 (Amended Complaint alleging same).

Second, Appellants mistake burdens on *individual businesses* for a burden on interstate commerce. They argue that out-of-state farmers using cruel confinement will bear disproportionate compliance costs or be shut out of the Massachusetts market. But the Commerce Clause does not "protect[ ] the particular structure or methods of operation in a retail market… the Clause protects the interstate market, *not particular interstate firms*, from prohibitive or burdensome regulations." *Exxon*, 437 U.S. at 127–28 (emphasis added); *see also IPPA*, 2024 WL 3158532, at *3 ("The mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulations does not, on its own, suffice to establish a substantial burden on interstate commerce.") (internal citation omitted). Moreover, Appellants' dire predictions of doom to the pork market, Br. at 66, are belied by the fact that major players in the pork industry are already capable of selling

31

Question 3-compliant pork and have declared that laws like it will not be an impediment to their businesses. *See supra* p.27.

Meanwhile, like in *Ross*, Appellants ignore the local benefit—which, under *Pike*, need only be "putative." 397 U.S. at 142. Question 3 "serves moral and health interests of some (disputable) magnitude for in-state residents." 598 U.S. at 382. Massachusetts voters sought to eliminate certain cruel products from their market and to reduce public health risks associated with eating animals raised in extreme confinement. *See infra* § II.A.2.

Courts have long recognized that preventing animal cruelty—on its own—is a legitimate exercise of state police powers. *See Ross*, 598 U.S. at 365 ("States (and their predecessors) have long enacted laws aimed at protecting animal welfare," citing Question 3); *U.S. v. Stevens*, 559 U.S. 460, 469 (2010) ("the prohibition of animal cruelty itself has a long history in American law"). Courts also recognize that states can achieve this goal by prohibiting the sale of products of cruelty. *See Eleveurs*, 729 F.3d at 952 (foie gras ban may "prevent complicity in a practice that it deemed cruel to animals"); *Cresenzi Bird Importers, Inc. v. State of New York*, 658 F. Supp. 1441, 1447 (S.D. N.Y. 1987), *aff'd sub. nom.* 831 F.2d 410 (2d

Cir. 1987) (the "State has an interest in cleansing its markets of commerce which the Legislature finds to be unethical"); *see also Ross*, 598 U.S. at 381 ("States may sometimes ban the in-state sale of products they deem unethical or immoral without regard to where those products are made").

In addition to public concern about animal cruelty, voters were also concerned about the public health implications of meat derived from such conditions. A972; M.G.L.A. 129 App. § 1-1. It is "well-established that close confinement leads to the increased spread of disease between hogs" and that "humans are not far behind." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 980 (4th Cir. 2020) (Wilkinson, J., concurring) (internal quotation marks omitted).[11]

All Appellants can muster in response to the clear local benefit is that some cruel pork products, like sausage, remain on the market. Br. at 48. But Appellants' identification of *additional* cruel products does not

---

[11] *See also* USDA, Agric. Mktg. Serv., Proposed Rule to Amend Organic Livestock and Poultry Production Requirements, 87 Fed. Reg. 48562, 48570 & 48574 (Aug. 5, 2022) (providing animals "sufficient space and freedom to lie down, turn around, stand up, fully stretch their limbs" "may be positively associated with improved health and well-being . . . and may result in *healthier livestock products for human consumption*.") (emphasis added).

change the fact that the products banned by the law are also cruel: states are allowed to tackle issues "one step at a time," and the underinclusiveness does not raise constitutional concerns in this context. *Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 489 (1955).

## III.   Appellants' Remaining Arguments Are Equally Meritless

Because the remainder of Appellants' claims were not "plausible on [their] face" and are based on misunderstandings of applicable laws or demands to overturn settled precedent, they were correctly dismissed under Rule 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007). The State has aptly explained the facial deficiencies of each claim. App.Br. at 69–75. *Amici* need not repeat those arguments here, but note that several of these claims (Privileges and Immunities, Full Faith and Credit, and Export-Import) appear to be motivated by the dissent of a single Justice in *Ross*, who expressly took "no view on whether such an argument ultimately would succeed," *Ross*, 598 U.S. at 408-10 (Kavanaugh, J., concurring and dissenting), and others are simply a rehashing of arguments the Ninth Circuit already rejected. *See IPPA*, 2024 WL 3158532, at *4-5 (rejecting Packers and Stockyards Act, Due Process vagueness, and Privileges and Immunities claims).

34

## CONCLUSION

For the above-stated reasons, this Court should affirm the judgment below.

Respectfully submitted.

October 28, 2024

/s/ *Bruce A. Wagman*
Bruce A. Wagman (CSB No. 159987)
Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
Telephone: (415) 275-8540
Facsimile: (415) 275-8551
bwagman@rshc-law.com

*Counsel for Amici Curiae*

Melissa Alpert
Rebecca Cary
The Humane Society of the United States
1255 23rd St. NW, Suite 450
Washington, DC 20037
Telephone: (202) 452-1100
malpert@humanesociety.org
rcary@humanesociety.org

*Counsel for Amicus Curiae The Humane Society of the United States*

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains [6,446] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirement of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in Microsoft Word using 14-point Century Schoolbook, a proportionally sized typeface.

Dated: October 28, 2024          /s/ *Bruce A. Wagman*
                                 Bruce A. Wagman (CSB No. 159987)

## CERTIFICATE OF SERVICE

I, Bruce A. Wagman, hereby certify that, pursuant to Federal Rule of Appellate Procedure 25, I caused the foregoing to be filed through this Court's CM/ECF system, which will serve as notice of electronic filing on all registered users, including counsel for Plaintiffs-Appellants and Defendants-Appellees.

Dated: October 28, 2024          /s/ *Bruce A. Wagman*
                                 Bruce A. Wagman (CSB No. 159987)