No. 24-1759

In The
# United States Court of Appeals for the First Circuit

————————

Triumph Foods, LLC, Christensen Farms Midwest, LLC, The Hanor Company of Wisconsin, LLC, New Fashion Pork, LLP, Eichelberger Farms, Inc. and Allied Producers' Cooperative, Individually and on Behalf of its Members,

*Plaintiffs-Appellants*,

v.

Andrea Joy Campbell, in her official capacity as Attorney General of Massachusetts, and Ashely Randle, in her official capacity as Massachusetts Commissioner of Agriculture,

*Defendants-Appellants*,

————————

On Appeal from the United States Court
for the District of Massachusetts

Case No. 1:23-cv-11671-WGY, The Honorable William G. Young

————————

## REPLY BRIEF OF APPELLANTS

————————

Ryann A. Glenn
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
(402) 964-5000
ryann.glenn@huschblackwell.com

Michael T. Raupp
Cynthia L. Cordes
Spencer Tolson
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
(816) 983-8000
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com

*Counsel to Appellants*

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF CONTENTS ............................................................................i

TABLE OF AUTHORITIES................................................................ iii

INTRODUCTION ..................................................................................1

ARGUMENT ..........................................................................................2

I.    The Act Is Preempted By The FMIA................................................2

    A.    The Act is expressly preempted...............................................2

    B.    The Act is preempted by the FMIA through conflict preemption................................................................................12

II.    This Court Should Direct Judgment For The Farmer Appellants On Their Direct-Discrimination Claim Under The Dormant Commerce Clause ........................................................................15

III.    If This Court Does Not Direct Judgment In Favor Of Appellants, It Should Remand The Case To The District Court .....................22

    A.    FMIA preemption and direct discrimination........................22

    B.    *Pike v. Bruch Church* claims ...............................................22

        1.  The Court should remand Appellants' *Pike* claim to be heard on its merits .............................................................22

        2.  The Court should remand because of the district court's lack of Rule 56(f) notice...................................................24

    C.    Remaining Claims...................................................................29

        1.  Privileges and Immunities Clause....................................29

2.  Packers and Stockyards Act.............................................31

3.  Full Faith and Credit Clause...........................................31

4.  Due Process...............................................................32

5.  Import-Export Clause....................................................32

6.  Declaratory Relief and State Law Judicial Review .........32

CONCLUSION .................................................................33

CERTIFICATE OF COMPLIANCE ........................................35

CERTIFICATE OF SERVICE.................................................35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anvar v. Dwyer*,
  82 F.4th 1 (1st Cir. 2023) .................................................................... 17

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*,
  33 F.4th 1107 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 2493 (2023) ..... 10

*Cavel Int'l, Inc. v. Madigan*,
  500 F.3d 551 (7th Cir. 2007) ................................................................ 10

*Cherry Hill Vineyard, LLC v. Baldacci*,
  505 F.3d 28 (1st Cir. 2007) .................................................................. 16

*Council Of Ins. Agents & Brokers v. Juarbe-Jimenez*,
  443 F.3d 103 (1st Cir. 2006) ................................................................ 30

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000) ............................................................................. 13

*Dunn v. Attorney General*,
  474 Mass. 675, 54 N.E.3d 1 (2016) ................................................. 17, 18

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*,
  476 F.3d 326 (5th Cir. 2007) ................................................................ 10

*Exxon Corp. v. Governor of Maryland*,
  437 U.S. 117 (1978) ............................................................................. 19

*Family Winemakers of California v. Jenkins*,
  592 F.3d 1 (1st Cir. 2010) .................................................... 16, 17, 18, 20

*Haskell v. Harris*,
  669 F.3d 1049 (9th Cir. 2012) ............................................................. 16

*Hunt v. Washington State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ................................................................. 19

*Leyva v. On The Beach, Inc.,*
  171 F.3d 717 (1st Cir. 1999) .................................................. 28

*McCoy v. Town of Pittsfield,*
  59 F.4th 497 (1st Cir. 2023) ............................................. 25, 27

*Nat'l Meat Ass'n v. Harris,*
  565 U.S. 452 (2012) ........................................................ passim

*Nat'l Pork Producers Council v. Ross,*
  598 U.S. 356 (2023) ........................................................ passim

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ................................................................. 26

*Stella v. Town of Tewksbury,*
  4 F.3d 53 (1st Cir. 1993) ........................................................ 28

*Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue,*
  483 U.S. 232 (1987) ................................................................. 30

*United States v. Johnson,*
  467 F.3d 56 (1st Cir. 2006) .................................................... 24

## **Statutes**

21 U.S.C. § 601 ................................................................... 7, 13

21 U.S.C. § 603-06 .................................................................. 11

21 U.S.C. §§ 603-605 ................................................................. 5

21 U.S.C. § 608 ....................................................................... 11

21 U.S.C. § 678 ......................................................................... 8

Mass. Gen. Laws Ann. ch. 129 App., § 1-1 ..........................................4, 21

Mass. Gen. Laws Ann. ch. 129 App., § 1-5 .............................................21

Mass Gen. Laws App. Ch. 129, § 1-6 ........................................................8

## **<u>Regulations</u>**

9 C.F.R. § 309.................................................................................4, 5, 11

9 C.F.R. § 310........................................................................................5

9 C.F.R. § 311........................................................................................5

## **<u>Other Authorities</u>**

FSIS Directive 8080.1 (Dec. 19, 2023) .................................................7, 13

## INTRODUCTION

The district court struck an unconstitutional provision from the Act because it discriminated against out-of-state processors in favor of in-state ones. Defendants do not cross-appeal nor even criticize that ruling. So it is final: Massachusetts unconstitutionally discriminated against out-of-state processors, and the offending provision is stricken.

Why is that so important for this appeal? Because Defendants expressly admitted the reason Massachusetts included the unconstitutional provision *was to avoid preemption under the FMIA*. With that provision stricken, this case is straightforward. The Supreme Court's *Harris* decision—and its adherence to the FMIA's broad preemption clause—dictates the outcome. The Act's sales ban is preempted and must be enjoined.

This Court need not proceed further, but if it does, the sales ban should also be enjoined because it directly discriminates against out-of-state farmers. Binding precedent—this time from this Court—compels this result, too. For the same reasons this Court invalidated Massachusetts' unconstitutional discrimination against out-of-state companies in *Family Winemakers of California v. Jenkins*, it should

likewise invalidate this Act's sales ban.

And, finally, if the Court proceeds past those two dispositive issues, the district court's adjudication of the remaining claims was procedurally improper and wrong on the merits. Those errors require at least reversal with a remand to properly evaluate the claims.

This Court should reverse.

## ARGUMENT

## I.    The Act Is Preempted By The FMIA.

### A.    The Act is expressly preempted

The original Act included a FMIA-facility exemption to avoid preemption. The problem? That prospective fix unconstitutionally discriminated against out-of-state processors. So, the district court severed it. Now,[1] the Act undoubtedly imposes "additional" and "different" requirements for FMIA-regulated processors nationwide. That is exactly what the FMIA's broad preemption clause forbids, as explained in *National Meat Association v. Harris*.

*Harris* controls here, and Defendants' efforts to refute it miss the

---

[1] To be clear, the FMIA preempts the Act with or without the FMIA-facility exception—its removal makes preemption all the more clear.

mark. Before reaching the details, Defendants take a broad shot at *Harris,* suggesting the Court can ignore it because the Act doesn't expressly dictate slaughtering operations. Appellees Br. 63.

But this ignores *Harris*'s holding: states cannot enact preempted laws under the guise of a sales ban. It does not matter that the additional operations are not explicitly detailed in the Act itself; what matters is these operations are *required* because of the Act. *Harris*'s sales ban was rendered unconstitutional because it "***functions* as a command**" for slaughterhouses to adjust operations. *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (emphasis added). And here, by banning the sale of non-compliant pork meat into Massachusetts, FMIA establishments *must* adapt their operations to comply with the Act. This functions as a "command," regardless of whether it is expressly within the Act's text—just like in *Harris*. Any other result would mean "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved" and "make a mockery of the FMIA's preemption provision." *Id.* at 464. Tellingly, nothing in Defendants' brief is responsive to this central argument.

Thus, Defendants' effort to sidestep *Harris* fails. Moving then to a

detailed preemption analysis, the Act begins in a dubious spot. As the Court noted in *Harris*, the "Department of Agriculture's Food Safety and Inspection Service (FSIS) has responsibility for administering the FMIA to promote its dual goals of safe meat and humane slaughter." *Id.* at 456. The Act's express purposes include "prevent[ing] animal cruelty" and decreasing the "risk of foodborne illness." Mass. Gen. Laws Ann. ch. 129 App., § 1-1.

And when the analysis reaches the core of *Harris*—a detailed look at what is actually required at the processing facility—the record chronicles a bevy of undisputed operational changes compelled by the Act, permeating the *entire* slaughterhouse operation. Just as the law in *Harris* required "different" and "additional" procedures from the FMIA, the Act does the same. A few examples illustrate this.

To start, the FMIA dictates what a slaughterhouse may do with pigs that arrive on its premises for ante-mortem inspection, often while the pigs are still on the farmer's truck. *Harris*, 565 U.S. at 456; *see* 9 CFR § 309.1. The Act requires altering this process, forcing the slaughterhouse to segregate pigs upon arrival to ensure they remain segregated from non-compliant pigs. *See* A113 ("Triumph had to

establish a process to keep Question 3-compliant pigs separated from conventional pigs at all points during the processing and inspection process.").

Likewise, the FMIA dictates what pigs can pass ante-mortem and post-mortem inspection by USDA officials, identifies which pigs are deemed "condemned" or "suspect," requires further action taken by the slaughterhouse, and determines whether meat is fit for consumption. *Harris*, 565 U.S. at 457; *see* 9 CFR §§ 309.1, 309.2, 309.3, 310, 311; 21 U.S.C. §§ 603-605.

But the *Harris* law prevented non-ambulatory pigs from being processed into human food, even though the FMIA allowed those pigs to be processed under certain circumstances. *Harris*, 565 U.S. at 461. The Act here does the same thing. It prevents non-compliant pigs from being processed into human food for Massachusetts, at *all aspects of the slaughterhouse operations and even after meat leaves its facility*, by banning the sale of such meat. A113 ("This means separate trucks, separate unloading, separate receiving alleys, separate areas in the barns, separation through each and every aspect of the processing line inside the processing plant itself.").

This situation is indistinguishable from *Harris*. There, a unanimous Court found a slaughterhouse may process an animal's meat *that has not been condemned* under the FMIA's regulations. That same Court found California's proscription concerning non-ambulatory pig meat exceeded the FMIA's regulation of what meat passed inspection for human consumption. So too here. Massachusetts' supplementation of the FMIA's prescription for USDA-condemned or USDA-passed meat exceeds the FMIA.

And to be clear, the Act exceeds the FMIA in a more pervasive manner than even the *Harris* statute did. Separating non-ambulatory pigs from an operation is certainly disruptive to FMIA-facility operations and was properly rejected as preempted. Here, *all* aspects of operations are disrupted: new SKU's, new physical sorting procedures both ante-mortem and post-mortem, how pork is physically stored at and shipped from Triumph's facility, and new and different labeling to identify that pork as compliant. *See, e.g.*, Add.34; A107-09; A1907; A2102. As a result, the Act continues to affect FMIA-facility operations—and interfere with FMIA directives—even after the pork has left the facility. The natural effects of this impose additional conditions under which a FMIA-

regulated facility must conduct a "recall" that otherwise is not required by the USDA. Yet, the FMIA specifically governs when a meat product *must* be recalled because it may be unfit for human consumption. FSIS Directive 8080.1 (Dec. 19, 2023); 9 C.F.R. Part 418; 21 U.S.C. § 601. When a FMIA-facility attempts compliance with the Act, and non-compliant pigs are inadvertently sorted or processed with compliant pigs, *none* of the pork can be sold. If that pork is already processed and distributed, it all must be "recalled," wasted, and cannot enter Massachusetts. The express preemption violation could not be more clear: where the FSIS directs there should *not* be a recall based upon sow housing, and that product is USDA-approved as safe for consumption, the Act requires the opposite.

At bottom, the Act "compels them to deal with [non-compliant] pigs on their premises in ways that the federal Act and regulations do not." *Harris,* 565 U.S. at 970. Ultimately, the Act (and the statute at issue in *Harris*) require different actions by a slaughterhouse confronted with a delivery truck containing either a non-compliant or non-ambulatory pig than the FMIA requires. The "former says 'do not receive or buy them'; the latter does not." *Harris,* 565 U.S. at 462.

Contrary to Defendants' argument, it is absurd to characterize the operational changes implemented by Triumph to comply with the Act as "voluntary." Appellees Br. 63-65. If Triumph fails to comply with the Act, it is subject to civil fines and injunctive proceedings. *See* Mass Gen. Laws App. Ch. 129, § 1-6. But more relevant to the analysis, note the key caveat buried within Defendants' argument: "the Act neither requires segregation nor prohibits commingling of compliant and non-compliant product at any stage prior to slaughter or during shipment, ***so long as the products can be identified***." Appellees Br. 66 (emphasis added). This is *the entire* point of Triumph's argument; by requiring Triumph to do *something* extra inside its facilities, the Act runs afoul of the FMIA.[2] 21 U.S.C. § 678.

For this reason, it is unclear why Defendants claim Triumph already "tracks it supply of pigs and implements procedures to market and distribute differentiated products to customers nationwide." Appellees Br. 64-65. To begin, this is legally irrelevant—*voluntary*

---

[2] As detailed in the record below, this "something" is far from minor. The new required inventory-management procedures impose millions of dollars in costs with substantial impacts on operational efficiency. *See, e.g.*, A103-160; A1869-72; A1489-97.

procedures have no impact on a preemption analysis. It is the *compelled* nature of the Act's required segregation that runs afoul of the FMIA.[3] Factually speaking, prior to the Act, Triumph did not implement procedures to segregate the offspring of sows based on whether sows could turn around freely. But that is now *required*, both different from and in addition to the FMIA. And if Triumph doesn't comply, it loses access to an entire state marketplace. *Harris* forbids this.

So, how does this argument square with Defendants' citation to the "general rule" that the "FMIA's preemption clause does not usually foreclose state regulation of the commercial sales activities of slaughterhouses"? *Harris*, 565 U.S. at 464 (quotation omitted). The answer is simple: state regulation is permitted, even placing additional or differing requirements, so long as those requirements fall *outside* the scope of the FMIA's preemption clause. And perhaps the clearest example of such permissible regulation (which also shows why the Act does not

---

[3] To be sure, some operators may *choose* to produce meat from pigs housed only in certain ways and market it accordingly. If the market demands it, perhaps that's a successful business strategy. But action *compelled* by the state is what runs afoul of the FMIA. The market should dictate this consumer choice, not the State. And if further regulation is necessary, the FMIA makes clear it must come from the *federal* government.

fall within that category) arises in the out-of-circuit horsemeat and foie-gras cases Defendants overemphasize.

With respect to *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007) and *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007), they involved **wholesale** sales bans on horsemeat, not just bans on certain categories of horsemeat based upon how the horse was raised. As a result, the sales bans did not violate the FMIA, as the facilities would *never* process horsemeat. *Harris*, 565 U.S. at 467 ("When such a ban is in effect, no horses will be delivered to, inspected at, or handled by a slaughterhouse, because no horses will be ordered for purchase in the first instance.").

As for *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta*, 33 F.4th 1107 (9th Cir. 2022), *cert. denied*, 143 S.Ct. 2493 (2023), it involved application of the "ingredient requirement" portion of the Federal Poultry Inspection Act's preemption clause, not the "premises, facilities and operations" portion of the FMIA. Accordingly, the Ninth Circuit distinguished *Harris* because it "was an express preemption case about the 'operations' provision in another federal statute." *Id.* at 1115. And because of that, the *Éleveurs* plaintiffs *did not argue* the "the sales

10

ban affects slaughterhouse operations like the sales ban challenged in [*Harris*]." *Id.*

In a footnote, Defendants also argue FSIS has not regulated sow housing. But the question is not whether FSIS *has regulated* sow housing; the question is whether it *could. See Harris*, 565 U.S. at 466. And here, if the FSIS wanted to segregate pork based on how pigs were raised, it could. *See, e.g.*, 21 U.S.C. § 603-06, 608; *see also* 9 C.F.R. § 309.1-.2 & .19.[4] But it hasn't; meaning the Act's requirements "differ from those of the FMIA—not that [the Act]'s requirements fall outside the FMIA's scope." *Harris*, 565 U.S. at 466.[5]

In sum, the cases Defendants rely upon do not overcome *Harris*. As the above analysis shows, the requirements imposed by the Act are indistinguishable from those in *Harris and, in fact,* are far *more* invasive than those in *Harris*. Whereas that statute forced processors to take actions with live non-ambulatory pigs at discrete points in the facility

---

[4] And, of course, the federal government would regulate if it believed housing requirements of the sow impacted the health of the pork from the offspring. The absence of such regulation is telling.

[5] Defendants' recordkeeping-exception argument is a red herring. The allegations and evidence here show the Act does more than merely imposing "recordkeeping" requirements. A107-09; Add.34; A1907.

process, the Act compels tracking, segregation and processing requirements at every stage of production—from intake, to holding, to ante-mortem inspection, to slaughter, to post-mortem inspection, to storage, to packing, to labeling, to shipping. At each stage, the processor must ensure each pork chop can be traced back to a specific "compliant" sow. Otherwise, the Act deems them unfit for consumption and banned for sale. The FMIA's preemption clause forbids these additional requirements, and *Harris* confirms Defendants cannot circumvent FMIA preemption through a sales ban.

## B. The Act is preempted by the FMIA through conflict preemption

Because the Act's sales ban is expressly preempted, this Court can stop there. But if the Court moves to conflict preemption, Defendants ignored Appellants' main point of error: the district court applied the wrong conflict-preemption standard by comparing the stated purposes of the FMIA with *only one of* the purposes of the Act (to prevent animal cruelty) to see if there was any conflict, entirely ignoring the other purpose of the Act (to prevent foodborne illness). Add.68. Had the court looked at the entire purpose for both the Act and FMIA, one can see the undeniable overlap between the Act and FMIA's primary purpose: to

provide safe meat in interstate commerce. *See* A1866-67. Regardless, the proper question is whether the effect of the state law conflicts with the "natural effects" of the federal legislation. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373-74 (2000).

Here, the effect of the Act conflicts with the natural effects of the FMIA, creating a disruption in the federal administration of a comprehensive, long-standing system that ensures safe, unadulterated meat exists for consumers. Defendants further assert Triumph's forced "recall"[6] does not conflict with the natural effects of the FMIA any different than a labeling error would. Appellees Br. 68; A127. However, FSIS regulates the recall process. FSIS Directive 8080.1; 9 C.F.R. Part 418. As previously noted, if non-compliant pigs are inadvertently sorted or processed with compliant pigs, *none* of the product can be sold and, if distributed, it must be "recalled." And while the FSIS regulations do not require a recall in such a situation if that product is approved for

---

[6] Unlike the Act now, a labeling error, such as failing to disclose an allergen, would likely generate a recall by FSIS, as the product would be considered misbranded or potentially adulterated. *See* 21 U.S.C. § 601(n). In direct conflict with the Act, the FMIA does not require a recall for product misbranded or potentially adulterated simply based on how a sow was raised.

consumption, the Act conflicts and states the opposite. In this situation, a "recall" must take place, or the Act is violated.

This is not merely hypothetical. As the record demonstrates, Appellant Hanor made a delivery error to Triumph. Non-compliant pigs were erroneously designated as compliant were sorted and processed with compliant pigs at delivery to Triumph, and ultimately the pork products were shipped, "tainting" all the meat processed together and designated as compliant. When Hanor discovered the error after the product was in route for delivery, Triumph had to "recall" and discard *all* the product or face civil or criminal violations, despite that under the FMIA, the meat was approved for sale, safe for consumption, and no recall necessary. A127; A113-15.

In sum, Appellants' argument is simple: pork meat product that has passed FMIA inspection cannot be sold, because of the Act, and if erroneously processed it must be discarded, and if shipped, must be recalled. This conflicts with at least one of the purposes and natural effects of the FMIA, which was to obtain efficient and functional state and federal overlay on meat inspection, processing and distribution (including recalls). *See, e.g.*, A1866-69.

14

Moreover, Defendants failed to respond to the effects-based theory underpinning Appellants' conflict preemption claim. Ultimately, "if enough states pass enough regulations, Triumph's processing capacity, along with the rest of the industry, would slow, and we [Triumph] would be forced to further ration our products." A108. Defendants' ignorance of this risk is a taciturn endorsement of an interstate meat market overcome by a morass of 50 individual states' preferences, which is what led to the passage of the FMIA initially. *See* A1866-69.

*     *     *

Whether under express preemption or conflict preemption, the Act's sales ban is preempted by the FMIA. This Court should enjoin it, and the analysis can stop here.

## II. This Court Should Direct Judgment For The Farmer Appellants On Their Direct-Discrimination Claim Under The Dormant Commerce Clause.

If this Court proceeds past the dispositive preemption claims, the next stop is the dormant Commerce Clause, and, specifically, the Farmer Appellants' direct-discrimination claim. On this point, Defendants fixate on whether the Act discriminates facially, in purpose, or just in effect. To be clear, Farmer Appellants' direct discrimination claim is largely about

15

discriminatory *effects* of the Act. *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 33 (1st Cir. 2007). And those effects can be shown by many things, including legislative statements. Likely for this reason, Defendants attempt to justify the legislative statements about the Act and its discriminatory impact, but these arguments miss the point. Subjective awareness of a direct discriminatory consequence of legislation is at *least* evidence the effect—to exclusively target out-of-state farmers—was intended.[7] Indeed, in *Family Winemakers of California v. Jenkins*, this Court held a law was discriminatory when the state law had "effects on out-of-state [producers that] could easily be foreseen." 592 F.3d 1, 14 (1st Cir. 2010). And this "gap between Massachusetts's professed neutrality and [the challenged law]'s practical effects also underscore[d] the conclusion of discriminatory purpose." *Id.* at 14-15. As applied here, the Act's discriminatory impact was recognized not only by Massachusetts legislators, but by its very own courts. A1132-

---

[7]  Defendants also contend because the Act was "enacted by voters," Appellees Br. 37, the Act's "Voter Guide" is a better source of legislative intent. But state action is state action, no matter if enacted by voters or by legislators. *See Haskell v. Harris*, 669 F.3d 1049, 1070 (9th Cir. 2012) (in determining whether a law is unconstitutional, it "does not matter whether that law was enacted by the legislature or approved directly by the voters.").

34, A1308; *Dunn v. Attorney General*, 474 Mass. 675, 54 N.E.3d 1, 7 (2016).

Defendants next reference the Act's foreword, claiming it overcomes the Act's plain discriminatory effects. But whether a state law violates the dormant Commerce Clause is a holistic inquiry, considering "statutory context, legislative history, and other factors." *Jenkins*, 592 F.3d at 5 (quotation omitted). Perhaps most important is the *natural effect* of the Act and whether evidence shows the Act "impos[es] disproportionate burdens on out-of-state interests and confer[s] advantages upon in-state interests," *Anvar v. Dwyer*, 82 F.4th 1, 12 (1st Cir. 2023).

With respect to that evidence, Defendants claim the need for "substantial evidence" of discriminatory effect as there is no discriminatory purpose here. For reasons previously discussed, there was a discriminatory purpose here. Nonetheless, Defendants also contend the Act will not benefit Massachusetts' farmers, at least relative to out-of-state farmers, because "Massachusetts's in-state pork production cannot meaningfully expand due to geographic and other limitations." Appellees Br. 41. Comparatively, it is out-of-state actors who produce compliant

17

pork that will more likely take the new market share as opposed to those in-state. *Id.*

Even if this were somehow true, nothing in the record supports it. This Court should disregard Defendants' conjecture. Regardless, this turns the analysis on its head. The undisputed evidence shows in-state farmers now gain access to a larger market share at reduced cost relative to out-of-state farmers, as the sales ban prevents "out-of-states farmers . . . [from] underpricing their Massachusetts competitors." *Dunn*, 474 Mass. at 681, 54 N.E.3d at 7. Appellants detailed how "Triumph will be forced to avoid farmers who are not compliant with [the Act] in order to remain in the Massachusetts market[.]" A111. Appellants also detailed how the Act will result in increased production costs for pork producers outside of Massachusetts. *See, e.g.*, A118-123; A127-133; A139-145; A149-151; A156-160; A203–07. This is precisely what occurred in *Jenkins*, where the state law at issue had "[t]he ultimate effect of . . . artificially limit[ing] the playing field . . . in a way that enables Massachusetts's [businesses] to gain market share against their out-of-state competitors." *Jenkins*, 592 F.3d at 12.

The same discriminatory impact existed in *Hunt v. Washington*

*State Apple Advertising Commission.* There, the Supreme Court held the law banning apples from bearing a source-specific grade marking violated the dormant Commerce Clause because it was an "obvious . . . consequence" that the law "rais[ed] the costs of doing business in the North Carolina market for Washington apple growers and dealers, while leaving those of their North Carolina counterparts unaffected." 432 U.S. 333, 351 (1977). And this was because:

> North Carolina apple producers, unlike their Washington competitors, were not forced to alter their marketing practices in order to comply with the statute . . . .Obviously, the increased costs imposed by the statute would tend to shield the local apple industry from the competition of Washington apple growers and dealers . . . .

*Id.* So too here; the Act shields local commerce at the expense of out-of-state commerce, who must alter their practices with zero impact locally.

Defendants attempt to use *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978) to avoid the Act's discriminatory purpose and effect. But *Exxon* does not cure the Act's discriminatory effect. In *Exxon*, the Court evaluated a Maryland statute stating a producer or refiner of petroleum products (1) could not operate any retail service station within the state and (2) must extend all "voluntary allowances" uniformly to all service stations to which the producers supply. 437 U.S. at 119-20. The

19

Court held the statute did not discriminate, but for good reason: *all* gasoline sold in Maryland came from out-of-state refineries. Thus, it was *impossible* for the Maryland law to discriminate against interstate commerce because *no in-state producers existed to be benefitted by the law*. *Id.* at 121-22; *see also Jenkins*, 592 F.3d at 13 ("[A] law that restricts a market consisting entirely of out-of-state interests is not discriminatory because there is no local market to benefit. *Exxon* is not apposite where, as here, there is an in-state market and the law operates to its competitive benefit."). Not so here, where Massachusetts has its own hog farms and pork-production facilities. *See, e.g.*, A118-123; A127-133; A139-145; A149-151; A156-160; A203-07.

Defendants then attempt to distinguish this case from *Jenkins*, but their attempt falls flat. They argue *Jenkins* shouldn't apply because the law there "was enacted as a replacement for a facially discriminatory law recently struck down as unconstitutional." Appellees Br. 45. To begin, Defendants overlook that the same is essentially true here, where a portion of the Act has already been stricken as unconstitutional, a final order. In any event, that's a legally insignificant distinction—what matters is whether the effects of the Act discriminate. Here, they do.

To that end, Defendants also argue *Jenkins* is inapposite because the Act creates a single standard applicable to all producers no matter where they reside. But Defendants miss the forest for the trees: The problem in *Jenkins* was that a portion of the law benefited, uniquely, in-state interests. Here, too, the Act benefits uniquely in-state interests, because no gestation crates were being used in Massachusetts. And the sales ban helps protect those interests.

Finally, Defendants briefly turn to legitimate local interest. The Act presents two local interests to assess: 1) food safety and 2) animal welfare. *See* Mass. Gen. Laws Ann. ch. 129 App., § 1-1. With respect to the first, food safety is expressly assigned to the FMIA (which is likely why Defendants failed to discuss it). And with respect to animal welfare, the essential point of Appellants' argument goes unrefuted: the exemptions within the Act allow for such non-compliant products to be sold (*e.g.*, hotdogs, sausage, ground pork), period, just simply not as Whole Pork Meat. *Id.* § 1-5. If Massachusetts was truly concerned about animal welfare, it would not contain such exemptions to purportedly "grind out" the cruelty within the pork.

The Act's sales ban directly discriminates against out-of-state

Farmers to the benefit of in-state ones. This Court should reverse and direct entry of judgment in favor of the Farmer Appellants on this claim.

## III. If This Court Does Not Direct Judgment In Favor Of Appellants, It Should Remand The Case To The District Court.

In the event this Court does not reverse and direct judgment on either of the two above grounds, it should remand for further proceedings due to several errors—both procedural and substantive.

### A.    FMIA preemption and direct discrimination

For the reasons set forth above, this Court should hold the Act as either preempted by the FMIA or at least violative of the dormant Commerce Clause. But in the case the Court disagrees, or finds disputed facts about the impact the Act has on FMIA establishments or out-of-state farmers, it should at least remand the case for a full trial.

### B.    *Pike v. Bruch Church* claims

#### 1.    *The Court should remand Appellants'* Pike *claim to be heard on its merits*

Defendants contend the *Pike* claims were foreclosed as a matter of law by *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023). But Defendants' citations to *Ross* not only overstate the applicability of that opinion, but also attempt to substitute their analysis for the analysis the

22

district court should have performed.

To begin, Defendants' primary response to the *Pike* balancing inquiry hardly illustrates the claim is *legally* foreclosed. Defendants criticize the weight of the evidence, Appellees Br. 50 n.13 (criticizing Appellants' "claim to speak for the entire pork industry"); call it speculative; and generally argue the nature of the harm falls within the scope of the burdens alleged in *Ross*. These factual disputes are items the district court should have resolved in the first instance.

In any event, *Ross* involved a different state statute analyzed under different legal claims. And, to be sure, Appellants take exception to the Defendants' representation that this case is similar to *Ross*, or that "Proposition 12 is materially identical to the Act." Appellees Br. 11. Most notably, Proposition 12 contains an FMIA-establishment sales exception; the same exception now severed *as unconstitutionally discriminatory* by the district court. The failure of Defendants to appeal that legal ruling and severance, at a minimum, materially distinguishes *Ross*'s analysis. Here, the *Pike* analysis now must ***begin*** with a recognition the Act, as first enacted, *did* discriminate against interstate commerce. *See, e.g.*, Add.24-45.

Were that not enough, in *Ross*, the plaintiff "disavow[ed] any discrimination-based claim, conceding that [the California state law] imposes the same burdens on in-state pork producers that it imposes on out-of-state ones." *Ross*, 598 U.S. at 370. Here, those allegations *are* at issue here and have been since the inception of the case. They deserve fulsome analysis.

Moreover, Defendants do not attempt to justify the district court's erroneous application of *Pike*, which applied a non-binding "holding" of *Ross*. This Court looks to *all* opinions—including dissenting and concurring opinions—"to find the ground of decision embraced by a majority of the Justices," *United States v. Johnson*, 467 F.3d 56, 65 (1st Cir. 2006). The fact *Pike* remains good law and capable of judicial determination was missed by the district court, despite it being bound by that holding.

### 2. The Court should remand because of the district court's lack of Rule 56(f) notice

At the very least, the district court's ruling on the *Pike* claims was procedurally improper under Rule 56(f). Defendants fail to justify that procedure, which the district court imposed on claims: that Appellants expressly carved out of their motion for summary judgment; on which

Defendants never moved for summary judgment; for which no party submitted any evidence; and about which the district court provided no notice under Rule 56(f) until the moment it entered judgment. Attempting to nevertheless justify this procedure, Defendants stake out some rather remarkable ground.

First, Defendants contend the district court gave sufficient notice at the hearing itself. Appellees Br. 54. To be clear, this is *the same hearing wherein the district court dismissed the* Pike *claims.* Providing notice of a *sua sponte* ruling *minutes before that ruling* is, to say the least, insufficient notice under the rules, and this Court should flatly reject this argument.[8]

Undeterred, Defendants contend the district court gave Rule 56(f) notice through an order issued two days prior to any motion for summary judgment being made, in response to several ongoing discovery battles and case-management disputes between the parties. After ruling on those issues, the district court wrote:

[T]he Court must say frankly that the more it examines the

---

[8] Defendants' citation to *McCoy v. Town of Pittsfield*, 59 F.4th 497 (1st Cir. 2023) is disingenuous here. *McCoy* had a *nineteen-day period* between the hearing where notice was given and the district court's dispositive order.

jurisprudence of the "dormant commerce clause," the less the Court understands why the economic impact of Massachusetts's popularly mandated legislation is material to the analysis. *But see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Supreme Court most recently spoke to these issues in *National Pork Producers v. Ross*, 598 U.S. 356, 371 (2023). Plaintiffs and their amici frequently cite Justice Kavanaugh's opinion in that case. It is the dissenting opinion.

A963. This is *not* notice the district court is going to grant *sua sponte* summary judgment against Appellants. The district court's own "*but see*" cite indicates the economic impact of the Act may be material to the analysis, depending on the appropriate interpretation of *Ross*.

Next, Defendants also argue Appellants have briefed their *Pike* theory "twice." Appellees Br. 56. But any briefing involved completely different procedural postures, different legal standards, and in no way related to arguments under Rule 56. And while Appellants did submit evidence in support of their *Pike* claim *for purposes of obtaining a preliminary injunction* at the outset of the case, that does not absolve the district court's notice error in granting *summary judgment* on a claim Appellants did not move on, and expressly reserved for trial. Tellingly, Defendants cite no case to support this position.

Further, Defendants argue Appellants were able to submit all necessary evidence on their *Pike* claim for purposes of refuting a *sua*

*sponte* summary judgment ruling, and thus any failure to provide notice was harmless. This is incomprehensible; Defendants admit nearly every piece of evidence related to the *Pike* balancing test was disputed. And in no way were these *immaterial* disputes; the record is replete with instances in which Defendants dispute the burden that would have needed to have been analyzed under *Pike*. *See, e.g.*, A821-28. For this reason, Appellants did not move for summary judgment on their *Pike* claims, and because there is an important distinction between evidentiary submissions being submitted in favor of a preliminary injunction and whether there are disputed facts at issue that should preclude summary judgment, Appellants never had reason to believe they needed to present that evidence. *See, e.g.*, *McCoy*, 59 F.4th at 505.

To the extent Defendants are bringing some type of waiver argument, they fail to address how any waiver occurred when Appellants specifically filed an objection on the issue, and the parties exchanged several briefs arguing this precise point to the district court shortly after the *sua sponte* order occurred. *See* A1440. Regardless, any waiver argument must fail when it wasn't even clear *to the parties* what the district court was doing. Confusion abounded from the start of the

27

hearing, with the district court starting from the premise it was *Defendants'* motion for summary judgment, when Defendants never moved for summary judgment on any claim. *See, e.g.*, A1455-56 ("Now as to -- then we're dealing with the Commonwealth's motion for summary judgment as to the other plaintiffs."). The district court then compounded the error, stating it was *Defendants' request* that had put Appellants "on notice" of a *sua sponte* ruling. A1456. And at the end of the hearing, Appellants asked for "one point of clarification": "With respect to the claims under *Pike vs. Bruce Church*, which I don't think were moved on, certainly not by us -- THE COURT: Well theirs was an outright, um, opposition, and I think they're properly before me, and in any event I reject it." Add.18-19.

No matter how Defendants attempt to contort the record,[9] the reality is Appellants were deprived of putting their "best foot forward" in opposing such an order, *Leyva v. On The Beach, Inc.*, 171 F.3d 717, 720

---

[9] Defendants contend *Stella v. Town of Tewksbury* analyzed an older version of Rule 56 holding the parties "be afforded the benefit of the [then-applicable] minimum 10-day period mandated by Rule 56." 4 F.3d 53, 56 (1st Cir. 1993). The point is not that 10 days is sufficient; but that a proxy for what constitutes adequate notice is the amount of time Appellants would have been entitled to otherwise to respond to a summary judgment motion.

(1st Cir. 1999). This Court should remand for this reason alone.

### C.   Remaining Claims

Finally, this Court should at least reverse the district court's dismissal of nine of Appellants' ten original claims without a written order and without any reasoning. Defendants are unfairly critical of the brevity of Appellants' arguments on these claims, seeing as there is no analysis from the district court with which to engage. In any event, a de novo review of the Amended Complaint shows Appellants plainly stated a claim on each of these counts.

#### 1.   *Privileges and Immunities Clause*

Regarding Appellants' Privileges and Immunities Clause claim, Defendants offer two arguments: (1) the Clause is not applicable to corporations; and (2) the Act itself does not place citizens of different states on different footings, *i.e.*, there were insufficient factual allegations for the claim. Appellees Br. 70.

With respect to the first argument, the Amended Complaint contains an entire section alleging standing, and specifically alleges at least one of the Appellants has organizational standing. A25, A47-49. This is a permissible way to proceed as a matter of law. *Council Of Ins.*

*Agents & Brokers v. Juarbe-Jimenez*, 443 F.3d 103, 106-111 (1st Cir. 2006).

With respect to the second, the clause guards "against rank discrimination against citizens of other States[.]" *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 265 (1987) (Scalia, J., concurring in part and dissenting in part). At base, the Amended Complaint alleges discrimination that invites retaliation and prevents out-of-state farmers from engaging in their chosen profession. A24, A54. And the Amended Complaint contains myriad allegations to support this charge of discrimination. A32-54.

In sum, what the Act does—and what an increasing number of states are beginning to do based on a subjective sense of "what is right"— is deny the rights and privileges afforded to in-state individuals from out-of-state individuals who are simply attempting to pursue their calling. And the door swings both ways; one can only imagine how an impacted state, such as Missouri or Iowa, will begin to retaliate against states who enact laws targeting and impacting important industries therein. This constitutional conundrum should be analyzed on the merits of the claim, not a Rule 12(b)(6) motion—and least of all without any explanation, oral

or written. *See also* Br. of Amicus Curiae In Supp. of Appellants, Oct. 1, 2024; *see also Ross*, 598 U.S. 356 at 409 (Kavanaugh, J., concurring and dissenting in part) (stating the claim "warrants further analysis in a future case.").

### 2. *Packers and Stockyards Act*

As alleged, the Act encourages preference and unfair competition by favoring producers who had already converted to the Act's provisions, or those who never used the production methods now banned—which just so happened to be in-state farmers. A33, A61. This is a plausible allegation of a conflict with the PSA.

### 3. *Full Faith and Credit Clause*

Appellants are not attempting to compel Massachusetts to substitute any of its laws with those from other states; they merely ask Massachusetts not enact laws hostile to those of other states. Defendants fail to rebut the key allegation that Massachusetts has enacted a law hostile to the laws of other states, thereby testing the "core" of the Full Faith and Credit Clause. *Ross*, 598 U.S. at 409 (Kavanaugh, J., concurring and dissenting in part).

### 4.    *Due Process*

In response to Appellants' due process arguments, Defendants have not answered the main problem with the district court's dismissal: it failed to credit the allegations in the Amended Complaint regarding the vagueness of the Act, as applied on the ground to Appellants' businesses. If there was any doubt as to this ambiguity, it should not have been resolved at the motion to dismiss stage.

### 5.    *Import-Export Clause*

Appellants are aware the Clause has only applied historically to international trade. Nonetheless, several Supreme Court Justices have criticized this reading and have suggested it be a valid manner in which to challenge laws like the Act here. *See, e.g.*, *Ross*, 598 U.S. at 408 (Kavanaugh, J., concurring and dissenting in part). Here, the Act essentially does just that, and if there was any doubt about how the Act constitutes a duty or tax on out-of-state goods, the district court should have resolved the claim at least via summary judgment.

### 6.    *Declaratory Relief and State Law Judicial Review*

As for the last two counts, Appellants rely on the arguments submitted in their opening brief. Appellants simply request the right to

seek such relief.

## CONCLUSION

This Court should reverse and direct that judgment be entered in favor of Appellants. In the alternative, this Court should remand Appellants' claims for further adjudication. In the event of remand for further proceedings, this Court should direct the district court to enter a preliminary injunction, or direct the court to promptly, and separately, adjudicate that motion.

Dated: October 31, 2024            Respectfully submitted,

/s/ Michael T. Raupp
MICHAEL T. RAUPP
CYNTHIA L. CORDES
SPENCER A. TOLSON
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
cynthia.cordes@huschblackwell.com
spencer.tolson@huschblackwell.com

RYANN A. GLENN
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
ryann.glenn@huschblackwell.com

*Attorneys for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because it contains 6,482 words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(b)(iii).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook, 14-point type.

*/s/ Michael T. Raupp*
*Attorney for Appellants*
*Dated: October 31, 2024*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this Thursday, October 31, 2024 the foregoing document was electronically filed with Clerk of the Court using the CM/ECF system which sent electronic notification of such filing to all CM/ECF Participants.

*/s/ Michael T. Raupp*