No. 24-1759

In The
# United States Court of Appeals for the First Circuit

*Triumph Foods, LLC , individually and on behalf of its members;*
*Christensen Farms Midwest, LLC , individually and on behalf of its members;*
*The Hanor Company of Wisconsin, LLC , individually and on behalf of its*
*members; New Fashion Pork, LLC, individually and on behalf of its members;*
*Eichelberger Farms, Inc., individually and on behalf of its members; and*
*Allied Producers' Cooperative, individually and on behalf of its members*,

Plaintiffs-Appellants,

v.

*Andrea Joy Campbell, Attorney General of Massachusetts;*
*Ashley Randle, Massachusetts Commissioner of Agriculture*,

Defendants-Appellees.

Appeal from the United States District Court for
Massachusetts, No. 1:23-cv-11671-WGY

**BRIEF OF *AMICUS CURAE***
**PERDUE PREMIUM MEAT COMPANY, INC., D/B/A NIMAN RANCH**
**IN SUPPORT OF APPELLEES AND AFFIRMANCE**

October 28, 2024

Mitchell Y. Mirviss (Bar No. 1214195)
Kyle H. Keraga
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
(410) 244-7412
mymirviss@venable.com

Roger A. Colaizzi
VENABLE LLP
600 Massachusetts Ave., N.W.
Washington, DC 20001
(202) 344-4400
rcolaizzi@venable.com

*Counsel for Amicus Curiae*
*Perdue Premium Meat Company, Inc., d/b/a Niman Ranch*

## DISCLOSURE STATEMENT

Perdue Premium Meat Company, Inc., d/b/a Niman Ranch discloses that it is a privately held corporation, and that its ultimate parent corporation is Perdue Farms, Inc.  No publicly held corporation owns stock in Perdue Farms, Inc.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF INTEREST .......................................................................... 1

ARGUMENT ................................................................................................... 3

    I.    Question 3 codifies growing consumer demands for humane treatment of livestock and animal welfare standards imposed by many producers and retailers. ............................................. 5

    II.   Question 3 will not materially harm producers or small farmers, who can do business and earn a profit without relying on cruel confinement methods. .................................... 8

    III.   Leading pork industry producers have already converted their operations without suffering material economic harm. ................ 10

    IV.   Question 3 does not discriminate against out-of-state producers or impermissibly burden interstate commerce. ..................... 16

CONCLUSION ............................................................................................... 19

CERTIFICATE OF COMPLIANCE ............................................................... 20

CERTIFICATE OF SERVICE ........................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*CTS Corp. v. Dynamics Corp.*,
    481 U.S. 69 (1987) ............................................................................17

*Exxon Corp. v. Governor of Maryland*,
    437 U.S. 117 (1978) ..........................................................................16

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987) ..........................................................................18

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981) ..........................................................................16

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ................................................................4, 6, 16

*Robertson v. California*,
    328 U.S. 440 (1946) ..........................................................................17

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018) ......................................................................17

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) ..........................................................................18

*Thompson v. Thompson*,
    484 U.S. 174 (1988) ..........................................................................18

*United States v. Stevens*,
    559 U.S. 460 (2010) ..........................................................................18

*W. & S. Life Ins. Co. v. State Bd. of Equalization of California*,
    451 U.S. 648 (1981) ..........................................................................18

**Other Authorities**

Animal Welfare Inst., *Consumer Perceptions of Farm Animal Welfare*
    (last visited Oct. 27, 2024) ............................................................3, 5

Ann Hess, *Higher Margins on Pork, Market Hogs Improve Seaboard's Operating Loss*, Nat'l Hog Farmer (May 3, 2024) ........................14

Chloe Sorvino, *Meet the Billionaire Pig Farming Family Group Going Hog Wild for Ethical Products*, Forbes (Mar. 19, 2024).........................15

Dave Swenson, *The Economic Contribution of Niman Ranch Hog Production in Iowa* (Mar. 2021) ...........................................................................9

Dennis Smith, *Six Reasons to Suspect a Rising Hog Market*, Nat'l Hog Farmer (Feb. 5, 2024) .....................................................................4, 15

Hatfield, *A Higher Standard of Animal Care, California Proposition 12 & Massachusetts Question 3 Compliant Portfolio* (last visited Oct. 27, 2024)...................................................................................15

Hormel Foods, *Massachusetts Question 3 Space Requirements for Animal Housing* (May 11, 2023) ........................................................................13

Hormel Foods, *Supply Chain: Hogs* (last visited Oct. 27, 2024) ...........................12

Hormel, *Hormel Foods Reports Third Quarter Fiscal 2024 Results* (Sep. 4, 2024)..............................................................................................13

Jim Eadie, *California's Prop. 12 Implementation: Impact on Pork Prices and Market Dynamics*, Swineweb (Mar. 25, 2024) ........................15, 16

Jim Eadie, *CIH's Hog Margin Watch Report for March 1-15, 2024*, Swineweb (Mar. 19, 2024) ..................................................................................11

John McCracken & Ben Felder, *With California's Prop 12 Now Law, Pork Producers Adapt While Lobbying Groups Continue to Fight*, Investigate Midwest (Mar. 6, 2024) ........................................................6, 10, 14

Laura Rance, *Proposition 12 'Insulting,' but Economic Effects Muted*, Manitoba Cooperator (Jan. 19, 2024)......................................................................4

LinkedIn, Vande Rose Farms ...........................................................................................15

Lisa Lubin, *Majority of Pork-Buyers Prefer Retailers that Don't Use Gestation Crates*, Crate Free USA (Jan. 12, 2021) ................................................3

Nat'l Sanitation Found., *Nearly 70% of Americans Say Animal Wellness Plays an Important Role in Purchasing Decisions* (Feb. 14, 2024) ................................................................................5

Niman Ranch, *About Niman Ranch* (last visited Oct. 24, 2024) ..............................2

Ryan McCarthy, *Niman Ranch has Strong Impact on Iowa Economy*, Meat+Poultry (Sept. 1, 2021) ...........................................................10

Staff, *Clemens Food Group to Phase Out Gestation Crates*, Meat+Poultry (Sept. 8, 2024) ...........................................................14

Tom Polansek, *U.S. Pork Producer to Limit Sales in California Over New Pig Law*, Reuters (Dec. 17, 2021) ..............................................13

Tom Polansek, *U.S. Pork, Producer to Resume Shipments to California After Farm Animal Law Delayed*, Reuters (Feb. 8, 2022) ................................................................................13

Tyson Foods, *Third Quarter 2021 Earnings* (Aug. 9, 2021) .................................12

Tyson Foods, *Third Quarter 2024 Earnings* (Aug. 5, 2024) .................................12

Tyson Foods, *What We Do* (last visited Oct. 27, 2024) .........................................11

Walmart, *Animal Welfare* (Aug. 19, 2024)...............................................................6

Whole Foods Market, *Meat Department Quality Standards* (last visited Oct. 27, 2024).....................................................................6

## STATEMENT OF INTEREST[1]

Amicus Curiae Perdue Premium Meat Company, Inc., d/b/a Niman Ranch ("PPMC" or "Niman Ranch") is a corporation organized under the laws of the State of California. Its parent corporation is Perdue Farms, Inc. As a leader in humane animal husbandry working with independent small and midsize family farms, PPMC writes to counter the portrait of economic calamity painted by Appellants and the State Attorneys General writing as amici. As PPMC's lengthy experience and recent industry developments demonstrate, compliance with humane animal care laws such as Massachusetts' Question 3 is straightforward and economically feasible for small, midsize, and large pork producers.

PPMC's Niman Ranch raises livestock using traditional, humane methods—and without the use of gestation or farrowing crates. Niman Ranch began in the early 1970s as a family-owned cattle ranch in Bolinas, California. In response to the rise of factory farming and shrinking margins for independent livestock farmers, fifth-generation family farmer Paul Willis of Iowa joined Niman Ranch in the mid-1990s, forming the Niman Ranch Pork Company. Today, the Niman Ranch Pork Company

---

[1] The parties have consented to the filing of this amicus brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amicus curiae and its counsel made a monetary contribution intended to fund the preparation or submission of the brief.

gives family farms using humane animal care standards the resources, support, and connections they need to compete in the nationwide marketplace.

Niman Ranch's long industry experience has taught it how to produce great tasting meat while caring for its animals, its land, and its farmers. *See* Niman Ranch, *About Niman Ranch*, https://www.nimanranch.com/about-niman-ranch/ (last visited Oct. 24, 2024). Niman Ranch is committed to crate-free animal husbandry, and has long recognized that gestation crates, farrowing crates, and extreme confinement are both unnecessary for business and cruel to highly intelligent animals such as pigs. Niman Ranch protocols require farmers to raise their hogs outdoors or in deeply bedded pens; to provide bedding at all phases of a pig's life; and to ban all teeth clipping, tail docking, and antibiotics. Following these strict animal-husbandry standards, the Niman Ranch Pork Company has expanded into a network of more than 600 independent family farmers and ranchers, all raising Certified Humane® beef, pork, and lamb.

This amicus brief offers an alternative industry voice to show that compliance with humane agriculture laws will place no substantial burden on the pork industry. Like other pork producers outside the Commonwealth of Massachusetts, Niman Ranch has run a profitable business while meeting all of Question 3's requirements —proving that small farmers and pork businesses can continue to profit without the use of gestation crates and cruel confinement techniques. Compliance with similar

laws has already proven straightforward for many industry leaders, and financially feasible for farms of all sizes.

## ARGUMENT

This case is not about economic discrimination and interstate balkanization, but consumers voting their expectations and demands and the market shifting to respond. A growing majority of consumers demand pork that is farmed humanely, sustainably, and without cruel confinement practices.[2] As of 2022, "80% of likely voters nationally said they would support a law in their state . . . which prohibits intensive confinement of egg-laying hens, veal calves, and gestating sows."[3] And a growing number of states have honored this growing consumer demand with laws, regulations, and ballot measures to prohibit the sale of inhumane meat. The subject of this litigation, Massachusetts' Question 3, is among them.

Recent experience with California's Proposition 12 reveals that Question 3 will not materially harm pork producers. When a near-supermajority of California

---

[2] *See* Lisa Lubin, *Majority of Pork-Buyers Prefer Retailers that Don't Use Gestation Crates*, Crate Free USA (Jan. 12, 2021), https://cratefreeusa.org/pork-buyers-prefer-no-gestation-crates/.

[3] *See* Animal Welfare Inst., *Consumer Perceptions of Farm Animal Welfare*, https://awionline.org/sites/default/files/uploads/documents/ConsumerPerceptionsFarmWelfare.pdf (last visited Oct. 27, 2024) (citing Sara Amundson & Kitty Block, *Breaking: New Developments in Key US Supreme Court Case for Animals*, A Humane World (Aug 8, 2022), https://hslf.org/blog/2022/08/breaking-new-developments-key-us-supreme-court-case-animals).

voters approved Proposition 12, certain lobbying groups and producers cried foul—arguing that the law would have calamitous effects on the nationwide pork industry. But in *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), the Supreme Court rejected that argument. Sure enough, the law's "economic effects" have been "muted,"[4] as the "market has fully adjusted to Prop 12."[5] Industry titans such as Tyson, Hormel, JBS, Seaboard, and Clemens have adjusted their farming practices to supply compliant pork to the California and Massachusetts markets at a premium. Small and midsize farmers using humane animal care, including those supplying Niman Ranch, have viewed this law as an opportunity to grow. And early evidence suggests that the primary market participants paying for this regulatory shift are the California consumers that voted for it.

Question 3 likewise creates no risk of broad economic disruption. Contrary to the apocalyptic predictions advanced by Appellants and their amici, producers can and will adjust to the demands of the market and raise hogs humanely without sacrificing their ability to earn profits. Indeed, Niman Ranch's farmers have been meeting the Question 3 standards for years, and industry-leading firms have already

---

[4] *See, e.g.*, Laura Rance, *Proposition 12 'Insulting,' but Economic Effects Muted*, Manitoba Cooperator (Jan. 19, 2024), https://www.manitobacooperator.ca/news-opinion/news/proposition-12-insulting-but-economic-effects-muted/.

[5] Dennis Smith, *Six Reasons to Suspect a Rising Hog Market*, National Hog Farmer (Feb. 5, 2024), https://www.nationalhogfarmer.com/market-news/six-reasons-to-suspect-a-rising-hog-market.

adjusted to Proposition 12 with minimal impacts on their revenue. It follows that Question 3 will not burden farmers and industry with excessive costs—and that the Commonwealth's interest in keeping inhumane food off the market outweighs any marginal burdens the law might impose on interstate commerce.

### I.    Question 3 codifies growing consumer demands for humane treatment of livestock and animal welfare standards imposed by many producers and retailers.

Laws such as Question 3 reflect a shift in consumer preferences that is widely recognized by retailers and producers. Recently, consumers have expressed a strong and growing demand for pork that is farmed humanely, without cruel confinement. About 70% of Americans report that "animal wellness is either very or extremely important to purchasing decisions," and in 2022, "80% of likely voters nationally said they would support a law in their state . . . which prohibits intensive confinement of egg-laying hens, veal calves, and gestating sows." Nat'l Sanitation Found., *Nearly 70% of Americans Say Animal Wellness Plays an Important Role in Purchasing Decisions* (Feb. 14, 2024), https://www.nsf.org/news/nsf-reveals-americans-say-animal-wellness-important-role-purchasing-decisions; Animal Welfare Inst., *Consumer Perceptions of Farm Animal Welfare*, https://awionline.org/sites/default/files/uploads/documents/ConsumerPerceptionsFarmWelfare.pdf (last visited Oct. 27, 2024). That is precisely the type of law Massachusetts has enacted.

The reality is that the market is shifting, and consumers in Massachusetts have simply voted their preferences. Question 3 "reflects consumer demand, informed by individual taste, health, or moral considerations." *See Ross*, 598 U.S. at 365. And it codifies animal welfare standards that producers such as Niman Ranch and leading retailers around the country have been implementing for some time. For example, Whole Foods requires its meat suppliers to satisfy the Global Animal Partnership ("G.A.P.") base certification standards for animal welfare.[6] Other major retailers such as Kroger, Walmart, Albertsons, Grocery Outlet, and Trader Joe's are also in the process of transitioning their supply chains to source pork products from farms that do not use gestation crates.[7]

Many pork producers that have complied with these requirements have found them beneficial. The first companies that undertook the initial effort and cost to meet G.A.P. Base Certification 1 compliance benefitted from their efforts—and continued

---

[6] *See* Whole Foods Market, *Meat Department Quality Standards*, https://www.wholefoodsmarket.com/quality-standards/meat-standards (last visited Oct. 27, 2024).

[7] *See* John McCracken & Ben Felder, *With California's Prop 12 Now Law, Pork Producers Adapt While Lobbying Groups Continue to Fight*, Investigate Midwest (Mar. 6, 2024), https://investigatemidwest.org/2024/03/06/with-californias-prop-12-now-law-pork-producers-adapt-while-lobbying-groups-continue-to-fight/; *e.g.*, Walmart, *Animal Welfare* (Aug. 19, 2024), https://corporate.walmart.com/purpose/esgreport/environmental/animal-welfare.

to do so as those costs normalized.[8] The same is true of many of PPMC's animal welfare programs that provide a solution for top grocers to acquire specialty natural products from leading authentic brands—produced domestically by family farmers and ranchers who follow humane animal care standards with no antibiotics or added hormones. Retailers and producers are following consumer demand and their own values to produce and sell higher-welfare pork products. Many of those consumers are the same voters who overwhelmingly passed Question 3 in Massachusetts, and Proposition 12 in California.

Accordingly, this is not a case about forced change and irreparable harm, but about voter/consumer preference and demand; the perspective of industry leaders that innovate to satisfy those demands; the industry players that resist market headwinds; and the competition that results. Because the market is already shifting, the industry will not be harmed when the growing consumer preferences for animal welfare are codified. When it comes to those preferences, the writing is on the wall— producers that embrace change will benefit, while those that refuse to meet the growing consumer demand for humane standards for the confinement of breeding pigs will eventually be left behind. These are competitive choices to be made by all

---

[8] Pertinent facts herein are supported by a declaration appended to an amicus brief filed by PPMC in litigation filed in Iowa by anti-Proposition 12 groups. *See* Decl. of Christopher Oliviero, *Iowa Pork Producers Ass'n, et al. v. Bonta, et al.*, No. 3:21-cv-3018-CJW-Mar (N.D. Iowa), ECF No. 38-2 (July 20, 2021).

pork producers. That is basic economics, and there is no constitutional right to be protected from fair competition.

**II.     Question 3 will not materially harm producers or small farmers, who can do business and earn a profit without relying on cruel confinement methods.**

The State Attorneys General writing as amici argue that Question 3 will "disrupt the pork industry by imposing stringent requirements inconsistent with industry practices on hog farmers and pork processors around the country." *See* State Att'y Gen. Br. ("SAG Br.") 3–4. They also argue Question 3 will inflict "enormous compliance costs" on pork producers, and that it "will disproportionately affect small farmers" by requiring them to undertake costly changes. *Id.* at 5–6. Time, data, and industry experience have proven these projections incorrect.

Humane animal care aligns with established industry practices—standards such as G.A.P. represent a growing industry trend in response to strong consumer demands. Niman Ranch and PPMC have proven that humane care standards are financially viable at scale. Niman Ranch's more than 500 pork-producing farms have satisfied Question 3's humane animal husbandry standards for years, and done so profitably. So, too, have PPMC's other subsidiaries: Coleman Natural Foods, a leading supplier of pork, which has worked with its producers to supply pork meat fully in compliance with Prop 12 and Question 3. Likewise, Sioux-Preme® Packing Co. has had no issues preparing its packing facilities to segregate Prop 12-compliant

8

pork to the extent its producers require packing for Massachusetts- and California-bound pork following the measure's effective date.

As these subsidiaries' adaptation to market conditions indicates, segregation and tracing of meat is more than possible—it is already being done. Producers have used segregation and tracing mechanisms for years to provide consumers with premium pork products that follow organic, non-GMO, specific breeds, and other unique specifications.[9] Commercial brands tell their farm networks what types and cuts of pork they need, and make clear what standards their suppliers need to follow. In turn, the brands set alternative costing programs to compensate farmers for their efforts. Accordingly, Appellants' assertion that it is "neither feasible nor practical for farmers to segregate their product on a state-by-state basis" is simply incorrect. Appellants Br. 21 (citation omitted).

And humane animal care is beneficial for small farms, their employees, and their communities. A recent economic analysis revealed that Niman Ranch creates 50% greater economic value for local economies and over 150% more jobs than the conventional hog industry for every 100,000 pigs marketed. *See* Dave Swenson, *The*

---

[9] In subsequent California litigation brought following dismissal of the Iowa action cited *supra*, a California Department of Food and Agriculture official, Dr. Annette Jones, submitted a declaration on segregation and tracing mechanisms used in the industry. *See Iowa Pork Producers Ass'n, et al. v. Bonta, et al.*, No. 2:21-cv-09940-CAS-AFM (C.D. Cal.), Jones Decl. at 5 ¶¶ 17-18, ECF No. 69-1. PPMC concurs with Dr. Jones' statements.

*Economic Contribution of Niman Ranch Hog Production in Iowa* (Mar. 2021), https://www.nimanranch.com/wp-content/uploads/2021/08/The-Economic-Contribution-of-Niman-Ranch-Pork-Production-in-Iowa.pdf. Indeed, "for every $1 million in direct sales, Niman Ranch farms produce 14 jobs and generate an additional $2.03 million in other economic inputs, including labor income and value-added spending." *See* Ryan McCarthy, *Niman Ranch has Strong Impact on Iowa Economy*, Meat+Poultry (Sept. 1, 2021), https://www.meatpoultry.com/articles/25447-niman-ranch-has-strong-impact-on-iowa-economy. Thus, the portrait of economic calamity painted by Appellants is wholly inaccurate. Humane animal husbandry practices can reap sizable economic benefits for small family farms and their regional economies. Other industry players would do well to follow suit.

## III.    Leading pork industry producers have already converted their operations without suffering material economic harm.

Niman Ranch and PPMC are hardly the only pork producers that can do business and make a profit without resorting to extreme animal confinement. Developments in the wake of California's Proposition 12 reveal that the impacts of a gestation crate ban on industry leaders are small and manageable. Long before Prop 12, many leading producers joined PPMC and announced their commitment to humane confinement standards. Today, "[m]ost of the nation's major pork producers have taken steps to become compliant with [Proposition 12 and Question 3], some starting the transition more than a decade ago." John McCracken & Ben Felder, *With*

10

*California's Prop 12 Now Law, Pork Producers Adapt While Lobbying Groups Continue to Fight*, Investigate Midwest (Mar. 6, 2024), https://investigate midwest.org/2024/03/06/with-californias-prop-12-now-law-pork-producers-adapt-while-lobbying-groups-continue-to-fight/.[10] The recent industry experience of these producers illustrates that Appellants' projections of economic disaster will not bear out in reality.

Industry titan Tyson Foods is one of the world's largest meat processing companies and is responsible for "approximately 20% of the beef, pork and chicken in the United States."[11] In a 2021 earnings call, Tyson's President and CEO, Donnie King, conceded that Proposition 12 would not harm the company's operations:

> Prop 12, it's about 4% of total production. That's not significant for us today. Tyson is currently aligning incentivizing suppliers where appropriate. We can do multiple programs simultaneously, including Prop 12. So . . . we can align suppliers, and we can certainly provide the raw material to service our customers in that way.

---

[10] *See also* Jim Eadie, *CIH's Hog Margin Watch Report for March 1-15, 2024*, Swineweb (Mar. 19, 2024), https://www.swineweb.com/market-reports/cihs-hog-margin-watch-report-for-march-1-15-2024/ (observing that "California's Prop 12 restrictions . . . were expected to exert a negative impact on prices" but "that has not happened so far in Q1 as pork remains competitive"). Indeed, many Appellants have themselves converted their operations to comply with Proposition 12 and begun shipping compliant meat into Massachusetts. *See* Appellee Br. 41–42.

[11] *See* Tyson Foods, *What We Do*, https://www.tysonfoods.com/who-we-are/our-story/what-we-do (last visited Oct. 27, 2024).

*See* Tyson Foods, *Third Quarter 2021 Earnings* at 15 (Aug. 9, 2021), https://s203.q4cdn.com/483587180/files/doc_financials/2021/q3/08-11-21_Tyson-Foods-080921.pdf. Sure enough, in Q3 2024, King announced that "momentum continues to build," with the company reporting "the highest profitability in the last seven quarters," including a 175% growth in adjusted operating income and a 500% growth in earnings per share.[12]

Hormel Foods, one of the largest pork producers in the country, has responded to rising consumer demands for pork raised through humane animal care methods. Today, "all of [Hormel's] designated market hogs are housed in group pens from birth," and its "company-owned hog farm has transitioned to group sow housing." Hormel Foods, *Supply Chain: Hogs*, https://www.hormelfoods.com/global-impact/planet/supply-chain/hogs/#california-proposition-12-and-massachusetts (last visited Oct. 27, 2024). Like Tyson, Hormel confirmed that it is fully prepared to adapt to Question 3:

> Hormel Foods has confirmed that it faces no risk of material losses from compliance with Question 3. While it adds complexity to our supply chain, including costs associated with compliance, Massachusetts is an important market for Hormel Foods, and we will continue to meet the needs of our consumers and customers throughout these states.

---

[12] Tyson Foods, *Third Quarter 2024 Earnings* at 1 (Aug. 5, 2024), https://s203.q4cdn.com/483587180/files/doc_financials/2024/q3/08-07-2024_Tyson-Foods-080524.pdf.

Hormel Foods, *Massachusetts Question 3 Space Requirements for Animal Housing* (May 11, 2023), https://www.hormelfoods.com/position/massachusetts-question-3-space-requirements-for-animal-housing/. And much like Tyson, Hormel reported "above-industry growth" and "growing benefits from . . . impactful improvements across [its] supply chain" in Q3 2024.[13]

Seaboard Foods, which maintains a herd of 7.2 million hogs, declared it would cease selling whole pork products within California after Proposition 12.[14] But when Prop 12 took effect, the company quietly complied, converting several facilities into humane housing arrangements.[15] In January 2024, corporate representative David Eaheart explained Seaboard's change of heart by acknowledging the flexibility of the company's supply chain:

> In our connected food system, our farms raise market hogs born from sows in various housing types based on customer requirements, including . . . for Prop 12 group housing compliant for California. . . . Because of this, we can flex between different sow housing requirements to produce pork products based on customer demand.

---

[13] Hormel, *Hormel Foods Reports Third Quarter Fiscal 2024 Results* (Sep. 4, 2024), https://www.hormelfoods.com/wp-content/uploads/Hormel-Foods-Earnings-Release-Q3-2024.pdf.

[14] *See* Tom Polansek, *U.S. Pork Producer to Limit Sales in California Over New Pig Law*, Reuters (Dec. 17, 2021), https://www.reuters.com/markets/commodities/us-pork-producer-limit-sales-california-over-new-pig-law-2021-12-17/.

[15] *See* Tom Polansek, *U.S. Pork Producer to Resume Shipments to California After Farm Animal Law Delayed*, Reuters (Feb. 8, 2022), https://www.reuters.com/legal/litigation/us-pork-producer-resume-shipments-california-after-farm-animal-law-delayed-2022-02-08/.

John McCracken & Ben Felder, *With California's Prop 12 Now Law, Pork Producers Adapt While Lobbying Groups Continue to Fight*, Investigate Midwest (Mar. 6, 2024), https://investigatemidwest.org/2024/03/06/with-californias-prop-12 -now-law-pork-producers-adapt-while-lobbying-groups-continue-to-fight/.  Indeed, in March 2024, after Proposition 12 took effect, Seaboard reported "higher margins on pork products," with increased sales of $31 million.[16]

Pennsylvania-based pork industry powerhouse Clemens Food Group "fully transitioned to group housing for all [its] sows" as of the beginning of 2023, phasing out gestation crates entirely.[17]  Its leading brand, Hatfield Quality Meats, proudly announced this shift:

> Hatfield offers a variety of pork products across our portfolio of bacon, marinated, and fresh pork items that meet the "Prop 12" and "Question 3" statutory requirements. Sows are housed in pens that allow them to get up and turn around freely at all times, and have 24+ sq. ft. of usable floor space per sow.

---

[16] Ann Hess, *Higher Margins on Pork, Market Hogs Improve Seaboard's Operating Loss*, Nat'l Hog Farmer (May 3, 2024), https://www.nationalhogfarmer.com/market -news/higher-margins-on-pork-market-hogs-improve-seaboard-s-operating-loss.

[17] *See* John McCracken & Ben Felder, *With California's Prop 12 Now Law, Pork Producers Adapt While Lobbying Groups Continue to Fight*, Investigate Midwest (Mar. 6, 2024), https://investigatemidwest.org/2024/03/06/with-californias-prop-12-now-law-pork-producers-adapt-while-lobbying-groups-continue-to-fight/; Staff, *Clemens Food Group to Phase Out Gestation Crates*, Meat+Poultry (Sept. 8, 2024), https://www.meatpoultry.com/articles/11652-clemens-food-group-to-phase-out-gestation-crates.

Hatfield, *A Higher Standard of Animal Care, California Proposition 12 & Massachusetts Question 3 Compliant Portfolio*, https://simplyhatfield.com/about-us/our-commitment-to-animal-care/ (last visited Oct. 27, 2024). Far from suffering economic hardship, Clemens has grown its market share and announced revenue in excess of $2 billion.[18]

These announcements make clear that Appellants' concerns about widespread economic hardship are self-serving and vastly overblown.[19] The "market has fully adjusted to Prop 12,"[20] and so, too, will it adjust to Question 3. Non-Massachusetts markets will remain huge sources of income for farms that, for whatever reason, do not opt to convert to gestation crate-free practices. To the extent that the price of some whole pork meat products might increase, those costs will be borne primarily by Massachusetts voters who buy Question 3-compliant meat—just as the effects of Proposition 12 have been felt primarily in California. *See* Jim Eadie, *California's*

---

[18] *See* Chloe Sorvino, *Meet the Billionaire Pig Farming Family Going Hog Wild for Ethical Products*, Forbes (Mar. 19, 2024), https://www.forbes.com/sites/chloe sorvino/2024/03/18/meet-the-billionaire-pig-farming-family-clemens-food-group-brad-clemens-prop-12/.

[19] Of course, these firms are not alone in innovating in response to consumer demand. *See, e.g.*, LinkedIn, Vande Rose Farms, https://www.linkedin.com/company/vande-rose-farms (offering "the highest animal welfare supply chain with GAP certified farms supported by Certified Humane 3rd party audit programs").

[20] Dennis Smith, *Six Reasons to Suspect a Rising Hog Market*, National Hog Farmer (Feb. 5, 2024), https://www.nationalhogfarmer.com/market-news/six-reasons-to-suspect-a-rising-hog-market.

*Prop. 12 Implementation: Impact on Pork Prices and Market Dynamics*, Swineweb (Mar. 25, 2024), https://www.swineweb.com/latest-swine-news/californias-prop-12-implementation-impact-on-pork-prices-and-market-dynamics/ (observing that California pork prices have increased, but other "pork products not covered by the initiative have not experienced significant price fluctuations"). If Massachusetts consumers and voters choose to pay higher prices in exchange for Massachusetts-bound pork that complies with humane standards for the confinement of breeding pigs, that is their choice.

### IV.    Question 3 does not discriminate against out-of-state producers or impermissibly burden interstate commerce.

Question 3 is not economic protectionism, but a moral judgment by Massachusetts voters regulating the Massachusetts market. The law targets conduct occurring within Massachusetts: the sale of pork products produced through animal cruelty. And it prohibits the sale of inhumane meat products "without regard to where those products are made." *Ross*, 598 U.S. at 381; *see also Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981). In doing so, Question 3 regulates in-state and out-of-state pork producers on equal terms: Massachusetts farmers will run afoul of its prohibitions if they sell pork derived from hogs born in gestation crates. And out-of-state firms offering more humane, crate-free pork products—including industry giants Tyson, Hormel, Seaboard, and Clemens—will have no difficulty operating in Massachusetts. *Cf. Exxon Corp. v. Governor of Maryland*, 437 U.S.

16

117, 127 (1978) (holding that the constitution protects "the interstate market," not "particular interstate firms"). What appellants truly seek, then, is not to protect the interstate market, but to protect themselves from their more innovative competitors. No constitutional provision affords them such protection.

Appellants and their amici insist that Question 3 violates the Dormant Commerce Clause simply because no Massachusetts producers use gestation crates to house pregnant sows. Not so. The mere fact that Question 3 "will apply most often to out-of-state entities" does not render it discriminatory. *See CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 88 (1987). Moreover, "the Commerce Clause was designed to prevent States from engaging in economic discrimination," *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2093–94 (2018), not to "force all of the states to accept the lowest standard for conducting the business permitted by one of them," *Robertson v. California*, 328 U.S. 440, 460 (1946). The view advanced by the Appellants and their amici would require every state to accede to the sale of meat derived from hogs raised using gestation crates merely because some states allow it.

Appellants also argue that Question 3 burdens interstate commerce without serving any legitimate local interest. But for all the reasons discussed above, that alleged burden is belied by PPMC's long market experience and producers' smooth transition following Proposition 12. Whatever burden does exist—once stripped of Appellants' hyperbole—is not "clearly excessive" in relation to the law's benefits.

17

States have an obvious, longstanding interest in limiting the sale of products they deem unhealthy or immoral. *Cf. United States v. Stevens*, 559 U.S. 460, 469 (2010) ("[T]he prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the colonies."); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 503 (1987) (holding states have a "sovereign right" to protect "the lives, health, morals, comfort and general welfare of the people" (quoting *Manigault v. Springs*, 199 U.S. 473, 480 (1905))). That interest outweighs any burdens that Question 3 might impose.

Finally, Appellants regurgitate Justice Kavanaugh's separate opinion in *Ross* to argue that Question 3 violates the Import-Export Clause, the Privileges and Immunities Clause, and the Full Faith and Credit Clause. But no other Justices joined Justice Kavanaugh's opinion, and longstanding Supreme Court caselaw forecloses all three arguments. *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 516 (2019) (holding that the Import-Export Clause, which forbids states from imposing duties or tariffs on imported goods, "refer[s] only to international trade"); *Thompson v. Thompson*, 484 U.S. 174, 182–83 (1988) (holding that the Full Faith and Credit Clause does not provide a private right of action); *W. & S. Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 656 (1981) (holding that the Privileges and Immunities Clause "is inapplicable to corporations"). Tellingly, the State Attorneys General rely on dissents, concurrences, and law review

articles to make these claims. SAG Br. 15–17. Those sources may be interesting

theory, but they are not law.

## CONCLUSION

Just as the Supreme Court upheld Proposition 12, this Court should uphold

the decision of Massachusetts voters and consumers and reject Appellants' challenge

to Question 3.

Dated: October 28, 2024                    Respectfully submitted,


                                           /s/ Mitchell Y. Mirviss
                                           Mitchell Y. Mirviss (Bar No. 1214195)
                                           Kyle H. Keraga
                                           VENABLE LLP
                                           750 E. Pratt Street, Suite 900
                                           Baltimore, MD 21202
                                           (410) 244-7412

                                           Roger A. Colaizzi
                                           VENABLE LLP
                                           600 Massachusetts Ave., N.W.
                                           Washington, DC 20001
                                           (202) 344-4400



*Counsel for Amicus Curae*
*Perdue Premium Meat Company, Inc., d/b/a Niman Ranch*

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this brief complies with the type-volume limits of Fed. R. App. P. 29(a)(5) and Circuit Rules 29 and 32-1 because it contains 4053 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

Additionally, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirement of Fed. R. App. P. 32(a)(6), because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: October 28, 2024          /s/ Mitchell Y. Mirviss
                                 Mitchell Y. Mirviss (Bar No. 1214195)

**CERTIFICATE OF SERVICE**

I certify that on October 28, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via email in PDF format.


Dated: October 28, 2024                    /s/ Mitchell Y. Mirviss
                                           Mitchell Y. Mirviss (Bar No. 1214195)