# United States Court of Appeals
## For the First Circuit

---

No. 24-1759

TRIUMPH FOODS, LLC, CHRISTENSEN FARMS MIDWEST, LLC, THE HANOR
COMPANY OF WISCONSIN, LLC, NEW FASHION PORK, LLP, EICHELBERGER
FARMS, INC. and ALLIED PRODUCERS' COOPERATIVE, individually and
on behalf of its members,

Plaintiffs, Appellants,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney
General of Massachusetts, and ASHLEY RANDLE, in her official
capacity as Commissioner of the Massachusetts Department of
Agricultural Resources,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

---

Before

Gelpí, Thompson, and Rikelman,
Circuit Judges.

---

Michael T. Raupp, with whom Ryann A. Glenn, Cynthia L. Cordes,
Spencer Tolson, and Husch Blackwell LLP were on brief, for
appellants.

Maryanne Reynolds, Assistant Attorney General, Massachusetts
Office of the Attorney General, with whom Vanessa A. Arslanian,
Assistant Attorney General, and Grace Gohlke, Assistant Attorney
General, were on brief, for appellees.

---

October 3, 2025

---

GELPÍ, **Circuit Judge**.  In 2016, Massachusetts passed the
Act to Prevent Cruelty to Farm Animals (the "Massachusetts Act").
As relevant here, the Massachusetts Act prohibits the use of
certain methods of confinement ("gestation crates") on pig farms
in Massachusetts.[1]  Mass. Gen. Laws Ann., ch. 129, App. § 1-2.  It
also prohibits the sale, in Massachusetts, of pork products derived
from pigs who were confined in gestation crates.  See id. § 1-3.
Plaintiffs are out-of-Massachusetts pig farmers and the
slaughterhouse those farmers co-own (collectively, "Plaintiffs").
They sued to challenge the Massachusetts Act, chiefly arguing that
it violated the dormant Commerce Clause and that it was preempted
by federal law.  The district court disagreed, first dismissing
most of the claims and later entering summary judgment against
Plaintiffs on the remaining dormant Commerce Clause claim.  We
affirm the district court's rulings.

### I. Background

### A. The Act to Prevent Cruelty to Farm Animals

The Massachusetts Act became enforceable on August 24,
2023, after a series of legal challenges.[2]  Its stated purpose is

---

[1] Gestation crates are "stalls so small [breeding pigs] cannot
lie down, stand up, or turn around" in them.  Nat'l Pork Producers
Council v. Ross, 598 U.S. 356, 363 (2023).

[2] Though enacted in 2016, the Massachusetts Act became
effective following the Supreme Court's decision in National Pork,
a decision we will invoke later.  We note that the parties and the
district court refer to that decision as "Ross," we adopt "National

to "prevent animal cruelty by phasing out extreme methods of farm animal confinement, which also threaten the health and safety of Massachusetts consumers, increase the risk of foodborne illness, and have negative fiscal impacts on the Commonwealth of Massachusetts." Mass. Gen. Laws Ann., ch. 129, App. § 1-1. To that end, the Massachusetts Act prohibits pig farmers within Massachusetts from knowingly causing a breeding pig "to be confined in a cruel manner," defined in relevant part as "in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs or turning around freely."[3] Id. §§ 1-2, 1-5.

The Massachusetts Act also makes it illegal for a "business owner or operator to knowingly engage in the sale within [Massachusetts] of any: . . . Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal that was confined in a cruel manner, or is the meat of the immediate offspring of a covered animal that was confined in a cruel manner." Id. § 1-3. A sale is defined as "a commercial sale by a business that sells any item covered by section 3" and

_____

Pork" to conform with recent circuit opinions. See Ass'n to Pres. & Protect Loc. Livelihoods v. Sidman, No. 24-1317, 2025 WL 2304915, at *15 (1st Cir. Aug. 11, 2025).

[3] The Massachusetts Act also covers other animals and animal products, such as eggs and "veal meat." Id. § 1-3. We focus here only on those provisions relevant to the Plaintiffs' claims.

"shall be deemed to occur at the location where the buyer takes physical possession of" the relevant item.  Id. § 1-5.

### B. Procedural Background

Plaintiffs are a combination of pig farmers and one pork processor (Triumph).  Triumph Foods, LLC v. Campbell, 715 F. Supp. 3d 143, 148 (D. Mass. 2024).  Triumph-produced pork is sold throughout the country, including in Massachusetts.  Plaintiffs are all located outside of Massachusetts, "in Minnesota, Iowa, Nebraska, Illinois, South Dakota, Wisconsin, Oklahoma, North Carolina, Missouri, Wyoming, and Indiana." Id.  The pork products they sell are produced from pigs housed in gestation crates.  On July 25, 2023, Plaintiffs sued to preliminarily and permanently enjoin the Massachusetts Act.  They filed an amended complaint (hereinafter, "complaint") on July 31, 2023.

Their complaint asserted ten causes of action: (1) dormant Commerce Clause violations by directly discriminating and by unduly burdening interstate commerce; (2) Privileges and Immunities Clause violations; (3) express preemption under the Federal Meat Inspection Act (the "FMIA"); (4) conflict preemption under the FMIA; (5) preemption under the Packers and Stockyards Act (the "PSA"); (6) Full Faith and Credit Clause violations; (7) Due Process Clause violations; (8) Import-Export Clause violations; (9) declaratory relief on unconstitutionality; and (10) judicial review of the Massachusetts Act's regulations.  In

support of these claims, Plaintiffs pleaded that the Massachusetts Act "discriminates against out-of-state farmers and pork processors in purpose and effect," "[g]iven that no Massachusetts pig farmers confine breeding sows in a manner that is prohibited by the [Massachusetts] Act."

The district court consolidated Plaintiffs' request for a preliminary injunction with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(1). See Triumph Foods, LLC v. Campbell, 742 F. Supp. 3d 63, 66 (D. Mass. 2024). The Massachusetts Office of the Attorney General ("Massachusetts" or "the Commonwealth") then moved to dismiss the complaint on September 28, 2023. It argued that the Massachusetts Act did not discriminate facially, in purpose or effect, and that the Supreme Court's decision in Nat'l Pork Producers Council v. Ross foreclosed Plaintiffs' argument under the unlawful burden test set forth in Pike v. Bruce Church, Inc., 397 U.S. 137 (1970). The district court granted Massachusetts' motion to dismiss as to all claims, except for the dormant Commerce Clause claim (Count I).

Plaintiffs then filed a motion for partial summary judgment on that remaining count, which solely focused on the direct discrimination claim. Massachusetts opposed that motion and requested that the district court enter summary judgment sua sponte. As to Plaintiffs' claim under Count I, the district court severed a provision of the Massachusetts Act, "the slaughterhouse

exemption," which the district court determined violated the dormant Commerce Clause.[4]  It later entered summary judgment sua sponte against all Plaintiffs (aside from Triumph Foods).

Plaintiffs assert a slew of challenges on appeal, namely that the district court erred in: (1) dismissing most of their claims without a written order; (2) entering summary judgment sua sponte on their Pike dormant Commerce Clause claim when there were disputed material facts concerning the Massachusetts Act's burden on interstate commerce and without notice under FRCP 56(f); (3) entering summary judgment sua sponte on their direct-discrimination dormant Commerce Clause claim by holding that the Act did not discriminate against Plaintiffs and without notice under FRCP 56(f); and (4) holding that the Massachusetts Act is not preempted by the FMIA and the PSA.

## II. Standard of Review

This court reviews de novo an order dismissing a complaint under Rule 12(b)(6).  See Bazinet v. Beth Israel Lahey

---

[4] The district court concluded that one portion of the statute did discriminate against out-of-state farmers, so it severed that portion.  The "slaughterhouse exception" provided an "exemption from [the Massachusetts Act's] requirements for pork products when those products are sold on the premises of an FMIA-inspected facility."  Triumph Foods, LLC, 715 F. Supp. 3d at 149.  The district court held:  "The only way Triumph would be able to take advantage of the slaughterhouse exception would be to open its own federally inspected facility within the Commonwealth of Massachusetts, which the Supreme Court has held violates the Commerce Clause."  Id. at 153.  Neither party argues that severance was inappropriate, so it is not at issue before us.

Health, Inc., 113 F.4th 9, 15 (1st Cir. 2024) (citing Rivera v.
Kress Stores of P.R., Inc., 30 F.4th 98, 102 (1st Cir. 2022)).  We
review sua sponte grants of summary judgment under the same de
novo standard.  See McCoy v. Town of Pittsfield, 59 F.4th 497, 504
(1st Cir. 2023).  We affirm where "the record, viewed in the light
most favorable to the [appellants], discloses 'no genuine dispute
as to any material fact'" and shows that Massachusetts is "entitled
to judgment as a matter of law."  See id.

### III. Procedural Errors

Plaintiffs assert that the district court committed
procedural error in both its order of dismissal and its grant of
summary judgment.  We address each argument in turn.

#### A. Motion to Dismiss

Plaintiffs emphasize that most of their claims were
dismissed "without a written order" and "without any reasoning on
the record."  While recognizing there is no "technical requirement
for a court to 'state findings or conclusions when ruling on a
motion under Rule 12,'" they contend that the court "err[ed] both
on substance and procedure."  Massachusetts counters by
referencing the district court's "consider[ation of] the
complaint, pars[ing of] the language of the relevant statutes,
and . . . due consideration [of] the parties' arguments."

As Plaintiffs concede, there is no requirement that
district courts state their findings or conclusions when ruling on

- 8 -

a motion under Rule 12.  Fed. R. Civ. P. 52(a)(3).  Rule 52(a) "explicitly states that district courts are 'not required to state findings or conclusions when ruling on a motion under Rule 12 or 56.'"  <u>Barry</u> v. <u>Moran</u>, 661 F.3d 696, 702 n.9 (1st Cir. 2011)(quoting Fed. R. Civ. P. 52(a)(3)).  Accordingly, "[w]e may quickly dispose of this argument."  <u>Id.</u>  We find no procedural error on this issue.

### B. Summary Judgment

Plaintiffs also argue that the district court committed procedural error in granting summary judgment on their <u>Pike</u> claim and on the farmers' direct discrimination claim.  To understand this argument, it is important to note that Plaintiffs divide their dormant Commerce Clause claim into two legal theories: (1) intentional discrimination against interstate commerce and (2) a substantial burden on interstate commerce under the <u>Pike</u> test.  Plaintiffs contend that they moved for partial summary judgment only as to the first legal theory, and not as to the second.  Thus, Plaintiffs tell us, their motion for partial summary judgment contained no evidence in support of their <u>Pike</u> claim. However, in Massachusetts' opposition brief below, it requested summary judgment sua sponte as to both legal theories.  The district court then entered judgment sua sponte against Plaintiffs on both dormant Commerce Clause theories.  In doing so, it held

that Massachusetts' opposition motion was an "outright" opposition, such that both issues were properly before the court.

Under Federal Rule of Civil Procedure 56(f), a district court may grant a motion for summary judgment "on grounds not raised by a party" after "giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f). In other words, "[a] district court can enter summary judgment even though none of the parties asks for it." Sanchez v. Triple-S Mgmt., Corp., 492 F.3d 1, 7 (1st Cir. 2007). "A district court must meet two criteria before entering summary judgment sua sponte: (1) discovery must be sufficiently advanced to afford the parties a reasonable opportunity to glean the material facts; and (2) the targeted party must have been given notice and a chance to present its evidence on the essential elements of the claim or defense." McCoy, 59 F.4th at 504 (citation modified).

On appeal, Plaintiffs argue that Massachusetts did not move for summary judgment and that the district court did not provide the required notice of a sua sponte ruling. Plaintiffs assert that the district court "never received any evidence with respect to [the Pike] theory." Massachusetts disagrees. According to the Commonwealth, the court (1) gave pre-summary judgment notice that the Pike theory was in jeopardy and (2) made the same

clear at the hearing. Massachusetts also claims that the parties had "fully briefed" the Pike issue and theory (twice).

We first examine whether the first requirement for sua sponte summary judgment -- that discovery must be sufficiently advanced to afford the parties a reasonable opportunity to glean the material facts -- has been met. "[W]hat amounts to a 'reasonable opportunity' largely depends on the state of the particular litigation and the nature of the issue decided by the sua sponte summary judgment procedure." Sanchez, 492 F.3d at 8. We have previously held that summary judgment sua sponte is proper once "'discovery had proceeded to the point where the parties understood the material facts' at issue." Id. at 7 (quoting Penobscot Indian Nation v. Key Bank of Me., 112 F.3d 538, 562 (1st Cir. 1997)). We have "affirmed summary judgment entered sua sponte [even] before any discovery had taken place, where the decision was based on legal conclusions independent of any potentially available evidence." Id. (emphasis added) (citing Bank v. Int'l Bus. Machs. Corp., 145 F.3d 420, 431 (1st Cir. 1998)).

Here, we find that discovery did occur. When the district court issued the summary judgment, Plaintiffs' counsel had noted that "extensive discovery [was] going back and forth on issues related to" the Pike claim. Moreover, as Massachusetts points out, at the beginning of the case, Plaintiffs asserted that

"discovery was unnecessary." In our view, Plaintiffs' concession belies their own claims regarding lack of discovery.

Further, the district court reached legal conclusions, which informed its summary judgment decision on the Pike issue, independent of available evidence. The court stated that the "legal issue had been fully briefed and the [c]ourt's resolution obviated the need for evidence." Triumph Foods, LLC, 715 F. Supp. 3d at 152. Considering the briefing and record before it, the district court determined that the Supreme Court's Nat'l Pork decision foreclosed Plaintiffs' claim, as a legal matter. Id. at 151. We find no procedural error here, where the district court based its summary judgment ruling on independent legal conclusions.

We next review the second requirement for sua sponte summary judgment: the targeted party must have been given notice and a chance to present its evidence on the essential elements of the claim or defense. "In the context of a sua sponte summary judgment, 'notice' means that the targeted party 'had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward.'" Leyva v. On the Beach, Inc., 171 F.3d 717, 720 (1st Cir. 1999) (citation omitted). "Notice" does not require that the opposing party "receive a formal document called 'notice' or that the district court had to say the words 'you are on notice' or even that the court had to explicitly

tell [the opposing party], 'I am thinking of ordering summary judgment for [the winning party] sua sponte.'" Nat'l Expositions, Inc. v. Crowley Mar. Corp., 824 F.2d 131, 133 (1st Cir. 1987). Rather, the question is simply whether, "given the procedural circumstances of the case, the original movant [i.e., Plaintiffs] has had an adequate opportunity to show that there is a genuine issue and that his opponent is not entitled to judgment as a matter of law." Id. at 133-34 (quoting 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2720, at 34 (1983)).

Indeed, the district court provided adequate notice that it might reach the Pike claim. First, in an October 25, 2023 order -- in response to requests from both parties for "sweeping discovery" -- the district court said it "must say frankly that the more it examines the jurisprudence of the 'dormant [C]ommerce [C]lause,'" the less it understood why certain aspects of discovery were necessary. There, the district court also cited National Pork, noting that Plaintiffs "frequently" relied on the National Pork Court's dissent. Further, during the November 14, 2023 hearing, the district court recognized that Massachusetts requested "summary judgment taken against" the Plaintiffs, which put Plaintiffs "on notice that summary judgment may be taken against them." Perhaps most importantly, in Plaintiffs' reply in support of their motion for partial summary judgment (in response to Massachusetts' opposition motion), Plaintiffs clearly

- 13 -

recognized that Massachusetts requested summary judgment sua
sponte on the Pike claim.  There, Plaintiffs affirmatively
responded to Massachusetts' request for summary judgment sua
sponte, indicating Plaintiffs were aware that summary judgment on
the Pike claim was a possibility.  Thus, Plaintiffs had an
"adequate opportunity," in their response in support of their
motion for partial summary judgment, to show that there was a
genuine issue of material fact.  See Crowley Mar. Corp., 824 F.2d
at 133.

     In their brief, Plaintiffs rely on Leyva v. On the Beach,
Inc. to suggest that, as in the facts in that case, they did not
"receive[] a fair opportunity to put [their] best foot forward."
171 F.3d at 720.  The facts here are clearly distinguishable from
those in Leyva, where the district court, "[p]rior to making [a]
spontaneous ruling[,] . . . never informed the plaintiffs that it
was considering [rendering] a judgment" on certain claims.  Id.
Instead, "the court's margin order . . . stated in no uncertain
terms that its decision would conform to the limited scope of the
motion."  Id.  The court in Leyva thus found that the district
court "did not afford the plaintiffs adequate notice and a suitable
opportunity to be heard before it exceeded the scope of the motion
that was pending before it."  Id. at 721.  It is clear from the
facts presented to us that, as opposed to the court's actions in
Leyva, the district court made various pronouncements that

suggested the possibility that summary judgment might be taken against the Plaintiffs. Plaintiffs' reliance on Leyva is therefore incorrect.

Equally unconvincing is Plaintiffs' argument that the district court committed procedural error in granting summary judgment in favor of the Commonwealth on the farmers' direct discrimination claim. Plaintiffs acknowledged that the direct discrimination claim was fully briefed. Plaintiffs also asserted in their motion for partial summary judgment that the discrimination claim "[could] be decided by [the] Court without any fact finding," as it was "based on the statute itself" as well as on "publicly available uncontroverted material." Given Plaintiffs' representations, the sua sponte grant of summary judgment on the direct discrimination claim was proper. See Bank v. Int'l Bus. Mach. Corp., 145 F.3d 420, 431 (1st Cir. 1998).

For these reasons, we conclude that the district court did not procedurally err in entering summary judgment sua sponte.

### IV. Substantive Errors

Finding no procedural error, we next analyze the claims on the merits. We affirm both the district court's dismissal of Counts II-X and its entry of summary judgment on Count I.

#### A. Privileges and Immunities Clause

Plaintiffs argue that the Massachusetts Act "directly and intentionally targets and seeks to regulate out-of-state

activity that is permissible in the states in which it occurs" and represents an attempt to "effectively regulate pig farming, manufacturing, and production in other states."  They posit that the Massachusetts Act therefore offends the Privileges and Immunities Clause of the Constitution because that Clause protects the "right to practice a trade or profession."  In support of these assertions, Plaintiffs argue that because "Massachusetts pig farms did not use gestation crates for housing breeding sows," the "burden of compliance with the [Massachusetts] Act's Minimum Size Requirements falls almost entirely on out-of-state pig farmers and pork processors to the benefit of in-state farmers and pork processors."

The Privileges and Immunities Clause provides that "Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."  U.S. Const. art. IV, § 2, cl. 1; Nat'l Pork, 598 U.S. at 370.  "[T]he Privileges and Immunities Clause is inapplicable to corporations[.]"  W. & S. Life Ins. Co. v. State Bd. of Equalization of California, 451 U.S. 648, 656, (1981); see also Tennessee Wine & Spirits Retailers Ass'n v. Thomas, 588 U.S. 504, 516 (2019).  Because Plaintiffs are corporations, their argument fails.[5]

_____

[5] Plaintiffs describe themselves, in their complaint, as a "farmer-owned company" and a series of member-owners, who are LLCs, an LLP, a corporation, and a cooperative.  In their briefing on

### B. Dormant Commerce Clause Claim

Plaintiffs articulate two theories under the dormant Commerce Clause: (1) intentional discrimination against interstate commerce and (2) a substantial burden on interstate commerce under the Pike test.  We address each argument in turn.

### i. Intentional Discrimination

The Constitution's Commerce Clause gives Congress the power to "regulate Commerce . . . among the several States . . . ." U.S. Const. art. I, § 8, cl. 3.  It also "embodies a negative aspect" which "prevents state and local governments from impeding the free flow of goods from one state to another." All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005) (quoting Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)).  This so-called dormant Commerce Clause "bars states and localities from pursuing 'economic protectionism -- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  Becky's Broncos, LLC v. Town of Nantucket, 138 F.4th 73, 78 (1st Cir. 2025) (quoting New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988)).  "To ascertain whether a regulatory measure is so designed, we look for evidence of 'either discriminatory purpose or discriminatory effect,' recognizing 'the

---

appeal, they also describe themselves as "several limited liability companies, a limited partnership and cooperative."

primacy of [the latter] in the dormant Commerce Clause analysis of facially neutral legislation.'"[6]  Id. (alteration in original) (quoting Am. Trucking Ass'ns v. R.I. Tpk. & Bridge Auth., 123 F.4th 27, 36-37 (1st Cir. 2024)).  "[T]he Supreme Court has cautioned that the dormant Commerce Clause inquiry should be undertaken by 'eschew[ing] formalism for a sensitive, case-by-case analysis of purposes and effects.'"  Walgreen Co. v. Rullan, 405 F.3d 50, 55 (1st Cir. 2005) (alteration in original) (quoting West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 201 (1994)).

This court has "discussed the methodology for determining legislative purpose when a state statute is allegedly motivated by an intent to discriminate against interstate commerce."  Fam. Winemakers of Cal. v. Jenkins, 592 F.3d 1, 13 (1st Cir. 2010) (citing All. of Auto. Mfrs., 430 F.3d at 37).  This methodology requires us to "look to 'the statute as a whole,' including statutory text, context, and legislative history" and to "consider whether the statute was 'closely tailored to achieve the legislative purpose' the state asserted."  Id. (quoting All. of Auto. Mfrs., 430 F.3d at 37-38).

In determining whether a state law is discriminatory in effect, we must analyze whether "in practice, it affects similarly situated entities in a market by imposing disproportionate burdens

---

[6] Plaintiffs here have not claimed that the Massachusetts Act discriminates on its face.

on out-of-state interests and conferring advantages upon in-state interests." Id. at 10 (citing Or. Waste Sys., Inc. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994)). Cf. Ass'n to Pres. and Protect Loc. Livelihoods v. Sidman, 147 F. 4th 40, 59-60 (1st Cir. 2025) ("[A] plaintiff must first show that the measure does discriminate. To do so, a plaintiff must do more than show that the measure burdens out-of-state entities more than local ones." (internal citations omitted)). When challenging a statute as discriminatory in effect, plaintiffs "must present evidence as to why the law discriminates in practice." Jenkins, 592 F.3d at 11 (citing Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 36-37 (1st Cir. 2007)). When "a statute is evenhanded on its face and wholesome in its purpose," such showing of discriminatory effect must be "substantial." Cherry Hill, 505 F.3d at 36.

Before a district court, "[t]he proponent of a dormant Commerce Clause claim bears the burden of proof as to discrimination." All. of Auto. Mfrs., 430 F.3d at 40. "To block summary judgment, the party having the burden of proof on a critical issue must present evidence on that issue that is 'significantly probative,' not 'merely colorable.'" Id. (quoting Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997))(finding appellant's evidence "inadequate to make out a genuine issue of material fact" as to discrimination).

We hold that the district court did not err in finding insufficient evidence of discriminatory effect and of discriminatory purpose. To show discriminatory purpose, Plaintiffs identify supposed "legislative underpinnings" to argue that the Massachusetts Act was intended to discriminate against out-of-state pork producers. The "underpinnings" Plaintiffs identify -- a comment that gestation crates are not used in Massachusetts, a comment that Massachusetts uses meat produced out of state on farms that use "these cruel tactics," and a comment that the Massachusetts Act would protect animals outside of Massachusetts -- do not support the purported conclusion they draw. In reality, none of these comments make reference to supporting in-state farmers to the detriment of out-of-state farmers.[7] As Massachusetts tells us, the Act's nondiscriminatory purpose is plain from its text: "The purpose of this Act is to prevent animal cruelty by phasing out extreme methods of farm

---

[7] Plaintiffs also cite a 2016 Massachusetts Supreme Judicial Court (SJC) decision -- Dunn v. Attorney General, 474 Mass. 675, 681 (2016) -- for the proposition that "in-state farmers' economic benefit is a central purpose of the [Massachusetts] Act." Contrary to this contention, the SJC stated that the purpose was "prevent[ion of] farm animals from being caged in overly cramped conditions, consistent with the statement of purpose in section 1 of [the Massachusetts Act], 'to prevent animal cruelty by phasing out extreme methods of farm animal confinement.'" Id. The SJC also recognized that the Massachusetts Act "protects" Massachusetts farmers, without holding that was a purpose of the Massachusetts Act or that the protection ran afoul of the dormant Commerce Clause. See id.

animal confinement[.]" Further, because the Massachusetts Act was enacted as a result of a ballot initiative passed by Massachusetts voters, and not as a bill passed by the Massachusetts State Legislature, statements made during legislative hearings do not constitute an ideal "source of context." See Simmons v. Galvin, 575 F.3d 24, 45 (1st Cir. 2009)("[S]ince [the challenged statute] was put before the voters, the Information for Voters Guide is a better source of context" than "sporadic" comments from legislators). Plaintiffs, therefore, did not present "significantly probative" evidence to create a genuine issue of material fact concerning the discriminatory purpose of the Massachusetts Act. See All. of Auto. Mfrs., 430 F.3d at 40 (quoting Cadle Co., 116 F.3d at 960).

On discriminatory effect, Plaintiffs contend that the Massachusetts Act regulates conduct occurring only at out-of-state farms, which provides a "distinct advantage to in-state farmers." They, again, reference the legislative history of the Massachusetts Act, stating that "legislative committee hearing members had direct knowledge of" the alleged discrimination. Their sole factual allegation in support of this claim is that no Massachusetts farmers used gestation crates at the time the Massachusetts Act passed. Massachusetts counters that Plaintiffs failed to demonstrate that the Massachusetts Act imposes differential treatment on in-state and out-of-state economic

interests.  Massachusetts also tells us that the Supreme Court's opinion in National Pork is instructive in evaluating Plaintiffs' discrimination claim here, even though that case involved only a Pike claim.

Plaintiffs contend that National Pork is distinguishable from the present case because there was no discrimination claim in that case.  It is true that National Pork did not deal directly with a discrimination claim.  The National Pork plaintiffs conceded that the California law imposed "the same burdens on in-state pork producers that it impose[d] on out-of-state ones."  598 U.S. at 370; see also Ass'n to Pres. & Protect Loc. Livelihoods, 147 F.4th at 61 ("[T]he plaintiffs in National Pork explicitly disclaimed any discrimination-based arguments . . . .").[8]  The Court also accepted this concession.  See Truesdell v. Friedlander, 80 F.4th 762, 769 (6th Cir. 2023), cert. denied, 144 S. Ct. 1344 (2024), and cert. denied, 144 S. Ct. 1346 (2024) (citing Nat'l Pork, 598 U.S. at 367).

---

[8] The Court in National Pork referred to the Massachusetts Act, stating that "Massachusetts prohibits the sale of pork products from breeding pigs (or their offspring) if the breeding pig has been confined 'in a manner that prevents [it] from lying down, standing up, fully extending [its] limbs or turning around freely.'"  598 U.S. at 365 (alterations in original) (quoting Mass. Gen. Laws Ann., ch. 129, App. §§ 1-3, 1-5 (Cum. Supp. 2023)).  It also noted that Florida, Arizona, Maine, Michigan, Oregon, and Rhode Island all have similar laws that regulate animal confinement practices.  Id.

The National Pork Court addressed a California law "banning the in state sale of certain pork products derived from breeding pigs confined in stalls so small they cannot lie down, stand up, or turn around." Id. at 363. Much like the case before us, National Pork involved out of state pork producers filing suit, alleging that the law was in violation of the dormant Commerce Clause. Id. at 364. The Court "synthesized decades of dormant Commerce Clause jurisprudence into a few key principles. Chief among them is that economic 'antidiscrimination . . . lies at the very core of [the Court's] dormant Commerce Clause jurisprudence.'" New Jersey Staffing All. v. Fais, 110 F.4th 201, 205 (3d Cir. 2024) (alteration in original) (quoting Nat'l Pork, 598 U.S. at 369).

While the similar California law at issue in National Pork ultimately did not offend the dormant Commerce Clause, see 598 U.S. at 390-91, we acknowledge that the petitioners' concession in that case limits its instructive value for the present discrimination claim. The Court in National Pork, however, relied on an older case that defeats Plaintiffs' claim. See Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 119-120 (1978) (addressing a Maryland law that prevented producers or refiners of petroleum products from operating retail service stations in Maryland). There, Exxon argued that the "effect of the [Maryland law was] to protect in-state independent dealers from out-of-state

competition." Id. at 125.  The Court recognized that all of Maryland's gasoline supply "flows in interstate commerce" and there were "no local producers," and, as such, "claims of disparate treatment between interstate and local commerce would be meritless." Id.  "The Court rejected the refiners' dormant Commerce Clause challenge because the statute did not affect the right of only out-of-state entities to compete in the Maryland market; rather, all independent dealers (in and out-of-state) were permitted to compete and all refiners were excluded." Walgreen Co., 405 F.3d at 59 (citing Exxon, 437 U.S.at 127).

So too, here.  "[A] neutral law that 'regulates even-handedly' by treating interstate and intrastate commerce the same does not discriminate against interstate commerce simply because it affects more out-of-state businesses than in-state ones." Truesdell, 80 F.4th at 769 (citations omitted); see also Pike, 397 U.S. at 142; Exxon, 437 U.S. at 126.  Plaintiffs' arguments on this point are no different than those the Court squarely rejected in Exxon over 40 years ago.  The mere fact that a statute's requirements fall solely on interstate companies does not lead "to a conclusion that the State is discriminating against interstate commerce." Exxon, 437 U.S. at 125.  Plaintiffs have not demonstrated that the Massachusetts Act affirmatively grants in-state pork producers a "competitive advantage over out of state dealers." See id. at 126.  Thus, Plaintiffs have not "satisfied

their initial burden of showing that [the Massachusetts Act] is discriminatory in effect." See Cherry Hill, 505 F.3d at 34.

Still, Plaintiffs urge us that this case is factually similar to Jenkins. There, we held unconstitutional a Massachusetts statute ("Section 19F") which established differential methods for distribution of wine within Massachusetts. Jenkins, 592 F.3d at 5. That statute provided that "large" wineries, that is, those producing more than 30,000 gallons of grape wine annually, could only sell their wine either through wholesalers or directly to consumers. Id. at 8. By contrast, "small" wineries could simultaneously sell their wine through wholesaler distribution, through retail distribution, and by shipping directly to consumers. Id. Section 19F was "neutral on its face," as it "[did] not, by its terms, allow only Massachusetts wineries to distribute their wines through a combination" of the methods mentioned above. Id. at 5. "Section 19F instead use[d] a very particular gallonage cap to confer [a] benefit upon 'small'" wineries, which included all Massachusetts wineries, "as opposed to 'large' wineries," which were all located outside of Massachusetts. Id. We held that Section 19F violated the dormant Commerce Clause chiefly because the gallonage cap (1) had the ultimate effect of "enabl[ing] Massachusetts's wineries to gain market share against their out-of-state competitors," while simultaneously "burden[ing] all

the larger out-of-state competitors" and (2) "conferred a competitive advantage upon Massachusetts wineries by design."[9] Id. at 12-13.

Jenkins is distinguishable from the instant case. There, we found that the evidence presented by the plaintiffs demonstrated that Section 19F created a "competitive advantage" to in-state wineries, and a "comparative disadvantage" for out-of-state wineries. See id. at 11. Massachusetts wineries did, in fact, take advantage of the benefits conferred by Section 19F, with most Massachusetts' wineries obtaining the "small" wineries license and distributing "71 percent [of their annual production] through retail outlets," a benefit not conferred to "large" wineries. Id. at 4, 11-12. We also found that, by "[c]ombining [] distribution methods," Massachusetts wineries could sell wines "at maximum efficiency because they serve[d] complementary markets." Id. at 11. "'[S]mall' wineries' distribution costs [were also lowered] because they [could] choose

---

[9] Plaintiffs cite Hunt v. Washington State Apple Advert. Comm'n for the same proposition. See 432 U.S. 333, 340 (1977). There, North Carolina adopted a regulation, "unique in the 50 States," which required all closed containers of apples sold in the state to display either the "applicable USDA grade or none at all." Id. at 337. But that case, too, is inapposite, as the statute at issue there "ha[d] the effect of stripping away from [another state's] apple industry the competitive and economic advantages it ha[d] earned for itself through its expensive inspection and grading system." Id. at 351. Plaintiffs do not, and cannot, point to any similar reputational "leveling effect" here. See id.

which method or combination of methods [would] be most
cost-effective for a particular wine." Id. By contrast,
out-of-state, "large" wineries faced "comparatively greater
distribution costs because they [could not] always distribute a
given wine through the most cost-effective method." Id. at 12.
"Large" wineries' option to choose between wholesaler distribution
or direct shipping also implied a "significant loss of potential
profits, since using a single method result[ed] in a comparative
loss of consumer sales." Id.; contrast id. with Cherry Hill, 505
F.3d at 38-39 (finding that plaintiffs did not satisfy their burden
of showing that a Maine law that allowed wineries to conduct direct
sales to consumers only in face-to-face transactions was
discriminatory in effect, as plaintiffs failed to present evidence
that the law protected Maine vineyards or harmed out-of-state
wineries).

No "substantial" evidence of discriminatory effect,
either of advantage to in-state producers or disadvantage to
out-out-state producers, is present here. See Cherry Hill, 505
F.3d at 36. Plaintiffs contend that Massachusetts farmers will
obtain competitive advantage from the Massachusetts Act, as they
will "gain[] a larger market share [in Massachusetts]
uninterrupted by any cost, delay, or burden associated with the
Act." Plaintiffs' contention that the Act substantially
disadvantages out of state farmers, however, is not supported by

specific citations to record material.  The summary judgment record, in fact, squarely refutes this allegation: Massachusetts pork production decreased from 2021 to 2022, the year the Massachusetts Act went into effect.[10]

In Cherry Hill, we highlighted the important distinction between regulatory schemes that "explicitly discriminate against out-of-state goods or products" and those that do not.  505 F.3d at 36.  Because the Maine statute at issue "flatly outlaw[ed] any and all direct shipping of wine" for both "in-state" and "out-of-state wineries," we rejected plaintiffs' dormant Commerce Clause challenge.  Id. at 30; 35-36.[11]  Like Maine, Massachusetts has flatly outlawed a particular practice.  Both Massachusetts and out-of-state producers must abide by the same regulations, and the Massachusetts Act does not favor local groups over similarly

---

[10] We note that an amicus brief filed by another major pork producer presents data that is consistent with the record in this case.  See Br. for Perdue Premium Meat Company, Inc. D/B/A Niman Ranch as Amicus Curiae Supporting Appellees at 11-14 (explaining that Tysons Foods, one of the world's largest meat processing companies, conceded that the materially identical California law discussed in National Pork did not harm the company's operations and Seaboard Foods, which maintains a herd of 7.2 million hogs, reported increased sales after the California law took effect).

[11] "[Cherry Hill] only addressed the kind of showing required when a statute is challenged as discriminatory in effect but is concededly non-discriminatory in purpose."  Jenkins, 592 F.3d at 11 n.11 (citing Cherry Hill, 505 F.3d at 36).  Here, we need not, and do not, comment on "whether a lesser showing might suffice when a law is allegedly discriminatory in both effect and purpose," as we have already concluded that the Massachusetts Act is not discriminatory in purpose.  See id.

situated out-of-Commonwealth farmers or producers. Cf. Walgreen Co., 405 F.3d at 55-60 (invalidating, on dormant Commerce Clause grounds, a Commonwealth of Puerto Rico statute requiring all pharmacies seeking to open or relocate within Puerto Rico to obtain a "certificate of necessity and convenience," but exempting existing pharmacies from such certificate requirement).[12]    In short, the Massachusetts Act does not establish different "playing fields" for in and out-of-state interests. See id. at 58. Massachusetts "market share previously enjoyed by one group of profit-seeking, out-of-state businesses (farmers who stringently confine pigs and processors who decline to segregate their products) [may] be replaced by another (those who raise and trace [the Massachusetts Act]-compliant pork)." See Nat'l Pork, 598 U.S. at 385. The dormant Commerce Clause does not protect against this reality. See id. (citing Exxon, 437 U.S. at 127).

We thus discern no error in the district court's decision on this issue.

---

[12] In fact, Massachusetts asserts that the Massachusetts Act is, taken as a whole, more burdensome on Massachusetts farmers than out-of-state farmers.  Massachusetts farmers can neither confine pigs in gestation crates nor sell those pigs.  Mass. Gen. Laws Ann., ch. 129, App. §§ 1-2, 1-3.  Out-of-state farmers can still confine pigs in gestation crates, they just cannot sell those specific, non-compliant pork products within Massachusetts.

### ii. __Pike__

The Supreme Court has recognized that, even where a state law is not facially discriminatory, its "practical effects may also disclose the presence of a discriminatory purpose." Nat'l Pork, 598 U.S. at 377.   The Court articulated the "practical effects" test in Pike v. Bruce Church, Inc., holding that "[w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." See 397 U.S. at 142.   Such a statute "engenders a lower level of scrutiny." All. of Auto. Mfrs., 430 F.3d at 35 (citing Pharm. Rsch. & Mfrs. of Am. v. Concannon, 249 F.3d 66, 80 (1st Cir. 2001), aff'd sub nom. Pharm. Rsch. & Mfrs. of Am. v. Walsh, 538 U.S. 644, (2003)).

Plaintiffs contend that the district court improperly entered summary judgment on their Pike claim.   To succeed on a Pike theory, Plaintiffs "must demonstrate that a challenged law imposes a 'substantial' or 'significant' burden on interstate commerce before Pike balancing can occur." Flynt v. Bonta, 131 F.4th 918, 925 (9th Cir. 2025).   "Plaintiffs here face a heavy burden: 'the Supreme Court has not invalidated a law under Pike in

more than 30 years.'" Id. at 931 (quoting Truesdell, 80 F.4th at
773) (citation modified).

The district court relied on National Pork in ruling on
the Pike issue, noting:

> The Supreme Court ruled that "harm to some
> producers' favored methods of operation" did
> not rise to a "substantial harm to interstate
> commerce," and that "increased production
> expenses" cannot be compared by a court to
> "noneconomic" state benefits. Further, the
> Court explained, "judges often are 'not
> institutionally suited to draw reliable
> conclusions of the kind that would be
> necessary . . . to satisfy [the] Pike' test as
> petitioners conceive it."

Triumph Foods, LLC, 715 F. Supp. 3d at 151 (first quoting Nat'l
Pork, 598 U.S. at 385-87; then quoting id. at 380-81; and then
quoting id. at 380).

Plaintiffs argue that the district court incorrectly
relied on a portion of the National Pork opinion that was joined
by "only three justices." Because that portion was not the
majority's opinion, the argument goes, the district court erred in
"refus[ing] to engage in any Pike analysis." In response,
Massachusetts avers that "[a] majority of the [National Pork] Court
affirmed the Rule 12(b)(6) dismissal of a Pike challenge to
California's materially identical law. Appellants' Pike
challenge, based on indistinguishable allegations and evidence,
was therefore correctly rejected." We agree.

The record makes clear that the district court engaged with Plaintiffs' Pike claims both at oral argument and in its February 5, 2024 Order. Triumph Foods, LLC, 715 F. Supp. 3d at 151. While the district court did not apply the Pike balancing test, it did determine that the California state statute at issue in National Pork was "nearly identical" to the Massachusetts Act at issue here. Id. (citing Nat'l Pork, 598 U.S. at 367). Having reached that conclusion, the district court was under no obligation to apply the Pike test.[13] Because we hold that the Massachusetts Act is not discriminatory, the National Pork holding is dispositive.

In National Pork, five justices concluded that the petitioners' Pike claim failed, but they were unable to agree on a single rationale for that holding. 598 U.S. at 390-91. Justice Gorsuch, in a plurality opinion joined by Justices Thomas, Sotomayor, and Kagan, reasoned that, because the petitioners

---

[13] "The Justices in [National Pork] . . . agreed that whether a law imposes a substantial burden on interstate commerce is a threshold inquiry, although given the fractured nature of the Court's decision on the Pike question, there is no portion of any opinion on this point that commanded a majority." Flynt, 131 F.4th at 925 (first citing Nat'l Pork, 598 U.S. at 383 (plurality); then citing id. at 393 (Sotomayor, J., concurring) ("Alleging a substantial burden on interstate commerce is a threshold requirement that plaintiffs must satisfy before courts need even engage in Pike's balancing and tailoring analyses."); then citing id. at 394 (Barrett, J., concurring) (similar); and then citing id. at 395 (Roberts, C.J., concurring in part and dissenting in part) (similar)).

failed to "plead facts 'plausibly' suggesting a substantial harm to interstate commerce," the Pike claim could not proceed. Id. at 385. In a separate plurality, Justice Gorsuch, joined by Justices Thomas and Barrett, concluded that this claim failed because the alleged "costs" and "benefits" of the California law were incommensurable, as economic burdens could not be weighed against noneconomic benefits. Id. at 380-82.

Plaintiffs claim, however, that five justices would have upheld the Pike claim in National Pork: the four justices in dissent, Chief Justice Roberts, along with Justices Alito, Kavanaugh, and Jackson, as well as Justice Barrett in her concurrence. Plaintiffs cite United States v. Johnson, 467 F.3d 56 (1st Cir. 2006), to suggest that we should combine their separate opinions to uphold a Pike claim here. But putting aside any lurking issues regarding the application of the framework set forth in Marks v. United States, 430 U.S. 188 (1977), see Johnson, 467 F.3d at 62-64, Plaintiffs are simply incorrect that there were five votes to uphold a Pike claim in National Pork. See 467 F.3d 56, 62-64 (1st Cir. 2006). Justice Barrett did agree with the dissenters that the complaint in National Pork plausibly alleged, as a matter of fact, a substantial burden on interstate commerce. 598 U.S. at 393-94 (Barrett, J., concurring). Nevertheless, she concurred in the judgment that the petitioners there failed to state a Pike claim as a matter of law because the benefits and

burdens of the state law were incommensurable.  Id.  The benefits and burdens Plaintiffs point to here are indistinguishable from those alleged in National Pork, so Justice Barrett's concurrence cannot be combined with the dissenting opinion to save the day for Plaintiffs.

The Court in National Pork ultimately declined the "petitioners' incautious invitation[]" to "prevent a State from regulating the sale of an ordinary consumer good within its own borders on nondiscriminatory terms."  Id. at 390-91.  We follow the rationale in National Pork to resolve the matter before us. Because the Massachusetts Act is not discriminatory, we find that Plaintiffs' claim also "falls well outside Pike's heartland."  See id. at 380.  For these reasons, we agree with the district court's decision to enter summary judgment against the Plaintiffs on the Pike claim.

### C. Preemption

Plaintiffs alleged that both the FMIA and the PSA preempt the Massachusetts Act's enforcement.  At summary judgment, the district court held that the Massachusetts Act was not preempted. Triumph Foods, LLC, 742 F. Supp. 3d at 66.  We review the district court's entry of summary judgment de novo to determine whether Massachusetts is entitled to judgment as a matter of law.  See

McCoy, 59 F.4th at 504 (citing Cruz v. Mattis, 861 F.3d 22, 24 (1st Cir. 2017)).

"[C]ongressional enactments may preempt conflicting state laws." Nat'l Pork, 598 U.S. at 368 (citing U.S. Const. art. VI, cl. 2). "Federal preemption of a state law . . . 'may be either express or implied.'" Nw. Selecta, Inc. v. González-Beiró, 145 F.4th 9, 15 (1st Cir. 2025) (quoting Bower v. Egyptair Airlines Co., 731 F.3d 85, 92 (1st Cir. 2013)). "When a federal statute has an express preemption clause, 'we do not invoke any presumption against [preemption].'" Id. (alteration in original) (quoting Puerto Rico v. Franklin Cal. Tax-Free Tr., 579 U.S. 115, 125 (2016)). Rather, we focus on the plain wording of the clause. See id. (quoting Chamber of Com. of U.S. v. Whiting, 563 U.S. 582, 594 (2011)). We also look to the "preemption clause's statutory context and the statute's overall purpose." Id.

"Conflict preemption," on the other hand, "may occur 'where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Pub. Int. Legal Found., Inc. v. Bellows, 92 F.4th 36, 52 (1st Cir. 2024) (quoting Arizona v. United States, 567 U.S. 387, 399 (2012)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." Me. Forest Prods. Council v. Cormier, 51 F.4th 1, 6 (1st Cir. 2022)

(quoting Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000)).

### i. The FMIA

As we have previously explained, the district court ruled that one portion of the Massachusetts Act -- the "slaughterhouse exception" -- violated the dormant Commerce Clause. Accordingly, it severed that provision. Plaintiffs argue that, given that severance, the Massachusetts Act is expressly preempted and preempted by conflict under the FMIA. Hearing Plaintiffs' arguments post-severance, the district court held that "Congress ha[d] not preempted the state law in question" and granted summary judgment to Massachusetts. Triumph Foods, LLC, 742 F. Supp. 3d at 66.

The FMIA is a federal statute which "regulates the inspection, handling, and slaughter of livestock for human consumption." Nat'l Meat Ass'n v. Harris, 565 U.S. 452, 455 (citing 21 U.S.C. § 601 et seq.). "The FMIA regulates a broad range of activities at slaughterhouses to ensure both the safety of meat and the humane handling of animals." Id. Meat processing facilities are inspected under the FMIA and the United States Department of Agriculture Food Safety and Inspection Service

examines the product, facilities, and records of the processing facilities. The FMIA's express preemption clause provides:

> Requirements within the scope of [the FMIA] with respect to premises, facilities and operations of any [FMIA-inspected] establishment . . . which are in addition to, or different than those made under [the FMIA] may not be imposed by any State . . . .

21 U.S.C. § 678.

The district court concluded that the Massachusetts Act is not preempted because it does not regulate how a slaughterhouse operates or prohibit a slaughterhouse from processing meat that does not comply with the Massachusetts Act. Triumph Foods, LLC, 742 F. Supp. 3d at 70. In so holding, the district court provided an overview of National Meat Ass'n v. Harris, 565 U.S. 455, a 2012 case in which the Court reviewed whether the FMIA expressly preempted a California provision (the "California Act") that regulated slaughterhouses within the state. 565 U.S. at 452. There, the California Act contained, in relevant part, a provision that banned the "process, butcher, or [sale of] meat or products of nonambulatory animals for human consumption." See id. at 459 (quoting Cal. Penal Code § 599f(b)). The Court held that the California Act was expressly preempted by the FMIA because the California Act "substitute[d] a new regulatory regime" for the one the FMIA prescribed. Id. at 460. The Court further held that although "the FMIA's preemption clause does not usually foreclose

'state regulation of the commercial sales activities of slaughterhouses,' the California Act's sales ban was "a criminal proscription calculated to help implement and enforce each of the section's other regulations," and was thus preempted by the FMIA. Id. at 463-64.

Plaintiffs rely on the National Meat holding for much of their preemption argument. Because the Massachusetts Act "directly regulates FMIA regulated facilities," the argument goes, the Massachusetts Act is prohibited by the Supremacy Clause and the FMIA's express preemption clause. In advancing these arguments, Plaintiffs suggest that the Massachusetts Act functions in the same way as the California Act struck down in National Meat. By contrast, Massachusetts argues that Plaintiffs' "express preemption argument fails because they identify no 'requirements' 'within the scope' of the FMIA that the [Massachusetts] Act imposes on slaughterhouses." Plaintiffs also contend that the Massachusetts Act "adds a class of adulteration unrecognized in federal law by predetermining what meat may be sold."

Again, the California Act examined by National Meat specifically provided: "No slaughterhouse shall process, butcher, or sell meat or products of nonambulatory animals for human consumption." Nat'l Meat Ass'n, 565 U.S. at 459 (quoting Cal. Penal Code Ann. §599f (West 2010)). This language was in direct contention with the FMIA's proscriptions, which include that a

"slaughterhouse may hold (without euthanizing) any nonambulatory pig that has not been condemned [a]nd the slaughterhouse may process or butcher such an animal's meat for human consumption . . . ." Id. at 460 (internal citation omitted).

The California Act at issue in National Meat is fundamentally different than the Massachusetts Act. See Triumph Foods, LLC, 742 F. Supp. 3d at 70. "[T]he Act here only bans the sale of noncompliant pork meat; it does not regulate how a slaughterhouse operates." Id. Plaintiffs do not identify any operational requirement in the Massachusetts Act, nor could they. And the FMIA's express preemption provision applies only to "[r]equirements within the scope of [the FMIA]." See 21 U.S.C. § 678.

Indeed, the Supreme Court in National Meat expressly disavowed that its holding means what Plaintiffs now say it means. See 565 U.S. at 462-463. The Court stated that the record before it did not "disclose whether [the California Act's] ban on purchase ever applies beyond the slaughterhouse gate." Id. "And because that [was] so, [the Court had] no basis for deciding whether the FMIA would preempt it." Id. By contrast, the Massachusetts Act explicitly applies "beyond the slaughterhouse gate." See id.; see also Mass. Gen. Laws Ann., ch. 129, App. § 1-4(c) ("[A] covered animal shall not be deemed to be 'confined in a cruel manner' during: . . . Slaughter in accordance with any applicable

laws . . . ."). In short, unlike National Meat California Act, the Massachusetts Act regulates pork production, rather than pork inspection. The FMIA regulates only the latter and "Congress has yet to adopt any statute that might displace . . . laws regulating pork production . . . ." See Nat'l Pork, 598 U.S. at 368.

We also conclude that the Massachusetts Act does not create a "class of adulteration unrecognized in [the FMIA]." See Va. Uranium, Inc. v. Warren, 587 U.S. 761, 790-91 (2019) (Ginsburg, J., concurring)(citing Nat'l Meat Ass'n, 565 U.S. at 465, 467)("The distinction drawn in National Meat . . . supports this conclusion: A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field."); see also Br. for Perdue Premium Meat Company, Inc. D/B/A Niman Ranch as Amicus Curiae Supporting Appellees at 9 ("Producers have used segregation and tracing mechanisms for years to provide consumers with premium pork products that follow organic, non-GMO, specific breeds, and other unique specifications.").

As for Plaintiffs' conflict preemption claim, we find that the Massachusetts Act is not preempted by conflict with the FMIA. The Massachusetts Act does not "render it impossible to comply with the [FMIA], nor serve as an obstacle to its purposes and objectives." See Iowa Pork Producers Ass'n v. Bonta, No.

22-55336, 2024 WL 3158532, at *5 (9th Cir. June 25, 2024), cert. denied, No. 24-728, 2025 WL 1787818 (June 30, 2025).

Accordingly, we hold that the Massachusetts Act is not preempted by the FMIA.

### ii. The PSA

Plaintiffs also alleged that the Massachusetts Act is preempted by the Packers and Stockyard Act ("PSA") based on principles of conflict preemption.  The PSA "makes it unlawful 'for any packer or swine contractor' to '[m]ake or give any undue or unreasonable preference or advantage to any particular person or locality in any respect, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect.'"  Id.[14]

Plaintiffs argue that the PSA prevents "'unfair, discriminatory, or deceptive practices' in the packing industry . . . ."  Re-emphasizing their earlier arguments on discrimination, Plaintiffs state they must now "source compliant pigs to gain access to the Massachusetts marketplace and thus must pay a premium to farmers who meet the demand."  Because the Massachusetts Act does not discriminate, it follows that

---

[14] We need not address other claims dismissed by the district court -- including injunctive and declaratory relief -- to which Plaintiffs perfunctorily aver.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  As those claims are underdeveloped on appeal, they are waived.  See id.

Plaintiffs' PSA preemption claim, based wholly on discrimination grounds, fails.  The Massachusetts Act "does not require packers or wholesalers to favor or disfavor any pork producers based on their location.  It instead prohibits packers and wholesalers from selling non-compliant pork meat in [Massachusetts], regardless of where such meat originates."  Id.  The Massachusetts Act does not "render it impossible to comply with the [PSA], nor serve as an obstacle to its purposes and objectives."  See id.

Accordingly, we hold that neither the FMIA nor the PSA preempts the Massachusetts Act.

### D. Full Faith and Credit Clause

Plaintiffs allege that the Massachusetts Act is in "direct conflict" with the "Right to Farm" laws that exist in several states where the Plaintiffs operate, such as in Missouri, Wyoming, and Indiana.  See Mo. Const. art. I, § 35; Wyo. Stat. Ann. § 11-44-104 (2025); 345 Ind. Admin. Code 14-2-3, 14-2-4 (2025).  For this reason, Plaintiffs contend that the Massachusetts Act violates the Full Faith and Credit Clause.

The Full Faith and Credit Clause of the United States Constitution provides, in pertinent part, that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1.  "A statute is a public Act within the meaning of the Full Faith and Credit Clause."  Franchise Tax Bd. v. Hyatt, 578

U.S. 171, 176 (2016) (internal citations and quotations omitted).
A State, however, is not required to "substitute for its own
statute, applicable to persons and events within it, the statute
of another State reflecting a conflicting and opposed policy."
Id. (quoting Carroll v. Lanza, 349 U.S. 408, 412 (1955)).  The
Supreme Court has noted that a State's decision to decline to apply
another State's statute cannot be preceded by that State's adoption
of a "policy of hostility to the public Acts of [the] other State."
Id. (citation modified).

     The Massachusetts Act does not ban farming practices in
the states Plaintiffs have cited as having Right to Farm laws.
Rather, the Massachusetts Act bans the sale of products resulting
from certain practices in Massachusetts.  Mass. Gen. Laws Ann.,
ch. 129, App. § 1-3.  Because these out-of-state farmers are free
to continue with their current farming practices, it is our view
that the Massachusetts Act does not constitute a "policy of
hostility" to their "Right to Farm" laws.  See Hyatt, 578 U.S. at
176.

     We thus find that the Massachusetts Act does not violate
the Full Faith and Credit Clause.

### E. Due Process Clause

     Plaintiffs argue that the Massachusetts Act is
"unconstitutionally vague" in violation of the Due Process Clause
because (i) "it fails to define what it means to 'engage in the

sale' of the prohibited pork product" and (ii) it fails "to specify the square footage requirements for a breeding pig to 'turn around freely.'"  They posit that it is unclear whether "engaging" in a sale refers only to those who "sell" or includes all those who participate in the supply chain.  Plaintiffs also allege that, because sows are not "one size fits all," their ability to "turn around freely" varies.  As such, Plaintiffs are unable to discern whether the shipment of their pork products into Massachusetts will be compliant with the Massachusetts Act.

A statute can be unconstitutionally vague in two circumstances.  "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)).  Specifically, "'enactments with civil rather than criminal penalties' are held to a less exacting vagueness standard 'because the consequences of imprecision are qualitatively less severe.'" McCoy, 59 F.4th at 509 (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 495 (1982)).

The Massachusetts Act defines a "sale" as "a commercial sale by a business that sells any item covered [by the Massachusetts Act]," subject to certain exceptions.  Mass. Gen. Laws Ann., ch. 129, App. § 1-5 (emphasis added).  Moreover, a sale

"shall be deemed to occur at the location where the buyer takes physical possession of an item covered by [the Act]." Id. In our view, a person of "ordinary intelligence" will most likely understand from this definition that the Massachusetts Act specifically prohibits sellers from "engaging in the sale" of the products prohibited by the Act. See id. We find it unlikely for this provision to be interpreted as being applicable to all those who participate in the supply chain, as Plaintiffs argue in their Brief. We thus disagree with Plaintiffs' argument that this phrase renders the Massachusetts Act unconstitutionally vague.

We also disagree with Plaintiffs' contention that the requirement that sows must be able to "turn around freely" is unconstitutionally vague. As contended by Massachusetts, the Massachusetts Act clearly defines "turning around freely" as "turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal." Mass. Gen. Laws Ann., ch. 129, App. § 1-2. We find that this definition clearly states the standard that pig farms must follow to comply with this requirement. The lack of square footage requirements in this provision, therefore, does not render it unconstitutionally vague.

Accordingly, we find that the Massachusetts Act is not unconstitutionally vague.

### F. Import-Export Clause

Plaintiffs argue that "the [Massachusetts] Act essentially imposes a duty or tax on out-of-state goods through its imposition of a particular method of raising pigs," in violation of the Import-Export Clause of the United States Constitution. See U.S. Const. art I, § 10, cl. 2. In its response, Massachusetts explains that the application of the Import-Export Clause is limited to products imported from foreign countries, not other states.

We agree with Massachusetts. The Import-Export Clause prohibits States from "lay[ing] any Imposts or Duties on Imports or Exports" without the consent of Congress. U.S. Const. art I, § 10, cl. 2. "[T]he Import-Export Clause was long ago held to refer only to international trade." Tenn. Wine and Spirits Retail. Ass'n v. Thomas, 588 U.S. 504, 516 (2019) (citing Woodruff v. Parham, 75 U.S. 123, 136-137 (1869)). In a textual and historical analysis of the Constitution, the Court in Woodruff explained that "the words imports and imposts were used with exclusive reference to articles imported from foreign countries." 75 U.S. at 133. The Supreme Court therefore concluded that "no intention existed to prohibit, by [the Export-Import Clause], the right of one State to tax articles brought into it from another." Id. at 136. Plaintiffs ask us to apply the Import-Export Clause to prevent Massachusetts from "essentially impos[ing] a duty or tax" on goods

imported by other States.  Because the Import-Export Clause does

not bar states from imposing taxes or duties on imports from other

States, we conclude that the Massachusetts Act does not violate

the Import-Export Clause.  <u>Id.</u> at 133.

### V. Conclusion

For the foregoing reasons, we **<u>affirm</u>**.